ELIZABETH JONES SANGER (WI 1080449)
esanger@ftc.gov; (202) 326-2757
JAMES A. PRUNTY (OR 84128)
jprunty@ftc.gov; (202) 326-2438
EDWIN RODRIGUEZ (DC 446457)
erodriguez@ftc.gov; (202) 326-3147
SHIRA D. MODELL (DC 358757)
smodell@ftc.gov; (202) 326-3116
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Fax: (202) 326-3259

STACY PROCTER (Local Counsel) (CA 221078)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380
ATTORNEYS FOR PLAINTIFF

**FILED**
**CLERK, U.S. DISTRICT COURT**

10/10/2018

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ER_____ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**Federal Trade Commission,**

　　　Plaintiff,

　　　v.

**Jason Cardiff, et al.,**

　　　Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED UNDER SEAL**

**Case No.** ED18CV02104-JGB(KKx)

PLAINTIFF'S
MEMORANDUM IN
SUPPORT OF ITS *EX PARTE*
APPLICATION FOR (1)
TEMPORARY RESTRAINING
ORDER AND ORDER TO
SHOW CAUSE WHY A
PRELIMINARY INJUNCTION
SHOULD NOT ISSUE AND (2)
ORDER WAIVING NOTICE
REQUIREMENT

**LODGED**
**CLERK, U.S. DISTRICT COURT**

10/3/2018

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ER_____ DEPUTY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................1

II.   STATEMENT OF FACTS ....................................................................2

    A. Defendants' Deceptive Health Claims .........................................2

       1.  Defendants' TBX-FREE Claims .........................................2

       2.  Defendants' Eupepsia Thin Claims .....................................3

       3.  Defendants' Prolongz Claims..............................................4

       4.  Defendants' Claims for TBX-FREE, Eupepsia Thin, and Prolongz are Unsubstantiated or False.................................5

    B. Defendants Make Other Material Misrepresentations About TBX-FREE, Eupepsia Thin, and Prolongz ...................................6

       1.  False Claim that Eupepsia Thin is Made in the United States and Fake Testimonials in Eupepsia Thin Advertising .........6

       2.  False Money Back Guarantee Claims in TBX-FREE, Eupepsia Thin, and Prolongz Advertising .........................6

    C. Defendants Charge Consumers' Debit and Credit Cards Without Authorization and Enroll Them in Autoship Continuity Plans Without Their Knowledge or Consent .......................................7

    D. Defendants Make Abusive Telemarketing Calls .......................10

    E. Defendants Make Misleading Earnings Claims for Their Multilevel Marketing Scheme .................................................10

III.  THE DEFENDANTS...........................................................................11

    A. Corporate Defendants .................................................................11

       1.  Redwood Scientific Technologies, Inc. ("Redwood California")........11

       2.  Redwood Scientific Technologies, Inc. ("Redwood Nevada")............12

       3.  Redwood Scientific Technologies, Inc. ("Redwood Delaware").........13

4.  Identify, LLC ("Identify") ......................................................................14

5.  Advanced Men's Institute Prolongz LLC ("AMI") .............................14

6.  Run Away Products, LLC ("Run Away") ...........................................15

7.  Carols Place Limited Partnership .........................................................15

B. Individual Defendants.................................................................................16

1.  Jason Cardiff..........................................................................................16

2.  Eunjung Cardiff .....................................................................................18

3.  Danielle Cadiz .......................................................................................20

IV.  LEGAL ARGUMENT ........................................................................................21

A. The Court Possesses Authority to Grant the Requested Relief. ................21

B. The FTC is Likely to Succeed on the Merits...........................................22

1.  Defendants are Violating Sections 5 and 12 of the FTC Act ..............22

a.  Counts I-VI:  Defendants Make Unsubstantiated Claims About the
     Efficacy of TBX-FREE, Eupepsia Thin, and Prolongz, and False
     Claims That Those Products Have Been Proven Effective ..........25

     i. Counts I-II:  Unsubstantiated and False TBX-FREE Claims......26

     ii. Counts III-IV: Unsubstantiated and False Eupepsia Thin Claims .
     ........................................................................................................28

     iii.   Counts V-VI: Unsubstantiated and False Prolongz Claims ...29

b.  Count VII - IX:  Defendants Falsely Claim That Their Film Strips
     Are Sold With Money Back Guarantees,  That Eupepsia Thin Is
     Made in the USA, and That Testimonials in Eupepsia Thin
     Advertising Are True ...................................................................30

c.  Counts X and XI:  Defendants Fail to Adequately Disclose the
     Material Terms of Their Autoship Continuity Program, and Falsely
     Represent that They Will Not Enroll Consumers in the Program .31

       d.   Count XII: Defendants Unfairly Charge Consumers Without Authorization ................................................................... 32

   2.  Defendants are Violating the Restore Online Shoppers' Confidence Act (ROSCA) ........................................................................ 33

   3.  Defendants are Violating the Electronic Fund Transfer Act and Regulation E ...................................................................... 34

   4.  Defendants Are Violating the Telemarketing Sales Rule (TSR) ......... 35

   5.  Defendants are Making False and Unsubstantiated Earnings Claims for Their Rengalife Program ...................................................... 36

   6.  Defendants are Each Liable for the Law Violations ........................... 37

       a.   Corporate Defendants Operate as a Common Enterprise and are the Alter-Egos of Individual Defendants Jason and Eunjung Cardiff . 37

          i. Common Enterprise ................................................................ 37

          ii. Alter Egos ............................................................................. 41

       b.   The Individual Defendants Are Liable for Injunctive and Monetary Relief .......................................................................... 42

          i. Jason Cardiff is Liable for Injunctive and Monetary Relief ........ 43

          ii. Eunjung Cardiff is Liable for Injunctive and Monetary Relief .. 45

          iii.   Danielle Cadiz is Liable for Injunctive and Monetary Relief 46

C.  The FTC's Interest in Protecting the Public Interest Outweighs Defendants' Interest in Continuing the Deceptive Practices .................... 46

D.  The Scope of the Proposed *Ex Parte* TRO Is Necessary and Appropriate ............................................................................................. 47

   1.  Injunctive Relief is Necessary to Halt the Deceptive Practices. .......... 48

   2.  Asset Preservation Is Necessary to Preserve the Possibility of Final Relief ................................................................................. 48

   3.  A Receiver Is Necessary to Halt the Injury and Locate and Preserve Assets and Records .............................................................. 50

4.  Immediate Access and Limited Expedited Discovery Are Appropriate

..................................................................................................52

E.  The TRO Should Be Issued Without Notice to Defendants, to Preserve the

Court's Ability to Fashion Meaningful Relief..........................................52

V.   CONCLUSION ...............................................................................................54

1
2

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)........... 22, 43, 49, 53

*FTC v. Alliance Document Preparation*, *LLC*, 296 F. Supp. 3d 1197 (C.D. Cal. 2017) ................................................................................................ 37, 40

*FTC v. Am. Mortg. Consulting Grp., LLC*, No. SACV12-01561 DOC (JPRx), 2012 WL 4718927 (C.D. Cal. Oct. 1, 2012) ................................................53

*FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) ............................22

*FTC v. Am. Standard Credit Syst., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994) ........43

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ......................... 42, 43

*FTC v. BAM Fin., LLC,* SACV15-01672 (C.D. Cal. Oct. 21, 2015).......................53

*FTC v. BunZai Media Group, Inc.*, No. 2:15-cv-04527-GW-PLA (C.D. Cal. filed Jun. 16, 2015) ................................................................. 31, 32, 34, 35

*FTC v. BurnLounge*, *Inc.*, No. CV 07-3654-GW (FMOx) (C.D. Cal. Jul. 1, 2011), *aff'd,* 753 F. 3d 878 (9th Cir. 2014)..................................................37

*FTC v. Commerce Planet*, *Inc.*, 878 F. Supp. 1048 (C.D. Cal. 2012) .... 9, 24, 31, 32

*FTC v. Credit Bureau Ctr., LLC*, No. 17 C 194, 2018 U.S. Dist. LEXIS 106337 (N.D. Ill. Jun. 26, 2018)...................................................................34

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ....................... 24, 43

*FTC v. Data Med. Capital, Inc.*, No. SACV 99-1266 AHS, 2010 U.S. Dist. LEXIS 3344 (C.D. Cal. Jan. 15, 2010) ................................................41

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ..........................23

*FTC v. EDebitpay, LLC*, 07-cv-4880-QDW (AJWx) (C.D. Cal. July 30, 2007) ....53

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ..................................................24

*FTC v. Forensic Case Mgmt. Servs., Inc.*, No. 2:11-cv-07484-RGK-SS (C.D. Cal. Sept. 13, 2011)...................................................................................53

*FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) .........................43

*FTC v. Gill,* 265 F.3d 944 (9th Cir. 2001) ....................................................... 23, 24

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ....................................40

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011) ......... 31, 35, 39

*FTC v. Grant Connect, LLC*, No. 2:09-cv-01349 (D. Nev. filed Jul. 28, 2009) .....32

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ........................... 22, 48, 49

FTC *v. Harry*, No. 04C-4790, 2004 U.S. Dist. LEXIS 15588 (N.D. Ill. Jul. 27,
2004) ......................................................................................................................26

FTC *v. Health Care One, LLC*, No. SACV 10-1161 JVS (RNBx) (C.D. Cal. Aug.
3, 2010) ...................................................................................................................53

*FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF (D. Nev. Oct. 9,
2014) ................................................................................................................ 25, 34

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ..........................32

*FTC v. Lucas Law Ctr., Inc.*, No. SACV 09-0770 DCO (ANx) (C.D. Cal. July 9,
2009) ......................................................................................................................53

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd*
356 F. App'x 358 (11th Cir. 2009)................................................................ 23, 24, 25

*FTC v. NCH, Inc.*, No. CV-S-94-138-LDG, 1995 U.S. Dist. LEXIS 21098 (D. Nev.
May 25, 1995)........................................................................................................23

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010)................ 37, 43

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ............................. 23, 24, 25

*FTC v. Phoenix Avatar, LLC*, No. 1:04-cv-02897 (N.D. Ill. Apr. 23, 2004) ..........26

*FTC v. Pioneer Enters., Inc.*, No. CV-S-92-615-LDG (RJJ), 1992 Dist. LEXIS
19699 (D. Nev. Nov. 12, 1992) ............................................................................23

*FTC v. Pub. Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) .......................43

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir.
2008) ............................................................................................................... 24, 25

*FTC v. QT, Inc.*, No. 03 C 3578 (N.D. Ill. Jun. 6, 2003)........................................26

*FTC v. Seasilver USA, Inc.*, No. CV-S-03-0676-RLH(LRL) (D. Nev. Jun. 13, 2003) .................................................................................................26

*FTC v. Sharp*, 782 F. Supp. 1445 (D. Nev. 1991) ....................................43

*FTC v. Sili Neutraceuticals, LLC*, No. 1:07-cv-04541 (N.D. Ill. Aug. 13, 2007)...26

*FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708 (9th Cir. 1976)....................22

*FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ..........23

*FTC v. SlimAmerica, Inc.*, No. 97-6072 (S.D. Fla. Feb. 6, 1997) ..........26

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)..............49

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ...................... 24, 36, 43

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000) .............30

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) ..............50

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984)............22

*FTC v. Wealth Educators, LLC*, SACV15-2357 (C.D. Cal. Apr. 6, 2015) .............53

*FTC v. Wellness Support Network, Inc.*, 2014 U.S. Dist. LEXIS 21449 (N.D. Cal. Apr. 4, 2011).................................................................. 44, 45

*FTC v. Windward Marketing, Ltd.*, No. 1:96-cv-615-FMH, 1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Oct. 1, 1997) ...................................................32

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) . 23, 48

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ................... 22, 47

*In re Cliffdale Assocs.*, 103 F.T.C. 110 (1984)........................... 23, 24

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ............................49

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)........................ 23, 24

*Minton v. Cavaney*, 56 Cal. 2d 576 (S.Ct. Ca. 1961) ............................41

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015)..............25

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) .............................52

*Saunders v. Dyck O'Neal, Inc.*, No. 1:17-CV-335, 2018 U.S. Dist. LEXIS 121076 (W.D. Mich. Jul. 16, 2018)...........................................................36

*SEC v. Art Intellect*, No. 2:11-CV-357-TC, 2011 U.S. Dist. LEXIS 131869 (D. Utah, Nov. 15, 2011) ........................................................................................51

*SEC v. Ashbury Capital Partners*, 00 CIV 7898 (RCC), 2004 U.S. Dist. LEXIS 17697 (S.D.N.Y., Sept. 2, 2004) ........................................................................51

*SEC v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005) ..............................49

*SEC v. Faulkner*, No. 3:16-CV-1735-D, 2018 U.S. Dist. LEXIS 23938 (N.D. Tex., Feb. 13, 2018) ...........................................................................................51

*SEC v. First Fin. Grp. of Texas*, 645 F.2d 429 (5th Cir. 1981) .............................50

*SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir. 1963) ..............................................50

*Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 99 Cal. Rptr. 2d 824 (2000).................................................................................................41

*Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir.1986) ................................25

*Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 90 Cal. Rptr. 3d 589 (2009) ..........................................................................................................41

**Statutes**

12 C.F.R. § 205.10(b) ................................................................................. 34, 35

12 C.F.R. Part 205, Supp I, ¶ 10(b), comments (5) & (6) .....................................35

15 U.S.C. § 1693e(a) (2006)........................................................................ 34, 35

15 U.S.C. § 1693*l*........................................................................................35

15 U.S.C. § 45 ...............................................................................................22

15 U.S.C. § 45(a) ...........................................................................................22

15 U.S.C. § 45(n) ...........................................................................................23

15 U.S.C. § 52 ...............................................................................................23

15 U.S.C. § 53(b) ...........................................................................................21

15 U.S.C. § 55 ...............................................................................................23

15 U.S.C. § 8403 (2006) .................................................................................33

16 C.F.R. § 310.2(u) .......................................................................................33

16 C.F.R. §310.4(b)(1)(v) ...............................................................35

**Rules**

Fed. R. Civ. P. 26(d) ....................................................................52

Fed. R. Civ. P. 30(a)(2) ................................................................52

Fed. R. Civ. P. 33(a) ....................................................................52

Fed. R. Civ. P. 34(b) ....................................................................52

**Other Authorities**

FTC Enforcement Policy Statement on U.S. Origin Claims, 62 Fed. Reg. 63,756

(Dec. 1, 1997) .........................................................................31

Telemarketing Sales Rule ("TSR"), 73 Fed. Reg. 51164 (Aug. 29, 2008) .............35

## TABLE OF EXHIBITS

| PX Number | Description |
|-----------|-------------|
| FTC Staff | |
| PX-1 | Declaration of Connor Sands<br>FTC Lead Investigator (7 Parts) |
| PX-2 | Declaration of Emil T. George<br>FTC Forensic Accountant |
| PX-3 | Declaration of William Ducklow<br>FTC Investigator |
| PX-4 | Declaration of Biaunca Morris<br>FTC Paralegal Specialist |
| PX-5 | Declaration of Aine Farrell<br>FTC Investigator |
| PX-6 | Declaration of Lynne Colbert<br>Supervisory FTC Investigator |
| Expert Reports | |
| PX-7 | Declaration of Dr. Judith Prochaska<br>Expert |
| PX-8 | Declaration of Dr. David Levitsky<br>Expert |
| PX-9 | Declaration of Dr. Hossein Sadeghi-Nejad<br>Expert (2 Parts) |
| PX-10 | Declaration of Dr. Stacie Bosley<br>Expert |
| Consumer Declarations | |
| PX-11 | Declaration of Bonnie Fromal<br>Consumer |
| PX-12 | Declaration of Douglas Cooper<br>Consumer |
| PX-13 | Declaration of Betsy Rosen<br>Consumer |

| PX Number | Description |
|---|---|
| PX-14 | Declaration of Linda Harrell-Cox<br>Consumer |
| PX-15 | Declaration of David Garrett<br>Consumer |
| PX-16 | Declaration of Connie Bryant<br>Consumer |
| PX-17 | Declaration of Terry Reynolds<br>Consumer |
| PX-18 | Declaration of Stephen DeAngelo<br>Consumer |
| PX-19 | Declaration of Ian M. Kramer<br>Consumer |
| PX-20 | Declaration of Brian Grossman<br>Consumer |
| PX-21 | Declaration of Cynthia Boatright<br>Consumer |
| PX-22 | Declaration of Scott Chesko<br>Consumer |
| PX-23 | Declaration of Lisa Roberts<br>Consumer |
| PX-24 | Declaration of Cecilia Brown<br>Consumer |
| PX-25 | Declaration of Evelyn Jones<br>Consumer |
| PX-26 | Declaration of Dustin Fatch<br>Consumer |
| PX-27 | Declaration of Robert Frantz<br>Consumer |
| PX-28 | Declaration of Terri McKinney<br>Consumer |
| PX-29 | Declaration of Dorothy Basford<br>Consumer |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| PX Number | Description |
|---|---|
| PX-30 | Declaration of Brenda Herel Consumer |
| Miscellaneous | |
| PX-31 | Unreported Cases Cited in Memorandum (2 Parts) |

## I.      INTRODUCTION

Defendants operate a multi-pronged scheme that has bilked American consumers out of millions of dollars.  Defendants lure consumers to buy their dissolvable oral film strips with deceptive health claims, and trap them into autoship continuity programs that place recurring unauthorized charges on their credit and debit cards.  Defendants stymie consumers' attempts to return the product and get a refund – despite their pledged money-back guarantee – or to cancel their enrollment in the continuity program.  More recently, Defendants delivered illegal prerecorded marketing voicemails ("robocalls") to 1.5 million consumers, and launched a multilevel marketing scheme, luring consumers with false claims that they will earn substantial income.

Individual Defendants Jason Cardiff, Eunjung Cardiff, and Danielle Cadiz have committed this fraud through a web of interrelated companies that have operated as a common enterprise, and those entities are the Cardiffs' alter egos. The Corporate Defendants include three corporations with the same name – Redwood Scientific Technologies, Inc. (incorporated in California, Nevada, and Delaware) – and four other entities, Identify, LLC; Advanced Men's Institute Prolongz LLC; Run Away Products, LLC; and Carols Place Limited Partnership.

The FTC seeks a non-noticed *ex parte* TRO to immediately stop Defendants' unlawful activities.  Overwhelming evidence demonstrates that the FTC is likely to succeed on the merits, and the equities weigh in favor of protecting consumers. The proposed TRO would enjoin Defendants' unlawful practices, freeze their assets, appoint a temporary receiver over the Corporate Defendants and over Jason and Eunjung Cardiff's assets, provide immediate access to Defendants' business premises to preserve and collect records, and provide for certain expedited discovery.  This relief is essential to prevent further harm to consumers, prohibit Defendants from dissipating assets or destroying documents, and preserve the Court's ability to award effective final relief for Defendants' law violations.

Issuing the TRO *ex parte* and without notice is appropriate even though Defendants are aware of the FTC's investigation.  The Cardiffs have built an elaborate asset protection plan, and any notice of imminent action will likely result in the activation of that plan and the transfer of those assets overseas.

## II.   STATEMENT OF FACTS

### A.   Defendants' Deceptive Health Claims

Defendants market their dissolvable oral film strips – (1) TBX-FREE stop smoking aid; (2) Eupepsia Thin appetite suppressant; and (3) Prolongz men's sexual performance enhancement aid – using a mix of national television infomercials and shorter videos, print ads, websites, social media postings, and prerecorded robocalls.  The advertising consistently touts the remarkable health benefits each product provides and assures potential customers that clinical research proves their effectiveness.

### 1.   Defendants' TBX-FREE Claims

Defendants have marketed TBX-FREE as a uniquely effective smoking cessation aid since late 2015,[1] and have total sales of at least $8 million (before refunds and chargebacks).[2]

Defendants have advertised TBX-FREE through a national television campaign,[3] on websites,[4] in social media,[5] in print,[6] through prerecorded robocalls,[7]

---

[1] PX-1 (Declaration of Connor Sands, FTC Lead Investigator), p. 2, ¶ 4 & PX-1 (Att. 004), p. 228-229.

[2] PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 155-156; PX-1, p. 1, ¶ 3 & PX-1 (Att. 003), p. 216-222.

[3] PX-1, p. 61, ¶ 178 & PX-1 (Att. 216), p. 1362; PX-1, p. 2, ¶ 5 & PX-1 (Atts. 005-007), p. 230-287; PX-1, p. 6-7, ¶¶ 19-21.

[4] PX-1, p. 6-7, ¶ 6 & PX-1 (Att. 008), p. 288-298.

[5] PX-1, p. 3, ¶¶ 7-9 & PX-1 (Atts. 009-017), p. 299-341.

[6] PX-1, p. 3-4, ¶¶ 10-12 & PX-1 (Atts. 018-022), p. 342-348.

and on product packaging.[8]  Despite having never tested the product and spending a grand total of $130 for an online jobber to gather articles about the main ingredient,[9] Defendants have used these media to claim, among other things:  (1) that TBX-FREE has an "88% success rate," many times better than nicotine gum and patches;[10] (2) that clinical studies on more than 10,000 people have proven its success;[11] (3) that The New England Journal of Medicine (NEJM), Harvard Health Publications, and Johns Hopkins University have published clinical studies proving that TBX-FREE is effective;[12] and (4) that the product is so good smokers should not need to purchase more than a one month supply.[13]

## 2.    Defendants' Eupepsia Thin Claims

Defendants position Eupepsia Thin as the holy grail of weight loss – a product that enables users to lose weight without dieting or exercising.  These claims have enabled Defendants to bring in at least $2.2 million (before refunds and chargebacks)[14] since introducing the product in 2017.[15]

---

[7] PX-1, p. 37, ¶ 111 & PX-1 (Atts. 125-126), p. 747-752.

[8] PX-1, p. 15, ¶ 45 & PX-1 (Att. 081), p. 582-600.

[9] PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 181, 204.

[10] *See*, *e.g.*, PX-1, p. 2-3, ¶¶ 5-9 & PX-1 (Att. 006), p. 244-245, 263, 265-267 (gum/patch claims), PX-1 (Att. 8), p. 289-291(88% and gum/patch claims), PX-1 (Att. 010), p. 305, 308 (88% claim), PX-1 (Att. 013), p. 322 (88% claim), PX-1 (Att. 016), p. 334, 337 (88% and gum/patch claims), PX-1 (Att. 019), p. 345 (88% and gum/patch claims), PX-1 (Att. 021), p. 347 (88% and gum/patch claims).

[11] *See*, *e.g.*, PX-1, p. 2, ¶ 5 & PX-1 (Att. 006), p. 243 ("HUNDREDS & HUNDREDS OF CLINICAL STUDIES PERFORMED ON OVER 10,600 SMOKERS!") (emphasis in original).

[12] *See*, *e.g.*, PX-1, p. 2-3, ¶¶ 6-7 & PX-1 (Att. 008), p. 291-292, 294-295, PX-1 (Att. 010), p. 305, PX-1 (Att. 019), p. 345, PX-1 (Att. 021), p. 347.

[13] *See*, *e.g.*, PX-1, p. 3, ¶ 9 & PX-1 (Att. 016), p. 336 ("A whole month supply . . . which if you follow the direction[s] should be more than you ever need.").

[14] PX-1, p.1, ¶ 3 & PX-1 (Att. 003), p. 216-217, 223-224.

Defendants promote Eupepsia Thin through a national television campaign[16] and on the Internet,[17] with claims, among others, that Eupepsia Thin: (1) starts working in less than 20 seconds to suppress the user's appetite within minutes;[18] and (2) enables users to lose 10, 20, or even 100 pounds – including 15 pounds their first month – without dieting, giving up their favorite foods, or increasing their exercise.[19]  Several of these claims are "gut check claims" that the FTC staff has concluded – based on the advice of weight loss experts – are patently false.[20] Defendants deliver some of these deceptive weight loss claims through testimonials and, as discussed *infra* at page 6, at least four of those are fake. Defendants also tell consumers that clinical studies prove Eupepsia Thin works, [21] even though – as with TBX-FREE – they never tested the product and merely used the same online jobber to gather their "substantiation."[22]

### 3. Defendants' Prolongz Claims

Defendants have marketed Prolongz oral strips for improved male sexual performance since at least 2013.[23]  Prolongz sales total at least $5.9 million.[24]

---

[15] PX-1, p. 4-5 & PX-1 (Att. 001), p. 156.

[16] PX-1, p. 4-5, ¶ 13 & PX-1 (Att. 023, 024); PX-1, p. 4-5, ¶¶ 20-22 & PX-1 (Att. 32).

[17] PX-1, p. 5, ¶ 14 & PX-1 (Att. 026).

[18] PX-1, p. 4-5, ¶ 13 & PX-1 (Att. 024), p. 354; PX-1, p. 5, ¶¶ 15, 16 & PX-1 (Att. 027, 028).

[19] PX-1, p. 4-5, ¶ 13 & PX-1 (Att. 024, 025); PX-1, p. 5, ¶ 14 & PX-1 (Att. 026), p. 396.

[20] PX-1, p. 5, ¶ 18 & PX-1 (Att. 030), p. 416-422.  The seven "gut check claims" include that a product causes weight loss of two pounds or more a week for a month or more without dieting or exercise, or that it causes substantial weight loss for all users.  PX-1 (Att. 030), p. 418.

[21] PX-1, p. 5, ¶ 14 & PX-1 (Att. 026), p. 1; PX-1, p. 5, ¶ 15 & PX-1 (Att. 027).

[22] PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 201-202, 204.

[23] PX-4 (Declaration of Biaunca Morris, FTC Paralegal Specialist), p. 2, ¶ 4.

Defendants have advertised Prolongz on television[25] and on the Internet,[26] claiming that Prolongz:  (1) substantially increases ejaculatory control and the duration of sex,[27] (2) treats or prevents premature ejaculation,[28] and (3) is clinically proven to increase ejaculatory control and the duration of sex for 97% of users.[29]

4.   Defendants' Claims for TBX-FREE, Eupepsia Thin, and Prolongz are Unsubstantiated or False

The FTC retained experts in the fields of smoking cessation, weight-loss, and male sexual health to determine whether Defendants' claims are supported by the level of scientific evidence that experts in each field would require.[30]  After evaluating the documents Defendants proffered to support their claims and conducting their own literature reviews, each expert concluded that Defendants' efficacy claims are not supported by competent and reliable scientific evidence.[31]  Moreover, any claim that Defendants' products are backed by clinical testing is also false.  Indeed, Defendants have never tested TBX-FREE or Eupepsia Thin,[32] and a small pilot test of Prolongz was fundamentally flawed, as discussed *infra* at p. 30.

---

[24] PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 14-15.

[25] PX-6 (Declaration of Lynne Colbert, Supervisory FTC Investigator), p. 1, ¶¶ 2-3.

[26] PX-4, p. 2, ¶ 4.

[27] PX-4, p. 2, ¶ 4 & PX-4, (Att. A), p. 3-9.

[28] PX-4, p. 2, ¶ 4 & PX-4, (Att. A), p. 6, 7, 9.

[29] PX-4, p. 2, ¶ 4 & PX-4, (Att. A), p. 3, 4, 7.

[30] The FTC has submitted the reports of Dr. Judith Prochaska, Dr. David Levitsky, and Dr. Hossein Sadeghi-Nejad, who are, respectively, experts in smoking cessation, weight-loss, and male sexual health, as exhibits PX-7, PX-8, and PX-9.

[31] *Id.*

[32] PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 204 ("Redwood is informed and believes that it did not perform any unpublished human clinical studies for TBX-FREE or Eupepsia Thin.").

**B.  Defendants Make Other Material Misrepresentations About TBX-FREE, Eupepsia Thin, and Prolongz**

1.  <u>False Claim that Eupepsia Thin is Made in the United States and Fake Testimonials in Eupepsia Thin Advertising</u>

Defendants claim that Eupepsia Thin is made in the United States,[33] when, in fact, the product previously was made in China and is now made in India.[34] They also represent that individuals featured in their infomercial and website actually used the product to lose as much as 45, 90, and 132 pounds.[35] At least four of those testimonials are fake, however, because the men and women are actors who did not use Eupepsia Thin for the claimed weight loss.[36]

2.  <u>False Money Back Guarantee Claims in TBX-FREE, Eupepsia Thin, and Prolongz Advertising</u>

Defendants have advertised money-back guarantees for TBX-FREE, Eupepsia Thin, and Prolongz,[37] but many consumers found that they do not honor that promise.[38]  Consumers who sought refunds were often told that the charges are

---

[33] PX-1, p. 5, ¶¶ 16, 17 & PX-1 (Att. 027, 028).

[34] PX-1, p. 8-9, ¶¶ 223-27 & PX-1 (Att. 030 – 037).

[35] PX-1, p. 4-5, ¶¶ 13-14 & PX-1 (Att. 024, 025, 026).

[36] PX-3 (Declaration of William Ducklow, FTC Investigator), p. 4-5, ¶¶ 13-18 & PX-3 (Att. C, D, E), p. 8-31.

[37] PX-1, p. 3, ¶ 7 & PX-1 (Att. 010), p. 307; PX-1, p. 3, ¶ 8 & PX-1 (Att. 013), p. 322; PX-1, p. 3, ¶ 9 & PX-1 (Att. 016), p. 337; PX-1, p. 4-5, ¶ 13 & PX-1 (Att. 024), p. 366; PX-4, p. 2, ¶ 4 & PX-4 (Att. A), p. 3, 5, 7; PX-5 (Declaration of Aine Farrell, FTC Investigator), p. 1, ¶ 4 & PX-5 (Att. 1), p. 10-11.

[38] Defendants not only fail to adequately disclose refund policies, but actually have misrepresented their refund policies, for example, by claiming that consumers do not have to return the product to obtain a refund.  PX-1, p. 3, ¶ 8 & PX-1 (Att. 13), p. 322.  In fact, Defendants' policy is to require consumers to return the product after obtaining a Return Merchandise Authorization (RMA), and "some RMAs result in a refund and others do not."  PX-1, p. 1-2, ¶ 3 & PX-1 (Att. 3), p. 219.

not refundable, or that they failed to comply with applicable cancellation and refund policies that Defendants failed to adequately disclose.[39]

**C.      Defendants Charge Consumers' Debit and Credit Cards Without Authorization and Enroll Them in Autoship Continuity Plans Without Their Knowledge or Consent**

Not content with deceiving consumers into an initial purchase, Defendants then enroll them into autoship continuity plans – sending products and billing consumers monthly, without authorization, for those additional film strips they never ordered, until the consumer takes affirmative steps to cancel the enrollment.[40]

Defendants use a variety of tactics to enroll consumers in their continuity plan.  For both website and telephone sales, Defendants place consumers on autoship by default, providing little or no disclosure that this is the case.  For example, at the time of two undercover purchases of TBX-FREE by an FTC investigator online and by phone, Defendants' website had no disclosure whatsoever about the automatic enrollment in the continuity plan and Defendants' telephone sales representative did not disclose the automatic enrollment either.[41] In both instances, the FTC investigator was automatically enrolled, and many

---

[39] PX-14, pp. 8-9; PX 16, pp. 11-12; PX 18, p. 15-16; PX 19, pp. 17-18; PX 20, p. 19-20; PX 23, pp. 24-26 (consumers complained that Defendants don't honor money back guarantees or free trial offers); PX-11, p. 1-2; PX-13, p. 7; PX-14, p.9; PX-15, p. 10; PX-16, p. 11-12; PX-17, p. 14; PX-18, p. 15-16; PX-19, p. 17; PX-23, p. 25.

[40] PX-1, p. 20-22, ¶¶ 66-68 & PX-1 (Atts. 98-100), p. 647-49; PX-11, p. 1-3; PX-12, pp. 4-5; PX 13, pp. 6-7; PX-14, pp. 8-9; PX-15, p. 10; PX-16, p. 11; PX-17, pp.13-14; PX-20, pp. 19-20; PX-21, pp. 21-22; PX-23, pp. 24-26; PX-25, p. 28; PX-26, p. 29; PX-27, p. 30; PX-29, p. 32; PX-30, pp. 33-35.

[41] PX-1, p. 12, ¶ 33 & PX-1 (Att. 069), p. 499-508; PX-1, ¶ 42, p. 14 & PX-1 (Att. 078), p. 576.

consumers report similar experiences.[42]  In other instances, even when Defendants specifically promise to limit the sale to a single purchase, they still place consumers on the autoship program.[43]

Defendants' mechanisms for stopping recurring charges are often not effective.  Consumers are often not able to reach Defendants when they call to stop recurring charges, and even when consumers successfully cancel their enrollment in an autoship continuity plan, Defendants often continue sending additional shipments and placing unauthorized charges on consumers' debit and credit cards.[44]

Not surprisingly, these practices have resulted in thousands of consumers complaining directly to Defendants about the disguised autoship continuity program and placement of unauthorized charges on their debit and credit cards.[45] It also resulted in Defendants' merchant accounts experiencing high chargebacks (*i.e.*, credits to customers' credit cards)[46] that prompted the closing of several merchant accounts.  In fact, Defendants' chargeback rate has consistently been over the 1% threshold that credit card companies deem indicative of fraud.[47]

---

[42] PX-1, p. 13, ¶¶ 37-39 & PX-1 (Att. 073-075), p. 536-40; PX-1, pp. 14-15, ¶¶ 42, 44 & PX-1 (Att. 080), p. 579;  PX-1, p. 20, 21, 23, ¶¶ 66, 67, 75 & PX-1 (Att. 99), p. 648; PX-12, pp. 4-5; PX-15, p. 10; PX-22, p. 23; PX-28, p. 31.

[43] PX-1, p. 22, ¶ 68 & PX-1 (Att. 098), p. 648; PX-15, p. 10; PX-22, p. 23.

[44] PX-1, p. 22, ¶ 68 & PX-1 (Att. 100), p. 649; PX-20, p. 19-20; PX-23, p. 24-26; PX-24, p. 27.

[45] PX-1, p. 23, ¶ 75 & PX-1 (Att. 099), p. 648.

[46] PX-1, p. 27-33, ¶¶ 90-92, 94, 95, 96-98, 100, 101 & PX-1 (Atts. 105-07, 110), p. 658-59, 661, 670-71; PX-3, p. 2-4, ¶¶ 5, 11 & PX-3 (Att. A & B), p. 6-7; PX-1, p. 61, ¶ 175 & PX-1 (Att. 208), p. 1283 ("the chargebacks were crazy high levels").

[47] PX-3, p. 2, ¶ 6; PX-3, p. 4, ¶ 12; PX-1, p. 31-32, ¶ 100 (December 2017 memorandum by Vantiv noting the "generally acceptable rate of 1.00% CB # to Sales # Ratio" and that Redwood had historically been above that rate, "indicating

According to data provided to the Commission by Visa and MasterCard, Defendants' chargeback ratios over the life of those merchant accounts were significantly higher, including some that exceeded 10%.[48]

Most brazenly, when Defendants decided earlier this year that they needed more money, they took the stored debit and credit card information of consumers who had made only a one-time purchase (*i.e.*, a "straight" sale), and simply processed further charges on those cards – sometimes over a year after the consumer's purchase.  Defendants' records show that Jason Cardiff directed his employees to initiate these charges, that Danielle Cadiz worked with employees to make it happen,[49] and that Defendants successfully processed unauthorized charges for at least 1,893 consumers.[50]  Defendants chose to do this (January 22, 2018 – April 6, 2018) while the FTC's CID enforcement action[51] was ongoing, and even continued after the Commission moved in March 2018 for Redwood to be held in contempt.[52]

---

potential issues with the product, customer service, and/or marketing.").  *See also FTC v. Commerce Planet, Inc.*, 878 F. Supp. 1048, 1075-76 (C.D. Cal. 2012) (noting that the average chargeback rate in the United States is 0.2% of the transaction rate, and that Visa identifies merchants who exceed a chargeback rate of about 1% in any given month; also citing Visa expert who identified free trial offers, pay-for-shipping models and negative option plans as being potentially deceptive marketing tactics used by continuity merchants).

[48] PX-3, p. 2, ¶ 5 & PX-3 (Att. A), p. 6, PX-3, p. 3-4, ¶ 11 & PX-3 (Att. B), p. 7.

[49] PX-1, p. 11, ¶ 30 & PX-1 (Atts. 038-068), p. 437-496.

[50] PX-1, p. 10, ¶ 28 (Table 1).

[51] *FTC v. Redwood Scientific Technologies, Inc.*, No. 2:17-cv-07921-SJO-PLA (C.D. Cal. 2018) (Otero, J).

[52] *Id.* (FTC Application For An Order To Show Cause Why Redwood Scientific Technologies, Inc. Should Not Be Held In Contempt) (Dkt. No. 19, filed March 5, 2018).

### D.    Defendants Make Abusive Telemarketing Calls

In February 2018, Defendants began a large-scale robocall campaign, contracting with a telemarketing company to deliver prerecorded messages, commonly known as robocalls, straight to the voicemail boxes of 1.5 million consumers.[53]  Consumer Sentinel[54] complaints describe messages that match audio recordings produced by Defendants.[55]  Reverse-phone searches of several of the Caller ID numbers that appear repeatedly in the Consumer Sentinel complaints yielded recordings and transcripts of messages captured by consumers.[56]  Those messages match the audio recordings produced by Defendants.[57]  Defendants' records, which include Caller ID numbers, show approximately 20,000 to 50,000 calls per day in February and March 2018.[58]  Those Caller ID numbers match the Caller ID numbers reported by many consumers who filed complaints with the FTC, and are registered to Redwood and Jason Cardiff.[59]

### E.    Defendants Make Misleading Earnings Claims for Their Multilevel Marketing Scheme

Defendants launched their Rengalife multilevel marketing scheme in late March 2018.[60]  Defendants promoted Rengalife using a website and Internet videos featuring Jason Cardiff touting Rengalife's "life-changing products" (Defendants'

---

[53] PX-1, p. 35, ¶ 107 & PX-1 (Att. 118), p. 714-28.
[54] Consumer Sentinel is an online database of millions of consumer complaints available only to law enforcement.  https://www.ftc.gov/enforcement/consumer-sentinel-network.
[55] PX-1, p. 44-45, ¶ 123 & PX-1 (Att. 136), p. 768-774.
[56] PX-1, p. 45-46, ¶¶ 124-125 & PX-1 (Att. 137, 138), p. 775-778.
[57] PX-1, p. 37, ¶¶ 111-112 & PX-1 (Att. 123-128), p. 740-758.
[58] PX-1, p. 38-41 , ¶¶ 114-118.
[59] PX-1, p. 46-47, ¶¶ 126-129 & PX-1 (Atts. 139-142), p. 779-783.
[60] PX-1, p. 48, ¶ 130.

oral film strips), easy-to-understand pay structure, and unlimited earning potential that allows members to quit their jobs and be their own boss.[61]  Defendants represented that Rengalife Directors are guaranteed a minimum salary of $7,200, Vice Presidents $30,000, and Senior Vice Presidents $151,000,[62] with bonuses[63] as members advance through the ranks based on the number of recruits in their "downline" networks. The primary source of income for any Rengalife member comes from purchases of Redwood products by members of his or her own network.[64]

According to the Commission's expert, those earnings claims are false because at any point in time, nearly all Rengalife members will be in a negative financial position, having spent more money on required monthly purchases of Redwood film strips than they have received.[65]  The full extent of the injury caused by Defendants' claims is unknown because the FTC does not yet know how many people joined Rengalife.

## III.   THE DEFENDANTS

### A.   Corporate Defendants

1.   <u>Redwood Scientific Technologies, Inc. ("Redwood California")</u>

Redwood Scientific Technologies, Inc. ("Redwood California") is a California corporation formerly located at 250 W. 1st St., Claremont, CA 91711[66]

---

[61] PX-1, p. 48, ¶ 130 & PX-1 (Att. 143-145); PX-1, p. 48, ¶ 131 & PX-1 (Att. 146-147); PX-1, p. 48-49, ¶ 132 & PX-1 (Att. 149-150).

[62] PX-1, p. 48, ¶ 131 & PX-1 (Att. 146-147); PX-1, p. 48-49, ¶ 132 & PX-1 (Att. 149-150); PX-1, p. 49, ¶ 133 & PX-1 (Att. 156).

[63] PX-1, p. 48, ¶ 131 & PX-1 (Att. 147), p. 801, 803; PX-1 p. 48-49, ¶ 132 & (Att. 150), p. 821.

[64] PX-10, p. 28, ¶ 34.

[65] PX-10, pp, 5-7, ¶¶ 7-9; p. 26-27, ¶ 30; p. 28 (Table 2).

[66] PX-1, p. 49, ¶¶ 135-136 & PX-1 (Att. 157), p. 849, PX-1 (Att. 158), p. 850.

and now with its principal place of business at 820 N. Mountain Ave., Upland, California 91786.[67]   The company was initially Advanced Men's Institute Prolongz LLC, which became Redwood Scientific Technologies LLC, and then finally converted to the corporation Redwood California in November 2014.[68]   Jason Cardiff is the Chief Executive Officer and a Director; Eunjung Cardiff is the Secretary, Director, and Director of Marketing; and Danielle Cadiz was a Director of Redwood California.[69]

> ## 2.   Redwood Scientific Technologies, Inc. ("Redwood Nevada")

Redwood Scientific Technologies, Inc. ("Redwood Nevada") was incorporated in Nevada in December 2014.[70]   Jason Cardiff was the company's President and Eunjung Cardiff was its Secretary.[71]   The Nevada Secretary of State listed the same physical address as Redwood California's previous office location, 250 W. 1st St., Claremont, California 91711, as the address for all Redwood Nevada officers and directors.[72]   On January 6, 2015, Redwood Nevada "acquired" Redwood California and began conducting its operations through the California

---

[67] PX-1, p. 50, ¶ 137 & PX-1 (Att. 159), p. 851.
[68] PX-1, p. 1, ¶ 2 & PX-1 (Att. 1), p. 151-152; PX-1, p. 50, ¶¶ 138-139 & PX-1 (Att. 160), p. 853, PX-1 (Att. 161), p. 854.  Redwood California claims to have seven subsidiaries: American Nutra Partners, Smoke Stop LLC, Nature's Future LLC, Owl Enterprises, Top Hill Shop, Expo Supplements, Ax Distributors, and Healthy Way Express.  PX-1, p. 1, ¶ 2 & PX-1 (Att. 1), p. 153-154.  Redwood California is a wholly owned subsidiary of Redwood Nevada.  PX-1, p. 1, ¶ 2 & PX-1 (Att. 1), p. 154.
[69] PX-1, p. 49-50, ¶¶ 136-137 & PX-1 (Att. 158), p. 850, PX-1 (Att. 159), p. 851.
[70] PX-1, p. 50, ¶ 140 & PX-1 (Att. 162), p. 855-859.
[71] PX-1, p. 50, ¶ 141 & PX-1 (Att. 163), p. 860-861.
[72] PX-1, p. 50, ¶¶ 140-141 & PX-1 (Att. 162), p. 855-859; PX-1 (Att. 163), p. 860-861.

subsidiary.[73]  On December 29, 2017, Redwood Nevada merged into an existing Delaware corporation, Greenway Design Group, Inc., which changed its name to Redwood Scientific Technologies, Inc., a Delaware corporation.[74]  Although papers were filed in December 2017 with the Nevada Secretary of State to dissolve Redwood Nevada,[75] Redwood California identified Redwood Nevada as its parent in March 2018,[76] and as recently as March 27, 2018, Defendants continued to seek investors in Redwood Nevada.[77]  Defendant Carols Place Limited Partnership owns 66% of Redwood Nevada's stock.[78]

> 3.  Redwood Scientific Technologies, Inc. ("Redwood Delaware")

Redwood Scientific Technologies, Inc. ("Redwood Delaware") is a Delaware corporation with its principal place of business at 820 N. Mountain Ave., Upland, California 91786.[79]  After Redwood Nevada merged into Greenway Design Group, Inc., to form Redwood Delaware, Redwood Delaware adopted Redwood Nevada's Board of Directors (including the Cardiffs), and hired Jason Cardiff as CEO and Eunjung Cardiff as Chief Operating Officer and Chief Marketing Officer.[80]  Disclosure documents filed by Redwood Delaware identify the Cardiffs as nearly 97% owners of the new corporation, with their ownership

---

[73] PX-1, p. 50, ¶ 142 & PX-1 (Att. 164), p. 868.
[74] PX-1, p. 50-51, ¶ 143 & PX-1 (Att. 165), p. 964.
[75] PX-1, p. 50, ¶ 141 & PX-1 (Att. 163), p. 860-861; PX-1, p. 51, ¶ 144 & PX-1 (Att. 166), p. 965.
[76] PX-1, p. 1, ¶ 2 & PX-1 (Att. 1), p. 153.
[77] PX-1, p. 62-63, ¶ 182 & PX-1 (Att. 346), p. 2050.
[78] PX-1, p. 51, ¶ 146 & PX-1 (Att. 168), p. 973.
[79] PX-1, p. 51-52, ¶ 147 & PX-1 (Att. 169), p. 988.
[80] PX-1, p. 51-52, ¶ 147 & PX-1 (Att. 169), p. 996-997.

shares titled under Carols Place Limited Partnership and True and Honesty, LLC (a recently formed Wyoming entity with Jason Cardiff as its President).[81]

### 4.   Identify, LLC ("Identify")

Identify, LLC ("Identify") is a Wyoming limited liability company that has addresses in Wyoming[82] and at 820 N. Mountain Ave., Upland, CA 91786.[83] Jason Cardiff is the sole member and manager of the limited liability company,[84] although Eunjung Cardiff identified herself as an owner in confessions of judgment.[85]  Identify has registered multiple trade names in Wyoming, including "TBX-FREE," "Redwood Scientific Technologies," "Runaway Products," and "Advanced Men's Institute Prolongz."[86]

### 5.   Advanced Men's Institute Prolongz LLC ("AMI")

Advanced Men's Institute Prolongz LLC ("AMI") was a California limited liability company formed on January 30, 2014.[87]  Eunjung Cardiff was the owner and CEO and Danielle Cadiz was a member.[88]  Corporate documents also list Run Away Products, LLC, as a member of AMI.[89]  In late 2014, AMI became Redwood

---

[81] PX-1, p. 51-52, ¶ 147 & PX-1 (Att. 169), p. 1000.  As noted in PX-1, p. 52, ¶ 147, the disclosure document contains hidden text, which is only viewable if the text is highlighted and then copy-and-pasted into a separate document.

[82] PX-1, p. 54, ¶ 153 & PX-1 (Att. 174), p. 1021.

[83] PX-1, p. 54, ¶ 155 & PX-1 (Att. 176), p. 1025-1026.

[84] PX-1, p. 54, ¶ 155 & PX-1 (Att. 176), p. 1025-1026; PX-1, p. 60, ¶ 173 & PX-1 (Att. 194), p. 1208; PX-1, p. 56-57, ¶ 158 & PX-1 (Att. 179), p. 1034.

[85] PX-1, p. 61, ¶ 177 & PX-1 (Att. 214), p. 1308, PX-1 (Att. 215), p. 1348.

[86] PX-1, p. 56-57, ¶ 158-159 & PX-1 (Att. 179), p. 1036-1037, 1040-1043, PX-1 (Att. 180), p. 1060-1061.

[87] PX-1, p. 57, ¶ 160 & PX-1 (Att. 181), p. 1063.

[88] PX-1, p. 57, ¶ 161 & PX-1 (Att. 182), p. 1064.

[89] PX-1, p. 57, ¶ 162 & PX-1 (Att. 183), p. 1065.

Scientific Technologies LLC, and then Redwood California.[90]  AMI's principal place of business was located at 250 W. 1st St., Claremont, CA, 91711.[91]

### 6.    Run Away Products, LLC ("Run Away")

Run Away Products, LLC ("Run Away") is a New York limited liability company formed on March 10, 2009.[92]  Eunjung Cardiff is the manager of Run Away,[93] and Jason Cardiff is a member of Run Away.[94]  Run Away's address was 250 West 1st St., Claremont, CA, 91711.[95]

### 7.    Carols Place Limited Partnership

Carols Place Limited Partnership, an Arizona asset management limited partnership formed on January 23, 2017,[96] holds 99.9% of Jason and Eunjung Cardiff's common shares in Redwood Delaware, which together with their voting securities in True and Honesty, LLC, account for 96.6% of all voting securities issued.[97]  The two partners of Carols Place Limited Partnership are Carols Place Trust and Extension First, LLC, a Wyoming company formed on January 13, 2017 and owned by Jason and Eunjung Cardiff.[98]  Carols Place Trust is a bridge trust – a

---

[90] PX-1, p. 1, ¶ 2 & PX-1 (Att. 1), p. 151-152; PX-1, p. 50, ¶¶ 138-139 & PX-1 (Att. 160), p. 853, PX-1 (Att. 161), p. 854.
[91] PX-1, p. 57, ¶ 160 & PX-1 (Att. 181), p. 1063; PX-1, p. 57, ¶ 161 & PX-1 (Att. 182), p. 1064; PX-1, p. 57, ¶ 162 & PX-1 (Att. 183), p. 1065.
[92] PX-1, p. 57-58, ¶ 163 & PX-1 (Att. 184), p. 1066.
[93] PX-1, p. 58, ¶ 164 & PX-1 (Att. 185), p. 1069.
[94] *Id.*
[95] *Id.*
[96] PX-1, p. 58, ¶ 166 & PX-1 (Att. 187), p. 1076.
[97] PX-1, p. 51-52, ¶¶ 147-148 & PX-1 (Att. 169), p. 999-1000.
[98] PX 1, p. 60, ¶ 173 & PX-1 (Att. 196), p. 1217-19; PX-1, p. 58-59, ¶¶ 167-68 & PX-1 (Atts. 188-89).

type of asset protection trust[99] – formed on January 17, 2017, whose only two settlors and trustees are Jason Cardiff and Eunjung Cardiff.[100]  Carols Place Trust has held title to the Cardiffs' home since January 31, 2017, when Jason and Eunjung Cardiff, in their role as trustees of the Jurikel Family Trust, a revocable living trust, granted their interest in the property to themselves under Carols Place Trust.[101]

**B.    Individual Defendants**

1.    Jason Cardiff

Individual Defendant Jason Cardiff is the CEO and President of all of the Redwood companies (Redwood California, Redwood Nevada, and Redwood Delaware).[102]  He was 100% owner of Redwood California,[103] 66% owner of Redwood Nevada (via Carols Place Limited Partnership),[104] and owns 96.6% of the voting securities in Redwood Delaware (via Carols Place Limited Partnership and True and Honesty, LLC).[105]  Mr. Cardiff is a member of Run Away Products LLC,[106] and has held himself out as the owner of Identify, LLC[107] and Advanced

---

[99] PX-1, p. 66-73, ¶¶ 195-97 ("The bridge trust is designed strategically with the goal of protecting your assets.")

[100] PX-1, p. 59, ¶ 169 & PX-1 (Att. 190), p. 1111-14.

[101] PX-1, p. 75, ¶ 203 & PX-1 (Att. 192), p. 1188-1204; PX-1, p. 60, ¶¶ 171-72 & PX-1 (Att. 193), p. 1205-07.

[102] PX-1, p. 49-50, ¶¶ 135-37 & PX-1 (Atts. 157-59), p. 849-52; PX-1, p. 50, ¶ 141 & PX-1 (Att. 163); PX-1, p. 50, ¶ 142 & PX-1 (Att. 164), p. 913; PX-1, p. 50-51, ¶ 143 & PX-1 (Att. 165), p. 964.

[103] PX-1, p. 50, ¶ 142 & PX-1 (Att. 164), p. 868.

[104] PX-1, p. 51, ¶ 146 & PX-1 (Att. 168), p. 973.

[105] PX-1, p. 52, ¶ 148 & PX-1 (Att. 169), p. 999-1000.

[106] PX-1, p. 58, ¶ 164 & PX-1 (Att. 185), p. 1069.

[107] PX-1, p. 55-57, ¶ 158 & PX-1 (Att. 179), p. 1050-51.

Men's Institute Prolongz, LLC.[108]  He and his wife, Eunjung Cardiff, are also owners of Carols Place Limited Partnership via their joint ownership of Extension First, LLC and co-trusteeship of Carols Place Trust.[109]  Mr. Cardiff is a signatory on bank accounts of Corporate Defendants, as well as a trustee for Carols Place Trust.[110]

Jason Cardiff participates in or controls every aspect of the unfair or deceptive practices at issue.  He oversees advertising and plans and directs infomercials.[111]  He stars in Facebook Live videos for TBX-FREE[112] and was advised that the Eupepsia Thin advertising contained impermissible "gut check" claims.[113]  He participated in placing television spots with media buyers,[114] and in at least one instance staked his personal assets as guarantor on a contract to advertise Prolongz.[115]  He controlled the telemarketing campaigns that delivered illegal prerecorded messages to more than a million consumers, and personally recorded at least one of those messages.[116]  Mr. Cardiff created the Rengalife program, and appears in many videos touting its earnings claims.[117]

---

[108] PX-1, p. 60, ¶ 173 & PX-1 (Att. 195), p. 1215.

[109] PX-1, p. 60, ¶ 173 & PX-1 (Att. 196), p. 1217-19.

[110] *Id.*; PX-2 (Declaration of Emil T. George, FTC Forensic Accountant), p. 1, ¶ 4 & PX-2 (Att. A1), p. 12-13.

[111] PX-4, p. 2, ¶ 5 & PX-4 (Att. B), p. 11, 14.

[112] PX-1, p. 3, ¶ 8 & PX-1 (Atts. 012-14), p. 314-26; PX-1, p. 3, ¶ 9 & PX-1 (Atts. 015-17), p. 327-41; PX-1, p. 3, ¶ 7 & PX-1 (Atts. 009-11), p. 299-313.

[113] PX-1, p. 60, ¶ 174 & PX-1 (Att. 197), p. 1220-21.

[114] PX-1, p. 60, ¶ 174 & PX-1 (Att. 198), p. 1233-35, (Att. 199), p. 1239-40.

[115] PX-1, p. 60, ¶ 174 & PX-1 (Att. 200), p. 156-57.

[116]  PX-1, p. 35, ¶ 108 & PX-1 (Att. 119), p. 730-733; PX-1, p. 3, ¶¶ 111, 112 & PX-1 (Att. 123, 124, 127, 128), p. 740-46, 753-58.

[117] PX-1, p. 48-49, ¶¶ 130-132 & PX-1 (Att. 143, 144, 146, 147, 149-151), p. 784-824.

Mr. Cardiff controls the autoship continuity programs that process unauthorized payments and ordered his staff to process unauthorized charges on the accounts of consumers who had purchased in the past.[118]  Mr. Cardiff applied for merchant account financing, was notified that a merchant account was terminated due to "crazy high chargebacks," directed his employees to open multiple additional merchant accounts, and monitored chargebacks on existing merchant accounts.[119]

## 2.   Eunjung Cardiff

Eunjung Cardiff, a/k/a Eunjung Lee, a/k/a Eunjung No, is the Secretary, Chief Operating Officer, and a member of the Board of Directors of Redwood California, as well as its registered agent.[120]  She is the Chief Operating Officer, Chief Marketing Officer, and a Director of Redwood Delaware, and she owns 550,800 shares of that company's Common Stock.[121]  She was the Secretary of

---

[118] PX-1, p. 61 ¶ 175 & PX-1 (Att. 203), p. 1263 ("Per Jason The straight sale 1 month supply orders between December 21, 1017 - January 22, 2018 will be placed on continuity."); PX-1, p. 61 ¶ 175 & PX-1 (Att. 204), p. 1265 ("Jason has approved this"); PX-1, p. 61 ¶ 175 & PX-1 (Att. 205), p. 1267 ("We still have to find and run 10 k a day line one"); PX-1, p. 61 ¶ 175 & PX-1 (Att. 206), p. 1271-72 (Diana Melendez: "The list has many expired cards..." . . . Jason Cardiff: "Increase the year").

[119] PX-1, p. 61 ¶ 176 & PX-1 (Att. 207), p. 1273-82; PX-1, p. 61 ¶ 176 & PX-1 (Att. 208), p. 1283; PX-1, p. 61 ¶ 176 & PX-1 (Att. 209), p. 1284 ("We need to start to pen [sic] new merchant accounts again in order to cover us. We can use Identfy llc [sic] for them. We should get chase and vantiv as well as any others we want."); PX-1, p. 61 ¶ 176 & PX-1 (Att. 210), p. 1286 ("Team let's get ready if we lose our vantiv account. We need to get more chase payment tech accounts asap."); PX-1, p. 61 ¶ 176 & PX-1 (Att. 211), p. 1287-88 ("code red charge back alert").

[120] PX-1, p. 50, ¶ 137 & PX-1 (Att. 159), p. 851.

[121] PX-1, p. 51, ¶ 147 & PX-1 (Att. 169), p. 996, 999.

Redwood Nevada before its December 2017 dissolution.[122]  Ms. Cardiff formed

AMI in 2014 and is the managing member of Run Away.[123]  She has signed sworn

statements identifying herself as an owner of Redwood Scientific Technologies,

Inc., AMI, and Identify.[124]  She is also a trustee for Carols Place Trust.[125] Ms.

Cardiff is a signatory on several of Corporate Defendants' checking accounts.[126]

Eunjung Cardiff was responsible for disseminating TBX-FREE, Eupepsia

Thin, and Prolongz TV ads on cable networks across the country[127] to reach

Defendants' target audiences.[128]  She worked with cable networks to clear TV ads

for broadcast by addressing their concerns about TV ad content, including product

claims.[129]  She participated in the creation of advertising, creating TV ads and

providing voiceovers for TV advertising,[130] reviewing and approving TBX-FREE

print advertising,[131] and recording an illegal prerecorded robocall promoting TBX-

FREE.[132] She co-founded the Rengalife program and assisted Jason Cardiff in

---

[122] PX-1, p. 50, ¶ 141 & PX-1 (Att. 163), p. 860.

[123] PX-1, p. 57, ¶ 160 & PX-1 (Att. 181), p. 1063, (Att. 185), p. 1068-1069.

[124] PX-1, p. 61, ¶ 177 & PX-1 (Att. 214), p. 1308, PX-1 (Att. 215), p. 1348.

[125] PX-1, p. 60, ¶ 173 & PX-1 (Att. 196), p. 1217-19.

[126] PX-2, p. 1, ¶ 4 & PX-2 (Att. A1), p 12.

[127] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 216-230), p. 1362-1419.

[128] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 231-235), p. 1420-29.  Eunjung Cardiff directed media buying companies Cannella Response Television, LLC, and Mercury Media to use TV guide descriptors or titles that targeted Defendants' audiences (*e.g.*, "FAST WEIGHT LOSS- Lose up to 10lbs in 1 week!"; "STOP SMOKING NOW- TBX Free is the #1 selling stop smoking aid- guaranteed!"). PX-1, p. 61, ¶ 178 & PX-1 (Att. 234), p. 1424.

[129] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 238-242), p. 1462-96.

[130] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 243-247), p. 1497-1513.

[131] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 248-256), p. 1514-48.

[132] PX-1, p. 37, ¶ 111 & PX-1 (Atts. 125-126), p. 747-52.

promoting it.[133]  She paid for Facebook advertising.[134]  She consented to Jason Cardiff's personal guaranty of at least one media buying contract[135] and personally swore to confessions of judgment guaranteeing the debt of Corporate Defendants.[136]

### 3.   Danielle Cadiz

Danielle Cadiz, a/k/a Danielle Walker, is Director of Operations and/or Operations Manager for the common enterprise companies.[137]  Other than the Cardiffs, Ms. Cadiz is the only current Redwood employee who is authorized to engage in marketing on behalf of the company.[138]  Ms. Cadiz is frequently the face of Corporate Defendants in dealings with external vendors – she manages Defendants' relationship with the oral film strip manufacturer, coordinates Corporate Defendants' business entity and trade name registrations, signs contracts and negotiates payments with vendors, and is an authorized signor on corporate bank accounts.[139]  She also supervises call center staff, hires and fires employees, and pays the companies' bills.[140]  Ms. Cadiz administered illegal robocall

---

[133] PX-1, p. 60, ¶ 174 & PX-1 (Att. 202), p. 1262; PX-1, p. 61, ¶ 179 & PX-1 (Atts. 257-261), p. 1549-57.

[134] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 236-237), p. 1430-61.

[135] PX-1, p. 60, ¶ 174 & PX-1 (Att. 200), p. 1257.

[136] PX-1, p. 61, ¶ 177 & PX-1 (Att. 212), p. 1292-95, PX-1 (Att. 214), p. 1308-12, PX-1 (Att. 215), p. 1346-52 (pages out of order in original).

[137] PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 153.

[138] PX-1, p. 61, ¶ 180 & PX-1 (Att. 262), p. 1558.

[139] PX-1, p. 61, ¶ 180 & PX-1 (Atts. 263-264), p. 1559-62; PX-1, p. 61, ¶ 180 & PX-1 (Atts. 265-266), p. 1563-70 ; PX-1, p. 61, ¶ 180 & PX-1 (Att. 267), p. 1585; PX-1, p. 61, ¶ 180 & PX-1 (Att. 268), p. 1587-99; PX-2, p. 1, ¶ 4 & PX-2 (Att. A1), p. 12-13; PX-1, p. 61, ¶ 180 & PX-1 (Att. 269), p. 1606.

[140] PX-1, p. 61, ¶ 180 & PX-1 (Att. 270), p. 1607; PX-1, p. 61, ¶ 180 & PX-1 (Att. 271), p. 1610; PX-1, p. 61, ¶ 180 & PX-1 (Att. 272), p. 1613; PX-1, p. 61, ¶ 180 & PX-1 (Att. 273), p. 1614-26; PX-1, p. 36, ¶ 109 & PX-1 (Att. 121), p. 736.

campaigns on behalf of Defendants, procured 1-800 numbers for television media buys, and participated in the creation of the Rengalife website.[141]  In addition to her day-to-day role, Ms. Cadiz has served as registered agent for Redwood California.[142]

Ms. Cadiz received regular reports documenting TBX-FREE, Eupepsia Thin, and Prolongz sales, including continuity sales, cancellations, refunds, and chargeback rates.[143] She also was aware of the high volume of complaints about unauthorized charges and supervised staff who were converting single-purchase sales into continuity charges without consumers' knowledge or consent.[144]  Ms. Cadiz also provided documents containing falsified information about Identify, LLC in connection with applications for merchant accounts.[145]

## IV.   LEGAL ARGUMENT

### A.   The Court Possesses Authority to Grant the Requested Relief.

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives the district court authority to grant both a permanent injunction against violations of any provisions of law enforced by the FTC and "any ancillary relief necessary to accomplish complete justice," including an *ex parte* temporary restraining order, a preliminary

---

[141] PX-1, p. 44, ¶ 122 & PX-1 (Att. 135), 767; PX-1, p. 61, ¶ 180 & PX-1 (Att. 274), 1628-29; PX-1, p. 61, ¶ 180 & PX-1 (Att. 275), p. 1643.
[142] PX-1, p. 61, ¶ 180 & PX-1 (Att. 276), p. 1648.
[143] PX-1, p. 61, ¶ 180 & PX-1 (Att. 277), p. 1649 ("Prolongz, TBX-FREE, and EPEP Revenue Reports for 06/08/2017").
[144] PX-1, p. 61, ¶ 180 & PX-1 (Att. 278), p. 1650 ("Vantiv Chargebacks - order examples"); PX-1, p. 61, ¶ 180 & PX-1 (Att. 279), p. 1652 ("Okay so here are the instructions...").
[145] PX-1, p. 75-77, ¶¶ 206-10 & PX-1 (Atts. 326-332), p. 1858-99; PX-1, p. 79, ¶ 216 & PX-1 (Att. 338), p. 1921.

injunction, an asset freeze, and the appointment of a receiver.[146]  In determining whether to grant preliminary relief under Section 13(b), a court must consider two factors:  (1) the FTC's likelihood of ultimate success, and (2) whether the public equities outweigh any private equities.[147]  Unlike private litigants, the FTC does not need to prove irreparable injury,[148] which is presumed in a statutory enforcement action.[149]  When weighing the equities, the public interest receives greater weight than private interests.[150]

### B.    The FTC is Likely to Succeed on the Merits

The evidence shows that the FTC is likely to succeed in showing that Defendants have violated Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45 and 52, Section 4 of ROSCA, 15 U.S.C. § 8403, Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), Section 1005.10(b) of EFTA's implementing Regulation E, 12 C.F.R. § 1005.10, and Section 310.4(b)(1)(v) of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(v).

1.    <u>Defendants are Violating Sections 5 and 12 of the FTC Act</u>

"An act or practice is deceptive under Section 5(a) of the FTC Act,[151] if "first, there is a representation, omission, or practice that, second, is likely to

---

[146] *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111–13 (9th Cir. 1982); *see also FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233-1234 (9th Cir. 1999) (*ex parte* TRO and preliminary injunction including asset freeze); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987) (TRO and preliminary injunction including asset freeze and appointment of a receiver).

[147] *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) (citing *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 714 (9th Cir. 1976)).

[148] *Warner Commc'ns*, 742 F.2d at 1159.

[149] *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).

[150] *Id.* (citing *Warner Commc'ns*, 742 F.2d at 1165).

[151] 15 U.S.C. § 45(a) (2006).

mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[152]  An act or practice is unfair, and violates Section 5(n) of the FTC Act, if it causes, or is likely to cause, substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition.[153]

Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in order to induce the purchase of food, drugs, devices, services, or cosmetics.[154]  A false advertisement is one that is "misleading in a material respect."[155]

---

[152] *FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (quoting and adopting the standard set forth in *Cliffdale Assocs.*, 103 F.T.C. 110, 164–65 (1984)).  Under Section 5, the FTC is not required to prove that a defendant intended to deceive consumers, nor is a defendant's good faith a defense to liability.  *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *FTC v. NCH, Inc.*, No. CV-S-94-138-LDG, 1995 U.S. Dist. LEXIS 21098, at *18 (D. Nev. May 31, 1995); *FTC v. Pioneer Enters., Inc.*, No. CV-S-92-615-LDG, 1992 U.S. Dist. LEXIS 19699, at *2-4 (D. Nev. Nov. 12, 1992).

[153] 15 U.S.C. § 45(n) (2006)

[154] TBX-FREE, Eupepsia Thin, and Prolongz are drugs for purposes of Section 12. *See, e.g.*, *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1266, 1272 (S.D. Fla. 1999).  Courts apply the same three-prong test for deception to determine if a party has disseminated a "false advertisement."  Section 12 violations are violations of Section 5(a).  15 U.S.C. § 52(b); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 7-8 (1st Cir. 2010), *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1188-1189 (N.D. Ga. 2008), *aff'd* 356 F. App'x 358 (11th Cir. 2009); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992).

[155] 15 U.S.C. §§ 52, 55; *Pantron I Corp.*, 33 F.3d at 1099.

In determining whether an advertiser has made the asserted claims, a court must consider the overall net impression of the advertisement.[156]  A representation is material if it "'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'"[157]  Express claims, deliberately-implied claims used to induce the purchase of a product, and claims that "significantly involve health" are presumed material.[158]  That presumption applies here, where Defendants made express health claims for all three products at issue.  A presumption that consumers relied on the material misrepresentations arises once the FTC has proved that the Defendants made material misrepresentations, that they were widely disseminated, and that consumers purchased Defendants' products.[159]

The FTC is likely to succeed in proving that Defendants made material misrepresentations about their film strips, the Rengalife program, and recurring charges, as well as that they processed unauthorized charges that consumers could not reasonably avoid and that the injury resulting from this practice was not outweighed by countervailing benefits to consumers or competition.  The FTC is

---

[156] *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009); *Gill*, 265 F.3d at 956; *Commerce Planet*, *Inc.*, 878 F. Supp. 2d. at 1063; *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1189 ("If the advertisement explicitly states or clearly and conspicuously implies a claim, the court need not look to extrinsic evidence to ascertain whether the advertisement made the claim."); *FTC v. QT*, *Inc.,* 448 F. Supp. 2d 908, 957-58 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008).
[157] *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165).
[158] *Pantron I*, 33 F.3d at 1095-96; *Kraft, Inc.*, 970 F.2d at 322-323 (citations omitted).
[159] *FTC v. Figgie Int'l*, 994 F.2d 595, 605-606 (9th Cir. 1993) (citations omitted).

therefore likely to succeed in showing that Defendants' violated Section 5(a), 5(n), and 12 of the FTC Act.

>    a.   Counts I-VI:  Defendants Make Unsubstantiated Claims About the Efficacy of TBX-FREE, Eupepsia Thin, and Prolongz, and False Claims That Those Products Have Been Proven Effective

The FTC and the federal courts have distinguished between simple "efficacy claims" and related "establishment claims."  An efficacy claim conveys that a product successfully yields the advertised benefit, (*e.g.*, TBX-FREE is an effective smoking cessation product), whereas an establishment claim conveys that the product's effectiveness or superiority has been scientifically established (*e.g.*, "clinically proven").[160]  Advertising claims are deceptive or misleading if:  (1) the advertiser lacked a reasonable basis to assert the claims as true at the time they were made, or (2) the claims are false.[161]

Courts rely on experts in a given field to identify the level of substantiation that would provide a reasonable basis for claims about a product's effectiveness.[162] Courts have entered TROs to enjoin unsubstantiated and false efficacy claims for a wide array of products and services in FTC cases.[163]

---

[160] *Thompson Med. Co. v. FTC*, 791 F.2d 189, 194 (D.C. Cir.1986); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015).

[161] *Pantron I*, 33 F.3d at 1096; *QT, Inc.*, 448 F. Supp. 2d at 958-59.

[162] *See, e.g.*, *POM Wonderful*, 777 F.3d at 495 (expert testimony supported finding that randomized controlled trial was necessary to support disease-related benefits claims); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1202 (expert testimony presented as to evidence needed to substantiate weight-loss and erectile dysfunction claims).

[163] Unreported cases cited in this Memorandum have been provided as PX-31.  *See, e.g.*, *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF (D. Nev. Oct. 9, 2014) (TRO enjoined false or unsubstantiated claims about weight-loss or

i.      Counts I-II:  Unsubstantiated and False TBX-FREE Claims

The FTC's smoking cessation expert, Dr. Judith Prochaska, opines that Defendants do not have substantiation for the challenged TBX-FREE efficacy claims.[164]  Dr. Prochaska says that to substantiate the challenged TBX-FREE efficacy claims, experts in the field of nicotine addiction would require randomized, controlled trial evidence from a study of TBX-FREE.[165]  Dr. Prochaska opines that a study of TBX-FREE should involve nicotine-dependent subjects and compare TBX-FREE to a placebo.[166]  Successful results would show statistically significant improvements on standard outcome measures, such as biochemically confirmed continuous abstinence rates.[167]

---

reduction of body fat); *FTC v. Sili Neutraceuticals, LLC*, No. 1:07-cv-04541 (N.D. Ill. Aug. 13, 2007) (TRO enjoined unsubstantiated weight-loss claims); *FTC v. Harry*, No. 04C-4790, 2004 U.S. Dist. LEXIS 15588, at *8 (N.D. Ill. Aug. 4, 2004) (TRO enjoined health benefits claims unless they were supported by competent and reliable scientific evidence); *FTC v. Phoenix Avatar, LLC*, No. 1:04-cv-02897 (N.D. Ill. Apr. 23, 2004) (TRO enjoined claims about weight-loss, increased metabolism, decreased appetite, or reduced food cravings, and any claim about health benefits or efficacy, unless supported by competent and reliable scientific evidence); *FTC v. QT, Inc.*, No. 03 C 3578 (N.D. Ill. Jun. 6, 2003) (TRO enjoined defendants from misrepresenting that products relieve pain, and required competent and reliable scientific evidence for any health claim); *FTC v. Seasilver USA, Inc.*, No. CV-S-03-0676-RLH(LRL) (D. Nev. Jun. 13, 2003) (TRO enjoined misrepresentations that products are effective treatments for various diseases, and cause rapid, substantial, and permanent weight-loss without dieting); *FTC v. SlimAmerica, Inc.*, No. 97-6072 (S.D. Fla. Feb. 6, 1997) (TRO enjoined false or misleading claims about weight-loss or a reduction in body size).
[164] PX-7, p. 5-6, 19.
[165] PX-7, p. 13.
[166] *Id.*
[167] *Id.*

Dr. Prochaska found no evidence in the scientific literature supporting the challenged TBX-FREE claims.[168]  There are no published results of human clinical trials of TBX-FREE, and thus no studies comparing TBX-FREE to a placebo to determine whether it has any efficacy at all for smoking cessation.[169]  Nor do Defendants have any unpublished studies of TBX-FREE.[170]

Dr. Prochaska reviewed the documents Defendants provided to support the TBX-FREE claims and the scientific literature regarding the purported active ingredient in TBX-FREE – cytisine – and opines that they do not substantiate the claims.[171]  A few cytisine studies that follow the standards of experts in the field have demonstrated modest efficacy for smoking cessation, but the studies were of a completely different product that is marketed outside the United States by a third-party.[172]  Dr. Prochaska opines that these studies cannot be extrapolated to support any of the TBX-FREE efficacy claims, let alone the outrageous claim that TBX-FREE has an 88% success rate, because the dosages, dosage regimens, and modes of administration are just too different.[173]  In fact, Defendants have conceded that the 88% success rate claim is unsupported.[174]

Despite having no reliable science to back-up their claims, Defendants go even further, claiming that clinical studies prove that TBX-FREE is an effective

---

[168] PX-7, p. 13-14.
[169] *Id.*
[170] In response to an interrogatory, Defendants stated "Redwood is informed and believes that it did not perform any unpublished human clinical studies for TBX-FREE or Eupepsia Thin."  PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 203-04.
[171] PX-7, p. 14.
[172] PX-7, p. 14-17.
[173] PX-7, p. 15-18.
[174] PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 174.

smoking cessation product.[175]  These representations are false, as Dr. Prochaska's search of the scientific literature revealed no clinical study of TBX-FREE.[176]

        ii.      Counts III-IV: Unsubstantiated and False Eupepsia Thin Claims

Dr. David Levitsky, the FTC's weight-loss expert, opines that Defendants' appetite suppression and weight-loss claims for Eupepsia Thin are not supported by reliable scientific evidence.[177]  He explains that to substantiate the efficacy claims made for Eupepsia Thin, experts in the weight-loss field would require double-blinded, randomized, placebo-controlled trial evidence from a study of the product itself or from a product using the same ingredients in the same dosages; ideally, the results would be replicated by independent laboratories.[178]  Successful results would show statistically significant improvements on standard outcome measures, including clinical (not self-reported) measurements of weight and body fat.[179]

Dr. Levitsky found no evidence in the scientific literature that meets these standards.  Eupepsia Thin has not been studied in a human clinical trial.[180]  There are therefore no studies comparing it to a placebo or to an active control to determine whether it is an effective weight-loss product.  Dr. Levitsky reviewed the evidence that Defendants submitted to the FTC and determined that it does not support the Eupepsia Thin efficacy claims.[181]  In addition, Dr. Levitsky's own

---

[175] *See supra* notes 11-12, at 3.
[176] PX-7, p. 13-14.
[177] PX-8, p. 8, 13, 18.
[178] PX-8, p. 9-12.
[179] PX-8, p. 11.
[180] PX-8, p. 13; PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 203-04.
[181] PX-8, p. 13-17.

review of the scientific literature regarding the main ingredient of Eupepsia Thin –
Paullinia Cupana H.B.K. 1X – found no studies that can be extrapolated to
Eupepsia Thin.[182]

Dr. Levitsky states that some research suggests that high doses (more than
400 mg) of caffeine – the active agent in Eupepsia Thin – are associated with
appetite suppression, but that there is no evidence either that Eupepsia Thin
(supposedly a diluted homeopathic product) contains that much caffeine or that
caffeine consumption causes weight loss.[183]  In short, Defendants' efficacy claims
are unsubstantiated and their claim that clinical evidence proves the product's
effectiveness is false.

### iii.    Counts V-VI: Unsubstantiated and False Prolongz Claims

Dr. Hossein Sadeghi-Nejad, an expert in urology and sexual medicine,
opines that Defendants have no reliable science to support the Prolongz ejaculation
control and premature ejaculation claims.[184]  Dr. Sadeghi-Nejad says that to
substantiate the Prolongz claims of increased ejaculatory control and treatment or
prevention of premature ejaculation, experts in his field would require well-
designed, randomized, double-blind, properly controlled human clinical testing of
Prolongz or a substantially similar product using the same dosage and route of
administration.[185]  The clinical trial must test the appropriate study population and
be properly powered (*e.g.*, sufficient duration and sample size) to yield accurate
and reliable results.[186]  Dr. Sadeghi-Nejad opines that Defendants' substantiation

---

[182] PX-8, p. 17.
[183] PX-8, p. 12-13.
[184] PX-9, p. 5.
[185] PX-9, p. 7-9.
[186] PX-9, p. 9-11.

does not meet these standards.[187]  The pilot study sponsored by Defendants was not randomized, placebo-controlled, or blinded.[188]  In addition, the study was too short (1-week use of test product) and too small (29 study subjects) to yield accurate and reliable results.[189]  The scientific literature compiled by Defendants on the purported active ingredients in Prolongz was not comparable either to the dosage or to the route of administration of Prolongz.[190]  Similarly, Dr. Sadeghi-Nejad has found no relevant evidence in the scientific literature that meets these standards.[191]

Despite this lack of substantiation for their ejaculation control and premature ejaculation claims, Defendants claim that clinical studies prove that Prolongz increases ejaculatory control and the duration of sex for 97% of users.  This establishment claim is false.

> **b.  Count VII - IX:  Defendants Falsely Claim That Their Film Strips Are Sold With Money Back Guarantees, That Eupepsia Thin Is Made in the USA, and That Testimonials in Eupepsia Thin Advertising Are True**

Defendants' claims that their film strips are sold with money back guarantees is false, as is their claim that Eupepsia Thin is made in the United States.[192]  Consequently, both claims violate Sections 5(a) and 12 of the FTC Act.[193]  Similarly, Defendants' use of fake testimonials in Eupepsia Thin advertising is deceptive and a violation of Sections 5(a) and 12.[194]

---

[187] PX-9, p. 17-18.

[188] PX-9, p. 12-13.

[189] PX-9, p. 12-14.

[190] PX-9, p. 15-16.

[191] PX-9, p. 17.

[192] *See supra*, p. 6.

[193] *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1005-1006, 1012 (N.D. Ind. 2000) (summary judgment granted where defendants falsely represented that

1
2
3

        **c.**      **Counts X and XI:  Defendants Fail to Adequately Disclose the Material Terms of Their Autoship Continuity Program, and Falsely Represent that They Will Not Enroll Consumers in the Program**

4

        Defendants enroll consumers who believe they are making a one-time

5

purchase of TBX-FREE, Eupepsia Thin, or Prolongz in an autoship continuity

6

plan, without disclosing to those consumers that they will be charged for additional

7

shipments.  Consumers cannot consent to information they are not provided at all,

8

or that conveys a false impression.[195]  The evidence shows that thousands of

9

consumers complained to Defendants about charges that they were unaware of, did

10

not authorize, or explicitly rejected.[196]  These practices violate Sections 5(a) and 12

11

of the FTC Act.[197]

12

---

13

their program came with a money-back guarantee without disclosing material

14

conditions before purchase); FTC Enforcement Policy Statement on U.S. Origin

15

Claims, 62 Fed. Reg. 63,756, 63,767 (Dec. 1, 1997) (a "Made in USA claim, "like any other objective advertising claim," violates Section 5 of the FTC Act if it is not truthful and substantiated).

16

[194] *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1227-1228 (D. Nev. 2011),

17

*aff'd in part and vacated in part on other grounds*, 763 F.3d 1094 (9th Cir. 2014)

18

(court granted summary judgment, finding testimonials to be fake where receiver

19

found no evidence supporting testimonials and defendants presented no evidence that testimonials were genuine).

20

[195] *Commerce Planet*, 878 F. Supp. 2d at 1065 (website landing and billing pages

21

were materially misleading because they created the net impression that consumers

22

could obtain a free auction kit, when they actually were subscribing to a continuity program with monthly subscription).

23

[196] PX-1, p. 23, ¶ 75 & PX-1 (Att. 099), p. 648; PX-1, p. 25, ¶ 83 & PX-1 (Att.

24

100), p. 649; PX-1, p. 22, ¶ 68 & PX-1 (Att. 098), p. 648; PX-15, p. 10; PX-22, p. 23.

25

[197] *Grant Connect*, 827 F. Supp. 2d at 1224 (summary judgment granted where

26

defendants failed to adequately disclose recurring monthly membership fee buried

27

in the terms and conditions and in fine print); *see also FTC v. BunZai Media Group, Inc.*, No. 2:15-cv-04527-GW-PLA (C.D. Cal. Jun. 16, 2015) (TRO

28

d.      Count XII: Defendants Unfairly Charge Consumers
        Without Authorization

Defendants routinely charge consumers' debit or credit cards without their express informed consent.  Consumers experience substantial injury from Defendants' autoship practices:  they receive unwanted products that are charged to their accounts, and must spend time and effort to resolve the problem with Defendants, their credit card companies, and their banks.  They cannot reasonably avoid this injury because they only learn about the shipments and charges after the fact.  The consumer injury resulting from Defendants' actions has no countervailing benefits for consumers or competition, much less any that outweighs that injury.  Courts in this Circuit have consistently held these practices to be unfair under the FTC Act.[198]

_____

enjoined defendants' from failing to disclose or disclose clearly and conspicuously all material terms and conditions of a continuity plan); *FTC v. Grant Connect, LLC*, No. 2:09-cv-01349 (D. Nev. Jul. 28, 2009) (TRO enjoined the failure to disclose the terms and conditions of a continuity program).

[198] *Commerce Planet*, 878 F. Supp. 2d at 1078-1079 (it was an unfair practice to charge consumers a monthly charge because consumers, who did not give their consent, were harmed by a practice for which they did not bargain and the monthly charge was not reasonably avoidable); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202-1203 (C.D. Cal. 2000) (defendants engaged in unfair practices by submitting unauthorized charges) (citing *FTC v. Windward Marketing, Ltd.*, No. 1:96-cv-615-FMH, 1997 U.S. Dist. LEXIS 17114, at **29-30 (N.D. Ga. Oct. 1, 1997); *see also BunZai Media Grp.,* No. 2:15-cv-04527-GW-PLA (C.D. Cal. Jun. 16, 2015) (TRO enjoined defendants from charging, causing to be charged, or assisting others in charging any consumer's credit card, or debiting, causing to be debited, or assisting others in debiting any consumer's financial account, without the consumers' express informed consent for each charge or debit).

2.   <u>Defendants are Violating the Restore Online Shoppers'</u>
<u>Confidence Act (ROSCA)</u>

Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold on the Internet through a negative option feature, unless the seller clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains the consumer's express informed consent before making the charge, and provides a simple mechanism to stop recurring charges.[199]  Defendants' continuity plans are a negative option feature, as defined by the TSR.[200]

The FTC's online undercover purchase of TBX-FREE shows that Defendants did not disclose the negative option feature of their autoship continuity program before the FTC purchaser provided his billing information.[201]  Therefore, Defendants enrolled the FTC's purchaser in an autoship continuity program without obtaining his express informed consent to incur additional charges.  The

_____

[199] *See* 15 U.S.C. § 8403 (2006).

[200] It is unlawful "for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations)" without clearly and conspicuously disclosing material terms, obtaining a consumer's informed consent, and providing a simple mechanism to stop recurring charges.  15 U.S.C. § 8403 (2006).  The TSR defines a negative option feature as "an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u) (2006).

[201] PX-1, p. 14, ¶ 42 & PX-1 (Att. 078), p. 576; PX-1, p. 15, ¶ 47 & PX-1 (Att. 083), p. 603.

FTC's experience mirrors that of ordinary consumers.[202]  In addition, in many instances, consumers have had to contact Defendants repeatedly to cancel the autoship program, and in many cases continue to receive shipments anyway, showing that Defendants have failed to provide simple mechanisms to stop additional charges.[203]  These practices violate ROSCA.[204]

          3.      Defendants are Violating the Electronic Fund Transfer Act and Regulation E

      EFTA and Regulation E require that, before a merchant can make recurring electronic fund transfers (*i.e.*, debits) from a consumer's bank account, it must obtain a written authorization signed or similarly authenticated by the consumer.[205] For an authorization to be valid, the terms of the preauthorized transfer must be "clear and readily understandable" and the authorization "should evidence the

---

[202] PX-11, p. 1, ¶ 2; PX-13, p. 6, ¶ 2; PX-17, p. 13, ¶ 2; PX-19, p. 17, ¶¶ 2-3; PX-21, p. 21, ¶ 5; PX-23, p. 24, ¶ 3; PX-25, p. 28, ¶ 3; PX-26, p. 29, ¶ 4; PX-27, p. 30, ¶ 2; PX-29, p. 32, ¶ 5.

[203] PX-23, p. 24-25, ¶¶ 5-6.

[204] *FTC v. Credit Bureau Ctr., LLC*, No. 17 C 194, 2018 U.S. Dist. LEXIS 106337, at *22 (N.D. Ill. Jun. 26, 2018) (court granted summary judgment on ROSCA claim because defendant did not "clearly and conspicuously" disclose that its website involved a negative option transaction and did not obtain consumers' express informed consent); *see also BunZai Media Grp., Inc.*, No. 2:15-cv-04527-GW-PLA (C.D. Cal. Jun. 16, 2015) (TRO enjoined charging any consumer in an Internet-based sale through a negative option without disclosing all material terms of a negative option before obtaining the consumer's billing information, obtaining a consumer's express informed consent to the negative option feature before making any charge, and providing a simple mechanism for a consumer to stop recurring charges); *FTC v. Health Formulas, LLC*, No. 2:14-cv-01649-RFB-GWF (D. Nev. Oct. 9, 2014) (TRO enjoined charging consumers in Internet-based sales through a negative option feature without complying with ROSCA requirements.).

[205] 15 U.S.C. § 1693e(a) (2006); 12 C.F.R. § 205.10(b) (2006).

consumer's identity and assent to the authorization."[206]  Moreover, a copy of the authorization must be provided to the consumer.[207]  A consumer's rights under EFTA cannot be waived.[208]

      The evidence shows that Defendants failed to obtain written authorization for recurring electronic fund transfers and failed to give consumers a copy of any such authorization.[209]  These failures violate EFTA and Regulation E.[210]

           4.   <u>Defendants Are Violating the Telemarketing Sales Rule (TSR)</u>

      Defendants' own documents and consumer complaints show that they sent "ringless voicemails" to more than 1.5 million consumers.[211]  Defendants' use of these prerecorded messages violates the TSR, which prohibits initiating outbound telephone calls with prerecorded messages designed to induce the purchase of goods or services.[212]

---

[206] Federal Reserve Board's Official Staff Commentary to Regulation E, 12 C.F.R. Part 205, Supp I, ¶ 10(b), comments (5) & (6).

[207] 15 U.S.C. § 1693e(a); 12 C.F.R. § 205.10(b).

[208] 15 U.S.C. § 1693*l* (2006).

[209] PX-11, p. 1, ¶ 2; PX-13, p. 6, ¶¶ 2-3; PX-14, p. 8, ¶ 3; PX-16, p. 11, ¶¶ 3-5; PX-17, p. 13, ¶¶ 2-3; PX-20, p. 19, ¶¶ 2-3; PX-23, p. 24, ¶ 3; PX-24, p. 27 (customer sent another order despite cancellation); PX-25, p. 28, ¶¶ 3-4; PX-28, p. 31, ¶¶ 2-3.

[210] *Grant Connect, LLC*, 827 F. Supp. 2d at 1230-1232 (summary judgment where defendants failed to present evidence that preauthorization transfer terms were clear and readily understandable, or that they provided consumers with a copy of the authorization for the recurring charges); *see also BunZai Media Grp., Inc.*, No. 2:15-cv-04527-GW-PLA (C.D. Cal. Jun. 16, 2015) (TRO enjoined defendants' from failing to timely obtain written authorization signed or similarly authenticated by the consumer for any preauthorized electronic fund transfer from a consumer's account before initiating any preauthorized electronic fund transfer, and failing to provide the consumer with a copy of the authorization).

[211] PX-1, p. 35-36, ¶ 107-08 & PX-1 (Atts. 118-119), p. 720, 731.

[212] 16 C.F.R. §310.4(b)(1)(v).  *See also* Telemarketing Sales Rule ("TSR"), 73 Fed. Reg. 51164, 51165 (Aug. 29, 2008) (Commission notes that amendment of TSR

5. <u>Defendants are Making False and Unsubstantiated Earnings Claims for Their Rengalife Program</u>

The FTC's multilevel marketing expert, Dr. Stacie Bosley, reviewed Rengalife's promotional materials, including details of the program's structure and compensation plan.[213]  Dr. Bosley concluded that compensation in Rengalife was "based almost exclusively" on the endless recruitment of downline distributors – all of whom must purchase $200 of Redwood film strips monthly[214] – and not by retail sales of those strips to consumers.[215]  She further concluded that at any point in time, the overwhelming majority of Rengalife members would have spent more money purchasing Redwood film strips than they would have earned in "commissions" from their own downline networks, meaning that they would be in a loss position overall.[216]  Defendants' claim that Rengalife members are likely to earn substantial income therefore is false.  Defendants further lack a basis for earnings claims based on the sale of Redwood film strips, because those products have never been sold absent deceptive and unfair practices, and because they made these claims before Rengalife had any track record.  Thus, Defendants' Rengalife earnings claims violate Section 5(a) of the FTC Act.[217]

---

provision concerning prerecorded message calls applies to prerecorded messages left on an answering machine or voicemail system); *cf.*, *Saunders v. Dyck O'Neal, Inc.*, No. 1:17-CV-335, 2018 U.S. Dist. LEXIS 121076, at *8 (W.D. Mich. Jul. 16, 2018) (direct-to-voicemail messages are a "call" under the Telephone Consumer Protection Act).

[213] PX-10.

[214]  PX-10, p. 12 (Table 1).

[215] PX-10, p. 30, ¶ 34.

[216] PX-10, pp, 5-7, ¶¶ 7-9; PX-10, p. 26-27, ¶ 30; PX-10, p. 28 (Table 2).

[217] *Stefanchik*, 559 F.3d at 928-929 (claims that consumers would make lots of money quickly by brokering mortgages were deceptive where owner had no substantiation for the earnings claim and evidence showed consumers made little to nothing); *FTC v. BurnLounge, Inc.*, No. CV 07-3654-GW (FMOx) (C.D. Cal. Jul.

Although the Rengalife website has been inactive since approximately July 1, 2018,[218] the FTC seeks a TRO covering misleading earnings claims because Defendants could restart it – or a similar program – at any time.

      6.   <u>Defendants are Each Liable for the Law Violations</u>

         a.   Corporate Defendants Operate as a Common Enterprise and are the Alter-Egos of Individual Defendants Jason and Eunjung Cardiff

            i.   Common Enterprise

Jason and Eunjung Cardiff, together with Danielle Cadiz, run their scam through a web of companies that operate as a common enterprise.  To determine the existence of a common enterprise, a court may consider a variety of factors including:  common ownership, management, and control, including common officers or a common administrator; shared common office space and employees; the failure to maintain separation of companies; whether the companies were jointly engaged in a common venture; unified advertising; and the commingling of corporate funds.[219]

---

1, 2011), *aff'd*, 753 F. 3d 878 (9th Cir. 2014)  (misleading claims regarding the actual and potential income of defendants' pyramid scheme).

[218] PX-1, p. 49, ¶ 134.

[219] *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010) (common enterprise where companies pooled resources, staff, and funds; were all owned and managed by individual husband and wife defendants, and all participated in common venture to sell Internet kiosks); *FTC v. Alliance Document Preparation*, *LLC,* 296 F. Supp. 3d 1197, 1203-04 (C.D. Cal. 2017) (companies were a common enterprise because they were under common ownership, management, and control; shared common office space and employees, including a common administrator; were jointly engaged in a common venture, selling the same services; shared the same cloud, hosting, and phone services; and shared substantial funds among one another).

Corporate Defendants are all owned and controlled by Jason and Eunjung Cardiff.  Eunjung Cardiff is the owner of AMI[220] and is the managing member of Run Away,[221] which is a member of AMI.[222]  Jason Cardiff has identified himself as the owner of AMI[223] and is a member of Run Away.[224]  The Cardiffs also jointly control Redwood California, with Jason Cardiff as its CEO and Director, and Eunjung Cardiff its Secretary, Director, and Chief Operating Officer.[225]  They have both also held themselves out as owners of Identify,[226] and control Carols Place Limited Partnership through 50/50 interests in both Carols Place Trust and Extension First, LLC.[227]

Corporate Defendants have shared office space over time.  Redwood Nevada, Redwood California, AMI, and Run Away were all located at 250 W. 1st St., Claremont, CA.[228]  Currently, Redwood California, Redwood Delaware,

---

[220] PX-1, p. 57, ¶ 160-161 & PX-1 (Atts. 181-182), p. 1063-64.

[221] PX-1, p. 58, ¶ 164 & PX-1 (Att. 185), p. 1069.

[222] PX-1, p. 57, ¶ 162 & PX-1 (Att. 183), p. 1065.

[223] PX-1, p. 60, ¶ 173 & PX-1 (Att. 195), p. 1212-15.

[224] PX-1, p. 57, ¶ 162 & PX-1 (Att. 183), p. 1065.

[225] PX-1, p. 49-50, ¶ 136-137 & PX-1 (Att. 158), p. 850, PX-1 (Att. 159), p. 851-52; PX-1, p. 61, ¶ 178 & PX-1 (Att. 242), p. 1492-96; PX-4, p. 2, ¶ 5 & PX-4 (Att. B), p. 10-15.

[226] PX-1, p. 61, ¶ 177 & PX-1 (Att. 212), p. 1292-95, PX-1 (Att. 214), p. 1308-12, PX-1 (Att. 215), p. 1346-52 (pages out of order in original); PX-1, p. 55-57, ¶ 158 & PX-1 (Att. 179), p. 1050-51.

[227] PX-1, p. 60, ¶ 173 & PX-1 (Att. 196), p. 1217.

[228] PX-1, p. 50, ¶ 142 & PX-1 (Att. 164), p. 862; PX-1, p. 49, ¶¶ 135-136 & PX-1 (Atts. 157-158), p. 849-50; PX-1, p. 57, ¶¶ 160-162 & PX-1 (Atts. 181-183), p. 1063-65; PX-1, p. 58, ¶ 164 & PX-1 (Att. 185), p. 1068.

Identify, AMI, and Run Away share a common space at 820 North Mountain Ave., Upland, CA 91786.[229]

Corporate Defendants have engaged in the common venture of advertising and selling TBX-FREE, Eupepsia Thin, and Prolongz.  AMI, Run Away, Redwood California, and Identify have all participated in advertising the products,[230] and have all applied for and obtained merchant accounts to process payments for them.[231]  Defendants assert that their entities are one-and-the-same – they provided the following statement to their Indian film strip supplier who was experiencing banking problems when invoices in the name of one Corporate Defendant were paid from bank accounts in the names of others:

> IT IS HEREBY DECLARED THAT THE FOLOWING COMPANIES ARE OUR GROUP OF COMPANIES (OUR SISTER CONCERN COMPANIES):
>
> I.    **IDENTIFY LLC**
> II.   **REDWOOD SCIENTIFIC TECHNOLOGIES, INC**
> III.  **RUN AWAY PRODUCTS LLC**

---

[229] PX-1, p. 50, ¶ 137 & PX-1 (Att. 159), p. 851; PX-1, p. 51-52, ¶ 147 & PX-1 (Att. 169), p. 988; PX-1, p. 54, ¶ 155 & PX-1 (Att. 176), p. 1025; PX-1, p. 61, ¶ 178 & PX-1 (Att. 236), p. 1430; PX-1, p. 61, ¶ 178 & PX-1 (Att. 237), p. 1443; PX-1, p. 62, ¶ 181 & PX-1 (Att. 280), p. 1653.

[230] PX-1, p. 6-8, ¶¶ 19-22 & PX-1 (Atts. 031-032), p. 423-426; PX-1, p. 50, ¶ 142 & PX-1 (Att. 164), p. 952 ("Runaway Products . . . purchases media for" Redwood); PX-1, p. 62, ¶ 181 & PX-1 (Atts. 281-286), p. 1664-1673; PX-2, p. 4-5, ¶ 12.

[231] PX-1, p. 33-34, ¶ 104 & PX-1 (Att. 115), p. 703-704; PX-2, p. 2-3, ¶ 9; PX-1, p. 61, ¶ 177 & PX-1 (Att. 213), p. 1296-1304; PX-1, p. 61, ¶ 175 & PX-1 (Att. 207), p. 1273-82.  *Grant Connect*, 827 F. Supp. 2d at 1217-1218 (court found a common enterprise where defendants blurred the lines of corporate separateness and coordinated activities to make it appear they were different companies when dealing with payment processors, merchant accounts, and high chargeback rates).

## IV. ADVANCE [sic] MENS INSTITUTE[232]

Corporate records show that all of these entities purchased the oral film strips from Defendants' Indian and Chinese suppliers.[233]  In addition, Redwood California payroll was paid from an Identify bank account as recently as March-April 2018.[234] FTC Forensic Accountant Emil T. George's declaration shows that Redwood California, Identify, and Run Away have all paid suppliers, advertising agencies, and payment processing companies.[235]  Mr. George's declaration also shows that Corporate Defendants have transferred more than $3.9 million among themselves.[236]  The commonality among the Corporate Defendants is further confirmed by Jason Cardiff's use of Identify as an umbrella under which he registered the names of the Corporate Defendants (*i.e.*, "Redwood Scientific Technologies," "Runaway Products," and "Advanced Men's Institute") as Identify's trade names, and under which Defendants maintain bank accounts for the common enterprise.[237]

Because Corporate Defendants operate as a common enterprise, they are all jointly and severally liable for the violations alleged in the Complaint.[238]

---

[232] PX-1, p. 62, ¶ 181 & PX-1 (Atts. 287-288), p. 1674-75.

[233] PX-1, p. 8, ¶ 23-25 & PX-1 (Atts. 033-035), p. 427-29; PX-1, p. 62, ¶ 181 & PX-1 (Atts. 289-294), p. 1676-94.

[234] Redwood California payroll documents – PX-1, p. 62, ¶ 181 & PX-1 (Att. 295), p. 1695-1717 – show payment from account "XXXXX4462," which is an Identify account.  PX-2, p. 1, ¶ 4 & PX-2 (Att. A1), p. 12.

[235] PX-2, p. 4-6, ¶¶ 12-13.

[236] PX-2, p. 3-4, ¶ 10 & PX-2 (Att. C), p. 17.

[237] PX-1, p. 55-57, ¶¶ 158-159 & PX-1 (Atts. 179-180), p. 1031-62; PX-1, p. 62, ¶ 181 & PX-1 (Att. 297), p. 1722-23.

[238] *Alliance Document Preparation*, 296 F. Supp. 3d at 1203-1204 (finding each of the corporate defendants jointly and severally liable for the acts and practices of the common enterprise) (citing *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014)).

ii.     Alter Egos

Moreover, Corporate Defendants are the alter-egos of Jason and Eunjung Cardiff.  "Under the alter ego doctrine, . . . [w]hen the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations controlling the corporation."[239]  To determine whether Corporate Defendants are the alter egos of Jason and Eunjung Cardiff, the Court inquires whether:  (1) there is a "unity of interest and ownership" such that the separate personalities of the corporation and its owners do not really exist, and (2) there will be an "inequitable result" if the company's acts "are treated as those of a corporation alone."[240]

As shown throughout this Memorandum, there is a unity of interest and ownership between Corporate Defendants and Jason and Eunjung Cardiff, who own and control all of the Corporate Defendants.[241]  In addition, Jason and Eunjung Cardiff have held themselves personally liable for Corporate Defendants' debts.[242]  For example, the Cardiffs pledged their personal property as a guaranty

---

[239]*FTC v. Data Med. Capital, Inc.*, No. SACV 99-1266 AHS, 2010 U.S. Dist. LEXIS 3344, at *59-60 (C.D. Cal. Jan. 15, 2010), citing *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (Cal. Ct. App. 2000) and *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1342-43 (Cal. Ct. App. 2009).
[240] *Sonora Diamond*, 83 Cal. App. 4th at 538.
[241] *See supra*, Sec. III; Sec. IV.B.6.a.i.
[242] *Minton v. Cavaney*, 56 Cal. 2d 576, 579 (Cal. 1961) (equitable owners are personally liable when they treat the assets of the corporation as their own and add or withdraw capital from the corporation at will, when they hold themselves out as being personally liable for the corporation's debts, or when they provide inadequate capitalization and actively participate in the conduct of corporate affairs).

for Prolongz television advertising.[243] Eunjung Cardiff personally guaranteed the debt of AMI, Redwood California, and Identify in sworn confessions of judgment.[244]  Jason Cardiff has loaned money to Redwood California.[245]  Jason and Eunjung Cardiff maintain credit card accounts in their names and the names of Corporate Defendants,[246] and have used these accounts to pay for personal expenses.

The Cardiffs have also used their alter egos to hide assets from potential creditors, having transferred 99.9% of their Redwood Delaware common shares – as well as $1 million in jewelry and other valuables[247] – to Carols Place Limited Partnership, which is itself owned by the bridge trust (whose trustees are the Cardiffs) and another limited liability company that they own.[248]  Jason and Eunjung Cardiff have used Corporate Defendants to defraud consumers such that treating Corporate Defendants' acts as those of the entities alone would achieve an inequitable result.

                b.      The Individual Defendants Are Liable for Injunctive and Monetary Relief

To obtain injunctive relief against an individual defendant, the FTC must establish that the person participated directly in the unlawful acts or practices or had authority to control them.[249]  In determining whether an individual defendant had the authority to control the company's unlawful practices, the court looks to

---

[243] PX-1, p. 60, ¶ 174 & PX-1 (Att. 200), p. 1242-57.

[244] PX-1, p. 61, ¶ 177 & PX-1 (Att. 212), p. 1290-95.

[245] PX-1, p. 63, ¶ 183.

[246] PX-2, p. 1, ¶ 4 & PX-2 (Att. B), p. 16.

[247] PX-1, p. 75, ¶ 201 & PX-1 (Atts. 321-322), p. 1821-30.

[248] *See supra*, Sec. III.A.7.

[249] *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).

the individual's exercise of control over the practices in question.[250]  The FTC can show control through evidence that an individual "controlled the day-to-day affairs" of an operation.[251]

An individual will be liable for monetary redress if he also had knowledge of the acts or practices.[252]  The FTC may satisfy the knowledge requirement by showing actual knowledge of the misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth.[253]  It need not show an individual's subjective intent to defraud.[254]  An individual's "degree of participation in business affairs is probative of knowledge."[255]

i.   Jason Cardiff is Liable for Injunctive and Monetary Relief

As discussed above, Jason Cardiff participates in or controls all of the unfair and deceptive practices at issue, including the dissemination of material misrepresentations relating to TBX-FREE, Eupepsia Thin, Prolongz, and

---

[250] *Id.* ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer" (citations omitted)).

[251] *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 467 (11th Cir. 1996).

[252] *Network Servs. Depot*, 617 F.3d at 1138 n.9, 1141.

[253] *Id.* at 1139 (quoting *FTC v. Am. Standard Credit Syst., Inc.*, 874 F. Supp. 1080, 1089) (C.D. Cal. 1994).

[254] *Id.*; *Stefanchik*, 559 F.3d at 931; *Cyberspace.com, LLC*, 453 F.3d at 1202; *FTC v. Pub. Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997); *Amy Travel*, 875 F.2d at 573-574;.

[255] *Affordable Media, LLC*, 179 F.3d at 1235 (citing *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991) and *Amy Travel*, 875 F.2d at 574); *see also Network Servs. Depot*, 617 F.3d at 1138-40 (distribution of deceptive promotional materials was evidence of knowledge); *Pub. Clearing House*, 104 F.3d at 1171 (company president's work as telephone solicitor was probative of her knowledge).

Rengalife, and control over the autoship continuity programs that result in unauthorized charges.

Mr. Cardiff has the requisite knowledge to be held liable for monetary relief. He knows that the film strips are made overseas, and that TBX-FREE and Eupepsia Thin have never been studied, yet recklessly relied on an online contractor to whom Defendants paid $130 to gather substantiation for Defendants' efficacy claims.[256]  He personally made efficacy claims for his products in videos and robocalls, as well as baseless Rengalife earnings claims.[257]  He was informed by merchant banks about FTC laws with which he had to comply,[258] and was specifically warned that Defendants' claims for Eupepsia Thin likely violated the FTC's "gut check" claims guidelines for weight loss marketing.[259]  He was aware of the "crazy high" chargeback rates, which indicated that his customers were the victims of unauthorized charges.[260]  Most egregiously, without any effort at veiling the theft, he directed his employees to push through unauthorized charges for past customers.[261]

---

[256] PX-1, p. 9, ¶ 27 & PX-1 (Att. 037), p. 435-36; PX-1, p. 1, ¶ 2 & PX-1 (Att. 001), p. 181, 203-04.  *See FTC v. Wellness Support Network, Inc.*, 2014 U.S. Dist. LEXIS 21449, at *62-63 (N.D. Cal. Apr. 4, 2011) (defendant was individually liable because he was recklessly indifferent to the truth or falsity of representations in advertising, as shown by evidence that he founded and ran the company, formulated the product, was not trained as a scientist or doctor, obtained claim substantiation only from Internet research, and was responsible for advertising).
[257] *See, supra* notes 111, 116, and 117, and accompanying text.
[258] PX-1, p. 61 ¶ 176 & PX-1 (Att. 207), p. 1282 (signing acknowledgement with merchant bank that compliance with FTC Act, TSR, ROSCA, and EFTA was a condition of merchant agreement).
[259] PX-1, p. 60, ¶ 174 & PX-1 (Att. 197), p. 1220-21.
[260] PX-1, p. 61, ¶ 176 & PX-1 (Att. 208), p. 1283.
[261] *See supra* note 119 and accompanying text.

ii.   Eunjung Cardiff is Liable for Injunctive and Monetary Relief

Eunjung Cardiff also participates in and controls the unfair and deceptive practices, and has the requisite knowledge to be held liable for monetary relief.[262] She controlled the dissemination of TBX-FREE, Eupepsia Thin, and Prolongz television advertising across the United States[263] and participated in robocalls sent to 1.5 million consumers.[264]  She was aware of the product claims, approving print ads, providing a voiceover for Eupepsia Thin advertising, and reciting TBX-FREE claims herself in a robocall.[265]  Although the products had not been tested, she disseminated product claims knowing that the standards and practices departments of television stations had questions about claim substantiation.[266]  She paid for advertising, including Facebook ads and robocalls.[267]  She monitored ad campaign sales results, receiving daily reports.[268]

---

[262] *Wellness Support Network,* 2014 U.S. Dist. LEXIS 21449, at *63-65 (N.D. Cal. Apr. 4, 2011) (daughter of company founder was individually liable despite uncontested evidence that she did not formulate the products and was not responsible for claim substantiation; her reliance on her father's judgment as to the scientific validity of claims reflected reckless indifference to the truth or falsity of advertising representations when she was a co-owner, played a significant role in running the company, and was extensively involved in product advertising).

[263] PX-1, p. 61 , ¶ 178 & PX-1 (Atts. 216-230), p. 1362-1419.

[264] PX-1, p. 37, ¶ 111 & PX-1 (Atts. 125, 126), p. 747-752.

[265] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 248-256), p. 1514-48; PX-1, p. 61, ¶ 178 & PX-1 (Att. 243), p. 1497; PX-1, p. 37, ¶ 111 & PX-1 (Atts. 125-126), p. 747-752.

[266] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 238-242), p. 1462-96.

[267] PX-1, p. 61, ¶ 178 & PX-1 (Atts. 236-237), p. 1430-61; PX-1, p. 36, ¶ 110 & PX-1 (Att. 122), p. 738-739.

[268] PX-1, p. 61, ¶ 180 & PX-1 (Att. 277), p. 1649.

iii.    Danielle Cadiz is Liable for Injunctive and
Monetary Relief

Danielle Cadiz participates in every aspect of the alleged unfair and deceptive practices.  She placed orders for film strips with the foreign manufacturers,[269] signed the Gawk contract for illegal robocalls,[270] works with Defendants' employees to process unauthorized charges for consumers,[271] and generally manages the day-to-day operations of the common enterprise.[272]  As the conduit between the Cardiffs and Defendants' staff, she communicates the Cardiffs' directives and aids employees in carrying them out, and is kept informed of progress – including when employees were converting straight sales to continuity programs in accordance with Jason Cardiff's wishes.[273]  Ms. Cadiz has also provided documents with falsified information about Identify, LLC to merchant banks.[274]  Ms. Cadiz has the requisite knowledge to be held liable for monetary relief.

**C.    The FTC's Interest in Protecting the Public Interest Outweighs Defendants' Interest in Continuing the Deceptive Practices**

Defendants have operated their deceptive scheme since at least 2013, and have received millions of dollars in ill-gotten gains from thousands of consumers. Absent injunctive relief, there is a strong likelihood that future violations will occur.  The public's interest in immediately halting this conduct and preventing the

---

[269] PX-1, p. 8-9, ¶ 36-37 & PX-1 (Att. 36-37), p. 430-436.
[270] PX-1, p. 35, ¶ 107 & PX-1 (Att. 118), p. 714-729.
[271] PX-1, p. 11, ¶ 30 & PX-1 (Att. 55-58, 278), p. 470-475, 1650.
[272] *See supra*, Sec. III.B.3.
[273] PX-1, p. 11-12, ¶ 31 & PX-1 (Att. 053), p. 466.
[274] *See supra* note 145 and accompanying text.

victimization of additional consumers far outweighs any interest Defendants may have in continuing to operate their businesses.[275]

### D.   The Scope of the Proposed *Ex Parte* TRO Is Necessary and Appropriate

The proposed *ex parte* TRO includes conduct relief, asset preservation, a temporary receiver over both the Corporate Defendants and the assets of Jason and Eunjung Cardiff, immediate access to the business locations, and expedited discovery.  As discussed above, the Ninth Circuit and other federal circuits have granted this relief in similar cases.[276]

Defendants' actions clearly demonstrate the need for this relief.  Not only did they launch Rengalife, send illegal robocalls, and unilaterally convert consumers who had made one-time product purchases into unauthorized continuity plans while already before the Court in the Commission's CID enforcement action, Defendants have also shown no compunction about submitting false information to merchant banks, including having shills open new accounts that Defendants would then use,[277] and misrepresenting their financial condition to potential lenders.[278] They have also gone to great lengths to frustrate potential creditors by transferring

---

[275] *See World Wide Factors*, 882 F.2d at 347 (affirming the district court's finding that "'there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment'").

[276] *See supra*, note 163.

[277] PX-1, p. 34-35, ¶ 105 & PX-1 (Att. 116), p. 705-06; PX-1, p. 35, ¶ 106 & PX-1 (Att. 117), p. 707-13.

[278] PX-1, p. 51, ¶ 145 & PX-1 (Att. 167), p. 966-71; PX-1, p. 76-78, ¶ 207 & PX-1 (Att. 327-335), p. 1860-1918.

their assets to offshore shelters.[279]  Indeed, faced with such a contingency, the Cardiffs have created a web of entities (including Carols Place Trust and Carols Place Limited Partnership) to hold and protect their assets, including automatically sending those assets to the Cook Islands (a known asset haven) if faced with a "duress" event.[280]  Absent this relief, there is every reason to believe that no funds will be available for consumer redress at the conclusion of this case, and that any financial documents not already produced to the Commission will be destroyed.

### 1.    Injunctive Relief is Necessary to Halt the Deceptive Practices.

To prevent ongoing consumer injury, the proposed TRO prohibits the practices challenged in the FTC's Complaint, including the dissemination of misrepresentations about Defendants' products and multilevel marketing plans, the making of robocalls, and the placement of consumers into unauthorized autoship continuity plans.  These measures are within the Court's authority under Section 13(b) of the FTC Act to grant ancillary relief.[281]

### 2.    Asset Preservation Is Necessary to Preserve the Possibility of Final Relief

The FTC requests an asset freeze covering all Defendants.  Restitution is an appropriate final remedy in this case and the asset freeze is necessary to ensure that assets are available to make restitution to injured consumers.[282]  Without a freeze Defendants are likely to continue spending consumers' money to further their

---

[279] PX-1, p. 74, ¶ 200 & PX-1 (Att. 320), p. 1818-20 ("we need to fast track this now [.] They want to have me in court feb 2nd which I am pushing out a week.")
[280] PX-1, p. 66, ¶ 195 & PX-1 (Att. 190), p. 1111, 1116, 1133.
[281] *H.N. Singer, Inc.*, 668 F.2d at 1113 (Section 13(b) of the FTC Act gives the court authority to grant injunctive as well as all necessary ancillary relief traditionally available to it).
[282] *World Travel Vacation Brokers,* 861 F.2d at 1031.

fraudulent business and maintain the Cardiffs' luxurious lifestyle,[283] or hide valuable property obtained using funds from their business.[284]  Indeed, the sole purpose of an asset protection trust such as Carols Place Trust is to provide a mechanism to whisk assets out of the country into a safe jurisdiction at a moment's notice.

Defendants, including Danielle Cadiz, have no right to dissipate or conceal funds that the Court may later determine were wrongfully gained.  Freezing individual assets is warranted where the individual defendant controls the business that perpetrated the unfair and deceptive acts alleged.[285]  As the Ninth Circuit noted in upholding an asset freeze, an individual who has "impermissibly awarded himself" funds that are not rightfully his, "is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment."[286]

Indeed, the Cardiffs, who move money back and forth between their various corporations and charities,[287] have already attempted to shield corporate and personal assets in foreign accounts, an asset management limited partnership, and a Cook Islands trust.[288]  An asset freeze is needed to preserve the status quo and ensure that funds do not disappear during the course of this action.

---

[283] PX-2 p. 9-10, ¶¶ 24-33.

[284] *See Affordable Media*, *LLC*, 179 F.3d at 1236-37; *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 720-721 (5th Cir. 1982); *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005) ("full asset freeze would be necessary to preserve such funds for potential disgorgement").

[285] *World Travel Vacation Brokers, Inc.*, 861 F.2d at 1031.

[286] *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009); *see also H.N. Singer,* 668 F.2d at 1113.

[287] PX-2, p. 3-4, ¶¶ 10-11, p. 8-9 ¶¶ 22-23 & PX-2 (Att. 1A), p. 12, lines 15, 17, PX-2 (Att. C), p. 17; PX-2, p. 10-11, ¶ 34.

[288] PX-1, p. 65-66 , ¶ 192 & PX-1 (Att. 306), p. 1739; PX-1, p. 75, ¶¶ 201-02 & PX-1 (Atts. 321-323), p. 1821-31; PX-1, p. 73-74, ¶¶ 198-200 & PX-1 (Atts. 318,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3.   <u>A Receiver Is Necessary to Halt the Injury and Locate and Preserve Assets and Records</u>

The FTC seeks appointment of a temporary receiver over the seven Corporate Defendants and over the assets of Jason Cardiff and Eunjung Cardiff, including all assets held in trusts they have created.  This Court has inherent power to appoint a receiver.[289]  Indeed, a receiver is necessary when a defendant has defrauded the public, and – in the absence of the appointment of a receiver – assets are likely to be dissipated to the detriment of injured consumers.[290]  A neutral receiver would prevent further harm to consumers and would locate and secure assets and records without disrupting any legitimate business activity.  A receiver would also help assess the extent of the fraud, trace its proceeds, prepare an accounting, and make an independent report of Defendants' activities to the Court.

The receivership must include all of Jason and Eunjung Cardiff's assets.  The Cardiffs have put their home into a series of trusts that might not be accessible to a receiver who is restricted to corporate entities; they have also created purported charities and other entities that pay their bills and allow them to live in luxury while claiming no income.[291]  Moreover, the Commission has incomplete knowledge about the full range of their assets:  for example, internal emails referring to banks in South Korea, as well as in Arizona, suggest that the Cardiffs

---

319), p. 1816-17; PX-1, p. 67, ¶¶ 195-96 (attorneys who created the bridge trust say in promotional materials, "If a legal crisis occurs, the Trust and accompanying assets 'cross the bridge' to the world's oldest and most tested offshore jurisdiction – **The Cook Islands**." (Emphasis in original).

[289] *See FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432, 1434 (11th Cir. 1984).

[290] *See SEC v. First Fin. Grp. of Texas,* 645 F.2d 429, 438 (5th Cir. 1981); *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963) (it was "hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of [the corporate defendant]").

[291] PX-2, p. 10-11, ¶ 30-34; PX-1, p. 81, ¶ 223 & PX-1 (Att. 350), p. 2102-03.

have accounts of which the Commission is unaware and thus cannot serve with a TRO.[292]  The receiver can marshal the necessary facts needed to discover those assets (including repatriating those overseas), prepare a full accounting and fully implement the asset freeze.  The Cardiffs' attempts to construct legal obstacles to protect their wealth should not be permitted to defeat the public interest in preserving funds for ultimate relief.  Moreover, insofar as Jason Cardiff recently stated under oath, among other things, that neither he nor his wife is employed, and he has had no income since 2010 or 2011; that he has no checking or savings or other bank accounts in the United States, and owns no jewelry other than a wedding ring and a heartbeat watch; that his living expenses are taken care of by an overseas accounting firm but he could not remember the name of the trust that pays those expenses; and that he does not know "a Carols Place Limited Partnership,"[293] a receivership over the Cardiffs' assets is needed to sort out the true state of their financial affairs.[294]

---

[292] PX-1, p. 65, ¶ 192 & PX-1 (Att. 306), p. 1739-49; PX-1, p. 74, ¶ 200 & PX-1 (Att. 320), p. 1818-19.

[293] PX-1, p. 81, ¶ 223 & PX-1 (Att. 350), p. 2082-84, 2102-03, 2116-17, 2153.

[294] *SEC v. Faulkner*, No. 3:16-CV-1735-D, 2018 U.S. Dist. LEXIS 23938, *3-5, *43-46 (N.D. Tex., Feb. 13, 2018) (holding in contempt an individual Receivership Defendant and others); *SEC v. Art Intellect*, No. 2:11-CV-357-TC, 2011 U.S. Dist. LEXIS 131869, *3-4, *33 (D. Utah, Nov. 15, 2011) (holding in contempt of the asset freeze order a husband and wife who were among the receivership defendants); *SEC v. Ashbury Capital Partners*, 00 CIV 7898 (RCC), 2004 U.S. Dist. LEXIS 17697, *3-4 (S.D.N.Y., Sept. 2, 2004) (after appointing a receiver over an individual and two of his corporate entities, the court held that a condominium down payment made by individual defendant was receivership property).

### 4.   Immediate Access and Limited Expedited Discovery Are Appropriate

The proposed TRO directs Defendants to provide both the temporary receiver and the FTC with immediate access to Corporate Defendants' business premises to allow the receiver and the FTC to quickly and efficiently locate assets Defendants have wrongfully taken from consumers, identify possible additional defendants, and locate and secure documents pertaining to Defendants' business. The business premises to which the receiver and the FTC would have immediate access include offices located at 820 North Mountain Ave., Suite 100, Upland, CA 91786; 870 North Mountain Ave., Suites 115 and 118, Upland, CA 91786, and additional business locations if they are discovered during the immediate access. In addition, the FTC seeks permission to conduct limited expedited discovery on financial matters to locate and identify documents and assets.  District courts may depart from normal discovery procedures to meet discovery needs in particular cases,[295] especially as preliminary relief in a case involving the public interest.[296]

### E.   The TRO Should Be Issued Without Notice to Defendants, to Preserve the Court's Ability to Fashion Meaningful Relief

Federal Rule of Civil Procedure 65(b) permits this Court to grant a TRO without notice if notice will result in "irreparable injury, loss, or damage" and the applicant certifies the reason why.  *See also* L.R. 7-19.2.  The FTC's experience shows that defendants engaged in fraudulent schemes often withdraw funds from bank accounts and move or shred documents upon learning of impending legal

---

[295] *See* Fed. R. Civ. P. 26(d), 30(a)(2), 33(a), and 34(b).

[296] Since the public interest is involved, equitable powers are broader and more flexible than when only private interests are involved.  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

action.[297]  District courts, including courts in this district, therefore have regularly granted the FTC relief without notice to Defendants in similar cases.[298]

The Commission requests issuance of a non-noticed *ex parte* TRO despite previous dealings with Redwood California's counsel in connection with the Commission's CID and resulting enforcement action.  Although Defendants know that the FTC is investigating the marketing and sale of TBX-FREE and Eupepsia Thin, they do not know that the Commission has authorized this filing.

The Cardiffs' actions – including moving large sums from corporate accounts to their personal accounts,[299] transferring more than $1 million in jewelry and their shares in Redwood Delaware to Carols Place Limited Partnership,[300] establishing a trust with a duress clause that will send assets to the Cook Islands upon notice of an adverse event and also transferring the deed to their house to that trust – provide ample evidence that they would likely conceal or dissipate assets if given notice of the Commission's complaint and requested freeze.  Indeed, in response to the question, "can my assets get stuck in the U.S. or frozen before I can

---

[297] *See* Certification and Declaration of Counsel of Elizabeth Jones Sanger, p. 7-13, ¶¶ 19-20 (citing numerous instances where FTC defendants have dissipated assets or destroyed evidence when given notice of the FTC action).

[298] *See, e.g., Affordable Media, LLC*, 179 F.3d at 1232 & n. 2; *FTC v. Am. Mortg. Consulting Grp., LLC*, No. SACV12-01561 DOC (JPRx), 2012 WL 4718927 (C.D. Cal. Oct. 1, 2012); *see also FTC v. BAM Fin., LLC*, SACV15-01672 (C.D. Cal. Oct. 21, 2015); *FTC v. Wealth Educators, LLC*, SACV15-2357 (C.D. Cal. Apr. 6, 2015); *FTC v. Forensic Case Mgmt. Servs., Inc.*, No. 2:11-cv-07484-RGK-SS (C.D. Cal. Sept. 13, 2011); FTC *v. Health Care One, LLC*, No. SACV 10-1161 JVS (RNBx) (C.D. Cal. Aug. 3, 2010); *FTC v. Lucas Law Ctr., Inc.*, No. SACV 09-0770 DCO (ANx) (C.D. Cal. July 9, 2009); *FTC v. EDebitpay, LLC*, 07-cv-4880-QDW (AJWx) (C.D. Cal. July 30, 2007).

[299] PX-2, p. 6, ¶14.

[300] PX-1, p. 75, ¶ 202 & PX-1 (Att. 321-322), p. 1821-1830.

1   move them?" the attorneys who created Carols Place Trust state in promotional

2   materials that "the inherent delays in the U.S. legal system provide more than

3   enough time" to trigger the bridge trust before the client's assets are frozen.[301]

4   This reassurance, together with Mr. Cardiff's statements under oath in July 2018

5   that he plans to emigrate in the next few months,[302] further demonstrate the need

6   not only for all of the immediate relief sought by the Commission, but also for the

7   TRO to be issued without prior notice to Defendants.

8   **V.   CONCLUSION**

9          The FTC has shown that it is likely to succeed on the merits of its Complaint

10  and that an *ex parte* TRO to protect the public interest outweighs Defendants'

11  interests in perpetuating their deceptive schemes.  The FTC respectfully requests

12  the proposed *ex parte* TRO be issued without notice to Defendants.

13

14                              Respectfully submitted,

15

16  Dated: October 3, 2018

17                              ELIZABETH SANGER
                                esanger@ftc.gov (202) 326-2757;
18                              JAMES A. PRUNTY
                                jprunty@ftc.gov; (202) 326-2438
19                              EDWIN RODRIGUEZ
20                              erodriguez@ftc.gov; (202) 326-3147
                                SHIRA D. MODELL
21                              smodell@ftc.gov; (202) 326-3116
22                              Federal Trade Commission
                                600 Pennsylvania Ave., NW
23                              Washington, DC 20580

24

25  _____

26  [301] PX-1, p. 75, ¶ 197 & PX-1 (Att. 311), p. 1788.

27  [302] PX-1, p. 81, ¶ 223 & PX-1 (Att. 350), p. 2114.

28

                                    54

Fax: (202) 326-3259

STACY PROCTER (Local Counsel)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION