ELIZABETH JONES SANGER (*pro hac vice*)
esanger@ftc.gov; (202) 326-2757
SHIRA D. MODELL (*pro hac vice*)
smodell@ftc.gov; (202) 326-3116
JAMES A. PRUNTY (*pro hac vice*)
jprunty@ftc.gov; (202) 326-2438
EDWIN RODRIGUEZ (*pro hac vice*)
erodriguez@ftc.gov; (202) 326-3147
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Fax: (202) 326-3259

STACY PROCTER (Local Counsel) (CA 221078)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380
ATTORNEYS FOR PLAINTIFF

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **Federal Trade Commission**, <br><br> Plaintiff, <br><br> v. <br><br> **Jason Cardiff, et al.**, <br><br> Defendants. | No. ED 5:18-cv-02104-SJO-PLA <br><br> MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANTS EUNJUNG AND JASON CARDIFF AND THIRD PARTY JACQUES POUJADE SHOULD NOT BE HELD IN CONTEMPT OF THE COURT'S PRELMINARY ORDERS AND SANCTIONED UNTIL THEY COMPLY FULLY WITH THOSE ORDERS <br><br> **Hearing Date:  July 15, 2019** <br> Time:          10:00 a.m. <br> Place:         Courtroom 10C <br>                  [Hon. S. James Otero] |

# TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................... 1

II.  THE CARDIFFS' CANNABIS FILM STRIP OPERATIONS ARE A DE FACTO CONTINUATION OF THE REDWOOD SCIENTIFIC COMMON ENTERPRISE ........................................................................................... 3

   A.  Cloverstrips ..................................................................................... 3

   B.  Pharmastrip and dissolveresponsibly.com ..................................... 6

   C.  Other Cannabis Operations ............................................................ 9

III.  THE CARDIFFS HAVE VIOLATED MULTIPLE PROVISIONS OF THIS COURT'S ORDERS ........................................................................ 11

   A.  The Cardiffs Hid Assets in Canada and the United States from the Commission and the Receiver ....................................................... 11

     1. Cannabis Business Bank Account Funds ..................................... 11

     2. Cannabis Business Fixed Assets .................................................. 13

   B.  The Cardiffs Dissipated Assets that Should Have Been Turned Over to the Receiver ....................................................................... 13

   C.  The Cardiffs Did Not Report Their Cannabis Film Strip Businesses to the Commission Or the Receiver ............................................... 15

IV.  JACQUES POUJADE HAS VIOLATED THIS COURT'S ORDER BY ACTING IN CONCERT WITH THE CARDIFFS TO CIRCUMVENT THE ASSET FREEZE ....................................................................................... 16

   A.  Jacques Poujade Had Knowledge of the Asset Freeze ................. 16

   B.  Jacques Poujade Assisted and Continues to Assist the Cardiffs in Dissipating Assets and Concealing Their Business Activities ............................. 16

   C.  Jacques Poujade Continues to Assist the Cardiffs in Evading the Asset Freeze and Concealing Their Current Business Activities ............... 19

V.  LEGAL ARGUMENT ............................................................................ 19

   A.  Legal Standard .............................................................................. 19

B.   The Assets at Issue Belong in the Receivership..............................................20

C.   The Cardiffs Are in Contempt of the Court's Orders....................................21

D.   Jacques Poujade Is in Contempt of the Court's Orders................................22

E.   The Cardiffs' and Jacques Poujade's Contempt Warrants Civil Incarceration as to the Cardiffs and a Fine as to Jacques Poujade Until They Transfer and Return Assets and Produce a Detailed Accounting...........................................23

1. Coercive Incarceration for the Cardiffs.........................................................23

2. Monetary Sanction for Jacques Poujade........................................................24

3. Purge Conditions:  Detailed Accounting, Repatriation and Turn Over, and Replenishing of the Receivership Estate.........................................................24

VI.    CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Baxter v. Palmigiano*, 425 U.S. 308 (1976)................................................................13

*Bunnett & Co. v. Dores*, No. A-15-CV-1104-LY-AWA, 2018 U.S. Dist. LEXIS 36478 (W.D. Tex. Mar. 6, 2018)................................................................20

*CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV 03-8339 AHM, 2004 U.S. Dist. LEXIS 27511 (C.D. Cal. Jul. 29, 2004)................................................................20

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)................................19

*FTC v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096 (C.D. Cal. 2001)................19

*FTC v. Redwood Sci. Tech., Inc.*, No. 2:17-cv-07821-SJO-PLA (C.D. Cal. Mar. 20, 2018) (Otero, J.)................................................................2

*Gifford v. Heckler*, 741 F.2d 263 (9th Cir. 1984)................................................19

*Jones v. All Am. Auto Prot., Inc.*, No. 2:15-cv-01656-SJO-AGR, 2016 U.S. Dist. LEXIS 69409 (C.D. Cal. May 24, 2016) (Otero, J)................................23

*Keating v. Office of Thrift Supervision*, 45 F.3d 322 (9th Cir. 1995)................13

*SEC v. Bankers Alliance Corp.*, No. 95-cv-0428 (PLF), 1995 U.S. Dist. LEXIS 14730 (D. D.C. May 5, 1995)................................................................ 16, 23, 24

*SEC v. Fujinaga*, No. 2:13-CV-1658 JCM, 2016 U.S. Dist. LEXIS 159428 (D. Nev. Nov. 15, 2016)................................................................24

*Shillitani v. United States*, 384 U.S. 364 (1966)................................................19

*Stone v. City & Cnty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992)................20

*U.S. v. United Mine Workers of Am.*, 330 U.S. 258 (1947)................................23

# I.    INTRODUCTION

On October 10, 2018, this Court entered a Temporary Restraining Order ("TRO") against Eunjung and Jason Cardiff ("the Cardiffs") and the web of alter ego corporations they used to deceptively market dissolvable oral thin film strips. (Dkt. 29).  The TRO froze and placed the assets of both the Cardiffs and their companies under receivership.  The TRO also ordered the Cardiffs to submit sworn financial disclosure forms to the FTC, cooperate with expedited discovery, identify any new business activity to the Temporary Receiver, and repatriate and turn over assets held outside the United States.[1]  The Cardiffs were served with the TRO on October 12, 2018.  Dkts. 38, 39.

In violation of the TRO and PI, the Cardiffs have secreted their assets while maintaining control and use of them.  In the first four business days after he was served with the TRO, Jason Cardiff made 39 calls to the Canadian bank where Clover Cannastrip Thin Film Technologies, Inc. ("Clover Cannastrip") had an account – an account that he controlled; those same days, more than $1.5 million (Canadian dollars, "CAD") was drained from the account in two large transactions. By November 7, 2018 – when the Cardiffs personally appeared before this Court – $3 million CAD had been wired to a company purportedly controlled by the brother of Jacques Poujade, the Cardiffs' longtime friend, and coincidentally bearing the same brand name the Cardiffs had been using since at least June 2018. The next day, a newly-opened bank account in the name of a company registered by Jacques Poujade received an infusion of $100,000 USD from the brother's company, and the money started flowing to the Cardiffs.  All told, $490,000 USD

---

[1] The Court subsequently extended the TRO (Dkt. 48), and later issued a Preliminary Injunction ("PI") (Dkt. 59) containing substantially similar provisions. The PI was issued on November 8, 2018, and the Cardiffs and their then-counsel were served that same day.  Sands Decl., p. 8-9, ¶ 46 & Att. 82, p. 929.

moved between those two companies from November 8, 2018 to May 22, 2019, with at least $206,000 USD paying for the Cardiffs' lavish personal expenses, and the remainder paying for the expenses of cannabis film strip business activities.

As discussed below, the Cardiffs (1) failed to repatriate and turn over $4 million CAD that they controlled via one of their businesses, Clover Cannastrip; (2) dissipated assets subject to the asset freeze by spending freely on luxurious personal expenses and their ongoing cannabis film strip venture; and (3) failed to disclose their domestic and foreign cannabis film strip operations by submitting incomplete financial disclosure forms and refusing to comply with requests for documents.

Jacques Poujade has violated this Court's Orders by assisting or acting in concert with the Cardiffs to circumvent the asset freeze and receivership. Specifically, Jacques Poujade funnels money that the Cardiffs control to them under the guise of a loan and hides Jason Cardiff's ongoing involvement in several cannabis film strip businesses.

A coercive fine for the Cardiffs makes no sense as it could only come from frozen funds that should be preserved for consumer redress. Further, the Cardiffs are recidivists[2] for whom monetary fines will be ineffective. Accordingly, the Court should order the Cardiffs to show cause why they should not be incarcerated until they purge their contempt by: repatriating all foreign assets and turning over those assets to the Receiver; replenishing the Receivership estate for money

---

[2] The Cardiffs disregarded this Court's Orders to comply with the FTC's Civil Investigative Demand; Jason Cardiff ordered his employees to destroy documents before making a production to the FTC; and the Cardiffs immediately violated the TRO in the present litigation. *See FTC v. Redwood Sci. Tech., Inc.*, No. 2:17-cv-07821-SJO-PLA, Dkt. 22 (C.D. Cal. Mar. 20, 2018) (Otero, J.); Sands Decl., p. 2, ¶ 6 & Att. 5, p. 68-74; Receiver's Joinder, Temporary Receiver's Affidavit of Noncompliance, Oct. 23, 2018.

1  dissipated in violation of the asset freeze; and providing the FTC and Receiver

2  with a full and accurate accounting of all Cardiff businesses and assets.

3      The Court should order Jacques Poujade to show cause why he should not be

4  held in contempt and sanctioned until he replenishes the Receivership estate for the

5  full amount of funds he assisted the Cardiffs in dissipating; provides a full and

6  accurate accounting of the disposition of all Cardiff assets; and fully complies with

7  the Commission's subpoena for documents.

## II. THE CARDIFFS' CANNABIS FILM STRIP OPERATIONS ARE A DE FACTO CONTINUATION OF THE REDWOOD SCIENTIFIC COMMON ENTERPRISE

### A. Cloverstrips

The Cardiffs, began developing their cannabidiol ("CBD") film strip business under the brand name "Cloverstrip" in early 2018.[3]  Relying initially on their existing alter ego common enterprise corporations,[4] the Cardiffs used a web of old and new entities – with shared officers and directors, addresses, and incorporation numbers – to launch the CBD strips.  Sands Decl., p. 26-27, ¶ 83 & Table 8.

Defendant Redwood Scientific designed packaging for Cloverstrips by at least June 6, 2018.  Schools Decl., p. 2-3, ¶ 6 & Att. 29, p. 159.  Defendant Advanced Men's Institute registered Cloverstrips with the FDA on June 22, 2018.  Sands Decl., p. 2, ¶ 9 & Att. 10, p. 127; p. 3, ¶ 10 & Att. 24, p. 192; p. 3, ¶ 10 &

---

[3] "Cloverstrips" were the unifying theme of various Cardiff alter egos in the U.S. and Canada, which used the names Clover Cannastrip Thin Film Technologies Corp., Clover Cannabis Thin Film Technologies Corp., Cloverstrip Thin Film Technologies, Cannabis Oral Thin Film Technology, Roadrunner Scientific, Intel Property, and Pharmastrip, among others.  *See* Sands Decl., p. 27, Table 8.

[4] The Court previously found that the FTC was likely to succeed in showing that the named corporate defendants acted as a common enterprise and are the alter egos of Jason and Eunjung Cardiff.  Dkt. 59, p. 6, ¶ D (lines 12-17).

Att. 23, p. 191.  By early July 2018, Defendants Redwood Scientific and Advanced Men's Institute were importing Cloverstrips from one of the companies that manufactured the smoking cessation, weight loss, and male sexual enhancement strips that are the subject of the Complaint.  Sands Decl., p. x, ¶ y & Att. 8-9, p. 122-26.  The Commission found stacks of shipping boxes containing more than 15,000 Cloverstrip packages at the business premises on October 12, 2018. Schools Decl., p. 3, ¶ 7 & Att. 35, p. 186-90.

Eunjung Cardiff signed merchant account applications on behalf of Defendant Identify, doing business as "Clover Strip" (Sands Decl., p. 2, ¶ 9 & Att. 11-12, p. 128-45), and Jason Cardiff signed a merchant account application on behalf of Intel Property LLC[5] to sell "CBD oral thin film strips," listing its website as cloverstrip.com (Schools Decl., p. 2-3, ¶ 6 & Att. 31, p. 170).  In August 2018, Jason Cardiff instructed wholesale purchasers of Cloverstrips to make payment to Intel Property, LLC.  Schools Decl., p. 2, ¶ 5 & Att. 16, p. 98.

Jason Cardiff incorporated Clover Cannastrip in British Columbia on July 31, 2018.  Sands Decl., p. 7, ¶¶ 35-36 & Att. 72-73, p. 871-74.  The company had three founding directors:  Eunjung Cardiff, Jason Cardiff, and Jacques Poujade.  *Id*. When Jason Cardiff applied for business liability insurance for Clover Cannastrip on October 1, 2018, he listed Redwood Scientific's Upland, California address and identified its website as "cloverstrip.com," the same website listed in the merchant account applications he and Eunjung Cardiff signed on behalf of Intel Property and Defendant Identify.  Sands Decl., p. 2, ¶ 10 & Att. 18, p. 168.

"Clover Strips" was also the title of an August 2018 investor presentation for Clover Cannabis Thin Film Technologies Corp. ("Clover Cannabis").  Sands Decl.,

---

[5] Redwood Scientific's 870 Mountain Ave. business suites were leased to Intel Property LLC.  Dkt. 81-1, p. 15.

p. 5, ¶ 25 & Att. 57, p. 711. That presentation – which featured an image of the same Cloverstrip packaging the Commission found at the Redwood Scientific business premises – identified Jason Cardiff as the CEO and President of Clover Cannabis.[6] Handwritten notes recovered from Eunjung Cardiff's desk closely match the presentation's timeline for investment rounds and details for geographic expansion of the business operation. Schools Decl., p. 2, ¶ 5 & Att. 26, p. 148-52.

Distributor agreements for Clover Cannabis also appear on Cloverstrip letterhead and refer to the same incorporation number that Clover Cannastrip received when Jason Cardiff incorporated it in July 2018 (Sands Decl., p. 3, ¶ 10 & Att. 16-17, p. 158-67, Att. 25, p. 193), meaning that these "companies" were, in reality, one and the same. Jason Cardiff signed one such distributor agreement on October 10, 2018 (the same day the Court issued the TRO). Sands Decl., p. 3, ¶ 10 & Att. 16, p. 158.

Jason Cardiff also used a similar name – Cloverstrip Thin Film Technologies – on a September 27, 2018 check he signed for "Cloverstrip Patent Trademark." Schools Decl., p. 2, ¶ 5 & Att. 12, p. 75-76. The check was from the same Clover Cannastrip bank account where $1.84 million CAD had been deposited earlier in the month, and from which $1.56 million CAD was later withdrawn, just days after Jason Cardiff received notice of the TRO. Sands Decl., p. 13, ¶ 50.

---

[6] It also noted that Clover Cannabis is "poised for a nationwide rollout" that would start producing CBD and tetrahydrocannabinol ("THC") film strips in California and leverage Redwood Scientific's "unparalled industry experience," gleaned from selling "87 million oral film strips," including the products challenged in the Commission's Complaint.

### B. Pharmastrip and dissolveresponsibly.com

Numerous documents found when the Receiver took over the Redwood Scientific business premises show the Cardiffs' preparations to launch CBD and THC film strips under the brand name Pharmastrip, often in tandem with Cloverstrips.

As early as July 1, 2018, Jason Cardiff was listed as President of Pharmastrip on a draft "Exclusive Product Reseller Agreement" with Oregon Thin Film Distribution Ltd., a Portland, Oregon business affiliate[7] that currently sells Cloverstrips and True CBD.[8]  Schools Decl., p. 2-3, ¶ 6 & Att. 30, p. 161; Sands Decl., p. 7, ¶ 37-38 & Att. 74-75, p. 875-911.  On October 3, 2018, he signed a Scope of Work agreement with FX Web Media (the company that developed advertising materials for the film strips challenged in the FTC's Complaint) for "Pharmastrip, corporate and product branding, marketing and advertising."  Sands Decl., p. 3, ¶ 10 & Att. 22, p. 188-90.  The marketing plan covered both Pharmastrip's "Classic Collection" of THC strips and Cloverstrip's "Harmony, Melody, and Serenity" CBD strips.  *Id.*  Both Eunjung and Jason Cardiff had

---

[7] Oregon Thin Film Distribution's principal, Stephen Sweeney, was also listed in a presentation as part of "The Team" of Cannabis Oral Thin Film Technology, along with the Cardiffs and Jacques Poujade.  Schools Decl., p. 2-3, ¶ 6 & Att. 17, p. 99.

[8] True CBD appears to be nothing more than rebranded Cloverstrips.  A True CBD eBay page actually featured the Cloverstrip Certificate of Analysis prepared for Oregon Thin Film Distribution, and the products share the "DISCREET – RELIABLE – NATURAL" slogan.  Sands Decl., p. 6-7, ¶ 32 & Att. 70, p. 802, 811.  True CBD's Facebook page is managed by blake@dislvs.com, which matches the domain used by former Redwood Scientific employee Julie Green to conduct business on behalf of Pharmastrip.  Sands Decl., p. 6, ¶ 31 & Att. 69, p. 796; p. 4, ¶ 21 & Att. 46, p. 417.  Jason Cardiff likely purchased the domain on October 24, 2018, but he refused to answer questions about it at his deposition. Sands Decl., p. 2, ¶ 5 & Att. 4, p. 67 [Tr. 121:17-123:8].

worked on product development, including product and flavor names and descriptions.  Sands Decl., p. 24, ¶ 74-75 & Att. 87, p. 946-47, 953; Schools Decl., p. 2, ¶ 5 & Att. 27, p. 154-55.

Phone records show that Jason Cardiff has continued to communicate with FX Web Media's principal, Ty Sherrell, on a regular basis; in fact, between October 12, 2018 and May 7, 2019, Jason Cardiff and Ty Sherrell exchanged at least 268 phone calls and spoke for at least 1,109 minutes.  Sands Decl., p. 19-20, ¶ 67 & Table 4.  Mr. Cardiff and Mr. Sherrell continued to talk as key deliverables from the Scope of Work agreement were met, including Mr. Sherrell's purchase of the Pharmastrip website domain (dissolveresponsibly.com)[9]; production of Pharmastrip corporate promotion videos; and the development of packaging and box designs for numerous Pharmastrip subbrands, including a line of copycat Redwood Scientific products containing the same "active" ingredients as the stop-smoking and sexual performance strips challenged in the FTC's Complaint, among others, and a "Classic Collection" line matching digital package mock-ups recovered at the Redwood Scientific business premises on October 12, 2018. Sands Decl., p. 8, ¶ 45 & Att. 81, p. 926-28; p. 21-22, ¶ 68-69 & Att. 86, p. 941-43; p. 24, ¶ 76-77 & Att. 71; p. 22-23, ¶ 70 & Att. 87, p. 948-55.

Other records also show that Pharmastrip was already integrated into the Cardiffs' business operation before the TRO (e.g., a saved username and password for administration of Pharmastrip.com[10]; an order confirmation for t-shirts and caps

---

[9] Mr. Sherrell was listed as the registrant of dissolveresponsibly.com until March 30, 2019.  Jason Cardiff was questioned about Mr. Sherrell's role with the website at his March 29 deposition; the two then spoke by phone on March 30.  Sands Decl., p. 22, ¶ 69.

[10] Internet domain records show that pharmastrip.com, cannabisotf.com, and greenpharma.co were all registered on June 25, 2018 by GoDaddy.com.  On June 25, 2018, Eunjung Cardiff's credit card incurred $277.22 in charges from

bearing the Pharmastrip logo that were ordered at Jason Cardiff's direction; and the title page of a compilation of cannabis-related scientific journal articles that referenced both "Cloverstrip Cannabis CBD" and "Pharmastrip Thin Film Technologies."  Sands Decl., p. 3, ¶ 13 & Att. 34-35, p. 234-35, 237; p. 2, ¶ 9 & Att. 14, p. 151.

Finally, Jason Cardiff's signature as "President and CEO" of Pharmastrip appears on an October 8, 2018 letter on Pharmastrip letterhead, addressed to the U.S. Consulate in Shanghai, and listing the Redwood Scientific business address in Upland, California.  Sands Decl., p. 25, ¶ 82 & Att. 33, p. 233.  Former Redwood Scientific employee Julie Green,[11] who drafted the letter, testified that it was mistakenly drafted on Pharmastrip letterhead (and should have been on Redwood Scientific letterhead), despite the text's five internal references to Pharmastrip. Sands Decl., p. 2, ¶ 8 & Att. 7, p. 108-12; 117-20.  But documents obtained from the U.S. Department of State, Bureau of Consular Affairs belie Ms. Green's testimony:  the applicant referenced in the letter did, in fact, apply for a visa in connection with Pharmastrip – and listed Jason Cardiff as his contact.  Sands Decl., p. 5, ¶ 26 & Att. 60, p. 739-43.

---

GoDaddy.com.  Eunjung and Jason Cardiff had emails @cannabisotf.com and Jason Cardiff had one @greenpharma.co.  Sands Decl., p. 5, ¶ 24 & Att. 55, p. 709; p. 5, ¶ 26 & Att. 60, p. 740; Schools Decl., p. 2-3, ¶ 6 & Att. 17, p. 99.

[11] Pharmastrip's Chief Chemist identified Ms. Green as a current manager of Pharmastrip in a May 2019 conversation with the Receiver.  Dkt. 121, p. 7, ¶ 9. Julie Green never even missed a paycheck, receiving a check from Redwood Scientific on October 15, 2018, and one from Alphatech on November 1, 2018, where she continued to develop Pharmastrip letterhead.  Sands Decl., p. 2, ¶ 8 & Att. 7, p. 102-07; 115; Sands Decl., p. 3, ¶ 14 & Att. 36, p. 319.  Alphatech bank records also show regular biweekly payments beginning in November 2018 to former Redwood Scientific employee Justin Daines.  Sands Decl., p. 3, ¶ 14 & Att. 36, p. 309-14.

Stated simply, to get their passports back, the Cardiffs lied about Jason Cardiff getting a job offer from some independent company called Pharmastrip. Sands Decl., p. 1-2, ¶ 4 & Att. 3, p. 66 [Tr. 121:1-9].  The overwhelming evidence shows that the Pharmastrip brand was nothing more than a continuation of their old businesses with new corporations as cover.

Jason Cardiff's phone records also show hundreds of ongoing communications not only with Pharmastrip's media firm, but also with key employees, such as Julie Green and Yuan Yang, among other business associates.[12] Sands Decl., p. 4-5, ¶ 22-23 & Att. 47-54, p. 472-708; p. 20-21 & Tables 5-6. Indeed, he speaks with Mr. Yang (Pharmastrip's Chief Chemist) on a daily basis in person, by telephone, or by text message. *Id*.; Dkt. 121, p. 7, ¶ 9.  Pharmastrip's Chief Chemist informed the Receiver that Pharmastrip "just completed its first run of cannabis-related products which are now being shipped to customers. ... [and] that an additional cannabis-related production facility in Colorado is expected to be operational in June 2019, and that other cannabis-related production facilities are planned." Dkt. 121, p. 7, ¶¶ 9-10.  The Commission does not yet know how much revenue has been generated by this current business activity.

## C. Other Cannabis Operations

The Cardiffs  control at least two other entities that appear to be involved in – or established for purposes relating to – their cannabis film strip venture. Cannastrip Labs LLC was established in Wyoming on July 26, 2018, just days before Jason Cardiff incorporated Clover Cannastrip in Canada.  Sands Decl., p. 6, ¶ 29 & Att. 67, p. 783.  Although Internal Revenue Service documents list Jason

---

[12] Although Julie Green stated in her March 22, 2019 deposition that she had last spoken with Jason Cardiff "a couple weeks ago," phone records indicate that she spoke to him the night before her deposition.  Sands Decl., p. 2, ¶ 8 & Att. 7, p. 116; p. 8-10, ¶ 8-10 & Att. 52, p. 622.

Cardiff's 89-year old father, Gerald Cardiff, as the "sole [member]," the elder Mr. Cardiff does not know anything about this company. Sands Decl., p. 3, ¶ 12 & Att. 32, p. 231. Jason Cardiff is identified as the contact person in case of a subpoena,[13] and the Cardiffs' asset protection limited partnership (Defendant Carols Place Limited Partnership) is the 100% member. Sands Decl., p. 3, ¶ 12 & Att. 31, p. 229-30.

On October 2, 2018, Jason Cardiff filed incorporation papers as the sole Director of Haffelgad Switzerland Ltd., a company he registered in Ireland. Sands Decl., p. 3, ¶ 10 & Att. 21, p. 177-87. The same day, a Shanghai, China machinery manufacturer issued a "pro forma invoice" for film strip manufacturing equipment to Haffelgad Switzerland Ltd.; Jason Cardiff's name is on the invoice. Sands Decl., p. 3, ¶ 10 & Att. 20, p. 174-76. The machines were priced at $113,800 USD total. *Id*. Jason Cardiff appears to have also ordered three additional sets of machines from the same Chinese company. Pro forma invoices for that equipment – identifying Machine 1, Machine 2, and Machine 3 – are dated October 7, 2018, January 9, 2019, and October 7, 2018, respectively, for sets of machines cumulatively valued at nearly $400,000 USD. Sands Decl., p. 4, ¶ 20 & Att. 43, p. 385-93.

---

[13] Gerald Cardiff also disclaimed knowledge of merchant applications for the sale of oral film strips, filed in September 2018 by the ironically-named "True and Honesty, LLC," that purportedly bear his signature. Sands Decl., p. 2, ¶ 7 & Att. 6, p. 78; p. 3, ¶ 12 & Att. 29, p. 219. Nor was the elder Mr. Cardiff familiar with IRS notices listing him as sole member of True and Honesty, or a bank account for that same entity opened in his name. Sands Decl., p. 2, ¶ 7 & Att. 6, p. 77. True and Honesty was also used by the Cardiffs to hold their "super voting preferred" shares of Redwood Scientific stock. Dkt. 7, p. 52-53, ¶ 147.

### III.  THE CARDIFFS HAVE VIOLATED MULTIPLE PROVISIONS OF THIS COURT'S ORDERS

#### A. The Cardiffs Hid Assets in Canada and the United States from the Commission and the Receiver

##### 1. Cannabis Business Bank Account Funds

The Cardiffs did not report Clover Cannastrip investment funds to the Commission or the Receiver, did not repatriate the money, and did not identify to the Commission or the Receiver the TD Canada Trust bank account in which those funds were held, despite the fact that they were two of the company's three Directors.[14]  Jason Cardiff  controlled the Clover Cannastrip bank account when he received notice of the TRO, as evidenced by his September 27, 2018 signature on a check for that account and by the fact that $1.56 million CAD was drained from the account during the same four-day period (October 15-18, 2018) when he made 39 phone calls to the bank.

On September 6, 2018, a Canadian cannabis business, FSD Pharma, Inc., made a $1.5 million CAD investment in Clover Cannastrip pursuant to a subscription agreement that listed Jason Cardiff as the sole contact for Clover Cannastrip.  Sands Decl., p. 5, ¶ 25 & Att. 59, p. 731-38.  Those funds (minus brokerage fees) were in Clover Cannastrip's TD Canada Trust account when Jason Cardiff was served with the TRO.  Sands Decl., p. 13, ¶ 50 & Att. 42, p. 377-84.  Clover Cannastrip's assets were not limited to the FSD Pharma investment.  On or about September 10, 2018, a group of unidentified investors paid $500,000 CAD

---

[14] On November 16, 2018, Clover Cannastrip updated its business entity registration, stating that the Cardiffs resigned as Directors on October 8, 2018. Sands Decl., p. 7, ¶ 36 & Att. 73, p. 873-74.  The update is highly suspect, given that the referenced event purportedly occurred six weeks earlier, and because the Cardiffs refused to answer questions about their positions as Directors of Clover Cannastrip at their depositions.  Sands Decl., p. 1-2, ¶ 4 & Att. 3, p. 66; p. 2, ¶ 5 & Att. 4, p. 67.

for 2.5 million shares of stock.  Dkt. 126, p. 10-11, ¶ 15.  Those funds were also in Clover Cannastrip's Canadian bank account when Jason Cardiff was served with the TRO.  Sands Decl., p. 13, ¶ 50 & Att. 42, p. 377-84.

A British Columbia Securities Commission filing made by Clover Cannastrip reports an additional $2.02 million CAD raised on November 5, 2018.  Sands Decl., p. 31, ¶ 51 & Att. 68, p. 785-95.  Those funds were not deposited in Clover Cannastrip's TD Canada bank account; instead, they were wired (minus brokerage fees) to the trust account of Clover Cannastrip's Canadian law firm, Sui & Co., Solicitors, on November 5, 2018.  Sands Decl., p. 13, ¶ 53 & Att. 44, p. 394-97.

Jason Cardiff's own actions show that he controlled all of the Clover Cannastrip funds.  In mid-October 2018, when the Cardiffs sought to retain legal counsel in the days following their notice of the TRO, Jason Cardiff represented to a prospective law firm that he had access to funds in Canada that he believed could be used to pay for the Cardiffs' legal representation.  Sands Decl., p. 1, ¶ 2 & Att. 1, p. 49-50.  The firm explored those sources with Mr. Cardiff – a pending $2 million business deal in Canada and $200,000 in a Canadian company (in which Jason Cardiff's shares were held by an LLC owned by his father).[15]  *Id.*  One of the attorney's contemporaneous notes also say "[Jason Cardiff's] laptops have e-mails about cannabis company and 1 million shares."  *Id.*; p. 24, ¶ 74 & Att. 27, p. 196-203.  Jason Cardiff's conversations with that law firm comport with the $2 million CAD deal closed by Clover Cannastrip just two weeks later, on November 5, and the Cannastrip Labs LLC registered in the name of his father.

---

[15] The firm ultimately determined that the funds in question were subject to the asset freeze, and therefore could not be used as payment for legal services.  Sands Decl., p. 24, ¶ 74 & Att. 27, p. 215-16.

In total, the Cardiffs failed to identify, account for, repatriate, and turn over at least $4 million CAD to the Receiver: $500,000 received on September 6, $1.5 million received on September 13, and $2.02 million received on November 5.

### 2. Cannabis Business Fixed Assets

The Cardiffs' assets also include the machinery that Pharmastrip is using to produce film strips in Cathedral City, California. Dkt. 121, p. 7, ¶10. Yuan Yang's statements about the company's expansion plans are consistent with Eunjung Cardiff's handwritten notes indicating plans to expand the business operation to Washington and potentially 18 other states. Schools Decl., p. 2, ¶ 5 & Att. 26, p. 148-52. Based on the four pro forma invoices sent to Haffelgad Switzerland, the machinery is worth more than $500,000 USD. Sands Decl., p. 3, ¶ 10 & Att. 20, p. 174-76; p. 4, ¶ 20 & Att. 43, p. 385-93. When asked about the status and location of the film strip machines at his deposition, Jason Cardiff refused to answer. Sands Decl., p. 2, ¶ 5 & Att. 4, p. 6-7. The Court should infer that Jason Cardiff owns and is concealing Pharmastrip's film strip machines.[16]

### B. The Cardiffs Dissipated Assets that Should Have Been Turned Over to the Receiver

The Commission and the Receiver have previously laid out in detail the Cardiffs' penchant for the "good life," to the tune now of more than $206,000 USD in personal expenses paid by Alphatech's U.S. Bank account over the seven-month period following their notice of the TRO. Sands Decl., p. 15, ¶ 58; Dkt. 115-2, p. 13, line 15; Dkt. 121, p. 5-6. The Commission can now show the route that the Clover Cannastrip funds – which were covered by the asset freeze – took to get to

---

[16] *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir. 1995) (trier of fact can draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding), citing *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). The Cardiffs' refusal to answer other deposition questions warrants adverse inferences about the subjects of those questions. See also Dkt. 115-2, p. 8, lines 8-9.

Pharmastrip Corp. (the company purportedly controlled by Jacques Poujade's brother, Richard Poujade) and then to Alphatech.

Sui & Co. ("Sui"), a Canadian law firm that represents various Cardiff interests,[17] manages a trust account that was originally named "Pharmastrip Corp./Clover Cannastrip Thin Film Technologies Corp." and then renamed "Pharmastrip Corp./True Pharmastrip, Inc." The account names show the unity of these three entities. Sands Decl., p. 4, ¶ 20 & Att. 44-45, p. 394-401. Even more important, Sui's trust statements for that account show that the law firm: (1) received $1.2 million CAD from Clover Cannastrip on October 16, 2018, and wired the same amount to Pharmastrip Corp. on October 25; and (2) received a deposit of $1.7 million CAD on November 5, 2018 (the same date for which Clover Cannastrip reports a $2.02 million CAD sale of securities), and wired $1.8 million to Pharmastrip Corp. one day later. Sands Decl., p. 4, ¶ 20 & Att. 44, p. 394-95.

Also on November 6, 2018, Jacques Poujade's accountant foreign-enrolled Alphatech Holdings LLC in California. Sands Decl., p. 1, ¶ 3 & Att. 2, p. 55-57. On November 7, 2018, the accountant opened a bank account for Alphatech at US Bank. *Id*. On November 8, 2018, Pharmastrip Corp. wired $100,000 USD to the Alphatech account from the home address of Richard Poujade. Thirteen wire transfers from Pharmastrip followed between January 2, 2019 and May 22, 2019, for a total of $490,000 USD (minus international wire fees). Sands Decl., p. 16-17, ¶ 59 & Table 3 & Att. 36-40, p. 238-367.

---

[17] After being served with the TRO, Jason Cardiff tried to wire $40,000 USD to Sui from the bank account of Defendant Carols Place Limited Partnership, the Cardiffs' asset protection limited partnership. Receiver's Joinder, Temporary Receiver's Affidavit of Noncompliance, Oct. 23, 2018.

There is no legitimate business explanation for the money Pharmastrip Corp. received from Clover Cannastrip (via Sui), and no evidence that Pharmastrip Corp. provided any consideration for those funds.  Pharmastrip Corp. was incorporated on September 19, 2018.  Sands Decl., p. 28, ¶ 85 & Att. 89, p. 980-86.  It has no employees and cannot yet legally conduct business in Canada.  Dkt. 115-2, p. 4, ¶19; Dkt. 126, p. 12.  Its address is a "virtual office" mail drop that is paid for by Alphatech.  Sands Decl., p. 4, ¶ 21 & Att. 46, p. 403-06.  The source of Pharmastrip Corp.'s funds, therefore, can only reasonably be attributed to the Cardiffs' preexisting cannabis film strip business, with Richard Poujade's Pharmastrip Corp. bank account nothing more than a pass-through device to move funds to the Cardiffs under the guise of a loan.

This elaborate ruse enabled the Cardiffs to divert Clover Cannastrip investor funds to cover their personal expenses, in circumvention of the asset freeze, and prevent the disruption of their ongoing cannabis film strip business activities by providing a distinct Canadian legal entity beyond the Receiver's reach under which those activities could occur undetected.  The Alphatech bank account was closed on May 24, 2019; only $3,146 of the $490,000 USD it received from Pharmastrip remained.  Sands Decl., p. 4, ¶ 17 & Att. 40, p. 356.

### C. The Cardiffs Did Not Report Their Cannabis Film Strip Businesses to the Commission Or the Receiver

Eunjung and Jason Cardiff each submitted a Financial Disclosure form to the Commission on October 25, 2018 pursuant to the TRO.  Sands Decl., p. 5, ¶ 28 & Att. 65-66, p. 760-82.  That form required them to report specific information "for this year-to-date and for each of the previous five full years, for each business entity of which [they were] a director, officer member, partner, employee . . . agent owner, shareholder contractor, participant or consultant at any time during that period."  They were also required to identify "all bank accounts for all entities" for which they either had been an officer, director, member, owner, or signatory for

the last five years.  Despite these requirements, the Cardiffs did not mention Clover Cannastrip, Clover Cannabis, Pharmastrip, Cannastrip Labs, Haffelgad Switzerland, the Sui trust account, or the Clover Cannastrip or Pharmastrip bank accounts on their forms, nor did they report these entities to the Receiver.  *Id.*; Kane Decl., p. 2, ¶ 3.  The Cardiffs also refused to comply with the FTC's request for production of documents, asserting an invalid Fifth Amendment privilege on May 16, 2019.[18]  Sands Decl., p. 27, ¶ 84 & Att. 88, p. 956-62.

## IV.    JACQUES POUJADE HAS VIOLATED THIS COURT'S ORDER BY ACTING IN CONCERT WITH THE CARDIFFS TO CIRCUMVENT THE ASSET FREEZE

### A. Jacques Poujade Had Knowledge of the Asset Freeze

Jacques Poujade acknowledges that he first learned of the TRO in October 2018, when Jason Cardiff told him that "all of his assets were seized" and "that the injunction completely prohibited him from having a bank account."  Dkt. 126, p. 13-14, ¶¶ 28-29. Additionally, Jacques Poujade's counsel, who agreed to accept service of subpoenas to Jacques Poujade and his accountant, received a copy of the PI on March 20, 2019.  Sands Decl., p. 9, ¶ 47 & Att. 83, p. 930.

### B. Jacques Poujade Assisted and Continues to Assist the Cardiffs in Dissipating Assets and Concealing Their Business Activities

There is no dispute that Jacques Poujade has funneled through the Alphatech bank account at least $206,000 that was used to pay for the Cardiffs' personal expenses.  What is disputed is the nature and control of those funds.  The Commission has presented clear and convincing evidence that the money used to pay the Cardiffs' expenses was, in fact, money the Cardiffs controlled, originally

---

[18] *SEC v. Bankers Alliance Corp.*, No. 95-cv-0428 (PLF), 1995 U.S. Dist. LEXIS 14730, **11-12 (D.D.C. May 5, 1995) (Fifth Amendment privilege was not implicated by turning over records of foreign bank accounts).

through Clover Cannastrip.  This money was then washed through other accounts before paying those expenses.

The Cardiffs' and Jacques Poujade's version of the facts defies belief.  They ask the Court to believe that Jacques Poujade was the architect of the cannabis film strip venture.  Dkt. 126, p. 8-9, ¶¶ 7-9.  Yet the overwhelming evidence shows that it is a continuation of the Redwood Scientific common enterprise ("same team... same technology," Sands Decl., p. 5, ¶ 25 & Att. 57, p. 717), relying on the Cardiffs' existing business operation and Jason Cardiff's continued involvement and control.  The Cardiffs spent months preparing to sell CBD and THC dissolvable film strips.

Jacques Poujade concedes that the Cardiffs initially controlled Clover Cannastrip's Board of Directors, but he contends that they "agreed to resign" before any capital was raised, and Jason Cardiff "surrendered his 100 shares of stock" on August 29, 2018.  Dkt. 126, p. 9, ¶ 10; p. 10, ¶ 13.  This post-hoc attempt to divorce his friends from the business before both the substantial September 2018 investments in Clover Cannastrip and the issuance of the TRO by claiming that the Cardiffs immediately acceded to his demand that they walk away – apparently without compensation – is simply not credible.

In addition, Jacques Poujade's versions of events do not align with the facts.  First, he cites a November 16, 2018 business registration filing as proof that the Cardiffs resigned as Directors on October 8, 2018; this contradicts his own claim that they agreed to resign in August.  Dkt. 126, p. 11, ¶ 18.  In addition, the evidence shows that Jason Cardiff traveled to Toronto on August 30, 2018 and pitched FSD Pharma on Cloverstrips, identifying himself (not Jacques Poujade, *see* Dkt. 126, p. 9, ¶ 10) as President and CEO of Clover Cannabis, and serving as the only named contact in the subscription agreement signed by FSD Pharma on September 6, 2018.  Sands Decl., p. 5, ¶ 25 & Att. 59, p. 731-38, Att. 57, p. 711-27; p. 5, ¶ 24 & Att. 56, p. 710.  Jason Cardiff also maintained phone contact with

-17-

Clover Cannastrip's securities counsel, broker, and corporate counsel well after Jacques Poujade supposedly cut him out in August 2018.  Dkt. 126, p. 9-10, ¶¶ 12-13; Sands Decl., p. 13-14, ¶ 51-55.

Jacques Poujade's story frequently relies on undated documents of dubious authenticity.  The document he presented as evidence that Jason Cardiff surrendered 100 shares of Clover Cannastrip stock on August 29, 2018 actually only shows the date on which the shares were issued (July 31, 2018).  Dkt. 126, p. 18.  Similarly, the notice purporting to show that the Cardiffs resigned as Directors of Clover Cannastrip on October 8, 2018 was not filed until November 16, 2018 (a week *after* the Cardiffs personally appeared before this Court and had been served with the PI).  Dkt. 126, p. 19-20.  Further, his claim that the *November 1, 2018* promissory note between Jason Cardiff and Alphatech "mirrored" the *January 2, 2019* promissory note between Alphatech and Pharmastrip is simply chronologically impossible.  Dkt. 126, p. 14, ¶ 29; p. 22-25.

Jacques Poujade's claim that he "came up with the idea of manufacturing cannabis infused oral thin strips" in June 2018 does not withstand scrutiny because the Cardiffs were already preparing to market Cloverstrips by June 6, 2018.  Dkt. 126, p. 8, ¶ 7; *see supra*, Sec. II.A.  His claim that the Cardiffs did not control Clover Cannastrip funds is an outright lie – Jason Cardiff signed a check from the Clover Cannastrip bank account for legal services on September 27, 2018 (Dkt. 126, p. 9-10, ¶¶ 12-13; *see supra*, Sec. II.A.), and he was prepared to use that money to fund his legal defense in this case (see supra, Sec. III.A.1).  As with Jacques Poujade's assertion that he was the moving force behind Clover Cannastrip, there is no evidence that he came up with the name Pharmastrip in August 2018; in fact, Jason Cardiff was using the name at Redwood Scientific as early as June and July 2018.  Sands Decl., p. 5, ¶ 24 & Att. 55, p. 709; p. 3, ¶ 13 & Att. 35, p. 237; Schools Decl., p. 3, ¶ 6 & Att. 30, p. 160, 167.

### C. Jacques Poujade Continues to Assist the Cardiffs in Evading the Asset Freeze and Concealing Their Current Business Activities

Every day Jacques Poujade continues to maintain the fiction that the Cardiffs do not control the assets of Clover Cannastrip (now renamed "True Pharmastrip"), Pharmastrip, and Alphatech, he is acting in concert or participation with them to evade the asset freeze, repatriation provisions, and business reporting requirements of the Preliminary Injunction. The FTC served him with a subpoena for relevant documents on April 10, 2019, issued pursuant to the PI's expedited discovery provision. He continues to withhold records for his brother's Canadian Pharmastrip bank account even after admitting in his declaration that Clover Cannastrip, Pharmastrip Corp., and Alphatech all work together as one in the cannabis film strip business. Dkt. 126, p. 13, ¶¶ 25, 27. While $490,000 USD was siphoned into the Alphatech account for the Cardiffs' use, the remainder of the $4 million CAD acquired by Clover Cannastrip in September and November 2018 remains unaccounted for, presumably in the Pharmastrip Corp. bank account.

## V.   LEGAL ARGUMENT

### A. Legal Standard

This Court has inherent authority to enforce compliance with its lawful orders through the remedy of civil contempt. *See Gifford v. Heckler*, 741 F.2d 263, 265-66 (9th Cir. 1984); *see also Shillitani v. United States*, 384 U.S. 364, 370 (1966). This authority extends to non-parties like Jacques Poujade pursuant both to Fed. R. Civ. P. 65(d) in connection with actions "in active concert or participation" with named defendants, and to the Court's broader power to fashion equitable relief to enforce in rem injunctions, such as the classic example of an injunction to preserve the assets of a receivership estate. *FTC v. Productive Mktg., Inc.*, 136 F. Supp. 2d 1096, 1103-06 (C.D. Cal. 2001) (finding nonparty in contempt of preliminary injunction for failing to turn over assets to a receiver).

After the FTC's showing of contempt, "[t]he burden then shifts to the contemnors to show why they were unable to comply[,]" *FTC v. Affordable Media,*

*LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (quotation omitted), a showing that requires the Cardiffs and Jacques Poujade to prove they "took every reasonable step" to comply. *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992). In determining whether a party is in contempt, the Court may consider the credibility of the alleged contemnors. *Bunnett & Co. v. Dores*, No. A-15-CV-1104-LY-AWA, 2018 U.S. Dist. LEXIS 36478, **11-15, 33 (W.D. Tex. Mar. 6, 2018) (court determined that the contemnors' excuses lacked credibility, and that clear and convincing evidence showed that defendant and nonparties were in contempt of a TRO by using a backhand method and tortured payment structure to provide money to a defendant in violation of an asset freeze). Here, the Cardiffs and Jacques Poujade share a complete lack of credibility, and the overwhelming evidence shows that they used a multi-step series of transactions involving Clover Cannastrip, Pharmastrip, and Alphatech to provide the Cardiffs money in violation of the asset freeze.

### B. The Assets at Issue Belong in the Receivership

The TRO and PI unambiguously define "assets" as "any legal or equitable interest in, right to, or claim to, any property, wherever located and by whomever held." The TRO and PI injunctive provisions expand on this already broad definition by covering assets that are owned or controlled, directly or indirectly, by Defendants or any entity owned, managed or controlled by them, are held for their benefit, or are in their actual or constructive possession. See, e.g., TRO and PI Sections VII (Asset Freeze) and Sections VIII (Duties of Asset Holders and Other Third Parties).

Clear and convincing evidence shows that the assets at issue are directly or indirectly owned or controlled by the Cardiffs and by Clover Cannastrip and Pharmastrip, alter-ego entities owned, managed, or controlled by the Cardiffs, and which are a de facto continuation of the Cardiffs' thin film business operations. The overwhelming evidence also shows that the assets are held for the Cardiffs'

benefit and are in their actual or constructive possession.  *CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV 03-8339 AHM, 2004 U.S. Dist. LEXIS 27511, **18-21 (C.D. Cal. Jul. 29, 2004) (failure to repatriate assets violated asset freeze; nominal ownership was irrelevant where order defined "assets" to include funds controlled by or held for the benefit of Defendants).

### C. The Cardiffs Are in Contempt of the Court's Orders

Clear and convincing evidence shows that the Cardiffs are in contempt of at least nine separate provisions of the Court's TRO and PI relating to assets that should be a part of the Receivership.  Dkts. 29, 59.  Specifically, the evidence clearly and convincingly shows that the Cardiffs have violated Sections VII, IX, X, XI, XIV, XVII, XVIII, XX, and XXVI of the TRO and PI.  As described above, the Cardiffs have concealed and dissipated their assets (e.g., Clover Cannastrip and Pharmastrip assets), in violation of Section VII (Asset Freeze).  They have failed to report assets and entities of which they were directors, officers, and owners, in violation of Section IX (Financial Disclosures).  They have failed to provide a full accounting of all assets and accounts outside of the United States, have failed to take all steps necessary to provide documents and records held by third parties outside the United States, and have failed to transfer to the United States and deliver to the Receiver all documents and assets located in foreign countries, in violation of Section X (Foreign Asset Repatriation).

The Cardiffs have taken actions that resulted in the dissipation of domestic or foreign assets, and in the hindrance of the repatriation of those assets, in violation of Section XI (Non-Interference with Asset Freeze and Repatriation).  They have operated and exercised control over business entities without providing the FTC and the Receiver a written statement disclosing required information (i.e., name, address, identity of officers, directors, principals, managers, employees, and intended activities), in violation of Section XIV (Report of New Business Activity).  They have failed to deliver assets to the Receiver, in violation of

Section XVII (Transfer of Receivership Property to Receiver). They have failed to provide to the Receiver a list of all assets and accounts of the Receivership entities and the Cardiffs held in other names, in violation of Section XVIII (Provision of Information to Receiver). They have interfered with the Receiver's efforts to take possession of assets or documents subject to the receivership, and disposed of assets belonging to the Receivership and the Cardiffs, in violation of Section XX (Non-Interference with the Receiver). And they have failed to produce a single document pursuant to requests made via expedited discovery, in violation of Section XXVI (Expedited Discovery).

Despite Jason Cardiff's more active role, both he and Eunjung Cardiff are responsible for these ongoing violations. They have both concealed and dissipated assets, failed to provide a full accounting of their assets, and failed to turn over assets to the Receiver. They both failed to disclose their connection to Clover Cannastrip, and failed to disclose the continued foreign and domestic operations of Clover Cannastrip, Pharmastrip, and Alphatech. They have both benefited from the Clover Cannastrip funds that were channeled through Pharmastrip and then Alphatech to pay personal expenses, in violation of the asset freeze. They have both failed to respond to discovery.

### D. Jacques Poujade Is in Contempt of the Court's Orders

The evidence clearly and convincingly shows that Jacques Poujade has violated Sections VII, VIII, XI, XVII, and XXVI of the TRO and PI. As described above, he has – in active concert or participation with the Cardiffs – transferred, loaned, concealed, and disbursed Cardiff assets, in violation of Section VII (Asset Freeze). He has failed to hold, preserve, and prohibit the disbursement, dissipation, or other disposal of Cardiff documents and assets, in violation of Section VIII (Duties of Asset Holders and Other Third Parties). He has taken actions that resulted in the dissipation of domestic or foreign assets, and in the hindrance of the repatriation of those assets, in violation of Section XI (Non-

Interference with Asset Freeze and Repatriation).  He has failed to deliver Cardiff assets to the Receiver, in violation of Section XVII (Transfer of Receivership Property to Receiver).  And he has failed to provide complete expedited discovery, in violation of Section XXVI (Expedited Discovery). These violations are ongoing.

**E. The Cardiffs' and Jacques Poujade's Contempt Warrants Civil Incarceration as to the Cardiffs and a Fine as to Jacques Poujade Until They Transfer and Return Assets and Produce a Detailed Accounting**

The Court's power to impose civil contempt sanctions in order to coerce compliance with its orders is clear.  *Jones v. All Am. Auto Prot., Inc.*, No. 2:15-cv-01656-SJO-AGR, 2016 U.S. Dist. LEXIS 69409, \*\*1-2 (C.D. Cal. May 24, 2016) (Otero, J).  In fashioning a coercive sanction, this Court has considered "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'"  Id. at \*4, (*quoting U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)).

1. Coercive Incarceration for the Cardiffs

The Court should immediately incarcerate the Cardiffs.  Monetary sanctions will not be effective in convincing them to comply with the Preliminary Injunction, since their funds are already frozen.  In addition, any money should be preserved for the ultimate purpose of consumer redress.  Further, given the extent of the Cardiffs' contumacy over more than seven months, and history of disregarding this Court's Orders, only the threat of coercive incarceration until such time as they comply fully with all of the provisions of the Preliminary Injunction is likely to gain their compliance. *Bankers Alliance Corp.*, 881 F.Supp. 673, 683-84 (D. D.C. 1995) (failure to comply with contempt order finding violation of repatriation provision in preliminary injunction warranted incarceration of individual defendants).

2.  Monetary Sanction for Jacques Poujade

A coercive fine, rather than incarceration, may be an appropriate remedy, provided Jacques Poujade can show that the money is not coming from the funds he is helping the Cardiffs hide.  The FTC requests that the Court impose a daily fine in an amount high enough to compel Jacques Poujade's prompt compliance, such as $5,000 per day, until he purges his contempt.

3.  Purge Conditions:  Detailed Accounting, Repatriation and Turn Over, and Replenishing of the Receivership Estate

The FTC requests that the Court order the Cardiffs and Jacques Poujade to: provide a detailed accounting of all assets covered by the TRO and PI, including all Clover Cannastrip and Pharmastrip assets; turn over all Cardiff assets to the Receiver, including assets that have to be repatriated from abroad; and replenish the receivership estate for the funds they have dissipated in violation of the asset freeze.  *SEC v. Fujinaga*, No. 2:13-CV-1658 JCM, 2016 U.S. Dist. LEXIS 159428, **17-18 (D. Nev. Nov. 15, 2016) (upon receiver's contempt motion, court ordered defendant to return all funds withdrawn from a bank account and to disclose their source; and to provide a detailed accounting under oath of each deposit/credit to, and each withdrawal/debit from, the bank account, including the source of each deposit/credit, the recipient or beneficiary of each withdrawal/debit, and the purpose of each debit); *Bankers Alliance Corp.*, No. 95-cv-0428 (PLF), 1995 U.S. Dist. LEXIS 14730, **11-12 (D. D.C. May 5, 1995) (contemnor was capable of repatriating assets and Fifth Amendment privilege was not implicated by turning over records of foreign bank accounts).  In addition to the information required in *Fujinaga*, the FTC requests that a full accounting include the identification of any consideration received for any transfer of funds, including consideration for any transfers from Clover Cannastrip to Pharmastrip, from Pharmastrip to Alphatech, and from Alphatech to the Cardiffs, and the production of all bank documents on

file with banks where subject accounts are held, including documents identifying the parties responsible for the account and wire transfer details.

## VI.    CONCLUSION

For the foregoing reasons, the FTC respectfully requests that the Court order the Cardiffs to appear personally and show cause why they should not be held in contempt and coercively incarcerated until they repatriate their foreign assets and turn their assets over to the Receiver; replenish the receivership estate for the funds they have dissipated to date in violation of the asset freeze; and provide a full accounting of the $4 million CAD of Clover Cannastrip funds and all other unreported monetary and non-monetary Cardiff assets.

The FTC also requests that Jacques Poujade be ordered to appear personally and show cause why he should not be held in contempt and sanctioned with a daily fine until he replenishes the receivership estate for the $490,000 USD he helped dissipate and produces all documents responsive to the Commission's subpoena, including a full accounting of the Clover Cannastrip funds.


Respectfully submitted,


Dated:  June 17, 2019                    s/ Elizabeth Jones Sanger
                                        ELIZABETH JONES SANGER
                                        esanger@ftc.gov; (202) 326-2757
                                        SHIRA D. MODELL
                                        smodell@ftc.gov; (202) 326-3116
                                        JAMES A. PRUNTY
                                        jprunty@ftc.gov; (202) 326-2438
                                        EDWIN RODRIGUEZ
                                        erodriguez@ftc.gov; (202) 326-3147
                                        Federal Trade Commission
                                        600 Pennsylvania Ave., NW
                                        Washington, DC 20580
                                        Fax: (202) 326-3259

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STACY PROCTER (Local Counsel)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION