1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3           HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5    FEDERAL TRADE COMMISSION,              )
                                            )
6                    Plaintiff,             ) Case No.
                                            ) ED CV 18-2104-SJO
7         vs.                               )
                                            ) **Volume 2**
8    JASON CARDIFF, ET AL.,                 ) **(Pages 157 - 303)**
                                            )
9                    Defendants.            )
     _____)
10

11

12

13                REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                ORDER TO SHOW CAUSE RE: CONTEMPT

15                   TUESDAY, JULY 30, 2019

16                        8:54 A.M.

17                   LOS ANGELES, CALIFORNIA

18

19

20

21
     _____
22
                  MAREA WOOLRICH, CSR 12698, CCRR
23             FEDERAL OFFICIAL COURT REPORTER
               350 WEST FIRST STREET, SUITE 4311
24              LOS ANGELES, CALIFORNIA 90012
                   mareawoolrich@aol.com
25

**UNITED STATES DISTRICT COURT**

1                        **APPEARANCES OF COUNSEL:**

2

3

**FOR THE PLAINTIFF:**

4
            FEDERAL TRADE COMMISSION
5           BY:  ELIZABETH JONES SANGER
            JAMES A. PRUNTY
6           EDWIN RODRIGUEZ
            600 Pennsylvania Avenue NW
7           Washington, DC 20580
            (202) 326-2757
8

9

**FOR THE RECEIVER ROBB EVANS & ASSOCIATES, LLC:**

10
            FRANDZEL, ROBINS, BLOOM & CSAT, LC
11          BY:  MICHAEL G. FLETCHER
            1000 Wilshire Boulevard, 19th Floor
12          Los Angeles, CA 90017
            (323) 852-1000
13

14

**FOR THE DEFENDANTS JASON CARDIFF AND EUNJUNG CARDIFF:**

15
            THURMAN LEGAL
16          BY:  MICHAEL A. THURMAN
            1055 East Colorado Boulevard, 5th Floor
17          Pasadena, CA 91106
            (626) 399-6205
18
            LAW OFFICES OF JAMES D. WHITE
19          BY:  JAMES D. WHITE
            P.O. Box 367
20          113 Quarter Horse Drive
            Bellevue, ID 83313
21          (949) 697-9236

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **APPEARANCES OF COUNSEL CONTINUED:**

2

3     **FOR THE OBJECTOR JACQUES POUJADE:**

4          VENABLE LLP
           BY:  ROGER COLAIZZI
5          600 Massachusetts Avenue, NW
           Washington, DC 20001
6          (202) 344-4000

7          VENABLE LLP
           BY:  ARI N. ROTHMAN
8          2049 Century Park East, Suite 2300
           Los Angeles, CA 90067
9          (310) 229-9900

10         LITIGATION & BUSINESS LAW GROUP, INC.
           BY:  MICHAEL W. KINNEY
11         41690 Ivy Street, Suite C
           Murrieta, CA 92562
12         (951) 296-9910

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            I N D E X

 2                    TUESDAY, JULY 30, 2019

 3     VOLUME 2

 4         ------------------------------------------------------

 5              CHRONOLOGICAL INDEX OF WITNESSES

 6

 7
       WITNESS                                            PAGE
 8
       JACQUES POUJADE
 9          DIRECT EXAMINATION BY DECLARATION
            CROSS-EXAMINATION BY MR. FLETCHER            165
10          REDIRECT EXAMINATION BY MR. COLAIZZI         172
            RECROSS-EXAMINATION BY MR. PRUNTY            219
11          RECROSS-EXAMINATION BY MR. FLETCHER          242
            FURTHER REDIRECT EXAMINATION BY             245
12          MR. COLAIZZI

13     EUNJUNG CARDIFF
            DIRECT EXAMINATION BY DECLARATION
14          CROSS-EXAMINATION BY MR. RODRIGUEZ           267
            REDIRECT EXAMINATION BY MR. THURMAN          289
15          RECROSS-EXAMINATION BY MR. RODRIGUEZ:        296

16

17         ------------------------------------------------------

18                       INDEX OF EXHIBITS

19

20                   RECEIVED INTO EVIDENCE

21
       POUJADE EXHIBIT NO. 1                             217
22     POUJADE EXHIBIT NOS. 2, 3, 4, and 5               266

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, JULY 30, 2019

 2                            8:54 A.M.

 3                             -oOo-

 4

 5              THE CLERK:  Calling Item No. 1, ED CV 18-2104,

 6    Federal Trade Commission versus Jason Cardiff, et al.

 7              Counsel, state your appearances, please.

 8              MS. SANGER:  Elizabeth Sanger for the Federal Trade

 9    Commission.

10              MR. PRUNTY:  James Prunty for the Federal Trade

11    Commission.

12              MR. RODRIGUEZ:  Edwin Rodriguez for the Federal

13    Trade Commission.

14              MR. FLETCHER:  Good morning, Your Honor.

15    Mike Fletcher, Frandzel Robins, on behalf of the receiver, Robb

16    Evans & Associates.

17              MR. WHITE:  Good morning, Your Honor.  James White

18    on behalf of Jason and Eunjung Cardiff.

19              MR. THURMAN:  Good morning, Your Honor.  Michael

20    Thurman on behalf of the defendants, the Cardiff defendants.

21              MR. COLAIZZI:  Good morning, Your Honor.  Roger

22    Colaizzi with Venable on behalf of Jacques Poujade.

23              MR. ROTHMAN:  Good morning, Your Honor.  Ari Rothman

24    also from Venable on behalf of Jacques Poujade.

25              MR. KINNEY:  Good morning, Your Honor.  Michael
```

```
 1    Kinney on behalf of Jacques Poujade.

 2              THE COURT:  And Mr. Poujade is present also.

 3    Thank you.

 4              So good morning to everyone.  I understand from the

 5    clerk that the -- that Mr. Cardiff's Irish passport has now

 6    been returned to the receiver and that problem has been

 7    addressed.  Is that correct?

 8              MR. FLETCHER:  Yes, Your Honor.  I have the

 9    passport.  Counsel handed it to me this morning.  I have it

10    here in case the Court wants to examine it.  Otherwise I'll

11    hand it to the receiver.

12              THE COURT:  And I just want to make sure that

13    counsel for the FTC has been able to examine the passport.

14              MS. SANGER:  If I could take a look real quickly.

15              We've had a chance to examine the passport,

16    Your Honor.

17              THE COURT:  The Court would conclude that the

18    contempt has been purged and therefore Mr. Cardiff will be

19    released from custody.

20              MR. THURMAN:  Thank you, Your Honor.

21              MR. WHITE:  Your Honor, Mr. Cardiff is in leg irons.

22    May those be --

23              THE COURT:  Yes.  All of that should be removed.

24    He's no longer in custody.

25              MR. WHITE:  Thank you, Your Honor.
```

**UNITED STATES DISTRICT COURT**

1          MR. FLETCHER:  Your Honor, with the Court's

2    permission, I'll hand the passport to the receiver.

3          THE COURT:  Yes, please.

4          MR. FLETCHER:  Thank you, Your Honor.

5          THE COURT:  Then, Mr. Poujade, would you resume your

6    seat in the witness chair, please.

7          MR. COLAIZZI:  Your Honor?

8          THE COURT:  Yes.

9          MR. COLAIZZI:  If I may, I spoke with Mr. Fletcher

10   this morning, and he has got some direct examination of -- or

11   maybe it's cross, however you want to call it, of Mr. Poujade.

12   And so it's fine for him to go first.

13         THE COURT:  Yes, please.

14         MR. FLETCHER:  Thank you, Your Honor.  I approached

15   counsel and asked what his preference is, and he expressed that

16   preference, and frankly I don't care.

17         THE COURT:  Okay.  Your witness.

18         MR. FLETCHER:  Thank you, Your Honor.

19         A housekeeping matter.  I have handed the clerk two

20   copies of Mr. Poujade's declaration and exhibits.  They are in

21   the Court's docket at 148-13 and 148-14.  The clerk has two

22   hard copies which I've hand identified as Receiver's 2.  And

23   would the Court prefer that I refer to them by the ECF docket

24   number, 148-13, 148-14, or as Receiver's 2?

25         THE COURT:  Let's -- Receiver's 2.

1          MR. FLETCHER:  Very well, Your Honor.  And could I

2   ask the Court for one copy of Receiver's 2 to be handed to the

3   witness?  And I also believe that Ms. Sanger has the same

4   document electronically, and she'll put it up on the screen.

5          THE COURT:  I've been handed two copies.  So let me

6   provide the clerk with one so he can provide it to Mr. Poujade.

7          MR. COLAIZZI:  Your Honor, may I interrupt?

8          THE COURT:  Yes.

9          MR. COLAIZZI:  This document of course was filed and

10  he's got the correct number for it.  But there was a corrected

11  document filed at 153-5.  So we would object to not using the

12  corrected document.

13         MR. FLETCHER:  Your Honor, I understand that at one

14  point, a different declaration was lodged with this Court that

15  makes certain changes.  I don't believe any question I have of

16  the witness gets into an area where there's been a change, but

17  I'm also of the belief that when you declare something under

18  penalty of perjury, facts don't change.  I certainly have no

19  problem with counsel pointing out if there's been a change.

20         THE COURT:  Well, if there are inconsistencies in

21  the statements between the two documents, that may be a matter

22  for the Court to consider.  So you can proceed.

23         MR. FLETCHER:  Thank you, Your Honor.  May I

24  inquire?

25         THE COURT:  Yes.

1                           JACQUES POUJADE,

2      called as a witness, was previously sworn and testified as

3      follows:

4                          CROSS-EXAMINATION

5      BY MR. FLETCHER:

6           Q     Good morning, Mr. Poujade.  I'm Mike Fletcher.

7      I'm with Frandzel Robins.  I represent the receiver in this

8      matter.

9                You should have in front of you a copy of a

10     document that's now been marked for identification as

11     Receiver's 2 in the lower right-hand corner of the first page.

12               Do you have that?

13          A     I do.

14          Q     Okay.

15               And for ease of everyone's reference, the next

16     page is simply a printout from this Court's docket because when

17     we printed Mr. Poujade's declaration, 148-13, for some reason

18     the ECF header didn't print.  So the next page is the docket

19     reference so that everyone can see what we are talking about.

20               Mr. Poujade, first as a housekeeping matter, on

21     Receiver's 2, if you could turn to page 19, page number at the

22     bottom, there appears to be a signature there.  Let me know

23     when you are there, sir.

24          A     Yes.

25          Q     Is that, in fact, on page 19 your signature?

```
 1        A       Yes.

 2        Q       And did you, in fact, sign Receiver's 2 on

 3   July 8, 2019, at Aliso Viejo in California?

 4        A       Yes.

 5        Q       Thank you.

 6                While we are doing signatures, let's take care of

 7   the other ones that I'm interested in.  Exhibit 2 to the

 8   declaration what I'm going to call Bates stamp page 26.  That's

 9   lawyer talk for there's a number in the lower right-hand

10   corner, 26.  It's part of Exhibit 2.  Are you there?

11        A       Page 26, yes.

12        Q       Page 26, do you see a signature on page 26 of

13   Exhibit 2?

14        A       Yes.

15        Q       Is that, in fact, your signature?

16        A       Yes.

17        Q       Final signature, if you could continue on to

18   page 29, we have another signature.  Same question.  Is that

19   your signature?

20        A       Yes.

21        Q       Thank you.

22                Now, if I recall your testimony correctly from

23   yesterday, you indicated that money flowed in from Irwin Lowy

24   which I gather is a Canadian law firm into the account at

25   TD Canada; is that correct?
```

```
 1          A      Yes.

 2          Q      Could you turn to page 27 of Exhibit 3.  Are you

 3   there?

 4          A      Yes.

 5          Q      And up at the top, it says "Subscription

 6   Agreement to Clover Cannastrip Thin Film Technologies Corp.,

 7   the company," and then "and to Irwin Lowy LLP" and then a

 8   definition "ILL."  Do you see that?

 9          A      On page 27?

10          Q      On page 27 in the upper left.

11          A      Yes.

12          Q      When you referred to Irwin Lowy yesterday, was

13   this the law firm you were referring to?

14          A      Yes.

15          Q      Now, if I understood your testimony correctly,

16   money flowed into Irwin Lowy and then got turned over to the

17   TD Bank account in September; correct?

18          A      Yes.

19          Q      And I believe you characterize that as a mistake

20   because it wasn't your money yet; right?

21          A      Yes.

22          Q      Okay.  If I'm understanding this transaction

23   correctly -- could you turn back to page 29 --

24          A      Yes.

25          Q      -- of Exhibit 3?
```

1          If I'm understanding this transaction correctly,

2     these stock transactions that you were assembling in Canada

3     closed, I believe you indicated, on November 5, 2018; correct?

4          A     Yes.  This particular transaction did.

5          Q     And your signature on page 29, in fact, is dated

6     November 5; correct?

7          A     Yes.

8          Q     Okay.  Now, yesterday we talked about a couple of

9     transfers out of this account, and I believe the FTC had a

10    slide if they can find it.  It's the next one.  Up on your

11    screen -- oh, it was up on your screen -- was a demonstrative

12    exhibit called Clover Cannastrip TD Canada account.  Do you see

13    that?

14         A     Yes.

15         Q     And then there's a red date line, October 12,

16    2018, "Cardiffs served with TRO."  Do you see that?

17         A     Yes.

18         Q     All right.  There was a transaction on

19    October 16, 2018, where 1.2 million was wired out of the

20    account by you with Mr. Cardiff's assistance to Sui & Company;

21    correct?

22         A     Correct.

23         Q     And Sui & Company are lawyers in British

24    Columbia; correct?

25         A     Yes.  They are corporate counsel.

**UNITED STATES DISTRICT COURT**

1       Q       Corporate counsel for --

2       A       Clover Cannastrip TD.

3       Q       Clover Cannastrip?

4       A       Clover Cannastrip, yes.

5       Q       I believe your testimony was the money that came

6   in in September should not have come in from Irwin Lowy.  They

7   made a mistake.  It wasn't your money.  So the money -- this

8   million two Canadian went to Sui & Company; correct?

9       A       Correct.

10      Q       I believe you characterized these transfers above

11  the red line as improper because that wasn't your money?

12      A       Correct.

13      Q       Okay.  So here's my question.  If the overall

14  stock deal didn't close until November 5, you took 360,000

15  Canadian dollars that wasn't yours and sent it to your brother

16  on October 18th; isn't that correct?  Not your money?

17      A       The conditions precedent to it --

18      Q       Yes or no?

19      A       Yes.

20      Q       Did you send 360,000 of money that was not yours

21  to your brother on October 18th?

22      A       Yes.

23      Q       Now, in the little town I'm from in Central

24  California, that's called stealing.

25              THE COURT:  Let's not be argumentative, please.

```
 1   BY MR. FLETCHER:

 2        Q      Was that an appropriate transaction, Mr. Poujade?

 3        A      Your categorization was not appropriate, but the

 4   transaction was appropriate.

 5        Q      But you didn't own the money?

 6        A      The condition --

 7        Q      Yes or no?

 8        A      Technically, no.

 9        Q      Now, Mr. Cardiff signed a document from

10   TD Canada where he identified himself as the president of

11   Clover Cannastrip; correct?

12        A      That is submitted into evidence.

13        Q      So he did sign that; right?

14        A      Yes.

15        Q      And he labeled himself as president?

16        A      Yes.

17        Q      Was he lying?

18        A      It was a misstatement or miscategorization of his

19   position.

20        Q      So you are saying he was not president?

21        A      He was never president.

22        Q      Now, is it a serious offense in Canada to say

23   something that's not true to a Canadian bank?

24        A      You'd have to ask the Canadians.  I don't know.

25        Q      You are a charter accountant in Canada, are you
```

1    not?

2         A      I don't know.

3         Q      You don't know.

4                You are an executive of any number of American

5    financial institutions; correct?

6         A      Yes.

7         Q      Would it be inappropriate here?

8                MR. COLAIZZI:  Your Honor, I'll object.  This is

9    calling for a legal conclusion.  He's asking about whether it's

10   lawful.

11               THE COURT:  Overruled.

12   BY MR. FLETCHER:

13        Q      You may answer.

14        A      Could you repeat the question?

15        Q      Your declarations, all of them, reference all

16   sorts of involvement in American financial institutions;

17   correct?

18        A      Yes.

19        Q      And I believe you corrected counsel for the FTC

20   yesterday indicating that they had left out a whole bunch of

21   ones; right?

22        A      Yes.

23        Q      Is it inappropriate in the United States to say

24   something that's not true --

25        A      Yes.

1    Q        -- to a financial institution?

2    A        Yes.

3            MR. FLETCHER:  I have no further questions of this

4    witness at this time, Your Honor.

5            THE COURT:  Thank you.

6            THE WITNESS:  Thank you, sir.

7            THE COURT:  Direct?

8            Just for the marshals, the contempt has been purged.

9    So Mr. Cardiff is no longer in custody.  You are welcome to

10   remain, but it's no longer required.

11           THE BAILIFF:  Yes, Your Honor.

12           THE COURT:  Thank you.

13           MR. COLAIZZI:  May I proceed, Your Honor?

14           THE COURT:  Yes.

15                        REDIRECT EXAMINATION

16   BY MR. COLAIZZI:

17   Q        Good morning, Mr. Poujade.

18   A        Good morning.

19   Q        I want to go back and give you a chance to give

20   us some information about your background.  You got some of it

21   out when Mr. Prunty was questioning you, but clearly there was

22   more.

23           So if you could briefly give us your educational

24   background.

25   A        Yes.  I graduated from Concordia University in

1    Montreal, Canada with a degree in finance.  I then went on to

2    graduate school at McGill University and obtained a degree in

3    graduate studies with a concentration in accounting.

4                 I was then hired by Coopers & Lybrand.  And you

5    have to be an apprentice for a minimum of two years as part of

6    your qualifications, and you have to write national exams to

7    pass and become chartered into what they call becoming a

8    chartered accountant and chartered into the roles.  I was at

9    Coopers & Lybrand for five years.

10                And in 1986, Bank of Boston Canada became a

11   customer of Coopers & Lybrand, and I was the manager on the

12   account.  And Bank of Boston Canada made me an offer to join

13   their team as a credit analyst, and I soon became the assistant

14   to the president of Bank of Boston Canada Jim Shonaker.

15                I spent a lot of time in Boston and in the U.S.

16   working on leveraged buyout transactions for the bank which

17   required me to visit companies, prospective clients of the

18   bank, then write up a report for credit committee and present

19   to credit committee, and I did that for two and a half years.

20                I was then recruited to go work with Olympia &

21   York, a subsidiary of Olympia & York in London, and I worked on

22   Canary Wharf until April of 1990 when I was recruited to come

23   to California to work for a large real estate conglomerate

24   which had a development company, a realty company, had a

25   mortgage company.

1          And then in October of -- I left that employment

2     in '95 because I wanted to strike out on my own.  On

3     October 1st of 1996, I started my first mortgage company called

4     First Allegiance Financial Corporation.  I sold that company in

5     September or October of '97 for $20 million to a NASDAQ company

6     called City Holding Company which was a NASDAQ company that

7     held regional banks.

8          If you invested $50,000 with me at

9     First Allegiance in October of '96, your return was $500,000 in

10    September of '97.  It was a very good transaction for the

11    shareholders.

12         City Holding Company owned regional banks, and

13    one of the banks was federally chartered.  I became the loan

14    production office or arm of the federally chartered bank which

15    allowed me to originate loans in 50 states because of the

16    federal banking charter that they had.

17         So First Allegiance went from 8 states to

18    50 states.  I grew the business to 350 loan officers,

19    200 support personnel including processors, funders,

20    underwriters.  And I stayed with the bank until December '99.

21    Jason joined the company in 1998, and that's when we first met.

22         I had an option to renew my contract.  However,

23    my second son, Anton, had just been born, and my wife had

24    enough of my 80 hours a week and asked me to take a year, a

25    couple years off which I did.

175

1          And on January 1st, 2003, I started my second

2   company called Lenders Direct because my noncompete was over.

3   We actually incorporated in May of 2003, and I didn't start

4   operations until September 2003.

5          I quickly grew that business.  In 2004 we did

6   500 million of production.  In 2006, we did 1.2 billion of

7   production, and then in 2005 we did 1.2 billion.  In 2006, we

8   did 2 billion of production.

9          I had Reggie Jackson of the New York Yankees as

10  my spokesperson.  We were -- the original model was to do

11  something similar to The Money Store with Phil Rizzuto.  So we

12  filmed commercials that we -- for consumers, that were directed

13  at consumers where Reggie -- we got permission from major

14  league baseball for Reggie -- three consecutive home runs in

15  that one game of the World Series was the lead for that

16  commercial.  And then Reggie would come on and say something

17  about Lenders Direct.  If you want to hit a home run with your

18  home mortgage, come to my friends at Lenders Direct.

19          Anyway, the commercial was not successful.  I

20  quickly found out that the even though I was a fan of

21  Reggie Jackson, not many others were a fan of Reggie Jackson, I

22  guess because they beat their baseball teams.

23          So then quickly Reggie was very well known in

24  Wall Street, and I was quickly able to start relationships with

25  Credit Suisse, Merrill Lynch, Deutsche Bank, Citicorp.  And by

```
 1   2006 I had $350 million in warehouse lines.  These are credit
 2   lines where I would originate, underwrite, process, and fund
 3   the mortgages and then sell them into their securities.
 4           In late 2006 we got an offer from Merrill Lynch
 5   for the company for $75 million, but we were four partners.
 6   Two of the partners -- two of us wanted to take the
 7   transaction.  Two of the other partners wanted to do an IPO the
 8   following year.
 9           In 2007 the capital market started reeling, and
10   there was compression in the pricing on the mortgage-backed
11   securities.  We were typically making 103 on $100 million which
12   was $3 million of revenues.  And by 2007, those margins had
13   compressed to less than 101.  And in February of 2007, they
14   actually went to 99 which means for every $100 million we sold,
15   we lost a million dollars.
16           One of the partners was an attorney, and he said
17   to us, that's okay, we'll make it up in volume.  I said that's
18   not a good idea.  So we decided to wind down the operations.
19           I had a retail operation that was doing
20   $250 million a month in production -- excuse me.  $250 million
21   a year in production.  And that channel continued to operate
22   well because Bear Stearns, IndyMac, Countrywide were still
23   paying 102 and a half for that production.
24           So it allowed us to wind down the company in an
25   orderly fashion.  Everybody got repaid except the principals.
```

1   We lost all our capital.  And -- but it allowed us because we

2   exited in a proper manner and met all our obligations, I was

3   allowed to continue in the mortgage business.  Many were not.

4   And those names are known.

5        Q       What was your next company after that?

6        A       After that we incorporated a company called

7   Tri-Emerald Financial Group, Inc.  That was in 2008.  And that

8   was with two partners and myself.  One partner was the

9   president of Citi Mortgage, and he had left Citi Mortgage to

10  start this venture with me.  And the other was Michael McGuigan

11  who was a partner of mine from Lenders Direct.

12            This business was all retail.  No brokers.  We

13  went direct to the consumer.  The company's name was changed in

14  2014 to Lenders -- to Lend Plus, excuse me, because it was more

15  of a consumer facing name rather than Tri-Emerald Financial

16  Group.  The name Tri-Emerald Financial Group was chosen by my

17  two other partners because they were both Irish.

18       Q       Is Lend Plus the business you are operating now?

19       A       Yes.  Now, Lend Plus then went on to have many

20  different companies as part of its network and subsidiaries to

21  include a realty company, to include a portal which was tied to

22  multiple listings where people could visit the homes that they

23  wanted to buy, all with the focus of creating more business for

24  the mortgage company.

25       Q       Is it a full-time job at Lend Plus?

1    A    Yes.  And also last -- in 2018 we -- I chair a

2  company that is in blockchain technology and artificial

3  intelligence called True Block.  And its purpose of the

4  blockchain is so in the context of mortgages somebody could

5  actually apply for a mortgage and it would be the last credit

6  application they would ever have to complete because through

7  the blockchain, the data is protected, and it's immutable, and

8  you can build on it.

9    So the purpose there was -- or the purpose is, I

10  should say, because there's plans to bring that company public

11  here shortly, is once you capture that customer on the premise

12  that this is the last mortgage application they will ever have

13  to complete, you've got that customer for life.

14    Q    Mr. Poujade, you mentioned that you first met

15  Jason Cardiff in 1998.

16    A    That's correct.

17    Q    You said he was working for your company.  What

18  was his position then?

19    A    When he originally joined, he didn't have the

20  proper licensing.  So he joined as an apprentice, for lack of a

21  better word, a trainee.  And he had to go through a one-month

22  training program and then write his real estate exam to be

23  licensed under the Bureau of Real Estate of California which is

24  the licensing we had at the time.

25    All mortgage originators have to be licensed in

```
 1    that manner, or they can be licensed under the Department of
 2    Corporations.
 3              We held -- it depends on what license the company
 4    holds.  We held a Bureau of Real Estate license.  Therefore,
 5    he had to qualify and pass the license with the Bureau of
 6    Real Estate.
 7         Q    Okay.  How long -- what company was that that he
 8    worked with?
 9         A    That was First Allegiance Financial Corp., my
10    first mortgage company.
11         Q    And you sold that in -- did you say 1999?
12         A    I sold it in 1997.  But I left in December of
13    1999 when my contract came up and I did not exercise the
14    extension.
15         Q    Okay.  So he was -- came on as a -- what was his
16    title?
17         A    Well, originally he was a trainee, but then he --
18    once he passed real estate exam, he was a mortgage
19    loan officer.
20         Q    How long did Mr. Cardiff -- when you left, was
21    Mr. Cardiff still working there?
22         A    I believe so.
23         Q    I think you said you had 350 loan officers?
24         A    Yes, that's correct.
25         Q    How often did you see him?
```

180

```
 1        A       He quickly became the No. 1 loan officer in terms
 2   of production.  So I saw him more often than I would see
 3   others.
 4        Q       Okay.  When you left within a year -- I think you
 5   said 1999 you left?
 6        A       I left December 1999.
 7        Q       Okay.  When did you see Jason again, Jason
 8   Cardiff?
 9        A       I ran into Jason 2005.  We happened -- I was
10   getting a haircut at a hair salon, and his wife used the same
11   stylist.  And I walked in, and the whole family was there.
12        Q       Did you stay in touch with him after 2005?
13        A       On and off, yes.
14        Q       Any events in 2005 when you saw him at the hair
15   salon?
16        A       We went to dinner.
17        Q       After 2005, did you see Mr. Cardiff again?
18        A       Yes.
19        Q       When?
20        A       Socially.  And in 2009 I was approached by a very
21   good friend.  He was part of the St. Vincent de Paul Society.
22   His name is Tom Fuentes.  He's no longer with us.  He died of
23   liver cancer.
24                St. Vincent de Paul had a project called
25   Lights On.  And Lights On is at Orange County jail they release
```

```
 1    prisoners or inmates between 10:00 at night and 3:00 in the
 2    morning depending on what their release timing was.  If they
 3    had gone to court that day and they were discharged, then they
 4    were released by midnight.  And if their time served came up,
 5    they were released between 12:00 and 3:00 in the morning
 6    because I was told the county receives $150 a day per
 7    individual.  So if they released them at 12:01, they got the
 8    $150, and they didn't have to take care of the person for the
 9    day.
10              I approached Jason in 2014.  There were -- two
11    things happened.  I started this project in 2009.  They had a
12    dilapidated RV that we parked outside the jail with big
13    floodlights where people being released could sit and wait in
14    safety.
15              A couple years earlier, the exit for the women
16    and the men is the same place out of Orange County jail.  It's
17    in Santa Ana, and it's in a tough part of town.  There was a
18    woman that was raped and murdered in the early morning hours.
19    So St. Vincent de Paul got involved by having the Lights On
20    project with an RV where people could come out of jail, sit
21    with these big floodlights that we had in safety.  We would
22    recharge their cell phones.  So we had a generator.  We had
23    coffee, cigarettes, et cetera.  But we provided a safe place
24    for people to wait for their rides.
25              And in 2014 Lights On and St. Vincent de Paul
```

```
 1    came into financial difficulty.  Maybe 2013.  Two things
 2    happened.  At this point Tom Fuentes was on his death bed.
 3              THE COURT:  Let's -- Counsel, ask your next
 4    question.
 5              MR. COLAIZZI:  Yes.
 6         Q    You said you had a connection with Mr. Cardiff in
 7    2014 related to this?
 8         A    Yes.
 9         Q    Tell me about that connection.
10         A    I asked Jason if he would help support Lights On.
11         Q    Okay.  Did he?
12         A    Yes.
13         Q    What was his support?
14         A    He contributed 2,500 a month to do that.
15         Q    How long did you work for Lights On?
16         A    I stopped my involvement in 2015.  My involvement
17    was not just financial and supportive.  For instance, I wrote a
18    grant to get a new RV.  What I also -- I also had Tuesday night
19    until 3:00 a.m. in the morning as one of my contributions every
20    single week.  And, you know --
21         Q    Did you come across Mr. Cardiff subsequent to
22    asking him to -- after you asked him to contribute some money,
23    was there a time you --
24              MR. PRUNTY:  I'm going to object to this line of
25    questioning not being germane.
```

```
 1              THE COURT:  I'll allow some leeway here, but let's
 2   move forward and focus on the more important issues.
 3              MR. PRUNTY:  Thank you.
 4   BY MR. COLAIZZI:
 5        Q      Mr. Prunty had asked you a couple of questions
 6   about a stint that you had helping a Redwood Scientific or
 7   attempting to help them to go public.
 8        A      Yes.
 9        Q      When did that happen?
10        A      2014.
11        Q      2014?
12        A      2014.
13        Q      How did you come to work for or do some work for
14   Redwood Scientific?
15        A      Through the conversations I was having with
16   Jason.
17        Q      Can you describe what you did for Redwood
18   Scientific and how you ended up doing that work?
19        A      Yes.  Jason wanted to bring Redwood public, and
20   he had a controller, and he had a general manager, and he had
21   staff.  But he needed my expertise.  And he had already been
22   contacted by an investment banker -- his name is Patrick
23   Imeson -- and then a capital markets firm called Aspenwood from
24   Denver, Colorado.  And they felt that I could definitely help
25   Redwood and Jason organize and produce the internal controls
```

184

```
 1    and the systems that were needed to effectuate that result.

 2         Q       You testified when Mr. Prunty was asking you

 3    questions that you were a consultant and was it a paid

 4    consultant?

 5         A       Yes.

 6         Q       What were you paid?

 7         A       5,000 a month.

 8         Q       How long did you -- strike that.

 9                 Did you oversee the auditors and the controller

10    and the accountants as part of your duty?

11         A       I coordinated all those activities.

12         Q       After the five or six months, why did -- what

13    caused you to stop?

14         A       We had a disagreement.  Jason stopped paying --

15                 THE COURT:  Would you refer to Mr. Cardiff by his

16    last name?  The rules require that.  If you would, please.

17    Thank you.

18                 THE WITNESS:  Yeah.  Mr. Cardiff and I came to a

19    disagreement.  There were a lot of things going on in my life

20    with my companies.  And my mother who had been diagnosed with

21    Parkinson's was getting worse and worse.  And it required me

22    going to Canada a lot, and I just -- I no longer had the time

23    to do -- or to work with Mr. Cardiff.

24    BY MR. COLAIZZI:

25         Q       What was the state of the efforts to have the
```

1  Redwood Scientific go public at that time?

2      A      There was -- so I should have also mentioned

3  there was a controller or CFO by the name of Melvina.  I don't

4  remember her last name.  Things were getting squared away quite

5  nicely.  And, in fact, I participated in drafting and helping

6  draft the S-1 which had -- which got filed.  And it's at that

7  point that then I couldn't continue.

8      Q      Did you have -- other than a consultant, did you

9  have any titles at Redwood Scientific?

10     A      I was given the title of CFO.

11     Q      Did you operate as a CFO for Redwood Scientific?

12     A      I operated as a -- as a consultant.  There were

13  two subsequent CFOs that were brought in.

14     Q      Subsequent to when you left after five or six

15  months?

16     A      Yes.

17     Q      All right.  And this was all in 2014?

18     A      I left in '15.  Or I stopped -- I never had an

19  office there.  But I stopped that engagement in 2015.

20     Q      Did you ever find out whether Redwood Scientific

21  went public?

22     A      I understood from the bankers, Patrick Imeson in

23  particular, that there was a reverse merger done.  And whenever

24  that happened I -- I don't even know what date that happened.

25     Q      Did you come to find out -- I think Mr. Prunty

1    asked you some questions about whether you were a CFO in 2018.

2    Were you a CFO in 2018 for Redwood Scientific?

3        A        No.

4        Q        Did you come to find out you were listed on a

5    document that indicated you were a CFO?

6        A        I'm on a document.  I'm on the S-1, and

7    Mr. Kinney provided me with that.

8        Q        When did you find out?

9        A        I don't recall, but it was 2019.

10       Q        Okay.  After that work you did in 2014 through

11   the beginning of 2015, did you cross paths with Mr. Cardiff

12   again?

13       A        Yes.

14       Q        When was that?

15       A        It was in a social context.

16       Q        Were you ever in business with Mr. Cardiff?

17       A        No.

18       Q        Did you -- so one of the issues here in this

19   Court is Mr. Cardiff's role at Clover Cannastrip Thin Strip

20   Technologies.  Was he -- he was an initial shareholder; right?

21       A        Yes.

22       Q        As were you?

23       A        Yes.

24       Q        Okay.  And he was a director?

25       A        Yes.

1       Q       And his wife, Mrs. Cardiff, was a director?

2       A       Yes.

3       Q       And you were a director?

4       A       Yes.

5       Q       All right.  That was incorporated July 31, 2018;

6    right?

7       A       Correct.

8       Q       There came a time when Mr. Cardiff tendered his

9    shares for cancellation back to the company?

10      A       Yes.

11      Q       When was that?

12      A       That was August 29th, 2018.

13      Q       And after he tendered those shares, how many

14   shareholders were there for the company?

15      A       Well, today there are 165 shareholders, and

16   there's 52 million shares outstanding.  So you'd have to give

17   me a time frame as to --

18      Q       I'm saying at the time that he -- his shares were

19   canceled, how many shareholders were there?

20      A       Just me.

21      Q       Why was he asked to relinquish his shares?

22      A       So again, the plan for True Pharmastrip, Inc.

23   which it's called today, which is a lot easier than

24   Clover Cannastrip Thin Film Technologies Corp., was to go

25   public.  And Haywood was the investment bank that was not only

1   going to provide the original seed capital, not only provide

2   the initial capital of $4 million, but was also going to bring

3   us public.

4              And once they did the due diligence on the team,

5   they came to the conclusion that the -- that Mr. Cardiff could

6   not be a shareholder.  And the reason the contract went from an

7   employment contract to a management contract is they -- I

8   couldn't -- he could not be an employee either.  So I went from

9   you can't be a shareholder.  You can't be a director, and you

10  can't be an employee.

11      Q     Was that -- were those mandates happen all at the

12  same time?

13      A     No.  Through this timeline that we've been

14  discussing.

15      Q     Okay.

16             THE COURT:  Just for my clarification, he tendered

17  his shares on August 29th, 2018?

18             THE WITNESS:  Correct, sir.

19             THE COURT:  When did he withdraw as a director.

20             THE WITNESS:  October 8th is when it was formalized

21  by Erwin Sui.  But he tendered his resignation in September,

22  but Erwin Sui was so behind in our corporate documents that

23  October 8th is the date of that resolution.

24             THE COURT:  And what documents, if any, exists that

25  reflect that he tendered shares on the 29th and withdrew as a

**UNITED STATES DISTRICT COURT**

```
 1   director October 8th?
 2            THE WITNESS:  There's a resolution of October 8th.
 3   That's in the exhibits.  And I believe that the share
 4   cancellation of 100 shares was also provided in the exhibits.
 5   My attorneys would have to tell me.
 6            THE COURT:  Is there any other documentation that
 7   supports the two acts to your knowledge?
 8            THE WITNESS:  No.
 9            THE COURT:  Thank you.
10            THE WITNESS:  Excuse me, Your Honor.  There are the
11   appropriate filings with the various corporate agencies.
12            THE COURT:  What filings are you referring to?
13            THE WITNESS:  Those that would have been done by
14   Erwin Sui, our general counsel.
15            THE COURT:  I'm not sure what you are referring to.
16            THE WITNESS:  Oh, there's a registry of directors in
17   British Columbia.  Sort of like the Department of Corporations
18   here.
19   BY MR. COLAIZZI:
20       Q      Was there something filed with that registry?
21       A      Yes.
22       Q      Reflecting the stepping down by Mr. Cardiff as a
23   director?
24       A      Correct.
25       Q      And the stepping down of Mrs. Cardiff as a
```

```
 1   director?

 2       A      Yes.

 3       Q      Was her stepping down also effective on

 4   October 8th?

 5       A      Correct.

 6       Q      When was that document filed with the British

 7   Columbia Corporate Registry?

 8       A      To the best of my knowledge, that was

 9   November 5th and I'm told, yes.

10              MR. COLAIZZI:  Your Honor, we'll refer the Court to

11   Mr. Sui's declaration with respect to the filing of that

12   document.  And I think it's attached as well.

13       Q      So on October 8th, he resigned as a

14   director.  And then what's been raised a number of times

15   is that Mr. Cardiff and then subsequently Mrs. Cardiff were

16   signatories to the TD Bank account for True Pharmastrip, Inc.

17              I'm going to -- if it's okay with the Court, I

18   can refer to the company as True Pharmastrip, Inc., but at the

19   time we are talking about, it was called the Clover Cannastrip

20   Thin Film Technologies, Inc. just for ease of reference if it's

21   all right with the Court?

22              THE COURT:  Certainly.  So long as it's clear.

23   BY MR. COLAIZZI:

24       Q      So Mr. Poujade, how did -- strike that.

25              Were you expecting to be a signatory on the bank
```

```
 1   account?

 2         A       Yes.

 3         Q       You testified about that yesterday?

 4         A       Yes.

 5         Q       All right.  I won't go through it again.

 6                 We've seen a couple of times the FTC's

 7   demonstrative exhibit with transactions that happened in

 8   October of 2018.  Mr. Fletcher just had it up there a minute

 9   ago.  How were those transactions effectuated mechanically?

10   How were those done vis-a-vis the bank?

11         A       So there were some done in September when he

12   was -- I'm speculating, but they were in branch --

13                 THE COURT:  Please don't guess or speculate.

14                 THE WITNESS:  Okay.

15   BY MR. COLAIZZI:

16         Q       So when was the first time you were able to see

17   bank statements reflecting transactions?

18         A       We got access or I got access in October.

19         Q       Of?

20         A       2018.

21                 MR. COLAIZZI:  Your Honor, may I ask the FTC if

22   they can put that exhibit up?

23                 THE COURT:  Yes, please.

24                 MR. COLAIZZI:  Thank you.

25                 THE COURT:  Let me ask while that is being done and
```

```
 1    only if you have personal knowledge, but what was the
 2    relationship, if any, between Mr. Cardiff and Sui & Company?
 3                   THE WITNESS:  There was no relationship.
 4                   MR. COLAIZZI:  I apologize, Your Honor.  I did not
 5    hear the question as I was --
 6                   THE COURT:  The relationship between Mr. Cardiff and
 7    Sui & Company, and the response was there was no relationship.
 8                   MR. COLAIZZI:  Okay.
 9         Q    So these are the transactions, and I'm not going
10    to ask you to go through them all.  But --
11         A    I'd like to point something out.
12         Q    Okay.
13         A    Those are not the transactions as they appear in
14    the TD Bank records.  This is the backup to the bank records.
15    If you look at the bank statements, you do not have any of
16    these descriptions as to the recipient.
17         Q    Okay.  So -- and when did you first see the
18    backup that reflected the information of the recipient?
19         A    In the receiver's declaration and exhibits most
20    recently.
21         Q    In late July of this year?
22         A    Whenever it was, yeah.
23         Q    So you knew that there were a number of
24    transactions taking place in October of 2018 --
25         A    Yes.
```

1      Q       -- and Mr. Cardiff and Mrs. Cardiff had stepped

2   down as directors effective October 8th, 2018.  Did there come

3   a time when the methodology by which access to that account was

4   provided to you?

5      A       Yes.

6      Q       What was the methodology that allows you to -- or

7   the company to make wire transfers?

8      A       So we have to get a little bit more specific.

9   There's the first level to view the online banking is through

10  user name and password.  And what it gives you is exactly what

11  you see on the TD Bank statement.  It doesn't give you this

12  detail.

13          So on the bank statement, it shows as, for

14  instance, there would be a lump of wires.  Whatever happened on

15  the 4th, there would be no description, and it would just say

16  "outgoing wire."

17          So to effectuate wire transfers, you need a key

18  fob in addition to the login information.  And the key fob is a

19  device, and when you press it, you press a button on it, it

20  gives you a six-digit code that is randomized to that specific

21  device.  And that specific device is tied to your login

22  information.

23          So that's why if you put in a number that's bogus

24  and not coming from the key fob and the systems know that

25  that's not a legitimate key fob code that you are inputting,

**UNITED STATES DISTRICT COURT**

```
 1   and it won't let you do the transaction.  So to do wires you

 2   need both the login information and the key fob.

 3           Q       When did you receive the wire information and the

 4   key fob?

 5           A       I received the -- well --

 6           Q       The codes and the key fob?

 7           A       On end of business October 9th.  So when we saw

 8   that all these transactions were happening, Jason was -- had

 9   resigned as a director.  We had not completed the closing of

10   the transaction, and money was being spent.  The decision was

11   made to return the money to Erwin Sui's trust account.

12                   Now, he kept telling me it's closing, it's

13   closing, it's closing.

14           Q       Who is the he?

15           A       Sorry.  Erwin Sui.  Because we had to effectuate

16   the Haywood founder share closing to a penny prior to taking in

17   from a corporate government's perspective any other money.

18   So --

19           Q       Is that because the other money was an offering

20   of shares at a higher amount?

21           A       Yes.

22           Q       Go ahead.

23           A       And they were not founders whereas Haywood was a

24   founder.

25           Q       What do you mean by founder?
```

1      A      They provided the original I called it seed

2  capital as does the attorneys called it.  So the original

3  capitalization for the company.

4      Q      And they provided that --

5      A      Yes.

6      Q      -- directly?

7      A      Correct.

8      Q      Okay.  So you indicated that on -- that you

9  returned the -- you returned the money to Sui & Company?

10     A      Yes.

11     Q      But it had never been to Sui & Company before?

12     A      No.

13     Q      Okay.  Why Sui & Company and not Irwin Lowy?

14     A      Irwin Lowy -- at Haywood there are multiple

15  fiefdoms.  There's the corporate finance fiefdom that's run by

16  a group, and Irwin Lowy was their attorney of choice.  And then

17  there's the retail side of the business which manages

18  customers, and it's billions and billions of dollars.

19         The retail side of the business had done several

20  transactions with Erwin Sui.  In fact, I have done business

21  with them for the last 20 years and have brought many companies

22  public.  Their preference was to use Erwin Sui.  So we started

23  with Irwin Lowy as the law firm, and then we were instructed to

24  engage Erwin Sui.

25         Erwin Sui is in British Columbia.  Irwin Lowy is

1    in downtown Toronto.  Erwin Sui did not want to disrupt all the

2    work that Irwin Lowy had done.  So he made them or they made

3    them a subagent to the transaction.

4         Q        All right.  So on October 16th, 2018, 1.2 million

5    Canadian was transferred to Sui & Company pending the

6    transaction closing?

7         A        With the founder's shares which closed later that

8    day.

9         Q        After the wire went?

10        A        After the wire went.

11        Q        Okay.  What was the effect of the founder's

12   shares being issued in closing?

13        A        It was the action that needed to take precedent

14   to everything that happened next.

15        Q        Okay.  So what happened next?

16        A        What happened next was we were able to formalize

17   the closing for the 20-cent round.  And the first investment

18   was $2 million which was 500,000 from XIB, a big venture

19   capital firm, and FSD Pharma.  And then the next 2 million also

20   came from Haywood, but it was their retail customers that were

21   participating.

22        Q        So Mr. Fletcher earlier this morning asked you

23   about the October 18th transaction of $360,000 Canadian to

24   Richard Poujade.

25        A        Correct.

1    Q    And you had indicated that the transaction was

2    proper.  Maybe you didn't use that word.  I don't mean to put

3    words in your mouth.  What did you say?

4    A    All the conditions precedent for us closing now

5    the first 20 cent round of 2 million existed and were being

6    documented and formalized.

7    Q    When you said round of 2 million, you are

8    referring to the number of shares?

9    A    No.  Dollars.

10    Q    $2 million?

11    A    And these are Canadian dollars.  And I'm

12    referring to specifically XIB half million and FSD Pharma

13    1.5 million.

14    Q    So the -- what conditions precedent were there

15    that permitted you to wire the money to Richard Poujade rather

16    than to Sui & Company?

17    A    So we needed a bank account for Pharmastrip Corp.

18    And to be expeditious, I sent it to Richard so he could open

19    the Pharmastrip Corp. bank account.

20    Q    Okay.  What permitted you to -- when did the

21    transaction for the 500,000 for -- Canadian for XIB finalize?

22    A    Well, it was documented with board resolutions

23    and with my signing of the subscription agreement on

24    November 5th.

25    Q    So November 5th is obviously after October 18th?

```
 1        A       It is.

 2        Q       Was your signature needed before the money was

 3   considered to be the companies that True Pharmastrip, Inc.

 4   or --

 5        A       I was instructed by Erwin Sui that I could do

 6   that.

 7        Q       You could send the money to Mr. Richard Poujade

 8   so that he could open a bank account, deposit monies in that

 9   bank account for Pharmastrip Corp.?

10        A       That's correct.

11        Q       And Pharmastrip Corp. was incorporated in

12   September?

13        A       Correct.

14        Q       What was Mr. Richard Poujade's title in that

15   company?

16        A       He was president.

17        Q       Did he own any other titles?

18        A       He was director.

19        Q       Were there any other directors of Pharmastrip?

20        A       No.

21        Q       Have there ever been any other directors of

22   Pharmastrip?

23        A       No.

24        Q       Are there any other officers of Pharmastrip

25   Corp.?
```

**UNITED STATES DISTRICT COURT**

1          A       No.

2          Q       Have there ever been any other officers of

3     Pharmastrip Corp.?

4          A       No.

5          Q       How many directors are there of True Pharmastrip,

6     Inc. currently?

7          A       Five.

8          Q       You are one of the directors?

9          A       Yes.

10         Q       How many percentagewise?  What is your holding

11    for shares of True Pharmastrip, Inc.?

12         A       8.8 percent.

13         Q       Just under 9 percent?

14         A       Correct.

15         Q       You are the CEO of True Pharmastrip, Inc.?

16         A       That's correct.

17         Q       Are you able to transfer money -- is there a

18    limit of the amount of money you can transfer as it relates to

19    your title of CEO?

20         A       It would be within conventional amounts.

21    Anything of consequence I would get board approval.

22         Q       So earlier with respect to this hearing and also

23    with respect to a position FTC has taken, there are two

24    references to a Clover company.  One is Clover Cannastrip Thin

25    Film Technologies, Inc. which is now called True Pharmastrip,

```
 1    Inc.; is that correct?

 2         A     One small correction.  It's called Clover

 3    Cannastrip Thin Film Technologies Corp., not Inc.

 4         Q     Thank you.

 5               There's also been reference to Clover Cannabis.

 6    What is Clover Cannabis?

 7         A     Yes, this was the original project that was

 8    worked on with Jason and I.

 9         Q     When you say --

10         A     Yes, but that company to my knowledge never came

11    into existence.

12         Q     When you say the original company you were going

13    to work with Mr. Cardiff on, what do you mean by that?

14         A     Well, that was the planned name in our original

15    discussions with Haywood.  But that company did not come into

16    existence.  In fact, the Haywood deck has the wrong company

17    name.

18         Q     So are you referring to some questions that

19    Mr. Prunty asked you relating to Clover Cannabis?

20         A     Yes.

21         Q     Could you --

22         A     And it has the incorrect share structure and

23    capital structure.

24         Q     When you say the incorrect share structure and

25    capital structure, what do you mean?
```

```
 1         A       In part of the presentation of the deck is a

 2   pro forma share capital structure.  And that's not the share

 3   capital structure of TPI today.

 4         Q       Was that share capital structure you are

 5   referring to in the deck, was that ever utilized by True

 6   Pharmastrip, Inc. or Clover Cannastrip Thin Film Technologies

 7   Corp.?

 8         A       No.

 9         Q       And that is to the extent investors invested

10   money, they were investing in a different share structure; is

11   that right?

12         A       In -- so if they invested in a company called

13   Clover Cannabis, I have no knowledge of that.

14         Q       Do you know if Clover Cannabis exists today as a

15   company?

16         A       Only in the reference that I think somebody made

17   to it.

18         Q       Were you ever part of any company called Clover

19   Cannabis?

20         A       No.

21         Q       Let me talk about True Pharmastrip, Inc. as it's

22   now called.  Did True Pharmastrip, Inc. receive any money from

23   the Cardiffs ever?

24         A       No.

25         Q       Did True Pharmastrip, Inc. ever get money from
```

 1   any entities or persons associated with the Cardiffs as

 2   referenced in the lawsuit by the FTC?

 3        A     No.

 4        Q     As of the -- do you understand that on

 5   October 12th, 2018 -- let me strike that.

 6              Do you understand that on October 10th, 2018, the

 7   Court signed a temporary restraining order and asset freeze

 8   against the Cardiffs and a number of their companies?

 9        A     Do I understand today?

10        Q     Yes, that's the question.

11        A     Yes.

12        Q     And do you understand today when that order was

13   served on the Cardiffs?

14        A     Yes.

15        Q     Was that October 12th, 2018?

16        A     That's my understanding.

17        Q     Did you ever receive an actual copy of the

18   temporary restraining order or the subsequent preliminary

19   injunction order ordered by this Court?

20        A     Not until recently.

21        Q     When you say recently, can you give me a time

22   frame?

23        A     When the OSC was issued by the Court.

24        Q     As a result of this hearing and the papers that

25   were filed initiating this hearing, that's when you first saw

203

```
 1    either the temporary restraining order or the preliminary

 2    injunction issued by the Court in the underlying case against

 3    the Cardiffs?

 4         A     That's correct.

 5         Q     There was a time when you heard from Mr. Cardiff

 6    that he couldn't have a bank account I think you said earlier?

 7         A     Yes.

 8         Q     Did you ever learn that Mr. Cardiff's bank

 9    accounts were frozen --

10         A     Yes.

11         Q     -- or words to that effect?

12         A     Yes.

13         Q     When was that?

14         A     That was in late October/early November when he

15    came to me for the loan.

16         Q     When you say "the loan," you are talking about

17    what loan now?

18         A     He came to me for a loan.

19         Q     So when you transferred money on October 16th,

20    2018, and October 18th, 2018, you had not known about the

21    temporary restraining order or preliminary injunction?

22         A     No.

23         Q     There were some questions about a phone call you

24    had with Mr. Cardiff on the 12th.

25         A     Yes.
```

1        Q        Had you -- and it was referenced as a ten-minute

2    phone call.  Do you remember that?

3        A        Yes.

4        Q        Did you have other calls -- other than that

5    ten-minute call, did you have other calls with Mr. Cardiff on

6    the 12th?

7        A        I did.

8                THE COURT:  This is the 12th of October?

9                MR. COLAIZZI:  October 12, 2018, Your Honor.

10                THE COURT:  Thank you.

11                THE WITNESS:  I had a 45-minute call with him early

12    that morning at 7:30.

13    BY MR. COLAIZZI:

14        Q        There's been discussion about when -- at this

15    hearing about when Mr. Cardiff was actually -- that the time of

16    day he was served with the order, I think the testimony was it

17    was at 10:30 in the morning?  Do you recall that hearing that?

18        A        Not --

19        Q        Other than just now, do you remember hearing that

20    yesterday?

21        A        Yes.

22        Q        So the call you had for 45 minutes at 7:30 in the

23    morning was obviously before Mr. Cardiff was served with the

24    order; correct?

25        A        I had a running joke with Mr. Cardiff.  He didn't

1    work on Fridays.  So I called him at 7:30 to discuss business.

2        Q      What business did you discuss with him at 7:30 in

3    the morning?

4        A      He obviously still wanted to be involved with the

5    company.  And, you know, we were working on -- it was still

6    very much a startup.  And we were working on all those things

7    related to a startup.

8        Q      How many calls did you have with Mr. Cardiff

9    prior to 10:30 on October 12th, 2018?

10       A      In -- prior to October --

11       Q      Prior to 10:30 on October 12, 2018.

12       A      That day or that month?

13       Q      That day.

14       A      It was either one call or two calls.

15       Q      Okay.  And you had testified about --

16           THE COURT:  Just for clarification, the first call

17   was at 7:30 a.m. approximately?

18              THE WITNESS:  Yes.

19           THE COURT:  And the second call was what time?

20              THE WITNESS:  At 12:00 or 12:10?

21   BY MR. COLAIZZI:

22       Q      Are you saying the second call was at -- the call

23   that was referenced as a ten-minute call?

24       A      Yes.  And I expected him to be on the golf course

25   because that's when he golfed.  And it was a ten-minute call.

1   And he said, "I can't talk right now."  I said, "You are

2   actually working?"  and laughed.  And he said, "I really can't

3   talk right now."  He was distraught.  He was upset.  And he

4   said, "This is not a good time to talk.  I need to call you

5   back."

6            THE COURT:  How do you know it was a ten-minute

7   call?

8            THE WITNESS:  Because it's in the --

9            THE COURT:  Records?

10           THE WITNESS:  -- records provided by the FTC.

11           THE COURT:  In your initial declaration with the

12   Court, you -- I think you indicated that Mr. Cardiff told you

13   in October of 2018 that all his assets were seized and that the

14   injunction completely prohibited him from having a bank

15   account.  So what date in October were you told that?

16           THE WITNESS:  It was the end of October.  When he --

17   it was the end of October when he first started speculating or

18   floating the idea that I would have to -- he would need a loan.

19           THE COURT:  You initially said it was the end of

20   October or the beginning of November.  Was it October or

21   November?

22           THE WITNESS:  The first discussion was the end of

23   October, and then beginning of November is when I structured --

24   I said I'm going to make you a loan.  These are the documents.

25           THE COURT:  So just to clarify, sometime at the end

```
 1    of October, you don't recall the particular date; is that

 2    correct?

 3              THE WITNESS:  Right.

 4              THE COURT:  Mr. Cardiff told you that all his assets

 5    were seized and that the injunction completely prohibited him

 6    from having a bank account.  Is that what he said?

 7              THE WITNESS:  Not that they were seized, that they

 8    were frozen.

 9              THE COURT:  Did you use the word "seized" in your

10    declaration?

11              THE WITNESS:  I don't recall.  I believe I used

12    "frozen."

13              THE COURT:  Pardon?

14              THE WITNESS:  I believe I used "frozen."

15              THE COURT:  Declaration paragraph 28 and 29,

16    ECF No. 126.  I don't have that in front of me, but --

17              MR. FLETCHER:  Your Honor, I have an electronic copy

18    if the Court needs to see that.

19              THE COURT:  Yes, if we can put that up.  I just want

20    to make sure that's the correct word.

21              And just going back from October 12th until this

22    phone call took place at the end of October where he mentioned

23    that his assets were frozen or seized, you had not spoken to

24    him in between?

25              THE WITNESS:  I spoke to him on October 14th.  It
```

1    was a Sunday.

2            THE COURT:  How long was that conversation?

3            THE WITNESS:  The record shows it was seven minutes.

4    I was coming back from church Sunday night, and I called him on

5    the way home.

6            THE COURT:  What was the nature of that phone call?

7            THE WITNESS:  Just checking in.  And, again, he, you

8    know -- you'll see from the length of my phone calls with Jason

9    they are lengthy, and again, he just blew me off.

10           THE COURT:  So on October -- back on October 12th in

11   reference to the second phone call at approximately 12:10 which

12   lasted about 45 -- I'm sorry.  Let's go to the first phone

13   call.  The first phone call is where you detected he was

14   distraught.

15           THE WITNESS:  The first phone call in the morning at

16   7:30, no, it was business as usual.

17           THE COURT:  The second phone call.

18           THE WITNESS:  Yes.

19           THE COURT:  And then on October 14th, did you ask

20   him why he was distraught on October 12th?

21           THE WITNESS:  Yes.

22           THE COURT:  What was his response?

23           THE WITNESS:  He said he couldn't talk and he was in

24   a bad situation.  And it reminded me of the phone call I

25   received from him when he was having marital affairs or --

```
 1    excuse me -- marital problems.  And I did not want -- he didn't

 2    want to into it, and I didn't push it.

 3                THE COURT:  Thank you.

 4                MR. COLAIZZI:  Your Honor, in response to one of

 5    the documents the FTC had put forth in the record, it showed

 6    Mr. Cardiff's phone bill during that period of time.  A lot of

 7    the numbers were blacked out, and it turns out some of those

 8    numbers that were blacked out are actual phone calls where

 9    there is a call using Mr. Poujade's phone and to a number with

10    Mr. Cardiff's phone or that's been identified as Mr. Cardiff's

11    phone.

12                And so we wanted to offer to the Court the

13    October -- a bill -- I say the October bill.  A bill for the

14    period of October 2018 through November 1, 2018.  And I've

15    handed it to counsel here as well.

16                THE COURT:  We need it marked in a particular

17    order --

18                MR. COLAIZZI:  Thank you, Your Honor.

19                THE COURT:  -- if it's not been previously

20    referenced.  And may I have a copy also?

21                MR. THURMAN:  Your Honor, could we take a brief

22    break?  The defendant needs to use the restroom.

23                THE COURT:  Yes.  We probably should be taking a

24    recess.  So let's resume again at 10:30.  And we'll resume at

25    10:30.
```

```
 1                  (At 10:10 a.m. a brief recess was taken.)

 2                  THE COURT:  We are back on the record in FTC versus

 3      Cardiff.  All counsel are present.  All parties are present.

 4                  We did that check, the docket in reference to the

 5      words used by Mr. Poujade in his declaration, and the word

 6      "seized" was used.  That being said, let's go on to more

 7      important issues.

 8                  MR. COLAIZZI:  Yes, Your Honor.  I was about to

 9      clarify that myself on the screen.  So thank you.

10          Q       Mr. Poujade, can you tell me -- there's been

11      reference to Redwood Scientific and obviously a True

12      Pharmastrip, Inc.  And when we were first getting started,

13      there was a reference made that the Clover Cannastrip Thin Film

14      Technologies Corp. was organized to market thin film CBD

15      strips.  Is that correct?

16          A       That it was organized --

17          Q       To market thin film CBD strips.

18          A       It was one of the contemplated products.

19          Q       And when you say "market" -- could you describe

20      exactly -- let me ask it a different way.  Can you tell me the

21      differences between True Pharmastrip, Inc., whatever it was

22      called throughout this period of time, and Redwood Scientific

23      in terms of what each company does if there are any

24      differences.

25          A       There are big differences.
```

1       Q       Okay.  Please explain.

2       A       So Redwood was an importer of product -- of a

3  variety of product.  It wasn't only thin films.  They had other

4  product that they brought in from overseas and sold.  So they

5  were a distributor retailer in the food chain of organizations

6  and what they do in specific industries.

7              TPI was organized and created and constituted to

8  be a manufacturer of thin film strips for a specific reason,

9  the manufacture of THC infused thin film strips.  The licensing

10  around doing that is specific, and it's specific the way it's

11  handled in Canada and the way it's handled in the U.S.

12             In the U.S. the states bear the legislative right

13  to allow it.  The licensing process is very specific.  There

14  are different types of licenses that are issued in California,

15  for example.  There are licenses to grow the product, the

16  cannabis.  There are licenses to do manufacturing.  There's two

17  types of manufacturing.  There's also a subset to that that has

18  to do with combustibles which is the process of taking the

19  plant and making it into an oil which is a very volatile

20  process.

21             Then there's a distribution license where only

22  the distributors can sell product to the retail stores called

23  dispensaries, and that's also a different license.  So each

24  phase has a different license attached to it.  And the license

25  is specific to a city and a location.

1              So TPI is the holding company for a company

2    called Pharmastrip Corp.  Pharmastrip Corp. enters into joint

3    ventures with specific state operators that have these

4    licenses.  And they enter into joint venture agreements.  It's

5    the only manner in which we can operate is to operate under

6    their licenses that are specific to a state, that are specific

7    to a city, that are specific to a building.

8              So to now answer your question, TPI through its

9    subsidiary Pharmastrip Corp. and its joint ventures,

10   manufactures THC infused sublingual strips.  That is a far

11   different business from whatever Redwood did.  Redwood was just

12   an importer.

13             So if you want to use sort of a common metaphor

14   or analogy, Ford Motor Company makes the cars, but they don't

15   own the dealerships.  There might be a dealership that sells

16   Ford Motor Company cars, but they have nothing to do with that

17   dealership other than a licensing agreement or some sort of

18   agreement that allows them to sell those cars.

19             So TPI is in the manufacturing business.

20        Q     Okay.  Thank you.

21             While we are talking about the differences, for

22   Redwood Scientific you had mentioned in responding to questions

23   by Mr. Prunty that you also were briefly on the board of

24   Redwood Scientific.  Do you recall that?

25        A     During what period?

1        Q       In 2018.

2        A       Yes.

3        Q       And could you explain why you were on that board

4    and for how long?

5        A       Yes.  Just the period June through the end of

6    August.

7        Q       Okay.  And that was to facilitate a potential

8    transaction; right?

9        A       Yes.

10        Q       Was it possible to do a potential transaction

11    with Redwood Scientific in the manufacturing of THC contained

12    products?

13        A       No.

14        Q       Why?

15        A       Because the attorneys quickly came to the

16    conclusion that Redwood, as a publicly traded company, could

17    not be connected to THC or cannabis because it's not legal

18    federally.  And that's why I left the board.

19        Q       Of Redwood Scientific?

20        A       Yes.

21        Q       We were talking about -- you said TPI.  Were you

22    referring to True Pharmastrip, Inc.; is that correct?

23        A       Yes.

24        Q       Did -- on the TD Bank account for True

25    Pharmastrip, Inc., did either of the Cardiffs have any

1    interest, financial or otherwise, in that bank account?

2        A      No.

3        Q      Did either of the Cardiffs make a claim or have a

4    right with respect to that bank account?

5        A      No.

6        Q      Did either of the Cardiffs have a claim to any

7    property as it related to that bank account?

8        A      No.

9        Q      With respect to Pharmastrip Corp. -- let me go

10   back to that series of questions I asked.  I would ask the same

11   series of questions as it relates to an interest in, a right

12   to, a claim to or any property in the bank account.  Did any of

13   the other defendants or related entities have an interest in, a

14   right to, a claim to any property in that TD Bank account?

15       A      No.

16       Q      Were any of the Cardiffs or entities with which

17   they were associated officers or shareholders of Pharmastrip

18   Corp.?

19       A      No.

20       Q      Did either of the Cardiffs or entities with which

21   they are associated hold any shares in Pharmastrip Corp.?

22       A      No.

23       Q      Are either of the Cardiffs or entities with which

24   they are associated officers or directors of Alphatech?

25       A      No.

```
 1        Q       Are any of the Cardiffs or entities with which
 2   they are associated shareholders of Alphatech?
 3        A       No.
 4        Q       I want to clear up one other thing.  You had
 5   mentioned earlier that the first time you had seen a TRO or PI
 6   was in connection with this hearing in which you are
 7   participating.  Do you remember that?
 8        A       Yes.
 9        Q       I want to draw a distinction between the
10   temporary retraining order and the preliminary injunction.  Did
11   you see either of those documents prior to this order to show
12   cause hearing?
13        A       The preliminary injunction was given to
14   Michael Kinney, my attorney, at Peter Picciano's deposition
15   which was in April.  That's when I first saw it.
16        Q       April of 2019?
17        A       Correct.
18        Q       All right.  You also testified about where else
19   there would be documents reflecting both the cancellation of
20   shares that Mr. Cardiff had in True Pharmastrip, Inc. as well
21   as references to when he withdrew as a director.  Do you
22   remember the Court asking you questions about that?
23        A       Yes.
24        Q       We mentioned a few.  Were there any filings with
25   the SEC relating to that?
```

```
1      A      I don't recall -- all filings were handled by

2  Erwin Sui.

3            MR. COLAIZZI:  Okay.  I'll just reference,

4  Your Honor, the declaration of Erwin Sui which is

5  Document 153-6 which is an errata sheet to Exhibit 9 which has

6  the information in it.

7      Q      Are board resolutions also filed with any entity,

8  public entity?

9      A      No.  We are a private company.

10     Q      Are they filed with any corporate registrar?

11     A      That's an Erwin Sui question.  I don't know.  I

12  believe the resolutions were filed as exhibits.  That's my

13  belief.

14     Q      Okay.

15            Your Honor, at the beginning of the hearing, you

16  referenced some documents, and they were accepted into

17  evidence.  We had -- I think you have accepted all of our

18  documents and declarations that were filed with the Court.  But

19  you hadn't gone through them individually.  I just wanted to

20  confirm that they are in evidence.

21            THE COURT:  Yes.

22            MR. COLAIZZI:  Okay.  I would also move Poujade

23  Exhibit 1 into evidence.

24            MR. PRUNTY:  No objection.

25            THE COURT:  Any objection?
```

```
 1              MR. FLETCHER:  No objection.

 2              THE COURT:  It's received.

 3          (Poujade Exhibit No. 1 received into evidence.)

 4              MR. COLAIZZI:  That's all I have, Your Honor.

 5              THE COURT:  I just -- let's see.  The Alphatech

 6    account was closed?

 7              THE WITNESS:  Yes.

 8              THE COURT:  Why was it closed?

 9              THE WITNESS:  For a couple of reasons.

10              THE COURT:  If you could speak into the microphone.

11              THE WITNESS:  Yes, sir.  I was instructed by my

12    attorney that that was the appropriate thing to do.  And I

13    didn't want any more transactions being processed through that

14    account from any source.

15              THE COURT:  Does Alphatech have any other accounts

16    either in the United States or abroad to your knowledge?

17              THE WITNESS:  In the United States, there's a Bank

18    of America account.

19              THE COURT:  Any other accounts other than the Bank

20    of America account?

21              THE WITNESS:  No, sir.

22              THE COURT:  Any other accounts overseas?

23              THE WITNESS:  No, sir.  Alphatech was created to be

24    the manufacturer's rep for Pharmastrip Corp.

25              THE COURT:  There was a transfer of $490,000 to
```

**UNITED STATES DISTRICT COURT**

```
1    Alphatech; is that correct?

2              THE WITNESS:  Over time.

3              THE COURT:  Did the Pharmastrip's board approve the

4    transfer?

5              THE DEFENDANT:  Pharmastrip Corp. or TPI?

6              THE COURT:  Pharmastrip Corp.

7              THE WITNESS:  Yes.

8              THE COURT:  And there was a loan to the Cardiffs,

9    unsecured loan by Alphatech; is that correct?

10             THE WITNESS:  Yes.

11             THE COURT:  What was the legitimate purpose of that

12   loan?

13             THE WITNESS:  It was to just help out a friend.  I

14   should have done that loan personally in retrospect, not

15   through my company.

16             THE COURT:  I think in your declaration you

17   reference that Alphatech is the employer of Pharmastrip's chief

18   chemist Dr. Yang.  Is that what you said?

19             THE WITNESS:  Well, it's Alphatech's chief chemist.

20             THE COURT:  Dr. Yang?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Is Dr. Yang still employed as the

23   chemist for Alphatech?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Any additional questions by the
```

1    government?

2            MR. PRUNTY:  Your Honor, we have a few additional

3    questions.

4            THE COURT:  Yes.  Go ahead.

5            THE WITNESS:  Thank you, sir.

6            MR. PRUNTY:  If I may inquire.

7            THE COURT:  Yes, please.

8                         RECROSS-EXAMINATION

9    BY MR. PRUNTY:

10       Q     When you were testifying this morning, you

11    identified a second son by the name of Anton.

12       A     Yes.

13       Q     What is his last name?

14       A     Poujade.

15       Q     Excuse me?

16       A     Poujade.

17       Q     Poujade.  Okay.

18       A     His full name is Anton Jacques Poujade.

19       Q     Are you related in any way to any of the board

20    members currently sitting on what we are referring to as TPI

21    which used to be Clover Cannastrip?

22       A     No.

23       Q     Earlier we were talking about a phone call which

24    would be reflected in the exhibit just referred to by counsel.

25    Was that Exhibit 1?  Is that correct?

```
 1              MR. ROTHMAN:  Poujade 1.

 2              MR. PRUNTY:  Poujade 1, thank you.

 3         Q        And you were talking about a ten-minute phone

 4    call.  Do you recall that?

 5         A        Yes.

 6         Q        And in that ten-minute phone call, you indicated

 7    that you were not able to speak to Mr. Cardiff at that time?

 8         A        Well, I did speak to him.

 9         Q        Can you -- I know that we've covered this ground,

10    but I'd like you to be patient with me and tell me exactly what

11    you can remember was said in that account.

12         A        I'd be happy to.  He kept telling me that he

13    couldn't talk.  He couldn't talk.  "I'm not in a position to

14    talk right now."  I said, "Is everything okay?"  And he just

15    kept insisting that he's not in a good position to speak right

16    now.  And I said, "Are you okay?  What's going on?"  And he

17    goes, "I just -- look, I need to handle whatever is going on

18    here," and that was the extent of it.

19         Q        Was there any further inquiry by you at that

20    point?

21         A        No.  I mean, I thought, like I said previously,

22    that it was a personal matter.  I thought it was that he was

23    having difficulties and -- possibly in his marriage and I

24    didn't want to push it because I've had that phone call him

25    before when he first divorced Amy.
```

1    Q    And did you talk about any other subject area?

2    A    No.

3    Q    So what you've just recounted to the Court lasts

4    much less than 30 seconds.  Would you agree?

5    A    It was a back and forth, my pushing gently, his

6    rebuffing saying "I really can't talk to you right now.  I'm

7    going to have to call you back."

8    Q    And your testimony is that that took ten minutes?

9    A    That's what the record shows.  I wasn't aware if

10    it was going to take ten minutes.  That's just what the record

11    shows.

12    Q    And you can think of no subject that you spoke

13    about?

14    A    Other than it was a very difficult moment for him

15    and he could not talk.

16    Q    I'd like to draw your attention to the payment

17    that the receiver's representative was asking about earlier of

18    $360,000 from the TD Canada account held in the flame of

19    Clover Cannastrip on October 18th, 2018.  Do you recall that

20    transfer?

21    A    Yes.

22    Q    That transfer was for the personal benefit of

23    Richard Poujade.  At least it was sent to his personal account;

24    is that right?

25    A    Yes.

```
 1         Q       And you have to date not produced for the Court
 2   or the Federal Trade Commission any bank record memorializing
 3   that transfer from the perspective of Mr. Poujade, Richard
 4   Poujade?
 5         A       (No audible response.)
 6         Q       Have you produced any of Richard Poujade's bank
 7   accounts showing that that transfer was received?
 8         A       So we produced an accounting --
 9         Q       Yes or no?
10         A       That it was received by Richard --
11         Q       Yes.  Have you produced any bank documents
12   showing that Richard Poujade received that transfer?
13         A       No.
14         Q       Have you produced any bank documents showing that
15   Richard Poujade placed that money into the Pharmastrip Corp.
16   account?
17         A       I produced an accounting of Pharmastrip Corp.
18   account.
19         Q       Yes or no, have you produced any bank account
20   statements for the Pharmastrip Corp. account showing it was
21   actually received?
22         A       No.
23         Q       Not to the Court and not to the Federal Trade
24   Commission in response to our April 10th subpoena; is that
25   correct?
```

UNITED STATES DISTRICT COURT

223

```
 1         A       Correct.

 2         Q       Okay.  The October 12th call was at 12:55 p.m.;

 3    is that right?

 4         A       If that's what the record shows.

 5         Q       Do you agree the record is accurate?

 6         A       I believe so.  I spoke to him around lunch time.

 7              MR. PRUNTY:  The Court's indulgence?

 8              THE COURT:  Yes.

 9    BY MR. PRUNTY:

10         Q       Mr. Poujade, I was misreading the -- your first

11    exhibit to the Court.  I had the impression I was looking at

12    Mr. Cardiff's activity, and this is your activity.  So that

13    this would have been an incoming call to your mobile phone

14    number from Jason Cardiff on October 12th, 12:55 p.m. which

15    lasted ten minutes.  Would it be your testimony that he called

16    you and then didn't want to talk to you?

17         A       So he was returning my call.  So yeah, he called

18    me.

19         Q       He called you and he spent ten minutes saying he

20    didn't want to talk to you; is that right?

21         A       So he was returning my call, and the conversation

22    was around -- first it was like, "Oh, you are working today?"

23    Because on Fridays he always golfed.  And then he goes, "Yeah,

24    yeah.  But I can't really talk right now."

25         Q       So you just recounted to the Court a 45-minute
```

**UNITED STATES DISTRICT COURT**

phone call that occurred that date on October 12th at 7:30 in

the morning and you indicated the only other call you had with

Mr. Cardiff was the one at 1:00?  That we are talking about,

12:55 p.m.?

A       Yes.

Q       So those are the two calls?

A       That's my recollection.

Q       Have you had an opportunity to review the records

submitted by the FTC in support of this motion regarding the

transfers, the money transfers from Alphatech U.S. bank account

to the creditors of the Cardiffs?

A       Yes.

Q       Do you recall the total of $211,000?  I can show

it to you if you need it.

A       No.  So that is your total, yes.

Q       That's a total of transfers on behalf of the

Cardiffs from the U.S. bank account held in the name of

Alphatech.  Do you dispute that?

A       Well, there's 40,000 of business expenses in

there.

Q       Yes or no?

A       Yes.

Q       You do dispute it.  Do you dispute it because of

the types of transfers and what they meant to Alphatech, or do

you dispute it because they did not happen?

```
 1        A       No.  Because some are in question, are under
 2   review.
 3        Q       Did those transfers happen?
 4        A       Yes.
 5        Q       So $211,000 was transferred to creditors of the
 6   Cardiffs.  Whether or not they are disputed is the remaining
 7   question; is that correct?
 8        A       So it was a loan to Jason to pay his bills.
 9        Q       It's a yes or no question.
10        A       Yes.
11                THE COURT:  The loan was unsecured; is that correct?
12                THE WITNESS:  Yes, sir.
13                THE COURT:  Why?
14                THE WITNESS:  Because I knew Jason.  He lived in a
15   big home.  He -- I wasn't worried about it being repaid.  I
16   knew that I could put him to work to repay it.
17                THE COURT:  This was not your money, is that
18   correct, your personal funds?
19                THE WITNESS:  Correct.
20                THE COURT:  Thank you.
21                THE WITNESS:  Yes, sir.
22   BY MR. PRUNTY:
23        Q       I'd like to direct your attention to
24   Docket 157-1, page 11.  It's a multi-page document produced as
25   Table 3 to the declaration of Connor Sands, our lead
```

```
 1   investigator in this case.  It recounts beginning November 9th,

 2   just two days after the Cardiffs were in this courtroom, and

 3   continuing through May.  And I'd like to just go to the bottom

 4   of page 11 if I could to the total of $211,000.  Do you see

 5   that total?

 6        A      Yes, sir.

 7        Q      And you indicate, yes, that you do, in fact,

 8   dispute that those were creditors of the Cardiffs; is that

 9   correct?  All of the listed expenses in Table 3?

10        A      Partially.

11        Q      Let's go over these credit card accounts.  Is

12   there any dispute they are held in the name of either

13   Jason Cardiff or Eunjung Cardiff?

14        A      No.

15        Q      And the Amex cards also owned either in a

16   corporate name, which is one of the corporate defendants sued

17   in this case, or in the name of Jason Cardiff or Eunjung

18   Cardiff.  Do you dispute that?

19        A      No.

20        Q      In the Claremont Manor expenses for the benefit

21   of Gerald Cardiff, do you dispute that?

22        A      No.

23        Q      Would it help you to review this document so you

24   could tell the Court which of these expenses you dispute as not

25   being legitimate creditors of the Cardiffs?
```

1      A      The only credit card in question is Barclays.

2      Q      Can you tell us why?

3      A      Because he asked me if he could put business --

4  company business expenses on the Barclays card.  I don't have

5  the Barclays statement.  So I don't know which one of those

6  expenses are business or personal.  That's --

7      Q      You are not taking the position that all of the

8  Barclays expenses are business?

9      A      No.  I'm not taking a position either way because

10  I still don't have the Barclays statements.

11      Q      So you've chosen to disregard those as being part

12  of this total?  Is that your testimony?

13      A      No.  In the accounting that we provided, they are

14  just under review.

15      Q      And these expenses go back to November that we

16  are looking at right here on this page.  Do you agree?

17      A      Yeah.

18      Q      So since November -- it's now the end of July.

19      A      Yes.

20      Q      And you are still reviewing these Barclays

21  expenses?  Is that your testimony?

22      A      I still don't have the Barclays statements.

23      Q      Have you inquired of Mr. Cardiff's attorney?

24      A      No.

25      Q      Okay.  Beyond the expenses we just looked at, are

UNITED STATES DISTRICT COURT

```
 1   there any other expenses on behalf of Cardiff creditors or
 2   Cardiff services?
 3        A     No.
 4        Q     So you have not paid $50,000 to Mr. Cardiff's
 5   attorney?
 6        A     Not through Alphatech.
 7        Q     So you did pay $50,000 to one of Mr. Cardiff's
 8   attorneys?
 9        A     Yes.  Personally I did that.
10        Q     You did it personally?
11        A     Yes, sir.
12        Q     To which one?
13        A     To Michael Thurman.
14        Q     And there were other expenses on behalf of
15   Mr. White, another attorney for Mr. Cardiff; right?
16        A     That was paid by Pharmastrip Corp.
17        Q     That's just your brother's account; right?
18        A     No.  It has a bank account.
19        Q     Okay.  So Mr. Richard Poujade has a bank account,
20   and it's in a company name, and he can do whatever he wants
21   with it?  Is that your testimony?
22        A     No.  This is per the contract that we have, the
23   management contract we have with Mr. Cardiff.  Those amounts
24   that were not paid to Mr. Cardiff but that were set aside or
25   accrued were advanced to Mr. White.
```

1     Q     So the $90,000 that you had previously indicated

2    was being held by Pharmastrip on behalf of Mr. Cardiff were

3    instead applied to attorneys' fees?  Is that your testimony?

4     A     My attorneys instructed me I could do that.

5     Q     Which attorneys?

6     A     Michael Kinney.

7     Q     You referred moments ago to a stock cancellation

8    that you testified took place August 29th of 2018.

9     A     Yes.

10    Q     Are you certain that's when this stock was

11   canceled?

12    A     Yes.

13    Q     As you sit here today many months later, you are

14   certain of that exact date?

15    A     Yes.

16    Q     You are not sure when you received notice of the

17   temporary restraining order, but you are certain that of what

18   took place August 29th with respect to the stock certificate?

19    A     Yes.

20    Q     I'd like to show you the stock certificate.  I'm

21   referring to -- excuse me.

22          THE COURT:  Identify the document, please.

23          MR. PRUNTY:  Thank you.  I'm looking for the docket,

24   Your Honor, Docket 126 page 18.

25    Q     I believe this would have been part of the

1    May 28th declaration, and this was an exhibit you appended to

2    that declaration.  Do you recall that?

3         A     Yes.

4         Q     Can you read that page and tell me where you find

5    the date August 29th.

6         A     So it's not on that document.

7         Q     You testified that that took place on

8    August 29th.  Are you sure of that?  Yet there's no date on it.

9         A     Yes, because there's a purchase agreement of that

10   cancellation, and that's dated August 29th.  And there's a

11   resolution that specifically refers to August 29th to that

12   cancellation.

13        Q     Those documents were created by whom?

14        A     Erwin Sui, our general counsel.

15        Q     Erwin Sui --

16        A     Our --

17        Q     -- created those documents?

18        A     Yes, sir.

19        Q     Have you ever received the originals of those

20   documents?  You know where they are maintained?

21        A     Those are with him.

22        Q     I'd like to draw your attention --

23              THE COURT:  One moment.

24              THE WITNESS:  I'm diabetic.  Could I just get a

25   water?

```
 1              THE COURT:  Can we get a water for the witness?  Do
 2      you need to take a recess?
 3              THE WITNESS:  No.  Just a water will help.  I
 4      appreciate it.  Thank you.  Thank you, sir.
 5      BY MR. PRUNTY:
 6          Q      Mr. Poujade, you previously testified this
 7      morning that the October resignation letters or the resignation
 8      letters of the Cardiffs were actually tendered in September.
 9          A      Yes.
10          Q      And you are certain of that?
11          A      Yes.
12          Q      I'd like to draw your attention to the record
13      where you've appended those October 8th resignation letters.
14          A      Okay.
15          Q      These were appended to the Cardiffs' exhibits.
16      It is Docket 147-1.  Page 13 is Jason Cardiff.
17          A      Yes.
18          Q      And your testimony is that this October 8th
19      resignation was not actually tendered until September?
20          A      It was tendered in September, and I instructed
21      Erwin Sui to get it done.
22          Q      And you previously testified that the BC registry
23      amendment was made by Erwin Sui in November?
24          A      As to the directorships, yes.
25          Q      And that date is November 16th, isn't it?
```

232

```
 1        A       I don't know.  I thought it was earlier, but --
 2        Q       So these letters that we have in front of us of
 3   resignation were signed a month after they were tendered.  Is
 4   that your testimony?
 5        A       They were documented a month after they were
 6   tendered.
 7        Q       Do you see by the signature of Jason Cardiff a
 8   date?
 9        A       Uh-huh, yes.
10        Q       What is that date?
11        A       October 8th.
12        Q       Is that after September?
13        A       Yes.
14        Q       Okay.
15        A       But Haywood was categorical.  This deal was not
16   going forward unless they resigned.
17        Q       But that's the date he signed this form?
18        A       Yes.
19        Q       Nobody added that date after he signed it?
20        A       No.  But I had to represent to Haywood that he's
21   no longer a director, and I did represent that.
22        Q       You did it before he actually tendered his
23   resignation?
24        A       No.  He tendered his resignation when he came
25   back from Toronto in September.
```

1       Q       So the answer is yes?

2       A       The answer is yes to --

3       Q       It's a yes or no question.

4       A       Repeat the question.

5               MR. PRUNTY:  Can the court reporter repeat --

6               THE COURT:  Look, let's move on.  I see the

7    document.  I've considered the testimony of Mr. Poujade, and

8    the Court will have to reach credibility determinations going

9    forward.

10   BY MR. PRUNTY:

11      Q       Earlier you were equivocal about the date of the

12   name changes of directors in the BC registry.  I'm looking at a

13   Docket 126, page 19, a notice of change of directors.  I'd like

14   you to read from the form the date and time of that filing.

15      A       I'm not seeing the entire form.

16      Q       The top of it is --

17      A       November 16th, 2018, 9:25 a.m.

18      Q       Does that refresh your recollection about the

19   date?

20      A       Again, this was handled by Erwin Sui.

21      Q       It's a yes or no question.

22      A       Does this --

23      Q       Does --

24      A       Yes.

25      Q       Is the date November 16th?

1        A        Yes.

2        Q        Thank you.

3                 You testified you instructed your brother,

4    Richard, to open a Pharmastrip Corp. account; is that right?

5        A        Yes.

6        Q        Is there some reason you didn't open an account

7    by simply giving them copies of your passport and driver's

8    license?

9        A        I'm not on Pharmastrip Corp. as a director or an

10   officer or -- it would have to be done by Richard.

11       Q        You couldn't actually have it in your name, could

12   you?  Is there some reason you couldn't have Pharmastrip Corp.

13   in your name?

14       A        (No audible response.)

15       Q        Why did it have to be your brother?

16       A        Because he formed the company in September.  He

17   was the only officer and director.

18       Q        He could have made you an officer, and you could

19   have opened this account using -- your testimony yesterday was

20   a copy of a driver's license or passport would do it.

21       A        I said that's what I did here in California.

22       Q        But you thought that was true in Canada?

23       A        Yes.

24       Q        Because you wouldn't have asked Mr. Cardiff to do

25   that if you didn't think it was true.

235

```
 1        A       Correct.

 2        Q       So you could have really sidestepped a lot of

 3   this by just opening an account in your name; isn't that right?

 4        A       I didn't.  I'm CEO of TPI.  I --

 5        Q       This is a yes or no question.

 6        A       Ask the question again.

 7        Q       You could have simply sidestepped the entire

 8   process by sending copies of your passport and your driver's

 9   license to the bank and opening the account yourself?

10        A       No.

11        Q       You thought you could.

12        A       No.  I was not connected to Pharmastrip Corp.  I

13   was not an officer, not a director.

14        Q       Okay.  But Pharma Corp. freely lends money to

15   Alphatech in the tune of at least $490,000 not to mention what

16   they paid for attorney fees.

17        A       Those are all approved by Pharmastrip Corp.'s

18   board.

19        Q       Pharmastrip Corp. doesn't have a board.

20   Pharmastrip Corp. is your brother.

21        A       It has a board.  It's a legally-constituted legal

22   entity in Canada.

23        Q       You've previously testified that he's the sole

24   director.

25        A       Yes.
```

1      Q      So you are talking about your brother.

2      A      Yes.

3      Q      Okay.  Isn't it true that previously Mr. Cardiff

4    has, in fact, done business on behalf Clover Cannastrip using

5    the name Clover Cannabis?  You've seen documents in the record

6    like that; right?

7      A      That would call for speculation.

8      Q      Would it assist you in remembering that if I show

9    you the document?  It's a distributor agreement from July of

10   2018, and it says "Clover Cannabis Film Strip," and it uses the

11   same BC registry number as Clover Cannastrip.

12     A      I have no knowledge of that.

13     Q      I'm showing you Docket 134-3, page 52 of 90.

14     A      Okay.

15     Q      On the bottom of that page, it says "Clover

16   Cannabis Thin Film Technology, Jason Cardiff."

17     A      I see it.

18     Q      You see the reference in the very first paragraph

19   to Clover Cannabis Thin Film Technologies, a Canadian

20   corporation at the Clover Cannastrip Vancouver address with the

21   registry number of BC1174145.  Do you see that?

22     A      I see it.

23     Q      That's the same registry number that we just

24   looked at in the docket that I showed you earlier.

25     A      Mr. Cardiff also had cannabis labs --

```
 1          Q       This is a yes or no question.  Is that the same
 2    registry number we just looked at?
 3          A       I don't know what the registry number is off the
 4    top of my head.
 5          Q       We just looked at the form.  Would you like me to
 6    get it for you?
 7          A       That's not the registry number -- if that's TPI
 8    registry number, that is not the registry number for Clover
 9    Cannabis Thin Film Technologies Corp. because a company
10    cannot -- two companies cannot have the same BC registry
11    number.
12          Q       I'm asking about whether that's the same number,
13    and I'm going to refer you back to the BC registry services
14    form we just looked at.
15          A       Look at the name on the registry.  It says --
16          Q       I'm asking the questions.  Do you see the number
17    at the BC registry number at the top left of the page,
18    BC1174145?
19          A       I see that.
20          Q       Is that the same number I repeated moments ago?
21          A       Can you go back to the other form?
22          Q       Certainly.
23          A       Thank you.
24          Q       Third line down on Docket --
25          A       It is the same number, but not the same company.
```

```
1         Q      It's the same number?  And it's Mr. Cardiff's

2    signature as president?

3         A      It appears so.

4         Q      Thank you.

5              MR. PRUNTY:  The Court's indulgence?

6              MR. THURMAN:  Your Honor, just pointing out I don't

7    see any indication of Mr. Cardiff's title on that document.

8              MR. PRUNTY:  Duly noted.

9              Thank you, Your Honor.

10        Q      The date of this document is what?

11        A      Of the Clover Cannabis Thin Film --

12        Q      Yes, this agreement, this distributor agreement.

13        A      It appears to be 10/10.

14        Q      October 10th, 2018?

15        A      Yes.

16        Q      Was that after Mr. Cardiff parted ways with

17   Clover Cannastrip as an officer?

18        A      Yes.

19        Q      And you testified that he had no authority; is

20   that correct?

21        A      Yes.

22        Q      We talked yesterday about a presentation that was

23   made by Mr. Cardiff in Toronto to FSD Pharma.  Do you recall

24   that presentation or discussion of a presentation that

25   Mr. Cardiff made or he gave to representatives of one of Clover
```

1    Cannastrip's investors, FSD Pharma?  Do you remember that?

2         A       I also remember saying I wasn't there.

3         Q       That's right.  But your picture is on it, isn't

4    it?

5         A       Which presentation are you referring to?

6         Q       The presentation that was provided to the Federal

7    Trade Commission by FSD Pharma as the presentation they

8    received from Clover Cannastrip representative Jason Cardiff on

9    August 31st, 2018.

10        A       I've also testified that that presentation was

11   put together by Haywood and has the wrong company name on it.

12        Q       So you are familiar with the presentation?

13        A       If that's the presentation you are speaking

14   about, yes.

15        Q       This is Docket 134-17, page 9 of 17.  Is that you

16   listed as chief financial officer for Clover Cannabis Thin Film

17   Technologies?

18        A       If we could go to the cover page, I could tell

19   you which presentation this is and if it was the Haywood

20   presentation or not.

21        Q       Okay.  Here's page 1.  Do you need to see page 2?

22        A       It would be helpful.

23        Q       Okay.

24                MR. THURMAN:  Your Honor, I think counsel

25   inadvertently represented in one of the questions earlier that

1    Mr. Cardiff had said that he presented this presentation to

2    investors at that August 31 meeting.  My recollection of his

3    testimony was that he did not present any pitch at that

4    meeting.  So I just wanted to remind the Court and direct you

5    to the record.

6    BY MR. PRUNTY:

7         Q      Does this page help to refresh your recollection

8    about which presentation this was?

9         A      Could we just go through it real quickly?  It

10   can't be more than --

11        Q      It's 17 pages, but I'm happy to walk you through

12   it.

13        A      Okay.  Okay.  Thank you.  Thank you.  Yes.  Thank

14   you.  Thank you.  So if you could repeat the question.  That is

15   my picture, yes.

16        Q      And this is the presentation that was -- I'm

17   going to represent to you this was a presentation provided to

18   the Federal Trade Commission by FSD Pharma.  It's part of the

19   record.

20        A      Okay.

21        Q      And they indicate that they received it from

22   Mr. Cardiff on August 31st.  It has your picture as chief

23   financial officer and Mr. Cardiff's picture as chief executive

24   officer.  Do you see that?

25        A      Yes.

1      Q    And just six days later, there's an infusion of

2  capital from FSD Pharma to the account of Clover Cannastrip

3  Thin Film Technologies on September 6th.  We looked at that

4  slide yesterday.  Do you recall that?

5      A    I recall.  Can you go where it shows the cap

6  structure?  What I'm trying to determine is -- right there.  So

7  this was prepared by Haywood, I believe.

8      Q    There's no question pending.

9      A    Okay.

10      MR. PRUNTY:  The Court's indulgence?

11      (Pause in proceedings.)

12      MR. PRUNTY:  I have nothing further at this time,

13  Your Honor.

14      THE COURT:  Questions?

15      MR. FLETCHER:  Yes, Your Honor, briefly.

16      THE COURT:  We are going to stop at 11:30 and take

17  the afternoon recess at 11:30.

18      MR. WHITE:  Your Honor, if I may, as to Mr. Prunty's

19  representation to the Court as to source of information about

20  who supplied --

21      THE COURT:  Is there an objection of some sort?  If

22  you want to make argument at a later date, you can.

23      MR. WHITE:  Very well.  We'll do it then.  Thank

24  you.

25      MR. FLETCHER:  May I inquire, Your Honor?

```
 1              THE COURT:  Yes.
 2                    RECROSS-EXAMINATION
 3    BY MR. FLETCHER:
 4         Q     Mr. Poujade, again, I'm Mike Fletcher.  I
 5    represent the receiver.
 6              Do you have the document that we've been -- that
 7    we've identified as Poujade Exhibit 1 that I believe is now in
 8    evidence?
 9         A     I do.
10         Q     Will you turn to page 19?
11         A     Yes.
12         Q     And specifically there are six entries on
13    October 12th.  I want to call your attention to those entries.
14    Do you have that?
15         A     I do.
16         Q     At 10:01 you called Jason Cardiff for one minute;
17    correct?
18         A     Yes.
19         Q     Okay.  At 10:02 Jason Cardiff called you back.
20    Do you see that?
21         A     Yes.
22         Q     For three minutes?
23         A     Yes.
24         Q     At 10:04 Jason Cardiff called you back for
25    17 minutes.  Do you see that?
```

```
 1        A       Yes.

 2        Q       The receiver then walked in, served him with a

 3   restraining order, asset freeze, injunction, all the rest of

 4   it.  Then he called you back again at 12:55, and you spoke for

 5   ten minutes.  Do you see that?

 6        A       Yes.

 7        Q       Okay.  Now, you've characterized the 12:55

 8   conversation as Jason Cardiff was distraught, he was upset, and

 9   he couldn't talk to you.

10        A       Correct.

11        Q       Yet he called you; correct?

12        A       Yes.

13        Q       In fact, this is the third time he, quote,

14   "called you back that morning"; correct?

15        A       Yes.

16        Q       Okay.  Turn the page, if you would, to page 20 of

17   Poujade Exhibit 1, please.

18        A       Yes.

19        Q       There's only one entry, October 14 at 7:40 in the

20   evening.  Do you see that?

21        A       Yes.

22        Q       And that's Sunday, October 14th?

23        A       Yes.

24        Q       Jason Cardiff called you for seven minutes;

25   correct?
```

**UNITED STATES DISTRICT COURT**

```
 1         A      I don't know how to distinguish inbound versus
 2   outbound.
 3         Q      Well, it says incoming to you.
 4         A      Yes.
 5         Q      And the prior ones are all incoming to you;
 6   correct?
 7         A      I see that.
 8         Q      So on Sunday, he was still distraught.  He was
 9   still upset, and he stilled couldn't talk; correct?
10         A      Yes.
11         Q      But he called you; correct?
12         A      Yes.
13               MR. FLETCHER:  Thank you, Your Honor.  I have no
14   further questions.
15               THE COURT:  We'll take the afternoon recess and
16   resume again at 1:00.
17               MR. FLETCHER:  Your Honor, may I inquire whether we
18   can leave things?
19               THE COURT:  Yes, you can leave everything.
20               MR. FLETCHER:  Thank you.
21               (At 11:25 a.m. the lunch recess was taken.)
22               THE COURT:  Okay.  We are back on the record in the
23   Federal Trade Commission versus Cardiff, et al.
24               Let's continue with the examination.
25               MS. SANGER:  Your Honor, if I may just before we
```

```
 1    begin, Attorney Jim Prunty representing the FTC will not be

 2    joining us in the afternoon.

 3              THE COURT:  Okay.  Thank you for noting that on the

 4    record.

 5                    FURTHER REDIRECT EXAMINATION

 6    BY MR. COLAIZZI:

 7         Q     Good afternoon, Mr. Poujade.  I'm just going to

 8    reference the questioning that Mr. Prunty had regarding when

 9    Mr. Cardiff tendered his resignation of his directorship.  Do

10    you recall Mr. Cardiff's testimony about being -- up talking to

11    Haywood and saying to them that he was going to come back and

12    talk to you about resigning -- possibly resigning as director?

13         A     Yes.

14         Q     Did he ever talk with you about that?

15         A     Yes.

16         Q     Okay.  What was the substance of the conversation

17    about?

18         A     It was a difficult conversation.

19         Q     Was it one conversation or more than one?

20         A     It was several conversations.

21         Q     Can you just describe it generally?

22         A     Yeah.  So what he was exploring was how

23    Mr. Cardiff would stay involved in the company now that he was

24    resigning his directorship.

25         Q     Was he -- had he determined he was going to
```

246

```
 1    resign his directorship prior to September?
 2          A      It was in early September.  It was the only
 3    conclusion he could come to -- that we could come to.
 4          Q      Why is that?
 5          A      Because Haywood would not advance without it.
 6    And, again, that's in the context of what Haywood wanted to do.
 7    They wanted to go public.
 8          Q      Okay.  So what were the conversations about when
 9    he was going to do it or about whether he had to do it, resign?
10          A      Well, he had to do it, or else we were just going
11    to walk away.
12          Q      So you said he tendered his resignation in
13    September.  Do you remember that?
14          A      Yes.
15          Q      Did he?
16          A      Yes.
17          Q      Early September I think you just said.
18          A      Yes.  But it was --
19          Q      Did he hand you a piece of paper, "I hereby
20    resign"?
21          A      No.  It was verbal.
22          Q      And was that the first time he said I'm going to
23    resign since coming back after talking to Haywood when he said
24    to Haywood that he was going to explore whether he had to
25    resign?
```

```
 1        A       That's when he came to the conclusion that he had

 2   to resign.

 3        Q       When is?

 4        A       When we had that conversation in September.

 5        Q       Okay.  So you didn't actually get the piece of

 6   paper of him resigning; is that right?

 7        A       That's correct.

 8        Q       Okay.  Did you -- let me put up here --

 9   Mr. Prunty or Mr. Fletcher -- I think it was Mr. Prunty asked

10   you about this document.

11        A       Yes.

12        Q       He was asking you about that this document was

13   dated November 16th, 2018.  Do you recall that?

14        A       Yes.

15        Q       What is significant of that date?  And I'll

16   direct you to the shaded box at the top.

17        A       That's the date it was filed.

18        Q       And what is the date of the change of directors?

19        A       October 8th.

20        Q       2018?

21        A       Yes.

22        Q       Okay.  Mr. Prunty also asked you about a deck.

23        A       Yes.

24                MR. COLAIZZI:  Can we pull that document up?

25        Q       This is the deck that he showed you.
```

```
 1        A        Keep going.  Yes.

 2        Q        And there it says "Disclaimer" there.  Do you see

 3    that?

 4        A        Yes.

 5        Q        Can you make out all the words?  Do you need it

 6    bigger?

 7        A        No, I can read that.  Thank you.  It says

 8    "Disclaimer.  Forward looking information.  The information

 9    contained in this investor presentation" --

10            THE COURT:  Slow it down, please.

11            THE WITNESS:  Sorry, Your Honor.  "The information

12    contained in this investor presentation for Clover Cannabis

13    Thin Film Technologies Corp."

14    BY MR. COLAIZZI:

15        Q        Is there a Clover Cannabis -- strike that.

16            Has the company that's now known as True

17    Pharmastrip, Inc., was it ever called Clover Cannabis Thin Film

18    Technologies?

19        A        No.

20        Q        Was this document that was shown to you earlier,

21    is that something that was approved by you?

22        A        No.

23        Q        Do you recall seeing your picture on this

24    document?

25        A        No.  Oh, in this document?  Yes.
```

```
 1        Q       Did you okay the use of your picture in this

 2   document?

 3        A       No.

 4        Q       Did you ever use this document for any

 5   presentations to any investors?

 6        A       No.

 7        Q       Is this a deck for Clover Cannastrip?

 8        A       No.

 9        Q       This is the front page of this document.  There's

10   a date of August 2018.  Does that date have any significance?

11        A       Not in my world.

12        Q       Mr. Prunty also asked you about a distributor

13   agreement, and he was asking you to look at the -- I think he

14   called it the BC number.  I'm going to have it pulled up here.

15                Let me show you what -- this is the document that

16   Mr. Prunty put in front of you.  Can you tell me what that logo

17   is in the top left corner?

18        A       It says, "CloverStrip," but underneath it, it

19   says, "Cannabis" -- I'm not quite sure what the rest of that

20   says.  "Cannabis" -- I don't know if you can make it larger.

21   "Cannabis Oral Thin Film Technology Corp."

22        Q       In fact, if you look at the parties to the

23   agreement, can you -- I think you pointed out before it was

24   Clover Cannabis not Clover Cannastrip Thin Film Technologies?

25        A       Correct.  I've also pointed out that I've never
```

1    seen this agreement prior to its submission.

2         Q      Okay.  It's not the same company as Clover

3    Cannastrip Thin Film Technologies?

4         A      No.

5         Q      Does True Pharmastrip, Inc. or -- regardless of

6    the name it had since its beginning, did it ever have a

7    distributor agreement?

8         A      No.

9         Q      Why not?

10        A      True Pharmastrip, Inc. is the parent company, and

11   for a myriad of reasons including insurance, it cannot be in

12   the cannabis business.  But its subsidiaries can.

13        Q      Does it distribute anything?

14        A      No.

15        Q      Let me direct your attention to the phone calls

16   that we talked about earlier.  And do you have Poujade

17   Exhibit 1?

18        A      I do.

19        Q      And if you turn to page 219 -- sorry -- page 19,

20   Poujade Exhibit 1, I'm going to set the stage here and ask you

21   if you remember when Mr. Fletcher said to you are you really

22   testifying that Mr. Cardiff called you back four times after

23   you called him.  Do you remember that?

24        A      Yes.

25        Q      So let me put this up on the screen.  I think

```
 1   that's in focus enough.
 2              So if you look on October 12th, if you look at
 3   the first call at 8:35 a.m., it was for 46 minutes.  Do you see
 4   that?
 5        A     Yes.
 6        Q     If you add 46 minutes to the time of 8:35 -- I
 7   did the math on my own.  So I'm happy to be corrected.  But it
 8   takes you to 9:21 a.m.  Do you see that?
 9        A     Yes.
10        Q     And the next call started at 9:20 a.m.  Do you
11   see that?
12        A     Yes.
13        Q     And that was Mr. Cardiff calling you back; right?
14        A     Yes.
15        Q     That's what the document reflects; right?  It may
16   be off by a minute because the one call was 46 minutes and
17   takes you to 8:21 -- I'm sorry -- 9:21.  So if you add
18   13 minutes to 9:20 a.m., you get 9:33; right?  And that is you
19   calling -- I'm sorry.  That's the call where Mr. Cardiff called
20   you back.
21              And then at 10:01 a.m., you called Mr. Cardiff,
22   and you were on for a minute.  It takes you to 10:02 a.m.  The
23   next call is 10:02 a.m., and that was a three-minute call which
24   takes you to 10:05 a.m.; right?
25        A     Yes.
```

1      Q      And at 10:04 a.m., Mr. Cardiff called you back

2  and you spoke for 17 minutes.

3      A      Yes.

4      Q      Which takes you to 10:21; right?

5      A      Yes.

6      Q      Do you remember the receiver -- Mr. Fletcher

7  representing that the receiver went in at 10:22 a.m. on

8  October 12th?

9      A      Yes.

10      Q      Do you recall Mr. Cardiff saying anything about

11  having to call you back?

12      A      No.

13      Q      He did call you back though; correct?

14      A      Yes.

15      Q      And that was at 12:55?

16      A      Yes.

17      Q      So have you ever had any issues with your cell

18  phone or Mr. Cardiff's cell phone when you call each other by

19  cell phones?

20      A      He has a lot of dropped calls because of where he

21  lives in Upland at the base of the mountain.

22      Q      Does this refresh your recollection as to whether

23  these calls were just redials of dropped calls?  Do you have

24  any recollection at all?

25      A      Yeah.  The short calls would be a reflection of

1    that.

2         Q       The first call you go from 8:35 to 9:21.   And

3    then there's a call back to you at 9:20.  Do you see that?

4         A       Yes.

5         Q       You don't recall specifically if that was a

6    dropped call?

7         A       Not the 13-minute one, no, I don't remember.  No.

8         Q       Okay.  Or even the first call that you made early

9    in the morning; right?

10        A       Correct.

11        Q       So --

12               THE COURT:  Before you move on, I just have a

13   question.  I just want clarity in the record so that I

14   understand.

15               Mr. Poujade, in reference to the call on

16   October 12th at 12:55 p.m. that was incoming to you that

17   references that it's a ten-minute call, are you claiming that

18   that was a dropped call?

19               THE WITNESS:  No.  I'm just saying that we had been

20   discussing business all day, all morning, and he just called me

21   back to tell me that this was a difficult day for him and he --

22   and I made a joke about his golfing, et cetera, et cetera.  And

23   he said I just -- this is not a good time for me.

24               THE COURT:  Okay.  So in the FTC's pleading, the FTC

25   has taken the position -- and I'm quoting from their pleading.

1      "It's strange credulity to think that the TRO was not the main

2      topic of the conversation at the time" referencing

3      October 12th, the ten-minute call, "especially given

4      Mr. Poujade's role as financial officer of the Redwood City

5      Scientific."  And that's in the reply at page 2.

6               So help me out here.  You indicated that during this

7      call at 12:55 on October 12th, Mr. Cardiff just informed you

8      that he couldn't talk right now?

9               THE WITNESS:  Correct.

10              THE COURT:  When you recounted that, it took

11     30 seconds.  So fill in the conversation.  What else was

12     discussed?

13              THE WITNESS:  Well, we had had several calls that

14     day.  There were several issues we were talking about.  We were

15     talking about Haywood, you know, the plans that I had with

16     Haywood, the machinery --

17              THE COURT:  So you were talking about the plans

18     regarding Haywood during the --

19              THE WITNESS:  The earlier --

20              THE COURT:  -- 12:55?

21              THE WITNESS:  The earlier calls.

22              THE COURT:  I'm just referring to the 12:55 call.

23     It lasts ten minutes --

24              THE WITNESS:  As a result of the earlier calls, I

25     had a lot of outstanding issues, and he didn't want to deal

1    with those outstanding issues.

2              THE COURT:  Walk me through the conversation.

3              THE WITNESS:  Yeah, it's like, Jason, where's the

4    first -- you know, we have to have -- our first piece of

5    equipment has been ordered.  FSD Pharma wants it.  We have got

6    California that it should go into.  We were talking about the

7    clean rooms that have to be built.  We were talking about the

8    chemist.  We needed a chemist.

9              THE COURT:  When you say "we were talking," was he

10   saying more than "I can't talk now"?

11             THE WITNESS:  I was asking those questions.  We need

12   to put an ad in for the chemist.  The machines have been

13   ordered.  And he said, "I can't talk about that right now."  In

14   fact, I really thought he was having marital issues.

15             THE COURT:  Yes.  Continue with the conversation, if

16   you can.

17             THE WITNESS:  Yes.  He just kept saying, "This is

18   not a good time.  I can't talk about that right now.  Can we

19   talk about that later?"  I said, "We have to make decisions.

20   The machinery has been ordered.  It's going to be on the boat."

21   I said, "We have -- I want to put it in Canada."

22             There were problems with Canada.  The FSD Pharma

23   agreement had not been done yet even though they were excited

24   about the investment.  We had Falcon in California that wanted

25   the equipment --

1          THE COURT:  Is this part of your conversation?

2          THE WITNESS:  These were all the outstanding things.

3     I have a punch list.

4          THE COURT:  No, no.  I'm interested in what you were

5     talking with Mr. Cardiff at 12:55 p.m. on October 12th that

6     references a ten-minute call.

7          THE WITNESS:  Yes.  He kept saying, "I can't talk

8     about that.  I can't talk right now.  I'm not in a good space."

9          "Is everything okay?  Is everything okay with you

10    and Eunjung?  Are the kids okay?"

11         "I don't want to talk about it right now.  I need to

12    call you back."

13         That was the nature of the conversation, Your Honor.

14         THE COURT:  And that took less than a minute.  So

15    did you have any other conversations with him?

16         THE WITNESS:  The outstanding items.  I said, "We

17    need to go through the punch list."  And I kept repeating "We

18    need an ad for the chemist.  We need to decide California first

19    or Canada first for the machinery."

20         THE COURT:  So when he told you he could not talk

21    now, did you say, well, I'll call you later?

22         THE WITNESS:  No.  I just said call me when we can

23    talk about this.

24         THE COURT:  You told him that?

25         THE WITNESS:  Yes.

```
 1              THE COURT:  When was the next phone call that you

 2   received from him?

 3              THE WITNESS:  The next phone call came in on that

 4   Sunday.

 5              THE COURT:  October --

 6              THE WITNESS:  14th.

 7              THE COURT:  -- 14th?

 8              THE WITNESS:  Yes, sir.

 9              THE COURT:  Thank you.

10              THE WITNESS:  Thank you, sir.

11   BY MR. COLAIZZI:

12        Q      Mr. Poujade, did he just not want to talk about

13   what the issue was, or did he not want to talk about the

14   business, or did he not want to talk about anything?

15        A      He didn't want to talk about anything.

16        Q      Okay.  And do you have a recollection of how many

17   items were on your punch list as of October 12th?

18        A      It was a page long.

19        Q      And what had you been talking about up until that

20   call for the -- and I will represent I added up the minutes,

21   and it comes to 80 minutes of actual connection time.

22        A      So Canada was the first country where it was

23   legalized where cannabis was legalized.  We were working with

24   FSD Pharma to put a machine in their facility.  We were also

25   having conversations with Jim Kunevicius and his partner about
```

```
 1   California.  They're -- Falcon is the biggest licensed

 2   distributor in California.

 3            And there was competing interest for that first

 4   machine.  And I believed it needed to go in California.  Bigger

 5   market, bigger distributor.  Falcon is in 380 of the 420

 6   dispensaries.

 7            We had to hire a chemist.  We had to start that

 8   process.  Putting distillate THC on thin film strips is a very

 9   complicated process.

10       Q    I'm going to interrupt you.  I know you've

11   identified a lot of things that you had talked about in the

12   morning before the roughly 1:00 call.  Prior to the 1:00 call,

13   were your calls with Mr. Cardiff effectively two-way calls

14   where you were discussing the issues in depth?

15       A    Yes.

16       Q    Okay.  And then at the 12:55 call, was it two-way

17   call in terms of discussing the issues?

18       A    Well, yes, I was still working the list, and he

19   said, "I need to get back to you on this.  This is" --

20       Q    Was he responding to any of the issues that you

21   raised as something that could be -- he could give his opinion

22   on or resolve when it came to the issues on your punch list?

23       A    Some of it but he was obviously distracted.

24       Q    While it took you a brief time to describe the --

25   what effectively happened -- and I know you don't directly
```

1  recall how long the call took even though it's reflected here.

2  Is your punch list long enough and the issues that were

3  outstanding for you to have raised these issues and it taking

4  ten minutes to go through it including the issue he wasn't

5  disclosing?

6      A      Easily.  It was a page-long line.  That's 26

7  items.

8      Q      Okay.  So by 12:55, it became a one-way

9  conversation with you doing most of the work?

10     A      Yes.

11            THE COURT:  You spoke for ten minutes?

12            THE WITNESS:  Yes, sir.

13            MR. COLAIZZI:  Your Honor, I'm just comparing

14  Poujade Exhibit 1 to the document that the FTC has provided.

15  The unfortunate thing is this document shows a call at

16  7:01 a.m. on October 12th.  It's identified as being with

17  Jacques Poujade.  But we don't have a phone number to be able

18  to confirm that, and when you look at the other end of the

19  call --

20            THE COURT:  Is there a question pending?

21  BY MR. COLAIZZI:

22     Q      Do you recall a call on October 12th prior to an

23  8:35 a.m. call?

24     A      There was no call.

25     Q      Okay.  And you see on FTC's exhibit attached to

1    Mr. Sands' declaration that it's showing that there was a call

2    with Mr. Cardiff at 7:04 a.m. from you that lasted a minute.

3    Do you see that?

4           A      Well, here it shows it's 7:01.

5           Q      Yes.

6           A      Yes.  There was no call.

7           Q      Okay.  But there is the call at 8:35?

8           A      Correct.

9           Q      All right.  The Court read to you the FTC's

10   allegation which included their disbelief that there was no

11   discussion of the TRO with you particularly in light of the

12   fact that you are CFO of Redwood Scientific.  Were you CFO of

13   Redwood Scientific on October 12th, 2018?

14          A      I was not.

15          Q      Okay.  On Alphatech -- let me -- one more

16   question on the calls.

17                 Are you certain that Jason Cardiff, Mr. Cardiff,

18   did not mention the temporary restraining order on

19   October 12th?

20          A      I'm positive.

21          Q      How can you be positive?

22          A      It would have been problematic, and it would have

23   been devastating, and he did not mention it.

24          Q      Did he mention -- did he mention an asset freeze

25   or asset seizure?

261

```
 1        A        On October 12th?

 2        Q        Yes?

 3        A        No.

 4        Q        Did he mention the FTC -- did he mention the FTC

 5   on your call on October 12th?

 6        A        No.  I really thought it was a personal issue

 7   related to his family.

 8        Q        Finally on Alphatech, you are the sole owner of

 9   Alphatech; right?

10        A        That's correct.

11        Q        And you are responsible for -- you are solely

12   responsible for Alphatech?

13        A        That's correct.

14        Q        How is Mr. Yang getting paid?

15        A        Through Alphatech.

16        Q        Is he getting paid today through Alphatech?

17        A        We have frozen Alphatech.  We closed the bank

18   account.  So I'm paying him.

19        Q        What are you using for money to pay him?

20        A        My own personal funds.

21        Q        Are you paying anything else on behalf of

22   Alphatech?

23        A        Yes.  Whatever expenses that are -- so we have a

24   couple of other employees that are on the Alphatech payroll, a

25   total of four employees.  I'm paying them as well.
```

262

```
 1          Q        Anything else that you are having to cover?

 2          A        Yes.

 3          Q        What?

 4          A        Whatever miscellaneous bills but basically we

 5    have frozen the activity of Alphatech until this is resolved.

 6               MR. COLAIZZI:  Nothing further, Your Honor.

 7               THE COURT:  Does Alphatech have any open bank

 8    accounts?

 9               THE WITNESS:  The --

10               THE COURT:  Active open bank accounts?

11               THE WITNESS:  Only the Bank of America one,

12    Your Honor.

13               THE COURT:  Thank you.  Thank you for your

14    testimony.

15               THE WITNESS:  Thank you, Your Honor.

16               THE COURT:  Any additional witnesses to be called?

17               MR. RODRIGUEZ:  Thank you, Your Honor.  Eunjung

18    Cardiff.

19               MR. COLAIZZI:  Your Honor, I apologize.  I have one

20    more --

21               THE COURT:  Feel free.

22               MR. COLAIZZI:  Thank you.

23          Q        There was a question yesterday about any more

24    notes with respect to the loan of the monies from Pharmastrip

25    to Alphatech.
```

**UNITED STATES DISTRICT COURT**

1          I've got some hard copies, Your Honor, that I can

2    pass out.  There are four additional --

3          THE COURT:  Next in order.  We need it marked.

4          MR. COLAIZZI:  Yes, Your Honor.

5          THE COURT:  It would be Poujade 2.

6          MR. COLAIZZI:  I can mark them Poujade 2 through 5.

7    And the chronological order I'll identify.

8          THE COURT:  The first is Mr. Poujade 2 which is the

9    January 2nd promissory note.

10         Go ahead.

11         THE WITNESS:  They are out of sequence, Your Honor.

12         THE COURT:  They are out of sequence.  What note are

13   you starting with, sir.

14         THE WITNESS:  The number --

15         MR. COLAIZZI:  There's a -- additional notes are

16   March 4, 2019 --

17         MS. SANGER:  I would object to the entry of these

18   exhibits.

19         THE COURT:  Well, let's get them marked first.  We

20   have March 4, 2019.

21         MR. COLAIZZI:  Poujade 2 would be dated November 8,

22   2018.

23         THE COURT:  One second.  November 8, 2018.

24         MR. COLAIZZI:  Poujade 3 will be January 2, 2019.

25         THE COURT:  Let me find it.  January 2nd, 2019.

```
1              MR. COLAIZZI:  Poujade 4 would be March 4, 2019.

2              THE COURT:  Okay.  That's Poujade 4.

3              MR. COLAIZZI:  And Poujade 5 is April 22, 2019.

4    Those are the dates on the front page.

5              THE COURT:  And the -- the nature of the objection,

6    Ms. Sanger?

7              MS. SANGER:  Your Honor, if these are the same

8    exhibits we received by e-mail last night, I'd like to point

9    out that three of these we saw for the first time despite the

10   fact that they were all responsive to the FTC's April 10, 2019

11   subpoena to Jacques Poujade.  But furthermore, upon inspecting

12   the metadata of the documents, they all appear to be created on

13   June 21st, 2019.

14             Now, without having seen the original word files, we

15   cannot confirm whether these documents were all created on

16   June 21st, 2019, or whether they were created at some other

17   time.  And without having seen those originals, we are

18   objecting to them being placed on the record today to the

19   extent that they purport to be created on the dates that are

20   reflected in the documents.

21             THE COURT:  Were the documents provided prior to

22   yesterday?

23             MR. COLAIZZI:  Your Honor, apparently -- Mr. Rothman

24   just reminded me.  We were retained right around that time,

25   June 21st I think she said, and we received a bunch of
```

```
 1    documents on that -- on, I think, that date, on or about that

 2    date.  And what got produced -- we did not produce the other

 3    three because it was a mistake.  It wasn't an attempt to

 4    withhold any information.  There's no reason to produce one and

 5    not the other three.  It's not obviously to our benefit.

 6            But we had them in June.  And, quite frankly, it

 7    didn't come up out of the document folder or zip file when it

 8    came.  It may have been a mistake, somebody thought they were

 9    all the same, or some other reason.  I can't tell you exactly

10    why the reason one got produced and the other three didn't.

11            THE COURT:  Ms. Sanger, your objection is that you

12    are concerned about the date they were created?

13            MS. SANGER:  Yes.  We are concerned about the

14    authenticity of the documents.  I do see Mr. Poujade's lawyers

15    in the courtroom here have their computers with them.  If they

16    are able to produce the original files, that would help allay

17    our concerns.

18            MR. ROTHMAN:  Your Honor, if I may, when I was

19    involved -- I was the one personally involved in this --

20            THE COURT:  Let me have your appearance again.

21            MR. ROTHMAN:  Sure.  My name is Ari Rothman,

22    Roger Colaizzi's partner.

23            When we were retained for this, it happened very

24    quickly.  We asked to receive a lot of documents from our

25    client relative to this matter.  They were all uploaded to a
```

266

1   Dropbox or a box file on or about June 20th or June 21st.  I

2   can't remember the exact date.

3           That probably explains why the metadata on the PDF

4   is that date is because that's when it was uploaded to the

5   cloud and either downloaded by us -- I don't remember exactly

6   who downloaded or what.  I don't handle that piece of it.  But

7   somebody at our office downloaded it.  And so that would

8   resolve that issue or in terms of why that date appears there.

9   It wasn't a date that we created the document or anything like

10  that.  It was a date that it was uploaded and then subsequently

11  downloaded by somebody on our team.

12          In terms of the original documents, we do not have

13  those.  This is what we have.

14          THE COURT:  Okay.  Just in terms of when they were

15  provided to the FTC, that was accomplished yesterday; is that

16  correct?

17          MR. COLAIZZI:  Last night, yes, Your Honor, in

18  response to a question about why was the promissory note dated

19  January 2 when the loan was in November.

20          THE COURT:  Okay.

21          MR. COLAIZZI:  And why it was it for a

22  hundred instead of --

23          THE COURT:  The objection is overruled.  The 2, 3,

24  4, and 5 will be received.

25   (Poujade Exhibit Nos. 2, 3, 4, and 5 received into evidence.)

1          MR. COLAIZZI:  Thank you, Your Honor.  I think I'm

2     really done.

3          THE COURT:  Have we concluded with the witness?

4     Yes?

5          Thank you, sir.

6          THE WITNESS:  Thank you, sir.

7          THE COURT:  Mrs. Cardiff, would you come forward,

8     please.

9          THE CLERK:  Do you solemnly swear that the testimony

10    you shall give in the cause now before this Court shall be the

11    truth, the whole truth, and nothing but the truth, so help you

12    God?

13         THE WITNESS:  I do.

14         THE CLERK:  Please be seated.

15         MR. RODRIGUEZ:  Your Honor, my name is Edwin

16    Rodriguez.  I'm representing the Federal Trade Commission.

17         THE COURT:  One moment.

18         THE CLERK:  Will you please state and spell your

19    full name for the record.

20         THE WITNESS:  Yes.  Eunjung Cardiff, E-u-n-j-u-n-g,

21    C-a-r-d-i-f-f.

22         THE COURT:  Your witness.

23                    EUNJUNG CARDIFF,

24    called as a witness, was sworn and testified as follows:

25    ///

                          CROSS-EXAMINATION

1    BY MR. RODRIGUEZ:

2         Q      Mrs. Cardiff, you stated in your declaration that

3    when Clover Cannastrip was incorporated on July 31st, 2008, you

4    were a director of that company; is that correct?

5         A      Yes.

6         Q      I'm putting your declaration up on the screen so

7    you can take a look at it.  This is Document 147-2, and it's on

8    page 3.

9              So you did confirm, didn't you, that you were a

10   director of Clover Cannastrip on July 31st?

11        A      Yes.

12        Q      And you were also a signer on the company's bank

13   account at TD Bank Canada; is that correct?

14        A      Yes.  But not on July 31st.

15        Q      In fact, you and your husband have been the only

16   two signatories on that account; isn't that right?

17        A      Yes.

18        Q      Mrs. Cardiff, I'm directing your attention to --

19             THE COURT:  Would you identify the document on the

20   screen, please?

21             MR. RODRIGUEZ:  Yes.  On the screen is 144-1,

22   page 20 of 38.

23             THE COURT:  Thank you.

24   BY MR. RODRIGUEZ:

1          Q        Directing your attention to a TD Canada Trust

2    Business Banking and Services Agreement dated October 4th,

3    2018, that document identifies you as the manager of

4    Clover Cannastrip, doesn't it?

5          A        Yes.  I don't see where it says that though.  I

6    spoke too soon on that.  I didn't see.

7          Q        I'll put it up on the screen for you.  This is

8    page 27 of Document 144-1.

9          THE COURT:  Can you pull it down so I can -- yes.

10   Thank you.  The question?

11         MR. RODRIGUEZ:  Excuse me for one second.  I'm

12   trying to get the whole document on the screen so that it's a

13   complete image.  That's the best we can do.

14         Q        Doesn't this document bear your signature at the

15   bottom?

16         A        Yes.

17         Q        On this page, page 27, aren't you identified as

18   the manager of Clover Cannastrip Thin Film Technologies?

19         A        Yes.  Is this the same document from earlier?

20         Q        Yes.

21         A        Okay.

22         Q        Is your answer yes?

23         A        Yes.

24         Q        Again, is that your signature on that page?

25         A        Yes.

1       Q       Do you see that both signatures are dated

2   October 4th?

3       A       Yes, it's dated October 4th.  But that's not my

4   handwriting.

5       Q       The date or the signature?

6       A       The date.

7       Q       Now, since this document is dated October 4th, do

8   you claim that -- you also claim in your declaration that you

9   resigned as a director of Clover Cannastrip only four days

10   later on October 8th; is that correct?

11      A       Yes.

12      Q       Are you asking the Court to believe that you

13   would go to the trouble of submitting a document to TD Canada

14   on October 4th or even --

15              THE COURT:  Rephrase the question.  It's

16   argumentative.

17              MR. RODRIGUEZ:  Okay.

18      Q       Did you, in fact, submit a document to TD Canada

19   dated October 4th or even in late September, if your husband's

20   testimony is believed, only to resign four days later --

21              THE COURT:  Compound question.  Rephrase.

22              MR. RODRIGUEZ:  Okay.

23      Q       Is it true that you submitted this document

24   either on October 4th or soon -- sometime during that period?

25              MR. WHITE:  Objection.  Vague.

271

```
 1              THE COURT:  When did you submit the document if you
 2   did?
 3              THE WITNESS:  I don't remember when I submitted the
 4   document.
 5   BY MR. RODRIGUEZ:
 6         Q     Yesterday your husband stated that in late
 7   September you went on vacation to Nova Scotia and that it was
 8   in late September.  Does that refresh your recollection?
 9         A     Yes.  We went to New York, a few places, Nova
10   Scotia being one of them.
11         Q     So was it at that time that this document was
12   submitted to the bank?
13         A     Yes.
14         Q     And you resigned on October 8th?
15         A     Yes.
16         Q     Which would make it approximately about a week
17   after this document was submitted; is that correct?
18         A     No, since the date I signed the document it would
19   be two and a half weeks.
20         Q     Now --
21              THE COURT:  I'm confused.  The document that's on
22   the screen now, do you recall signing that document?
23              THE WITNESS:  Yes, in September --
24              THE COURT:  What was the date that it was signed?
25              THE WITNESS:  I believe it was maybe September 19th
```

**UNITED STATES DISTRICT COURT**

1    or 20th in Nova Scotia.

2    BY MR. RODRIGUEZ:

3        Q        So that would make it about two and a half weeks

4    before you resigned; is that correct?

5        A        Yes.

6        Q        Did you know at the time that you signed this

7    document that you would have to resign?

8        A        No, I did not know.

9        Q        So you didn't have any discussions with

10   Jacques Poujade about the necessity of you resigning from

11   Clover Cannastrip?

12       A        I never spoke to him about that subject.

13       Q        How did you learn that you would have to resign?

14       A        My husband told me.

15       Q        What did you get in return for your alleged

16   resignation?

17       A        I don't understand that question.

18       Q        Did you get any compensation for your

19   resignation?

20       A        No.

21       Q        So you walked away from what has been described

22   as a lucrative cannabis business for nothing?  Is that your

23   testimony?

24       A        I don't know if it was a lucrative cannabis

25   business the day I resigned.

273

```
 1          Q       But you walked away for nothing?

 2          A       I resigned, yes.

 3          Q       And you received nothing in return for your

 4   resignation?

 5          A       No, I did not.

 6                  THE COURT:  Before you remove the document -- if you

 7   can put it back up.

 8                  So the document is dated October 4th, 2018.

 9                  THE WITNESS:  Yes.

10                  THE COURT:  You testified that you placed your

11   signature on the document September 19th?

12                  THE WITNESS:  Yes.

13                  THE COURT:  Why didn't you date the document when

14   you placed your signature on it?

15                  THE WITNESS:  I don't know.  I was at the bank, and

16   they asked us to sign, and I signed it.  And I don't know why I

17   didn't date it.

18                  THE COURT:  Did you recognize that there was a

19   portion of the document that called for a date at the time you

20   signed it?

21                  THE WITNESS:  I may have.  I believe so, but that is

22   not my handwriting.

23                  THE COURT:  I understand that.  Why didn't you place

24   the date in that portion --

25                  THE WITNESS:  I don't know.
```

**UNITED STATES DISTRICT COURT**

274

```
 1              THE COURT:  -- at the time you signed it?

 2              THE WITNESS:  I don't know.  I don't know why I did

 3    that or didn't do that at the time.

 4              THE COURT:  Thank you.

 5    BY MR. RODRIGUEZ:

 6        Q     Mrs. Cardiff, I'm directing your attention to a

 7    document that's marked Document 134-12, page 45.

 8              THE COURT:  Would you pull it down so I could make

 9    sure that's correct?  Thank you.

10    BY MR. RODRIGUEZ:

11        Q     We obtained this document pursuant to a subpoena

12    to Mr. Jacques Poujade.

13              MR. THURMAN:  Your Honor, I'd like to raise a

14    concern.

15              THE COURT:  You can state an objection.

16              MR. THURMAN:  Thank you.  That the FTC and the

17    receiver appear to have sent out many, many subpoenas and

18    copies of the Court's order but have not --

19              THE COURT:  What's your objection?

20              MR. THURMAN:  The objection is that this document I

21    don't think was produced to the defendants before the FTC used

22    it as an exhibit in this case.

23              THE COURT:  Are you confident of that, that it was

24    not produced to you or Mr. White?

25              MR. THURMAN:  It was not produced to me.  It's
```

**UNITED STATES DISTRICT COURT**

```
 1    possible it may have been produced to Mr. White.

 2            THE COURT:  Why don't you consult with Mr. White

 3    first.

 4            MR. THURMAN:  Thank you.

 5            (Discussion held off the record.)

 6            MR. THURMAN:  Your Honor, I'm going to withdraw the

 7    objection.  Thank you.

 8            THE COURT:  Thank you.

 9    BY MR. RODRIGUEZ:

10        Q    Can you please read from this document what the

11    balance was on September 10th before you resigned.

12            MR. THURMAN:  Objection, Your Honor.  Misstates the

13    date of Ms. Cardiff's resignation as a director.

14            THE COURT:  Overruled.

15            Ask the question again.  I'm not sure I -- go ahead.

16    What's your question?

17    BY MR. RODRIGUEZ:

18        Q    Would you please read the balance as of

19    September 10th, 2018, before you allegedly resigned on

20    October 8th.

21        A    Next to September 10th and then balance it says,

22    "$500,000."

23        Q    Okay.  And on September 13th, that balance had

24    gone up to 1,840,000, again, before you resigned; isn't that

25    right?
```

1          MR. THURMAN:  I'd object again.  Mr. Rodriguez is

2     misstating the date of her alleged resignation which was

3     October 8th which is before those dates.

4          MR. RODRIGUEZ:  I didn't mention the date.

5          THE COURT:  Ask the question again.

6     BY MR. RODRIGUEZ:

7          Q     And on September 13th on this document, that

8     balance had gone up to $1,840,000, and September 13th is before

9     the date that you allegedly resigned; isn't that right?

10         A     September 13th is before October 8th, yes.

11         Q     Okay.  And on September 28th, again, which occurs

12    before the date you resigned, the balance was $1,787,252.54;

13    isn't that right?

14         A     Yes, that's what it says on the statement.

15         Q     I'm directing your attention now to the same

16    document but page 44.  Isn't it true that on October 4th, 2018,

17    which is the same date on the TD Canada agreement, that the

18    balance in this account was 1,724,000 -- $1,724,143.03, wasn't

19    it?

20         A     Are you referring to the previous document as an

21    agreement?

22         Q     Yes.

23         A     I don't know if I'd call it an agreement.  But on

24    October 4th it says $1,724,143.03.

25         Q     So is it your testimony that you walked away from

1    being a director and manager from Clover Cannastrip only

2    four days later from October 4th with no compensation despite

3    all the money in that account?

4         A      I have not seen this document until now.

5         Q      But you were a signatory on this account; isn't

6    that correct?

7         A      Yes, I was.

8         Q      So as one of the two signatories on the account,

9    are you saying you had no idea what the account balance was?

10        A      Yes.  I also say that in my declaration.

11        Q      And you walked away from the business without

12   checking?

13        A      Yes.

14        Q      Now, you graduated from Columbia University,

15   didn't you?

16        A      Yes.

17        Q      And you are a sophisticated business woman who

18   has worked as a marketing executive; right?

19        A      I have worked as a marketing executive.

20        Q      Not only at Redwood but also at a media placement

21   agency called Cannella Response Television; isn't that right?

22        A      Yes.

23        Q      And you have claimed that, while you were at

24   Cannella, you grew that business from zero dollars to nearly

25   $3 million per year in fewer than three years; isn't that

**UNITED STATES DISTRICT COURT**

```
 1   right?
 2        A      Yes.
 3        Q      And you served as the managing director for
 4   Cannella for five years?
 5        A      I believe it was about five years.
 6        Q      And yet with all that experience, you didn't feel
 7   that it was necessary to know what the balance of your own bank
 8   account was?
 9        A      It wasn't my bank account.  I was a signer on it.
10   And yes, I did not know the balance on October 8th.
11        Q      Now, do you see on this same page that
12   $1.2 million was transferred out of the Clover Cannastrip
13   account on October 16th?
14        A      Yes.
15        Q      Did you know about that debit?
16        A      No.
17        Q      Do you see the $360,000 debit on October 18th?
18        A      Yes.
19        Q      Is it also your testimony that you did not know
20   about that debit?
21        A      That's correct.
22        Q      And you felt no responsibility as a manager to
23   know what was going on with the account?
24        A      No, I did not.  I was a signer and a manager, but
25   I did not feel that responsibility.
```

**UNITED STATES DISTRICT COURT**

279

```
1        Q       But you were aware of the asset freeze as of

2   October 12th; right?

3        A       We were served the TRO on October 12th, correct.

4        Q       And after you were served with the TRO on that

5   date, you didn't take any steps to safeguard or preserve any

6   money in the TD Canada account; isn't that right?

7        A       What do you mean by safeguard?

8        Q       To prevent its transfer out of the account.

9        A       No.

10       Q       And did you seek at any point any clarification

11  from this Court about whether the money in that account was

12  subject to the asset freeze?

13       A       No, I did not.  I didn't really understand what

14  was going on on October 12th.

15       Q       Did you seek any clarification at any time?

16       A       I don't think so.

17       Q       The temporary restraining order required you to

18  submit a financial statement to the FTC; isn't that correct?

19       A       I believe so, yes.

20       Q       And you did, in fact, submit a financial

21  statement dated October 25th, 2018; is that correct?

22       A       Can I see it, please?

23       Q       Did you submit a financial statement to the FTC?

24       A       I don't remember.

25       Q       You don't remember submitting any financial
```

```
 1    statements to the FTC?

 2         A      Not on October 25th.  I don't remember that.

 3         Q      Do you remember submitting any financial

 4    statements to the FTC?

 5         A      Yes.  I believe it was submitted last week,

 6    financial statements.

 7         Q      But around -- the temporary restraining order has

 8    an attachment, a financial statement.  Did you submit that as

 9    required by the TRO to the FTC?

10         A      I don't remember if I submitted that on

11    October 25th.  And it's my understanding whatever we did

12    submit, whether it was on October 25th, was incorrectly done.

13    We had no counsel at the time.

14              THE COURT:  Before you move on, I'm -- you were a

15    director and manager at Clover Cannastrip; correct?  What were

16    your duties and functions?

17              THE WITNESS:  At the time I didn't have any duties

18    or functions.  It was a new company, and I was not involved in

19    any of the raising or -- really, I guess, raising funds.

20              THE COURT:  You were a director but had no duties?

21              THE WITNESS:  A manager but I didn't have any duties

22    at the time.

23              THE COURT:  And you were a manager and had no

24    duties?

25              THE WITNESS:  Not at the time.
```

```
 1              THE COURT:  No responsibilities?

 2              THE WITNESS:  Not at the time.  It was still a young

 3   company.

 4              THE COURT:  Thank you.

 5   BY MR. RODRIGUEZ:

 6        Q      Do you recall attending a hearing before this

 7   Court on November 7th for the preliminary injunction?

 8        A      Yes.

 9        Q      I'm directing your attention to the transcript of

10   that hearing.  At the hearing on November 7th, the FTC asked

11   the Court to issue a preliminary injunction requiring that you

12   provide bank account information.  And specifically, Ms. Sanger

13   requested that the preliminary injunction require that the

14   Cardiffs provide bank account information, meaning names and

15   account numbers for any entities for which they were owners,

16   officers, or signatories during the past five years.

17              And my question to you is at that time, didn't

18   the -- didn't the reference to the last five years jog your

19   memory that you were a signatory of the Clover Cannastrip

20   account within the last five years?

21        A      I did not think that.  I did not think anything

22   the first time I appeared in front of this Court.

23              So no, I didn't think about anything when I

24   appeared in front of this Court for the first time, Your Honor.

25        Q      But isn't it true that you did not take that
```

282

```
 1    opportunity to disclose the Clover Cannastrip account and the

 2    fact that you were a director and manager?

 3        A       Not that day.

 4        Q       Now, the TD Bank agreement that has the

 5    October 4th date on it, even if you did sign it in

 6    mid-September, the period between September and November 7th,

 7    the date of the hearing, is not very long.  So you didn't

 8    remember that you had signed that agreement in the past

 9    five years?

10        A       On that day, November 7th, I didn't remember

11    anything.  Everything was a little bit shocking to me that day

12    when I first appeared in front of this Court.  I wasn't

13    thinking about signatories.  I was just trying to figure out

14    what was going on in reference to the TRO.

15        Q       Despite the fact that you were the signatory on

16    that account, you didn't take that opportunity to seek any

17    clarification from the Court about your reporting obligations

18    relating to the TD Canada account, did you?

19        A       Not that day.

20        Q       Mrs. Cardiff, I'm directing your attention to

21    Document 59, page 18.  This is a copy of the preliminary

22    injunction entered against you by the Court.  And I'm directing

23    your attention to section 9, subparagraph C.

24                Now, this is a preliminary injunction against you

25    and you received a copy of this, didn't you?
```

1       A       Yes.

2       Q       And section 9, subparagraph C specifically reads

3  as follows:

4               That you were supposed to, quote, "Identify to

5  plaintiff's counsel and the receiver all bank accounts for all

6  entities for which Defendant Jason Cardiff or Defendant Eunjung

7  Cardiff has been an officer, director, member, owner, or

8  signatory for the last five years."

9               Now, did this not jog your reporting obligations?

10      A       No, not that day.

11      Q       When did it jog your reporting obligations?

12      A       My husband and I, we tried to go back and list

13  all of the entities on our own.  It didn't jog my memory about

14  the Clover Cannastrip because I've never even seen a statement

15  and I had no involvement in any of the banking.

16      Q       Now, this provision specifically references

17  directors, signatories last five years.  You were both a

18  director and a signatory on the Clover Cannastrip account

19  within the last five years and yet this provision -- is it your

20  testimony that you did not understand it?

21      A       I understand it now, but it just didn't come to

22  my mind that day.

23      Q       What day?

24      A       When I first appeared in front of this Court,

25  November 7th.

284

1       Q       This is the preliminary injunction that was

2   issued the following day against you.  And did it jog your

3   recollection about your involvement with Clover Cannastrip at

4   any time?

5       A       I don't believe it did.

6               THE COURT:  Your degree from Columbia is in what

7   area?

8               THE WITNESS:  History, East Asian history.

9   BY MR. RODRIGUEZ:

10      Q       Do you recall that one of the issues at the

11  November 7th hearing was your withdrawal of $3,715 from Chaffey

12  Federal Credit Union on October 12th, 2018?

13      A       Yes.

14      Q       Do you recall that another issue before the Court

15  that day was your visit on October 17th, 2018, to a post office

16  to take mail that was under the receiver's domain?

17      A       I remember that came up as well, but I don't know

18  what date it was.

19      Q       Mrs. Cardiff, I'm directing your attention again

20  to the hearing transcript for the hearing of November 7th.

21              Do you recall that at that hearing the Court

22  admonished you that it had, quote, "Significant concerns that

23  you have not been complying with the prior order and notice

24  issued by this Court.  So going forward, make sure that you are

25  diligent in compliance with the Court's orders.  There are

```
 1   significant consequences that could be imposed if you are in

 2   violation of the Court's orders.  And just make sure that you

 3   make all reasonable efforts to comply"?  Do you see that?

 4        A     I see that.

 5        Q     Do you recall that admonition?

 6        A     I see it here in the transcripts, but I remember

 7   it did not go so well with His Honor that day.

 8        Q     Now, isn't it true that despite the Court's

 9   admonishment, you have never disclosed until the last couple of

10   days that you were a director of Clover Cannastrip?

11        A     I believe so, yes.  I believe that's in our

12   financial disclosure that we sent last week.

13        Q     When?

14        A     Last week.

15        Q     But that was the first time you disclosed that;

16   right?

17        A     I believe so.

18        Q     And that was -- was that also the first time that

19   you disclosed that you were a manager of Clover Cannastrip?

20        A     I believe so.

21        Q     Now, the Clover Canada account contained close to

22   $2 million after the date of the TRO.  And did you take the

23   opportunity after the Court's admonishment to seek any

24   clarification from the Court or an attorney?

25        A     I didn't have --
```

```
 1              THE COURT:  Complete your question, please.
 2   BY MR. RODRIGUEZ:
 3        Q      Despite the Court's admonishment, did you seek
 4   any clarification from the Court about whether you needed to
 5   report those assets?
 6        A      We didn't have any representation.  We didn't
 7   have any counsel.  I didn't -- even if I wanted to, I wouldn't
 8   have known how to communicate with the Court.  I wanted to have
 9   some follow-up questions after we left court that day.  I
10   really didn't know how to communicate with the Court.
11        Q      When did you retain counsel?
12        A      I believe it was February or March.  I'm not sure
13   about the exact date.
14        Q      Mrs. Cardiff, the FTC deposed you on March 28,
15   2019; isn't that correct?
16        A      Yes.
17        Q      And at that deposition, you refused to answer any
18   questions; isn't that correct?
19        A      So by the advice of counsel a few weeks before
20   March --
21        Q      Can you please answer my question?  At that
22   deposition you refused to answer any questions; isn't that
23   correct?
24        A      Yes.
25              Your Honor, may I clarify though?
```

```
 1              THE COURT:  No.  There's a question-and-answer
 2   format.  Your lawyer will have an opportunity to clarify.
 3              THE WITNESS:  Okay.  Yes.
 4   BY MR. RODRIGUEZ:
 5       Q      And you refused to answer those questions based
 6   on your Fifth Amendment right; isn't that correct?
 7       A      Yes.
 8       Q      And you refused to answer any questions about
 9   your connection to Clover Cannastrip; isn't that correct?
10       A      Yes.
11       Q      When you were asked whether you were a control
12   person of Clover Cannastrip, you refused to answer that
13   question; isn't that true?
14       A      Yes.
15       Q      Now, this was yet another opportunity for you to
16   disclose your connection to Clover Cannastrip and you didn't;
17   isn't that correct?
18       A      Yes.  By the advice of counsel, I was advised to
19   assert my Fifth Amendment privilege.
20       Q      Isn't it true you and your husband used money
21   that came to you through Alphatech to pay for personal
22   expenses?
23       A      It was a loan.
24       Q      Isn't it true you used funds from that account to
25   pay for personal expenses?
```

1        A        Yes.  We had a loan to pay for expenses.

2        Q        Isn't it true that you haven't taken any steps to

3   turn over any Clover Cannastrip assets to the receiver?

4        A        Yes.

5        Q        Isn't it also true that you have not taken any

6   steps to turn over any Clover Cannastrip assets that were

7   transferred to Pharmastrip to the receiver?

8        A        I don't know about any assets that were

9   transferred outside of Clover Cannastrip.

10       Q        But you haven't taken any steps to turn over any

11  of those assets; isn't that correct?

12       A        CloverStrips, yes.  Yes.

13            MR. RODRIGUEZ:  Your Honor, may I consult with

14  co-counsel for just a minute?

15            THE COURT:  Yes.

16            MR. RODRIGUEZ:  Thank you.

17            (Discussion held off the record.)

18            MR. RODRIGUEZ:  No more questions, Your Honor.

19            THE COURT:  Any questions?

20            MR. FLETCHER:  No questions, Your Honor.

21            THE COURT:  We are going to stop at 1:30 for a

22  recess.  No later than 1:30.  Do you prefer taking that recess

23  now?

24            MR. THURMAN:  Yes, please, Your Honor.

25            THE COURT:  Please return back at 25 to the hour.

```
 1    It will be a 15-minute recess.
 2              (At 2:18 p.m. a brief recess was taken.)
 3              THE COURT:  We are back on the record in the FTC
 4    versus Cardiff.  All parties are present and counsel remain.
 5              So I'm assuming this is the last witness; is that
 6    correct?  Yes?
 7              MS. SANGER:  Yes, Your Honor.
 8              THE COURT:  Okay.  Let's conclude.
 9              MR. THURMAN:  Thank you, Your Honor.
10                         REDIRECT EXAMINATION
11    BY MR. THURMAN:
12         Q      Ms. Cardiff, just before we broke, Mr. Rodriguez
13    asked you whether you had taken any steps to turn over the
14    Clover Cannastrip assets to return them somehow to the
15    receiver.  Is there anything that you could do today to cause
16    those assets to be returned to the receiver?
17         A      No, there isn't.
18         Q      Did you ever think that you had any right to or
19    claim for ownership of any of those assets?
20         A      No, I did not.
21         Q      Did you put any funds into the Clover Cannastrip
22    account yourself?
23         A      No.
24         Q      Did your husband put any funds in?
25         A      No.
```

1     Q       Did any of your businesses that you and your

2  husband -- various businesses that you've disclosed to the

3  FTC, were any funds from any of those businesses put in the

4  Clover Cannastrip accounts?

5     A       No.

6     Q       Mr. Rodriguez asked you about your trip to

7  Canada, and we talked about a bank account agreement that you

8  and your husband signed.  Can you describe that trip in a

9  little more detail?  How long were you in Canada?  How long

10  were you in Nova Scotia?

11     A       I believe we were there for one day.  It was a

12  trip that lasted about a week and a half.

13     Q       Where did you travel during the week and a half

14  that you were in Canada?

15     A       We went to Nova Scotia, Montreal.

16     Q       Did you go to Canada for the purpose of signing

17  the bank account in Nova Scotia?

18     A       No.

19     Q       How did the fact that you signed the bank account

20  agreement in Nova Scotia come up?

21     A       We started that trip in Montreal, and I believe

22  we went to New York, Boston, Rhode Island, and then one of our

23  stops was in Nova Scotia.  So my husband suggested that we

24  visit a branch and add myself as a signatory.  And I believe

25  that was towards the end of the trip.

1       Q       And do you have any recollection regarding when

2    your trip finally ended and you returned to Southern

3    California?

4       A       Yes.  Because it was two or three days -- three

5    days, I believe, before our daughter's fifth birthday.  So

6    September 24th.

7       Q       So you returned two or three days before

8    September 24th; is that correct?

9       A       It would have been September 24th, the return

10   date.

11      Q       So you were back by September 24th.  The trip had

12   taken about a week and a half; is that correct?

13      A       Yes.

14      Q       And the Nova Scotia part was when?

15      A       I believe it was four or five days prior to our

16   return.

17      Q       So around September 19 or 20?

18      A       Yes.

19      Q       When you went to the bank, did you meet with a

20   banker?

21      A       Yes.

22      Q       And did they sit down with you and fill out

23   documents for you and your husband?

24      A       They presented me with a signatory card that's

25   now being called "the agreement."

1      Q       Approximately how long did that meeting take?

2      A       Maybe 45 minutes.

3      Q       Do you have any recollection whether you were

4   asked to date that document or not date it?  Do you remember

5   one way or another?

6      A       No.

7      Q       Mr. Rodriguez asked you why you did not disclose

8   your role with Clover Cannastrip as a director and as a

9   signatory prior to the disclosure that you've made recently.

10  Did you do so on purpose?  Did you intentionally avoid

11  disclosing your role in Clover Cannastrip?

12     A       No.

13     Q       Were you trying to hide that fact from the FTC or

14  the receiver?

15     A       No, not at all.

16     Q       Did you ever do any work on behalf of Clover

17  Cannastrip?

18     A       No.

19     Q       Did you anticipate you would had things gone as

20  you had originally expected?

21     A       I didn't have any expectations.

22     Q       Did you ever have any ownership interest in

23  Clover Cannastrip?

24     A       No.

25     Q       And you testified that you resigned as a director

```
 1   of Clover Cannastrip on October 8, 2018; is that correct?

 2        A      Yes.

 3        Q      I'd like to show you a document.  It's marked

 4   147-2, and it's page 7.

 5             THE COURT:  Thank you.

 6   BY MR. THURMAN:

 7        Q      Do you recognize this document, Ms. Cardiff?

 8        A      Yes.

 9        Q      What is it?

10        A      It is my resignation as a director.

11        Q      Did you sign it there at the bottom?

12        A      Yes.

13        Q      When did you sign it?

14        A      October 8th.

15        Q      Why did you sign this document?

16        A      My husband told me that he had some ongoing

17   discussions with Mr. Poujade and that our involvement would

18   hinder their -- the company's growth and survival, I guess.

19        Q      I think it's been established you didn't receive

20   anything in return for signing this document; is that correct?

21        A      No.

22        Q      Were you present when your husband signed any

23   resignation papers from the company?

24        A      I believe we did sign them together.

25        Q      Let me show you another document.  This is
```

1    Document 147-1, page 13.  Do you recognize this document?

2         A       Yes.

3         Q       What is it?

4         A       It's Jason Cardiff's resignation from the

5    company.

6         Q       Did you see Mr. Cardiff sign this document?

7         A       Yes.  We were together.

8         Q       And when did he sign it?

9         A       October 8th.

10        Q       Do you know what happened to these documents as

11   far as what was done with them after you signed them?

12        A       I do not.

13        Q       Did you ever participate or assist or have

14   anything to do with any banking transactions in connection with

15   the Clover Cannastrip account other than signing the signature

16   form up in Nova Scotia?

17        A       No.

18        Q       You never wired any money or withdrew any money

19   or anything like that?

20        A       No.

21        Q       Mr. Rodriguez showed you a provision from the

22   preliminary injunction that was entered by the Court in

23   November 2018.  It specifically was Section 9, Subsection C.

24   And it described a requirement to provide information regarding

25   any companies that you had bank accounts or were a director of

```
 1    or an officer.  Have you subsequently complied with that
 2    requirement?
 3          A      Yes.
 4          Q      When did you do that?
 5          A      Last week.
 6          Q      At the same time, did you assist in preparing
 7    financial disclosures for all of the companies that were
 8    required to be disclosed by the Court?
 9          A      Yes.
10          Q      Did you provide an inventory of your household
11    items to the receiver in FTC in connection with the
12    requirements of the order?
13          A      Yes.
14          Q      To the best of your ability, have you done
15    everything that you could do in connection with complying with
16    the order?
17          A      Yes.
18          Q      Do you have any ability to repatriate any funds
19    that you or your husband have that have not been returned to
20    the receiver?
21          A      No.
22          Q      You have not to the best of your ability -- or
23    have you tried to the best of your ability to repatriate any
24    funds?
25          A      Oh, yes.
```

1      Q      If you were asked today or at any time by the

2   receiver to assist by signing a document or contacting a bank,

3   would you do so?

4      A      Yes.

5      Q      Have you been out of the United States since your

6   trip to Nova Scotia in September of 2018?

7      A      No.

8      Q      Has your husband been out of the United States

9   since that time?

10      A      No.

11          MR. THURMAN:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Rodriguez, any additional questions?

14          MR. RODRIGUEZ:  Yes, I have a few.

15          THE COURT:  Keep it short, please.

16          MR. RODRIGUEZ:  Just a few questions Your Honor.

17                        RECROSS-EXAMINATION

18   BY MR. RODRIGUEZ:

19      Q      Mrs. Cardiff, I'm directing your attention to

20   your declaration, Document 147-2 at page 2.  Do you see that?

21      A      Yes.

22      Q      In paragraph 4 it reads, "Our company Redwood was

23   founded in 2014 with personal investments from only myself and

24   my husband.  And that only just before when the company went

25   public in April 2018 were there" -- "where there were other

297

```
 1     investors in Redwood."  Do you see that?
 2          A      Yes.
 3          Q      So from the period from 2014 to when the company
 4     went public in 2018 -- that's four years -- you operated that
 5     entity with your husband; isn't that correct?
 6          A      Yes.  And other employees.
 7          Q      Yes.  And Mr. Jacques Poujade was not involved,
 8     was he?
 9          A      He was not an employee.
10          Q      You ran this entity successfully for four years,
11     didn't you?
12          A      We ran it for four years.
13          Q      Now, this company was an oral thin film business,
14     wasn't it?
15          A      We didn't manufacture anything.  We bought
16     product from overseas.
17          Q      And those products were oral thin films; isn't
18     that correct?
19          A      Yes.  But we also had other products like
20     flashlights.
21          Q      Now, focusing on the oral thin films, how many
22     oral thin films -- how many kinds were there?
23          A      Can you be more specific?
24          Q      How many products that were oral thin films did
25     you sell?
```

**UNITED STATES DISTRICT COURT**

```
 1          A       We sold maybe around five that were actually

 2   sold.  We ordered maybe around eight or nine different types.

 3          Q       Okay.  And of those types, one of them was

 4   TBX Free; isn't that correct?

 5          A       Yes.

 6          Q       Another was one was Eupepsia Thin; isn't that

 7   right?

 8          A       Yes.

 9          Q       And another one was Prolongz; right?

10          A       Yes.

11          Q       And there was also a product for insomnia; is

12   that correct?

13          A       There was a sleep aid.

14          Q       Okay.  And what other aids were there?  What

15   other products?

16          A       We had a women's product, a libido product.  But

17   no one ever bought that.  We bought an aspirin, but we didn't

18   necessarily market that.  I think there was a melatonin

19   product.

20          Q       Did there ever come a time when Redwood started

21   selling oral thin films with CBD?

22          A       For a short time, yes.

23          Q       And under the brand name CloverStrips?

24          A       It was called CloverStrip, yes.

25          Q       So since you had been selling so many different
```

**UNITED STATES DISTRICT COURT**

 1  kinds of oral thin films, couldn't you also have engaged in --

 2  strike that.

 3            I have no more questions, Your Honor.

 4            THE COURT:  Thank you.

 5            Final questions?

 6            MR. THURMAN:  No, Your Honor.

 7            THE COURT:  Thank you for your testimony.

 8            Any additional evidence that has not already been

 9  received?

10            MR. THURMAN:  Your Honor, I have one important issue

11  I just wanted to raise with the Court.  I alluded to it earlier

12  during Mr. Cardiff's examination.

13            We are very concerned about the Court being

14  knowledgeable about the present status of the TD Canada

15  CloverStrip account.  If that account is not frozen, the

16  Cardiffs are happy to sign any documentation to release those

17  funds to the receiver.  On the other hand, if that account is

18  already frozen, then it seems like it should not be an issue

19  for this Court in terms of contempt since they have no control

20  over that account.

21            But we've been unable to determine from the

22  receiver's counsel whether or not that account is frozen.

23            THE COURT:  Response?

24            MR. FLETCHER:  Yes, Your Honor.  A demand has been

25  made by the receiver on TD Canada.  We have information from

 1    TD Canada.  I would have to take instructions from the receiver

 2    whether the account has been formally frozen or not.

 3            I'm not aware of anything other than a repeated

 4    demand since November for cooperation, turnover that hasn't

 5    been ceded to.  I understand that the Cardiffs are scrambling

 6    now over the last couple of days to do that.  But I'm not aware

 7    of anything at the moment in that regard.

 8            And I will tell the Court that it's been the

 9    perception of the receiver and certainly this counsel that the

10    collective defendants' side wants to know a lot of different

11    things because they only want to feed back to the receiver that

12    which the receiver already knows about.  And so we have

13    purposely not responded to a number of requests that have been

14    made because of, frankly, game playing that we see going on in

15    this proceeding.

16            As specifically to the TD Canada account, I will ask

17    the receiver if the Court wants me to.

18            THE COURT:  Okay.

19            Go ahead.

20            MR. THURMAN:  I'm very new to the case.  If there's

21    a change in tactics, it's because there's new counsel, and the

22    questions I've been asking are questions that I'm used to

23    seeing receivers answer in the ordinary course of every FTC

24    asset freeze case I've been involved with.

25            So it's not any kind of game playing.  As the

1   receiver and the FTC can confirm, since I've arrived in the

2   case, we've made extensive efforts to try and disclose and are

3   ready, willing, and able to disclose anything else that we can.

4          We want to cooperate.  And at the same time, I do

5   expect the receiver to make full reports both to the Court

6   about inventory and assets that have been secured as well as

7   share with counsel information about document requests and

8   things like that.

9          This particular item though is germane to this

10  hearing, and that is determining the status of that account is

11  critical for the Court's decision on whether or not there's

12  been a contempt.  And so we want to get that resolved.

13         THE COURT:  So it would appear at this time that

14  because we have new counsel representing the Cardiffs on the

15  case, that new counsel and the counsel for the receiver, the

16  receiver and the FTC should make some additional efforts to try

17  to resolve the dispute.

18         The matter will be put over until tomorrow.

19  Tomorrow the Court will -- if the case is not resolved

20  tomorrow, the Court will hear argument from counsel.  And --

21  regarding whether the FTC has established that the Cardiffs

22  have violated orders issued by the Court and then the issue of

23  appropriate remedy.

24         MR. FLETCHER:  Thank you, Your Honor.

25         THE COURT:  Okay.  So see what you can do to resolve

**UNITED STATES DISTRICT COURT**

```
 1    the case this evening.
 2              MR. THURMAN:  Thank you, Your Honor.
 3              THE COURT:  Thank you.
 4              Let's have everybody return at 9:00 tomorrow.
 5              MR. THURMAN:  Thank you.
 6              THE COURT:  Thank you.
 7              And please give new counsel an opportunity to see if
 8    the issues could be resolved.
 9              MR. FLETCHER:  Certainly, Your Honor.
10              (At 2:58 p.m. the proceedings adjourned.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

 6    REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

 7    CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

 8    TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

 9    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15              DATED THIS  3RD  DAY OF AUGUST, 2019.

16

17

18         /S/ MAREA WOOLRICH

19         MAREA WOOLRICH, CSR NO. 12698, CCRR
           FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**