1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5    FEDERAL TRADE COMMISSION,            )
                                          )
6                     Plaintiff,          ) Case No.
                                          ) ED CV 18-2104-SJO
7           vs.                           )
                                          )
8    JASON CARDIFF, ET AL.,               )
                                          )
9                     Defendants.         )
     _____)
10

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14        ORDER TO SHOW CAUSE RE: CONTEMPT (CONTINUED)

15                 TUESDAY, AUGUST 27, 2019

16                       10:07 A.M.

17                 LOS ANGELES, CALIFORNIA

18

19

20

21

22    _____

              MAREA WOOLRICH, CSR 12698, CCRR
23         FEDERAL OFFICIAL COURT REPORTER
           350 WEST FIRST STREET, SUITE 4311
24          LOS ANGELES, CALIFORNIA 90012
                mareawoolrich@aol.com
25

```
 1                    APPEARANCES OF COUNSEL:

 2

 3

     FOR THE PLAINTIFF:
 4

         FEDERAL TRADE COMMISSION
 5       BY:  ELIZABETH JONES SANGER
         JAMES A. PRUNTY
 6       EDWIN RODRIGUEZ
         600 Pennsylvania Avenue NW
 7       Washington, DC 20580
         (202) 326-2757
 8

 9   FOR THE RECEIVER ROBB EVANS & ASSOCIATES, LLC:

10       FRANDZEL, ROBINS, BLOOM & CSAT, LC
         BY:  MICHAEL G. FLETCHER
11       1000 Wilshire Boulevard, 19th Floor
         Los Angeles, CA 90017
12       (323) 852-1000

13
     FOR THE DEFENDANTS:
14

         THURMAN LEGAL
15       BY:  MICHAEL A. THURMAN
         1055 East Colorado Blvd., 5th Floor
16       Pasadena, CA 91106
         (626) 399-6205
17

18   FOR THE OBJECTOR JACQUES POUJADE:

19       SPERTUS, LANDES & UMHOFER
         BY:  JAMES SPERTUS
20            M. ANTHONY BROWN
         1990 S. Bundy Drive, Suite 705
21       Los Angeles, CA 90025
         (310) 826-4700

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, AUGUST 27, 2019

 2                              10:07 A.M.

 3                                -oOo-

 4

 5              THE CLERK:  Calling Item No. 1, Case No. ED CV

 6   18-02104 SJO, Federal Trade Commission versus Jason Cardiff,

 7   et al.

 8              Counsel, would you please state your appearances.

 9              And everyone in the audience can be seated, please.

10              MS. SANGER:  Elizabeth Sanger, Federal Trade

11   Commission.

12              MR. RODRIGUEZ:  Edwin Rodriguez for the Federal

13   Trade Commission.

14              MR. PRUNTY:  James Prunty for the Federal Trade

15   Commission.

16              MR. FLETCHER:  Good morning, Your Honor.

17   Mike Fletcher, Frandzel Robins, on behalf of the receiver.

18              MR. THURMAN:  Good morning, Your Honor.

19   Michael Thurman on behalf of Defendants Jason and Eunjung

20   Cardiff.

21              MR. SPERTUS:  Good morning, Your Honor.

22   James Spertus and Tony Brown on behalf of nonparty Jacques

23   Poujade.  He's present before the Court.

24              THE COURT:  Any other appearances?  Good morning,

25   everyone.  Have a seat.
```

 1          So the matter is here on the continued order to show

 2     cause.  The parties have filed numerous pleadings and documents

 3     in this case which the Court has reviewed.  I also have spent

 4     some time reviewing the proposed findings of fact and

 5     conclusions offered by the FTC, objections thereto by

 6     Mr. Poujade or Poujade's counsel and objections thereto by the

 7     Cardiffs.

 8          So I've been in the process of trying to finalize

 9     those proposed findings.  That being said, there has been

10     some -- certain recent filings by Mr. Spertus or counsel for

11     Mr. Poujade that may be helpful in narrowing certain issues.

12          Since the last hearing, it's been brought to the

13     Court's attention that True Pharmastrip's board of directors

14     authorized a deposit of 1.56 million Canadian into the Spertus

15     trust account to bring those assets before the Court and, in

16     part, remove any threat of dissipation.

17          And so Mr. Spertus has advanced the following:  That

18     there are only three remaining issues for resolution at today's

19     hearing, and he's identified those issues as the amount that

20     True Pharmastrip should preserve during the pendency of this

21     case, the location where any preserved funds should reside, and

22     whether the receiver should return the True Pharmastrip

23     manufacturing machines that the Court ordered Mr. Poujade to

24     deliver to the receiver at the last hearing.

25          There is a claim that the order -- the Court's order

```
 1   regarding the machines at the last hearing was a bit ambiguous.
 2   I didn't interpret my comments to be ambiguous.  I believe I
 3   ordered that the machines to be turned over to the receiver.
 4   As I understand it, there are two machines -- there may be
 5   more, but there are at least two machines, one located in
 6   Cathedral City, and I believe the receiver has custody or
 7   control of that, and then maybe one located in Colorado
 8   someplace.
 9            MR. FLETCHER:  That's correct, Your Honor.  Mike
10   Fletcher on behalf of the receiver.  There's a machine in
11   Cathedral City that's in the possession of the receiver.  There
12   is a machine that we call the Colorado machine, location
13   unknown, and based on some recent financial records, there may
14   be a third.
15            THE COURT:  I think you need to speak into the
16   microphone for the record and for me also, please.
17            MR. FLETCHER:  Thank you, Your Honor.  My apologies
18   to the Court.  Mike Fletcher, Frandzel Robins, on behalf of the
19   receiver.
20            There is a machine that's in Cathedral City that is
21   in the receiver's custody and possession.  We are aware of a
22   second machine that we call the Colorado machine, location
23   unknown.  And based on some financial records turned over that
24   the receiver saw over the weekend, there may be a third
25   machine, also location unknown.  So we have one machine in
```

1    custody and one not.

2              THE COURT:  One unknown location?

3              MR. FLETCHER:  The Colorado machine's location is

4    unknown.  And there could be, based on the financial records, a

5    third machine, also location unknown.

6              THE COURT:  Okay.  So we'll come back to the machine

7    issue.

8              MR. FLETCHER:  Thank you, Your Honor.

9              THE COURT:  So in reference to the 1.56 million

10   or -- 1.56 million Canadian that has been transferred to this

11   Spertus trust account, I think that's a major movement in the

12   right direction.  In terms of where those funds should remain,

13   as I mentioned, the funds are in the trust account of

14   Mr. Spertus.  I think, you know, the reputation of the Spertus

15   firm speaks for itself.  There is little risk that these funds

16   would be unlawfully dissipated.

17              That being said, the orders issued by this Court, in

18   particular the TRO order, ordered that all assets be turned

19   over to the receiver and not merely that they be shielded from

20   dissipation.  So it's the role of the receiver to protect and

21   manage these assets, and it would appear to the Court that the

22   funds should be turned over to the receiver with a final

23   determination as to who the funds belong to at some later point

24   in time.  I think if that is accomplished, then much of the

25   issues before the Court would be resolved.

1          We have -- separate and apart from the 1.56, there

2     was -- the FTC has been pursuing the 2.2 million Canadian

3     deposited directly with Pharmastrip.  And the FTC's position is

4     that that should be subject -- should be the subject of the

5     asset freeze also.  And so that issue really depends on whether

6     there is a clear and convincing evidence that has been offered

7     here that would allow the Court to conclude that the Cardiffs

8     owned and control those assets either directly or indirectly.

9          Based on what I've heard so far, the tentative would

10    be for the Court to conclude that that has not been

11    established.  The 2.2 has -- that has not been established by

12    clear and convincing evidence.  That may change if there's

13    other evidence that's provided.

14         In reference to the machines themselves and whether

15    the machines are subject to the asset freeze depends on whether

16    they are owned and paid for by the Clover Cannastrip or by

17    Pharmastrip.  And so there may be some additional issues there

18    to discuss.

19         In reference to compliance with other orders, it

20    would appear that the defendants must still provide a detailed

21    accounting of all assets removed from Clover Cannastrip's

22    account.  The FTC should be in a position where they should be

23    able to trace a direct line between the funds leaving a Clover

24    Cannastrip account, and the defendants -- Cardiffs should

25    provide all information that would allow that tracing.  So that

```
 1   needs to be done.

 2           So I guess the question is if -- and I think we have

 3   certain members of the board of the directors here who have

 4   authorized a transfer.  I have -- separate and apart from the

 5   pleadings, there's -- there was an objection by Mr. Poujade to

 6   the receiver's third affidavit of noncompliance.  And attached

 7   to that objection --  well, I'm sorry.  Separate and apart from

 8   that pleading there was evidence offered in support of nonparty

 9   Poujade's objections.  And attached to that were various

10   declarations from the board of directors of True Pharmastrip.

11           And the board of directors have authorized the

12   transfer of the 5.56 (sic) into Mr. Spertus' account.  If the

13   board would agree and everyone would agree to have those funds

14   transferred into the custody and control of the receiver with

15   determination to be laid -- to be made later on as to who is --

16   who should be in rightful possession of those funds, then that

17   would resolve a lot.  If not, the Court is prepared to go on

18   with the findings of fact and conclusions of law.

19           So I'll hear from Mr. Spertus.

20           MR. SPERTUS:  Thank you, Your Honor.

21           THE COURT:  As an aside, as a housekeeping matter, I

22   should say that one of my law clerks has recently been offered

23   a position with the Spertus firm, and this Court -- it was by

24   coincidence only, and this Court has made sure that that person

25   has been walled off from these proceedings here.
```

UNITED STATES DISTRICT COURT

1          MR. SPERTUS:  Your Honor, I appreciate the Court's

2     overview.  And our goal is to avoid any contempt findings

3     whatsoever against Mr. Poujade.  So the 1.56 million was set

4     aside to ensure that ownership of it can be resolved in an

5     orderly way through discovery.  The one alternative to turning

6     it over to the receiver is that we interplead the funds with

7     the Court in an action in the nature of interpleader which

8     would allow True Pharmastrip to participate in discovery.

9          Because right now the challenge for the company is

10    that Mr. Cardiff lied to, I guess, the Glaser Weil firm, said

11    this money was his when it was not.  Hopefully today

12    Mr. Cardiff will own that statement as being untrue.  But

13    that's become the foundation for the Court's understandable

14    view that the money was Jason Cardiff's money.  It was not.

15         And the board of directors declarations are to try

16    to explain to the Court that True Pharmastrip is a very

17    legitimate company led by business leaders who are very

18    accomplished and believe in a mission.  And Jason Cardiff,

19    although he was at one point in time a founder, has nothing to

20    do with the company today.  And he's a complete stranger today

21    to --

22         THE COURT:  Look, I've heard this before.

23         MR. SPERTUS:  I know.

24         THE COURT:  And so much of this is credibility

25    determinations.  Mr. Cardiff's statements to you or to the

1  Court are simply statements that are hard to accept as being

2  true and correct.  So he's lost all credibility --

3          MR. SPERTUS:  And he should have none.  That's fine.

4  Assume Mr. Cardiff has zero credibility.

5          THE COURT:  So separate and apart from that, let me

6  hear from Mr. Fletcher regarding where the funds should be

7  deposited.

8          MR. SPERTUS:  And, Your Honor, may I return later to

9  discuss the amount issue?

10          THE COURT:  Yes.

11          MR. SPERTUS:  Okay.  Thank you.

12          MR. FLETCHER:  Thank you, Your Honor.  Mike

13  Fletcher, Frandzel Robins, on behalf of the receiver.

14          The receiver would concur that the funds should be

15  deposited with the receiver.  They can be accounted for in such

16  a way that obviously nothing is going to happen to the funds

17  until -- unless the Court makes rulings as to where that money

18  should go.

19          THE COURT:  Sure.

20          MR. FLETCHER:  While this has nothing to do with

21  Mr. Spertus and his firm, those funds were subject to potential

22  levy by third parties if they learn about them.  And the only

23  place that they can be safely stashed as far as we're aware is

24  with the receiver.  So the receiver would concur in that

25  regard.

```
 1              THE COURT:  Okay.  The Court -- I'll hear more from
 2     Mr. Spertus.  But, Mr. Spertus, it would appear -- look, the
 3     order previously issued by the Court, the order was clear that
 4     the assets are to be turned over to the receiver, and it's the
 5     role of the receiver to protect and manage those assets.  I
 6     recognize that there's certain other third party claims
 7     regarding those assets, and those issues can be resolved later
 8     on so everyone is protected.  But that would be -- that would
 9     seem to be consistent with the prior orders of the Court.
10              MR. SPERTUS:  The prior orders of the Court are the
11     TRO.  That's what brings us all here today.  May I approach the
12     lectern, Your Honor?
13              THE COURT:  Yes.
14              MR. SPERTUS:  And I -- I understand we are not going
15     to solve all issues today.  So the suggestion that the funds be
16     interplead is a tool to --
17              THE COURT:  I'm not going to agree to it.
18              MR. SPERTUS:  Okay.  You're not going to agree.
19              So there is a question of whether or not those
20     assets fall within the language of the TRO, and I'd like just
21     to ensure True Pharmastrip can defend that those funds are its
22     own, were not Jason Cardiff's at any time.  They came from
23     third-party innocent investors who invested in True Pharmastrip
24     who didn't even know the name Jason Cardiff.  And through an
25     orderly discovery process, we are going to develop those facts.
```

1          If we assumed for purposes of discussion

2    Jason Cardiff has zero credibility, that means his statement

3    that the funds were his own is itself something that shouldn't

4    be believed.  We think in an orderly way through discovery we

5    will establish it's not his money.

6          THE COURT:  There are certain statements that the

7    Court would accept as true from Mr. Cardiff, one being a

8    statement he made under oath at the last hearing regarding

9    certain advice by Mr. White, his former lawyer, concerning a

10   passport, and certain statements that the Court would not

11   accept.  So I'm not sure where you want to go with this.

12         MR. SPERTUS:  I agree.  We are not defending him.

13   We agree with the Court's evaluation of Mr. Cardiff.  We are

14   joined in that issue.

15         What I want to submit to the Court is that True

16   Pharmastrip, the entity, is also a victim of Jason Cardiff.  We

17   want to develop that through discovery.  As the Court knows,

18   True Pharmastrip today still can't attend a deposition, can't

19   issue a subpoena, can't present evidence in an orderly fashion.

20   We are an outsider to this case.

21         So all I want to do is if the funds get deposited

22   with the receiver as opposed to intervention, which would allow

23   us to make the claim that it's our money, how do we pursue that

24   claim without filing a separate action and relating it to this

25   case?

1          THE COURT:  Mr. Fletcher?

2          MR. FLETCHER:  I have a suggestion, Your Honor.

3  Thank you.

4          THE COURT:  Okay.

5          MR. FLETCHER:  Again, Your Honor, Mike Fletcher on

6  behalf of the receiver.

7          I can understand counsel's concerns, and I will

8  inform the Court this counsel and his client are not the only

9  potential claimants in the receivership estate who have

10  expressed similar concerns.  And what the receiver has told

11  everyone else who has expressed such a concern is when and if

12  there is any sort of claims process set up, everyone will be

13  given notice of it.

14          If and when anyone is attempting to get an order

15  from this Court about any particular asset in which they have

16  an interest, the receiver will make sure that they all know

17  about it and that an appropriate process can be set up where

18  everybody can have their discovery if they need it, their day

19  in court if they need it.

20          It's not just counsel and True Pharmastrip.  The

21  same issues have been raised with regard to a creditor named

22  InterMedia and their legal counsel, a creditor named Auctus and

23  their legal counsel.  And across the board, the receiver has

24  said that there will be a claims process.  Everyone will have

25  an opportunity to say whatever it is that they think they need

1   to say.

2            If they need discovery, the receiver will certainly

3   participate in a process to effectuate whatever discovery they

4   may think they need.  And that question is a separate question

5   from where the assets ought to be turned over to the receiver.

6            So I think there's a process to do this.  And

7   certainly the receiver is cognizant of it, and we have been

8   dealing with it with other potential claimants.

9            MR. SPERTUS:  Your Honor, one point of

10   clarification.  Each entity that the receiver just listed is a

11   creditor of the Redwood Scientific entity seeking restitution.

12   The True Pharmastrip is saying this is not Jason Cardiff's

13   money.  We are not seeking restitution.  We are -- I created an

14   analogy in our briefing to a bank robber who steals $10,000.

15   We are the victim bank.  We want our property back.

16            And what I'm -- what I am in need of is the

17   discovery tool that civil litigation affords parties to develop

18   that this is not a receivership asset in the end and shouldn't

19   be available for restitution to any Jason Cardiff victims.

20            THE COURT:  So all I can say is that the Court is

21   prepared today to order the funds to be transferred to the

22   custody of the receiver and to -- if you have concerns

23   regarding the final disposition of those funds at a later date

24   in time, your client will have its day in court to make certain

25   claims and provide evidence to the Court that suggests that

```
1    your client was duped by the Cardiffs and the monies deposited
2    are rightfully your client's.  There may be other claimants
3    also here.
4           MR. SPERTUS:  Right.  And the additional claim that
5    it is not a TRO -- it is not a receivership asset.  We are
6    parking the money -- we will deposit whatever the Court orders
7    with the receiver to eliminate and take off the table the
8    threat of dissipation.  That's not happening.
9           But we do want to argue and establish through facts
10   that this is not a receivership asset.  It doesn't fall within
11   the scope of the TRO, and we'll make that point later.
12          THE COURT:  Yes.  And I don't think anyone is -- I
13   don't think there's any disagreement there.  It seems that you
14   should have -- your client should have their day -- its day in
15   court regarding whether the funds, you know, rightfully belong
16   to -- or portions of the funds rightfully belong to your
17   client.
18          MR. SPERTUS:  Thank you, Your Honor.
19          And then the last remaining issue, and then I think
20   we've accomplished the goals, is that the amount -- you know,
21   Mr. Poujade was brought before the Court because at the time,
22   unaware of some of the facts that have now become known, he was
23   paying Mr. Cardiff's expenses, and the amount was 490,000, that
24   in the notice in the motion for OSC re contempt the FTC and
25   receiver sought to have Mr. Poujade brought before the Court to
```

1    replenish $490,000 of funds.

2            And the citations in that briefing, because it's

3    fixed, is -- I'll provide to the Court in a second.  But

4    Docket 134.2, page 29.  And so with that amount is what brought

5    Mr. Poujade before the Court in the first place, I'd ask that

6    only $490,000 be replenished, which was the request, and then

7    we'll make our claim for the money back at a future date after

8    a hearing.

9            MR. FLETCHER:  With regard to the first issue,

10   Your Honor, from the receiver's perspective, the receiver takes

11   a broad view of what a claim is.  A claim is a claim is a claim

12   whatever the basis of it is.  With regard to amounts, I'm going

13   to leave that to the FTC, Your Honor.

14           MS. SANGER:  Your Honor, I would request to be heard

15   on the issue of the amount.

16           THE COURT:  Yes, absolutely.

17           MS. SANGER:  Your Honor, Liz Sanger for the Federal

18   Trade Commission.

19           Unfortunately, the $1.56 million that has been the

20   subject of much of this pleading is just the tip of the

21   iceberg.  And the FTC did receive a production on Thursday

22   night from Mr. Poujade containing financial statements and

23   reproduced and augmented Sui trust account statements marked

24   with a confidential mark that contain troubling discrepancies

25   between documents that were previously produced to the FTC and

1    to which we placed into the record as well as additional

2    information about the amount that we are talking about here.

3            Now, these documents do bear a confidential stamp.

4    There's no protective order in the case at this point.  The FTC

5    would like to discuss these documents with the Court today

6    because they bear on the remedies that the FTC is seeking for

7    the contempt of Mr. and Mrs. Cardiff as well as Mr. Poujade.

8            And I have prepared some slides comparing the

9    documents that are already on the open record with reproduced

10   documents and then the additional documents obviously bearing

11   that confidential seal will need to be dealt with in some

12   manner today.  We don't believe that they are properly marked

13   as confidential or they should be sealed.  But we would

14   encourage the Court to ask Mr. Spertus or Mr. Poujade's counsel

15   to justify why those should not be entered into the record

16   today and subject to the discussion about the turnover amount.

17           And then I'll just reiterate not only did the Court

18   find Mr. and Mrs. Cardiff to be totally unbelievable at the

19   last hearing, but there are also credibility findings as to

20   Mr. Poujade's credibility.  And given this latest information

21   that has been produced to us, we believe there is even further

22   grounds for the Court to call into question the credibility of

23   documents that have been provided to the FTC to date in this

24   case.

25           And regarding the order interpretation issue,

1    Mr. Poujade's counsel did argue this issue at the last

2    three-day hearing and has already had an opportunity to present

3    to the court its views on how the Court should interpret its

4    orders.

5            THE COURT:  So I'm hearing from the FTC that the

6    1.56 million is not enough.

7            But that being said, the 1.56 million has been

8    deposited into your account, Mr. Spertus, or the firm's

9    account, and it would appear to the Court that all of that

10   should be provided to the -- or placed in the custody and

11   control of the receiver.

12           MR. SPERTUS:  Okay, Your Honor.  Thank you.

13           And, Your Honor, since the basis for the Court's

14   order was that the True Pharmastrip machines were purchased

15   with that money transferred out right before the TRO issued, a

16   natural corollary would be that True Pharmastrip should get its

17   machines back.

18           And I'd like to request that the Court order the

19   receiver to return the machines currently in its possession.

20   There's only a second machine.  It's being transported and will

21   arrive tomorrow at the Cathedral City location where the

22   receiver is holding the first machine.

23           And we did try and meet and confer as the Court

24   ordered last Wednesday and were unsuccessful in persuading the

25   receiver to accept the cash that was used to buy the machines

1  and return the machines.  So with a deposit of 1.56 million

2  Canadian, which is a lower amount in United States dollars,

3  with the receiver, will the Court order the machine returned?

4         THE COURT:  Well, I'm not sure what the value of the

5  machines are.

6         MR. SPERTUS:  About $120,000 each ballpark.  They

7  are purchased from China.  They are expensive.  But most

8  importantly, later in this case the Court will see that True

9  Pharmastrip has nothing to do with Jason Cardiff any longer.

10  Other than in August 2018, in that time frame, we've separated

11  from him entirely and want to continue with the business that

12  the investors invested in.  So to enable that to happen, we

13  need the machines back.

14         And with regard to the FTC's argument about the

15  amount, the -- I mean, the goal posts have been moving

16  continuously throughout these contempt proceedings.  When the

17  contempt proceedings are over, that won't be the end of the

18  issues, and the FTC can raise in an orderly way claims for

19  different amounts of money.

20         But I do want the Court to be aware that, you know,

21  Dana Rohrabacher is present before Your Honor.  Ralph Olson,

22  Kamlesh Shaw is not because his wife is receiving a medical

23  treatment today.  And Anton Drescher is before the Court.  All

24  have traveled from far away.  Mr. Rohrabacher flew in yesterday

25  from Maine, Mr. Olsen from Denver, and Mr. Drescher from

1  Vancouver.

2          These are prominent businesspeople who are raising

3  funds and pursuing a business objective that they believe in.

4  And to have the receiver claim that this ongoing business is

5  a -- related to the Redwood businesses that brought Mr. Cardiff

6  before the Court is just not true.  And so we will develop that

7  in an orderly way later.

8          We just need the contempt proceedings to end.  So we

9  will deposit the 1.56 million and hopefully get the machines

10  back which --

11          THE COURT:  And I have -- -- look, this proceeding

12  has gone on far too long.  I think we had two and a half days

13  of hearings last time.  And, you know, I've expressed my

14  opinions regarding the Cardiffs.  And they've significantly

15  complicated matters.

16          I do appreciate the board of directors for

17  Pharmastrip authorizing the transfer of the funds into your

18  account so that we could narrow the proceedings today and

19  hopefully move on and the Court can attend to other business it

20  has.

21          In reference to the machines, let me -- let me hear

22  from the receiver.  And then I'll hear from the FTC.  So what

23  I'm hearing from Pharmastrip is that the machines are important

24  to them not so much in terms of the value of the machines but

25  in terms of their ability to move forward with their business.

```
1    And so that certainly is a concern of the Court.

2                MR. FLETCHER:  Thank you, Your Honor.  Mike Fletcher

3    on behalf of the receiver.

4                First, if there is another machine and it's being

5    delivered to the Cathedral City location and if this Court

6    concludes that the machines should stay in the receiver's

7    possession, the receiver -- this is the first we've heard about

8    it -- the receiver will make arrangements then to have that

9    second machine sequestered in the Cathedral City location.

10   That's the first thing.

11               The second thing is requests were made of the

12   receiver not to proceed with regard to this Court's July 31

13   order to turn over the machines.

14               THE COURT:  Yes.

15               MR. FLETCHER:  The receiver declined.  The receiver

16   basically told counsel, well, if you don't like the order, go

17   back to the Court.  But the order is the order is the order.

18               THE COURT:  The order issued orally.  There wasn't a

19   written order that followed, but the order was clear, yes.

20               MR. FLETCHER:  That's correct.  And in point of

21   fact, I believe the Poujade side understood the Court's order

22   because I immediately was in negotiations and consultation with

23   Poujade's counsel which effectuated the turnover of the first

24   machine.

25               THE COURT:  I understood my order.  So I'm surprised
```

1     that others did not.

2              MR. FLETCHER:  With regard to -- the Poujade side

3     has advanced two arguments.  One is that the 1,560,000 Canadian

4     is a stand-in for the machine, and they've been told that the

5     accounting has been not made.  The FTC apparently received some

6     additional information late Thursday/Friday.  The receiver

7     didn't get it until Saturday midday.  I don't know of a tracing

8     that can be made in that regard.

9              The second issue is that it's the receiver's

10    understanding that the FTC position is that the Cardiffs were

11    engaged in a common enterprise with Redwood of which these

12    machines were part.  And so for both of these reasons, the

13    receiver understood that's why the machines were to be taken

14    into custody.

15             We've done no independent evaluation of the value of

16    the machine.  What counsel mentioned here is roughly akin to

17    what I've heard other people indicate was the value of the

18    machines.

19             With regard to the ongoing operation, that is an

20    issue for the Court's determination, which from my

21    understanding has already been made, but I'm not going to

22    presume what the Court believes in that regard, that the way

23    Jason Cardiff dealt with these machines is part and parcel of

24    the underlying common enterprise with Redwood and similar thin

25    strip dissolvable materials.

1          So for those reasons the receiver believes both

2     machines should be taken into custody.  And if there is no

3     third machine, so be it.  We stand ready to do that.  And to

4     the extent the Court determines that the machines should not be

5     in custody, the receiver stands ready to turn it over

6     immediately.

7          THE COURT:  So is there a remedy in between where

8     the machines can be placed in a location that would allow

9     Pharmastrip to be able to use the machines and then a final

10    determination later on made as to who probably owns them?

11         MR. FLETCHER:  I believe that the answer is

12    partially yes.  The Cathedral City location to my understanding

13    includes one machine that is in custody that's in a clean room

14    setting.  We've done nothing to determine the operational

15    status of that machine, but we have no reason to believe that

16    it cannot be allowed to be operated.

17         Whether and to what extent the second machine can go

18    in that location, I don't know.  But assuming that it can,

19    consistent with the claims that have been made about it needing

20    to be in a clean environment, presumably both machines could be

21    kept in place in Cathedral City and operated in such a way they

22    are not being deteriorated in value presumably.

23         THE COURT:  Mr. Spertus, what's your view on that?

24         MR. FLETCHER:  Thank you, Your Honor.

25         MR. SPERTUS:  Thank you, Your Honor.

1          Your Honor, I have three points.  First, I don't

2    believe that there's any dispute that Mr. Cardiff's Redwood

3    Scientific business purchases thin strips abroad in China and

4    India and had nothing to do with the manufacturing process.

5    These machines were never used by Jason Cardiff's Redwood

6    Scientific businesses.  They are only True Pharmastrip

7    businesses which is manufacturing for the THC strips, and those

8    are very tightly regulated.

9          So the machine in California is regulated under

10   California law.  Although we've transported it to Colorado and

11   back, the machine in Colorado will be operated in Colorado.  It

12   can't be operated in California and shipped to Colorado.  So

13   it's very complicated.  There are a lot of lawyers advising the

14   company in the different states on how to comply with laws.

15         I hope the Court understands these machines can't be

16   vaporized and disappear into air.  If the Court ever ordered

17   the machines surrendered to the receiver in the future, we

18   would gather them, shut down those businesses, and ship them to

19   the receiver.  They aren't at risk of dissipation.  They would

20   require forklifts and trucks to move.

21         So the Court could simply say to True Pharmastrip,

22   which isn't even a party, that operate the machines subject to

23   future orders, don't sell them to other business.  And then

24   True Pharmastrip will always be answerable to the Court because

25   it will, through subsidiaries, maintain control over those

1  machines until this case is concluded.  I just don't think we

2  can have a solution where the receivership supervises that

3  possessory interest.

4  THE COURT:  Thank you.

5  Then let me hear from Ms. Sanger regarding the

6  machines.

7  MS. SANGER:  Is the screen turning up blank?

8  THE COURT:  There's a --

9  MS. SANGER:  Okay.  Well, I'll do without

10  demonstratives because I don't want to waste the Court's time

11  here.  I do want to refer back to some information that was

12  discussed in quite some level of detail at the last hearing and

13  this regards the initial deposits made for the machines at

14  issue.

15  There's evidence in the record at Docket 144-1 as

16  well as in the receiver's second affidavit of the Cardiffs'

17  noncompliance that Mr. Cardiff made deposits on the machines

18  from the TD Canada account in the name of Clover Cannastrip on

19  October 9th, 2018.  There were two deposits made in the amounts

20  of $35,110 U.S.  Mr. Cardiff admitted that he made those

21  transfers and those transfers were made for the purchase of

22  machines.

23  Furthermore, the machines at issue here, which were

24  obtained from a manufacturer in China, were the subject of lots

25  of activity at Redwood Scientific before the TRO was entered.

The FTC deposed Julie Green who worked for Redwood Scientific.
And when Redwood Scientific was shut down by the receiver,
immediately picked up her work with Alphatech Holdings, LLC,
Mr. Poujade's LLC here, to do work on behalf of Pharmastrip or
Clover Cannastrip or True Pharmastrip, however you want to
refer to the work that was being done.

Ms. Green obfuscated and evaded many of our
questions at deposition.  But when we put e-mails in front of
her between her and Mr. Cardiff and Mrs. Cardiff regarding a
trip she took in September of 2018 to China to the machine
manufacturer's location, she admitted that she was there at
their behest doing Redwood business.

And, in fact, we can put in front of -- we can offer
as exhibits today, if necessary, those printed out e-mails with
Ms. Green's handwritten notes regarding the visit.  There are
notes about CloverStrips, the CBD product that Redwood
Scientific was rolling out around the time that the FTC filed
its Complaint.

Also regarding the machines and the ongoing business
concern referenced by Mr. Poujade's counsel, we are talking
about THC-containing strips here.  And Mr. Spertus has made a
number of comments about lawyers advising Mr. Poujade and the
company about how to navigate various laws.  Obviously under
federal law there are implications here for the ongoing
business.

1          And, finally, and I wish that I could -- I wish

2    that my computer was connecting to the courtroom technology

3    here, but I can point the Court to a place in the docket,

4    Docket 134-21, page 20.  The idea that True Pharmastrip, Inc.,

5    as it is now known or Pharmastrip as the operation here in the

6    U.S. seems to be referred to has nothing to do with the Redwood

7    products or is somehow divorced from or separate from the

8    Redwood common enterprise is a highly questionable claim based

9    on the fact that on April 23rd of this year our investigator

10   captured the dissolveresponsibly.com website, which is

11   Pharmastrip's website, including where many of these products

12   that Pharmastrip is marketing are displayed, and as part of

13   that capture, captured a stop smoking product containing

14   cytisine, the same ingredient as TBX-Free which is challenged

15   in the Complaint, a male sexual performance product containing

16   damiana and ginseng, these extracts, the same ingredients in

17   Prolongs which is subject to this Complaint, as well as other

18   quote/unquote "lifestyle products" or, as they might otherwise

19   be known, dietary supplement-type products containing once

20   again the same ingredients as previous Redwood products, and

21   I'll give the Court three examples.

22          A stress relief product called Float containing or

23   purportedly containing serotonin.  A sleep aid.  Mrs. Cardiff

24   testified at the last hearing that one of the products Redwood

25   was promoting before the TRO was a sleep aid.  This product

1    purportedly contains melatonin.  So does the product called

2    Rested that was available and marketed on the

3    dissolveresponsibly.com website in April.  And finally, a

4    multivitamin product again resembling a product previously sold

5    by Redwood Scientific.

6              So the Court has seen evidence presented by the FTC

7    of the Cardiffs' extensive plans for this business.  We've also

8    presented to the Court common uses of these common enterprise

9    factors such as control people, the Cardiffs themselves,

10   employees, Ms. Green being a primary example, but there are

11   others, Justin Daines, Edgar Figueroa.

12             The use of the same addresses or physical office

13   locations.  Mr. Cardiff was using the 820 North Mountain Avenue

14   business address to conduct Clover Cannastrip business.  The

15   only reason that Pharmastrip is no longer using that address is

16   because now the receiver has taken possession of the premises.

17   Mr. Cardiff was using his personal home address on Clover

18   Cannastrip subscription agreements.

19             We have put into the record a declaration from

20   Corina Grodek who worked for Pharmastrip for a month who

21   observed Mr. Cardiff giving tours to potential investors of

22   Pharmastrip on the business premises.

23             And, again, we haven't gotten to this issue yet, and

24   the FTC can wait to address this, but the additional raised

25   funds which nearly triple or more than triple the amount we

1    were talking about the last time we in this courtroom need to

2    be addressed at some point.

3            So there's plenty of evidence of the Cardiffs'

4    ongoing control.  We have a statement --

5            THE COURT:  Look, I recognize the egregious nature

6    of the conduct of the Cardiffs, and I've expressed that openly

7    in court today and then last time.  And I also expressed that

8    there should be a referral of this matter to the criminal

9    authorities for possible criminal contempt.

10            But this is a civil proceeding, and I think there's

11   so much more here that probably should be investigated in a

12   different context.

13            MS. SANGER:  Thank you, Your Honor.  And I think

14   that will -- I'll take your cue and rest regarding the

15   machines.  If you do -- if the Court would like to see any of

16   the potential exhibits that I've referenced, the e-mails from

17   Ms. Green to Mr. and Mrs. Cardiff regarding the machines and

18   her trip to China to essentially seal the deal for the purchase

19   of the machines, we do have them handy, and we could enter them

20   into the record if the Court would desire.

21            THE COURT:  Go ahead.

22            MR. SPERTUS:  I won't unwind the facts that counsel

23   is referencing as the bad things done by Mr. Cardiff.  But I

24   want to identify for the Court that the conduct for the

25   acquisition of the machines was, according to the FTC,

1    October 2018.  That is when the machines were purchased.  They

2    were purchased for the THC strips.  Mr. Cardiff was involved at

3    that time in October.  When the TRO issued and the Complaint

4    was filed, everything began to change, and as of today, he has

5    nothing to do with the company.

6            So the company is an ongoing business.  These

7    machines were purchased with -- from the account that contained

8    the 1.56 million that we are replenishing.  So since the

9    money that was used to pay for those machines -- and yes,

10   Jason Cardiff was involved in their acquisition -- we are

11   replacing the money to get the machines back hopefully.

12           THE COURT:  Mr. Cardiff has so -- the Cardiffs have

13   so poisoned the well here that the Court is not prepared to

14   reach a conclusion at this time that they continue -- that they

15   no longer have any involvement with the related companies.

16           Let me -- let me take a short recess, and we'll come

17   back, and I'll make a decision regarding the machines.

18           MR. SPERTUS:  Thank you, Your Honor.

19           THE CLERK:  Court is in recess.

20           (At 10:53 a.m. a brief recess was taken.)

21           THE COURT:  Please have a seat.  We are back in

22   session.

23           MR. SPERTUS:  Mr. Poujade will be right back.  He's

24   in the men's room.  He's on his way back.

25           THE COURT:  Mr. Poujade?

1           MR. SPERTUS:  Yeah.  But we can proceed.

2           THE COURT:  So in reference to the machines, I think

3    the suggestion by the Court and the position taken by

4    Mr. Spertus to allow the machines to be used under the

5    jurisdiction of the Court, the parties would have to consent to

6    the jurisdiction of the Court having authority over those

7    machines to be decided at a later date based on new

8    information.  The machines can be used.

9           I'm -- it's not clear to me why a Colorado machine

10   has to remain in Colorado and why a California machine has to

11   remain in California, but I accept that there are certain

12   nuances in the law that require that.  And no one has suggested

13   otherwise.

14          So the Court will allow the machines to be used as

15   long as the receiver has knowledge of the location of the

16   machines.  And if there's any attempt to try to remove the

17   machines or transfer the ownership of the machines, that would

18   be brought to the attention of the Court.

19          The 1 -- with the deposit of 1.56 million with the

20   custody of the receiver, it would seem to me, to the Court,

21   that that would resolve the contempt proceedings before the

22   Court today.  There are other issues that the FTC has raised

23   today, and that can be the subject of additional proceedings

24   later on if the record -- when the record is more fully

25   developed.

1          So I would also just state that allowing -- I want

2    to make it clear that allowing the machines to be used by

3    Pharmastrip, the Court is not condoning that they be used --

4    personally condoning that they be used for a purpose that may

5    be a violation of federal law.  So that's -- the Court is not

6    condoning that.

7          Do we have any -- what else has to be accomplished

8    here today?  I think we probably need a stipulation or a

9    proposed stipulation and order to follow regarding the

10   machines, the location, how the receiver can maintain some

11   jurisdiction over those machines to make sure that they are

12   maintained in a proper working order and not removed.  And then

13   we need to have an order that would cause the transfer of the

14   1.56 million to the receiver.

15         MR. SPERTUS:  Yes.  We'll prepare one and send it to

16   the receiver for comment and then file it.

17         Your Honor, there's one additional mechanical step.

18   We then I believe will be filing a motion to intervene for the

19   limited purpose of participating in discovery, True

20   Pharmastrip.  We'll talk internally about that.  Perhaps we can

21   reach a stipulation with the FTC to allow us to appear and

22   engage in discovery.

23         THE COURT:  That -- you can have those discussions

24   with counsel for the FTC and see if that could be resolved.

25         I do think that there are -- there's some, you know,

```
 1    serious effort by Pharmastrip to distance themselves from the
 2    conduct of the Cardiffs and others.  Going forward, I
 3    appreciate the board being here today.  And it appears that
 4    there are certain legitimate persons and businesspeople
 5    involved with that entity going forward.  And so I'm hopeful
 6    that these issues can be resolved in the future.
 7               MR. SPERTUS:  Thank you, Your Honor.
 8               MS. SANGER:  Your Honor, I do wish to be heard
 9    regarding outstanding issues.
10               THE COURT:  Go ahead.
11               MS. SANGER:  Your Honor, the FTC has requested a
12    full accounting including each deposit and credit to and each
13    withdrawal or debit from the subject bank accounts as well as,
14    you know, any records that are kept in the Sui trust account
15    would be included in that request.
16               The records that we received late last Thursday are
17    not complete.  There's both redacted information in those
18    records as well as some of the records appear only to go
19    through about June 6th of this year.
20               THE COURT:  I think that should be also ordered by
21    the Court.  A full and complete accounting should be included.
22               MS. SANGER:  Thank you, Your Honor.  And then just
23    one remaining request from the FTC.  We've been seeking
24    communications between and among Mr. and Mrs. Cardiff and
25    Mr. Poujade as well as their business associates so that we
```

1    have an opportunity to investigate and cross-examine these

2    claims that the Cardiffs are no longer involved in the business

3    at this point.

4            We have been met by refusal after refusal to turn

5    over those communications.  And we are seeking e-mails, text

6    messages, encrypted chat messages.  Mr. Cardiff testified at

7    the last hearing that he had communicated with Mr. Poujade

8    using several different encrypted chat messages -- or

9    applications on his phone.

10           THE COURT:  Well, I think that's probably an order

11   also.  Any communications or -- of any type between the

12   Cardiffs and Mr. Poujade should be turned over.

13           MS. SANGER:  Thank you, Your Honor.  And if I --

14           THE COURT:  Wait.  Let me hear from Mr. Spertus.  I

15   see him standing.  Yes?

16           MR. SPERTUS:  Your Honor, I just am surprised to

17   hear the FTC's calculation.  When we appeared, which was I

18   think the week before last, we've immediately collected data.

19   We have 132,000 total e-mails from one account and 32 gigabytes

20   of data from Mr. Poujade's phone including application data.

21           We communicated that to the FTC, sent them a

22   proposed search term list.  They have not responded, which they

23   can take all the time they want.  But they can't then stand

24   before Your Honor and say we are refusing to produce that.

25           THE COURT:  Okay.  If you've cooperated and produced

1   those communications, that's fine.  And hopefully this issue

2   could be resolved going forward.

3           MR. SPERTUS:  Yeah, we will resolve it.  And the

4   ball is in the FTC's court.  Saying we proposed a protective

5   order that they brought up today -- if the Court would just

6   allow us to meet and confer to resolve these issues, we

7   shouldn't have to involve the Court at all.

8           THE COURT:  Ms. Sanger, I think it's probably a good

9   idea to sit down and have communications with Mr. Spertus.

10          MS. SANGER:  Yes, Your Honor.  We are happy to

11  continue -- excuse me.  We are happy to continue to communicate

12  with Mr. Spertus, and I'm happy to hear the update of the

13  amount of data that's been collected and the number of e-mails.

14          To be clear, we are asking that the order also apply

15  to the Cardiffs.  And to date, we haven't received any

16  communications from the Cardiffs.

17          THE COURT:  To be clear, it applies to the Cardiffs.

18          MS. SANGER:  Yes.  And, Your Honor, given evidence

19  in the record that Mr. Cardiff in the past has ordered the

20  destruction of documents after receiving document requests from

21  the FTC, we would actually propose to the Court today that the

22  Court order the Cardiffs to turn their mobile phones over to

23  the receiver so that they can be imaged by the FTC's forensic

24  data analyst.  We have a forensic data analyst standing by in

25  DC who could board the next plane to Los Angeles, and they

```
 1    could be returned to the Cardiffs immediately after they are

 2    imaged.

 3           But we have serious concerns here that if the

 4    Cardiffs ever do apply -- every do comply with the Court's

 5    order to turn over the communications, that what we will

 6    receive will be a greatly reduced or altered set of

 7    communications and data.

 8           We also would request this order to issue today

 9    because there is data in the phones themselves that could show

10    attempted deletion or destruction of data or applications.  And

11    we believe the FTC should be the one harvesting the data rather

12    than the Cardiffs.

13           MR. THURMAN:  Your Honor, may I be heard on this?

14           THE COURT:  Yes.

15           MR. THURMAN:  Ms. Sanger failed to disclose the fact

16    that when the request -- the recent request was made by the FTC

17    for the Cardiffs to provide communications with Mr. Poujade and

18    others, that the Cardiffs responded they will provide that

19    information.  And that information is also being gathered and

20    collected right now.

21           This is a request being made to the Court that has

22    never been made to the Cardiffs.  So in effect, Ms. Sanger is

23    assuming that they will not receive clean data that has not

24    been manipulated or in any way altered and for that basis are

25    demanding the opportunity to have a direct inspection.  No
```

1    notice on this other than right now.

2              THE COURT:  I am not surprised that Ms. Sanger has

3    waited until today to raise the issue because if she raised the

4    issue previously the Cardiffs may have taken action to delete

5    or remove information contained on that phone.  I would not be

6    surprised.  And, again, this case is so serious, the -- the

7    civil proceeding here is simply not a proper mechanism to

8    resolve all issues.  It really should be a criminal proceeding.

9              The Court is going to order that the phones be

10   produced.  Do you have numbers -- how many phones are at issue?

11             MS. SANGER:  Your Honor, based on the T-Mobile

12   records in the record here, we believe there are two phones

13   belonging to Mr. Cardiff and one phone belonging to

14   Mrs. Cardiff.

15             THE COURT:  Are you able to identify those phones

16   today?

17             MS. SANGER:  Yes, Your Honor.  I would just need a

18   second to pull it up in my records, the phone numbers.

19             MR. THURMAN:  Your Honor, I simply ask that

20   arrangements be made with whoever the person is that's going to

21   be doing the pulling of the documents for any attorney-client

22   communications to be segregated and shielded.

23             THE COURT:  Yeah, that should be -- there should be

24   a protocol in place to protect the -- any attorney-client

25   communications.

1                    MR. FLETCHER:  Your Honor, Mike Fletcher on behalf

2      of the receiver.

3                    It's my understanding that the request for -- was

4      for a turnover of phones today.  I don't know whether the Court

5      has ordered that or a turnover at some other point in time.

6                    THE COURT:  Let me hear from Ms. Sanger first.

7                    MS. SANGER:  Your Honor, I apologize.  I was looking

8      for the phone numbers, and I didn't hear the question.

9                    THE COURT:  Whether the phone should be turned over

10     today as opposed to a date in the future.

11                   MS. SANGER:  Yes, Your Honor.  We absolutely believe

12     there should be an immediate turnover of the phones.

13                   MR. THURMAN:  Your Honor, one other concern I'd like

14     to put before the Court on this issue is, as with most people,

15     my understanding is the Cardiffs use their cell phones as their

16     only way of communicating.  I don't want to lose the ability to

17     continue to communicate with them.  Is there a way to set some

18     kind of limitation on how much -- how long these phones will be

19     removed from them so that they can -- we can continue to

20     communicate with one another?

21                   THE COURT:  Look, I'm sure there's other ways that

22     the parties could think of in terms of continued communication

23     and also just purchasing or securing other phones.  But the

24     imaging should be conducted expeditiously and the phones

25     returned.

**UNITED STATES DISTRICT COURT**

1          How long is that going to take?  What's your

2    proposal for turning over the phones today, Ms. Sanger?

3          MS. SANGER:  Yes, Your Honor.  I can provide a few

4    specifics.  We will fly our forensic data analyst from

5    Washington, D.C. to Los Angeles.  As I stated earlier, he can

6    board the next available flight to get here.

7          Once here, we can image several phones at once.  So

8    this process could take place simultaneously with the three

9    phones that Mr. Cardiff and Mrs. Cardiff have been using.

10   Depending on the amount of data on the phone, this process

11   could take one to two hours or probably max in the range of 20,

12   24 hours.  So we are talking about a relatively short period of

13   time here.

14         Also to address the concern raised by the Cardiffs'

15   counsel, we do have a protocol in place for how we collect this

16   data.  We would use a similar protocol to what we employed on

17   October 12th when we went in for the immediate access to

18   protect potentially privileged communications.

19         I will also note that the Cardiffs have waived their

20   attorney-client privilege as to information about their assets.

21   So that's a potential factor that may play into which

22   information is reviewable.

23         And then once imaged, we would return them to the

24   receiver to be returned to the Cardiffs or to the Cardiffs'

25   counsel.  We do need to ask that as part of this turnover

1   order, that they be turned over unlocked with the passwords

2   available so that when it comes time to image the phones, the

3   forensic data analyst can access the phone to perform that

4   imaging.

5        And to the extent that there are additional

6   encryption keys or passwords associated with the chat apps, for

7   example, potentially an additional password to access WhatsApp

8   or Signal, that those passwords or encryption keys will also

9   need to be identified to the receiver and turned over with the

10  phones so that the imaging can be accomplished.

11       THE COURT:  Ms. Sanger, you are very thorough, and

12  that would be the order of the Court.

13       MS. SANGER:  Okay.  Thank you, Your Honor.

14       THE COURT:  So we have -- where are the phones?  I

15  need the phone numbers, and then we have to determine where the

16  phones are right now.

17       MS. SANGER:  Yes, Your Honor.  I have just quickly

18  pulled up one of the T-Mobile phone records in our records

19  here.  And I believe that the phone numbers at issue are

20  (646) 526-3840, (909) 816-9662, and (951) 333-0609.

21       I would just ask the Court's permission -- we will

22  do a second check on these phone numbers just to make sure that

23  I haven't missed anything or that I haven't misstated one of

24  the numbers.  I've just looked at one of the statements.  And

25  to be absolutely thorough, I would like to just touch base with

1    our investigator.  But these are the three phones that we

2    believe are in their possession.

3            THE COURT:  So we need all this reduced to writing.

4    So I would order counsel, Mr. Spertus and Ms. Sanger, to -- and

5    the receiver to sit down, meet and confer regarding a proposed

6    order that the Court can execute concerning the transfer of the

7    monies to the custody of the receiver and also the preservation

8    of the machines but the machines to be used by Pharmastrip

9    going forward and then a separate order concerning the phones

10   themselves.

11           MS. SANGER:  Thank you, Your Honor.

12           THE COURT:  And so the question, Mr. Thurman, is

13   where are your client's phones today?  They probably should

14   be -- I would order that they be provided to you --

15           MR. THURMAN:  Thank you.

16           THE COURT:  -- and that you retain control of those

17   phones until the forensic analyst from Washington, D.C. is able

18   to receive them.  And then all of this should be conducted

19   within a 48-hour period from the date that the phones are

20   turned over to the analyst.  Is that -- that gives you plenty

21   of time.

22           MS. SANGER:  That sounds reasonable, Your Honor.

23   And we will work with Mr. Spertus then to arrange a transfer

24   time or pick up time for the transfer -- for imaging the

25   phones.

```
 1                THE COURT:  That's Mr. Thurman.

 2                MS. SANGER:  Excuse me.  Yes, Mr. Thurman.

 3                THE COURT:  Anything further today?

 4                MR. THURMAN:  Thank you, Your Honor.

 5                MR. SPERTUS:  No, Your Honor.  Thank you.

 6                THE COURT:  Thank you.  We're adjourned.

 7                (At 11:21 a.m. the proceedings adjourned.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CERTIFICATE OF OFFICIAL REPORTER

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS  5TH  DAY OF SEPTEMBER, 2019.

/S/ MAREA WOOLRICH
_____
MAREA WOOLRICH, CSR NO. 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER