ELIZABETH JONES SANGER (*pro hac vice*)
esanger@ftc.gov; (202) 326-2757
JAMES A. PRUNTY (*pro hac vice*)
jprunty@ftc.gov; (202) 326-2438
EDWIN RODRIGUEZ (*pro hac vice*)
erodriguez@ftc.gov; (202) 326-3147
SHIRA D. MODELL (*pro hac vice*)
smodell@ftc.gov; (202) 326-3116
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Fax: (202) 326-3259

STACY PROCTER (Local Counsel) (CA 221078)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380
ATTORNEYS FOR PLAINTIFF

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **Federal Trade Commission**, <br><br> Plaintiff, <br><br> v. <br><br> **Jason Cardiff, et al.**, <br><br> Defendants. | Case No. 5:18-CV-02104-DMG (PLA) <br><br> PLAINTIFF FTC'S RESPONSE TO CARDIFF DEFENDANTS' STATEMENT OF GENUINE DISPUTES <br><br><br> Hearing Date:  October 9, 2020 <br> Time:           2:00 p.m. |

# Table of Contents

Preface to Plaintiff FTC's Response to Cardiff Defendants' Statement of Genuine Disputes.................................................................................... 1

I.    Pre-Complaint Investigation.............................................................. 4

II.   Defendants.......................................................................................14

    A.   Individual Defendants..........................................................14

        Jason Cardiff ......................................................................14

        Eunjung Cardiff.................................................................27

    B.   Jason and Eunjung Cardiff Were Each Directly Involved in the Wrongful Conduct ...........................................................39

    C.   Corporate Defendants ........................................................116

    D.   Common Enterprise ...........................................................126

III.  TBX-FREE....................................................................................... 152

    A.   Defendants' Marketing of TBX-FREE................................152

    B.   Defendants' Smoking Cessation Claims for TBX-FREE....................170

    C.   Defendants' Smoking Cessation Claims for TBX-FREE Were False or Unsubstantiated ......................................................193

    D.   Defendants' Claims that TBX-FREE Was Proven To Be Effective Were False .................................................................228

IV.  Eupepsia Thin.................................................................................. 232

    A.   Defendants' Marketing of Eupepsia Thin............................232

    B.   Defendants' Appetite Suppression and Weight Loss Claims for Eupepsia Thin ..............................................................247

    C.   Defendants' Appetite Suppression and Weight Loss Claims for Eupepsia Thin Were False or Unsubstantiated....................306

    D.   Defendants' Claims That Eupepsia Thin Was Proven To Be Effective Were False.......................................................340

V.   Prolongz.........................................................................................344

A.   Defendants' Marketing of Prolongz ......................................344

B.   Defendants' Sexual Performance Claims for Prolongz......................360

C.   Defendants' Sexual Performance Claims for Prolongz Were False or
Unsubstantiated..............................................................371

D.   Defendants' Claims That Prolongz Was Proven To Be Effective Were
False ......................................................................401

VI.   False Made in USA Claim for Eupepsia Thin…………………………..405

VII.   False and Misleading Money Back Guarantee Claims……………………409

VIII. Deceptive Testimonials for Eupepsia Thin……………………………… 439

IX.   Defendants' Autoship Plans………………………………………… 446

A.   Defendants Enrolled Consumers in Autoship Plans Without Their
Authorization ..............................................................446

B.   Chargebacks................................................................497

C.   Jason Cardiff's "Straight Sales-to-Continuity" Initiative...................508

X.   Ringless Voicemails………………………………………………… 522

XI.   Rengalife………………………………………………………… 523

A.   Defendants' Marketing of the Rengalife Multilevel Marketing
Program....................................................................523

B.   Defendants' Earnings Claims for Rengalife Were False and
Unsubstantiated..............................................................548

XII.  FTC's Response to Additional Material Facts In Cardiff Defendants'
Statement of Genuine Disputes……………………………………… 568

**Preface to Plaintiff FTC's Response to Cardiff Defendants' Statement of Genuine Disputes**

In filing their Statement of Genuine Disputes (Dkt. 491-1, "DSGD"), the Cardiffs failed to abide by the Court's Standing Order, Dkt. 319, p. 7, which sets forth the required format: "The lefthand column must restate the allegedly undisputed fact, and the righthand column must state either that it is undisputed or disputed… the opposing party may submit additional material facts that bear on or relate to the issues raised by the movant… [which] shall continue in sequentially numbered paragraphs and shall set forth in the right hand column the evidence that supports that statement."

The Cardiffs did not repeat the FTC's facts and evidentiary citations, and in most cases they did not use the "undisputed/disputed" signal required by the Court. In the numerous cases where the Cardiffs failed to dispute (or in their words, "deny") a fact, the Court should treat the fact as undisputed. The Cardiffs did not formally propose any Additional Material Facts, but made several repeated assertions throughout their DSGD that could have been properly characterized as "Additional Material Facts." In the interest of efficiency, the FTC responds below to these assertions, which lack evidentiary support and are actually contradicted by the evidence, and has added an Additional Material Facts section (see SUF 938-941) to collect the evidentiary citations for the FTC's Response to these claims.

In their DSGD, the Cardiffs group many of the FTC's facts together, providing only general responses or vague objections to the specific allegations and evidentiary citations contained in each of the FTC's facts. They rely heavily on several boilerplate objections, including a "lack of timeframe" objection that is applied indiscriminately, including in cases where the date or date range in question is clearly stated in the fact itself. They also repeat close variations of an objection in which they claim to have ceased advertising and marketing the challenged products on January 25, 2018, January 28, 2018, or in or about

-1-

February 2018 (this objection appears more than 80 times, covering 453 of the FTC's facts), and a related objection in which they claim they stopped running TV advertisements through the media company Mercury Media in October (TBX-FREE) and December 2017 (Eupepsia Thin) (this objection appears 28 times, covering 173 facts total). The FTC addresses these two "cessation of advertising/marketing" objections here to enable a more efficient Response to the Cardiffs' DSGD.

**Boilerplate Objection 1**: "The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8."

The Cardiffs make this objection at least 26 times, covering 176 facts total. Of all the times they repeat this objection, the TBX-FREE and Eupepsia Thin TV advertising placed by Mercury Media is implicated in just a handful of the facts. Other facts where this objection appears address issues as varied as TV advertising placed by other media agencies, non-TV advertising, the filming date of the Eupepsia Thin infomercial, the lack of clinical studies to prove deceptive advertising claims, the FTC's health experts' analyses of the challenged advertising claims, the fact that Redwood was also sued by the New England Journal of Medicine for falsely claiming the prestigious journal's endorsement, ringless voicemail marketing, and Prolongz advertising.

Even for the facts that do implicate the TV advertising placed by Mercury, the Cardiffs provide the wrong cut-off date of that advertising. They cite to the Declaration of Brian Young (of Broad Beam Media), Dkt. 432-2 at 3-8, submitted by the FTC, to support their contention that the last date TBX-FREE advertising was placed through Mercury was October 30, 2017. However, the declaration of John Cabrinha (of River Direct, Inc.) shows that Mercury's last airing of a TBX-FREE long-form advertisement was February 12, 2018. Dkt. 432-1, p. 3 (¶5), p. 21. (The TV advertising placed through Mercury is covered in two separate

declarations. In 2019, Mercury was sold and its assets and records were purchased by two companies, Broad Beam (short-form advertising) (Dkt. 432-2 at 2) and River Direct (long-form advertising) (Dkt. 432-1 at 2).)

**Boilerplate Objection 2**: "Defendants stopped its [sic] marketing campaigns in or about February, 2018." [and close variants, including variants citing January 25, 2018 and January 25, 2018 as the cut-off date]

Close variations of an objection in which the Cardiffs claim to have ceased advertising or marketing in February 2018 appear at least 80 times, covering 453 facts. Defendants did not cease advertising or marketing in February 2018. SUF 938.  They continued to advertise on websites, Facebook, and via email, ringless voicemails, outbound sales calls, press releases, and Amazon.

The Cardiffs also admit that Defendants were still selling TBX-FREE, Eupepsia Thin, and Prolongz on October 12, 2018. SUF 232.

Photos and documents taken at the October 12, 2018 Immediate Access evidence Redwood's ongoing business operation, including boxes of product ready to ship to consumers, bins full of inventory, sales scripts above the desk of one of Redwood's sales representatives, and an order tracking spreadsheet, among numerous other indicators of an ongoing business.  Dkt. 277, p. 11-14.

**Boilerplate Objection 3**: "Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018."

In response to this specific claim about their websites, which they repeat at least 23 times in their DSGD, the FTC submits and cites to copies of Defendants' websites archived by the Internet Archive showing the challenged advertising claims remained on websites for TBX-FREE and Eupepsia Thin at least as late as August 2018 and for Prolongz at least as late as October 2018. See SUFs 939-941.

## I.      Pre-Complaint Investigation

| FTC Fact | FTC Citation[1] | Cardiff Admit/Objection[2] |
|---|---|---|
| 1.  The FTC issued a Civil Investigative Demand ("CID") to Redwood Scientific Technologies, Inc. ("Redwood") on August 3, 2017. | Sands 3rd Dec. (PX-51), p. 1, ¶ 2 & p. 21 (Att. 1). | Admit. At no time did the Cardiff's receive a cease and desist letter. Dkt. 253-1 Declaration of Jason Cardiff ¶3, 26. Had the Cardiffs received warning letters from the FTC they would have complied with any demands, as was shown by their prior behavior of editing and removing claims made after receiving the CID. Ex. A, Jason Cardiff Declaration ¶4; Ex. B, Eunjung Cardiff Declaration ¶49. This CID request did not |

[1] Page citations to previously-filed declarations are to ECF designations, unless otherwise indicated.

[2] The FTC has reproduced the Cardiffs' DSGD as accurately as possible, without correcting for misspellings or other errors.

| | | inquire about any information pertaining to Prolongz. |
|---|---|---|
| **FTC Response to SUF 1**: The Defendants admit the fact. Their extraneous argument should be disregarded. | | |
| 2.   The CID's specifications required, among other things, that Redwood produce documents and information pertaining to the advertising of TBX-FREE and Eupepsia Thin oral film strips and pertaining to autoship programs and unauthorized charges. | Sands 3rd Dec. (PX-51), p. 1, ¶ 2 & p. 25-32 (Att. 1).<br><br>Walker Dec. (PX-32), p. 4, ¶ 15 & p. 234, 246 (Att. 25). | Admit. |
| 3.   The CID and the accompanying cover letter instructed Redwood to preserve all documents that may be responsive to the CID's requests. | Sands 3rd Dec. (PX-51), p. 1, ¶ 2, & p. 20, 23 (Att. 1). | Admit. |

| 4. | Redwood failed to comply with the CID and the FTC initiated an enforcement action against Redwood on October 30, 2017 in the U.S. District Court for the Central District of California. | Sands 3rd Dec. (PX-51), p. 1, ¶ 3.<br><br>*FTC v. Redwood Sci. Tech., Inc.*, No. 2:17-cv-07921-SJO-PLA (C.D. Cal. 2017) (Otero, J.) (Dkt. 1) (hereafter "*FTC v. Redwood*"). | Deny as to Redwood failing to comply with the CID. Redwood supplied information responding to requests for documents and interrogatories through Tracy Green. Redwood supplemented their documents over a period of six months. The CID was extensive and asked for copious amounts of documents and Redwood complied to the best of their ability and to meet the unrealistic deadlines given by the FTC. |
|---|---|---|---|

**FTC Response to SUF 4**: The Cardiffs do not dispute that the Commission filed suit to enforce its CID on October 30, 2017. Defendants had not produced a single document or answered a single interrogatory by the CID deadline or Redwood's own proposed extended deadlines, resulting in a contempt proceeding brought by the FTC. *FTC v. Redwood*, Dkt. 1, p. 6, ¶ 11. Redwood provided its first substantive response on March 22, 2018, two months *after* this Court issued an Order compelling Redwood to comply with the CID and five months after the FTC initiated its CID enforcement action (see SUF 7).

| 5. | On January 25, 2018, this Court | Sands 3rd Dec. (PX-51), p. 1-2, ¶ 4. | Admit that the Order was entered by the Court, |
|---|---|---|---|

| | | |
|---|---|---|
| issued an Order compelling Redwood to comply with the FTC's CID. | See *FTC v. Redwood*, Order Compelling Compliance With Civil Investigative Demand and Vacating Hearing (Dkt. 17) (Jan. 25, 2018). | however Deny as to Redwood failing to comply with the CID. Redwood supplied information responding to requests for documents and interrogatories through Tracy Green. Redwood supplemented their documents over a period of six months. The CID was extensive and asked for copious amounts of documents and Redwood complied to the best of their ability and to meet the unrealistic deadlines given by the FTC. Additionally, Redwood ensured that it complied with any concerns that FTC had over its advertising by cancelling all paid advertising both TV and print on January 28, 2018. |

**FTC Response to SUF 5**:  The Cardiffs admit the fact.  Their extraneous

| | | | |
|---|---|---|---|
| argument should be disregarded. | | | |
| 6.   On March 6, 2018, this Court issued an Order for Redwood to Show Cause why it should not be held in contempt for failure to comply with the FTC's CID. | Sands 3rd Dec. (PX-51), p. 1-2, ¶ 4.  See *FTC v. Redwood*, Order To Show Cause (Dkt. 20) (March 6, 2018). | Admit that the Order was issued by the Court, however Deny as to Redwood failing to comply with the CID. Redwood supplied information responding to requests for documents and interrogatories through Tracy Green. Redwood supplemented their documents over a period of six months. The CID was extensive and asked for copious amounts of documents and Redwood complied to the best of their ability and to meet the unrealistic deadlines given by the FTC. | |
| **FTC Response to SUF 6**:  The Cardiffs admit the fact.  Their extraneous argument should be disregarded. | | | |
| 7.   The FTC received from Redwood answers to interrogatories and | Sands 3rd Dec. (PX-51), p. 2, ¶ 5.  Walker Dec. (PX-32), p. | Admit | |

| | | | |
|---|---|---|---|
| a large volume of business records between March 22, 2018 and June 14, 2018. | 3-5, ¶¶ 14-18 & p. 234-426 (Atts. 25-30). | |
| 8. | Redwood's CID responses were certified as true by the then-Director of Operations for Redwood Scientific Technologies, Inc., Danielle Cadiz, a/k/a Danielle Walker. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 1-2, ¶¶ 2-3 & Dkt. 7, p. 54, 168.<br><br>See Walker Dec. (PX-32), p. 4, ¶ 15 (had authority to certify as Redwood's Director of Operations and records custodian). | Admit |
| 9. | Redwood's responses to the FTC's CID did not contain any video advertising or dissemination schedules for TBX-FREE or Eupepsia Thin. | See Sands 3rd Dec. (PX-51), p. 2, ¶ 6. | Deny. Defendants object to this statement as lacking in time frame and is non-specific as to which CID is the subject of the statement. Whatever "schedules" for "video advertising or dissemination" Redwood had at the time relating to TBX-FREE OR Eupepsia Thin would have been included in the data |

-9-

| | | dumps provided to the FTC. |
|---|---|---|
| **FTC Response to SUF 9**:  The Cardiffs' vague speculation that "whatever 'schedules'… Redwood had… would have been included in the data dumps provided to the FTC" does not create an issue of genuine fact because they do not claim to have produced any video advertising or dissemination schedules, nor do they identify any such materials from Redwood's CID production to the FTC. In fact the FTC sent only one CID to Redwood. Sands 3rd Dec. (PX-51), p. 2, ¶ 6. The "time frame" is the period during which Redwood, pursuant to Court Orders and under threat of contempt, submitted materials in response to the FTC's one and only CID. Redwood's first response was submitted on March 22, 2018. Its final response was submitted on September 24, 2018. See SUF 7. | | |
| 10.  Materials collected from Redwood company offices as part of the Immediate Access authorized by the Temporary Restraining Order issued by Judge Otero on October 10, 2018, also did not contain any video advertising or dissemination schedules. | See Sands 3rd Dec. (PX-51), p. 2, ¶ 7. | Neither admit nor deny because Defendants are unaware if these documents ever existed or, if they existed, were ever in their possession. If these documents existed and were in the Defendants possession, it would have been included in the data dump provided the FTC months before the lawsuit was filed. |

**FTC Response to SUF 10**:  The Cardiffs' use of the phrase "neither admit nor deny" is the functional equivalent of not disputing the fact.

The Cardiffs admit that Jason Cardiff received the final versions of all tv advertisements for TBX-FREE, Eupepsia Thin, and Prolongz from Ty Sherrell (see SUF 11), yet do not explain why those videos were not among Redwood's records.

| | | | |
|---|---|---|---|
| 11. | Ty Sherrell of FX Web Media, LLC, sent Jason Cardiff final versions of all television advertisements he produced, including advertisements for TBX-FREE, Eupepsia Thin, and Prolongz. | Sherrell Dec. (PX-34), p. 2, ¶ 3; p. 3, ¶ 5. | Admit |
| 12. | In approximately May 2018, Jason Cardiff told Danielle Walker and Gus Navarro to delete anything responsive to the FTC's CID, including referencing an 88% | Walker Dec. (PX-32), p. 5, ¶ 19.<br><br>See also Melendez Dec. (PX-35), p. 9, ¶ 33 (Navarro deleted files from her computer, telling her that Jason Cardiff had instructed him to delete everything | Jason Cardiff did NOT tell Danielle Walker or Gus Navarro to delete anything responsive to the FTC's CID. Ex. A, Jason Cardiff Declaration ¶99. |

| | | |
|---|---|---|
| success rate; any documents showing that he and Eunjung Cardiff approved marketing and advertising distribution; and any evidence showing that they had created the files (e.g., Facebook ads, content for paid advertisements). | from the laptops of certain employees, including hers). | |

**FTC Response to SUF 12**: Jason Cardiff's general denial is contradicted by the detailed sworn testimony of two former employees, including one who had files deleted from her own computer. Specifically, Jason Cardiff instructed Danielle Walker and Gus Navarro, Redwood's IT Manager, "to destroy documents on all Redwood employees' computers that were responsive to the FTC's CID, including documents related to Redwood's paid advertising of oral film strips on Facebook. I also specifically remember that he told us to delete anything referencing an 88% success rate; any documents that showed that he and Eunjung Cardiff approved marketing and advertising distribution; and any evidence showing that they had created the files." Walker Dec. (PX-32), p. 5, ¶ 19. It is also not a coincidence that Redwood never produced video advertising or dissemination schedules to the FTC in response to its CID and that no such files were discovered when the receiver took immediate access of Redwood's business offices on October 12, 2018.  See Sands 3rd Dec. (PX-51), p. 2, ¶¶ 6, 7.

| 13.   Gus Navarro carried | Melendez Dec. (PX-35), | Object as to vague. What |
|---|---|---|

| | | |
|---|---|---|
| out Jason Cardiff's instructions. | p. 9, ¶ 33. | instructions? Deny to the extent that the "instructions" were to destroy documents because no such instruction was ever given. Ex. A, Jason Cardiff Declaration ¶99. |
| **FTC Response to SUF 13**: Jason Cardiff's denial is contradicted by the sworn testimony of a former employee who had files deleted from her own computer. SUF 13 is not vague; it clearly follows from SUF 12. | | |
| 14.   The documents destroyed included documents related to Redwood's paid advertising of oral film strips on Facebook. | Walker Dec. (PX-32), p. 5, ¶ 19. | No documents were destroyed as a consequence of any instruction by Jason Cardiff because no such instruction was given by Jason Cardiff. Moreover, to the best of Jason Cardiff's knowledge, no "documents related to Redwood's paid advertising of oral thin film strips on Facebook" ever existed because as Jason Cardiff understood the process, all "paid advertising" on Facebook |

| | | |
|---|---|---|
| | | was accomplished on line thru the Facebook's on line portal, so no "documents" relating to such "paid advertising" were ever created. Documentation of such "paid advertising" is likely something that would be maintained by Facebook. Ex. A, Jason Cardiff Declaration ¶100. |

**FTC Response to SUF 14**:  Jason Cardiff's general denial is contradicted by the detailed sworn testimony of Danielle Walker and he does not explain why, e.g., Redwood did not produce any Facebook ads in response to the Commission's CID.

| | | |
|---|---|---|
| 15.   [reserved] | | |
| 16.   [reserved] | | |
| 17.   [reserved] | | |

## II.   Defendants

### A. Individual Defendants

**Jason Cardiff**

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 18.   Jason Cardiff stated in a sworn | J. Cardiff Dec., Dkt. 265-2, p. 2. | Admit. |

-14-

| | | | |
|---|---|---|---|
| | declaration that he "was an owner, officer, director and/or member of the business defendants identified as Defendants in [this] action." | | |
| 19. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was an owner of Redwood Scientific Technologies, Inc. (California). | J. Cardiff 1st RFA Resp., p. 1, ¶ 1 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 6 (Att. 1)). | Admit. |
| 20. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was the President of Redwood Scientific Technologies, Inc. | J. Cardiff 1st RFA Resp., p. 2, ¶ 2 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 7 (Att. 1)).<br><br>See also Walker Dec. (PX-32), p. 37 & p. 593-598 (Att. 59) (biographies of Jason | Admit. |

| | | | |
|---|---|---|---|
| | (California). | Cardiff on redwoodamerica.com and redwoodscientific.co). | |
| 21. | Jason Cardiff owned 100% of Redwood Scientific Technologies, Inc. (California). | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 142 & Dkt. 13-1, p. 7, 13 (Att. 164) (Jason Cardiff's shares of Redwood California represented 100% of oustanding shares). | Admit. |
| 22. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was the Chief Executive Officer of Redwood Scientific Technologies, Inc. (California). | J. Cardiff 1st RFA Resp., p. 2, ¶ 3 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 7 (Att. 1)).  See also Walker Dec. (PX-32), p. 2, ¶ 9 & p. 37 (Att. 8); p. 38 (Att. 9); and p. 9, ¶ 37 & p. 593-598 (Att. 59) (biographies of Jason Cardiff on redwoodamerica.com and redwoodscientific.co). | Admit. |
| 23. | Jason Cardiff admits that during some or all of the | J. Cardiff 1st RFA Resp., p. 2, ¶ 4 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 7 | Admit. |

| | | | |
|---|---|---|---|
| | time period from January 1, 2014 to October 3, 2018, he was a member of the Board of Directors of Redwood Scientific Technologies, Inc. (California). | (Att. 1)).<br><br>See also, Walker Dec. (PX-32), p. 2, ¶ 9 & p. 37 (Att. 8); p. 39-40 (Att. 10). | |
| 24. | Jason Cardiff was the Secretary and Chief Financial Officer of Redwood Scientific Technologies, Inc. (California). | Walker Dec. (PX-32), p. 2, ¶ 9 & p. 37 (Att. 8). | Admit. |
| 25. | Jason Cardiff was the Chief Executive Officer, President, and a Director of Redwood Scientific Technologies, Inc. (Nevada). | Walker Dec. (PX-32), p. 2, ¶ 9 & p. 41 (Att. 11) (Director); p. 46 (Att. 12) (President); p. 48, 99 (Att. 13) (Chief Executive Officer, President, and Director).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 141-142 & Dkt. 13-1, p. 5, 7, 58 (Atts. 163-164). | Admit. |

| | | | |
|---|---|---|---|
| 26. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was an owner of Redwood Scientific Technologies, Inc. (Delaware). | J. Cardiff 1st RFA Resp., p. 3, ¶ 7 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 8 (Att. 1)). | Admit. |
| 27. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was the President of Redwood Scientific Technologies, Inc. (Delaware). | J. Cardiff 1st RFA Resp., p. 3, ¶ 8 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 8 (Att. 1)).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51-52, ¶ 143 & Dkt. 13-1, p. 109 (Att. 165).<br><br>See also Walker Dec. (PX-32), p. 2, ¶ 9 & p. 150 (Att. 14); p. 167, 175 (Att. 16). | Admit. |
| 28. | Jason Cardiff admits that during some or all of the time period from | J. Cardiff 1st RFA Resp., p. 3, ¶ 9 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 8 (Att. 1)). | Admit. |

| | | | |
|---|---|---|---|
| | January 1, 2014 to October 3, 2018, he was the Chief Executive Officer of Redwood Scientific Technologies, Inc. (Delaware). | See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51-52, ¶ 143 & Dkt. 13-1, p. 109 (Att. 165). See also Walker Dec. (PX-32), p. 2, ¶ 9 & p. 150 (Att. 14); p. 167, 175 (Att. 16). | |
| 29. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was a member of the Board of Directors of Redwood Scientific Technologies, Inc. (Delaware). | J. Cardiff 1st RFA Resp, .p. 3, ¶ 10 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 8 (Att. 1)). See also Walker Dec. (PX-32), p. 2, ¶ 9 & p. 167, 175 (Att. 16). | Admit. |
| 30. | Jason Cardiff was the Secretary and Treasurer of Redwood Scientific Technologies, Inc. (Delaware). | Walker Dec. (PX-32), p. 2, ¶ 9 & p. 167, 175 (Att. 16). | Admit. |

| 31. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was, through Carols Place Limited Partnership, an owner of Redwood Scientific Technologies, Inc. (Delaware). | J. Cardiff 1st RFA Resp., p. 5, ¶ 14 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 9 (Att. 1)). | Admit. |
| 32. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was an owner of Identify, LLC. | J. Cardiff 1st RFA Resp., p. 5, ¶ 18 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 9 (Att. 1)). | Admit. |
| 33. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was a member of | J. Cardiff 1st RFA Resp., p. 5, ¶ 19 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 9 (Att. 1)).<br><br>See also Walker Dec. (PX-32), p. 3, ¶ 11 & p. | Admit. |

| | | | |
|---|---|---|---|
| | Identify, LLC. | 198-199 (Att. 21) (IRS document identifying Jason Cardiff as sole member of Identify); p. 200-201 (Att. 22) (registered agent services agreement identifying Jason Cardiff as member of Identify). | |
| 34. | On March 14, 2014, Jason Cardiff signed an Internal Revenue Service form as a member of Runaway Products, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 59, ¶ 164 & Dkt. 24-2, p. 10, 11 (Att. 185).<br><br>Walker Dec. (PX-32), p. 1, ¶ 6 & p. 25-31 (Att. 2). | Admit. |
| 35. | On February 6, 2014, Jason Cardiff signed a Media Purchasing Agent Agreement with Havas Edge LLC as VP of Run Away Products. | Sands 3rd Dec. (PX-51), p. 3, 17, ¶ 9, 51 & p. 44 (Att. 4). | Admit. |
| 36. | On March 18, 2014, Jason Cardiff signed an agreement with | Yallen Dec. (PX-40), p. 2 ¶ 9 & p. 8-9 (Att. 1). | Admit. |

| | | | |
|---|---|---|---|
| | Inter/Media Time Buying Corp. (a/k/a Inter Media Advertising) as VP of Run Away Products, LLC/Prolongz. | | |
| 37. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was a Trustee of Carols Place Trust. | J. Cardiff 1st RFA Resp., p. 7, ¶ 27 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 10 (Att. 1)).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 173 & Dkt. 24-9, p. 3 (Att. 196). | Admit. |
| 38. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was a named beneficiary of the Carols Place Trust. | J. Cardiff 1st RFA Resp., p. 7, ¶ 28 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 10 (Att. 1)). | Admit. |
| 39. | Jason Cardiff admits that during some or all of the | J. Cardiff 1st RFA Resp., p. 7, ¶ 30 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 10 | Admit. |

| | | (Att. 1)). | |
|---|---|---|---|
| | time period from January 1, 2014 to October 3, 2018, he was, through Carols Place Trust, a partner of Carols Place Limited Partnership. | | |
| 40. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was, through Extension First LLC, an owner of Carols Place Limited Partnership. | J. Cardiff 1st RFA Resp., p. 7, ¶ 31 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 10 (Att. 1)). | Admit. |
| 41. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he was, through Extension First | J. Cardiff 1st RFA Resp., p. 7, ¶ 32 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 10 (Att. 1)). | Admit. |

| | | | |
|---|---|---|---|
| | LLC, a partner of Carols Place Limited Partnership. | | |
| 42. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he had signature authority for bank accounts held in the name of Identify, LLC. | J. Cardiff 1st RFA Resp., p. 8, ¶ 36 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 11 (Att. 1)).<br><br>See also George Dec. (TRO PX-2), Dkt. 6, p. 2, ¶ 4 & p. 13-14 (Att. A1). | Admit. |
| 43. | Jason Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, he had signature authority for bank accounts held in the name of Carols Place Limited Partnership. | J. Cardiff 1st RFA Resp., p. 9, ¶ 40 (Sanger Dec. (PX-52), p. 1, ¶ 4 & p. 12 (Att. 1)). | Admit. |
| 44. | Jason Cardiff | Sands 1st Dec. (TRO PX- | Admit. |

| | | | |
|---|---|---|---|
| | controls 96.6% of the voting securities in Redwood Delaware. | 1), Dkt. 7, p. 52-53, ¶¶ 147-148 & Dkt. 13-1, p. 133, 144-145 (Att. 169). | |
| 45. | Jason Cardiff was an owner of Advanced Men's Institute Prolongz. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 173 & Dkt. 24-8, p. 25 – Dkt. 24-9, p. 1 (Att. 195).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 185-191 (Att. 17).<br><br>Yallen Dec. (PX-40), p. 3, ¶ 13 & p. 99, 121 (Att. 6). | Admit. |
| 46. | Jason Cardiff was the managing member and President of Advanced Men's Institute Prolongz LLC. | Yallen Dec. (PX-40), p. 3, ¶ 13 & p. 99, 103, 122 (Att. 6). | Admit. |
| 47. | Jason Cardiff is named as the Sole Member of Identify LLC on the Internal Revenue | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 56-58, ¶ 158 & Dkt. 24-1, p. 14-15 (Att. 179). | Admit. |

| | | | |
|---|---|---|---|
| | Service's letter assigning Identify LLC an Employer Identification Number. | | |
| 48. | Jason Cardiff held himself out as the manager of Identify, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 56-58, ¶ 158 & Dkt. 24, p. 23 (Att. 179).  See also Walker Dec. (PX-32), p. 3, ¶ 11 & p. 202-230 (Att. 23). | Admit. |
| 49. | Jason Cardiff is the President of True and Honesty, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 54, ¶¶ 151, 152 & Dkt. 24, p. 4-12 (Att. 172, 173). | Admit. |
| 50. | Jason Cardiff has transacted business in the Central District of California. | Walker Dec. (PX-32), p. 3, ¶ 13 (Jason Cardiff was in the office every day unless he was traveling).  Carranza Dec. (PX-33), p. 1, ¶ 6 (Jason Cardiff was on the Redwood premises nearly all the time). | Admit. |

|  |  | Melendez Dec. (PX-35), p. 1, ¶ 4.<br><br>Wu Dec. (PX-37), p. 3, ¶ 15 (Jason Cardiff was in the office daily). |  |
| --- | --- | --- | --- |
| 51. | Jason Cardiff was a signatory on five Redwood Scientific bank accounts. | George Dec. (TRO PX-2), Dkt. 6, p. 2, ¶ 4 & p. 13-14 (Att. A1). | Admit. |

**Eunjung Cardiff**

| **FTC Fact** | | **FTC Citation** | **Cardiff Admit/Objection** |
| --- | --- | --- | --- |
| 52. | Eunjung Cardiff has stated in a sworn declaration that she "was an owner, officer, director and/or member of the business defendants identified as Defendants in [this] action." | E. Cardiff Dec., Dkt. 265-3, p. 2. | Admit. |
| 53. | Eunjung Cardiff was the Chief | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 58, ¶ 161 & | Admit. |

|     |     |     |
| --- | --- | --- |
| | Executive Officer of Advanced Men's Institute Prolongz LLC. | Dkt. 24-2  p. 6 (Att. 182).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 33 (Att. 4).<br><br>Yallen Dec. (PX-40), p. 3, ¶ 13 & p. 75 (Att. 5). | |
| 54. | Eunjung Cardiff was the President, Manager, and managing member of Run Away Products, LLC. | Yallen Dec. (PX-40), p. 3, ¶ 13 & p. 72 (Att. 4).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 59, ¶ 164 & Dkt. 24-2, p. 10-12 (Att. 185).<br><br>Walker Dec. (PX-32), p. 1, ¶ 6 & p. 25-31 (Att. 2). | Admit. |
| 55. | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, she was a member of Run Away Products, LLC. | E. Cardiff 1st RFA Resp., p. 4, ¶ 19 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 63 (Att. 5)). | Admit. |
| 56. | Eunjung Cardiff admits that during | E. Cardiff 1st RFA Resp., p. 4, ¶ 20 (Sanger Dec. | Admit. |

| | | | |
|---|---|---|---|
| | some or all of the time period from January 1, 2014 to October 3, 2018, she was an officer of Run Away Products, LLC. | (PX-52), p. 1, ¶ 8 & p. 63 (Att. 5)). | |
| 57. | Eunjung Cardiff was the organizer of Advanced Men's Institute Prolongz LLC. | Walker Dec. (PX-32), p. 2, ¶ 9 & p. 32 (Att. 3).<br><br>Yallen Dec. (PX-40), p. 3, ¶ 13 & p. 74 (Att. 5).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 58, ¶ 160 & Dkt. 24-2 p. 5 (Att. 181). | Admit. |
| 58. | Eunjung Cardiff was the owner of Advanced Men's Institute Prolongz LLC. | Walker Dec. (PX-32), p. 2, ¶ 9 & p. 35 (Att. 6).<br><br>Yallen Dec. (PX-40), p. 3, ¶ 13 & p. 75 (Att. 5).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 58, ¶ 161 & Dkt. 24-2 p. 6 (Att. 182). | Admit. |
| 59. | Eunjung Cardiff was a member of Advanced Men's | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 138 & Dkt. 13, p. 172 (Att. | Admit. |

| | | Institute Prolongz LLC. | 160). | |
|---|---|---|---|---|
| 60. | | Eunjung Cardiff was a member of Redwood Scientific Technologies, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 139 & Dkt. 13, p. 173 (Att. 161).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 36 (Att. 7). | Admit. |
| 61. | | Eunjung Cardiff changed AMI's name to Redwood Scientific Technologies, LLC, incorporated Redwood Scientific Technologies, Inc., a California corporation, and converted Redwood Scientific Technologies LLC into the corporation. | Walker Dec. (PX-32), p. 2, ¶ 9 & p. 36 (Att. 7) (Eunjung Cardiff signing as member of the limited liability company and the incorporator of the corporation).<br><br>Yallen Dec. (PX-40), p. 2-3, ¶¶ 6, 13 & p. 77-78 (Att. 5). | Admit. |
| 62. | | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to | E. Cardiff 1st RFA Resp., p. 1, ¶ 1 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 62 (Att. 5)). | Admit. |

| | | | |
|---|---|---|---|
| | October 3, 2018, she was an owner of Redwood Scientific Technologies, Inc. (California). | | |
| 63. | Eunjung Cardiff was the Secretary and Director of Redwood Scientific Technologies, Inc. (California). | Sands 1st Dec. (TRO PX-1), Dk. 7, p. 50-51, ¶¶ 136-137 & Dkt. 13, p. 169-170 (Atts. 158, 159).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 38-39 (Atts. 9-10). | Admit. |
| 64. | Eunjung Cardiff was Chief Operating Officer of Redwood Scientific Technologies, Inc. (California). | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 178 & Dkt. 22, p. 24 (Att. 216). | Admit. |
| 65. | Eunjung Cardiff was the Director of Marketing of Redwood Scientific Technologies, Inc. (California). | Walker Dec. (PX-32), p. 9, ¶ 37 & p. 593-598 (Att. 59) (biographies of Eunjung Cardiff on redwoodamerica.com and redwoodscientific.co).<br><br>Morris Dec. (PX-4), Dkt. | Admit. |

| | | | |
|---|---|---|---|
| | | 9, p. 3, ¶ 5 & p. 14, 16 (Att. B). | |
| 66. | Eunjung Cardiff was the Chief Operating Officer, Marketing Director, Corporate Secretary, and a member of the Board of Directors of Redwood Scientific Technologies, Inc. (Nevada). | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 141 & Dkt. 13-1, p. 5 (Att. 163); Dkt. 7, p. 51, ¶ 142 & Dkt. 13-1, p. 7, 58-59 (Att. 164).<br><br>Adkinson-Connor Dec. (PX-38), p. 2, ¶¶ 7-8 & & p. 22-54 (Atts. 3-7) (Eunjung Cardiff signed contracts as COO of Redwood Nevada).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 46 (Att. 12) (Corporate Secretary) & p. 48, 99 (Att. 13) (Director, Marketing Director, and Secretary). | Admit. |
| 67. | Eunjung Cardiff was Chief Operating Officer, Chief Marketing Officer, and a member of the | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 52-53 ¶ 147 & Dkt. 13-1, p. 133, 142 (Att. 169).<br><br>Walker Dec. (PX-32), p. | Admit. |

| | | | |
|---|---|---|---|
| | Board of Directors of Redwood Scientific Technologies, Inc. (Delaware). | 2, ¶ 9 & p. 167, 175 (Att. 16). | |
| 68. | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, she was a Trustee of Carols Place Trust. | E. Cardiff 1st RFA Resp., p. 5, ¶ 24 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 64 (Att. 5)).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 173 & Dkt. 24-9, p. 3 (Att. 196). | Admit. |
| 69. | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, she was a named beneficiary of Carols Place Trust. | E. Cardiff 1st RFA Resp., p. 5, ¶ 25 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 64 (Att. 5)). | Admit. |
| 70. | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to | E. Cardiff 1st RFA Resp., p. 5, ¶ 26 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 64 (Att. 5)). | Admit. |

| | | | |
|---|---|---|---|
| | October 3, 2018, she was, through Carols Place Trust, an owner of Carols Place Limited Partnership. | | |
| 71. | Eunjung Cardiff admits that During some or all of the time period from January 1, 2014 to October 3, 2018, she was, through Extension First LLC, an owner of Carols Place Limited Partnership. | E. Cardiff 1st RFA Resp., p. 5, ¶ 28 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 64 (Att. 5)). | Admit. |
| 72. | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, she had signature authority for bank accounts held in the name of Redwood | E. Cardiff 1st RFA Resp., p. 5, ¶ 30 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 64 (Att. 5)). | Admit. |

| | | | |
|---|---|---|---|
| | Scientific Technologies (California) | | |
| 73. | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, she had signature authority for bank accounts held in the name of Advanced Men's Institute Prolongz LLC. | E. Cardiff 1st RFA Resp., p. 6, ¶ 34 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 65 (Att. 5)). See also George Dec. (TRO PX-2), Dkt. 6, p. 2, ¶ 4 & p. 13-14 (Att. A1). | Admit. |
| 74. | Eunjung Cardiff admits that during some or all of the time period from January 1, 2014 to October 3, 2018, she had signature authority for bank accounts held in the name of Run Away Products, LLC. | E. Cardiff 1st RFA Resp., p. 6, ¶ 35 (Sanger Dec. (PX-52), p. 1, ¶ 8 & p. 65 (Att. 5)). See also George Dec. (TRO PX-2), Dkt. 6, p. 2, ¶ 4 & p. 13-14 (Att. A1). | Admit. |
| 75. | Eunjung Cardiff admits that during | E. Cardiff 1st RFA Resp., p. 6, ¶ 37 (Sanger Dec. | Admit. |

| | | |
|---|---|---|
| some or all of the time period from January 1, 2014 to October 3, 2018, she had signature authority for bank accounts held in the name of Carols Place Limited Partnership. | (PX-52), p. 1, ¶ 9 & p. 65 (Att. 5)). | |
| 76. Eunjung Cardiff signed statements identifying herself as an owner of AMI, Redwood Scientific Technologies, Inc. and Identify. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 177 & Dkt. 24-13, p. 1 (Att. 212) (sworn confession of judgment signed by Eunjung Cardiff, in which she identifies herself as owner of Redwood Scientific Technologies, Inc., Identify LLC, AMI LLC, and other entities); p. 62, ¶ 177 & Dkt. 24-13, p. 17 (Att. 214) (Identify LLC). | Admit. |
| 77. Jason Cardiff and Eunjung Cardiff are owners of Carols | Statement of Uncontroverted Facts (hereafter "SUF") 31, 37- | Admit. |

| | | | |
|---|---|---|---|
| | Place Limited Partnership via their joint ownership of Extension First, LLC and co-trusteeship of Carols Place Trust. | 41, 43, 68-71, 75. | |
| 78. | Eunjung Cardiff was a signatory on a People [United] for Christians, Inc. bank account. | George Dec. (TRO PX-2), Dkt. 6, p. 1, ¶ 4 & (Att. A1), p. 13 (Att. A1). | Admit. |
| 79. | Eunjung Cardiff has transacted business in the Central District of California. | Walker Dec. (PX-32), p. 3, ¶ 13 (Eunjung Cardiff was in the office several times each week and also worked from home).<br><br>Melendez Dec. (PX-35), p. 1, ¶ 4 (Eunjung Cardiff was in the Redwood office every week).<br><br>Carranza Dec. (PX-33), p. 1, ¶ 6 (Eunjung Cardiff was on the Redwood premises every week). | Admit. |

| | | | |
|---|---|---|---|
| | | Wu Dec. (PX-37), p. 3, ¶ 15 (Eunjung Cardiff was usually in the office several time per week). Rodoracio Dec. (PX-36), p. 5 ¶ 21 (Eunjung Cardiff was in the office weekly). | |
| 80. | Eunjung Cardiff previously worked for approximately five years as a marketing executive at Cannella Response Television, a media placement agency. | Contempt Hearing Transcript, Dkt. 187-1, p. 277, ln. 17 – p. 278, ln. 5. See also, Adkinson-Connor Dec. (PX-38), p. 2, ¶ 9. | Admit |
| 81. | During her years at Cannella Response Television, Eunjung Cardiff grew the business from $0 to nearly $3 million per year. | Contempt Hearing Transcript, Dkt. 187-1, p. 277, ln. 17 – p. 278, ln. 5. | Deny. Ex. B, Eunjung Cardiff Declaration ¶¶6, 32, 37. |

**FTC Response to SUF 81**: While denying this fact, the defendants do not specifically dispute it either. The cited paragraph that addresses Eunjung Cardiff's time at Cannella (¶ 6) does not dispute SUF 81 and an uncited

paragraph from her declaration (¶ 7) also seems to support it.  Two of the three cited paragraphs from Eunjung Cardiff's declaration (¶¶ 32, 37) do not address her years at Cannella and therefore have no bearing on this fact. The FTC's evidentiary citation is to Eunjung Cardiff's sworn contempt hearing testimony on July 30, 2019.

**B.  *Jason and Eunjung Cardiff Were Each Directly Involved in the Wrongful Conduct***

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 82.  Jason Cardiff had final approval of all Redwood product advertising (online, video, and print). | Sherrell Dec. (PX-43), p. 2, ¶ 6.  Wu Dec. (PX-37), p. 3, ¶ 14.  Walker Dec. (PX-32), p. 6, ¶ 23 (final approval of Facebook ads). | Admit. |
| 83.  Redwood's websites were created at Jason Cardiff's direction and approved by him before going live. | Walker Dec. (PX-32), p. 6, ¶ 23. | Admit. |
| 84.  Jason Cardiff wrote content for | Walker Dec. (PX-32), p. 6, ¶ 23. | Object as to timeframe and irrelevant. After |

-39-

| | | |
|---|---|---|
| | Facebook ads and directed Redwood staff and outside contractors to create TBX-FREE advertising for placement on Facebook, which he approved. | | February, 2018, all outside marketing and advertising was discontinued by Redwood and the Cardiffs. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 50. Prior to that time, Admit. |
| 85. | Jason Cardiff directed Redwood staff and outside contractors to create TBX-FREE advertising for placement on Facebook, which he then approved. | Walker Dec. (PX-32), p. 9, ¶ 39. | |
| 86. | Jason Cardiff appeared in Facebook Live videos for TBX-FREE. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 240-254 (Atts. 009-11).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 255-267 (Att. 012-014). | |

| | | |
|---|---|---|
| | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 268-282 (Atts. 015-017).<br><br>Walker Dec. (PX-32), p. 6, ¶ 22; p. 9-10, ¶ 39 (recognizing Jason Cardiff in PX-1, Atts. 9, 12, and 15). | |

**FTC Response to SUF 84-86**: The Cardiffs do not dispute that, prior to Feburary 2018, Jason Cardiff wrote and approved content for Facebook ads and directed Redwood staff and outside contractors to create TBX-FREE advertising, directed Redwood staff and outside contractors to create TBX-FREE advertising for placement on Facebook, and appeared in Facebook Live videos for TBX-FREE. The Complaint challenges the Cardiffs' conduct from at least 2014 through the date of the Complaint. See Dkt. 1, p. 15, ¶ 36.

These facts are relevant to Jason Cardiff's individual liability for injunctive and monetary relief.

Their claim that "[a]fter February, 2018, all outside marketing and advertising was discontinued by Redwood and the Cardiffs" does not dispute that Jason Cardiff participated in and directed placing ads on Facebook.

Furthermore, the Cardiffs did not cease marketing TBX-FREE, Eupepsia Thin, and Prolongz in February 2018. See SUF 938. The Commission has added this fact in response to this oft-repeated assertion in the Cardiffs' DSGD.

| | | |
|---|---|---|
| 87. Jason Cardiff admits that he reviewed and approved advertisements for TBX-FREE.[3] | J. Cardiff 3rd RFA Resp., p. 7, ¶ 140 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 30 (Att. 3)). | Object as to lack of timeframe and irrelevant, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. Therefore denied after that date. At times prior to February, 2018, Defendants provided input as to where and when advertising would run. |
| 88. Eunjung Cardiff admits that she reviewed and approved advertisements for TBX-FREE. | E. Cardiff 3rd RFA Resp., p. 6, ¶ 134 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 98 (Att. 7)). | |
| 89. Jason Cardiff admits that he participated in deciding how media time would be used to advertise TBX-FREE. | J. Cardiff 3rd RFA Resp., p. 3, ¶ 117 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 26 (Att. 3)). See also Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11, ¶¶ 47-49 & p. 767-773 (Att. 23-24). | |
| 90. Eunjung Cardiff admits that she participated in | E. Cardiff 3rd RFA Resp., p. 2, ¶ 111 (Sanger Dec. (PX- | |

---

[3] The Cardiffs submitted a single objection to SUF 87-98; the FTC's response begins on p. 45.

| | | |
|---|---|---|
| deciding how media time would be used to advertise TBX-FREE. | 52), p. 2, ¶ 10 & p. 77 (Att. 7)).<br><br>See also Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11-12, ¶¶ 47-51 & p. 774-784 (Att. 25-29). | |
| 91. Jason Cardiff admits that he reviewed and approved advertisements for Eupepsia Thin. | J. Cardiff 3rd RFA Resp., p. 15, ¶¶ 185, 186 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 38 (Att. 3)). | |
| 92. Eunjung Cardiff admits that she reviewed and approved advertisements for Eupepsia Thin. | E. Cardiff 3rd RFA Resp., p. 12-13, ¶¶ 179, 180 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 87-88 (Att. 7)). | |
| 93. Jason Cardiff admits that he participated in deciding how media time would be used to advertise Eupepsia Thin. | J. Cardiff 3rd RFA Resp., p. 10, ¶ 161 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 33 (Att. 3)).<br><br>See also Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11, ¶¶ 47-49. | |

| | | | |
|---|---|---|---|
| 94. | Eunjung Cardiff admits that she participated in deciding how media time would be used to advertise Eupepsia Thin. | E. Cardiff 3rd RFA Resp., p. 9, ¶ 155 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 84, (Att. 7)).<br><br>See also Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11-12, ¶¶ 47-51 & p. 762-766 (Att. 22) & p. 774-784 (Att. 25-29). | |
| 95. | Jason Cardiff admits that he reviewed and approved advertisements for Prolongz. | J. Cardiff 3rd RFA Resp., p. 24, ¶¶ 241, 242 (Sanger Dec. (PX-52), p. 1, ¶ 6, & p. 47 (Att. 3)). | |
| 96. | Eunjung Cardiff admits that she both reviewed and approved advertisements for Prolongz. | E. Cardiff 3rd RFA Resp., p. 20, ¶¶ 235, 236 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 95 (Att. 7)). | |
| 97. | Jason Cardiff admits that he participated in deciding how | J. Cardiff 3rd RFA Resp., p. 21, ¶ 222 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 44 (Att. 3)). | |

| | | |
|---|---|---|
| media time would be used to advertise Prolongz. | See also Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11, ¶¶ 47-49 & p. 767-768 (Att. 23). | |
| 98.  Eunjung Cardiff admits that she participated in deciding how media time would be used to advertise Prolongz. | E. Cardiff 3rd RFA Resp., p. 17, ¶ 216 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 92 (Att. 7)).<br><br>See also Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11-12, ¶¶ 47-50. | |

**FTC Response to SUF 87-98:**  The FTC's evidentiary citations are to the Cardiffs' sworn responses to the FTC's requests for admissions.  The Cardiffs cannot now create a genuine dispute of material fact by contradicting their earlier sworn admissions with no explanation or supporting documentation.

The Cardiffs do not dispute this group of facts pre-February 2018. The Complaint challenges the Cardiffs' conduct from at least 2014 through the date of the Complaint. See Dkt. 1, p. 15, ¶ 36.

Furthermore, the Cardiffs did not cease marketing TBX-FREE, Eupepsia Thin, and Prolongz in February 2018. See SUF 938.

These facts are relevant to Jason Cardiff and Eunjung Cardiff's individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 99. | On behalf of Run Away Products, Inter/Media purchased media time for Prolongz long form advertising on TV networks across the United States from late 2013 through September 2014, first for a test period and then under contract. | Szymanski Dec. (PX-39), p. 3, ¶ 11<br><br>See also Yallen Dec. (PX-40), p. 2, ¶ 8-9. | Admit |
| 100. | Jason Cardiff and Eunjung Cardiff contacted Inter/Media about buying media time for Prolongz in late 2013. | Szymanski Dec. (PX-39), p. 3, ¶ 12. | Admit |
| 101. | The Cardiffs gave Inter/Media a written presentation about Prolongz. | Szymanski Dec. (PX-39), p. 3 ¶ 13 & p. 7 (Att. 1). | Admit |
| 102. | On behalf of Run Away Products, | Yallen Dec. (PX-40), p. 2, ¶ 9 & p. 8-9 (Att. 1). | Admit |

| | | |
|---|---|---|
| LLC/Prolongz, Jason Cardiff negotiated and signed an Insertion Order for Prolongz advertising with Inter/Media on March 18, 2014. | Szymanski Dec. (PX-39), p. 3, ¶ 15 & p. 61-67 (Att. 9). | |
| 103.  The Insertion Order provided that Jason Cardiff or Eunjung Cardiff had to approve media schedules for Prolongz advertising.[4] | Szymanski Dec. (PX-39), p. 3, ¶ 15 & p. 61 (Att. 9).<br><br>See also Yallen Dec. (PX-40), p. 3-4, ¶ 14(a) & p. 137 (Att. 7) (court finding that Jason Cardiff authorized and approved each airing of a Prolongz ad in 2014) | Object as to relevance and lack of timeframe, Defendants stopped its marketing campaigns in or about February, 2018. Ex. A, Declaration of Jason Cardiff ¶¶7, 9 and 46-53. Therefore denied after that date. At times prior to February, 2018, Defendants provided input as to where and when advertising would run. |
| 104.  Inter/Media would offer media buying opportunities to Jason Cardiff and Eunjung Cardiff | Szymanski Dec. (PX-39), p. 3, ¶ 11. | |

---

[4] The Cardiffs submitted a single objection to SUF 103-110; the FTC's response begins on p. 50.

| | | |
|---|---|---|
| and they decided where and when Prolongz advertising would run. | | |
| 105. Jason Cardiff and Eunjung Cardiff approved media schedules and budgets for Run Away Products' advertising of Prolongz. | Szymanski Dec. (PX-39), p. 3, 5, ¶¶ 11, 14, 22 & p 44-60 (Att. 2-8). | |
| 106. Jason and Eunjung Cardiff decided where and when the Prolongz advertising for which Inter/Media purchased media time would run. | Szymanski Dec. (PX-39), p. 3, ¶ 11; p. 5, ¶ 22. | |
| 107. Jason and Eunjung Cardiff closely monitored Inter/Media's work on the Prolongz account. | Szymanski Dec. (PX-39), p. 5, ¶¶ 22 & p. 69-115 (Att. 10); p. 221-23 (Att. 14-15); p. 260-68 (Att. 17-21). | |
| 108. Jason and Eunjung | Szymanski Dec. (PX-39), | |

| | |
|---|---|
| Cardiff approved all long form advertising schedules and budgets during the test period. | p. 3, ¶ 14 & p. 44-60 (Att. 2-8). |
| 109.  Jason Cardiff approved the television programming descriptors for Prolongz advertising for which Inter/Media purchased media time. | Szymanski Dec. (PX-39), p. 5, ¶ 22 & p. 68, 73-75 (Att. 10). |
| 110.  Jason Cardiff approved the television guide title "Hard Core Sex" and the guide description "Secrets to having longer lasting sex" for Prolongz for which Inter/Media purchased media time. | Szymanski Dec. (PX-39), p. 5, ¶ 22 & p. 70-75 (Att. 10). |

**FTC Response to SUF 103-110:**  The Cardiffs do not dispute that Inter/Media ran Prolongz advertising from late 2013 through September 2014 (see SUF 99, supra).

The Cardiffs do not dispute this group of facts pre-February 2018. The relevant period is 2013-2014, so the Cardiffs have failed to raise a genuine issue of fact for SUF 103-110.

Further, most of the Cardiffs' citations to Jason Cardiff's  declaration are to paragraphs that do not even mention Prolongz (¶¶ 7, 46-50, 53) and therefore do not bear on these facts. The remaining citations (¶¶ 9, 51-52) pertain to the Cardiffs' control over the content of one of the Prolongz websites, not the tv ads and the Cardiffs' involvement in the tv ad campaigns discussed in SUF 103-110.

These facts are relevant to Jason Cardiff and Eunjung Cardiff's individual liability for injunctive and monetary relief.

| 111. Run Away paid Inter/Media's invoices for placement of Prolongz advertising using an HSBC account belonging to AMI. | Walker Dec. (PX-32), p. 7, ¶ 27.<br><br>See also Szymanski Dec. (PX-39), p. 5, ¶ 23 (July 2014 check was written on an HSBC account in the name of AMI). | Object as to lack of timeframe. It is unclear for what time period Plaintiff believes Run Away paid Inter/Media for Prolongz. |

**FTC Response to SUF 111:**  The Cardiffs do not dispute that Defendant Run Away paid Inter/Media using a bank account in the name of Defendant AMI. The FTC's evidentiary citation specifies that one such check was written in July

| | | |
|---|---|---|
| 2014. The Cardiffs do not dispute that the time period of Inter/Media's business relationship with Defendants was late 2013 through September 2014 (see SUF 99, supra). | | |
| 112.  Eunjung Cardiff signed checks on that account to pay for media for Prolongz. | Walker Dec. (PX-32), p. 7, ¶ 27.<br><br>See also Szymanski Dec. (PX-39), p. 5, ¶ 23 (Eunjung Cardiff signed a check on an HSBC account in the name of AMI in July 2014).<br><br>See also Yallen Dec. (PX-40), p. 3, ¶ 11 (Eunjung Cardiff approved payments to Inter/Media in the summer and fall of 2014). | Object as to lack of timeframe. It is unclear as to when or for how long the FTC is claiming Eunjung Cardiff signed checks on the account to pay for media for Prolongz, or for how many of the checks she purportedly signed. |
| **FTC Response to SUF 112:**  The Cardiffs do not dispute that Eunjung Cardiff signed checks from a bank account in the name of Defendant AMI to pay for Prolongz media. The FTC's evidentiary citation specifies that one such check was written in July 2014. The Cardiffs do not dispute that the time period of Inter/Media's business relationship with Defendants was late 2013 through September 2014 (see SUF 99, supra). | | |
| 113.  After a check written on AMI's | Szymanski Dec. (PX-39), p. 5, ¶ 23. | Admit. |

| | | |
|---|---|---|
| HSBC account bounced, Inter/Media continued to buy long form time for Prolongz based on Jason Cardiff's assurances of payment. | | |
| 114.  Jason Cardiff oversaw the drafting of television commercial scripts for TBX-FREE, Eupepsia Thin, and Prolongz. | Sherrell Dec. (PX-43), p. 2, ¶ 6.<br><br>See also Walker Dec. (PX-32), p. 6, ¶ 23 (Jason Cardiff would collaborate with Redwood employees and outside contractors to create advertising for television and the Internet). | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. Therefore denied after that date. At times prior to February, 2018, Defendants provided input as to where and when advertising would run. |
| 115.  Jason Cardiff would instruct a contractor who had been hired by FX Web Media, LLC (a media and web services company) to reference | Sherrell Dec. (PX-43), p. 2, ¶ 6. | |

| | | |
|---|---|---|
| Redwood's websites for claims to be included in television advertisements. | | |
| 116. Jason Cardiff would also dictate specific advertising claims to the contractor. | Sherrell Dec. (PX-43), p. 2, ¶ 6.<br><br>See also Wu Dec. (PX-37), p. 1, ¶ 7 (Jason Cardiff would dictate advertising ideas to her). | |

**FTC Response to SUF 114-116:** The Cardiffs do not dispute these facts concerning Jason Cardiff's actions pre-February 2018. The Complaint challenges the Cardiffs' conduct from at least 2014 through the date of the Complaint. See Dkt. 1, p. 15, ¶ 36.

The Cardiffs do not refute the sworn declarations of two former Redwood employees and a third party contractor who detailed Jason Cardiff's control over drafting advertising claims.

The Cardiffs' claim that they stopped marketing "in or about February, 2018" does not dispute that Jason Cardiff controlled and participated in the development of tv advertising claims for all three challenged products. Furthermore, the Cardiffs did not cease marketing TBX-FREE, Eupepsia Thin, and Prolongz in February 2018. See SUF 938.

SUF 114-116 are relevant to Jason Cardiff's individual liability for injunctive

| and monetary relief. | | |
|---|---|---|
| 117. Jason Cardiff rejected the wording of certain advertising claims and replaced it with his own wording. | Sherrell Dec. (PX-43), p. 2, ¶ 6. | Defendant objects to this statement as it is non-specific, fails to identify the "certain advertising claims" and is therefore vague, ambiguous, overly broad and irrelevant. Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. Therefore denied after that date. At times prior to February, 2018, Defendants provided input as to where and when advertising would run. |
| **FTC Response to SUF 117:**  The Cardiffs do not dispute this fact pre-February 2018, and do not refute the sworn declaration of a third party contractor that Jason Cardiff controlled the precise wording of advertising claims.  This fact shows Jason Cardiff's control over advertising claims and authority to | | |

change specific wording he did not like. SUF 117 is relevant to his individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 118. When scripts were complete, FX Web Media's CEO, Ty Sherrell, would send them to Jason Cardiff for approval. | Sherrell Dec. (PX-43),p. 2, ¶ 6. | Object as to lack of timeframe, Defendants stopped its marketing campaigns in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. |
| 119. Jason Cardiff would sometimes instruct Ty Sherrell to make additional changes to the scripts, which would then be sent back to Jason Cardiff for final approval. | Sherrell Dec. (PX-43), p. 2, ¶ 6. | Therefore denied after that date. This fact provides no timeframe for when the FTC believes that Defendants approved claims for its products. Admit insofar as Defendant did review and approve the final product each advertising agency produced. |

**FTC Response to SUF 118-119:**  The Cardiffs admit that they "review[ed] and approve[d] the final product each advertising agency produced" and do not dispute this fact post-February 2018. They do not refute the sworn declaration of Ty Sherrell that Jason Cardiff had editing and approval authority over tv advertising scripts.

The period identified in the cited declaration of Ty Sherrell, which the Cardiffs

| | | |
|---|---|---|
| do not dispute, is 2013 through 2018. Dkt. 432-3, p. 3, ¶ 4. | | |
| 120.  Jason Cardiff had final approval over which of the testimonialists recruited by talent company Icon Studios Dallas would appear in Redwood television advertising. | Sherrell Dec. (PX-43), p. 3, ¶ 8. | Deny. Jason Cardiff did not "approve" testimonialists. Cardiff instructed Sherrill to locate individuals who took the products and were willing to provide a testimonial. Ex. A, Jason Cardiff Declaration ¶¶91-94. Deny. The Cardiffs ensured that the testimonials were real and from the person who said them. The Cardiffs had each testimonialist sign a form that indicated that what they were saying was true and based off their own personal experience with the product. Ex. A, Jason Cardiff Declaration ¶¶91-94. The form said: All of the statements made are true and accurate, all of my on-screen |

| | | representation, of the product [product], are of my own true story. *Id.* Jason Cardiff had never heard of the talent agency Icon Studios Dallas. He never interacted with anyone from there and was not aware of any their representation of testimonialists. This was something orchestrated by Ty Sherrill. *Id.* |
|---|---|---|

**FTC Response to SUF 120:**  Despite his self-serving claim refuting the sworn declaration of Ty Sherrell, Jason Cardiff knew that the testimonialists had not used Eupepsia Thin to lose the weight they discussed in the infomercial.  See Dkt. 434-1, p. 39-40 (Att. 3) (Ty Sherrell emails Jason Cardiff on February 1, 2017 that "[I] am working on getting testimonials from people who have already lost weight and I'm getting before pictures for them . . . they will still have the product and do the testimonials but ill [sic] have before pictures from their past fat lives lol [.] this is what you pay me for uncle jason, to use my [expletive deleted] brain";  Jason Cardiff replies "Love it big time[.]  Ty you are great." ).

The Cardiffs' claim that they instructed Ty Sherrell to "locate individuals who took the products" is further undermined by the fact that the infomercial was filmed (February 2017, see Dkts. 433-1, 433-2, 433-3) before Redwood starting selling Eupepsia Thin. See Dkt. 424-1, p. 13, ¶ 52.

| 121.  Jason Cardiff | Sherrell Dec. (PX-43), p. | Deny. Jason Cardiff did |
|---|---|---|

| | | |
|---|---|---|
| instructed Ty Sherrell about what to tell the testimonialists to say in Redwood's television advertising. | 3, ¶ 8. | not "instruct" Ty Sherrell about what to tell the testimonials to say in Redwood's television advertising. Cardiff instructed Sherrill to locate indigicuals who took the products and were willing to provide a testimonial. Ex. A, Jason Cardiff Declaration ¶¶91-94. Deny. The Cardiffs ensured that the testimonials were real and from the person who said them. The Cardiffs had each testimonialist sign a form that indicated that what they were saying was true and based off their own personal experience with the product. Ex. A, Jason Cardiff Declaration ¶¶91-94. The form said: All of the statements made are true and accurate, all of |

| | | my on-screen representation, of the product [product], are of my own true story. *Id.* |
|---|---|---|

**FTC Response to SUF 121:** The Cardiffs do not dispute the sworn declarations of three testimonialists who said they did not use Eupepsia Thin to lose the weight they talked about in the ads. (See also SUF 762, infra.) Instead, the Cardiffs claim that they "ensured that the testimonials were real" by requiring testimonialists to sign a form stating that all of the statements they made on camera were true. As set forth in the FTC's Response to SUF 120, Jason Cardiff knew that Ty Sherrell was looking for testimonialists who had previously lost weight without using Eupepsia Thin.

| 122. Jason Cardiff supervised the design of the Eupepsia Thin product packaging. | Wu Dec. (PX-37), p. 2, ¶ 8 & p. 5-6 (Att. 1). | Object as to vague. The word supervise is undefined and could encompass a wide variety of actions. Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. This fact provides no timeframe for when the FTC believes that Defendants designed |
|---|---|---|

| | | packaging for Eupepsia Thin. |
|---|---|---|
| **FTC Response to SUF 122:** The cited sworn declaration of former Redwood employee Jean Wu states that she worked for Redwood from April 2016-April 2017, which the Cardiffs do not dispute. Their claim that they do not know the meaning of the word "supervise" is not a serious objection. Jason Cardiff does not describe which actions he did or did not take vis-à-vis Eupepsia Thin packaging development, and the Cardiffs do not offer any specific facts to dispute that Jason Cardiff supervised Ms. Wu's design of the Eupepsia Thin packaging. | | |
| 123. In connection with the contract between Run Away and Inter/Media for Prolongz advertising, Jason Cardiff staked his personal assets as guarantor. | Yallen Dec. (PX-40), p. 2-3, ¶ 10, p. 5-6, ¶ 16(E) & p. 15-30 (Att. 2); p. 141 (Att. 8). <br><br> Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 174 & Dkt. 24-9, p. 28 – Dkt. 24-10, p. 14 (Att. 200). | Admit |
| 124. Jason Cardiff controlled the telemarketing campaigns that delivered ringless voicemail messages to more than 1.5 million | Walker Dec. (PX-32), p.19, ¶¶ 82-83 (Jason Cardiff negotiated the contract with Gawk, communicated directly with Gawk's CEO about how he wanted the ringless voicemails | Object as to lack of timeframe and relevance. Defendants stopped its marketing campaigns in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53 |

| | | |
|---|---|---|
| consumers. | implemented, and received reports about the ringless voicemail campaign) & p. 900-920 (Atts. 136-138)..<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 36-37, ¶ 108 & Dkt. 13, p. 49-52 (Att. 119).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 38, ¶¶ 111, 112 & Dkt. 13, p. 59-65, 72-77 (Atts. 123, 124, 127, 128). | |
| 125.  Jason Cardiff and Eunjung Cardiff admit that Jason Cardiff's voice is heard in two recorded messages promoting male sexual enhancement products. | J. Cardiff 2nd RFA Resp., p. 12-13, ¶¶ 101, 103 (Sanger Dec. (PX-52), p. 1, ¶ 5 & p. 19-20 (Att. 2)).<br><br>E. Cardiff 2nd RFA Resp., p. 11-12, ¶¶ 95, 97 (Sanger Dec. (PX-52), p. 2, ¶ 9 & p. 71-72 (Att. 6)). | |

| | |
|---|---|
| | See also Walker Dec. (PX-32), p. 6, ¶ 22; p. 19, ¶ 85 (recognizing Jason Cardiff's voice).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 38, ¶¶ 111, 112 & Dkt. 13, p. 59-65, 72-77 (Atts. 123, 124, 127, 128). |
| 126.  Jason Cardiff's two recorded messages promoting male sexual enhancement products were delivered to consumers' voicemail boxes. | Walker Dec. (PX-32), p. 6, ¶ 22; p. 19, ¶¶ 83, 85. |

**FTC Response to SUF 124-126:**  The Cardiffs' objection fails to raise a genuine dispute of fact. The Cardiffs admit that they used Gawk to deliver 1.5 million ringless voicemails and that Jason Cardiff negotiated the contract (Dkt. 491-1, p. 36; SUF 856-859). They do not dispute his control over the campaigns or that his voice is heard in two recorded messages that were delivered to consumers' voicemail boxes. The timeframe is the timeframe stated in the Complaint. The evidence accompanying SUF 124-126 shows that the Gawk contract was negotiated in February 2018 (Dkt. 427-1, p. 131-132); the Cardiffs admitted that they ran the ringless voicemails through July 2018 (Dkt. 441-1, p. 6, ¶ 22).

The Cardiffs' assertion that they stopped advertising in February 2018 is false and contradicted by the evidence, including the Cardiffs' admission that they ran ringless voicemails through July 2018. See also SUF 938.

Jason Cardiff's participation in and control over the ringless voicemail campaigns is relevant to his individual liability for injunctive and monetary relief.

| 127. Jason Cardiff created the Rengalife program, and appeared in many videos touting its earnings claims. | Walker Dec. (PX-32), p. 6, ¶ 22; p. 20, ¶¶ 89-90, 92 (identifying Jason Cardiff as appearing in videos identified as PX-1, Atts. 143, 146, and 149 and videos identified as "Rengalife -- Facebook - 03.21.2018," "Rengalife -- Facebook - 03.26.2018," "Rengalife -- Facebook - 03.28.2018," and "Rengalife -- Facebook - 04.25.2018").<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 49-50, ¶¶ 130-132 & Dkt. 13, p. 103-110, 113-132, 134- | Object, not a material fact. Regnalife was never an active company. It was supposed to be a program. Ex. A, Jason Cardiff Declaration ¶¶84-86.<br>Rengalife was a program that lasted and was advertised for about 45 days. Rengalife was started the end of march and we stopped advertising and the program itself at the beginning of May. Ex. A, Jason Cardiff Declaration ¶¶84-86.<br>No consumers acquired any membership from |

| | 144 (Atts. 143, 144, 146, 147, 149-151). | Rengalife. Ex. A, Jason Cardiff Declaration ¶¶84-86. Rengalife was created in order to create a big word of mouth network to help advertise the products of Redwood because we had stopped television marketing and modified our websites drastically. Ex. A, Jason Cardiff Declaration ¶¶84-86. |
|---|---|---|

**FTC Response to SUF 127:** The Cardiffs do not dispute that Jason Cardiff created the Rengalife program or that he appeared in many videos touting its earning claims.

The Cardiffs' additional narrative contains self-serving claims that do not bear on this fact and should be disregarded.

Jason Cardiff's participation in the founding of Rengalife and dissemination of its earnings claims is material to his individual liability for injunctive and monetary relief.

| 128. Jason Cardiff controlled the auto-ship continuity programs that processed | Walker Dec. (PX-32), p. 3, ¶ 13; p. 14, ¶ 64. See Melendez Dec. (PX-35), p. 7, ¶ 26 (told Jason | Object as to the word "control." It is vague and does not describe the types of responsibilities Cardiff or anyone else in |
|---|---|---|

| | | |
|---|---|---|
| unauthorized payments on consumers' credit and debit cards. | Cardiff that many customers said they had not signed up for auto-ship and were upset that they had been put on auto-ship plan anyway, but he did not want to move away from auto-ship orders) | Redwood had. Deny. The autoship program was controlled by the customer service agents who spoke with consumers during its sales calls. Ex. A, Jason Cardiff Declaration ¶¶96-97. |
| **FTC Response to SUF 128:** Defendant's blanket and non-specific denial of his control of customer service employees in their placement of customers into unauthorized autoship programs is directly contradicted by very specific testimony by former employees who took his directions. Those former employees rely on specific documents including emails from Defendant Jason Cardiff instructing their actions. Jason Cardiff's claim that he does not understand the word "control" is not a serious objection, and his own use of the word in the same objection belies his claimed confusion about its meaning. | | |
| 129. Jason Cardiff signed an Attestation of Outside Legal Review for Redwood in March 2016 in which he affirmed to payment processor Vantiv that the company was in | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 79-82 (Atts. 25-26). | Admit |

| | | |
|---|---|---|
| compliance with all applicable federal laws, including the FTC Act and the Restore Online Shoppers' Confidence Act. | | |
| 130.  In August 2016, Jason Cardiff, as President of Redwood Scientific Technologies, Inc., signed a Merchant Agreement with Electronic Merchant Systems that included a checklist of statutes and regulations with which Redwood was required to comply, including Sections 5 and 12 of the Federal Trade Commission Act, the Telemarketing and Consumer | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 176 & Dkt. 24-11, p. 15 – Dkt. 24-12, p. 6 (Att. 207).<br><br>Walker Dec. (PX-32), p. 18, ¶ 80 & p. 753, 762 (Att. 126). | Admit |

| | | |
|---|---|---|
| Fraud and Abuse Prevention Act, the Telemarketing Sales Rule, the Restore Online Shoppers' Confidence Act, and the Electronic Funds Transfer Act. | | |
| 131. The Cardiffs purchased media time for television commercials to promote their film strips through at least four media companies: Inter/Media Time Buying Corp., Havas Edge, Diversified Mercury Communications, LLC ("Mercury Media"), and Cannella Response Television, LLC | Walker Dec, (PX-32), p. 6-8, ¶¶ 25, 28-29 & p. 427-434 (Atts. 31-35) (Havas Edge); p. 435-535 (Atts. 36-47) (Mercury Media).<br><br>Szymanski Dec. (PX 39), p. 4, ¶ 16.<br><br>See also Adkinson-Connor Dec. (PX-38), p. 1, ¶ 5; p. 8, ¶ 31; p. 11-12, ¶¶ 47-51; p. 11, ¶ 46. | Object as to irrelevant and lack of timeframe. The last air date and services provided by Mercury Media to Redwood for Euepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. |

| | | |
|---|---|---|
| ("Cannella"). | | |

**FTC Response to SUF 131:**  The Cardiffs do not dispute that they purchased media time from at least four media companies.  The "timeframe" is the period covered by the Complaint, from at least 2014 to the filing of the Complaint. Redwood's business relationships with each of the four companies were 2013-2014 (Inter/Media), 2014 (Havas Edge), 2017 (Mercury Media), and 2014-2018 (Cannella). See, e.g., Dkt. 424-1, p. 8 (¶¶ 27, 28), p. 9 (¶ 34); Dkt. 425-1, p. 213. See also p. 2 *supra* (explanation re Boilerplate Objection 1 that Mercury Media's last airing of TBX-FREE long form advertising was February 12, 2018).

This fact is relevant to proving that Redwood's ads were widely disseminated. The Cardiffs' participation in purchasing media time is also relevant to their individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 132.  Cannella bought media time for Redwood from 2014-2018. | Walker Dec. (PX-32), p. 6, ¶ 25. | Object as to relevance and lack of timeframe. Advertising through these companies was stopped on January 28, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date. |

**FTC Response to SUF 132:**  The Cardiffs do not dispute this fact pre-January 28, 2018. The timeframe, 2014-2018, is stated in the fact.

SUF 132 is relevant to proving that Redwood's ads were widely disseminated.

| | | |
|---|---|---|
| 133.  In January 2015, Eunjung Cardiff, as Chief Operating | Adkinson-Connor Dec. (PX-38), p. 2, ¶ 7 & p. 22-47 (Atts. 3-4). | Admit. |

-68-

| | | |
|---|---|---|
| Office of Redwood Scientific Technologies, (Nevada), signed two Commercial Media Agreements with Cannella. | | |
| 134. Eunjung Cardiff, as Chief Operating Officer of Redwood Scientific Technologies (Nevada), signed agreements with REVShare, a short-form direct response television service provider that is part of Cannella, for the purchase of media time for short form advertisments for TBX-FREE and Eupepsia Thin. | Adkinson-Connor Dec. (PX-38), p. 2, ¶ 8 & p. 48-54 (Atts. 5-7). | Admit. |
| 135. From 2014-2018, Redwood paid | Adkinson-Connor Dec. (PX-38), p. 8, ¶ 32. | Admit. |

| | | |
|---|---|---|
| Cannella $6,581,634.85 to buy media time for TBX-FREE, Eupepsia Thin, and Prolongz advertising. | | |
| 136. For 2016-2017, Redwood paid REVShare $20,000 to buy media time for TBX-FREE and Eupepsia Thin. | Adkinson-Connor Dec. (PX-38), p. 8, ¶ 32. | Admit. |
| 137. Eunjung Cardiff and Jason Cardiff decided which ads to air through Cannella. | Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31. | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date.These ads did not play after in or about February, 2018. Therefore denied after that date |
| 138. Eunjung Cardiff and Jason Cardiff decided the TV markets where ads for their products would air through media time purchased by Cannella. | Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11, ¶ 48. | |

| | | |
|---|---|---|
| **FTC Response to SUF 137-138:** The Cardiffs do not dispute that they decided which ads to air through Cannella and the markets where those ads would air through media time purchased by Cannella  pre-February 2018.  The period of Redwood's business relationship with Cannella was 2014-2018.  See SUF 132, 135. | | |
| 139.  Eunjung Cardiff directed Cannella to air Eupepsia Thin advertising in "markets . . . in the top 10 for obesity in the country." | Adkinson-Connor Dec. (PX-38), p. 11, ¶ 48 & p. 762-766 (Att. 22). | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date.These ads did not play after in or about February, 2018. Therefore denied after that date. Deny as to any insinuation that Jason and Eunjung Cardiff were solely responsible for what markets the ads played in. Ex. A, Jason Cardiff Declaration ¶¶92, 94; Ex. B, Eunjung Cardiff Declaration ¶¶24-26. The evidence presented |

| | | by the FTC is one email in which Eunjung Cardiff states that a particular region is a top 10 market for obesity, this in of itself does not present a pattern or practice of the Defendants targeting any specific market. |
|---|---|---|
| **FTC Response to SUF 139:** The Cardiffs do not dispute that Eunjung Cardiff directed Cannella to run Eupepsia Thin advertising in markets in the "top 10 for obesity in the country." The timeframe, March 2017, is evident from the cited emails.  The Cardiffs' conclusory denial that they were not solely responsible for choosing the markets in which their ads played fails to identify with specificity or evidentiary support who else was responsible, and nevertheless do not dispute that they at least shared responsibility for those choices.  Thus it is insufficient to create a dispute of material fact. The cited paragraphs in their declarations do not address the substance of SUF 139. | | |
| 140.  Eunjung Cardiff and Jason Cardiff chose the TV networks and time slots they wanted for Prolongz, TBX-FREE, and Eupepsia Thin advertising. | Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11, ¶¶ 47, 49 & p. 767-779 (Atts. 23-26).  Walker Dec. (PX-32), p. 8-9, ¶¶ 34-36. | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. The last air date and services provided by Mercury Media to Redwood for Eupepsia |

| | | Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. These ads did not play after in or about February, 2018. Therefore denied after that date. Admit as to the Cardiffs choosing the networks that aired the ads. |
|---|---|---|

**FTC Response to SUF 140:**  The Cardiffs admit that they chose the networks that aired the ads for TBX-FREE, Eupepsia Thin, and Prolongz.  The timeframe is the entire period during which they ran ads for the three challenged products, late 2013-2018.  Their additional narrative does not bear on this fact and should be disregarded.

| | | |
|---|---|---|
| 141.  Eunjung Cardiff and Jason Cardiff directed Cannella on advertising budgets, including how budgets should be allocated to TBX-FREE, Eupepsia Thin, and Prolongz | Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31; p. 11-12, ¶¶ 50-51 & p. 780-784 (Atts. 27-29). | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date.These ads did not play after in or about February, 2018. |

| | | |
|---|---|---|
| advertising. | | Therefore denied after that date |

**FTC Response to SUF 141:** The Cardiffs' denial does not address the substance of the fact, but nevertheless does not dispute that they both directed Cannella on advertising budgets prior to February 2018.

The timeframe is the period when Cannella purchased media time for advertising those three oral film strips.

| | | |
|---|---|---|
| 142. Eunjung Cardiff approved payments to media companies. | Walker Dec. (PX-32), p. 9, ¶ 36. | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date. These ads did not play after in or about February, 2018. |

**FTC Response to SUF 142:** The Cardiffs' denial does not address the substance of the fact, but tneverthelss does not dispute that Eunjung Cardiff approved payments to media companies pre-February 2018.

| | | |
|---|---|---|
| 143. Eunjung Cardiff was Cannella's primary contact for Redwood advertising. | Adkinson-Connor Dec. (PX-38), p. 2, ¶ 9.<br><br>See Walker Dec. (PX-32), p. 9, ¶ 36 (Eunjung Cardiff was the main point of contact for Redwood's media | Deny. Ex. B, Eunjung Cardiff Declaration ¶¶6, 32, 37. |

| | buying). | |
|---|---|---|
| **FTC Response to SUF 143:**  The cited paragraphs of Eunjung Cardiff's declaration do not address this fact, much less dispute the sworn declarations of Kate Adkinson-Connor and Danielle Walker that Eunjung Cardiff was Cannella's primary contact, nor do they identify an alternative individual who served as Cannella's primary contact for Redwood advertising. | | |
| 144.  Eunjung Cardiff was the person who most often approved the airing of TBX-FREE, Eupepsia Thin, and Prolongz advertising through Cannella. | Adkinson-Connor Dec. (PX-38), p. 8, ¶ 31. | Deny. Ex. B, Eunjung Cardiff Declaration ¶¶6, 32, 37. |
| **FTC Response to SUF 144:**  The cited paragraphs of Eunjung Cardiff's declaration do not address this fact, much less dispute the sworn declaration of Kate Adkinson-Connor that Eunjung Cardiff was the person who most often approved tv ad airings, nor do they identify any other individuals at Redwood who approved airings of Redwood advertising. | | |
| 145.  Cannella representatives also communicated with Jason Cardiff, and he also made decisions on these issues. | Adkinson-Connor Dec. (PX-38), p. 2, ¶ 9; p. 8, ¶ 31. | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date. These ads did |

| | | not play after in or about February, 2018. Object as to "these issues" as a vague and Defendant is unable to admit or deny this. |
|---|---|---|
| **FTC Response to SUF 145:**  SUF 145 clearly follows SUF 144 and references approving airings of Redwood advertising, as does the evidentiary citation to ¶ 31 of the sworn Declaration of Kate Adkinson-Connor.  The timeframe is the period of Redwood's business relationship with Cannella, 2014-2018. Nevertheless, the Cardiffs do not dispute this fact pre-February 2018. Their additional narrative does not bear on this fact and should be disregarded. | | |
| 146.  Eunjung Cardiff was in charge of tracking media performance. | Melendez Dec. (PX-35), p. 5, ¶ 18.<br><br>Adkinson-Connor Dec. (PX-38), p. 13-14, ¶¶ 60-61 & p. 521-529 (Att. 11) (Eunjung Cardiff discontinued Cannella's access to database that allowed monitoring of sales attributable to television ads because she preferred to track advertising performance in-house at Redwood). | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date.These ads did not play after in or about February, 2018. Otherwise, admit. |

| | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 180 & Dkt. 23, p. 45 (Att. 277).<br><br>Walker Dec. (PX-32), p. 9, ¶ 36.<br><br>Carranza Dec. (PX-33), p. 2, ¶ 10. | |
|---|---|---|
| 147.  Eunjung Cardiff received daily charts showing which advertisement generated each sales call. | Melendez Dec. (PX-35), p. 5, ¶ 18. | |
| **FTC Response to SUF 146-147:**  the Cardiffs admit these facts pre-February 2018. | | |
| 148.  Jason Cardiff and Eunjung Cardiff decided what program listings and descriptions television viewers would see for Prolongz, TBX-FREE, and Eupepsia Thin ads | Adkinson-Connor Dec. (PX-38), p. 12-13, ¶¶ 53-59 & p. 785-812 (Atts. 30-40); p. 785 (Att. 30). | Object as to relevance and lack of timeframe. Cardiffs decided to stop all visual advertising for its products in or about February, 2018 in response to the FTC CID. Advertising was stopped on January 28, 2018. Dkt. 429-1 PX 38 at 101-102. |

| on television programing guides. | | The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Therefore denied after that date. |
|---|---|---|
| **FTC Response to SUF 148:**  The Cardiffs do not dispute that they decided on the program listings and descriptions fact pre-February 2018.  Because the program listings contained some of the challenged advertising claims (see SUF 149-153), the fact that the Cardiffs chose the descriptors is relevant to their participation in the deceptive advertising, and therefore their individual liability for injunctive and monetary relief. | | |
| 149.  Jason Cardiff monitored program listings for Prolongz advertising and recommended that Cannella use "Make her climax" and "sex party" as progam listings. | Adkinson-Connor Dec. (PX-38), p. 12, ¶¶ 54-56 & p. 786-804 (Atts. 31-35); p. 785 (Att. 30). | Object as to relevance and lack of timeframe. Advertising was stopped on January 28, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date. |
| **FTC Response to SUF 149:**  The Cardiffs do not dispute this fact pre-January | | |

| | | |
|---|---|---|
| 28, 2018.  The timeframe of at least 2015-2017 is evident in the cited paragraphs of the sworn Declaration of Kate Adkinson-Connor.  Jason Cardiff's participation in monitoring tv advertising program listings is relevant to his individual liability for injunctive and monetary relief. | | |
| 150.  Eunjung Cardiff monitored program listings for TBX-FREE advertising and asked Cannella to confirm a TBX-FREE listing, which was "Free FRM Cigarettes!," coupled with the program description, "Save your life and lives of loved ones with withdrawal free guarantee stop smoking aid." | Adkinson-Connor Dec. (PX-38), p. 12-13, ¶ 57 & p. 805-807 (Att. 36); p. 785 (Att. 30). | Object as to relevance and lack of timeframe. Cardiffs decided to stop all visual advertising for its products in or about February, 2018 in response to the FTC CID. Advertising was stopped on January 28, 2018. Dkt. 429-1 PX 38 at 101-102. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Therefore denied after that date. |
| 151.  Eunjung Cardiff monitored program listings for TBX-FREE advertising and asked Cannella to confirm a TBX-FREE listing, | Adkinson-Connor Dec. (PX-38), p. 12-13, ¶ 57 & p. 808 (Att. 37); p. 785 (Att. 30). | |

| | | |
|---|---|---|
| which was "STOP SMOKING NOW." | | |
| **FTC Response to SUF 150-151:**  The Cardiffs do not dispute these facts pre-February 2018.  The timeframe of at least 2016 is evident in the cited paragraph and attachments of the sworn Declaration of Kate Adkinson-Connor. Eunjung Cardiff's participation in monitoring tv advertising program listings for inclusion of challenged advertising claims is relevant to her individual liability for injunctive and monetary relief. | | |
| 152.  On April 24, 2017, Eunjung Cardiff asked Cannella to change  the program listing for Eupepsia Thin advertising to "FAST WEIGHT LOSS." | Adkinson-Connor Dec. (PX-38), p. 13, ¶ 58 & p. 810 (Att. 38). | Object as to relevance and lack of timeframe. Advertising was stopped on January 28, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date. |
| 153.  On September 14, 2017, Eunjung Cardiff asked Cannella to update the TBX-FREE and Eupepsia Thin program listings to "TBX Free- Stop Smoking Now (Life saving | Adkinson-Connor Dec. (PX-38), p. 13, ¶ 59 & p. 811 (Att. 39). | |

| | | |
|---|---|---|
| information about how to kick the habit for good)[.]" and "Eupepsia Thin- Fast Weight Loss ( Lose up to 100 pounds)[,]" respectively. | | |

**FTC Response to SUF 152-153:** The Cardiffs do not dispute these facts pre-January 28, 2018. The timeframe of April and September 2017 is stated in the facts. Eunjung Cardiff's instructions to Cannella to include challenged advertising claims in tv advertising program listings is relevant to her individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 154.  Jason Cardiff and Eunjung Cardiff made all of the decisions about media buying by Mercury Media for TBX-FREE and Eupepsia Thin advertising, including approving budgets and choosing media slots. | Walker Dec. (PX-32), p. 7-8, ¶¶ 29-30 & p. 466-535 (Atts. 39-47) (Mercury Media). | Object as to relevance and lack of timeframe. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Therefore denied after that date. |
| 155.  Eunjung Cardiff instructed | Walker Dec. (PX-32), p. 8, ¶ 33 & p. 523-527 | |

| | | |
|---|---|---|
| Mercury Media about the listings she wanted to appear on television programming guides for Eupepsia Thin and TBX-FREE. | (Att. 44). | |
| 156.  On August 11, 2017, Eunjung Cardiff told Mercury Media that the television guide descriptor for TBX-FREE should be "STOP SMOKING NOW- TBX Free is the #1 selling stop smoking aid- guaranteed!" and the descriptor for Eupepsia Thin should be "FAST WEIGHT LOSS- Lose up to 10lbs in 1 week!" | Walker Dec. (PX-32), p. 8, ¶ 33 & p. 523-527 (Att. 44).

Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 178 & Dkt. 22, p. 86 (Att. 234). | |

**FTC Response to SUF 154-156:**  The Cardiffs' general objections do not dispute the specific evidence showing that they controlled media budgets and provided instructions on tv descriptors and are therefore insufficient to create a genuine factual dispute. Moreover, they do not dispute SUF 154-156 pre-December 25, 2017.

These facts are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 157.  Eunjung Cardiff admits that she participated in responding to network requests for substantiation. | E. Cardiff 3rd RFA Resp., p. 10, ¶ 167 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 85, (Att. 7)). | The Cardiffs provided substantiation packets to networks who requested substantiation and relied on the networks advice as to whether the claims Redwood was making for its products were properly substantiated. Ex. A, Declaration of Jason Cardiff ¶12 and Ex. 3 and 4. Object as to irrelevant and lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date.These ads |
| 158.  Jason Cardiff and Eunjung Cardiff admit that Eunjung Cardiff supervised responses to network requests for substantiation. | J. Cardiff 3rd RFA Resp., p. 12, ¶ 174 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 35 (Att. 3)).    E. Cardiff 3rd RFA Resp., p. 10-11, ¶ 168 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 85-86 (Att. 7)). | |

| | | did not play after in or about February, 2018. Therefore denied after that date |
|---|---|---|
| **FTC Response to SUF 157-158:**  The Cardiffs admit they provided "substantiation packets" to networks and do not dispute these facts, including that Eunjung Cardiff supervised responses to the networks, pre-February 2018. The cited paragraph in Jason Cardiff's declaration does not state that the Cardiffs "relied on the networks [sic] advice as to whether the claims Redwood was making for its products were properly substantiated."<br><br>The Cardiffs' involvement in responding to requests for substantiation for product claims is relevant to their individual liability for injunctive and monetary relief. | | |
| 159.  When Cannella's account manager received inquiries from television networks during their advertising review process for Redwood ads, including inquiries about advertising claim substantiation, she referred those questions to | Adkinson-Connor Dec. (PX-38), p. 8-9, ¶¶ 35-36. | Admit. Defendants relied on the networks representations that the substantiation claims were sufficient to proceed with airing the informercials and thus the products were in compliance with all regulations. Ex. A, Declaration of Jason Cardiff ¶12; Ex. B, Declaration of Eunjung Cardiff ¶32. |

| | Eunjung Cardiff. | | Object as to relevance |
|---|---|---|---|
| 160. | In March 6, 2015, Redwood's account manager at Cannella informed Eunjung Cardiff that the A&E network had asked for substantiation for Prolongz. When asked if she had "any evidence of clinical studies or anything more that we can provide to the network," Eunjung Cardiff that "[t]he FDA registration is proof that our product is certified by the FDA as an over the counter drug that treats the condition[.]  It is a very powerful document granted and should | Adkinson-Connor Dec. (PX-38), p. 9, ¶ 37 & p. 530-531 (Att. 12). | and lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date. These ads did not play after in or about February, 2018. |

| | |
|---|---|
| suffice….” | |
| 161.  In June 2015, Cannella's account manager informed Eunjung Cardiff that, in connection with Prolongz advertising, the FOX Broadcasting Company had requested "support for the safety and efficacy of product – this support must address all claims made." | Adkinson-Connor Dec. (PX-38), p. 9, ¶ 38 & p. 532-535 (Att. 13). |
| 162.  In October 2016, when Cannella's account manager informed Eunjung Cardiff that, in connection with TBX-FREE advertising, Cannella's REVShare division had requested "substantiation of | Adkinson-Connor Dec. (PX-38), p. 9, ¶ 39 & p. 536-722 (Att. 14). |

| | |
|---|---|
| claims made," Eunjung Cardiff asked the account manager to send REVShare the TBX-FREE substantiation materials that Redwood had submitted to Cannella. | |
| 163.  In September 2017, Cannella's account manager informed Eunjung Cardiff that, in connection with TBX-FREE advertising, the SCRIPPS network was "very strict and requires this type of product to have FDA approval and not just be FDA registered." | Adkinson-Connor Dec. (PX-38), p. 10, ¶ 40 & p. 723-727 (Att. 15). |
| 164.  Eunjung Cardiff admits that during | E. Cardiff 3rd RFA Resp., p. 10, |

| | | |
|---|---|---|
| the clearance process for Eupepsia Thin television advertising, at least one television network requested substantiation for certain statements made in an advertisement. | ¶ 166 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 85 (Att. 7)). | |
| **FTC Response to SUF 159-164:** The Cardiffs admit the facts regarding Eunjung Cardiff's knowledge about and involvement in responding to tv network requests for substantiation. Their additional narrative is argument and should be disregarded.<br><br>The timeframe is the duration of the business relationship between Redwood and Cannella (2014-2018), which is evident from the dates of the cited emails. These facts are relevant to Eunjung Cardiff's individual liability for injunctive and monetary relief. | | |
| 165.  In March 2017, Cannella's account manager informed Eunjung Cardiff that, in connection with Eupepsia Thin advertising, television networks | Adkinson-Connor Dec. (PX-38), p. 10, ¶ 41 & p. 728-729 (Att. 16). | Objection as to relevance. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. Therefore denied after that date.These ads did |

| | | |
|---|---|---|
| might have ad "clearance issues" because of past FTC law enforcement actions related to weight-loss products, that "networks are going to require substantiation," and that "[t]estimonials will need to be provided, to make sure weight loss claims weren't due to being paid." | | not play after in or about February, 2018. |

**FTC Response to SUF 165**: The Cardiffs do not dispute that Eunjung Cardiff was informed that "networks are going to require substantiation" for Eupepsia Thin and that the advertising might have "ad clearance issues" because of past FTC law enforcement actions.

Eunjung Cardiff's knowledge of the need to substantiate advertising claims and past FTC actions is relevant to her individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 166.  In March 2017, Eunjung Cardiff | Adkinson-Connor Dec. (PX-38), p. 10, ¶ 42 & p. | Deny. The Cardiffs ensured that the |

| | | |
|---|---|---|
| sent Cannella's account manager talent releases for the testimonialists that appear in Eupepsia Thin TV advertising, including Dan Hogan, Karen Spero, and Todd Preston, who had been hired by a talent agency and had not used Eupepsia Thin to lose weight. | 730-737 (Att. 17).<br><br>Hogan Dec. (PX-45), p. 1, ¶ 6 (had not heard of Eupepsia Thin before shooting the commercial and had never used it).<br><br>Preston Dec. (PX-46), p. 1, ¶¶ 3, 6, 7 & (had not heard of Eupepsia Thin prior to filming testimonial).<br><br>Spero Dec. (PX-47), p. 1, ¶ 6 (did not use Eupepsia Thin to lose weight and had not heard of it prior to filming commercial). | testimonials were real and from the person who said them. The Cardiffs had each testimonialist sign a form that indicated that what they were saying was true and based off their own personal experience with the product. Ex. A, Jason Cardiff Declaration ¶¶91-92. The form said: All of the statements made are true and accurate, all of my on-screen representation, of the product [product], are of my own true story. Id.If the testimonialists lied about taking the product it was unbeknownst to the Cardiffs. |

**FTC Response to SUF 166:**  The Cardiffs' general denial does not dispute the specific evidence of a March 13, 2017 email from Eunjung Cardiff to Cannella attaching the talent releases for the three testimonialists. They also do not dispute that the infomercial was filmed before Eupepsia Thin was first sold to the public. See Dkt. 424-1, p. 13, ¶ 52. The Cardiffs also do not dispute the sworn declarations of the three testimonialists that they did not use Eupepsia Thin to

lose weight. They merely present argument about whether the Cardiffs knew the testimonials were fake. In fact, Jason Cardiff knew that the testimonialists had not used Eupepsia Thin to lose weight. See SUF 199.

| 167. Jason Cardiff and Eunjung Cardiff admit that Eunjung Cardiff's voice is heard in a recorded message promoting TBX-FREE. | J. Cardiff 2nd RFA Resp., p. 13-14, ¶ 105 (Sanger Dec. (PX-52), p. 1, ¶ 5 & p. 20-21 (Att. 2)).<br><br>E. Cardiff 2nd RFA Resp., p. 13, ¶ 99 (Sanger Dec. (PX-52), p. 2, ¶ 9 & p. 73 (Att. 6)).<br><br>See also Walker Dec., (PX-32), p. 6, ¶ 22; p. 19, ¶ 85 (identifying PX-1, Att. 125, as a ringless voicemail recording with the voice of Eunjung Cardiff that was sent to consumers).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 38, ¶¶ 111 & Dkt. 13, p. 66-77 (Atts. 125, 126). | Object as to lack of timeframe. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. These ads did not play after in or about February, 2018. Therefore denied after that date. |

**FTC Response to SUF 167:** The Cardiffs do not dispute that Eunjung Cardiff's

voice is heard in a recorded message promoting TBX-FREE, and admit that the ringless voicemail with her voice was delivered to consumers (see SUF 168). FTC SUF 167 clearly refers to Defendants' use of ringless voicemails, which Defendants ran from early 2018 (see SUF 856) to approximately July 2018 (Dkt. 441-4, p. 6, ¶ 21). Their post-February 2018 denial is based on irrelevant tv advertising airing dates and does not explain with specificity or evidence why the Cardiffs' earlier and current admissions that the voice is Eunjung Cardiff's should now be disregarded.

| | | |
|---|---|---|
| 168. Eunjung Cardiff's recorded message promoting TBX-FREE was delivered to consumers' voicemail boxes. | Walker Dec. (PX-32), p. 19, ¶¶ 83, 85. | Admit |
| 169. Eunjung Cardiff provided the voiceover for at least two Eupepsia Thin television advertisements. | Walker Dec. (PX-32), p. 6, ¶¶ 22, 24 (identifying the voice of Eunjung Cardiff in voiceovers in two Eupepsia commercials bates-stamped bates-stamped CANCARDIFF0000033 and CAN-CARDIFF0000046.<br><br>See also E. Cardiff 4th RFA Resp., p. 11-13, ¶¶ | Object as to lack of timeframe and relevance. Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for |

| | 310, 311, 315, 316 (Sanger Dec. (PX-52), p. 2, ¶ 11 & p. 108-109 (Att. 8)). | TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. These ads did not play after in or about February, 2018. Therefore denied after that date. |
|---|---|---|
| **FTC Response to SUF 169:** The Cardiffs do not dispute that Eunjung Cardiff provided the voiceover for two Eupepsia Thin tv advertisements and do not dispute the fact pre-February 2018.<br><br>The timeframe is the period Defendants advertised Eupepsia Thin on tv (2017-2018), and Eunjung Cardiff's participation in creating tv advertisements containing deceptive claims is relevant to her individual liability for injunctive and monetary relief. | | |
| 170.  Eunjung Cardiff had exclusive control of the log-ins for the Advanced Mens Institute, Run Away Products, and Redwood bank accounts. | Walker Dec. (PX-32), p. 2, ¶ 8 | Admit. |
| 171.  Eunjung Cardiff signed personal guarantees and confessions of | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 177 & Dkt. 24-12, p. 14 – Dkt. 24-13, p. 3 (Att. 212); | Admit. |

| | | |
|---|---|---|
| judgment guaranteeing the debt of Run Away, AMI, Redwood Scientific Technologies, and Identify. | Dkt. 24-13, p. 15 – Dkt. 24-14, p. 6 (Att. 214); Dkt. 22, p. 2-23 (Att. 215).<br><br>Yallen Dec. (PX-40), p. 2-3, ¶ 10, 14(c), 16(E) & p. 15, 30 (Att. 2); p. 137 (Att. 7); p. 141 Recital E (Att. 8) (personal guaranty of debt of Run Away).<br><br>Walker Dec. (PX-32), p. 18, ¶¶ 80-81 & p. 766, 768 (Att. 129) (confession of judgment for debt of Redwood Scientific Technologies, Inc., Identify LLC, AMI LLC, and other entities, signed by Eunjung Cardiff, individually and on behalf of the entities); p. 782, 784 (Att. 131) (confession of judgment for debt of Identify LLC, signed by Eunjung | |

| | | Cardiff, individually and on behalf of Identify; p. 816, 822 (Att. 132) (confession of judgment for debt of Redwood Scientific Technologies, Inc., and Identify, LLC, signed by Eunjung Cardiff, individually and on behalf of the entities) (pages out of order in the original). | |
|---|---|---|---|
| 172. | The Cardiffs transferred their Redwood Delaware common shares to Carols Place Limited Partnership. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 76, ¶ 202 & Dkt. 23, p. 76-77 (Att. 323).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 52-53, ¶ 147 & Dkt. 13-1, p. 133-150 (Att. 169). | Admit. |
| 173. | Eunjung Cardiff controlled the company banking and merchant accounts, and directed which bills to pay and | Rodoracio Dec. (PX-36), p. 5, ¶ 21. | Admit. |

| | | |
|---|---|---|
| when. | | |
| 174.  Facebook advertising for Redwood oral film strips was paid for using a credit card issued to Eunjung Cardiff in the name of Run Away Products. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 178 & Dkt. 22, p. 92-123 (Atts. 236-237).   Walker Dec. (PX-32), p. 10, ¶ 40. | Admit. |
| 175.  Eunjung Cardiff would then pay that card with Redwood funds and funds from other Cardiff companies as needed. | Walker Dec. (PX-32), p. 10, ¶ 40. | Admit. |
| 176.  Jason Cardiff and Eunjung Cardiff used corporate bank accounts to pay for automobiles leased from BMW, Porsche, and Bentley. | George Dec. (TRO PX-2), Dkt. 6, p. 10, ¶¶ 25-27. | Deny as to the Porsche. |
| **FTC Response to SUF 176:**  The Cardiffs' bald denial does not cite to any | | |

evidentiary support or explain their basis for disputing the FTC's forensic accountant's specific finding that between October 2015 and June 2018, 50 separate payments totaling $134,403.49 were made to Porsche, ranging from $2,297.37 to $3,006.33 each.

| 177. Jason Cardiff and Eunjung Cardiff charged luxury cruises, resort lodging, private charter air travel, and clothing and department store purchases to the credit cards of the coporate defendants and their related companies. | George Dec. (TRO PX-2), Dkt. 6, p. 11, ¶¶ 30-33. | Neither admit or deny, however it is true that Jason and Eunjung Cardiff received $335,000 of benefit from funds of Corporate Defendants. Dkt. 334-2 Declaration of Jason Cardiff ¶8b. This is undisputedly the only benefits Defendants received. *Id*. |

**FTC Response to SUF 177:**  The Cardiffs' use of the phrase "neither admit or [sic] deny" is the functional equivalent of not disputing the fact.

The Cardiffs' statement that they received "$335,000 of benefit from funds of Corporate Defendants" and that "[t]his is undisputedly the only benefits Defendants received" is argument that is, in fact, disputed by the FTC.  FTC's Statement of Genuine Disputes, Dkt. 490-1, p. 18, ¶ 26. See also Dkt. 423-2, p. 19-21, 52-53 (discussion of alter-ego in FTC's Motion for Summary Judgment).

| 178. Jason Cardiff and Eunjung Cardiff | J. Cardiff 4th RFA Resp., p. 7, ¶ 298 (Sanger Dec. | Admit |

| | | |
|---|---|---|
| admit that Eunjung Cardiff approved payment of Gawk's invoice for 1.5 million ringless voice mails. | (PX-52), p. 1, ¶ 7 & p. 58 (Att. 4)).<br><br>E. Cardiff 4th RFA Resp., p. 10, ¶ 301 (Sanger Dec. (PX-52), p. 2, ¶ 11 & p. 107 (Att. 8)).<br><br>See also Walker Dec, p. 19, ¶¶ 82, 84 & p. 924-927 (Atts. 141-142); p. 929-930 (Att. 144); p. 931, 934 (Att. 145) (Eunjung Cardiff paid $14,350 from an American Express card in her name and the name of Advanced Mens Institute).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 68-71 (Atts. 19-20). | |
| 179.  Eunjung Cardiff approved payment of $10,375 to Just Deliver It to allow | Walker Dec, p. 19, ¶¶ 82, 84 & p. 924-925 (Atts. 141); p. 928 (Att. 143); p. 931, 934 (Att. 145) | Admit |

| | | |
|---|---|---|
| Redwood to deliver ringless voicemail messages to consumers. | (Eunjung Cardiff paid $10,375 from an American Express card in her name and the name of Advanced Mens Institute). | |
| 180. Jason Cardiff and Eunjung Cardiff admit that Eunjung Cardiff approved payment of invoices to the foreign manufacturers of TBX-FREE and Eupepsia Thin oral film strips. | J. Cardiff 4th RFA Resp., p. 7, ¶ 299 (Sanger Dec. (PX-52), p. 1, ¶ 7 & p. 58 (Att. 4)) (Eunjung Cardiff approved payment to the foreign manufacturers of Eupepsia Thin oral film strips).<br><br>E. Cardiff 4th RFA Resp., p. 10, ¶¶ 302, 303 (Sanger Dec. (PX-52), p. 2, ¶ 11 & p. 107 (Att. 8)) (she approved payment to the foreign manufacturers of TBX-FREE and Eupepsia Thin oral film strips).<br><br>See also Walker Dec. (PX-32), p. 11, ¶ 50. | Admit |

| | | |
|---|---|---|
| 181.  Eunjung Cardiff approved the content of print ads for TBX-FREE, monitored their performance, and received reports about customer calls generated by print advertising and the resulting sales amounts. | Walker Dec. (PX-32), p. 10, ¶ 42 & p. 600-619 (Atts. 61-66). | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. Therefore denied after that date. At times prior to February, 2018, Defendants provided input as to the substance of the ads. |

**FTC Response to SUF 181:**  The Cardiffs do not dispute that Eunjung Cardiff approved and monitored print ads for TBX-FREE.

The time frames of November 2016 and January 2017 are evident from the cited emails sent by Eunjung Cardiff.

Eunjung Cardiff's participation in and control over the placement and monitoring of TBX-FREE print ads containing deceptive claims like "88% success rate," "Clinically Proven: New England journal of Medicine," and "smokers can now stop smoking with TBX-FREE" is relevant to her individual liability for injunctive and monetary relief.  See, e.g., Dkt. 426-1, p. 25.

| | | |
|---|---|---|
| 182.  Redwood Scientific Technologies, Inc. ("Redwood") retained Cannella | Adkinson-Connor Dec. (PX-38), p. 1, ¶ 5. | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in |

| | | |
|---|---|---|
| Response Television ("Cannella"), to place television advertising on TV networks for TBX-FREE, Eupepsia Thin, Prolongz, and other products. | | or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. Therefore denied after that date. At times prior to February, 2018, Defendants provided input as to where and when advertising would run. |
| 183.  At Redwood's request, Cannella purchased media time for Redwood to advertise these products across the United States. | Adkinson-Connor Dec. (PX-38), p. 1, ¶ 5. | |
| 184.  Most of the ads for which Cannella purchased media time on behalf of Redwood were long-form ads lasting 28 minutes and 30 seconds (28:30). | Adkinson-Connor Dec. (PX-38), p. 3-4, ¶ 13. | |
| **FTC Response to SUF 182-184:**  The Cardiffs do not dispute that they hired Cannella to place tv advertising across the United States. | | |

The timeframe is Redwood's business relationship with Cannella (2014-2018).

The fact that Redwood advertised nationwide is relevant to proving that their deceptive claims were widely disseminated.

| | | |
|---|---|---|
| 185.  Defendants paid an online contractor $130 to gather articles about the main ingredient in TBX-FREE as "substantiation" of the product's efficacy for smoking cesstion. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 121-122 (Att. 001).  See also Walker Dec. (PX-32), p. 10, ¶ 43 (at Jason Cardiff's direction, she found an online copywriter to help gather articles about product ingredients). | Admit |
| 186.  The FTC has published guidance on certain weight loss claims that experts say cannot be true, which are referred to as "gut check claims." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 18 & Dkt. 10, p. 69 (Att. 030). | Admit |
| 187.  The seven "gut check claims" include claims that a product causes | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 18 & Dkt. 10, p. 69, 71-72 (Att. 030). | Admit |

| | | |
|---|---|---|
| weight loss of two pounds or more a week for a month or more without dieting or exercise, or that it causes substantial weight loss for all users. | | |
| 188.  Several of the claims used to promote Eupepsia Thin were "gut check claims." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 18 & Dkt. 10, p. 69-75 (Att. 030).<br><br>SUF 485, 486, 488, 493, 496, 499, 506, 508, 520, 522. | Object as to lack of timeframe and irrelevant. Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, |
| 189.  In April 2017, Jason Cardiff was told that the head of underwriting at the bank RMS had noted that claims that you do not have to change your habits and you will miraculously lose weight was one of | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 89 (Att. 30). | and 46-53 The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. |

| | | |
|---|---|---|
| the FTC's and the FDA's top indicators of a problem product. | | Therefore denied after that date. |
| 190.  In April and May 2017, Jason Cardiff received an email noting that the bank RMS had expressed concerns that claims being made for Eupepsia Thin were similar to claims that the FTC had identified as false and misleading "gut check" claims, including claims the product caused weight loss of two pounds or more a week for a month or more without dieting or exercise. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 174 & Dkt. 24-9, p. 6-7 (Att. 197).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 90-92 (Att. 31). | |

**FTC Response to SUF 188-190:**  The Cardiffs do not dispute that several of their Eupepsia Thin claims were "gut check claims," or that Jason Cardiff had been informed that claims like "you do not have to change your habits and you

will miraculously lose weight" were one of the FTC's and FDA's top indicators of a problem product, and that RMS bank had concerns about Defendants' use of those claims.

The timeframe of April and May 2017 is evident from the facts themselves and the cited emails.

The Cardiffs did not cease advertising Eupepsia Thin in February 2018. SUF 938.

Jason Cardiff's knowledge of RMS's concerns over the gut check claims is relevant to his individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 191. Defendants hired an online contract researcher to gather articles on the listed active ingredient in Eupepsia Thin as "substantiation" of the product's efficacy as a weight loss aid, for which she was paid $130. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 126-128 (Att. 001).<br><br>Walker Dec. (PX-32), p. 10, ¶ 43. | Admit. |
| 192. In March 2017, Cannella's account manager sent | Adkinson-Connor Dec. (PX-38), p. 10-11, ¶ 43 & p. 738-758 (Atts. 18-19). | Object to this statement as irrelevant. The Cardiffs decided to stop |

| | | |
|---|---|---|
| Eunjung Cardiff information about an FTC lawsuit relating to deceptive weight-loss claims and a copy of the FTC's publication, "Gut Check: A Reference Guide for Media on Spotting False Weight Loss Claims," and Eunjung Cardiff replied "we will take this under advisement." | | all paid advertising for its products in or about February, 2018 in response to the FTC CID. Advertising was stopped on January 28, 2018. Dkt. 429-1 PX 38 at 101-102. Additionally, the Cardiffs modified the website for its products eliminating many of these claims. Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. |
| 193. Eunjung Cardiff told the Cannella Account Manager who sent her the FTC's "Gut Check" publication that she wanted to send the Eupepsia Thin ad "to all the networks " and | Adkinson-Connor Dec. (PX-38), p. 10-11, ¶ 43 & p. 756-758 (Att. 19). | |

| asked "[w]hich networks do you think are the most lenient." | | |
|---|---|---|
| **FTC Response to SUF 192-193**: The Cardiffs do not dispute that Cannella informed Eunjung Cardiff of an FTC weight-loss law enforcement action and forwarded her the FTC's publication "Gut Check" claims. They also do not dispute that Eunjung Cardiff's response to receiving that information was to seek out the "most lenient" tv networks to place Eupepsia Thin advertising.<br><br>Eunjung Cardiff's knowledge that Gut Check claims could invite scrutiny from the FTC and interest in placing Eupepsia Thin advertising on "lenient" tv networks is relevant to her individual liability for injunctive and monetary relief. | | |
| 194.  Jason Cardiff and Eunjung Cardiff each admit that during the time Eupepsia Thin was being advertised as an effective appetite suppressant, they knew that Defendants did not possess any human clinical studies conducted on Eupepsia Thin that | J. Cardiff 3rd RFA Resp., p. 18, ¶ 201 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 41 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 15, ¶ 195 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 90 (Att. 7)). | Admit, however Defendants contend that there were human clinical studies and other published materials relating to the active ingredients of Eupepsia Thin. Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs and genes related to this process (Lima et al., 2017) or an |

| | | |
|---|---|---|
| showed Eupepsia Thin to be an effective appetite suppressant. | | increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, are widely used for weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20. |
| 195. Jason Cardiff and Eunjung Cardiff each admit that during the time Eupepsia Thin was being advertised as an effective weight loss aid, they knew that Defendants did not possess any human clinical studies conducted on Eupepsia Thin that showed Eupepsia Thin to be an effective weight loss aid. | J. Cardiff 3rd RFA Resp., p. 19, ¶ 207 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 42 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 16, ¶ 201 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 91 (Att. 7)). | |
| 196. Jason Cardiff and Eunjung Cardiff each admit that during the time Eupepsia Thin was being advertised as a clinically proven | J. Cardiff 3rd RFA Resp., p. 19, ¶ 209 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 24 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 16, ¶ 203 | |

| | | |
|---|---|---|
| weight loss aid, they knew that Defendants did not possess any human clinical studies conducted on Eupepsia Thin that showed Eupepsia Thin to be an effective weight loss aid. | (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 91 (Att. 7)). | |
| **FTC Response to SUF 194-196:** The Cardiffs admit that during the time Eupepsia Thin was being advertised as a clinically proven weight loss aid, they knew that they did not possess any human clinical studies conducted on Eupepsia Thin proving its efficacy. Their additional narrative and attempt to play experts is argument and should be disregarded. | | |
| 197.  On March 16, 2017, Eunjung Cardiff directed Redwood's account manager at Cannella to go to www.thinliferx.com to access "clinical studies" that purportedly substantiated claims in Eupepsia | Adkinson-Connor Dec. (PX-38), p. 11, ¶ 44 & p. 759 (Att. 20). | Admit |

| | | |
|---|---|---|
| | Thin advertising. | |
| 198. | On April 7, 2017, Cannella's account manager informed Eunjung Cardiff that "A&E networks is asking if you have "independent studies for Eupepsia," and Eunjung Cardiff replied "All the clinicals are done on the active ingredients- there really isn't anything more to test." | Adkinson-Connor Dec. (PX-38), p. 11, ¶ 45 & p. 760-761 (Att. 21). | Admit |
| 199. | Jason Cardiff knew that the testimonialists had not used Eupepsia Thin to lose weight. | Sands 3rd Dec. (PX-51), p. 3, 17, ¶¶ 9, 50 & p. 38-39 (Att. 3). | Deny. Deny. Jason Cardiff did not "instruct" Ty Sherrell about what to tell the testimonials to say in Redwood's television advertising. Cardiff instructed Sherrill to locate indiguicals who took the products and |

| | | were willing to provide a testimonial. Ex. A, Jason Cardiff Declaration ¶¶91-94. |
| | | Deny. The Cardiffs ensured that the testimonials were real and from the person who said them. The Cardiffs had each testimonialist sign a form that indicated that what they were saying was true and based off their own personal experience with the product. Ex. A, Jason Cardiff Declaration ¶¶92-93. The form said: All of the statements made are true and accurate, all of my on-screen representation, of the product [product], are of my own true story. Id. If the testimonialist lied about not using Eupepsia Thin, it was unbeknownst to the Cardiffs. |

**FTC Response to SUF 199:**  The Cardiffs' general denial does not dispute the cited evidence of Jason Cardiff's February 1, 2017 email acknowledgement, "Love it big time; Ty you are great" in response to an email from Eupepsia Thin infomercial director Ty Sherrell stating: "[I] am working on getting testimonials from people who have already lost weight and I'm getting before pictures for them… they will still have the product and do the testimonials but ill [sic] have before pictures from their past fat lives lol // this is what you pay me for uncle jason, to use my [expletive deleted] brain."

The Cardiffs also do not dispute that the infomercial was filmed before Eupepsia Thin was first sold to the public. See Dkt. 424-1, p. 13, par. 52. Nor do they dispute the sworn declarations of three testimonialists that they did not use Eupepsia Thin to lose weight.  See SUF 166.

| | | |
|---|---|---|
| 200.  Jason Cardiff and Eunjung Cardiff instructed staff how to deal with Better Business Bureau complaints. | Carranza Dec. (PX-33), p. 6, ¶ 24. | Deny. This responsibility was Danielle Walker's. Ex. A, Jason Cardiff Declaration ¶97. |

**FTC Response to SUF 200:**  The Cardiffs do not dispute that they gave instructions to Redwood employee Tracy Carranza on "how to deal with BBB complaints," but merely claim that this was a responsibility of Danielle Walker.

| | | |
|---|---|---|
| 201.  Jason Cardiff and Eunjung Cardiff created the content of the Rengalife website, www.rengalife. | Walker Dec. (PX-32), p. 21, ¶¶ 88, 94-95 & p. 956-979 (Atts. 149-155).. | Object, not a material fact. Defendants ceased developing "Rengalife" in or about July, 2018. Dkt. 253-1 Declaration of Jason Cardiff ¶17. |

| | | |
|---|---|---|
| com, with the assistance of Redwood employees. | | Rengalife was a program that lasted and was advertised for about 45 days. Rengalife was started the end of march and we stopped advertising and the program itself at the beginning of May. Ex. A, Declaration of Jason Cardiff ¶84. No consumers acquired any membership from Rengalife. *Id.* at ¶85. Rengalife was created in order to create a big word of mouth network to help advertise the products of Redwood because we had stopped television marketing and modified our websites drastically. *Id.* at ¶86. Rengalife was never an active program. Redwood never made sales or had any customers because market research indicated |
| 202. Eunjung Cardiff came up with the name "Rengalife." | Walker Dec. (PX-32), p. 21, ¶ 94. | |
| 203. Jason Cardiff promoted Rengalife using email messages to consumers who had previously purchased Redwood oral film strips. | Sands 2nd Dec. Dkt. 277-4, p. 3-4, ¶ 7 & p. 13-15 (Att. 7). Walker Dec. (PX-32), p. 20, ¶ 88 & p. 960 (Att. 151). | |
| 204. Jason Cardiff signed Rengalife promotional and customer order confirmation emails, and spoke directly with Rengalife members who had questions or complaints about the program. | Ziolkowski Dec. (PX-49), p. 1-2, ¶¶ 5, 11 & p. 3, 4-5, 7-9 (Att. 1, 2, 4, 5) (emails signed by Jason Cardiff). | |
| 205. Some of the | Walker Dec. (PX-32), p. | |

| Rengalife videos were filmed in Redwood's office, and some were filmed in the Cardiffs' home. | 20, ¶ 89. | it was not a viable company. Ex. A, Declaration of Jason Cardiff ¶37. |
|---|---|---|

**FTC Response to SUF 201-205:** The Cardiffs do not dispute that they conceived of Rengalife, that Eunjung Cardiff chose the name, that Jason Cardiff personally marketed Rengalife and talked to its members, and that some of the Rengalife videos were filmed in the Cardiffs' home.

The cited paragraphs of Jason Cardiff's declaration contain general statements with no evidentiary citations and therefore fail to create a genuine issue of material fact about the specific examples of the Cardiffs' involvement in and control over Rengalife, including the sworn declaration of a Rengalife member who spent over $1,000 on Rengalife products and who spoke with Jason Cardiff several times and complained to him that he had been overcharged for product.

The facts about the Cardiffs' involvement in creating Rengalife advertising messages are material their individual liability for injunctive and monetary relief.

| 206. Jason Cardiff and Eunjung Cardiff had ultimate authority for making all Redwood business decisions, including signing | Walker Dec. (PX-32), p. 3, ¶ 13.<br><br>Melendez Dec. (PX-35), p. 6-7, ¶ 24 (managers did not have much leeway; Jason and Eunjung Cardiff made all | Deny. Danielle Walker had authority to make decisions on contracts, expenses, advertising, etc. when Jason and Eunjung Cardiff were not readily available, such as when Jason Cardiff |

| contracts, approving expenses, creating and approving advertising, placing advertising on television networks and social media, opening and managing bank and merchant accounts, and setting and enforcing company policies concerning autoship programs and customer refunds. | the decisions). Wu Dec. (PX-37), p. 3, ¶ 14 (Jason Cardiff approved all product claims and had final approval of all advertising). Rodoracio Dec. (PX-36), p. 1, ¶ 5; p. 5, ¶ 21. | traveled and was gone months at a time. Ex. 1, Jason Caridff Declaration ¶¶96-97. |
|---|---|---|

**FTC Response to SUF 206:** The Cardiffs' general denial does not provide any examples or evidence of Danielle Walker making decisions on "contracts, expenses, or advertising."  See also Dkt. 428-3, p. 2 ("Danielle Cadiz was responsible for making sure people carried out the Cardiffs' directions"); Dkt. 428-1, p. 2 ("Whenever Danielle told me to do something, I knew it was a directive coming from Jason or Eunjung Cardiff. For my position, everything had to be approved by Jason Cardiff.").

The Cardiffs cite to Jason Cardiff's declaration, where he claims that they split time between California and New York but states that they only had an

apartment in New York until "2016 some time." This general, time-limited statement is unsupported by any evidence of 4-6 week stints in New York and does not address the specific recollections of former Redwood employees for the period after 2016 that Jason Cardiff was in the office nearly every day and Eunjung Cardiff every week. See Dkt. 428-3, p. 2, ¶ 4; Dkt. 428-4, p. 2, ¶ 5; Dkt. 428-1, p. 2, ¶ 6.

*C. Corporate Defendants*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 207.   Redwood Scientific Technologies, Inc. ("Redwood California") is a California corporation that had its principal place of business at 820 N. Mountain Ave., Upland, California 91786 as of October 12, 2018. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 92-93 (Att. 001). <br><br> Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50-51, ¶¶ 135-137 & Dkt. 13, p. 168-171 (Atts. 157-159). <br><br> Walker Dec. (PX-32), p. 2, ¶ 9 & p. 36-40 (Atts. 7-10). | Admit. |
| 208.   Redwood California was previously located at 250 W. 1st St., Claremont, CA 91711. | Walker Dec. (PX-32), p. 2, ¶ 9 & p. 37-39 (Atts. 8-9). | Admit. |

-116-

| | | | |
|---|---|---|---|
| 209. | Advanced Men's Institute Prolongz LLC ("AMI") was a California limited liability company formed on January 30, 2014 with its principal place of business at 250 W. 1st St., Claremont, CA, 91711. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 93 (Att. 001).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 58, ¶¶ 160-162 & Dkt. 24-2, p. 5-7 (Att. 181-183).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 32 (Att. 3).<br><br>Yallen Dec. (PX-40), p. 2, ¶ 6 & p. 74 (Att. 5). | Admit. |
| 210. | AMI changed its name to Redwood Scientific Technologies LLC in November 2014. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 92-93 (Att. 001).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶¶ 138-139 & Dkt. 13, p. 172-173 (Atts. 160, 161).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 35 (Att. 6).<br><br>Yallen Dec. (PX-40), p. | Admit. |

| | | | |
|---|---|---|---|
| | | 2, ¶ 6 & p. 77 (Att. 5); p. 125 (Att. 6). | |
| 211. | Redwood Scientific Technologies, LLC then converted to the corporate form, Redwood Scientific Technologies, Inc. ("Redwood California"). | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 92-93 (Att. 001).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶¶ 138-139 & Dkt. 13, p. 172-173 (Att. 160, 161).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 36 (Att. 7).<br><br>Yallen Dec. (PX-40), p. 2, ¶ 6 & p. 78-80 (Att. 5); p. 125 (Att. 6) | Admit. |
| 212. | Redwood Scientific Technologies, Inc. ("Redwood Nevada") was incorporated in Nevada in December 2014. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 140 & Dkt. 13, p. 174 – Dkt. 13-1, p. 4 (Att. 162).<br><br>Walker Dec. (PX-32), p. 2, ¶ 9 & p. 41 (Att. 11). | Admit. |
| 213. | In response to the Commission's Civil Investigative | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 94-95 (Att. | Admit. |

| | | | |
|---|---|---|---|
| | Demand, Redwood California stated on April 4, 2018 that it was a wholly-owned subsidiary of Redwood Nevada. | 001). | |
| 214. | The Nevada Secretary of State listed 250 W. 1st St., Claremont, #310, California 91711, as the address for all Redwood Nevada officers and directors. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶¶ 140-141 & Dkt. 13, p. 174 – Dkt. 13-1, p. 6 (Att. 162-163). | Admit. |
| 215. | Redwood California acquired Redwood California through a "share exchange" on January 6, 2015. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 142 & Dkt. 13-1, p. 13 (Att. 164). | Admit. |
| 216. | As of March 27, 2018, Defendants were still using Redwood Nevada to raise money for their operations. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 63-64, ¶ 182 & Dkt. 25-2, p. 27 – Dkt. 25-3, p. 6 (Att. 346). | Admit. |
| 217. | On December 29, | Sands 1st Dec. (TRO PX- | Admit. |

| | | | |
|---|---|---|---|
| | 2017, Redwood Nevada merged into an existing Delaware corporation, Greenway Design Group, Inc., and changed its name to Redwood Scientific Technologies, Inc., a Delaware corporation. | 1), Dkt. 7, p. 51-52, ¶ 143 & Dkt. 13-1, p. 109 (Att. 165). <br><br> Walker Dec. (PX-32), p. 2, ¶ 9 & p. 150 (Att. 14). | |
| 218. | Redwood Scientific Technologies, Inc. ("Redwood Delaware") is a Delaware corporation with its principal place of business at 820 N. Mountain Ave., Upland, California 91786. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 52-53, ¶ 147 & Dkt. 13-1, p. 133 (Att. 169). | Admit. |
| 219. | Disclosure documents filed by Redwood Delaware identified the Cardiffs as owners | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 52-53, ¶ 147 & Dkt. 13-1, p. 133, 144-145 (Att. 169).  As noted in Sands 1st Dec. (TRO | Admit. |

| | | | |
|---|---|---|---|
| of nearly 97% of Redwood Delaware, with their ownership shares titled under Carols Place Limited Partnership and True and Honesty, LLC. | PX-1), Dkt. 7, p. 52-35, ¶ 147, the disclosure document contains hidden text, which is only viewable if the text is highlighted and then copy-and-pasted into a separate document. | |
| 220. | True and Honesty, LLC is a Wyoming entity created in 2017. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 53-54, ¶¶ 149-150 & Dkt. 13-1, p. 151-154 (Att. 170); Dkt. 24, p. 2-3 (Att. 171). | Admit. |
| 221. | Run Away Products, LLC ("Run Away") is a New York limited liability company formed on March 10, 2009. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 58-59, ¶ 163 & Dkt. 24-2, p. 8-9 (Att. 184).<br><br>Yallen Dec. (PX-40), p. 1, 2, ¶¶ 5, 6 & p. 72 (Att. 4); p. 81-83 (Att. 6). | Admit. |
| 222. | Run Away was registered in California as a foreign Limited Liabilty Company in November 2011. | Yallen Dec. (PX-40), p. 2, ¶ 6 & p. 72 (Att. 4). | Admit. |

| 223. | Run Away's California address as of March 2014 was 250 W. 1st St., Claremont, CA, 91711. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 59, ¶ 164 & Dkt. 24-2, p. 10-11 (Att. 185). <br><br> Yallen Dec. (PX-40), p. 2, ¶ 6 & p. 72 (Att. 4). | |
| 224. | Run Away is the manager of AMI. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 58, ¶ 162 & Dkt. 24-2, p. 7 (Att. 183). <br><br> Walker Dec. (PX-32), p. 2, ¶ 9 & p. 34 (Att. 5). <br><br> Yallen Dec. (PX-40), p. 2-3, ¶¶ 6, 13 & p. 7 (Att. 5); p. 127 (Att. 6). | Admit. |
| 225. | Identify LLC is a Wyoming limited liability company. | Walker Dec. (PX-32), p. 3, ¶ 11 & p. 194-197 (Atts. 19-20). | Admit. |
| 226. | Carols Place Limited Partnership is an Arizona asset management limited partnership formed on January 23, 2017. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 59, ¶ 166 & Dkt. 24-3, p. 1 (Att. 187). | Admit. |
| 227. | Carols Place | Sands 1st Dec. (TRO PX- | Admit. |

| | | | |
|---|---|---|---|
| | Limited Partnership owns 66% of Redwood Nevada's stock. | 1), Dkt. 7, p. 52, ¶ 146 & Dkt. 13-1, p. 118 (Att. 168). | |
| 228. | Carols Place Limited Partnership holds 99.9% of Jason and Eunjung Cardiff's common shares in Redwood Delaware. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 52-53, ¶¶ 147-148 & Dkt. 13-1, p. 133, 144-145 (Att. 169). | Admit. |
| 229. | The two partners of Carols Place Limited Partnership are Carols Place Trust and Extension First, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 173 & Dkt. 24-9, p. 3-5 (Att. 196). | Admit. |
| 230. | Extension First, LLC is a Wyoming limited liability company formed on January 13, 2017. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 59-60, ¶ 167 & Dkt. 24-3, p. 2-5 (Att. 188). | Admit. |
| 231. | Jason Cardiff and Eunjung Cardiff are the members of Extension First, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 173 & Dkt. 24-9, p. 3 (Att. 196). | Admit. |
| 232. | As of October 12, | Order Denying | Admit, however the sales |

| | | |
|---|---|---|
| 2018, Defendants were still selling TBX-FREE, Eupepsia Thin, and Prolongz. | Defendants' Motion For Relief From Preliminary Injunction, p. 4-5 (Dkt. 305).<br><br>Kane Dec., Dkt. 277-1, p. 2-3, ¶¶ 2-7 (Temporary Receiver found ongoing business and large amounts of inventory when immediate access was executed on October 12, 2018).<br><br>Garcia Dec. p. 4-5, ¶ 17 & p. 20, 27 (Att. 7) (sale made on October 12, 2018).<br><br>See also Walker Dec. (PX-32), p. 21-22, ¶ 98 (still selling Prolongz, TBX-FREE, and Eupepsia Thin as of July 2018). | did not violate the FTC Act as set out in Defendants brief. |

**FTC Response to SUF 232:**  The Cardiffs admit that as of October 12, 2018, Defendants were still selling TBX-FREE, Eupepsia Thin, and Prolongz.  The remaining narrative should be disregarded as argument.

| | | | |
|---|---|---|---|
| 233. | Jason Cardiff and Eunjung Cardiff both stated in sworn declarations that "Redwood was in the business of marketing several different homeopathic dissolvable thin-film strip products; a stop smoking aid (TBX-FREE), an appetite suppressant (Eupepsia Thin), and a men's sexual performance product (Prolongz)." | Dkt. 265-2 (Declaration of Jason Cardiff Regarding Motion to Dissolve Preliminary Injunction), p. 2, ¶ 5.<br><br>Dkt. 265-3 (Declaration of Eunjung Cardiff Regarding Motion to Dissolve Preliminary Injunction), p. 2-3, ¶ 5. | Admit. |
| 234. | Jason Cardiff and Eunjung Cardiff both stated in sworn declarations that "Redwood marketed its products to consumers primarily by | Dkt. 265-2 (Declaration of Jason Cardiff Regarding Motion to Dissolve Preliminary Injunction), p. 3, ¶ 7.<br><br>Dkt. 265-3 (Declaration of Eunjung Cardiff Regarding Motion to | Admit. |

| creating and running info-commercials on television stations in selected markets in the U.S. by contracting with outside paid marketing media, companies to place the ads on TV stations." | Dissolve Preliminary Injunction), p. 3, ¶ 7. | |

### D. Common Enterprise

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 235. Corporate Defendants Redwood Nevada, Redwood California, AMI, and Run Away shared space at 250 W. 1st St., Claremont, CA. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 142 & Dkt. 13-1, p. 7 (Att. 164) (Redwood Nevada). <br><br> Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50, ¶¶ 135-136 & Dkt. 13, p. 168-169 (Atts. 157-158) (Redwood California). <br><br> Sands 1st Dec. (TRO PX- | Admit. |

| | | |
|---|---|---|
| | 1), Dkt. 7, p. 58, ¶¶ 160-162 & Dkt. 24-2 p. 5-7 (Atts. 181-183) (AMI).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 59, ¶ 164 & Dkt. 24-2, p. 10 (Att. 185) (Run Away). | |
| 236. Redwood California, Redwood Delaware, Identify, AMI, and Run Away shared a common space at 820 North Mountain Ave., Upland, CA 91786. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 137 & Dkt. 13, p. 170 (Att. 159) (Redwood California).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 52-53, ¶ 147 & Dkt. 13-1, p. 133 (Att. 169) (Redwood Delaware)<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 55, ¶ 155 & Dkt. 24, p. 17 (Att. 176) (Identify).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 178 & Dkt. 22, p. 92, 105 (Att. 236, 237) (Run Away). | Admit. |

| | | |
|---|---|---|
| | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 63, ¶ 181 & Dkt. 23, p. 49 (Att. 280) (AMI). | |
| 237.  Corporate Defendants AMI, Run Away, Redwood California, and Identify all participated in advertising TBX-FREE, Eupepsia Thin, and Prolongz. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 7-9, ¶¶ 19-22 & Dkt. 10, p. 76-79 (Atts. 031-032) (Redwood).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 51, ¶ 142 & Dkt. 13-1, p. 7, 97 (Att. 164) ("Runaway Products . . . purchases media for" Redwood).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 63, ¶ 181 & Dkt. 23, p. 60-69 (Atts. 281-286) (AMI, Run Away).<br><br>George Dec. (TRO PX-2), Dkt. 6, p. 5-6, ¶ 12 (Redwood, Identify, Run Away). | Admit. |

| | | |
|---|---|---|
| 238. | AMI, Run Away, Redwood California, and Identify all applied for and obtained merchant accounts to process payments for TBX-FREE, Eupepsia Thin, and Prolongz. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 34-35, ¶ 104 & Dkt. 13, p. 22-23 (Att. 115) (Run Away, AMI, and Redwood); Dkt. 7, p. 62, ¶ 176 & Dkt. 24-11, p. 15 – Dkt. 24-12, p. 6, (Att. 207) (Redwood); Dkt. 7, p. 62, ¶ 177 & Dkt. 24-13, p. 5, (Att. 213) (Identify). <br><br> George Dec. (TRO PX-2), Dkt. 6, p. 3-4, ¶ 9. | Admit. |
| 239. | Identify, Redwood Scientific Technologies, Run Away, and AMI all participated, as buyers or consignees, in purchasing oral film strips from Defendants' Chinese and Indian suppliers. | Walker Dec. (PX-32), p. 11, ¶ 49 & p. 622-656 (Atts. 68-82). <br><br> George Dec. (TRO PX-2), Dkt. 6, p. 5-6, ¶ 12. <br><br> See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 63, ¶ 181 & Dkt. 23, p. 72-77 (Atts. 289-291). | Admit. |
| 240. | In March 2018, Jason Cardiff | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 63, ¶ 181 & | Admit. |

| | | |
|---|---|---|
| signed as President of Identify LLC a statement attesting that:<br>  IT IS HEREBY DECLARED THAT THE FOLLOWING COMPANIES ARE OUR GROUP OF COMPANIES (OUR SISTER CONCERN COMPANIES):<br>**I.   IDENTIFY LLC**<br>**II.**<br>**REDWOOD SCIENTIFIC**<br>**III.**<br>**TECHNOLOG IES, INC**<br>**RUN AWAY PRODUCTS LLC**<br>**IV.**<br>   **ADVANCE [sic] MENS INSTITUT E** | Dkt. 23, p. 70-71 (Atts. 287-288).<br><br>Walker Dec. (PX-32), p. 11-12, ¶ 51 & p. 64 (Att. 81).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 77 (Att. 23). | |
| 241.  Because Redwood | Walker Dec. (PX-32), p. | Object as irrelevant. |

| | | |
|---|---|---|
| used so many different company names to order and pay for the oral strips, Aavishkar, the Indian company that manufactured some of Redwood's oral film strips, had requested a signed statement clarifying that all of the companies whose names appeared on invoices were related. | 11-12, ¶ 51 & p. 653 (Att. 80). | Whether one company confused the Corporate Defendants does not matter. |

**FTC Response to SUF 241:**  The Cardiffs do not dispute that Aavishkar, the Indian supplier of some of their film strips, requested a signed statement that various Cardiff corporate entities whose names appeared on invoices were related.

The Cardiffs' relevance objection incorrectly suggests that Aavishkar was confused about the Corporate Defendants.  In fact Aavishkar's request clearly states that it was the supplier's bank that was requesting the declaration because "the Invoicing is in the name of Identify LLC, but the payment is [coming] from various accounts."  Dkt 426-1, p. 70.

| | | |
|---|---|---|
| SUF 241 is relevant to the Commission's allegation that the Corporate Defendants operated as a common enterprise. | | |
| 242.  Eunjung Cardiff asked Redwood's Director of Operations for confirmation that the certification had been sent to Aavishkar. | Walker Dec. (PX-32), p. 11-12, ¶ 51 & p. 655-656 (Att. 82). | Object as to relevance as well as vague. Unclear what certification is referring to, and thus cannot admit nor deny. |

**FTC Response to SUF 242:**  The Cardiffs do not dispute that Eunjung Cardiff asked Redwood's Director of Operations to confirm that Aavishkar had received the certification it had requested.

SUF 242 is not vague, as the certification Eunjung Cardiff wanted to be sure had been sent to Aavishkar is clearly the one requested by the supplier.  In fact, Eunjung Cardiff's question to her Director of Operations "Did you take care of this?," is in the same email chain as Aavishkar's original  request. Dkt. 426-1, p. 72.

SUF 242 is relevant to the Commission's allegation that the Corporate Defendants operated as a common enterprise and the Cardiffs' "cannot admit or deny" response " is the functional equivalent of not disputing the fact.

| | | |
|---|---|---|
| 243.  Danielle Walker worked for Jason Cardiff from 2010 to 2018. | Walker Dec. (PX-32), p. 1, ¶ 5. | Admit |

| | | |
|---|---|---|
| 244. Eunjung Cardiff joined the business in 2011. | Walker Dec. (PX-32), p. 1 ¶ 5. | Admit |
| 245. In 2014, Run Away Products usually paid for goods and services using bank accounts in the name of Advanced Men's Institute Prolongz, LLC. | Walker Dec. (PX-32), p. 2, ¶ 7. | Admit |
| 246. Jason Cardiff and Eunjung Cardiff also used bank accounts belonging to Identify, People United For Christians, and TV Sales to meet operational costs. | Walker Dec. (PX-32), p. 2, ¶ 7. | Objection, vague. However, Eunjung Cardiff used different bank accounts to ensure that her employees were getting. Ex. 2, Eunjung Declaration ¶40. |
| **FTC Response to SUF 246:** The Cardiffs do not dispute that they used bank accounts belonging to Identify, People United For Christians, and TV Sales to meet operational costs.<br><br>The Cardiffs do not specify what in SUF 246 is supposedly vague, and they admit that Eunjung Cardiff used various bank accounts for payroll expenditures. | | |
| 247. The Cardiffs continued using the | Walker Dec. (PX-32), p. 2-3, ¶ 10. | Admit |

| | | |
|---|---|---|
| AMI name to purchase oral film strips from Chinese and Indian manufacturers, even after AMI changed its name to Redwood Scientific Technologies, LLC, and then to Redwood Scientific Technologies, Inc. | | |
| 248. The Cardiffs continued using the AMI name to purchase oral film strips from Chinese and Indian manufacturers because AMI had been used to register the film strips as unapproved homeopathic drugs with the U.S. Food | Walker Dec. (PX-32), p. 2-3, ¶ 10. | Deny as to any insinuation that over the counter homeopathic drugs needed registration with the US FDA. |

| | | |
|---|---|---|
| and Drug Administration. | | |

**FTC Response to SUF 248:**  The Cardiffs do not dispute that they continued to use AMI's name to purchase oral film strips from Indian and Chinese suppliers because AMI had been used to register the strips as unapproved homeopathic drugs with U.S. Food and Drug Administration.

| 249.  Redwood (California), Redwood (Nevada), and Redwood (Delaware) were "all a single business operation marketing oral film strips." | Walker Dec. (PX-32), p. 2, ¶ 9. | Deny, only Redwood California did marketing. |
|---|---|---|

**FTC Response to SUF 249**:  The Cardiffs provide no evidence – not even a citation to a declaration – as support for their denial of SUF 249, nor do they explain the distinct functions the three different entities that shared the Redwood Scientific Technologies name (CA, NV, DE) supposedly performed. Accordingly, they have not established a genuine dispute of material fact.

Furthermore, their denial takes a single word in SUF 249 – "marketing" – out of context, rather than address the actual fact set forth above:  that the three Redwood entities "were 'all a single business operation marketing oral film strips.'"

Finally, the Cardiffs' denial is contradicted by their admission of SUF 274:

"Defendants Run Away, AMI, Redwood California, Redwood Nevada, and Redwood Delaware marketed at least the following oral thin film products: TBX-FREE, Eupepsia Thin, Prolongz…." Dkt. 491-1, p. 12.

| 250. Regardless of the corporate name being used, Danielle Walker and other employees always followed the Cardiffs' orders. | Walker Dec. (PX-32), p. 3, ¶ 13. | Deny as to overly broad and vague. Deny[] Jason Cardiff was gone for months at a time and Danielle Walker was in charge of all day to day operations and major decisions. Ex. A, Declaration of Jason Cardiff ¶¶96-97. |
|---|---|---|

**FTC Response to SUF 250:** The Cardiffs' general denial fails to specify or provide documentation for their assertion that they were "gone for months at a time," and their assertion that "Danielle Walker was in charge of all day to day operations and major decisions" is contradicted by detailed sworn declarations of former Redwood employees identifying Jason and Eunjung Cardiff as the ultimate decisionmakers for important business decisions. See Dkt. 428-3, p. 2 ("Danielle Cadiz was responsible for making sure people carried out the Cardiffs' directions"); Dkt. 428-1, p. 2 ("Whenever Danielle told me to do something, I knew it was a directive coming from Jason or Eunjung Cardiff. For my position, everything had to be approved by Jason Cardiff.").

| 251. Redwood employees sometimes received their salary from People | Melendez Dec. (PX-35), p. 1, ¶ 5 (Run Away and People United for Christians). | Objection, vague. However, Eunjung Cardiff used different bank accounts to ensure that her employees were |
|---|---|---|

| United for Christians, Run Away Products, or TV Sales. | Garcia Dec. (PX-34), p. 4, ¶ 14 & p. 18-19 (Att. 5, 6) (she was paid from bank accounts for People United for Christians and TV Sales, as well as Redwood).<br><br>Carranza Dec. (PX-33), p. 1, ¶ 7.<br><br>Rodoracio Dec. (PX-36), p. 1, ¶ 3. | getting paid and would reconcile them at a different time. Ex. 2, Eunjung Declaration ¶40. |
|---|---|---|

**FTC Response to SUF 251:** The Cardiffs do not dispute that Redwood employees sometimes received their salary from People United for Christians, Run Away Products.

The Cardiffs do not specify what in SUF 251 is supposedly vague, and they admit that Eunjung Cardiff would pay Redwood employees' salaries from other bank accounts, and then move money between those accounts to reconcile them.

| 252. People United for Christians used space in the same office as Redwood's warehouse and shipping operations. | Melendez Dec. (PX-35), p. 1, ¶ 6. | Not a material fact. People United for Christians is not a Defendant in this lawsuit and did not sell, market, or have any affiliation with any of the products sold or marketed by |
|---|---|---|

| | | Redwood. |
|---|---|---|

**FTC Response to SUF 252:** The Cardiffs do not dispute that People United for Christians used space in the same office as Redwood's warehouse and shipping operations.

| 253. Some employees split their time between working on mailings for People United for Christians and working in the Redwood call center. | Melendez Dec. (PX-35), p. 1, ¶ 6. | Deny. Red and People United for Christians had two separate payrolls. There were no employees working on both mailings. Ex. A, Declaration of Jason Cardiff ¶123. |
|---|---|---|

**FTC Response to SUF 253:** The Cardiffs do not deny that some employees split their time working for both People United for Christians and Redwood. Furthermore, their denial assumes an assertion different than what is actually stated in SUF 253: they assume it says there was only one payroll and employees who worked on mailings for People United for Christians also worked on mailings for Redwood.

| 254. Jason Cardiff used Identify as an umbrella under which he registered the names "Redwood Scientific Technologies," "Runaway | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 56-58, ¶¶ 158-159 & Dkt. 24, p. 23-28; Dkt. 24-1, p. 1, 4-7; Dkt. 24-2, p. 2-4 (Atts. 179-180).<br><br>Walker Dec. (PX-32), p. 3, ¶ 11 & p. 202-230 | Admit. |
|---|---|---|

| | | |
|---|---|---|
| Products," "Advanced Men's Institute," and "TBX-FREE" as Identify's trade names. | (Att. 23); p. 231-233 (Att. 24). | |
| 255. The Cardiffs started using the name Identify, LLC in early 2017 but the business of selling oral film strips remained the same. | Walker Dec. (PX-32), p. 3, ¶ 11 & p. 194-233 (Atts. 19-24). | Admit. |
| 256. The Cardiffs jointly controlled Redwood California, with Jason Cardiff as its CEO and Director, and Eunjung Cardiff as Secretary, Director, and Chief Operating Officer. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50-51, ¶¶ 136-137 & Dkt. 13, p. 169-170 (Atts. 158-159); Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 178 & Dkt. 22, p. 15-16 (Att. 242). Morris Dec. (TRO PX-4), Dkt. 9, p. 3, ¶ 5 & Dkt. 9, p. 11-16 (Att. B). | Deny, Jason Cardiff had control over Redwood. Ex. B, Eunjung Cardiff Declaration ¶2. |

**FTC Response to SUF 256:** The Cardiffs do not provide any basis for their denial of SUF 256, as Paragraph 2 of Eunjung Cardiff's Declaration says in its entirety that "When my husband and I formed Redwood in 2014, the intent was

to introduce the use of dissolvable, ingestible thin film strip technology as an easy to use delivery method for over the counter every day medications for those who had challenges with traditional methods of medication ingestion." Dkt. 491-4, p. 2.

| | | |
|---|---|---|
| 257. The Cardiffs control Carols Place Limited Partnership through their interests in both Carols Place Trust and Extension First, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 173 & Dkt. 24-9, p. 3-5 (Att. 196). | Admit. |
| 258. Defendants maintained bank accounts in the name of Identify, LLC. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 63, ¶ 181 & Dkt. 23, p. 118-119 (Att. 297). <br><br> George Dec. (TRO PX-2), Dkt. 2, p. 2, ¶ 4 & p. 13 (Att. A1). | Admit. |
| 259. Redwood California, Identify, Run Away and AMI all paid suppliers, advertising agencies, and | George Dec. (TRO PX-2), Dkt. 2, p. 5-7, ¶¶ 12-13. <br><br> Walker Dec. (PX-32), p. 7, ¶ 27 (AMI paid for Run Away ad expenses); | Admit. |

| | | |
|---|---|---|
| payment processing companies. | p. 10, ¶ 40 (Eunjung Cardiff charged expenses for Facebook ads on an American Express card in the name of Run Away, and paid the card from Redwood funds); p. 11, ¶ 49 & p. 622-643 (Atts. 68-76) (supplier invoices in multiple names); p. 19, ¶ 84 & p. 931-943 (Att. 145) (Eunjung Cardiff charged Redwood robocall expenses on an American Express card in the name of AMI). | |
| 260. At various times, Redwood, Run Away Products, Advanced Men's Institute Prolongz, and Identify purchased film strips from Chinese and Indian manufacturers. | Walker Dec. (PX-32), p.11, ¶ 49 & p. 622-643 (Atts. 68-76) (supplier invoices in multiple names).<br><br>George Dec. (TRO PX-2), Dkt. 2, p. 5-6, ¶ 12 (Redwood, Identify, and Run Away). | Admit. |
| 261. Jason and Eunjung Cardiff maintained | George Dec. (TRO PX-2), Dkt. 2, p. 2, ¶ 4 & p. | Admit. |

| | | |
|---|---|---|
| multiple credit card accounts in their names and the names of Corporate Defendants. | 17 (Att. B). | |
| 262. In July 2017, Run Away Products paid Inter/Media $64,712. | George Dec. (TRO PX-2), Dkt. 2, p. 5-6, ¶ 12. | Admit. |
| 263. Redwood California payroll was paid from an Identify bank account as late as June 2018. | George Dec. (TRO PX-2), Dkt. 6, p. 6-7, ¶ 13.<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 63, ¶ 181 & Dkt. 23, p. 91-113 (Att. 295) (Redwood payroll documents show payment from account "XXXXX4462," an Identify account). | Admit. |
| 264. Between April 2015 and May 2018, Corporate Defendants transferred $3.97 million between themselves. | George Dec. (TRO PX-2), Dkt. 2, p. 4-5, ¶ 10 & p. 18-19 (Att. C). | Admit. |

-142-

| | | |
|---|---|---|
| 265. In connection with the Inter/Media Insertion Order, Jason Cardiff signed a Continuing Guaranty of Payment and Performance on March 18, 2014. | Yallen Dec. (PX-40), p. 2-3, 5-6, ¶¶ 10, 16(E) & p. 15-30 (Att. 2); p. 137 (Att. 7).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 174 & Dkt. 24-9, p. 28 – Dkt. 24-10, p. 14 (Att. 200). | Admit. |
| 266. By signing the Continuing Guaranty of Payment and Performance, Jason Cardiff personally guaranteed payment for the services Inter/Media would provide Run Away Products, LLC for advertising Prolongz. | Yallen Dec. (PX-40), p. 2-4, ¶¶ 10, 14(c) & p. 15, 30 (Att. 2); p. 137 (Att. 7).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶ 174 & Dkt. 24-9, p. 28 – Dkt. 24-10, p. 14 (Att. 200). | Admit. |
| 267. Eunjung Cardiff consented to Jason Cardiff's personal guaranty of | Yallen Dec. (PX-40), p. 2-4, ¶¶ 10, 14(c) & p. 15, 30 (Att. 2); p. 134, 137 (Att. 7). | Admit. |

| | | |
|---|---|---|
| payment to Inter/Media for Prolongz advertising services. | | |
| 268. Run Away did not pay in full for Inter/Media's services. | Yallen Dec. (PX-40), p. 3, ¶ 11 & p. 61-66 (Att. 3). | Admit. |
| 269. Inter/Media filed a complaint naming named Run Away, Advanced Men's Institute Prolongz, LLC, Redwood Scientific Technologies, LLC, Jason Cardiff, Eunjung Cardiff, and Doe defendants after resolution could not be reached on payment for Prolongz advertising. | Yallen Dec. (PX-40), p. 3, ¶ 12.<br><br>Szymanski Dec. (PX-39), p. 5, ¶ 25. | Admit. |
| 270. In the course of that litigation, the | Yallen Dec. (PX-40), p. 3-4, ¶ 14 & p. 136-137 | The Order speaks for itself. |

| | | |
|---|---|---|
| Judge entered a discovery sanctions order containing specific findings concerning Prolongz advertising. | (Att. 7). | |
| 271. The Judge's discovery sanctions order included a finding that "Defendant Jason Cardiff fully guaranteed the 2015 contract obligations of the Defendant Run Away Product, LLC to Plaintiff, and his spouse, Defendant Eunjung Cardiff, aka Eunjung No, fully acknowledged and consented to said guarantee" and "Defendant Run Away Products, | Yallen Dec. (PX-40), p. 3-4, ¶ 14 & p. 137 (Att. 7). | |

| | | |
|---|---|---|
| LLC is the legal alter ego of Defendant Redwood Scientific Technologies, Inc., formerly known as Redwood Scientific Technologies, LLC, formerly known as Advanced Men's Institute Prolongz, LLC." | | |
| **FTC Response to SUF 270-271:**  The Cardiffs do not dispute SUF 270-271. | | |
| 272.  Jason Cardiff and Eunjung Cardiff signed a Settlement Agreement resolving the litigation with Inter/Media in March, 2017. | Yallen Dec. (PX-40), p. 4, ¶ 15 & p. 140-162 (Att. 8). | Admit |
| 273.  By signing the Settlement Agreement, Jason Cardiff and | Yallen Dec. (PX-40), p. 5, ¶ 16(C) & p. 140-141, Recital C (Att. 8). | The Order speaks for itself |

| | | |
|---|---|---|
| Eunjung Cardiff agreed to the recitals it contained, including the following: "Run Away Products, LLC ("Run Away") is a New York limited liability company that at times did business under the name "Prolongz", Advanced Men's Institute Prolongz, LLC is a California limited liability, Redwood Scientific Technologies, LLC is a California LLC, Redwood Scientific Technologies, Inc. is a Nevada Corporation and a successor to | | |

-147-

| | | |
|---|---|---|
| Advanced Men's Institute Prolongz, LLC and Redwood Scientific Technologies, LLC. Additionally, there is Redwood Scientific Technologies, Inc., a California corporation. These companies were involved in the marketing and sales of "Prolongz", a sex product that purports to assist in the slowing or delaying of male ejaculation during sexual intercourse. Eunjung Cardiff aka Eunjung No aka Eunjung Lee and Jason Cardiff are officers and/or directors and/or | | |

| | | |
|---|---|---|
| managers and/or owners of the legal entities described in this recital. All of the entities referred to in this recital are affiliated with Eunjung Cardiff aka Eunjung No aka Eunjung Lee and Jason Cardiff. . .." | | |
| **FTC Response to SUF 273:**  The Cardiffs do not dispute SUF 273. | | |
| 274.  Defendants Run Away, AMI, Redwood California, Redwood Nevada, and Redwood Delaware marketed at least the following oral thin film products: TBX-FREE, Eupepsia Thin, Prolongz, Prolongz-X (a stronger version of | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 52-53, ¶ 147 & Dkt. 13-1 p. 133, 136-137 (Att. 169).<br><br>Walker Dec. (PX-32), p. 5, ¶ 20 & p. 167, 170 (Att. 16) (AMI, Redwood Nevada, and Redwood Delaware's marketing of all products); p. 21-22, ¶ 98 (in July 2018, Redwood was selling Cloverstrips, as well as | Admit |

| | | |
|---|---|---|
| Prolongz), Product-X (for erectile dysfunction, not premature ejaculation like Prolongz), Provaxaltonin (for enhancing mood and reducing anxiety), Blossom (women's sexual enhancement), Comfort-Time (aspirin), Ocean-X, Sumnusent (for improving sleep), and Cloverstrips (CBD). | its other oral film strips).<br><br>Adkinson-Connor Dec. (PX-38), p. 7, ¶ 30 (Redwood Nevada's marketing of TBX-FREE, Eupepsia Thin, Prolongz, and Sumnusent).<br><br>Szymanski Dec. (PX-39), p. 3, ¶ 11 (Run Away's marketing of Prolongz).<br><br>Yallen Dec. (PX-40), p. 2, ¶ 8; p. 5, ¶ 16(C) & p. 140-141, Recitals C, D (Att. 8) (Run Away's marketing of Prolongz). | |
| 275.  Run Away Products was the contracting party with Inter/Media and Havas Edge. | Walker Dec. (PX-32), p. 7, ¶ 26. | Admit |
| 276.  Redwood was the contracting party with Cannella and Mercury Media | Walker Dec. (PX-32), p. 7, ¶ 26. | Admit |

| 277. Jason Cardiff and Eunjung Cardiff are the only two settlors and trustees of Carols Place Trust. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 60, ¶ 169 & Dkt. 24-4, p. 13 (Att. 190). | Admit |
|---|---|---|
| 278. Carols Place Trust has held title to the Cardiffs' home since January 31, 2017, when it was transferred from the Jurikel Family Trust, of which Jason Cardiff and Eunjung Cardiff are also co-trustees. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 61, ¶¶ 170-172 & Dkt. 24-8, p. 3-22 (Att. 192-193). | Admit |
| 279. In this litigation, the Court has found Jason Cardiff in contempt four times and Eunjung Cardiff in contempt three times, and the Receiver has issued six affidavits of noncompliance. | Dkts. 181, 237-238, 315, 417.<br><br>Dkts. 206, 144, 200-201, 273, 331, 402. | Objection as to relevance. Whether or not the Cardiffs have been held in contempt is irrelevant to findings of liability in the underlying causes of action. |
| **FTC Response to SUF 279:** The Cardiffs do not dispute that the Court has | | |

found Jason Cardiff in contempt four times and Eunjung Cardiff in contempt three times, and the Receiver has issued six affidavits of noncompliance.

SUF 279 is relevant to show the Cardiffs' recalcitrance in the face of court order and the need for strong injunctive relief in light of the Cardiffs' past order violations.

### III.   TBX-FREE

*A. Defendants' Marketing of TBX-FREE*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 280. The target audience for TBX-FREE were people who wanted to stop smoking. | Adkinson-Connor Dec. (PX-38), p. 12, ¶ 52. | Admit. |
| 281. Jason Cardiff and Eunjung Cardiff admit that Defendants sold TBX-FREE from at least 2015 to 2018. | J. Cardiff 3rd RFA Resp., p. 2, ¶ 112 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 25 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 1-2, ¶ 106 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 76-77 (Att. 7)). | Admit. |
| 282. Jason Cardiff and Eunjung Cardiff | J. Cardiff 3rd RFA Resp., p. 2, ¶ 111 (Sanger Dec. | Object as to lack of timeframe and relevance, |

| admit that Defendants advertised the TBX-FREE dissolvable oral film strip. | (PX-52), p. 1, ¶ 6 & p. 25 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 1, ¶ 105 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 76 (Att. 7)). | Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Therefore denied after that date. |
|---|---|---|

**FTC Response to SUF 282:** Defendants do not dispute their previous admissions that they advertised the TBX-FREE dissolvable oral film strip. They merely deny that the advertising went as long as it did, which is not alleged in the undisputed fact to which they object. In fact, their advertising of TBX-FREE did continue long after February 2018.  See Dkt. 491-3, p. 5-6 excerpted at Dkt. 491-3, p. 41-45 (captured by the Internet Archive in April 2018).  Also, the tbxfree.com website continued to advertise TBX-FREE as an effective smoking cessation product superior to nicotine patches and gums. See, e.g., Dkt. 491-3 p. 43, Defendants' advertising was still making deceptive claims in April 2018. See also SUF 938.

| 283.   According to the | Sands 1st Dec. (TRO PX- | Admit |
|---|---|---|

-153-

| | | | |
|---|---|---|---|
| | TBX-FREE package, each film strip contains Laburnum anagyroides 1X. | 1), Dkt. 7, p. 14, ¶ 36 & Dkt. 10, p. 168 (Att. 072). | |
| 284. | In its response to the Commission's CID, Redwood Scientific stated that gross 2015 sales revenues for TBX-FREE were $32,125.19. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 96 (Att. 001). | Admit |
| 285. | In its response to the Commission's CID, Redwood Scientific stated that gross 2016 sales revenues for TBX-FREE were $3,469,422.53. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7), p. 96-97 (Att. 001). | Admit |
| 286. | In its response to the Commission's CID, Redwood Scientific stated that gross 2017 sales revenues for TBX-FREE (not | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p. 158 (Att. 003). | Admit |

| | | |
|---|---|---|
| including third-party retail sales) were $4,163,823.85. | | |
| 287. In its response to the Commission's CID, Redwood Scientific stated that gross 2018 sales revenues for TBX-FREE (not including third-party retail sales) through April 30, 2018 were $365,007.49. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p. 158 (Att. 003). | Admit |
| 288. In its response to the Commission's CID, Redwood Scientific stated that TBX-FREE refunds in 2015 were $580.10. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2 ¶ 2 & Dkt. 7, p. 99 (Att. 001). | Admit |
| 289. In its response to the Commission's CID, Redwood Scientific stated that TBX-FREE refunds | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 100 (Att. 001). | Admit |

| | | | |
|---|---|---|---|
| | in 2016 were $108,831.90. | | |
| 290. | In its response to the Commission's CID, Redwood Scientific stated that TBX-FREE refunds in 2017 (including some but not all chargebacks) were $610,807.30. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p. 162 (Att. 003). | Admit |
| 291. | In its response to the Commission's CID, Redwood Scientific stated that TBX-FREE refunds in 2018 (including some but not all chargebacks) were $83,150.49 through April 30, 2018. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p. 163 (Att. 003). | Admit |
| 292. | In response to the Commission's CID, Redwood Scientific reported net TBX-FREE sales of $7,227,009.27 for 2015 through April | Sands 3rd Dec. (PX-51), p. 18, ¶ 53 & p. 1900 (Att. 128).<br><br>See also SUF 284-291. | Admit |

| | | |
|---|---|---|
| 2018. | | |
| 293.  Defendants advertised TBX-FREE using long-form and short-form national television commercials, websites, social media (including Facebook, Instagram, and YouTube), print, and robocalls. | Walker Dec. (PX-32), p. 5, ¶¶ 20-21.<br><br>Adkinson-Connor Dec. (PX-38), p. 1, ¶ 5; p. 2-3, ¶ 10 & p. 57-515 (Att. 9); p. 4-5, ¶¶ 14-21. | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Therefore denied after that date. |

**FTC Response to SUF 293:** Defendants admit they advertised TBX-FREE using long-form and short-form national television commercials, websites, social media (including Facebook, Instagram, and YouTube), print, and robocalls. They only object that television advertising through Mercury Media was discontinued after October 30, 2017.  See also p. 2 *supra* (Mercury Media's last airing of TBX-FREE long form advertising was February 12, 2018). While this is not relevant to liability, defendants continued advertising TBX-FREE with a different media company, Cannella, through 2018.  See SUF 132, 135, and 297.

| See also SUF 938 for online advertising through August 2018. | | |
|---|---|---|
| 294. Jason Cardiff and Eunjung Cardiff admit that Defendants purchased media time for TBX-FREE television advertisements from Cannella Response Television, LLC. | J. Cardiff 3rd RFA Resp., p. 2, ¶ 116 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 25 (Att. 3)). <br><br> E. Cardiff 4th RFA Resp., p. 2, ¶ 274 (Sanger Dec. (PX-52), p. 2, ¶ 11 & p. 106 (Att. 8)). | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. Therefore denied after that date. |
| **FTC Response to SUF 294:** Defendants do not dispute their prior admissions to placing media time with Cannella Response for TBX-FREE. The timeframe is not relevant to individual liability even if this particular advertising ceased in February 2018. The Cannella advertising before February 2018 is relevant to the Cardiff's individual liability for injunctive and monetary relief. | | |
| 295. Jason Cardiff and Eunjung Cardiff admit that Cannella arranged for TBX-FREE television advertisements to be broadcast on national cable television. | J. Cardiff 3rd RFA Resp., p. 3, ¶ 119 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 26 (Att. 3)). <br><br> E. Cardiff 3rd RFA Resp., p. 2-3, ¶ 113 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 77-78 (Att. 7)). | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to |

| | | |
|---|---|---|
| | | Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Therefore denied after that date. |

**FTC Response to SUF 295:**  Defendants do not dispute that they placed television advertising with Cannella on nationwide cable through February 2018. They only dispute what has not been asserted in the undisputed fact: that Mercury Media placed this advertising. These irrelevant arguments should be disregarded.

| | | |
|---|---|---|
| 296. | Cannella purchased media time for TBX-FREE television advertising at the end of 2015, and in 2016, 2017, and 2018.[5] | Adkinson-Connor Dec. (PX-38), p. 5, ¶¶ 18-21; p. 2-3, ¶ 10 & p. 171-222, 225-319 (Att. 9).<br><br>Walker Dec. (PX-32), p. 8 ¶ 34. | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. Therefore denied after that date. |
| 297. | During 2015, Cannella purchased media time for | Adkinson-Connor Dec. (PX-38), p. 5, ¶¶ 18-21; p. 2-3, ¶ 10 & p. 171-222 | |

[5] The Cardiffs submitted a single objection to SUF 296-310; the FTC's response begins on p. 165.

| | |
|---|---|
| TBX-FREE long-form ads entitled TBX FREE, TBX FREE NOW, TBX FREE PI, TBX FREE SYN, TBX FREE TBX01, TBX FREE V2, TBX FREE V3, TBX FREE V3 PI, and TBX FREE V3 W/HE30 from television stations that aired them across the United States. | (Att. 9).<br><br>See also J. Cardiff 3rd RFA Resp., p. 3-4, ¶ 120 (TBX-FREE); ¶ 121 (TBX FREE SYN); ¶ 122 (TBX FREE NOW); ¶ 123 (TBX FREE V2); ¶ 124 (TBX FREE V3); ¶ 126 (TBX FREE V3 W/HE30); ¶ 127 (TBX FREE PI) (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 26-27 (Att. 3)).<br><br>See also E. Cardiff 3rd RFA Resp., p. 3-4, ¶ 114 (TBX-FREE); ¶ 115 (TBX FREE SYN); ¶ 116 (TBX FREE NOW); ¶ 117 TBX FREE V2); ¶ 118 (TBX FREE V3);  ¶ 120 (TBX FREE V3 W/HE30); ¶ 121 (TBX FREE PI) (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 78-79 (Att. 7)). |

| | | |
|---|---|---|
| 298. | In 2016, Cannella purchased media time for the TBX-FREE short-form ad entitled U2GL (TBX FREE :60). | Adkinson-Connor Dec. (PX-38), p. 5, ¶ 19; p. 2-3, ¶ 10 & p. 225-319 (Att. 9). | |
| 299. | Cannella produced to the FTC the long-form ad entitled TBX-FREE with master number 454250 as a file bates-stamped CAN-CARDIFF0000042. | Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14. | |
| 300. | The long-form ads entitled TBX FREE, TBX FREE PI, and TBX FREE SYN share the same master number (454250). | Adkinson-Connor Dec. (PX-38), p. 3, ¶ 11; p. 4, ¶ 15. | |
| 301. | Cannella purchased media time for 242 airings of TBX FREE, 1,054 airings of TBX FREE PI, and 25 airings of | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1684 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14; p. 2- | |

| | | |
|---|---|---|
| | TBX FREE SYN, for a total of 1,321 airings of the three ads that share the 454250 master number. | 3, ¶ 10 & p. 171-175 (Att. 9) for TBX FREE, p. 181-196 (Att. 9) for TBX FREE PI, p. 196 (Att. 9) for TBX FREE SYN. |
| 302. | Cannella purchased media time for 427 airings of the long-form ad entitled TBX FREE NOW with master number 471025 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000034. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1684 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14; p. 2-3, ¶ 10 & p. 175-181 (Att. 9). |
| 303. | Cannella purchased media time for one airing of an ad entitled TBX FREE TBX01, which Extreme Reach, Cannella's dub house, produced to the FTC and identified as having master number | Sands 3rd Dec. (PX-51), p. 12, ¶¶ 38, 39, 41 & p. 1685 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 4, ¶ 17; p. 2-3, ¶ 10 & p. 196 (Att. 9); p. 3-4, ¶ 11-13.<br><br>Donato Dec. (PX-44), p. 2, ¶ 7. |

| | | |
|---|---|---|
| | 471025. | |
| 304. | Cannella purchased media time for 81 airings of the long-form ad entitled TBX FREE V2 with master number 476090 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000032. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1684 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14; p. 2-3, ¶ 10 & p. 196-197 (Att. 9). |
| 305. | Cannella produced to the FTC the long-form ad entitled TBX-FREE V3 with master number 477850 as a file bates-stamped CAN-CARDIFF0000041. | Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14. |
| 306. | The long-form ads entitled TBX FREE V3 and TBX FREE V3 PI share the same master number (477850). | Adkinson-Connor Dec. (PX-38), p. 3, ¶ 11; p. 4, ¶ 16. |
| 307. | Cannella purchased | Sands 3rd Dec. (PX-51), |

| | | |
|---|---|---|
| media time for 430 airings of TBX FREE V3 and 32 airings of TBX FREE V3 PI, for a total of 462 airings of the two ads that share the 477850 master number. | p. 12, ¶ 41 & p. 1684 (Att. 125). <br><br> Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14; p. 2-3, ¶ 10 & p. 197-204 (Att. 9). | |
| 308. Cannella purchased media time for 1,280 airings of the long-form ad entitled TBX FREE V3 W/HE30 with master number 483026 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000038. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1685 (Att. 125). <br><br> Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14; p. 2-3, ¶ 10 & p. 204-222 (Att. 9). | |
| 309. Cannella purchased media time for 2,844 airings of the short-form TBX-FREE ad entitled U2GL that it produced to the | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1685 (Att. 125). <br><br> Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14; p. 2-3, ¶ 10 & p. 225-319 | |

| | | | |
|---|---|---|---|
| | FTC as a file bates-stamped CAN-CARDIFF0000045. | (Att. 9). | |
| 310. | Cannella purchased media time for a total of 6,416 airings of TBX-FREE advertising. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1684-1685 (Att. 125).<br><br>See SUF 301-304, 307-309.<br><br>Adkinson-Connor Dec. (PX-38), p. 4, ¶ 14; p. 2-3, ¶ 10 & p. 171-222, 225-319 (Att. 9). | |

**FTC Response to SUF 296-310:**  The Defendants do not dispute that they placed long form and short-form TBX-FREE television advertising through Cannella in 2015, 2016, 2017, and 2018.  Their objection that they did not do so after Feburary 2018 is not relevant to liablity. The Defendants purchase of thousands of placements of these widely-disseminated nationwide deceptive advertisements during the times alleged is relevant to Defendants' individual liability for injunctive and monetary relief.

| | | | |
|---|---|---|---|
| 311. | Corporate Defendants signed a Client Services Agreement with Mercury Media in June 2017. | Cabrinha Dec. (PX-41), p. 1, ¶ 3 & p. 4-13 (Att. 1). | Object as to irrelevant. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at |
| 312. | That Client Services | Cabrinha Dec. (PX-41), | |

| | | | |
|---|---|---|---|
| | Agreement provided for Mercury Media to purchase television time in which Redwood's advertising would run. | p. 1, ¶ 3. | 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. |
| 313. | Jason Cardiff and Eunjung Cardiff admit that Mercury Media purchased media time for TBX-FREE television advertising, and that Mercury Media placed television advertising for TBX-FREE on national media. | J. Cardiff 3rd RFA Resp., p. 4-5, ¶¶ 129-130 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 27-28 (Att. 3)).  E. Cardiff 3rd RFA Resp., p. 4, ¶¶ 123-124 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 79 (Att. 7)).  See also Cabrinha Dec. (PX-41), p. 1-2, ¶¶ 3, 5 & p. 14-24 (Att. 2).  See also Young Dec. (PX-42), p. 1, ¶ 7. | |
| 314. | Mercury Media placed television advertising for | Cabrinha Dec. (PX-41), p. 1-2, ¶¶ 3, 5 & p. 14-24 (Att. 2). | |

| | | | |
|---|---|---|---|
| | TBX-FREE on national media between August and December 2017, and once in February 2018. | | |
| 315. | Jason Cardiff and Eunjung Cardiff admit that Mercury Media arranged for a 5-minute TBX-FREE television advertisement identified as "TBX 2017 SF1" to be broadcast on national cable television. | J. Cardiff 3rd RFA Resp., p. 5, ¶ 131 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 28 (Att. 3)). <br><br> E. Cardiff 3rd RFA Resp., p. 4, ¶ 125 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 79 (Att. 7)). | |
| 316. | Mercury Media arranged for the 5-minute TBX-FREE television advertisement with the master number #482725/H (NE), to be broadcast on national cable television in | Young Dec. (PX-42) p. 1, ¶ 7 & p. 2, 4-7 (Att. 1). | |

| | | |
|---|---|---|
| October 2017. | | |
| **FTC Response to SUF 311-316**:  Defendants do not dispute that they entered into contractual arrangements with Mercury Media, that Mercury purchased advertising time for TBX-FREE television advertising, or that the ads were broadcast on nationwide television.  They deny that any advertising was placed with Mercury after October 30, 2017.  See also p. 2 *supra* (explanation re Boilerplate Objection 1 that Mercury Media's last airing of TBX-FREE long form advertising was February 12, 2018). In any case, the timeframe is not relevant to the Cardiffs' liability for widely disseminating deceptive advertising claims and is relevant to their individual liability for injunctive and monetary relief. | | |
| 317.  Defendants advertised TBX-FREE on the websites www.tbxfree.com, trytbxfree.com, www.trytbxfreenow.com, and www.stopsmokingnow.com. | Walker Dec. (PX-32), p. 9, ¶ 37 & p. 536-546 (Att. 48).<br><br>Adkinson-Connor Dec. (PX-38), p. 13, ¶ 60.<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 229-239 (Att. 008). | Admit. As a result of the CID, and long before the FTC filed suit, Redwood stopped all advertising of products through any outside paid marketing and promotions after February 2018. Dkt. 253-1 Declaration of Jason Cardiff ¶10; Dkt. 253-2 Declaration of Eunjung Cardiff ¶10; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. |
| 318.  Defendants advertised TBX-FREE on social media. | Walker Dec. (PX-32), p. 9-10, ¶¶ 38-39 (Facebook and Instagram) & p. 599 (Att. 60).<br><br>Sands 1st Dec. (TRO PX- | |

| | | |
|---|---|---|
| | 1), Dkt. 7, p. 4, ¶¶ 7-9 & Dkt. 7, p. 240-282 (Atts. 009-017) (Facebook videos).<br><br>See also Wu Dec. (PX-37), p. 2, 9 (helped with design and placement of TBX-FREE ads on Facebook).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 78, 107139 (Atts. 24, 33-35). | |
| 319.   Defendants advertised TBX-FREE in print. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4-5, ¶¶ 10-12 & Dkt. 7, p. 283-289 (Atts. 018-022).<br><br>Walker Dec. (PX-32), p. 10, ¶ 42 & p. 600-619 (Atts. 61-66). | |
| **FTC Response to SUF 317-319:**  The Cardiffs admit that they advertised TBX-FREE on the listed website, on social media, and in print prior to February 2018. The remaining narrative is argument and should be disregarded.  Moreover, The Cardiffs did not cease promoting TBX-FREE in February 2018.  SUF 938. | | |
| 320.   Defendants advertised TBX- | Walker Dec. (PX-32), p. 6, ¶ 21. | Admit, through July, 2018. Ex. A, Declaration |

| | | |
|---|---|---|
| FREE through prerecorded robocalls. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 38, ¶ 111 & Dkt. 13, p. 66-71 (Atts. 125-126). | of Jason Cardiff ¶37. |
| 321.  Defendants advertised TBX-FREE on product packaging. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 16, ¶ 45 & Dkt. 10, p. 235-236 (Att. 081). | Object as irrelevant because packaging cannot create a net impression and induce a sale. |

**FTC Response to SUF 321:**  Defendants do not dispute that they advertised TBX-FREE on product packaging.  The objection is argument, however, even if consumers have already purchased the product, packaging statements can influence their decisions regarding using the product and purchasing additional product. In addition, because Defendants put images of the TBX-FREE package on their www.tbxfree.com/2 website, Dkt. 7, p. 229, 235 (Att. 008), potential customers would see label statements prior to purchase. Consequently, advertising on the package is relevant to the Cardiffs' individual liability for injunctive and monetary relief.

### B.  Defendants' Smoking Cessation Claims for TBX-FREE

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 322.  At least five of Defendants' TBX-FREE television ads said that "TBX-FREE MAKES IT EASY TO QUIT SMOKING!" | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 276, 301, ln. 6 (Att. 86). | Object as to lack of timeframe and relevance, Defendants stopped its marketing campaigns in or about |

-170-

| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 393, 417, ln. 10 (Att. 88).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 330, 359, ln. 12 (Att. 87).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 448, 473, ln. 6 (Att. 89).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 502, 527, ln. 8 (Att. 90). | February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Therefore denied after that date. |
| 323.  At least four of Defendants' TBX-FREE television ads said that "TBX-FREE is ready to set you free from nicotine addiction forever and the addiction to tobacco and cigarettes." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 393, 407 ln. 13-16 (Att. 88).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 276, 290, ln. 15-17 (Att. 86). | |

| | | |
|---|---|---|
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 448, 462, ln. 15-17 (Att. 89).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 502, 516, ln. 17-19 (Att. 90). | |
| 324. At least five of Defendants' TBX-FREE television ads asked viewers "Did you know the cure rate for the FDA approved patch and gum is a whopping 2 percent?  That's right.  A 2 percent success rate at best. . . . And what about the other 98 percent?  . . . Well, we have you 100 percent covered." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 276, 289, ln. 20 – p. 290, ln. 15 (Att. 86).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 330, 345, ln. 22 – p. 346, ln. 23 (Att. 87).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 393, 406, ln. 19 – p. 407, ln. 14 (Att. 88). | |

| | | |
|---|---|---|
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 448, 461, ln. 20 – p. 462, ln. 15 (Att. 89). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 502, 515, ln. 22 – p. 516, ln. 17 (Att. 90). | |
| 325.  At least one of Defendants' TBX-FREE television ads said "With an 88 percent success rate…TBX-FREE is the number one choice by smokers." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 556, 560, ln. 9-15 (Att. 91). | |
| 326.  At least four of Defendants' TBX-FREE television ads said   HUNDREDS & HUNDREDS OF CLINICAL STUDIES PERFORMED ON OVER 10,600 SMOKERS!" | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 276, 289, ln. 4-11 (Att. 86).   Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 393, 406, ln. 3-10 (Att. 88).   Sands 3rd Dec. | |

| | | |
|---|---|---|
| | (PX-51), p. 9-11, ¶ 37 & p. 448, 461, ln. 4-11 (Att. 89). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 502, 515, ln. 6-13 (Att. 90). | |
| 327.  At least four of Defendants' TBX-FREE television ads said "If you'll get your treatment started today, in as little as 30 days, you should never want to smoke another cigarette again." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 276, 322, ln. 17-20 (Att. 86).  Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 393, 438, ln. 21-24 (Att. 88).  Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 448, 494, ln. 17-20 (Att. 89).  Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 502, 548, ln. 19-22 (Att. 90). | |

**FTC Response to SUF 322 – 327:**  The Cardiffs do not dispute that their TBX-

FREE television ads prior to October 30, 2017 claimed that TBX-FREE was an effective smoking cessation aid, that it was more effective than nicotine patches and gum, that it had an 88 percent success rate, and that its efficacy had been shown in hundreds of clinical studies conducted on more than 10,600 smokers. Whether or defendants' ads ceased prior to October 30, 2017 is not relevant to the defendants' liability. The timeframe is the period when Defendants marketed and sold TBX-FREE (2015-2018, see Dkt. 1), and these facts are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

However, the Cardiffs did not cease advertising on October 30, 2017. See p. 2 *supra* (explanation re Boilerplate Objection 1 that Mercury Media's last airing of TBX-FREE long form advertising was February 12, 2018). Defendants also continued to market TBX-FREE after Feburary 12, 2018.  See SUF 938.


The objection regarding air dates for Eupepsia Thin do not bear on SUF 322-327 and should be disregarded.

| | | |
|---|---|---|
| 328.   Defendants' TBXFREE. com/2 website stated "Revolutionary New Stop Smoking Product More effective than the Patch and GUM." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 229 (Att. 008). | Admit |
| 329. Defendants' TBXFREE. com/2 website stated "The #1 Choice to QUIT SMOKING!" | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 7 & Dkt. 7, p. 229 (Att. 008). | Admit |
| 330. Defendants'TBXFREE.com/2 website stated "88% Success | Sands 1st Dec. (TRO PX-1), Dkt. | Objection as to lack of timeframe. |

| Rate." | 7, p. 3-4, ¶ 6 & Dkt. 7, p. 230, 237 (Att. 008). | Defendants took down this claim in or about February, 2018 and corrected the advertising issues brought forth in the CID. Dkt. 253-1 Declaration of Jason Cardiff ¶10; Dkt. 253-2 Declaration of Eunjung Cardiff ¶10; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53_. |
|---|---|---|
| **FTC Response to SUF 330**:  Defendants do not dispute that their TBXFREE. com/2 website claimed an "88% Success Rate" prior to February 2018. Whether or not othe website was changed in Feburary 2018 is not relevant to defendants' liability for making the claim. Further, at least one TBX website making the 88% claim was still active in August 2018.  SUF 938 & 939. | | |
| 331.  Defendants' TBXFREE.com/2 website displayed the statement "TBX-FREE VS. The Patch & Nicotine Gum" above an image of nicotine gum and the statement "LESS THAN 5% Success Rate to Quit Smoking." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 230 (Att. 008). | Admit. The relative difference in smoking cessation between cytisine and placebo (relative rate, 3.4) was higher than previous studies have shown for varenicline (2.3) and nicotine- |

| 332. Defendants' TBXFREE.com/2 website displayed an image of an arm with an attached patch and the statement "LESS THAN 10% Success Rate to Quit Smoking." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 231 (Att. 008). | replacement therapy (1.6) over a 4 week period. Ex. A, Declaration of Jason Cardiff ¶13. In a study that used the same dosage and active amount of cytisine, cytisine was 9% more effective that nicotine replacement therapy over a month period. Ex. A, Declaration of Jason Cardiff ¶16 |
|---|---|---|

**FTC Response to SUF 331-332**: The Cardiffs do not dispute that their TBX-FREE website claimed "TBX-FREE VS. The Patch & Nicotine Gum" above an image of nicotine gum and the statement "LESS THAN 5% Success Rate to Quit Smoking," and displayed an image of an arm with an attached patch and the statement "LESS THAN 10% Success Rate to Quit Smoking." The remaining narrative should be disregarded as argument. Furthermore, Jason Cardiff's gratuitous characterization of the findings of any scientific study is inadmissible under FRE 701. See SUF 392 (citing Prochaska Expert Report (TRO PX- 7), Dkt. 207, p. 6-7).

| 333. Below the image of the arm with an attached patch, Defendants' TBXFREE.com/2 website | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 231 (Att. | Objection as to lack of timeframe. Defendants took down the false |
|---|---|---|

| | | |
|---|---|---|
| displayed an image of TBX-FREE strip being placed on a person's tongue and the statement "OVER 70%+ Success Rate to Quit Smoking." | 008). | advertising in or about February, 2018 and corrected the advertising issues brought forth in the CID. Dkt. 253-1 Declaration of Jason Cardiff ¶10; Dkt. 253-2 Declaration of Eunjung Cardiff ¶10; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. |
| 334.  Defendants' TBXFREE.com/2 website stated that TBX-FREE "allows smokers to stop smoking once and for all without the use of nicotine. In clinical studies cited in The New England Journal of Medicine, the active ingredient in TBX-FREE has an 88% cure care [sic] compared to the patch and gum combined." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 232 (Att. 008). | |
| 335.  Defendants' TBXFREE.com/2 website displayed a graph entitled "Cure Rate Over Time in Months" that showed TBX-FREE with a higher rate at the 12 month point than nicotine patches and gums. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 232 (Att. 008). | |
| **FTC Response to SUF 333-335**:  The Cardiffs do not dispute that their | | |

TBXfree.com/2 website stated that TBX-FREE had a success rate exceeding 70%, that clinical studies cited in The New England Journal of Medicine reported an 88% cure rate for the active ingredient in TBX-FREE, or that TBX-FREE had a higher cure at the 12 month point than nicotine patches and gums. Whether or not this advertising ceased in February 2018 is not relevant to Defendants' liability.

However, Jason Cardiff's own evidence shows that through April 2018, the tbxfree.com website continued to tout TBX-FREE as an effective smoking cessation aid and superior to nicotine patches and gums (see Dkt. 491-3 p. 43).

| | | |
|---|---|---|
| 336.  The name and logo of "The New England Journal of Medicine" appeared below the "Cure Rate Over Time in Months" graph. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 232 (Att. 008). | Deny as it pertains to any wrongdoing of Defendants. Defendants used New England Journal of Medicine to show that cytisine, the active ingredient in TBX-FREE, is an effective smoking cessation. Ex. A, Declaration of Jason Cardiff ¶12-16. |
| 337.  Defendants' TBXFREE.com/2 website stated:  "Clinically Proven: New England Journal of Medicine STOP SMOKING NOW." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 232, 235 (Att. 008). | |
| 338. Defendants' TBXFREE.com/2 website stated: "Clinically Proven [in] Johns Hopkins University The New England Journal of Medicine | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 233, 236 (Att. 008). | |

| | | |
|---|---|---|
| Harvard Health Publications Harvard Medical School." | | |
| 339. Defendants' TBXFREE.com/2 website stated: "TBX-FREE Helps you Quit smoking . . The cytisine inside TBX-FREE absorbs quickly into the body to give the overwhelming sensation that you have just smoked a real cigarette!<br>• PROVEN IN RESEARCH STUDIES TO HELP SMOKERS QUIT THEIR ADDICTION!" | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 237 (Att. 008). | |
| 340. Defendants' TBXFREE.com/2 website stated: "Cytisine in TBX-FREE absorbs into the body and helps smokers calm their cigarette cravings.  TBX-FREE also gives the sensation of smoking a real cigarette when used as recommended with no | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 3-4, ¶ 6 & Dkt. 7, p. 238 (Att. 008). | |

| | | |
|---|---|---|
| withdrawal normally felt when trying to quit cold turkey.  TBX-FREE makes smoking feel unpleasant so that quitting becomes even easier.  TBX-FREE is the most advanced and most effective method of quitting smoking once and for all." | | |

**FTC Response to SUF 336 – 340:**  The Cardiffs do not dispute that the TBXFREE.com/2 website featured, among other statements and images, the name and logo of The New England Journal of Medicine, the statement "Clinically proven:  New England Journal of Medicine," and the statement that TBX-FREE had been clinically proven [in] Johns Hopkins University, the New England Journal of Medicine, and Harvard Medical School. Defendants, however, argue that this is not evidence of wrongdoing and again argue that TBX-FREE was effective by offering Jason Cardiff's characterization of a scientific study. This is both irrelevant and inadmissible under FRE 701.

| | | |
|---|---|---|
| 341.  Jason Cardiff appeared in Facebook Live advertising for TBX-FREE posted January 8, 2017.[6] | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 240, 241, 254 (Atts. 009, 010, 011). | Objection as to lack of timeframe and relevance. Defendants modified its advertising in or about February, 2018. |

---

[6] The Cardiffs submitted a single objection to SUF 341-374; the FTC's response begins on p. 192.

| | | |
|---|---|---|
| 342. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that it was a "life-saving and changing product that will stop you from smoking cigarettes." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 244, ln. 12-13 (Att. 010). | Dkt. 253-1 Declaration of Jason Cardiff ¶10; Dkt. 253-2 Declaration of Eunjung Cardiff ¶1; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. Defendants used numerous journals and clinical studies to show that cytisine, the active ingrednient in TBX-FREE, is an effective smoking cessation. Ex. A, Declaration of Jason Cardiff ¶12-16. Clinical studies did show that the active ingredient in TBX-FREE were effective smoking cessation agents. Out of a 60 person study, 13.8% quit smoking during a 12 month period with the aid of cytisine |
| 343. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that the product would stop smokers "from smoking cigarettes absolutely with a greater effective rate than anything on the market.  We have an 88 percent effective rate in long-term cure, in long-term smokers.  A long-term smoker is someone who's been smoking more than five years, more than a pack or around a pack a day on average." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 245, ln. 25 – p. 246, ln. 6 (Att. 010). | |
| 344. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "Our clinical data on TBX-Free has been done by some of the greatest medical and | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 246, ln. 7–13 (Atts. 010). | |

| | | |
|---|---|---|
| scientific institutions anywhere that we know of, including, not limited to the New England Journal of Medicine, which ranks our product ten times more effective than nicotine-replacement therapy to stop smoking. That's who's giving us this data." | | (Tabex) and the results were on par with "smokers receiving nicotine replacement therapy." Ex. A, Jason Cadiff Declaration ¶13. |
| 345. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "Our product has an 88 percent chan[c]e of you never smoking again." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 249, ln. 20-21 (Atts. 010). | The relative difference in smoking cessation between cytisine and placebo (relative rate, 3.4) was higher than previous studies have shown for varenicline (2.3) and nicotine-replacement therapy (1.6) over a 4 week period. Ex. A, Declaration of Jason Cardiff ¶14. |
| 346. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "all these scientists and doctors and studies and 10,600 smokers that went through the test to get these results, they're not wrong. The product works." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 250, ln. 19-22 (Atts. 010). | In a 12-month abstinence study of 40 participants, 8.4% of subjects quit smoking with help of cytisine as opposed to 2.4% of the placebo group. |
| 347. Jason Cardiff appeared in Facebook Live advertising | Sands 1st Dec. (TRO PX-1), Dkt. | |

| | | |
|---|---|---|
| for TBX-FREE posted February 7, 2017. | 7, p. 4, ¶ 8 & Dkt. 7, p. 255, 256, 267 (Atts. 012, 013, 014). | The 6% difference was deemed a 95% confidence level of effectiveness of cytisine. Ex. A, Declaration of Jason Cardiff ¶12. |
| 348.  Jason Cardiff stated in Facebook Live advertising for TBX-FREE that he was going to share "what is TBX-Free, how does it work, what is the secret to learn how to stop smoking cigarettes fast.  I mean really fast, within a week, within ten days." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 259, ln. 8-11 (Att. 013). | The FTC's expert, Prochaska noted that a few cytisine studies that follow the standards of experts in the field have demonstrated modest efficacy for smoking cessation. Dkt. 207, p. 6, n.2, to Dkt. 207-2 p. 85. |
| 349.  Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "We have long-term smokers that have learned this secret, that have been smoking for 30-plus years, two packs a day or more, and they no longer smoke cigarettes." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 259, ln. 12-15 (Att. 013). | |
| 350.  Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "you should never need more than one month." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 263, ln. 6-7 (Att. 013). | |

| | |
|---|---|
| 351. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "we have an 88 percent success rate." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 263, ln. 11 (Att. 013). |
| 352. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that the nicotine patch and gum "doesn't work with a 2 percent success rate." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 263, ln. 25 – 264, ln. 2 (Att. 013). |
| 353. Jason Cardiff appeared in Facebook Live advertising for TBX-FREE posted February 24, 2017. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 268 269, 282 (Atts. 015, 016, 017). |
| 354. Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "if you're smoking one of these products, these nasty cigarette-based products. I have the solution for you, and I can show you in a few short days how you can stop smoking for the last time, | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 272, ln. 9-13 (Att. 016). |

| | |
|---|---|
| once and for all." | |
| 355.  Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "We've developed the most successful stop-smoking product on the market, period, plain and simple. I challenge anybody that tells me they have a more successful stop-smoking product. It doesn't exist." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 274, ln. 15-18 (Att. 016). |
| 356.  Jason Cardiff stated in Facebook Live advertising for TBX-FREE that "We've replaced the feeling of smoking with a non-nicotine based product. And in five short days -- five days -- you get all the nicotine out of your system. You now have the nicotine out of your system and you have the chance to become and live a smoke-free life. And that is how the product works. That is why it has an 88 percent success rate, and we can look | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 275, ln. 16 – 276, ln. 2 (Att. 016). |

| | |
|---|---|
| here, we have an -- we have a proven track record of over an 88 percent success rate from some of the greatest medical institutions and universities in the United States and the U.K." | |
| 357. Jason Cardiff stated in Facebook Live advertising for TBX-FREE "You know you've tried to stop. You've tried to stop five, six, seven, ten times. This product will do it for you." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 278, ln. 3-5 (Att. 016). |
| 358. Jason Cardiff stated in Facebook Live advertising for TBX-FREE "You know the patches and gums won't give you any [money-back] guarantee because they know they don't work." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 278, ln. 18-20 (Att. 016). |
| 359. Defendants' print advertising for TBX-FREE said "Smokers can now stop smoking with TBX." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 5, ¶¶ 11-12 & Dkt. 7, p. 287-289 (Att. 020, 021, |

| | |
|---|---|
| | 022). |
| 360. Defendants' print advertising for TBX-FREE said "88% Success Rate vs 4% combined success rate of the patch & gum!" | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 5, ¶¶ 11-12 & Dkt. 7, p. 287-289 (Att. 020, 021, 022). |
| 361. Defendants' print advertising for TBX-FREE said "Clinically Proven:  New England Journal of Medicine." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 5, ¶¶ 11-12 & Dkt. 7, p. 287-289 (Att. 020, 021, 022). |
| 362. Eunjung Cardiff stated in advertising for TBX-FREE, "Someone who really cares for you asked me to reach out to help you quit smoking for good.  They say nothing has worked, but they want you to know about TBX Free, the stop smoking product that has changed so many lives. . . . I will absolutely help you quit for good and feel great about yourself." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 38, ¶ 111 & Dkt. 13, p. 66, 67-70 (Atts. 125, 126) ("Eunjung Better Than Me" ringless voicemail). Walker Dec. (PX-32), p. 19, ¶ 85 (identifying the voice of Eunjung Cardiff in the |

| | | |
|---|---|---|
| | ringless voicemail message previously identified as PX-1, Att. 125). | |
| 363. Defendants' Facebook advertisement for TBX-FREE said that the product was "PROVEN to curb cravings with an 88% success rate." | Sands 3rd Dec., PX-51), p. 3, ¶ 9 & p. 78 (Atts. 2, 24). | |
| 364. Jason Cardiff and Eunjung Cardiff admit that TBX-FREE was advertised as an effective smoking cessation product. | J. Cardiff 3rd RFA Resp., p. 7, ¶ 141 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 30 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 6, ¶ 135 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 81 (Att. 7)). | |
| 365. TBX-FREE was advertised as being more effective than either nicotine patches or nicotine gum in enabling cigarette smokers to quit smoking. | SUF 324, 328, 331-335, 343, 344, 351-352, 358, 360. | |
| 366. Jason Cardiff and Eunjung | J. Cardiff 3rd RFA | |

| | |
|---|---|
| Cardiff admit that TBX-FREE was advertised as enabling many cigarette smokers to quit in seven to ten days. | Resp., p. 7, ¶ 143 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 30 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 6, ¶ 137 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 81 (Att. 7)). |
| 367. Jason Cardiff and Eunjung Cardiff admit that TBX-FREE was advertised as having an 88 percent success rate. | J. Cardiff 3rd RFA Resp., p. 7-8, ¶ 144 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 30-31 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 6-7, ¶ 138 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 81-82 (Att. 7)). |
| 368. TBX-FREE was advertised as having an 88 percent success rate even among people who have smoked cigarettes for more than 5 years. | SUF 343.<br><br>See also SUF 325, 330, 334, 345, 351, 356, 360, 363 (88% success rate without reference |

| | | |
|---|---|---|
| | to years of smoking). | |
| 369.  TBX-FREE was advertised as so effective that smokers should not need to purchase more than one month of the product. | SUF 350. | |
| 370.  TBX-FREE advertising represented that clinical studies had been conducted on TBX-FREE. | SUF 326, 337-339, 344, 356, 361. | |
| 371.  TBX-FREE advertising represented that those clinical studies showed that TBX-FREE is an effective smoking cessation product. | SUF 337-339, 344, 346, 356, 360. | |
| 372.  TBX-FREE advertising represented that those clinical studies showed that TBX-FREE was more effective than nicotine patches or nicotine gum in enabling users to stop smoking. | SUF 334-336, 360. | |
| 373.  TBX-FREE advertising represented that The New England Journal of Medicine, Harvard Health | SUF 334-338, 344, 361. | |

| | | |
|---|---|---|
| Publications, and Johns Hopkins University had published clinical studies proving that TBX-FREE was an effective smoking cessation product. | | |
| 374.  TBX-FREE advertising represented that The New England Journal of Medicine's clinical studies showed that TBX-FREE is ten times more effective for smoking cessation than nicotine replacement therapy. | SUF 344.<br><br>See also SUF 360-361. | |

**FTC Response to SUF 341 – 374**: The Cardiffs do not dispute that Jason Cardiff or Eunjung Cardiff made the statements attributed to them in TBX-FREE advertising, or that their Facebook and print advertising made the statements in question; nor do they dispute, among other facts, that TBX-FREE was advertised as an effective smoking cessation product, more effective than nicotine patches or gums, gums, that it had an 88% success rate, that clinical studies conducted on TBX-FREE proved that it was more effective than nicotine patches and gums, and that the New England Journal of Medicine and other journals had published studies proving its efficacy. Whether or not the defendants ceased making these claims in Feburary 2018 is not relevant to their liability for deceptive advertising The relevant period when Defendants marketed TBX-FREE is 2015-2018, Dkt. 1.

The timeframe for these facts, as alleged in the complaint, is relevant to the Cardiffs' individual liability for making deceptive advertising claims that were widely disseminated. Defendants' actions are proof of their individual liability for injunctive and monetary relief.  In fact, the Cardiffs did not cease advertising TBX-FREE in February 2018. SUF 938.

The Cardiffs' assertion that there were clinical studies on the purported active ingredient in TBX-FREE is simply not relevant to the FTC's undisputed statement. In any event, Jason Cardiff's characterization of the findings of any scientific study is irrelevant to FTC SUF 341-374 and inadmissible under FRE 701. Dkt. 490, p.  15-18; see also, e.g., Dkt. 490-1, p. 27-30.

### C. Defendants' Smoking Cessation Claims for TBX-FREE Were False or Unsubstantiated

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 375. Jason Cardiff and Eunjung Cardiff admit that Defendants did not conduct any human clinical studies of TBX-FREE as a smoking cessation product. | J. Cardiff 3rd RFA Resp., p. 8, ¶ 147 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 31 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 7, ¶ 141 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 82 (Att. 7)).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, | Admit. Clinical studies did show that the active ingredient in TBX-FREE were effective smoking cessation agents. Out of a 60 person study, 13.8% quit smoking during a 12 month period with the aid of cytisine (Tabex) and the results were on par with "smokers receiving nicotine replacement |

| | ¶ 2 & Dkt. 7, p. 145 (Att. 001) ("Redwood is informed and believes that it did not perform any unpublished human clinical studies for TBX-FREE . . ..").<br><br>Walker Dec. (PX-32), p. 10, ¶ 43. | therapy." Ex. A, Declaration of Jason Cardiff ¶13. |
|---|---|---|
| **FTC Response to SUF 375**:  Defendants do not dispute that they did not conduct any human clinical studies of TBX-FREE as a smoking cessation product. The remaining narrative should be disregarded as argument not related to the subject matter. | | |
| 376.  The FTC submitted the Declaration and accompanying expert report of Judith J. Prochaska, Ph.D., MPH.[7] | Declaration of Judith J. Prochaska, PH.D., MPH (TRO PX-7), Dkt. 207 to 207-2. | Objection irrelevant and lacks timeframe. Defendants object to Dr. Prochaska's declaration the basis that he assumed facts regarding Redwoods product claims that were no longer valid. Defendants stopped marketing and |
| 377.  The Commission identified Dr. Prochaska as an | Sanger Dec. (PX-52), p. 2-3, ¶ 15. | |

[7] The Cardiffs submitted a single objection to SUF 376-440; the FTC's response begins on p. 227.

| | | |
|---|---|---|
| expert witness in its September 26, 2019 Initial Disclosures. | See also Sanger Dec. (PX-52), p. 2, ¶¶ 13-14 (FTC sent counsel for the Cardiffs copies of its four expert reports in March and April 2019). | changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8. Dr. Prochaska's testimony should be excluded because the FTC failed to disclose the compensation to be paid for her testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four |
| 378. As of September 12, 2018, when she signed her expert report in this case, Dr. Prochaska was a tenured Associate Professor of Medicine with the Stanford Prevention Research Center in the Department of Medicine and the School of Medicine at Stanford University. | Expert Report of Judith J. Prochaska, Ph.D, MPH (hereafter "Prochaska Expert Report") (TRO PX-7), Dkt. 207, p. 4. | |
| 379. Dr. Prochaska is a licensed clinical psychologist and holds medical privileges with | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | |

| | | |
|---|---|---|
| Stanford Hospital & Clinics where she treats patients who have nicotine addiction. | | years. Rule 26(a)(2). Moreover, Dr. Prohaska was not provided accurate information about the modified product claims made for TBX-Free. Accordingly, her opinions should be excluded under the Daubert test. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589; FTC v. Qualcomm Inc., 2018 U.S. Dist. LEXIS 208197, *9, 2018 WL 6460573 |
| 380. Dr. Prochaska has conducted numerous scientific research studies focused on tobacco use and treatments for tobacco addiction. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | |
| 381. Dr. Prochaska's research has focused on studies of tobacco use and treatments for tobacco addiction in diverse and vulnerable populations with high smoking prevalence. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | Defendants used numerous journals and clinical studies to show that cytisine, the active ingrednient in TBX-FREE, is an effective smoking cessation. Ex. A, Declaration of Jason Cardiff ¶12-16. |
| 382. As of September 12, 2018, when Dr. Prochaska signed her expert report in | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | Clinical studies did show that the active ingredient in TBX-FREE were |

| | | |
|---|---|---|
| this case, she had conducted eight clinical tobacco treatment trials with more than 1,800 smokers, spanning adolescents to older adults. | | effective smoking cessation agents. Out of a 60 person study, 13.8% quit smoking during a 12 month period with the aid of cytisine (Tabex) and the results were on par with "smokers receiving nicotine replacement therapy." Ex. A, Declaration of Jason Cardiff ¶13. |
| 383. Dr. Prochaska has been on the Editorial Boards of the Cochrane Tobacco Addiction Review Group, JAMA Internal Medicine, Tobacco Regulatory Science, and Health Psychology. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | The relative difference in smoking cessation between cytisine and placebo (relative rate, 3.4) was higher than previous studies have shown for varenicline (2.3) and nicotine-replacement therapy (1.6) over a 4 week period. Ex. A, Declaration of Jason Cardiff ¶14. |
| 384. Dr. Prochaska has authored more than 175 peer-reviewed publications in the areas of randomized controlled clinical trial evaluations of | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | In a 12-month abstinence study of 40 participants, 8.4% of subjects quit smoking with help of |

| | | |
|---|---|---|
| smoking cessation interventions, nicotine addiction, smoking and disease, psychiatric disorders, medical education, multiple risk behavior change, mHealth, measurement development and psychometrics, dissemination, and quantitative methods. | | cytisine as opposed to 2.4% of the placebo group. The 6% difference was deemed a 95% confidence level of effectiveness of cytisine. Ex. A, Declaration of Jason Cardiff ¶12. The FTC's expert, Prochaska noted that a few cytisine studies that follow the standards of experts in the field have demonstrated modest efficacy for smoking cessation. Dkt. 207, p. 6, n.2, to Dkt. 207-2 p. 85. |
| 385. As of September 12, 2018, Dr. Prochaska was the immediate past-President and a Fellow of the Society for Research on Nicotine and Tobacco (SRNT), the international scientific society that aims to | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | |

-198-

| | | |
|---|---|---|
| stimulate the generation and dissemination of new knowledge concerning nicotine and tobacco from bench to bedside and through to health policy. | | |
| 386. Dr. Prochaska has published in the New England Journal of Medicine; the Journal of the American Medical Association (JAMA); JAMA Internal Medicine; JAMA Psychiatry; the British Medical Journal (BMJ); Addiction; Tobacco Control; Nicotine and Tobacco Research; Tobacco | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. | |

| | |
|---|---|
| Regulatory Science; Circulation; and Oncology. | |
| 387.  Dr. Prochaska has led and collaborated on a number of highly cited meta-analyses of randomized controlled trials evaluating pharmacological treatments for tobacco addiction. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 4. |
| 388.  In the interest of advancing treatment of tobacco use and addiction in medical practice, Dr. Prochaska developed, evaluated, and disseminated the Rx for Change tobacco treatment curricula | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 5. |

| | | |
|---|---|---|
| (http://rxforchange.ucsf.edu) focusing on psychiatry and cardiology care providers. | | |
| 389. Based upon her education, training, and professional experience, above, and including her curriculum vitae, Dr. Prochaska is an expert in tobacco epidemiology, tobacco use behaviors, nicotine addiction, and behavioral, pharmacological, and health policy tobacco cessation interventions; clinical trials design; systematic reviews and meta-analyses; consumer risk perceptions, tobacco product | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 5. | |

| | | |
|---|---|---|
| marketing, cigarette design, and the tobacco industry documents. | | |
| 390.  According to Dr. Prochaska, tobacco is the leading cause of preventable death in the United States. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 5. | |
| 391.  Dr. Prochaska stated that 7 in 10 smokers want to quit, and about half quit for 24-hours in any given year, but fewer than 7 in 100 smokers are able to sustain abstinence for a year or more. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 5. | |
| 392.  Dr. Prochaska stated that to support claims of efficacy for a smoking cessation product, experts in the field would | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 6-7. | |

| | | |
|---|---|---|
| require scientific testing of the product itself in human subjects in double-blind, randomized, placebo-controlled trials showing statistically significant results in producing biochemically-verified tobacco abstinence. | | |
| 393. Dr. Prochaska stated that these statistically significant results should then be replicated to confirm product efficacy. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7. | |
| 394. Dr. Prochaska stated that in vitro and animal studies must be followed by human studies. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 16 n.21. | |
| 395. Dr. Prochaska | Prochaska Expert Report | |

| | | |
|---|---|---|
| stated that given many potential confounds and sources of bias in tobacco cessation studies, there are general agreed-upon requirements for generating reliable scientific evidence in such studies. | (TRO PX-7), Dkt. 207, p. 7. | |
| 396.  Dr. Prochaska stated that the strongest study design is the randomized double-blind placebo-controlled trial. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 8. | |
| 397.  Dr. Prochaska stated that the study should include a control group in order to isolate the effects of a treatment to determine whether | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7. | |

| | | |
|---|---|---|
| it is indeed the cause of the effect of interest. | | |
| 398. Dr. Prochaska stated that in a controlled experiment, identical procedures are carried out in two groups with the difference being that the experimental group receives the treatment of interest and the control group does not. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7. | |
| 399. Dr. Prochaska stated that placebos are inactive treatments that are indistinguishable in form from the active treatment, and are used to offset the effect | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 8. | |

| | | |
|---|---|---|
| that knowing they are not receiving the new drug could have on participants' behavior, including dropping out of the study early. | | |
| 400. Dr. Prochaska stated that in order to prevent experimenter bias, the study should be double-blind as well as placebo-controlled, so that the researchers and their staff do not know who is receiving the active versus the placebo treatment. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 8. | |
| 401. Dr. Prochaska stated that randomization of study participants allows investigators to test | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 8. | |

| | | |
|---|---|---|
| a new treatment without introducing known or unknown bias in treatment assignment. Proper randomization ensures that participants are assigned to a treatment arm by chance alone. | | |
| 402. Dr. Prochaska stated proper randomization ensures that participants are assigned to a treatment arm by chance alone. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 8. | |
| 403. Dr. Prochaska stated that randomization should result in the creation of equitable groups on all measured | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 9. | |

| | | |
|---|---|---|
| and unmeasured factors, which means that participants in both treatment arms should be similar on demographic characteristics (e.g., gender, age, race/ethnicity, education level) and in their heaviness of smoking, number of past quit attempts, belief in their ability to quit, and other unmeasured potential confounding factors that may relate to treatment success. | | |
| 404. Dr. Prochaska stated that randomization enables differences | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 9. | |

| | | |
|---|---|---|
| between the groups observed over time to be attributed to the treatment effect. | | |
| 405. Dr. Prochaska stated that replication of study findings is needed to confirm that the treatment effects seen in a single double-blind placebo controlled randomized trial are real and will generalize to other samples. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 9 (citation omitted). | |
| 406. Dr. Prochaska stated that relapse is the norm for smokers who attempt to quit. The longer an individual can sustain a quit attempt, the less likely he or she is | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 9. | |

| | |
|---|---|
| to relapse. | |
| 407. Dr. Prochaska stated that the general standard in the field for documenting treatment efficacy is sustained abstinence of at least 6 months from treatment start or quit date. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 9-10. |
| 408. Dr. Prochaska stated that most tobacco cessation drug trials report on 6-months sustained abstinence as their primary outcome, and a statistically significant difference at $p < 0.05$ between treatment and control is the convention for determining | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 10. |

| | |
|---|---|
| efficacy. | |
| 409. Dr. Prochaska stated that to address false reporting of quitting smoking, experts would expect clinic-based randomized controlled tobacco treatment trials to use biochemical verification of abstinence by testing carbon monoxide in expired air; testing of cotinine in saliva, urine, or plasma; or testing of anabasine in urine. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 10. |
| 410. Dr. Prochaska stated that if a clinical trial's sample size is too small, the study will not have | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 10. |

| | | |
|---|---|---|
| sufficient power to detect a treatment effect. | | |
| 411.  Dr. Prochaska stated that a power analysis should be used to calculate the minimum number of participants required so the study is reasonably likely to detect a clinically meaningful effect. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 10. | |
| 412.  Dr. Prochaska stated that although it is sometimes acceptable to rely on testing of one product to support the efficacy of another one (e.g., for branded to generic versions of a drug), it is not acceptable when the dose or | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 11. | |

| | |
|---|---|
| delivery mechanism is different. | |
| 413.  Dr. Prochaska stated that in the field of tobacco cessation treatment, the standard of practice for nicotine replacement therapy has been to conduct double-blind placebo randomized controlled trials for each type of delivery (i.e., transdermal patch, gum, lozenge, inhaler, nasal spray, mouth spray, and most recently, oral film), rather than extrapolating from the testing of one product to support | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 11. |

| | |
|---|---|
| the efficacy of another. | |
| 414. Dr. Prochaska stated that experts in the field of smoking cessation would require at least two double-blind, randomized, controlled trials producing statistically significant evidence that TBX-FREE users have a significantly greater likelihood of biochemically-verified tobacco abstinence relative to placebo to support the claim that TBX-FREE is an effective smoking cessation product and the claim that TBX-FREE is more | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 14. |

| | | |
|---|---|---|
| effective than nicotine patches or nicotine gum. | | |
| 415.  Dr. Prochaska stated that the bio-chemically confirmed tobacco abstinence for TBX-FREE subjects would have to reach 88 percent or higher as compared to placebo to support the claim that TBX-FREE has an 88 percent success rate. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 14. | |
| 416.  Dr. Prochaska stated that a study's design must include a sufficient number of subjects who reported smoking for more than 5 years to support a subgroup analysis | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 14. | |

| | |
|---|---|
| and specific claim made about such smokers. | |
| 417. Dr. Prochaska's unrebutted expert opinion is that for the claims that TBX-FREE enables cigarette smokers to quit in seven to ten days and smokers should not need to purchase more than one month of TBX-FREE (i.e., individuals will be tobacco-free after one month), experts would consider statistically significant results against placebo at the specified time points (i.e., 7 to 10 days and 1 month) as preliminary | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 14. |

| | | |
|---|---|---|
| evidence of efficacy, and would require more evidence because the outcome of interest is sustained abstinence 6-months or longer. | | |
| 418.  To evaluate the claims for TBX-FREE, Dr. Prochaska reviewed the documents submitted by the Defendants as substantiation for TBX-FREE. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 6; Dkt. 207, p. 75 to Dkt. 207-2, p. 85. | |
| 419.  Dr. Prochaska also conducted an independent search of the scientific literature to determine whether there was other scientific support for the challenged | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 6, n.2; Dkt. 207, p. 14; Dkt. 207, p. 68-69. | |

| | |
|---|---|
| TBX-FREE claims. | |
| 420. Dr. Prochaska found no study of TBX-FREE in the published scientific literature, or any registered trials of the product in clinicaltrials.gov. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7, 14, 14 n.16. |
| 421. The materials Dr. Prochaska received from the Commission for her review, which had been provided by Redwood Scientific Technologies, did not contain any studies of TBX-FREE. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7. |
| 422. The studies contained in the materials Dr. Prochaska received from the Commission for | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7. |

| | | |
|---|---|---|
| her review, which had been provided by Redwood Scientific Technologies, related to products other than TBX-FREE. | | |
| 423. Dr. Prochaska's unrebutted expert opinion is that experts in the field of smoking cessation would not simply extrapolate to TBX-FREE from the results of studies conducted on other products. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7. | |
| 424. Dr. Prochaska's search of the scientific literature relating to cytisine did not uncover any study supporting the efficacy of TBX- | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 15. | |

| | |
|---|---|
| FREE for smoking cessation. | |
| 425. Dr. Prochaska's unrebutted expert opinion is that most scientific research on cytisine for smoking cessation has been on a tablet sold in Eastern Europe under the brand name TABEX, and using the dosing regimen recommended for that product. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 15. |
| 426. Dr. Prochaska stated that the efficacy of cytisine in one modality (for example 1.5 mg TABEX tablets) cannot be assumed to hold true for a diluted dose and/or | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 16, 17. |

| | |
|---|---|
| another delivery form, such as the homeopathic TBX-FREE oral film strip. | |
| 427. Dr. Prochaska stated that the best available evidence for cytisine comes from two published double-blind, randomized controlled tests of TABEX against placebo with bioconfirmation of abstinence. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 17. |
| 428. Dr. Prochaska stated that even these two trials showed abstinence rates of only 8.4% and 10.6% at 6 to 12 months follow-up. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 17. |
| 429. Dr. Prochaska stated that the results of research | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 16. |

| | |
|---|---|
| on TABEX cannot be extrapolated to TBX-FREE, because the two products are very different in dose and delivery (tablet versus dissolvable film strip). | |
| 430. Dr. Prochaska stated that differences between the two products in the means of delivery can affect the pharmacokinetics of absorption, distribution, metabolism, and excretion of cytisine. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 16. |
| 431. Dr. Prochaska stated although there are studies of cytisine formulations in oral films, they are | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 19. |

| | |
|---|---|
| uncontrolled and the products tested are significantly different from TBX-FREE, so the results cannot be extrapolated to TBX-FREE | |
| 432. Dr. Prochaska is not aware of any tobacco cessation drug or other treatment that can legitimately claim an 88% success rate at a meaningful follow-up interval among established smokers. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 18. |
| 433. It was Dr Prochaska's unrebutted expert opinion that a claim that TBX-FREE was an effective smoking cessation product | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 20. |

| | |
|---|---|
| is not substantiated. | |
| 434.  It was Dr Prochaska's unrebutted expert opinion that a claim that TBX-FREE is more effective than either nicotine patches or nicotine gum in enabling cigarette smokers to stop smoking is not substantiated. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 6, 20. |
| 435.  It was Dr Prochaska's unrebutted expert opinion that a claim that TBX-FREE enables many cigarette smokers to quit in seven to ten days was not substantiated. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 6, 20. |
| 436.  It was Dr Prochaska's | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. |

| | |
|---|---|
| unrebutted expert opinion that a claim that TBX-FREE has an 88 percent success rate, including among people who have smoked cigarettes for more than 5 years, was not substantiated. | 6, 20. |
| 437. It was Dr Prochaska's unrebutted expert opinion that a claim that smokers should not need to purchase more than one month of TBX-FREE was not substantiated. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 6, 20. |
| 438. Defendants have admitted that their 88% success rate claim was erroneous. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 115 (Att. 001), (Redwood's response to FTC's Civil Investigative Demand says that "a chart regarding TBX that |

| | |
|---|---|
| | referenced an '88% success rate' … should not have been on the [web]site…."). |
| 439. Based on her expertise and review, Dr. Prochaska concluded that a claim that smokers should not need to purchase more than one month of TBX-FREE was not substantiated by materials produced by Redwood Scientific Technologies or by the scientific literature. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 6, 20. |
| 440. The Cardiffs did not submit any expert report disagreeing with Dr. Prochaska's conclusions about | Sanger Dec. (PX-52), p. 3, ¶ 16. |

| TBX-FREE or supporting the TBX-FREE claims challenged in this proceeding. | | |
|---|---|---|

**FTC Response to SUF 376 – 440**:  The Cardiffs do not dispute any of the foregoing facts concerning Dr. Prochaska's qualifications or explanations of the standards that smoking cessation experts use to determine whether claims for a specific smoking cessation product are substantiated, or her evaluation of the challenged claims made for TBX-FREE using those standards.

Dr. Prochaska's expert report is relevant and helpful to the Court. FRE 702, 702. She has described to the Court her credentials and expertise in this area of sciencewas and has opined, as an expert in smoking cessation, on whether the claims challenged in the Commission's complaint were substantiated.  That is exactly what she did, setting forth first the standards that experts in the field would use to answer that question and then examining the relevant scientific evidence.

The Cardiffs are wrong when they state that Dr. Prochaska failed to state how much she is being paid or the tobacco cases in which she has participated.  See Dkt. 207, p. 5.

Jason Cardiff's characterization of the findings of any scientific study is inadmissible under FRE 701 because he is providing testimony based on "scientific, technical, or other specialized knowledge within the scope of FRE 702," but has not been qualified as an expert.  Dkt. 490, p. 15-18; see also, e.g., Dkt. 490-1, p. 27-30.  Dr. Prochaska explained why none of those studies

substantiate claims for TBX-FREE.

The timeframe is the period when Defendants marketed and sold TBX-FREE (2015-2018, see Dkt. 1), and these facts are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

### D. Defendants' Claims that TBX-FREE Was Proven To Be Effective Were False

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 441. No clinical studies have been conducted on TBX-FREE assessing the product's efficacy for smoking cessation. | Prochaska Expert Report (TRO PX-7), Dkt. 207, p. 7, 14 n.16 (found no published or registered trials of TBX-FREE).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 145 (Att. 001) ("Redwood is informed and believes that it did not perform any unpublished human clinical studies for TBX-FREE . . . .").<br><br>Walker Dec. (PX-32), p. 11, ¶ 43 (to her | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶ 7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on |

| | knowledge, Redwood never conducted any scientific testing of TBX-FREE).  SUF 375. | October 30, 2017. Dkt. 432-2 at 3-8. Clinical studies did show that the active ingredient in TBX-FREE were effective smoking cessation agents. Out of a 60 person study, 13.8% quit smoking during a 12 month period with the aid of cytisine (Tabex) and the results were on par with "smokers receiving nicotine replacement therapy." Ex. A, Declaration of Jason Cardiff ¶13. |
|---|---|---|
| 442. Clinical studies of TBX-FREE were not conducted on 10,600 people. | SUF 420 441. | |
| 443. Clinical studies have not shown TBX-FREE to have an 88% success rate. | SUF 375, 420, 438, 441.  See also SUF 432, 436. | |
| 444. The New England Journal of Medicine, did not publish clinical studies or other material proving that TBX-FREE is an effective smoking cessation product. | Appel Dec. (PX-50), p. 1-2, ¶ 4. | |
| 445. The New England Journal of Medicine did not publish clinical | Appel Dec. (PX-50), p. 1-2, ¶ 4. | |

| studies or other material demonstrating that users of TBX-FREE had an 88% success rate. | | |
|---|---|---|
| **FTC Response to SUF 441 – 445**:  The Cardiffs do not dispute that no clinical studies have been conducted on TBX-FREE.<br><br>Defendants admitted in their responses to the Commission's CIDs that they did not conduct clinical studies on TBX-FREE, and the Commission's smoking cessation expert found no published or registered trials of the product.<br><br>The Cardiffs' timeframe objection is irrelevant to the question of whether clinical studies have been conducted on TBX-FREE.  These facts are relevant to proving that the Cardiffs' advertising claims were deceptive and to their individual liability for injunctive and monetary relief.<br><br>Their extraneous narrative does not address these facts and should be disregarded. | | |
| 446. The New England Journal of Medicine filed a lawsuit against Redwood Scientific Technologies alleging that Redwood had | Appel Dec. (PX-50), p. 1-2, ¶ 3-5. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101- |

| | | |
|---|---|---|
| falsely claimed in Internet advertising -- the tbxfree.com website and a YouTube video linked to the website – that TBX-FREE had been favorably studied by a number of medical institutions and journals, including the New England Journal of Medicine (NEJM), and that the NEJM had found in clinical trials that users of TBX-FREE succeeded in quitting smoking 88% of the time. | | 102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |

**FTC Response to SUF 446:**  The Cardiffs do not dispute that the New England Journal of Medicine sued them. Furthermore, they did not cease advertising in February 2018. SUF 938. The Declaration of Joseph Appel, Senior Counsel for the Massachusetts Medical Society, states the timeframe:  the complaint was filed "on or around May 3, 2017."  Dkt. 433-6, p. 2, ¶ 3. This fact is relevant to

| the Cardiffs' individual liability for injunctive and monetary relief. | | |
|---|---|---|
| 447.[reserved] | | |
| 448.[reserved] | | |
| 449.[reserved] | | |

## IV.    Eupepsia Thin

*A. Defendants' Marketing of Eupepsia Thin*

| **FTC Fact** | **FTC Citation** | **Cardiff Admit/Objection** |
|---|---|---|
| 450.  The target audience for Eupepsia Thin was people who wanted to lose weight. | Adkinson-Connor Dec. (PX-38), p. 12, ¶ 52. | Admit |
| 451.  Jason Cardiff and Eunjung Cardiff admit that Defendants advertised an oral film strip called Eupepsia Thin. | J. Cardiff 3rd RFA Resp., p. 10, ¶ 158 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 33 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 9, ¶ 152 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 84 (Att. 7)). | Admit |
| 452.  Jason Cardiff and Eunjung Cardiff admit that Defendants sold | J. Cardiff 3rd RFA Resp., p. 10, ¶ 159 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 33 (Att. 3)). | Admit |

| | | |
|---|---|---|
| Eupepsia Thin from at least 2017 to 2018. | E. Cardiff 3rd RFA Resp., p. 9, ¶ 153 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 84 (Att. 7)). | |
| 453. According to the Eupepsia Thin package label, each film strip contains Paullinia Cupana H.B.K. et K, 1X. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 19, ¶ 60 & Dkt. 10-1, p. 14-15 (Att. 095). See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 51 (Att. 026) (bethinrx.com website). Report of David A. Levitsky, Ph.D. (hereafter "Levitsky Expert Report") (TRO PX-8), Dkt. 208, p. 7, ¶ I.2.A.i. | Admit |
| 454. In its response to the Commission's CID, Redwood Scientific stated that gross 2017 sales revenues for | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p.158 (Att. 003). | Admit |

| | | |
|---|---|---|
| Eupepsia Thin (not including retail sales) were $1,913,446.79. | | |
| 455.  In its response to the Commission's CID, Redwood Scientific stated that gross 2018 sales revenues for Eupepsia Thin (not including retail sales) through April 30, 2018 were $343,247.68. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p. 158 (Att. 003). | Admit |
| 456.  In its response to the Commission's CID, Redwood Scientific stated that Eupepsia Thin refunds in 2017 (including some but not all chargebacks) were $245,690.57. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p. 164 (Att. 003). | Admit |
| 457.  In its response to the Commission's CID, Redwood | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2-3, ¶ 3 & Dkt. 7, p. 165 (Att. 003). | Admit |

| | | |
|---|---|---|
| Scientific stated that Eupepsia Thin refunds in 2018 (including some but not all chargebacks) were $64,544.88 through April 30, 2018. | | |
| 458.  In response to the Commission's Civil Investigative Demand, Redwood Scientific reported net Eupepsia Thin sales of $1,946,459.02 for 2017 through April 2018. | Sands 3rd Dec. (PX-51), p. 18, ¶ 53 & p. 1900 (Att. 128).<br><br>See SUF 454-457. | Admit |
| 459.  Defendants advertised Eupepsia Thin using long-form and short-form television commercials, | Walker Dec. (PX-32), p. 5, ¶ 21. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. |

| | | |
|---|---|---|
| websites, and social media.[8] | | Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |
| 460. Defendants advertised Eupepsia Thin through national television campaigns. | Adkinson-Connor Dec. (PX-38), p. 1, ¶ 5; p. 2-3, ¶ 10 & p. 57-515 (Att. 9); p. 5-6, ¶¶ 22-24.<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4-5, ¶ 13 & Dkt. 10, p. 2-46 (Att. 023, 024, 25).<br><br>Sands 3rd Dec. (TRO PX-51), p. 9-11, ¶¶ 37-39.<br><br>Cabrinha Dec. (PX-41), p. 1-2, ¶¶ 3, 5 & p. 14-24 (Att. 2). | |
| 461. Jason Cardiff and Eunjung Cardiff admit that FX Web Media produced Eupepsia Thin television | J. Cardiff 3rd RFA Resp., p. 13, ¶ 178 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 36 (Att. 3)).<br><br>E. Cardiff 3rd RFA | |

[8] The Cardiffs submitted a single objection to SUF 459-478; the FTC's response begins on p. 244.

| | | |
|---|---|---|
| advertisements for Defendants. | Resp., p. 11, ¶ 172 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 86 (Att. 7)).<br><br>See also Sherrell Dec. (PX-43), p. 2, ¶ 4. | |
| 462. Jason Cardiff and Eunjung Cardiff admit that Corporate Defendants purchased media time for Eupepsia Thin television advertisements from Cannella Response Television, LLC. | J. Cardiff 3rd RFA Resp., p. 10, ¶ 160 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 33 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 9, ¶ 154 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 84 (Att. 7)). | |
| 463. Jason Cardiff and Eunjung Cardiff admit that Cannella Response Television, LLC, arranged for Eupepsia Thin television advertisements to be broadcast on | J. Cardiff 3rd RFA Resp., p. 10, ¶ 163 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 33 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 9, ¶ 157 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 84 (Att. 7)). | |

| | | |
|---|---|---|
| national cable television. | | |
| 464. Cannella purchased media time for Eupepsia Thin advertising in 2017 and 2018. | Adkinson-Connor Dec. (PX-38), p. 6, ¶¶ 23-24; p. 2-3, ¶ 10 & p. 77-102, 321-515 (Att. 9). Walker Dec. (PX-32), p. 8, ¶ 34. | |
| 465. In 2017-2018, Cannella purchased media time for Eupepsia Thin long-form ads entitled EPEP LF V1, EPEP LF V2, EPEP LF V2 SCRIPPS, and EPEP LF V3 W/HE30 from television stations that aired them across the United States. | Adkinson-Connor Dec. (PX-38), p. 6, ¶¶ 23-24; p. 2-3, ¶ 10 & p. 77-102 (Att. 9). | |
| 466. In 2017, Cannella purchased media time for the Eupepsia Thin | Adkinson-Connor Dec. (PX-38), p. 6, ¶ 23; p. 2-3, ¶ 10 & p. 321-515 (Att. 9). | |

| | | |
|---|---|---|
| short-form ads entitled U2KM (using the www.controltheweight.com website) and U2JP (using the www.thinyounow.com website). | | |
| 467.  Jason Cardiff and Eunjung Cardiff admit that Cannella purchased media time for Eupepsia Thin TV ads EPEP LF V1, EPEP LF V2, EPEP LF V2 SCRIPPS, and EPEP LF V3 W/HE30 from television stations that aired them across the United States. | J. Cardiff 3rd RFA Resp., p. 11, ¶ 164 (EPEP LF V1); ¶ 165 (EPEP LF V2); ¶ 166 (EPEP LF V2 SCRIPPS); ¶ 167 (EPEP LF V3 W/HE30) (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 34 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 9-10, ¶ 158 (EPEP LF V1); ¶ 159 (EPEP LF V2); ¶ 160 (EPEP LF V2 SCRIPPS); ¶ 161 (EPEP LF V3 W/HE30) (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 84-85 (Att. 7)). | |
| 468.  Cannella purchased | Sands 3rd Dec. (PX-51), | |

| | |
|---|---|
| media time for 27 airings of the long-form ad entitled EPEP LF VI with master number 475750 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000040. | p. 12, ¶ 41 & p. 1685 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 5-6, ¶ 22; p. 2-3, ¶ 10 & p. 77 (Att. 9). |
| 469. Cannella purchased media time for 686 airings of the long-form ad entitled EPEP LF V2 with master number 476085 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000033. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1685 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 5-6, ¶ 22; p. 2-3, ¶ 10 & p. 77-87 (Att. 9). |
| 470. Cannella purchased media time for 105 airings of the long-form ad entitled EPEP LF V2 | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1685 (Att. 125).<br><br>Adkinson-Connor Dec. |

| | |
|---|---|
| SCRIPPS with master number 476675 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000039. | (PX-38), p. 5-6, ¶ 22; p. 2-3, ¶ 10 & p. 87-88 (Att. 9). |
| 471.   Cannella purchased media time for 941 airings of the long-form ad entitled EPEP LF V3 W/HE30 with master number 483044 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000035. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1685 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 5-6, ¶ 22; p. 2-3, ¶ 10 & p. 88-102 (Att. 9). |
| 472.   Cannella purchased media time for 5,561 airings of the short-form ad entitled U2KM (using the www.controlthewe | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1686 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 5-6, ¶ 22; p. 2-3, ¶ 10 & p. 321-406 |

| | |
|---|---|
| ight.com website) that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000046. | (Att. 9). |
| 473. Cannella purchased media time for 719 airings of the short-form ad entitled U2JP that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000047. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1686 (Att. 125). <br><br> Adkinson-Connor Dec. (PX-38), p. 5-6, ¶ 22; p. 2-3, ¶ 10 & p. 406-515 (Att. 9). |
| 474. Cannella purchased media time for a total of 8,039 airings of Eupepsia Thin advertising. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1685-1686 (Att. 125). <br><br> See SUF 468-473. |
| 475. Jason Cardiff and Eunjung Cardiff admit that Corporate Defendants purchased media | J. Cardiff 3rd RFA Resp., p. 11, ¶ 168 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 34 (Att. 3)). <br><br> E. Cardiff 3rd RFA |

| | |
|---|---|
| time for Eupepsia Thin television advertisements from Mercury Media, Inc. | Resp., p. 10, ¶ 162 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 85 (Att. 7)). |
| 476. Jason Cardiff and Eunjung Cardiff admit that Mercury Media, Inc., arranged for Eupepsia Thin television advertisements to be broadcast on national cable television. | J. Cardiff 3rd RFA Resp., p. 11, ¶ 169 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 34 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 10, ¶ 163 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 85 (Att. 7)). |
| 477. Mercury Media placed television advertising for Eupepsia Thin on national media between August and November 2017. | Cabrinha Dec. (PX-41), p. 1-2, ¶¶ 3, 5 & p. 14-24 (Att. 2). |
| 478. Defendants advertised Eupepsia Thin on Facebook. | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 93-106 (Att. 32). |

**FTC Response to SUF 459 – 478:**  The Cardiffs do not dispute that prior to February 2018, Eupepsia Thin was advertised on tv, the internet, and social media, including thousands of national airings of tv commercials. Whether or not this television advertising ceased in December 2017 or in February 2018 is not relevant to the defendants' liability. Although defendants ceased advertising Eupepsia Thin through Mercury on December 25, 2017, they continued this television advertising through another media company, Cannella, through at least January 27, 2018. See PX 41, att. 9, p. 102. Also, defendants' Redwood America website, which made deceptive claims for Eupepsia Thin, was in fact live as of March 28, 2018, when the Commission's investigator visited it (Dkt. 7, p. 6, ¶ 17), and their controltheweight.com website was still live as of August 9, 2018. Dkt. 434-1, p. 6, ¶ 18. See also SUF 938.

Defendants now deny their sworn FRCP admissions made in response to the FTC's Requests for Admission (FTC SUF 461-463, 475-475). Their contradictory declarations without detail or explanation for the change in their sworn testimony should be rejected.  They do not raise a genuine issue of disputed fact.

The timeframe alleged is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1), and these facts are relevant to proving that the Cardiffs' advertising claims were made and widely disseminated and to their individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 479. Defendants advertised Eupepsia Thin on the websites www.bethinrx.com | Walker Dec. (PX-32), p. 9, ¶ 37 & p. 547-581 (Atts. 49-55); p. 591-592 (Att. 58). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were |

| | | |
|---|---|---|
| , www.thinliferx.com, www.thinyounow.com, www.redwoodamerica.com, and www.controltheweight.com. | Adkinson-Connor Dec. (PX-38), p. 13, ¶ 60.<br><br>See Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶¶ 14, 17 & Dkt. 10, p. 49-62, 67-68 (Att. 026, 029) (thinrx.com and RedwoodAmerica.com).<br><br>Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187-216 (Att. 76). | made on their websites in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. |

**FTC Response to SUF 479:** The Cardiffs' do not dispute that Eupepsia Thin was advertised on the listed websites. Whether or not such advertising ceased in February 2018 is not relevant to defendants' liability. However, the Cardiffs did not cease advertising in February 2018. See SUF 938. Defendants' Redwood America website also made deceptive advertising claims for Eupepsia Thin and was live as of March 28, 2018, when the Commission's investigator visited it (Dkt. 7, p. 6, ¶ 17). Defendants' controltheweight.com website was still live as of August 9, 2018. Dkt. 434-1, p. 6, ¶ 18. See SUF 938 & 940.

The timeframe alleged is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1), and this fact is relevant to proving that the Cardiffs' advertising claims were made and widely disseminated as well as defendants' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 480. Defendants advertised | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶¶ 15, 16 | Object as to relevance. The consumers had |

| | | |
|---|---|---|
| Eupepsia Thin on product packaging. | & Dkt. 10, p. 63-66 (Att. 027, 028). | already purchased the product prior to seeing the packaging. There is no net-impression garnered by any "advertising" on the products packaging. |

**FTC Response to SUF 480**:  Defendants do not dispute that they advertised Eupepsia Thin on product packaging. They only make the legal argument that product packaging is not "advertising" and therefore the FTC's undisputed fact is not relevant.  Although this is not the place to make legal arguments, this fact is relevant.  Even if consumers have already purchased the product, packaging statements can influence their decisions regarding using the product and purchasing additional product. In addition, because Defendants' put images of the Eupepsia Thin packages on their websites, e.g., Dkt. 10, p. 53 (Att. 026), Dkt. 434-1, p. 191 (Att. 76), potential customers would see the label statements prior to purchase. Advertising on the package is relevant to the Defendants' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 481.  Jason and Eunjung Cardiff admit that the Eupepsia Thin box previously submitted as PX-1, Attachment 28 (Dkt. 10, p. 63), is a true and accurate copy of a Eupepsia Thin package. | J. Cardiff 3rd RFA Resp., p. 13, ¶ 177 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 36 (Att. 3)).

E. Cardiff 3rd RFA Resp., p. 11, ¶ 171 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 86 (Att. 7)). | Admit. |

### B.  Defendants' Appetite Suppression and Weight Loss Claims for
### Eupepsia Thin

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 482.  At least six of Defendants' Eupepsia Thin TV ads said that Eupepsia Thin would enable users to "shed those unwanted pounds."[9] | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 570, ln. 12-17; p. 577, ln. 21 – p. 578, ln. 1; p. 581, ln. 5-6; p. 586, ln. 7-12; p. 595, ln. 25 – p. 596, ln. 5; p. 603, ln. 16-17; p. 605, ln. 25 – p. 606, ln. 5; p. 609, ln. 5-6, ln. 19-20; p. 615, ln. 16-17; p. 617, ln. 15-20; p. 621, ln. 17-18; p. 625, ln. 17 – p. 626, ln. 3 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 638, ln. 14-19; p. 646, ln. 7-12; p. 649, ln. 24-25; p. 655, ln. 7-12; p. 665, ln. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The |

---

[9] The Cardiffs submitted a single objection to SUF 482-490; the FTC's response begins on p. 262.

| | | |
|---|---|---|
| | 17-22; p. 673, ln. 14-15; p. 675, ln. 23 – p. 676, ln. 3; p. 679, ln. 8-9, ln. 22-23; p.n 685, ln. 22-23; p. 687, ln. 21 – p. 688, ln. 1; p. 692, ln. 3-4; p. 696, ln. 5-16 (Att. 93). Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 710, ln. 14-19; p. 718, ln. 11-16; p. 721, ln. 25 – p. 722, ln. 1; p. 727, ln. 8-13; p. 737, ln. 19-24; p. 745, ln. 16-17; p. 747, ln. 25 – p. 748, ln. 5; p. 751, ln. 10-11; p. 751, ln. 24-25; p. 757, ln. 23-24; p. 759, ln. 22 – p. 760, ln. 2; p. 764, ln. 4-5; p. 768, ln. 6-17 (Att. 94). <br><br> Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 781, ln. 12-17; p. 788, ln. 22 – p. 789, ln. 2; p. 792, ln. 6-7; p. 797, ln. 9-14; p. 807, ln. 3-8; p. 814, ln. 14-15; p. 816, ln. 24 – p. | last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |

| | | |
|---|---|---|
| | 817, ln. 4; p. 820, ln. 4-5, 18-19; p. 826, ln. 12-13; p. 828, ln. 12-17; p. 832, ln. 14-15; p. 836, ln. 15-16 (Att. 95). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 847, ln. 22 – p. 848, ln. 2 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 852, p. 856, ln. 21 – p. 857, ln. 1 (Att. 97). | |
| 483.  At least six of Defendants' Eupepsia Thin TV ads stated that "Eupepsia is a safe and effective way to help you control your appetite." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 569, ln. 12-13; p. 576, ln. 21-22; p. 585, ln. 7-8; p. 594, ln. 25 – p. 595, ln. 1; p. 604, ln. 25 – p. 605, ln. 1; p. 616, ln. 15-16; p. 624, ln. 17-18 (Att. 92). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 634, ln. 14-15; p. 637, ln. 14-15; p. 645, ln. 7-8; p. | |

| | | |
|---|---|---|
| | 654, ln. 7-8; p. 664, ln. 17-18; p. 674, ln. 23-24; p. 686, ln. 21-22; p. 695, ln. 5-6 (Att. 93). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 709, ln. 14-15; p. 717, ln. 11-12; p. 726, ln. 8-9; p.736, ln. 19-20; p. 746, ln. 25 – p. 747, ln. 1; p. 758, ln. 22-23; p. 767, ln. 6-7 (Att. 94). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 780, ln. 12-13; p. 787, ln. 22-23; p. 796, ln. 9-10; p. 806, ln. 3-4; p. 815, ln. 24-25; p. 827, ln. 12-13; p. 835, ln. 15-16 (Att. 95). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 846, ln. 21-22 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), | |

| | | |
|---|---|---|
| | p. 9-11, ¶ 37 & p. 852, 855, ln. 21-22 (Att. 97). | |
| 484. At least seven of Defendants' Eupepsia Thin TV ads stated that "The ingredients in Eupepsia will begin to activate in your system in less than 20 seconds. . . . In minutes, you will feel your appetite suppress, giving you control over how much you eat." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 569, ln. 16 – p. 570, ln. 1-3; p. 576, ln. 25 – p. 577, ln. 12; p. 585, ln. 11-23; p. 595, ln. 4-16; p. 605, ln. 4-16; p. 616, ln. 19 – p. 617, ln. 6; p. 624, ln. 21 – p. 625, ln. 8 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 637, ln. 14 – p. 638, ln. 5; p. 645, ln. 11-23; p. 654, ln. 11-23; p. 664, ln. 21 – p. 665, ln. 8; p. 675, ln. 2-14; p. 686, ln. 25 – p. 687, ln. 12; p. 695, ln. 9-21 (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 709, ln. 18 – p. 710, ln. 5; p. 717, ln. 15 – p. 718, ln. 2; p. 726, ln. 12-24; p. | |

| | | |
|---|---|---|
| 1 | 736, ln. 23 – p. 737, ln. | |
| 2 | 10; p. 747, ln. 4-16; p. | |
| 3 | 759, ln. 1-13; p. 767, ln. | |
| 4 | 10-22 (Att. 94). | |
| 5 | | |
| 6 | Sands 3rd Dec. (PX-51), | |
| 7 | p. 9-11, ¶ 37 & p. 775, | |
| 8 | 780, ln. 16 – p. 781, ln. 3; | |
| 9 | p. 788, ln. 1-13; p. 796, | |
| 10 | ln. 13-25; p. 806, ln. 7- | |
| 11 | 19; p. 816, ln. 3-15; p. | |
| 12 | 827, ln. 16 – p. 828, ln. 3; | |
| 13 | p. 835, ln. 19 – p. 836, ln. | |
| 14 | 6 (Att. 95). | |
| 15 | | |
| 16 | Sands 3rd Dec. (PX-51), | |
| 17 | p. 9-11, ¶ 37 & p. 843, | |
| 18 | 846, ln. 25 – p. 845, ln. | |
| 19 | 13; p. 855, ln. 25 – p. | |
| 20 | 856, ln. 12 (Att. 96). | |
| 21 | | |
| 22 | Sands 3rd Dec. (PX-51), | |
| 23 | p. 12-13, ¶ 42 & p. 1206, | |
| 24 | 1211, ln. 14 – p. 1212, ln. | |
| 25 | 1; p. 1219, ln. 9-20; p. | |
| 26 | 1228, ln. 10-21; p. 1238, | |
| 27 | ln. 19 – p. 1239, ln. 6; p. | |
| 28 | 1248, ln. 25 – p. 1249, ln. | |

| | | |
|---|---|---|
| | 12; p. 1260, ln. 24 – p. 1261, ln. 11; p. 1296, ln. 8-19 (Att. 108).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1452, ln. 17 – p. 1453, ln. 3; p. 1460, ln. 13-25; p. 1496, ln. 15 – p. 1470, ln. 2; p. 1479, ln. 24 – p. 1480, ln. 11; p. 1502, ln. 4-16; p. 1510, ln. 12-24 (Att. 112). | |
| 485.  At least four of Defendants' Eupepsia Thin TV ads stated that "This one-of-a-kind product will help you lose weight -- without stepping one foot in  the gym or giving up any of your favorite foods. . . . No counting calories or tracking food and no expensive gym memberships to pay." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 572, ln. 22 – p. 573, ln. 9 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 641, ln. 6-18 (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 713, ln. 7-20 (Att. 94).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, | |

| | | |
|---|---|---|
| | 783, ln. 22 – p. 784, ln. 9 (Att. 95).<br><br>See also SUF 492. | |
| 486. At least six of Defendants' Eupepsia Thin TV ads stated that "Eupepsia is a fast-acting, thin film strip delivery solution offering you the ability to control your appetite and never struggle with overeating again." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 573, ln. 16-19 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 641, ln. 25 – p. 642, ln. 3 (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 714, ln. 2-5 (Att. 94).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 784, ln. 16-19 (Att. 95).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, 1215, ln. 24 – p. 1216, ln. 2 (Att. 108).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, | |

| | | |
|---|---|---|
| | 1457, ln. 2-5 (Att. 112). | |
| 487.  At least eight of Defendants' Eupepsia Thin TV ads showed a woman pushing away a plate of food. | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 577, ln. 7-8; p. 585, ln. 18-19; p. 595, ln. 11-12; p. 605, 11-12; p. 617, ln. 1-2; p. 625, ln. 3-4 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 637, ln. 25 – p. 638, ln. 1; p. 645, ln. 18-19; p. 654, ln. 18-19; p. 665, ln. 3-4; p. 675, ln. 9-10; p. 687, ln. 7-8; p. 695, ln. 16-17 (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 709, ln. 25 – p. 710, ln. 1; p. 717, ln. 22-23; p. 726, ln. 19-20; p. 737, ln. 9-10; p. 747, ln. 11-12; p. 759, ln. 8-9 (Att. 94).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, | |

| | | |
|---|---|---|
| | 780, ln. 23-24; p. 788, ln. 8-9; p. 796, ln. 20-21; p. 806, ln. 14-15; p. 816, ln. 10-11; p. 827, ln. 23-24; p. 836, ln. 1-2 (Att. 95). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 847, ln. 7-8 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 852, 856, ln. 7-8 (Att. 97). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, 1211, ln. 21-22; p. 1219, ln. 15-16; p. 1228, ln. 16-17; p. 1239, ln. 1-2; p. 1249, ln. 7-8; p. 1261, ln. 6-7; p. 1269, ln. 14-15 (Att. 108). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1452, ln. 23-24; p. 1460, ln. 20-21; p. 1469, ln. 22-23; p. 1480, ln. 6-7; p. | |

| | |
|---|---|
| | 1490, ln. 12-13; p. 1502, ln. 11-12; p. 1510, ln. 19-20 (Att. 112). |
| 488.  At least six of Defendants' Eupepsia Thin TV ads asked "Are you ready to lose 10, 20, even 100 pounds without following a strict and complicated diet plan?" | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 568, ln. 25 – p. 569, ln. 2; p. 576, ln. 9-11 p. 584, ln. 20-22; p. 594, ln. 13-15; p. 604, ln. 13-15; p. 616, ln. 3-5; p. 624, ln. 5-7 (Att. 92).

Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 637, ln. 2-4; p. 644, ln. 20-22; p. 653, ln. 20-22; p. 664, ln. 5-7; p. 674, ln. 11-13; p. 686, ln. 9-11; p. 694, ln. 18-20 (Att. 93).

Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 709, ln. 2-4; p. 716, ln. 24 – p. 717, ln. 1; p. 725, ln. 21-23; p. 736, ln. 7-9; p. 746, ln. 13-15; p. 758, ln. 10-12; p. 766, ln. 19-21 (Att. 94). |

| | | |
|---|---|---|
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 846, ln. 9-11; p. 855, ln. 9-11 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, 1210, ln. 23-25; p. 1218, ln. 17-19; p. 1227, ln. 18-20; p. 1238, ln. 3-5; p. 1248, ln. 9-11; p. 1260, ln. 8-10; p. 1268, ln. 16-18 (Att. 108). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1451, ln. 25 – p. 1452, ln. 2; p. 1459, ln. 22-24; p. 1468, ln. 24 – p. 1469, ln. 1; p. 1479, ln. 8-10; p. 1489, ln. 14-16; p. 1501, ln.13-15; p. 1509, ln. 21-23 (Att. 112). | |
| 489.  At least seven of Defendants' Eupepsia Thin TV ads showed an image of syrup | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 569, ln. 3; p. 576, ln. 12; p. 584, ln. 23; p. 594, ln. | |

| | | |
|---|---|---|
| being poured over pancakes. | 16; p. 604, ln. 16; p. 616, ln. 6; p. 624, ln. 8 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 637, ln. 5; p. 644, ln. 23; p. 653, ln. 23; p. 664, ln. 8; p. 674, ln. 14; p. 686, ln. 12; p. 694, ln. 21 (Att. 93).<br><br>Sands 3rd Dec. (PX-51); p. 9-11, ¶ 37 & p. 704, 709, ln. 5; p. 713, ln. 9; p. 717, ln. 2; p. 725, ln. 24; p. 736, ln. 10; p. 746, ln. 16; p. 758, ln. 13; p. 766, ln. 22 (Att. 94).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 780, ln. 2; p. 787, ln. 12; p. 795, ln. 24; p. 805, ln. 18; p. 815, ln. 14; p. 827, ln. 2; p. 835, ln. 5 (Att. 95). | |

| | | |
|---|---|---|
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 846, ln. 12; p. 855, ln. 12 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, 1210, ln. 1; p. 1218, ln. 20; p. 1227, ln. 21; p. 1238, ln. 6; p. 1248, ln. 12; p. 1260, ln. 11; p. 1268, ln. 19 (Att. 108). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1452, ln. 3; p. 1456, ln. 8; p. 1459, ln. 25; p. 1469, ln. 2; p. 1479, ln. 11; p. 1489, ln. 17; p. 1501, ln. 16 (Att. 112). | |
| 490. At least seven of Defendants' Eupepsia Thin TV ads showed images of a red "X" being super-imposed over a woman lifting weights. | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 569, ln. 6-7; p. 572, ln. 24-25; p. 576, ln. 13-14; p. 584, ln. 24-25; p. 594, ln. 17-18; p. 604, ln. 17-18; p. 616, ln. 7-8; p. 624, ln. 9-10 (Att. 92). | |

| | | |
|---|---|---|
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 637, ln. 6-7; p. 641, ln. 8-9; p. 644, ln. 24-25; p. 653, ln. 24-25; p. 664, ln. 9-10; p. 674, ln. 15-16; p. 686, ln. 13-14; p. 694, ln. 22-23 (Att. 93). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 709, ln. 6-7; p. 713, ln. 10-11; p. 717, ln. 3-4; p. 725, ln. 25 – p. 726, ln. 1; p. 736, ln. 11-12; p. 746, ln. 17-18; p. 758, ln. 14-15; p. 766, ln. 23-24 (Att. 94). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 780, ln. 4-5; p. 783, ln. 24-25; p. 787, ln. 14-15; p. 796, ln. 1-2; p. 805, ln. 20-21; p. 815, ln. 16-17; p. 827, ln. 4-5; p. 835, ln. 7-8 (Att. 95). | |

| | | |
|---|---|---|
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 846, ln. 13-14; p. 855, ln. 13-14 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, 1211, ln. 2-3; p. 1215, ln. 6-7; p. 1218, ln. 21-22; p. 1227, ln. 22-23; p. 1238, ln. 7-8; p. 1248, ln. 13-14; p. 1260, ln. 12-13; p. 1268, ln. 20-21 (Att. 108). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1452, ln. 4-5; p. 1456, ln. 9-10; p. 1460, ln. 1-2; p. 1469, ln. 3-4; p. 1479, ln. 12-13; p. 1489, ln. 18-19; p. 1501, ln. 17-18; p. 1509, ln. 25 – p. 1510, ln. 1 (Att. 112). | |

**FTC Response to SUF 482 – 490**: The Cardiffs do not dispute that they made deceptive advertising claims for Eupepsia Thin on nationwide television thousands of times prior to December 25, 2017. Whether or not this television

advertising ceased on December 25, 2017 is not relevant to the defendants'
liability for deceptive advertising. Although defendants may have ceased
Eupepsia Thin television advertising with Mercury Media on December 25,
2017, they continued this television advertising through another media company,
Cannella, through at least January 27, 2018. See PX 41, att. 9, p. 102. This
advertising falls within the relevant time period of 2017-2018, as alleged in the
complaint. (Dkt. 1)

The remaining objections based on website advertising and TBX-FREE
advertising are not in any way relevant to these undisputed statements of fact and
should be disregarded.

| | | |
|---|---|---|
| 491.  At least eight of Defendants' Eupepsia Thin TV ads included a testimonial from a man named Dan Hogan, identified as Danny in the ad, who claimed that he lost 45 pounds using Eupepsia Thin.[10] | See Hogan Dec. (PX-45), p. 1, ¶¶ 6-7 (confirming that he was in the Eupepsia Thin infomercial).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 570, ln. 18 – 571, ln. 3; p. 578, ln. 2 – 12; p. 581, ln. 11-21; p. 582 ln. 4-7; p. 586, ln. 13-23; p. 606, ln. 6-16; p. 606, ln. 23 – p. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and |

---

[10] The Cardiffs submitted a single objection to SUF 491-497; the FTC's response
begins on p. 280.

| | | |
|---|---|---|
| | 607, ln. 1; p. 617, ln. 21 – p. 618, ln. 5-6; p. 618 ln. 18-21; p. 626, ln. 4-14; p. 627, ln. 1-4 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 638, ln. 20-22; p. 639, ln. 7-8; p. 646, ln. 13 – p. 647, ln. 1; p. 650, ln. 5-18; p. 651, ln. 1-4; p. 655, ln. 13 – p. 656, ln. 1; p. 676, ln. 4-17; p. 676, ln. 24 – p. 677, ln. 2; p. 688, ln. 2-15; p. 689, ln. 2-5; p. 696, ln. 17 – p. 697, ln. 4 (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704; p. 710, ln. 20 – p. 711, ln. 8; p. 718, ln. 17 – p. 719, ln. 5; p. 722, ln. 6-19; p. 723, ln. 2-5; p. 727, ln. 14 – p. 728, ln. 2; p. 748, ln. 6-19; p. 749, ln. 1-4, p. 760, ln. 3-16; p. 761, 3-6; p. 768, ln. 18 – p. | services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 Testimonialists signed an agreement indicating that they were giving information about their personal experiences with the product. If the testominalists lied about their experience then it was unbeknownst to Redwood and the Cardiffs. Ex. A, Jason Cardiff Declaration ¶¶91-92. |

| | | |
|---|---|---|
| | 769, ln. 6; p. 769, ln. 18-21 (Att. 94). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775; p. 781, ln. 18 – p. 782, ln. 3; p. 789, ln. 4-13; p. 792, ln. 12-22; p. 793, ln. 5-8; p. 797, 15-25; p. 817, ln. 5-15; p. 817, ln. 22-25; p. 828, ln. 18 – p. 829, ln. 3; p. 829, ln. 15-18; p. 837, ln. 2-12; p. 837, ln. 24 – p. 838, ln. 2 (Att. 95). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 848, ln. 3-16 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 852, 857, ln. 2-15 (Att. 97). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206; p. 1212, ln. 16 – p. 1213, ln. 4; p. 1220, ln. 10-23; p. 1224, ln. 3-16; p. | |

| | | |
|---|---|---|
| | 1224, ln. 24 – p. 1225, ln. 2; p. 1229, ln. 11-24; p. 1250, ln. 2-15; p. 1250, ln. 22-25; p. 1262, ln. 1-14; p. 1263, ln. 1-4; p. 1270 – p. 1271, ln. 3; p. 1271 (Att. 108).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447; p. 1453, ln. 18 – p. 1454, ln. 6; p. 1461, ln. 15 – p. 1462, ln. 3; p. 1465, ln. 9-22; p. 1466, ln. 5-8; p. 1470, ln. 17 – p. 1471, ln. 5; p. 1491, ln. 7-20; p. 1492, ln. 2-5; p. 1503, ln. 6-19; p. 1504, ln. 6-9; p. 1511, ln. 20 – p. 1512, ln. 8; p. 1512, ln. 20-23 (Att. 112). | |
| 492. At least six of Defendants' Eupepsia Thin TV ads included a testimonial from a man named Andy, who claimed that he lost 30 to 40 pounds | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, p. 610, ln. 7-24 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, p. 680, ln. 10 – p. 681, ln. 2 | |

| | | | |
|---|---|---|---|
| using Eupepsia Thin without "hav[ing] to change anything, like my diet, my lifestyle." | (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, p. 752, ln. 12 – p. 753, ln. 4 (Att. 94).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, p. 821, ln. 6-23 (Att. 95).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, p. 1254, ln. 9 – p. 1255, ln. 1 (Att. 108).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, p. 1495, ln. 15 – p. 1496, ln. 7 (Att. 112). | |
| 493. | At least eight of Defendants' Eupepsia Thin TV ads included a testimonial from a woman named Karen Spero, identified by only her first name in the ad, who claimed | See Spero Dec. (PX-47), p. 1, ¶¶ 5-6 (confirming that she was in the Eupepsia Thin infomercial).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, | |

| | | |
|---|---|---|
| that she lost 90 pounds using Eupepsia Thin and was now "half the size I used to be." | 574, ln. 15-22; p. 575, ln. 7-21; p. 597, ln. 1-13; p. 607, ln. 14 – p. 608, ln. 1; p. 612, ln. 9 – p. 613, ln. 5; p. 619, ln. 9-21; p. 627, ln. 17 – p. 628, ln. 4 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632; p. 642, ln. 25 – p. 643, ln. 3; p. 643, ln. 17 – p. 644, ln. 7; p. 666, ln. 20 – p. 667, ln. 9; p. 677, ln. 15 – p. 678, ln. 4; p. 682, ln. 15 – p. 683, ln. 13; p. 689, ln. 18 – p. 690, ln. 7; p. 697, ln. 22 – p. 698, ln. 11 (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 715, ln. 3-10; p. 715, ln. 19 – p. 716, ln. 11; p. 738, ln. 22 – p. 739, ln. 11; p. 749, ln. 17 – p. 750, ln. 6; p. 754, ln. 17 – p. 755, ln. 15; p. 761, ln. | |

| | | |
|---|---|---|
| 1 | 19 – p. 762, ln. 8; p. 770, ln. 9-23 (Att. 94). | |
| 2 | | |
| 3 | | |
| 4 | Sands 3rd Dec. (PX-51), | |
| 5 | p. 9-11, ¶ 37 & p. 775, | |
| 6 | 785, ln. 1-18; p. 786, ln. | |
| 7 | 7-21; p. 808, ln. 4-16; p. | |
| 8 | 818, ln. 13-25; p. 823, ln. | |
| 9 | 8 – p. 824, ln. 4; p. 830, | |
| 10 | ln. 6-18; p. 838, ln. 15 – | |
| 11 | p. 839, ln. 2 (Att. 95). | |
| 12 | | |
| 13 | Sands 3rd Dec. (PX-51), | |
| 14 | p. 9-11, ¶ 37 & p. 843; p. | |
| 15 | 848, ln. 17 – p. 849, ln. 8 | |
| 16 | (Att. 96). | |
| 17 | | |
| 18 | Sands 3rd Dec. (PX-51), | |
| 19 | p. 9-11, ¶ 37 & p. 852; p. | |
| 20 | 857, ln. 16 – p. 858, ln. 7 | |
| 21 | (Att. 97). | |
| 22 | | |
| 23 | Sands 3rd Dec. (PX-51), | |
| 24 | p. 12-13, ¶ 42 & p. 1206; | |
| 25 | p. 1216, ln. 24 – p. 1217, | |
| 26 | ln. 6; p. 1217, ln. 14 – p. | |
| 27 | 1218, ln. 4; p. 1240, ln. | |
| 28 | 17 – p. 1241, ln. 5; p. | |

| | | |
|---|---|---|
| | 1251, ln. 13 – p. 1252, ln. 1; p. 1256, ln. 14 – p. 1257, ln. 11; p. 1263, ln. 17 – p. 1264, ln. 5; p. 1271, ln. 21 – p. 1272, ln. 9 (Att. 108). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1458, ln. 4-11; p. 1458, ln. 18 – p. 1459, ln. 9; p. 1481, ln. 22 – p. 1482, ln. 10; p. 1492, ln. 18 – p. 1493, ln. 6; p. 1497, ln. 20 – p. 1498, ln. 17; p. 1504, ln. 22 – p. 1505, ln. 10; p. 1513, ln. 11-24 (Att. 112). | |
| 494. At least six of Defendants' Eupepsia Thin TV ads included a testimonial from a man named Todd Preston, identified only by his first name in the ad, who claimed that he lost 132 pounds using | See Preston Dec. (PX-46), p. 1, ¶ 6 (confirming that he was in the Eupepsia Thin infomercial). Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564; p. 571, ln. 17 – p. 572, ln. 3; p. 579, ln. 1-12; p. 587, | |

| | | |
|---|---|---|
| Eupepsia Thin. | ln. 12-24; p. 601, ln. 1-3; p. 623, ln. 4-16 (Att. 92). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632; p. 639, ln. 25 – p. 640, ln. 13; p. 647, ln. 18 – p. 648, ln. 7; p. 656, ln. 18 – p. 657, ln. 7; p. 670, ln. 22-24; p. 693, ln. 15 – p. 694, ln. 4 (Att. 93). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704; p. 711, ln. 25 – p. 712, ln. 14; p. 719, ln. 19 – p. 720, ln. 8; p. 728, ln. 19 – p. 729, ln. 8; p. 742, ln. 24 – p. 743, ln. 1; p. 765, ln. 16 – p. 766, ln. 5 (Att. 94). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775; p. 782, ln. 17 – p. 783, ln. 4; p. 790, ln. 2-14; p. 798, ln. 14 – p. 799, ln. 1; p. 811, ln. 24 – p. 812, ln. 1; | |

| | | |
|---|---|---|
| | p. 834, ln. 1-13 (Att. 95).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206; p. 1213, ln. 21 – p. 1214, ln. 9; p. 1221, ln. 15 – p. 1222, ln. 3; p. 1230, ln. 16 – p. 1231, ln. 5; p. 1244, ln. 20-22; p. 1267, ln. 14 – p. 1268, ln. 2 (Att. 108).<br><br>Sands 3rd Dec. (PX-51) p. 12-13, ¶ 42 & p. 1447; p. 1454, ln. 23 – p. 1455, ln. 11; p. 1462, ln. 20 – p. 1463, ln. 9; p. 1471, ln. 22 – p. 1472, ln. 10; p. 1485, ln. 25 – p. 1486, ln. 2; p. 1508, ln. 19 – p. 1509, ln. 7 (Att. 112). | |
| 495. At least eight of Defendants' Eupepsia Thin TV ads included "before" and "after" pictures of Dan, Karen, and Todd. | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 570, ln. 18, 571, ln. 17; p. 574, ln. 1, ln. 19; p. 575, ln. 7, 18-19; p. 576, ln. 4; p. 578, ln. 2, 13; p. 579, ln. 1; p. 581, ln. 11; p. | |

582, ln. 4-5; p. 584, ln.
15; p. 586, ln. 13, 24; p.
587, ln. 12; p. 589, ln. 12;
p. 590, ln. 13; p. 591, ln.
24; p. 592, ln. 7; p. 594,
ln. 8; p. 596, ln. 6; p. 597,
ln. 1; p. 601, ln. 1; p. 604,
ln. 8; p. 606, ln. 6, 23; p.
607, ln. 14; p. 609, ln. 24;
p. 610, ln. 13, 25; p. 611,
ln. 19; p. 612, ln. 9; p.
615, ln. 23; p. 618, ln. 18;
p. 619, ln. 9; p. 623, ln.
25; p. 626, ln. 4; p. 627,
ln. 1; p. 628, ln. 22; p.
629, ln. 4 (Att. 92).

Sands 3rd Dec. (PX-51),
p. 9-11, ¶ 37 & p. 632,
636, ln. 22; p. 638, ln. 20;
p. 639, ln. 9, 25; p. 642,
ln. 10; p. 643, ln. 4, 17; p.
644, ln. 15; p. 646, ln. 13;
p. 647, ln. 2, 18; p. 650,
ln. 5; p. 651, ln. 1; p. 653,
ln. 15; p. 655, ln. 13; p.
656, ln. 2, 18; p. 658, ln.
20; p. 659, ln. 23, 661, ln.

| | | |
|---|---|---|
| 1 | 11, 19; p. 663, ln. 25; p. | |
| 2 | 665, ln. 23; p. 666, ln. 20; | |
| 3 | p. 670, ln. 22; p. 674, ln. | |
| 4 | 6; p. 676, ln. 24; p. 677, | |
| 5 | ln. 15; p. 680, ln. 16; p. | |
| 6 | 681, ln. 3; p. 681, ln. 25; | |
| 7 | p. 682, ln. 15; p. 686, ln. | |
| 8 | 4; p. 688, ln. 2; p. 689, ln. | |
| 9 | 2; p. 693, ln. 15; p. 694, | |
| 10 | ln. 13; p. 696, ln. 17; p. | |
| 11 | 697, ln. 7; p. 698, ln. 17 | |
| 12 | (Att. 93). | |
| 13 | | |
| 14 | Sands 3rd Dec. (PX-51), | |
| 15 | p. 9-11, ¶ 37 & p. 704, | |
| 16 | 708, ln. 22; p. 710, ln. 20; | |
| 17 | p. 711, ln. 9, 25; p. 714, | |
| 18 | ln. 12; p. 715, ln. 7, 19; p. | |
| 19 | 716, ln. 19; p. 718, ln. 17; | |
| 20 | p. 719, ln. 6, 19, p. 722, | |
| 21 | ln. 6; p. 723, ln. 2; p. 725, | |
| 22 | ln. 16; p. 727, ln. 14; p. | |
| 23 | 728, ln. 3, 19; p. 730, ln. | |
| 24 | 21; p. 731, ln. 25; p. 733, | |
| 25 | ln. 13; p. 736, ln. 2; p. | |
| 26 | 737, ln. 25; p. 738, ln. 22; | |
| 27 | p. 742, ln. 24; p. 746, ln. | |
| 28 | 8; p. 748, ln. 23; p. 749, | |

| | | |
|---|---|---|
| | ln. 1, 17; p. 752, ln. 4, 18; p. 753, ln. 5; p. 754, ln. 2; p. 758, ln. 5; p. 760, ln. 3; p. 761, ln. 3; p. 765, ln. 16; p. 766, ln. 14; p. 768, ln. 18; p. 769, ln. 18; p. 770, ln. 9; p. 771, ln. 18 (Att. 94). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 779, ln. 19; p. 781, ln. 18; p. 782, ln. 4, 17; p. 785, ln. 19; p. 786, ln. 7; p. 787, ln. 4; p. 789, ln. 14; p. 790, ln. 1; p. 792, ln. 10; p. 793, ln. 5; p. 795, ln. 16; p. 797, ln. 15; p. 798, ln. 1, 14; p. 800, ln. 14; p. 801, ln. 15; p. 803, ln. 1; p. 805, ln. 10; p. 807, ln. 9; p. 808, ln. 4; p. 811, ln. 24; p. 815, ln. 6; p. 817, ln. 5, 22-23; p. 818, ln. 13; p. 820, ln. 23; p. 821, ln. 12; p. 822, ln. 18; p. 823, ln. 8. p. 826, ln. 19; p. 828, ln. 18; p. | |

| | | |
|---|---|---|
| | 829, ln. 15; p. 830, ln. 6; p. 834, ln. 22; p. 837, ln. 2, 24; p. 838, ln. 15; p. 839, ln. 8, 20; p. 840, ln. 2 (Att. 95). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 843, 846, ln. 4; p. 848, ln. 17; p. 849, ln. 12 (Att. 96). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 852; p. 855, ln. 4; p. 857, ln. 2, 16; p. 858, ln. 10 (Att. 97). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, 1210, ln. 18; p. 1212, ln. 16; p. 1213, ln. 5, 21; p. 1216, ln. 9; p. 1217, ln. 3, 14; p. 1218, ln. 12; p. 1220, ln. 10, 25; p. 1221, ln. 15; p. 1224, ln. 3, 24-25; p. 1227, ln. 13; p. 1229, ln. 11, 25; p. 1230, ln. 16; p. 1232, ln. 20; p. | |

| | | |
|---|---|---|
| | 1233, ln. 23; p. 1235, ln. 10; p. 1237, ln. 23; p. 1239, ln. 21; p. 1240, ln. 17; p. 1244, ln. 20; p. 1248, ln. 4; p. 1250, ln. 2, 22; p. 1251, ln. 13; p. 1254, ln. 1, 15; p. 1255, ln. 2, 24; p. 1256, ln. 14; p. 1260, ln. 3; p. 1262, ln. 1; p. 1263, ln. 1; p. 1267, ln. 14; p. 1268, ln. 11; p. 1270, ln. 15; p. 1271, ln. 6; p. 1272, ln. 15 (Att. 108). | |
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1451, ln. 20; p. 1453, ln. 18; p. 1454, ln. 7, 23; p. 1457, ln. 12; p. 1458, ln. 8, 18; p. 1459, ln. 17; p. 1461, ln. 15; p. 1462, ln. 4, 20; p. 1465, ln. 9; p. 1466, ln. 5; p. 1468, ln. 19; p. 1470, ln. 17; p. 1471, ln. 6, 22; p. 1473, ln. 25; p. 1475, ln. 3; p. 1476, ln. 15, 23; p. 1478, | |

| | | |
|---|---|---|
| | ln. 3; p. 1481, ln. 1; p. 1485, ln. 25; p. 1488, ln. 9; p. 1490, ln. 7; p. 1492, ln. 2, 18; p. 1495, ln. 7, 21; p. 1496, ln. 8; p. 1497, ln. 5; p. 1500, ln. 8; p. 1503, ln. 6; p. 1504, ln. 6; p. 1508, ln. 19; p. 1509, ln. 16; p. 1511, ln. 20; p. 1512, ln. 20; p. 1513, ln. 11; p. 1514, ln. 7, 20; p. 1515, ln. 2 (Att. 112). | |
| 496. At least six of Defendants' Eupepsia Thin TV ads said that with Eupepsia Thin, there was "no counting calories or tracking food and no expensive gym memberships to pay." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 573, ln. 8-9 (Att. 92). Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 641, ln. 17-18 (Att. 93). Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 713, ln. 19-20 (Att. 94). Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 784, ln. 8-9 (Att. 95). | |

| | | |
|---|---|---|
| | Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, 1215, ln. 15-16 (Att. 108).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1456, ln. 15-16 (Att. 112). | |
| 497. Eupepsia Thin testimonialist Karen said in the infomercial that she had "tried every diet you can think of as I got older, the fad diets, ordering food, don't eat carbs, eat this only, you know, just tried it all." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 564, 612, ln. 18-20 (Att. 92).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 632, 683, ln. 1-3 (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 755, ln. 3-5 (Att. 94).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 823, ln. 17-19 (Att. 95).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1206, | |

| | | 1256, ln. 24 – p. 1257, ln. 1 (Att. 108).<br><br>Sands 3rd Dec. (PX-51), p. 12-13, ¶ 42 & p. 1447, 1498, ln. 5-7 (Att. 112). | |

**FTC Response to SUF 491 - 497**:  Defendants do not dispute that they used false testimonials and deceptive advertising claims in Eupepsia Thin television commercials distributed nationwide prior to December 25, 2017.  Whether or not this television advertising ceased in December 2017 is not relevant to the defendants' liability for deceptive advertising. Although defendants may have ceased advertising Eupepsia Thin through Mercury on or about December 25, 2017, they continued this television advertising through another media company, Cannella, through at least January 27, 2018. See PX 41, att. 9, p. 102. This advertising falls within the relevant time period of 2017-2018, as alleged in the complaint. (Dkt. 1).

The remaining objections based on website advertising and TBX-FREE advertising are not in any way relevant to these undisputed statements of fact and should be disregarded. While he denies it, Jason Cardiff knew that the testimonialists had not used Eupepsia Thin to lose the weight they discussed in the infomercial.  See Dkt. 434-1, p. 39-40 (Att. 3) (Ty Sherrell emails Jason Cardiff on February 1, 2018 that "[I] am working on gtting testimonials from people who have already lost weight and I'm getting before pictures for them . . . they will still have the product and do the testiomonials but ill [sic] have before picutures from their past fat lives lol [.] this is what you pay me for uncle Jason, to use my [expletive deleted] brain."  Jason Cardiff replies "Love it big time[.] Ty you are great.").  Jason Cardiff thus knew that the releases signed by the

-280-

testimonialists were not true or based off their own experience with Eupepsia Thin.

| | | |
|---|---|---|
| 498. Defendants' bethinrx website included "before" and "after" pictures of people who purportedly lost 90 pounds and 27 pounds, respectively, using Eupepsia Thin, as well as other "before" and "after" pictures purportedly showing substantial weight loss caused by the product. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 49, 51 (Att. 026). | Object as to lack of timeframe and relevance. After the CID order on January 25, 2018, this marketing was not used on any advertising platform. Ex. A Jason Cardiff Dec ¶¶7, 9, and 46-53. The FTC's own evidence does not have any advertising that postdate this. The Cardiff's attempted to comply with the FTC regarding any potential violations of the FTC Act. |
| 499. Defendants' bethinrx website said that Eupepsia Thin "makes you feel full and cause weight lose [sic] without additional exercise or a special meal plan." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 52 (Att. 026). | |

**FTC Response to SUF 498 – 499**:  Defendants do not dispute that their bethinrx website made deceptive advertising claims for Eupepsia Thin prior to January 25, 2018. Whether or not the advertising stopped in January 2018, as defendants claim, is not relevant to defendants' liability for deceptive advertising. However,

that advertising continued through February 5, 2018 and August 9, 2018. The Commission's investigator visited the live website bethinrx.com on February 5, 2018 – after the Cardiffs claim to have removed these statements and captured images from the website. Dkt. 7, p. 6, ¶ 14. Additionally, the FTC investigator visited the website controltheweight.com on August 9, 2018, capturing additional images of people who purportedly lost 90 pounds and 27 pounds using Eupepsia Thin, as well as the statement "No diets.  No Lifestyle changes.  No giving up your favorite food."  Dkt. 434-1, p. 6, ¶ 18 & Dkt. 434-1, p. 188-189 (Att. 076). See SUF 940.

The Cardiffs' other objections are no relevant and create no disputed issues of material fact.

| | | |
|---|---|---|
| 500. Defendants' bethinrx website said "Eupepsia Thin SCIENTIFIC [sic] PROVEN" | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 50 (Att. 026). | Object as to lack of timeframe and relevance. After the CID order on January 25, 2018, this |
| 501. Defendants' bethinrx website said "Studies show the new product, Eupepsia Thin, gives people a chance to live a more active lifestyle and keep weight off." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 53 (Att. 026). | marketing was not used on any advertising platform. Ex. A Jason Cardiff Dec ¶¶7, 9, and 46-53. The FTC's own evidence does not have any advertising that postdate this. The Cardiff's attempted to comply with the FTC |

| | | |
|---|---|---|
| | | regarding any potential violations of the FTC Act. |
| | | Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs and genes related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, are widely used for weight loss in humans. Ex. A, Declaration of Jason |

| | | Cardiff ¶20. |
|---|---|---|

**FTC Response to SUF 500 – 501:**  The Cardiffs do not dispute that until January 25, 2018, the bethinrx.com website promised that Eupepsia Thin was "scientific[] proven" and that studies showed it helped people keep weight off. Whether or not this advertising ceased in January 2018 is not relevant to defendants' liability for deceptive advertising. However, that advertising continued through February 5, 2018 and August 9, 2018. The Commission's investigator visited the live website bethinrx.com on February 5, 2018 – after the Cardiffs claim to have removed these statements and captured images from the website.  Dkt. 7, p. 6, ¶ 14. While the Cardiffs claim to have removed these statements and images from the website, the claims about scientific proof and supportive studies still appeared on the website.  Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 50 (Att. 026). Additionally, the FTC investigator visited the website controltheweight.com on August 9, 2018, capturing additional images of people who purportedly lost 90 pounds and 27 pounds using Eupepsia Thin, as well as the statement "No diets.  No Lifestyle changes.  No giving up your favorite food."  Dkt. 434-1, p. 6, ¶ 18 & Dkt. 434-1, p. 188-189 (Att. 076). See SUF 940.

The timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1) and the Cardiffs' widely disseminated false advertising claims are relevant to their individual liability for injunctive and monetary relief.

| 502. Defendants' bethinrx website said that people "have been going crazy over this one product that is helping people shed | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 49 (Att. 026). | Object as to lack of timeframe and relevance. After the CID order on January 25, 2018, this marketing was not |
|---|---|---|

| | | |
|---|---|---|
| pounds and keeping it off with no lifestyle changes."[11] | | used on any advertising platform. Ex. A Jason Cardiff Dec at ¶¶7, 9, and 46-53. The FTC's own evidence does not have any advertising that postdate this. The Cardiff's attempted to comply with the FTC regarding any potential violations of the FTC Act. |
| 503. Defendants' bethinrx website said "Reach Your Weight-Loss Goals!<br>Safe & Effective Weight-Loss" | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 53 (Att. 026). | |
| 504. Defendants' bethinrx website said that "Current calorie reduction and meal plans have less than 5% success rate while the new product, Eupepsia Thin has a substantially higher success rate." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 53 (Att. 026). | |
| 505. Defendants' websites included an image of the Eupepsia Thin package with the statement "Clinically | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶¶ 14, 17 & Dkt. 10, p. 53 (Att. 026) and p. 67 (Att. 029). | |

---

[11] The Cardiffs submitted a single objection to SUF 502-509; the FTC's response begins on p. 288.

-285-

| | | |
|---|---|---|
| proven to help suppress appetite between meals." | | |
| 506. Defendants' bethinrx website said: "If you would like to lose 8-20lbs – our one month supply at [$]69.95 will work for you. If you would like to lose 20-50lbs – our three month supply at [$]169.95 will work for you. If you would like to lose 50-70lbs – our six month supply at [$]239.95 will work for you. If you would like to lose 70-100lbs – our one year supply at [$]456.95 will work for you." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 55 (Att. 026). | |
| 507. Defendants' bethinrx website said that Eupepsia Thin will | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 49 (Att. 026). | |

| | |
|---|---|
| "stop the ups and downs [of] weight loss." | |
| 508. Defendants' websites said "Lose up to 15 pounds your first month with Eupepsia Thin oral strips without diets or changing your food or lifestyle choices." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 53 (Att. 026).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 17 & Dkt. 10, p. 67 (Att. 029). |
| 509. Defendants' website said "Forget counting every little calorie or gram of fat.  Simply take one of these fast acting, thin oral [fi]lm strips as directed and still enjoy your favorite food without worrying about overeating or gaining back those lost pounds." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 17 & Dkt. 10, p. 68 (Att. 029). |

**FTC Response to SUF 502 – 509:**  The Cardiffs do not dispute that prior to January 25, 2018, their websites deceptively claimed that Eupepsia Thin is superior to conventional weight-loss plans, causes significant and rapid weight loss with effortless maintenance, and users need not change their lifestyle or give

up favorite foods. Whether or not this advertising ceased in January 2018 is not relevant to defendants' liability for deceptive advertising. However, that advertising continued through February 5, 2018 and August 9, 2018. The Commission's investigator visited the live website bethinrx.com on February 5, 2018 – after the Cardiffs claim to have removed these statements and captured images from the website.  Dkt. 7, p. 6, ¶ 14. While the Cardiffs claim to have removed these statements and images from the website, the claims about scientific proof and supportive studies still appeared on the website.  Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 50 (Att. 026). Additionally, the FTC investigator visited the website controltheweight.com on August 9, 2018, capturing additional images of people who purportedly lost 90 pounds and 27 pounds using Eupepsia Thin, as well as the statement "No diets.  No Lifestyle changes.  No giving up your favorite food."  Dkt. 434-1, p. 6, ¶ 18 & Dkt. 434-1, p. 188-189 (Att. 076). See SUF 940.

The timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1) and the Cardiffs' widely disseminated deceptive advertising claims are relevant to their individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 510.  Defendants' controltheweight.com website said that Eupepsia Thin was "backed by several third party clinical studies, as well as, scientific research." | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 193 (Att. 76). | Object as to lack of timeframe and relevance. After the CID order on January 25, 2018, this marketing was not used on any advertising platform. Ex. A Jason Cardiff Dec ¶¶7, 9, and 46-53. |

| | | |
|---|---|---|
| | | The FTC's own evidence does not have any advertising that postdate this. The Cardiff's attempted to comply with the FTC regarding any potential violations of the FTC Act. |
| | | Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs and genes related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations |

| | | containing guarana in association with other herbal drugs, are widely used for weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20. |
|---|---|---|

**FTC Response to SUF 510:**  The defendants do not dispute that until January 25, 2018, the website controltheweight.com falsely claimed that Eupepsia Thin was "backed by several third party clinical studies, as well as, scientific research." Whether or not this advertising ceased in January 2018 is not relevant to defendants' liability for false advertising. However, defendants continued their website advertising through February 5, 2018 on the website bethinrx.com. The Commission's investigator visited the live website bethinrx.com on February 5, 2018 – after the Cardiffs claim to have removed these statements and captured images from the website.  Dkt. 7, p. 6, ¶ 14. While the Cardiffs claim to have removed these statements and images from the website, the claims about scientific proof and supportive studies still appeared on the website.  Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 50 (Att. 026). Additionally, the FTC investigator visited the website controltheweight.com on August 9, 2018, capturing additional images of people who purportedly lost 90 pounds and 27 pounds using Eupepsia Thin, as well as the statement "No diets.  No Lifestyle changes.  No giving up your favorite food."  Dkt. 434-1, p. 6, ¶ 18 & Dkt. 434-1, p. 188-189 (Att. 076). See SUF 940. The defendants' remaining arguments about attempted compliance and their characertizations of the scientific literature are irrelevant to the undisputed fact and are beyond their expertise. FRE 701.

The timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1)

| and these widely disseminated false advertising claims are relevant to the Cardiffs' individual liability for injunctive and monetary relief. | | |
|---|---|---|
| 511.  Defendants' controltheweight.com website said "No diets, no giving up food.  Works in 20 seconds." | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187 (Att. 76). | Object as to lack of timeframe and relevance. After the CID order on January 25, 2018, this marketing was not used on any advertising platform. Ex. A Jason Cardiff Dec ¶¶7, 9, and 46-53. The FTC's own evidence does not have any advertising that postdate this. The Cardiff's attempted to comply with the FTC regarding any potential violations of the FTC Act. |
| 512.  Defendants' controltheweight.com website said "No diets.  No lifestyle changes.  No giving up your favorite food." | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 188 (Att. 76). | |

**FTC Response to SUF 511 – 512:**  The Defendants do not dispute that until January 25, 2018, they made deceptive weight-loss claims on their website. Whether or not defendants ceased their advertising in January 2018 is not relevant to defendants' liablity for deceptive advertising.  However, the assertion that these advertising claims were not made after January 25, 2018 is not true. The FTC's investigator visited and captured that live website on August 9, 2018. Dkt. 434-1, p. 6, ¶ 18. That capture shows images of people who purportedly lost

90 pounds and 27 pounds using Eupepsia Thin, as well as the statement "No
diets.  No Lifestyle changes.  No giving up your favorite food."  Dkt. 434-1, p. 6,
¶ 18 & Dkt. 434-1, p. 188-189 (Att. 076). See SUF 940.

The timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1)
and these widely disseminated deceptive advertising claims are relevant to the
Cardiffs' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 513. Defendants' controltheweight. com website said: "'I'm half the size I used to be' -- Karen 'I lost 45 pounds.  I went from 230 lbs back to 185 lbs' – Danny 'This product really works!' – Anthony R. 'I'm able to eave whatever I want and still drink wine!' – Tricia" | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 188 (Att. 76). | Object as to lack of timeframe and relevance. After the CID order on January 25, 2018, this marketing was not used on any advertising platform. Ex. A Jason Cardiff Dec ¶¶7, 9, and 46-53. The FTC's own evidence does not have any advertising that postdate this. The Cardiff's attempted to comply with the FTC regarding any potential violations of the FTC Act. |
| 514. Defendants' controltheweight.com website included "before" and "after" pictures of Danny, the testimonialist who appeared in the | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 204 (Att. 76). | Danny signed a form indicating that what was advertised |

| | | |
|---|---|---|
| Eupepsia Thin infomercial, along with text saying that Danny lost 45 lbs!" and "From 230 lbs to 185 lbs!" | | actually happened. The Cardiffs ensured that the testimonials were real and from the person who said them. The Cardiffs had each testimonialist sign a form that indicated that what they were saying was true and based off their own personal experience with the product. Ex. A, Jason Cardiff Declaration ¶¶91-92. The form said: All of the statements made are true and accurate, all of my on-screen representation, of the product [product], are of my own true story. Id. |

**FTC Response to SUF 513–514**:  The Defendants do not dispute that until January 25, 2018, the website controltheweight.com made deceptive advertising claims with images of testimonialists claiming to have lost significant amounts of weight. Whether or not defendants ceased advertising in January 25, 2018 is not

relevant to defendants' liability for deceptive advertising. However, the assertion that these advertising claims were not made after January 25, 2018 is not true. The FTC's investigator visited and captured that live website on August 9, 2018. Dkt. 434-1, p. 6, ¶ 18. That capture shows images of people who purportedly lost 90 pounds and 27 pounds using Eupepsia Thin, as well as the statement "No diets.  No Lifestyle changes.  No giving up your favorite food."  Dkt. 434-1, p. 6, ¶ 18 & Dkt. 434-1, p. 188-189 (Att. 076). See SUF 940.

While he denies it in his response here, Jason Cardiff knew that the testimonialists had not used Eupepsia Thin to lose the weight they discussed in the infomercial.  See Dkt. 434-1, p. 39-40 (Att. 3) (Ty Sherrell emails Jason Cardiff on February 1, 2018 that "[I] am working on gtting testimonials from people who have already lost weight and I'm getting before pictures for them . . . they will still have the product and do the testiomonials but ill [sic] have before picutures from their past fat lives lol [.] this is what you pay me for uncle Jason, to use my [expletive deleted] brain."  Jason Cardiff replies "Love it big time[.] Ty you are great.").  Jason Cardiff thus knew that the releases signed by the testimonialists were not true or based off their own experience with Eupepsia Thin.

The relevant timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1) and these widely disseminated deceptive advertising claims are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| 515. Defendants' controltheweight. com website said that Eupepsia thin "is helping people shed pounds and | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 191 (Att. 76). | Object as to lack of timeframe and relevance. After the CID order on January 25, 2018, this marketing was not used on any advertising |
|---|---|---|

| | | |
|---|---|---|
| keeping it off with no lifestyle changes." | | platform. Ex. A Jason Cardiff Dec ¶¶7, 9, and 46-53. The FTC's own evidence does not have any advertising that postdate this. The Cardiff's attempted to comply with the FTC regarding any potential violations of the FTC Act. |
| 516. Defendants' controltheweight.com website said that the product "Blocks the brain from overeating," "Gives users the sensation of being full," is an "appetite suppressant" that enables users to "Keep off the weight long-term" while "eat[ing] your favorite food." | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 191 (Att. 76). | |
| 517. Defendants' controltheweight.com website said that the product "makes you feel full and cause weight loss without additional exercise | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 204 (Att. 76). | |

| | | |
|---|---|---|
| or a special meal plan." | | |
| 518. Defendants' controltheweight.com website said that Eupepsia Thin has a substantially higher success rate" than current calorie reduction and meal plans. | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 206 (Att. 76). | |

**FTC Response to SUF 515 – 518:** Defendants do not dispute that until January 25, 2018, their website made deceptive weight-loss claims, including that Eupepsia thin "has a substantially higher success rate" than current calorie reduction and meal plans "is helping people shed pounds and keeping it off with no lifestyle changes," "Blocks the brain from overeating," "Gives users the sensation of being full," is an "appetite suppressant" that enables users to "Keep off the weight long-term" while "eat[ing] your favorite food," and "makes you feel full and cause weight loss without additional exercise or a special meal plan." Whether or not this advertising ceased after January 2018 is not relevant to the defendants' liability for deceptive advertising. However, the assertion that these advertising claims were not made after January 25, 2018 is not true. The FTC's investigator visited and captured that live website on August 9, 2018. Dkt. 434-1, p. 6, ¶ 18. That capture shows images of people who purportedly lost 90 pounds and 27 pounds using Eupepsia Thin, as well as the statement "No diets. No Lifestyle changes. No giving up your favorite food." Dkt. 434-1, p. 6, ¶ 18 & Dkt. 434-1, p. 188-189 (Att. 076). See SUF 940.

The timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1) and these widely disseminated deceptive advertising claims are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 519. The Eupepsia Thin box said "Appetite Suppressant" and "Easy Weight Loss." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 15 & Dkt. 10, p. 63 (Att. 027).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 16 & Dkt. 10, p. 65 (Att. 028). | Objection, relevance. No net-impression can be made by the product box because the consumer had already received the box after ordering online or calling into Redwood. |
| 520. The Eupepsia Thin box said "Still eat your favorite foods.  No change in exercise required." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 15 & Dkt. 10, p. 63 (Att. 027).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 16 & Dkt. 10, p. 65 (Att. 028). | |
| 521. The Eupepsia Thin box said that the product was "clinically proven to help suppress appetite between meals." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 15 & Dkt. 10, p. 63 (Att. 027). | |

**FTC Reponse to SUF 519 – 521**: Defendants do not dispute that Eupepsia Thin product packaging included deceptive advertising claims, including "Appetite Suppressant" and "Easy Weight Loss," "Still eat your favorite foods.  No change in exercise required," and "clinically proven to help suppress appetite between

meals." Defendants argue that product packaging is not advertising. The objection is argument, however, even if consumers have already purchased the product, packaging statements can influence their decisions regarding using the product and purchasing additional product. In addition, because Defendants put images of the TBX-FREE package on their www.tbxfree.com/2 website, Dkt. 7, p. 229, 235 (Att. 008), potential customers would see label statements prior to purchase. Consequently, advertising on the package is deceptive advertising and relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 522. An advertising insert received with the FTC investigator's purchase of TBX-FREE said that "Eupepsia Thin is the product with proven clinical research to help you keep the weight off for life. This is the cure to obesity – a way to lose weight and keep it off.  The product works best if you are looking to lose more than 10 lbs.  The new | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 14, ¶ 36 & Dkt. 10, p. 187 (Att. 072). | Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs and genes related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, are widely used for |

| | | |
|---|---|---|
| thin film strip will allow you to eat whatever you like without adding additional exercise regime or meal plans [sic]." | | weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20. Objection as to lack of timeframe. Defendants made changes to its websites and marketing after receiving the CID from the FTC. The website was not even up and working at the time the lawsuit was filed by the FTC and Redwood stopped paid marketing on January 28, 2018. Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. |

**FTC Response to SUF 522:** Defendants do not dispute that the advertising insert they included with product shipments to customers said that "Eupepsia Thin is the product with proven clinical research to help you keep the weight off for life. This is the cure to obesity – a way to lose weight and keep it off. The product works best if you are looking to lose more than 10 lbs. The new thin film strip will allow you to eat whatever you like without adding additional exercise regime or meal plans [sic]." The remaining narrative concerning dates when paid advertising ceased and the analysis of a scientific study are not relevant to the undisputed fact and should be disregarded. Jason Cardiff's assertion that there were clinical studies on the purported active ingredient in TBX-FREE must be disregarded and his characterization of the findings of any scientific study is

inadmissible under FRE 701 because he is providing testimony based on "scientific, technical, or other specialized knowledge within the scope of FRE 702," but has not been qualified as an expert. Defendants are not qualified experts. FRE 701.

The relevant timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1).  These deceptive advertising claims were widely disseminated (including through product inserts) and are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 523.  Eupepsia Thin was advertised as an effective appetite suppressant. | SUF 483-484, 486-487, 505, 516 519, 521. | Admit. Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs and genes related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, |
| 524.  Jason Cardiff and Eunjung Cardiff admit that Eupepsia Thin was advertised as an effective appetite suppressant. | J. Cardiff 3rd RFA Resp., p. 16, ¶ 190 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 39 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 13, ¶ 184 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 88 (Att. 7)). | |
| 525.  Eupepsia Thin was advertised as an effective weight loss aid. | SUF 482, 485, 488, 491-495, 497-499, 502, 503, 506, 508, 513-515, 517-519, 522. | |
| 526.  Jason Cardiff and Eunjung Cardiff | J. Cardiff 3rd RFA Resp., p. 16, ¶ 191 (Sanger Dec. | |

| admit that Eupepsia Thin was advertised as an effective weight loss aid. | (PX-52), p. 1, ¶ 6 & p. 39 (Att. 3).<br><br>E. Cardiff 3rd RFA Resp., p. 13, ¶ 185 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 88 (Att. 7). | are widely used for weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20. |
|---|---|---|

**FTC Response to SUF 522 – 526:**  Defendants do not dispute that they have previously admitted that Eupepsia Thin was advertised as an effective appetite suppressant and that it was advertised as an effective weight loss aid. They also do not dispute that Eupepsia Thin was in fact advertised as an effective appetite suppressant.  The remaining response is argument based on Jason Cardiff's characterization of the findings of a scientific study. This is inadmissible under FRE 701 because he is providing testimony based on "scientific, technical, or other specialized knowledge within the scope of FRE 702," but has not been qualified as an expert.

| 527.  Eupepsia Thin was advertised as starting working in less than 20 seconds, and suppressing a user's appetite within minutes. | SUF 484, 511. | Admit. The studies on film strips shows that the active ingredients enter the blood stream within 20 seconds of taking the film strip. Ex. 1 Cardiff Declaration ¶¶80a-d. |
|---|---|---|

**FTC Response to SUF 527:**  Defendants admit and do not dispute that Eupepsia Thin was advertised as starting working in less than 20 seconds, and suppressing a user's appetite within minutes. The rest is argument and irrelevant.

| Jason Cardiff's characterization of the findings of any scientific study is inadmissible under FRE 701 because he is providing testimony based on "scientific, technical, or other specialized knowledge within the scope of FRE 702," but has not been qualified as an expert. | | |
|---|---|---|
| 528. Eupepsia Thin was advertised as enabling users to lose 10, 20, or even 100 pounds without dieting, giving up their favorite foods, or increasing their exercise. | SUF 485, 488-490, 492, 496-497, 499, 508-509, 511-512, 515-517, 520, 522. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |
| 529. Eupepsia Thin was advertised as enabling users to lose 15 pounds their first month without dieting or changing their food or lifestyle. | SUF 508. | |
| 530. Eupepsia Thin was advertised as enabling users to lose as much as 20 pounds in one month and as much | SUF 506. | |

| | | |
|---|---|---|
| as 50 pounds in three months. | | |
| 531.  Eupepsia Thin was advertised as more effective at causing weight loss than conventional calorie reduction and meal plans. | SUF 497, 504, 518. | |

**FTC Response to SUF 528 – 531:**  The Cardiffs do not dispute that Eupepsia Thin was advertised as enabling users to lose 10, 20, or even 100 pounds without dieting, enabling users to lose 15 pounds their first month without dieting or changing their food or lifestyle, enabling users to lose as much as 20 pounds in one month and as much as 50 pounds in three months, and more effective at causing weight loss than conventional calorie reduction and meal plans. Whether or not defendants stopped marketing Eupepsia Free in February 2018 is not relevant to their liability for deceptive advertising.  However, defendants did not stop marketing Eupepsia Free in February 2018.  Defendants' Redwood America website, which made efficacy claims for Eupepsia Thin was live as of March 28, 2018, when  Commission's investigator visited it, (Dkt. 7, p. 6, ¶ 17) and their controltheweight.com website was still live as of August 9, 2018.  Dkt. 434-1, p. 6, ¶ 18.

The controlyourweight.com website advertised weight loss of up to 15 pounds your first month; "No diets.  No lifestyle changes.  No giving up your favorite food."; weight loss of up to 20 pounds in a month and 50 pounds in three months.  Dkt. 434-1, pp. 197 - 201. See SUF 940.

The relevant timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1).  These deceptive advertising claims were widely disseminated and are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 532.  Eupepsia Thin was advertised as enabling consumers to avoid gaining back weight they lose, without any lifestyle changes. | SUF 502, 509, 515-516, 522.  See also SUF 507. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due |
| 533.  Eupepsia Thin advertising represented that clinical studies have been conducted on the product. | SUF 500, 501, 505, 510, 521-522. | |
| 534.  Eupepsia Thin advertising represented that those clinical studies showed that Eupepsia Thin is an effective appetite suppressant and | SUF 500, 501, 505, 510, 521. | |

| | | |
|---|---|---|
| weight loss aid. | | to its ability to modulate miRNAs and genes related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, are widely used for weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20.[12] |

**FTC Response to SUF 532 – 534:**  The Cardiffs' do not dispute that Eupepsia Thin was deceptively advertised as enabling consumers to avoid gaining back the weight they lost without any lifestyle changes, that clinical studies had been conducted on the product, and that those clinical studies showed that Eupepsia

---

[12] Defendants grouped objection to FTC SUF 532-538 together.  To be consistent with the Commission's original organization, this Reply separates FTC SUF 532-534 from 535-538.

Thin was an effective appetite suppressant and weight loss aid.  Whether or not defendants ceased placing television advertisements in December 25, 2017 or ceased advertising altogether in Feburary 2018 is not relevant to defendants' liability for deceptive advertising.  In fact defendants continued their television advertising through another media company, Cannella, through January 27, 2018. See PX 41, Att. 9, p.102. Additionally, defendants did not stop advertising Eupepsia Thin in February 2018. Defendants' Redwood America website, which made efficacy claims for Eupepsia Thin was live as of March 28, 2018, when Commission's investigator visited it, (Dkt. 7, p. 6, ¶ 17) and their controltheweight.com website was still live as of August 9, 2018.  Dkt. 434-1, p. 6, ¶ 18.

The controlyourweight.com website advertised weight loss of up to 15 pounds your first month; "No diets.  No lifestyle changes.  No giving up your favorite food."; weight loss of up to 20 pounds in a month and 50 pounds in three months. Dkt. 434-1, pp. 197 – 201. The relevant timeframe is when Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1).  These deceptive advertising claims were widely disseminated and are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

*C. Defendants' Appetite Suppression and Weight Loss Claims for Eupepsia Thin Were False or Unsubstantiated*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 535.  Jason Cardiff and Eunjung Cardiff admit that Defendants did not | J. Cardiff 3rd RFA Resp., p. 17, ¶ 199 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 40 (Att. 3)). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed |

| | | |
|---|---|---|
| conduct any human clinical studies of Eupepsia Thin as an appetite suppressant. | E. Cardiff 3rd RFA Resp., p. 14, ¶ 193 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 89 (Att. 7)).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 145 (Att. 001) ("Redwood is informed and believes that it did not perform any unpublished human clinical studies for . . . Eupepsia Thin.").<br><br>Walker Dec. (PX-32), p. 11, ¶ 43 (to her knowledge, Redwood never conducted any scientific testing of Eupepsia Thin). | the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs and genes |
| 536. Jason Cardiff and Eunjung Cardiff admit that Defendants did not conduct any human clinical studies of | J. Cardiff 3rd RFA Resp., p. 18, ¶ 205 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 41 (Att. 3)).<br><br>E. Cardiff 3rd RFA | related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, |

| | | |
|---|---|---|
| Eupepsia Thin as a weight loss aid. | Resp., p. 15, ¶ 199 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 90 (Att. 7)).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 145 (Att. 001) ("Redwood is informed and believes that it did not perform any unpublished human clinical studies for . . . Eupepsia Thin.").<br><br>Walker Dec. (PX-32), p. 11, ¶ 43 (to her knowledge, Redwood never conducted any scientific testing of Eupepsia Thin). | contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, are widely used for weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20. |
| 537. Jason Cardiff and Eunjung Cardiff admit that at the time Eupepsia Thin was being advertised as an effective appetite suppressant, | J. Cardiff 3rd RFA Resp., p. 17, ¶ 200 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 40 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 15, | |

| | | |
|---|---|---|
| Defendants did not possess any human clinical studies conducted on Eupepsia Thin that showed Eupepsia Thin to be an effective appetite suppressant aid. | ¶ 194 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 90 (Att. 7)). | |
| 538. Jason Cardiff and Eunjung Cardiff admit that at the time Eupepsia Thin was being advertised as an effective weight loss aid, Defendants did not possess any human clinical studies conducted on Eupepsia Thin that showed Eupepsia Thin to be an effective weight loss aid. | J. Cardiff 3rd RFA Resp., p. 18, ¶ 206 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 41 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 15-16, ¶ 200 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 90-91 (Att. 7)). | |
| **FTC Response to SUF 535 – 538**: Defendants do not dispute that they previously admitted that they possessed no human clinical studies of Eupepsia | | |

Thin for appetite suppression or weight loss, and they do not dispute that they have previously admitted that they advertised Eupepsia Thin for both appetite suppression and as a weight-loss aid.

The Cardiffs have provided no explanation or evidence that their prior admissions were somehow erroneous, and their additional narrative does not bear on these facts and should be disregarded.

| | | |
|---|---|---|
| 539. The FTC submitted the Declaration and accompanying expert report of David A. Levitsky, Ph.D.[13] | Declaration of David A. Levitsky, Ph.D., (TRO PX-8), Dkt. 208 to 208-2. | Objection irrelevant and lacks timeframe. Defendants claims about the efficacy of Eupepsia Thin at the time that the FTC its lawsuit did not encompass the claims that are at the heart of the study Dr. Levitsky. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Accordingly, his opinions should be excluded under |
| 540. The FTC identified Dr. Levitsky to Defendants in its September 26, 2019 Initial Disclosures. | Sanger Dec. (PX-52), p. 2-3, ¶ 15.<br><br>See also Sanger Dec. (PX-52), p. 2, ¶¶ 13-14 (FTC sent counsel for the Cardiffs copies of its four expert reports in March and April 2019). | |
| 541. Dr. Levitsky is a | Levitsky Expert Report | |

[13] The Cardiffs submitted a single objection to SUF 539-598; the FTC's response begins on p. 339. However, to be consistent with the Commission's original organization, this Response groups SUF 599 together with SUF 600, rather than with SUF 539-598.

| | | |
|---|---|---|
| tenured Professor in the Division of Nutritional Sciences and the Department of Psychology at Cornell University. | (TRO PX-8), Dkt. 208, p. 4, ¶ I.3. | the Daubert test. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, (); *FTC v. Qualcomm Inc.*, 2018 U.S. Dist. LEXIS 208197, *9, 2018 WL 6460573. |
| 542. Dr. Levitsky has taught numerous courses in the areas of nutrition and weight loss, including: Obesity and the Control of Body Weight; Introductory Nutrition, Drugs, and Behavior; Honors Research in Nutrition; and a Special Seminar in Statistics for Graduate Students in Nutrition. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 4, ¶ I.4. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |
| 543. Dr. Levitsky has has an established history of scholarly research and | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 4, ¶ I.5. | Guaraná, the active |

| | | |
|---|---|---|
| writing related to weight loss and nutrition, including authoring or co-authoring: (1) more than 115 articles published in peer-reviewed scientific journals; (2) more than 25 book chapters; and (3) two books. | | ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs and genes related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, are widely used for weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20. |
| 544. Dr. Levitsky has designed or co-designed numerous clinical studies related to human weight loss and the results of many of those studies have been published in peer-reviewed scientific journals. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 4-5, ¶ I.6. | |
| 545. Dr. Levitsky's professional responsbilities have included editorial positions, | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 6 ¶ I.7. | |

| | | |
|---|---|---|
| as well as the review and analysis of hundreds of scientific articles submitted to peer reviewed scientific journals, including The International Journal of Obesity, Obesity, Appetite, Journal of Nutrition, and The American Journal of Clinical Nutrition. | | |
| 546. Dr. Levitsky has received numerous professional awards and honors, including the Society for Nutrition Education's Outstanding Research Award (1994) and the American Society | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 6 ¶ I.9. | |

| | | |
|---|---|---|
| for Nutrition's Excellence in Nutrition Education Award (2011). | | |
| 547.  Through his own research and regular reading of peer-reviewed scientific journals in his field, Dr. Levitsky keeps current on new developments and research in the areas of weight loss. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 6 ¶ 8. | |
| 548.  Based upon his knowledge, experience, and training, Dr. Levitsky is an expert in the fields of weight loss, control of food intake, obesity, and bioenergetics. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 6 ¶ I.10. | |
| 549.  Dr. Levitsky | Levitsky Expert Report | |

| | reviewed a literature compilation provided to the FTC by the Defendants and additional materials that were provided by the FTC that were referenced, but not included, in the compilation. | (TRO PX-8), Dkt. 208, p. 8. | |
|---|---|---|---|
| 550. | Dr. Levitsky stated that his evaluation was based on well-recognized principles of energetics and weight loss. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ III.1. | |
| 551. | Dr. Levitsky stated that a decrease in body weight can only occur if the rate at which calories are burned is greater than the rate at which they | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ III.2. | |

-315-

| | |
|---|---|
| are consumed – that is, if the person has a negative energy balance. | |
| 552. Dr. Levitsky stated that a person can achieve a negative energy balance by decreasing the number of calories consumed, by increasing physical activity, or by doing both. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ III.2. |
| 553. Dr. Levitsky stated that dietary restriction is the most common method to create a negative energy balance. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p.10, ¶ III.3. |
| 554. Dr. Levitsky stated that evidence about the effectiveness of products that claim to cause weight-loss must be | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 10, ¶ III.4. |

| | |
|---|---|
| derived from procedures generally accepted in the relevant scientific community as capable of supporting valid conclusions about causation. | |
| 555. Dr. Levitsky stated that to support claims that a product is effective for weight loss, experts in the field would require randomized, placebo controlled, double blinded clinical trials in humans on the actual product or one with the same ingredients and dosages, and tested using the dosages for which the | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 10-11, ¶¶ III.5, III.6, III.8. |

| | | |
|---|---|---|
| claims are made, and that replication of results by at least two different laboratories working independently increases confidence in the results, because this minimizes the effects of any bias that might arise from the study being performed by a single laboratory. | | |
| 556. Dr. Levitsky stated that testing must be performed on humans, not on animals or *in vitro*, because animal and *in vitro* studies do not predict what might happen in humans. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 10-11, ¶ III.6. | |
| 557. Dr. Levitsky stated | Levitsky Expert Report | |

| | | |
|---|---|---|
| that randomization of subjects to treatment and control conditions is critical to ensure that any observed effects can be attributed to the treatment being studied, and to control for potential bias that might affect the results. | (TRO PX-8), Dkt. 208, p. 11, ¶ III.7. | |
| 558. Dr. Levitsky stated that the trial must use the same ingredients as the product being tested. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 11, ¶ III.8.C. | |
| 559. Dr. Levitsky stated that the results of studies of multi-ingredient products cannot be extrapolated to a product with just one active | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14, ¶ IV.4. | |

| | |
|---|---|
| ingredient. | |
| 560.  Dr. Levitsky stated that to constitute competent and reliable evidence, the clinical study must use the same dose as the product at issue, because different doses may have different effects. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 11-12, ¶ III.8.D. |
| 561.  Dr. Levitsky stated that the results of studies on conventional (or allopathic) active ingredients cannot be extrapolated to products using homeopathic dilutions of those ingredients. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14, ¶ IV.4. |
| 562.  Dr. Levitsky stated that to support weight loss efficacy claims, a clinical trial must | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 12, ¶ III.8.G. |

| | |
|---|---|
| be at least twelve weeks long. | |
| 563. Dr. Levitsky stated that a one-month study cannot substantiate any weight loss claim. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 12, ¶ III.8.G. |
| 564. Dr. Levitsky stated that because a clinical trial must continue for at least the time period over which the product is claimed to have an effect, a four-month study, for example, cannot substantiate a six-month weight-loss claim. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 12, ¶ III.8.G. |
| 565. Dr. Levitsky stated that to make valid conclusions about weight loss efficacy, a clinical study must directly measure objective | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 12, ¶ III.8.H. |

| | | |
|---|---|---|
| outcomes, including the participants' weight, and/or percentage of body fat, rather than using self-reported weights. | | |
| 566. Dr. Levitsky stated that the clinical trial must show a statistically significant treatment effect on the specific outcome about which a claim is made (not a related or surrogate outcome), including that the statistical comparison is between the test and control groups. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 13, ¶ III.8.I. | |
| 567. Dr. Levitsky stated to constitute competent and | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 13, ¶ 8.J. | |

| | | |
|---|---|---|
| reliable evidence, the magnitude of the effect found in a clinical study must be the same or greater than that claimed. | | |
| 568.  To evaluate the claims for Eupepsia Thin, Dr. Levitsky reviewed the documents produced or cited by Defendants as substantiation for Eupepsia Thin claims. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p.7-8, ¶ II.2. | |
| 569.  Dr. Levitsky also conducted an independent search of the scientific literature for guarana, sublingual administration of pharmaceutical agents, and homeopathy, generally. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 8-9, ¶ II.3; p. 13, ¶ IV.1. | |

| | | |
|---|---|---|
| 570. Dr. Levitsky stated that he found "no competent and reliable evidence to substantiate the efficacy claims that . . . Eupepsia Thin can cause biologically significant appetite suppression, reduction of food, intake, or weight loss. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. | |
| 571. Dr. Levitsky stated that Paullinia cupana is also known as guarana, and that guarana seeds contain caffeine. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 13, ¶ IV.1. | |
| 572. Because gaurana seeds contain caffeine, Dr. Levitsky reviewed scientific literature associating caffeine in | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 13, ¶¶ IV.1, 2. | |

| | |
|---|---|
| relatively high doses with appetite suppression. | |
| 573. Dr. Levitsky stated that the best data about the effect of caffeine on appetite suppression come from a study that used a dose of about 420 mg of caffeine. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 13, ¶ IV.2. |
| 574. Dr. Levitsky stated there is no indication that Eupepsia Thin contains the same dose of caffeine. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 13-14, ¶ IV2. |
| 575. Dr. Levitsky stated there is no sound evidence that caffeine consumption causes sustained weight loss. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14, ¶ IV.2. |
| 576. To evaluate the claims for Eupepsia Thin, Dr. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 1418, ¶ IV.3-IV.5. |

| | | |
|---|---|---|
| Levitsky reviewed 50 articles cited by Redwood Scientific Technologies, Inc. in the literature compilation it provided in response to the Commission's CID. | | |
| 577.  Dr. Levitsky stated that none of the 50 studies he reviewed "yielded any credible scientific evidence to support the claim that Eupepsia Thin causes a reduction in food intake, or produces weight loss in humans . . [because] none tested Eupepsia Thin itself or another | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14, ¶ 3, 5. | |

| | | |
|---|---|---|
| product with the same dose and usage instructions as Eupepsia Thin (such as placing an oral strip on the tongue or roof of the mouth)." | | |
| 578.  It is Dr. Levitsky's unrebutted expert opinion that information in Redwood's literature compilation fails to provide credible evidence supporting Eupepsia Thin's appetite suppression and weight loss claims because those studies were of multi-ingredient products. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14-18, ¶¶ IV.4-5. | |
| 579.  It is Dr. Levitsky's unrebutted expert | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. | |

| | | |
|---|---|---|
| opinion that information in Redwood's literature compilation fails to provide credible evidence supporting Eupepsia Thin's appetite suppression and weight loss claims because they did not test a homeopathic formulation of guarana, the active ingredient in Eupepsia Thin, and because the results of studies using a conventional (or allopathic) active ingredient cannot be extrapolated to products using homeopathic dilutions of the | p. 14, ¶ IV.4, 5. | |

| | |
|---|---|
| ingredient. | |
| 580. It is Dr. Levitsky's unrebutted expert opinion that information in Redwood's literature compilation fails to provide credible evidence supporting Eupepsia Thin's appetite suppression and weight loss claims because those materials did not address the efficacy of guarana by itself for appetite suppression or weight loss in humans. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. p. 14-18, ¶ IV.5. |
| 581. It is Dr. Levitsky's unrebutted expert opinion that information in | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14-18, ¶ IV.5. |

| | | |
|---|---|---|
| Redwood's literature compilation fails to provide credible evidence supporting Eupepsia Thin's appetite suppression and weight loss claims because those materials contained only general assertions with no scientific citations to any data demonstrating weight loss or appetite suppression. | | |
| 582.  It is Dr. Levitsky's unrebutted expert opinion that information in Redwood's literature compilation fails to provide credible | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14-18, ¶ IV.5. | |

| | | |
|---|---|---|
| evidence supporting Eupepsia Thin's appetite suppression and weight loss claims because those materials involved animal or in vitro testing. | | |
| 583. It is Dr. Levitsky's unrebutted expert opinion that information in Redwood's literature compilation fails to provide credible evidence supporting Eupepsia Thin's appetite suppression and weight loss claims because those materials did not include any food intake or body | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14-18, ¶ IV.5. | |

| | |
|---|---|
| weight data. | |
| 584. It is Dr. Levitsky's unrebutted expert opinion that information in Redwood's literature compilation fails to provide credible evidence supporting Eupepsia Thin's appetite suppression and weight loss claims because news articles and press releases are not scientific data about weight loss or appetite suppression. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 14-18, ¶ IV.5. |
| 585. Dr. Levitsky stated that none of the references he identified through his own search of the scientific | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 18, ¶ IV.6. |

| | | |
|---|---|---|
| literature yielded any credible scientific evidence to support claims that Eupepsia Thin causes a reduction in appetite or food intake or produces weight loss in humans. | | |
| 586. Dr. Levitsky also used PubMed and Google Scholar to conduct an independent search of the scientific literature to determine whether there was other scientific support for the challenged Eupepsia Thin claims. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 8-9, ¶ II.3B; p. 18 ¶ IV.6; p. 34-35 (Attachment B to Levitsky Declaration). | |
| 587. Dr. Levitsky identified 105 references mentioning Paullinia cupana or | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 18 ¶ IV.6; p. 34-45 (Attachment B to Levitsky Declaration). | |

| | |
|---|---|
| guarana. | |
| 588.  It is Dr. Levitsky's unrebutted expert opinion that none of those studies yielded credible scientific evidence supporting the claim that Eupepsia thin causes a reduction in appetite or food intake, or produces weight loss in humans. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 18, ¶ IV.6. |
| 589.  Dr. Levitsky based this conclusion the fact that none of those studies tested Eupepsia Thin by itself or a similar product with Eupepsia Thin's dose and usage instructions. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 18-19, ¶ IV.6. |
| 590.  It is Dr. Levitsky's unrebutted expert opinion that there | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D; p. 14, ¶ IV.3; |

| | | |
|---|---|---|
| was no credible scientific evidence to support the claim that Eupepsia Thin is effective in suppressing appetite or food intake or causes any weight loss. | p. 18-19, ¶ IV.6. | |
| 591. It is Dr. Levitsky's unrebutted expert opinion that the materials he reviewed did not provide reliable scientific evidence to support a claim that Eupepsia Thin is an effective appetite suppressant and weight loss aid. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. | |
| 592. It is Dr. Levitsky's unrebutted expert opinion that the materials he reviewed did not | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. | |

| | |
|---|---|
| provide reliable scientific evidence to support a claim that Eupepsia Thin starts working in less than 20 seconds, and suppresses a user's appetite within minutes. | |
| 593.  It is Dr. Levitsky's unrebutted expert opinion that the materials he reviewed did not provide reliable scientific evidence to support a claim that Eupepsia Thin enables users to lose 10, 20, or even 100 pounds without dieting, giving up their favorite foods, or increasing their exercise. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. |
| 594.  It is Dr. Levitsky's | Levitsky Expert Report |

| | |
|---|---|
| unrebutted expert opinion that the materials he reviewed did not provide reliable scientific evidence to support a claim that Eupepsia Thin enables users can lose 15 pounds their first month without dieting or changing their food or lifestyle. | (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. |
| 595. It is Dr. Levitsky's unrebutted expert opinion that the materials he reviewed did not provide reliable scientific evidence to support a claim that Eupepsia Thin enables users can lose as much as 20 pounds in one month and as much as 50 pounds in | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. |

| | |
|---|---|
| three months. | |
| 596. It is Dr. Levitsky's unrebutted expert opinion that the materials he reviewed did not provide reliable scientific evidence to support a claim that Eupepsia Thin is more effective at causing weight loss than conventional calorie reduction and meal plans. | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. |
| 597. Dr. Levitsky' unrebutted expert opinion is that the materials he reviewed did not provide reliable scientific evidence to support a claim that Eupepsia Thin enables consumers to avoid gaining back weight they lose, without any | Levitsky Expert Report (TRO PX-8), Dkt. 208, p. 9, ¶ II.3.D. |

| | | |
|---|---|---|
| lifestyle changes. | | |
| 598. The Cardiffs did not submit any expert report disagreeing with Dr. Levitsky's conclusions about Eupepsia Thin or supporting the Eupesia Thin claims challenged in this proceeding. | Sanger Dec. (PX-52), p. 3, ¶ 17. | |

**FTC Response to SUF 539 – 598:** The Cardiffs' do not dispute any of the foregoing facts concerning Dr. Levitsky's qualification, education, experience, knowledge, research experience, literature review and his explanation of the standards that experts in the field of weight loss would use to determine whether claims for a specific appetite suppression and weight loss product are substantiated. Defendants also do not dispute Dr. Levitsky's evaluation of the challenged claims made for Eupepsia Thin using those standards or his conclusion that there is no competent and reliable evidence that Eupepsia Thin can cause appetite suppression or weight loss. The Cardiffs' objections concerning the claims reviewed by Dr. Levitsky do not create a disputed issue of material fact. They are apparently just an unsupported factual argument that they did not make those deceptive advertising claims as alleged in the complaint.

Dr. Levitsky expert report is relevant and helpful to the Court.  Dr. Levitsy was asked to opine, as an expert in weight loss, control of food intake, obesity, and biogenics, on whether the claims challenged in the Commission's complaint were substantiated.  That is exactly what he did, setting forth first the standards

-339-

that experts in the field would use to answer that question and then examining the relevant scientific evidence.

The Cardiffs are wrong when they state that Dr. Levitsky failed to state how much he is being paid or the t cases in which he had participated in the past four years.  See Dkt. 208, p. 6.

Jason Cardiff's characterization of the findings of any scientific study is inadmissible under FRE 701 because he is providing testimony based on "scientific, technical, or other specialized knowledge within the scope of FRE 702," but has not been qualified as an expert.

The timeframe is the period when Defendants deceptively marketed and sold Eupepsia Thin (2017-2018, see Dkt. 1), and these facts are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

### D. Defendants' Claims That Eupepsia Thin Was Proven To Be Effective Were False

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 599.  Jason Cardiff and Eunjung Cardiff admit that during the time Eupepsia Thin was being advertised as a clinically proven weight loss aid, Defendants did not possess any human | J. Cardiff 3rd RFA Resp., p. 19, ¶ 208 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 42 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 16, ¶ 202 (Sanger Dec. (PX-52), p. | Objection irrelevant and lacks timeframe. Defendants claims about the efficacy of Eupepsia Thin at the time that the FTC its lawsuit did |

| | | |
|---|---|---|
| clinical studies conducted on Eupepsia Thin that showed Eupepsia Thin to be an effective weight loss aid. | 2, ¶ 10 & p. 91 (Att. 7)). | not encompass the claims that are at the heart of the study Dr. Levitsky. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Accordingly, his opinions should be excluded under the Daubert test. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, (); *FTC v. Qualcomm Inc.*, 2018 U.S. Dist. LEXIS 208197, *9, 2018 WL 6460573. Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims |

| | | |
|---|---|---|
| | | that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 Guaraná, the active ingredient in Eupepsia Thin, showed anti-adipogenic potential due to its ability to modulate miRNAs |

| | | |
|---|---|---|
| | | and genes related to this process (Lima et al., 2017) or an increase in energetic metabolism and stimulation of mitochondrial biogenesis, contributing to control of weight gain, even when associated with high-fat diet (Lima et al., 2018). Preparations containing guarana in association with other herbal drugs, are widely used for weight loss in humans. Ex. A, Declaration of Jason Cardiff ¶20. |
| **FTC Response to SUF 599:** The Cardiffs do not dispute that they previously admitted that they did not have clinical studies showing that Eupepsia Thin was a proven weight-loss aid when they were advertising it is a clinically-proven weight loss aid. | | |

Furthermore, their assertions concerning Dr. Levitsky are inapposite with respect to FTC SUF 599.

The timeframe is the period when Defendants marketed and sold Eupepsia Thin (2017-2018, see Dkt. 1), and these facts are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| 600. | In addition to reporting product-specific sales, Redwood reported in its response to the Commission's CID that it had made sales of TBX-FREE and Eupepsia Thin to third party sellers in 2017 and the first four months of 2018 in the total amount of $1,568,930.05. | Sands 3rd Dec. (PX-51), p. 18, ¶ 53 & p. 1901 (Att. 128). | Admit. |
| 601. | [reserved] | | |
| 602. | [reserved] | | |

## V.    Prolongz

### A. Defendants' Marketing of Prolongz

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|

| 603. | The target audience for Prolongz was people who wanted to improve their sexual performance. | Adkinson-Connor Dec. (PX-38), p. 12, ¶ 52. | Admit |
|---|---|---|---|
| 604. | Defendants advertised and sold Prolongz oral film strips since at least 2013. | Szymanski Dec. (PX-39), p. 3, ¶ 14.<br><br>Yallen Dec. (PX-40), p. 2, ¶ 8 (Inter/Media purchased media time for Prolongz advertising on behalf of Run Away in 2013 and 2014).<br><br>Walker Dec. (PX-32), p. 1, ¶ 5; p. 79, ¶ 27.<br><br>Morris Dec. (TRO PX-4), Dkt. 9, p. 3, ¶ 4. | Admit as to selling up until October 12, 2018. |

**FTC Response to SUF 603 – 604:** The Cardiffs admit they sold Prolongz from at least 2013 to October 12, 2018 and do not dispute that they advertised Prolongz from at least 2013.

| 605. | Eunjung Cardiff admits that Defendants advertised a dissolvable oral film strip called Prolongz. | E. Cardiff 3rd RFA Resp., p. 17, ¶ 213 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 92 (Att. 7)). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |
|---|---|---|---|

**FTC Response to SUF 605:** The Cardiffs do not dispute the substance of FTC SUF 605 – which cites Eunjung Cardiff's admission as its support – and they offer no explanation or documentation establishing that the admission was incorrect. Their objections do not create a genuine dispute as to a material fact. Defendants did not stop marketing Prolongz in February 2018, as Jason Cardiffs' own Declaration exhibit 3 shows. Dkt. 491-3, p. 46 (Prolongz website captured June 14, 2018).

Furthermore, airings of TBX-FREE and Eupepsia Thin, are not relevant to

-346-

| | | |
|---|---|---|
| Prolongz. | | |
| 606. | Jason Cardiff and Eunjung Cardiff admit that Defendants sold Prolongz from at least 2014 to 2018. | J. Cardiff 3rd RFA Resp., p. 21, ¶ 220 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 44 (Att. 3)). | Admit as to selling up until October 12, 2018 |
| | | E. Cardiff 3rd RFA Resp., p. 17, ¶ 214 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 92 (Att. 7)). | |
| **FTC Response to SUF 606:** The Cardiffs admit selling Prolongz from at least 2013 to October 12, 2018. See SUF 604. | | |
| 607. | According to the Prolongz label, each film strip contains 10 mg Damiana Extract 1X and 10 mg of Ginseng Extract 1X. | Expert Report of Hossein Sadeghi-Nejad, MD, FACS (hereafter "Sadeghi-Nejad Expert Report") (TRO PX-9), Dkt. 209, p. 7. | Admit |
| 608. | In its response to the Commission's CID, Redwood Scientific stated that gross 2015 sales revenues for Prolongz were | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 105 (Att. 003). | Admit |

-347-

| | | | |
|---|---|---|---|
| | approximately $4,265,068.57. | | |
| 609. | In its response to the Commission's CID, Redwood Scientific stated that gross 2016 sales revenues for Prolongz were approximately $1,601,070.26. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 104-105 (Att. 003). | Admit |
| 610. | In its response to the Commission's CID, Redwood Scientific stated that gross 2017 sales revenues for Prolongz through August 31, 2017 were $119,609.13. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 2, ¶ 2 & Dkt. 7, p. 105 (Att. 003). | Admit |
| 611. | In response to the Commission's Civil Investigative Demand, Redwood Scientific reported gross Prolongz sales of | Sands 3rd Dec. (PX-51), p. 18, ¶ 53 & p. 1901 (Att. 128). See SUF 608-610. | Admit |

| | | | |
|---|---|---|---|
| | $5,985,747.96 for 2015 through August 2017. | | |
| 612. | Defendants advertised Prolongz using long-form and short-form television commercials, websites, and social media.[14] | Walker Dec. (PX-32), p. 5, ¶ 21. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |
| 613. | Defendants advertised Prolongz through national television campaigns. | Adkinson-Connor Dec. (PX-38), p. 1, ¶ 5; p. 2-3, ¶ 10 & p. 57-515 (Att. 9); p. 6-7, ¶¶ 25-29. | |
| 614. | Jason Cardiff and Eunjung Cardiff admit that Inter/Media arranged for Prolongz television | J. Cardiff 3rd RFA Resp., p. 21, ¶¶ 221, 223 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 44 (Att. 3)). E. Cardiff 3rd RFA Resp., p. 17, ¶¶ 215, 217 | |

[14] The Cardiffs submitted a single objection to SUF 612-634; the FTC's response begins on p. 360.

| | | |
|---|---|---|
| | advertising to be broadcast on national cable television. | (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 92 (Att. 7)). |
| 615. | Inter/Media purchased media time to air Prolongz television ads for Run Away during a test period from late 2013 to March 2014. | Szymanski Dec. (PX-39), p. 2, 3, ¶¶ 9, 11, 14.<br><br>See also Yallen Dec. (PX-40), p. 2, 5-6 ¶ 9 16 (D, F). |
| 616. | After Jason Cardiff signed the Insertion Order for Prolongz advertising, Inter/Media purchased media time for Prolongz television ads on TV networks across the United States from April 2014 through September 2014. | See SUF 102.<br><br>Szymanski Dec. (PX-39), p. 4, ¶ 16 & p. 68-189 (Att. 10).<br><br>See also Yallen Dec. (PX-40), p. 2, ¶ 9 & p. 8-14 (Att. 1) (Cardiff signed insertion order for Prolongz ads); p. 5-6, ¶ 16(D) & p. 69-70 (Att. 3); p. 141 (Att. 8) (Prolongz ads ran from Apr. 2014-Sept. 2014). |

| | | |
|---|---|---|
| 617. | MediaPoint Network, Inc., a wholly owned subsidiary of Inter/Media, also purchased media time for Prolongz television advertisements from June 2014 through October 2014. | Szymanski Dec. (PX-39), p. 4-5, ¶ 21 & p. 221-259 (Att. 14-16). |
| 618. | All of the Prolongz advertising for which Inter/Media purchased media time focused on the messages of longer lasting sex and preventing premature ejaculation. | Szymanski Dec. (PX-39), p. 4, ¶ 17. |
| 619. | At Run Away's request, Inter/Media and its wholly owned subsidiary, | Szymanski Dec. (PX-39), p. 4-5, ¶ 21 & p. 221-259 (Att. 14-16). |

| | | |
|---|---|---|
| MediaPoint Network, Inc., worked with media buying companies Cannella Response Television, LLC and Havas Edge to place Prolongz advertising on TV networks. | | |
| 620. Jason Cardiff admits that Corporate Defendants purchased media time for Prolongz television advertising from Havas Edge. | J. Cardiff 3rd RFA Resp., p. 23, ¶ 236 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 46 (Att. 3)). Sands 3rd Dec. (PX-51), p. 3, 17, ¶ 9, 51 & p. 40-46 (Att. 4). See also Walker Dec. (PX-32), p. 6-7, ¶¶ 25-26, 28. | |
| 621. Jason Cardiff and Eunjung Cardiff admit that Havas Edge arranged for | J. Cardiff 3rd RFA Resp., p. 23, ¶ 237 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 46 (Att. 3)). | |

| | | |
|---|---|---|
| | Prolongz television advertising to be broadcast on national cable television. | E. Cardiff 3rd RFA Resp., p. 19, ¶ 231 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 94 (Att. 7)).<br><br>See also Walker Dec. (PX-32), p. 6-7, ¶¶ 25-26, 28. |
| 622. | Jason Cardiff and Eunjung Cardiff admit that Corporate Defendants purchased media time for Prolongz television advertising from Cannella Response Television, LLC. | J. Cardiff 3rd RFA Resp., p. 21, ¶ 224 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 44 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 18, ¶ 218 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 93 (Att. 7)). |
| 623. | Jason Cardiff and Eunjung Cardiff admit that Cannella Response Television, LLC arranged for | J. Cardiff 3rd RFA Resp., p. 21, ¶ 225 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 44 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 18, ¶ 219 |

| | | |
|---|---|---|
| | Prolongz advertising to be broadcast on national cable television. | (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 93 (Att. 7)). | |
| 624. | Cannella purchased media time for Prolongz television advertising for Redwood in 2014, 2015, and 2016. | Adkinson-Connor Dec. (PX-38), p. 1, ¶ 5; p. 7, ¶¶ 27-29; p. 2-3, ¶ 10 & p. 57-75 and p. 102-158 (Att. 9).<br><br>Walker Dec. (PX-32), p. 8, ¶ 34. | |
| 625. | In 2014-2016,Cannella purchased media time for Prolongz long form ads PROLONGZ PI, PROLONGZ 2015, PROLONGZ ADVANCED MENS INSTIUE REV., PROLONGZ ADVANCED MENS | Adkinson-Connor Dec. (PX-38), p. 1-2, ¶ 6; p. 7, ¶¶ 27-29; p. 2-3, ¶ 10 & p. 57-75 and p. 102-158 (Att. 9).<br><br>See also J. Cardiff 3rd RFA Resp., p. 21-22, ¶ 226 (PROLONGZ 2015); ¶ 227 (PROLONGZ ADVANCED MENS INSTITUTE REV); ¶ 228 (PROLONGZ ADVANCED MENS INSTITUTE REV. PI); ¶ | |

| | | |
|---|---|---|
| INSTITUTE REV. PI, PROLONGZ REVISED ADDED DISCLAIMERS, AND PROLONGZ WITH NEW TAGS from television stations that aired them across the United States. | 229 (PROLONGZ REVISED ADDED DISCLAIMERS) (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 44-45 (Att. 3)). | |
| | See also E. Cardiff 3rd RFA Resp., p. 18, ¶ 220 (PROLONGZ 2015); ¶ 221 (PROLONGZ ADVANCED MENS INSTITUTE REV); ¶ 222 (PROLONGZ ADVANCED MENS INSTITUTE REV. PI); ¶ 223 (PROLONGZ REVISED ADDED DISCLAIMERS) (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 93 (Att. 7)). | |
| 626. Most of the ads for which Cannella purchased media time were long form ads lasting twenty-eight minutes and 30 seconds (28:30). | Adkinson-Connor Dec. (PX-38), p. 3-4, ¶ 13. | |

| | | |
|---|---|---|
| 627. | In 2015, Cannella also purchased media time for the Prolongz short-form ad, PROLONGZ FREE TRIAL :60. | Adkinson-Connor Dec. (PX-38), p. 7, ¶ 28; p. 2-3, ¶ 10 & p. 157 (Att. 9). | |
| 628. | Cannella purchased media time for 59 airings of the long-form ad entitled PROLONGZ REVISED ADDED DISCLAIMERS with master number 442749 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000037. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1686 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 6-7, ¶ 25; p. 2-3, ¶ 10 & p. 157-158 (Att. 9). | |
| 629. | The long-form ads entitled PROLONGZ PI, PROLONGZ | Adkinson-Connor Dec. (PX-38), p. 3, ¶ 11; p. 7, ¶¶ 26-27. | |

| | | |
|---|---|---|
| ADVANCED MENS INSTITUTE REV., and PROLONGZ ADVANCED MENS INSTITUTE REV. PI share the same master number (428629). | | |
| 630. Cannella purchased media time for 760 airings of PROLONGZ PI, 2,014 airings of PROLONGZ ADVANCED MENS INSTITUTE REV., and 1,590 airings of ADVANCED MENS INSTITUTE REV. PI, for a total of 4,364 | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1686-1687 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 6-7, ¶ 25; p. 2-3, ¶ 10 & p. 57-75 (Att. 9) for PROLONGZ PI; p. 106-135 (Att. 9) for PROLONGZ ADVANCED MENS INSTITUTE REV.; p. 135-157 (Att. 9) for ADVANCED MENS INSTITUTE REV. PI. | |

| | | |
|---|---|---|
| airings of the three ads that share the 428629 master number. | | |
| 631. Cannella purchased media time for 320 airings of the long-form ad entitled PROLONGZ 2015 with master number 449775 that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000043. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1687 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 6-7, ¶ 25; p. 2-3, ¶ 10 & p. 102-106 (Att. 9). | |
| 632. Cannella purchased media time for 1 airing of the long-form ad entitled PROLONGZ WITH NEW TAGS with master number 446662 | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1687 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 6-7, ¶ 25; p. 2-3, ¶ 10 & p. 158 (Att. 9). | |

| | | |
|---|---|---|
| that it produced to the FTC as a file bates-stamped CAN-CARDIFF0000031. | | |
| 633.  Cannella purchased media time for 4 airings of the short-form ad entitled PROLONGZ FREE TRIAL :60 with master number 433674 that the FTC obtained from Cannella's dub house, Extreme Reach. | Sands 3rd Dec. (PX-51), p. 11-12, ¶¶ 40, 41 & p. 1687 (Att. 125).<br><br>Adkinson-Connor Dec. (PX-38), p. 6-7, ¶ 25; p. 2-3, ¶ 10 & p. 157 (Att. 9). | |
| 634.  Cannella purchased media time for a total of 4,748 airings of Prolongz advertising. | Sands 3rd Dec. (PX-51), p. 12, ¶ 41 & p. 1686-1687 (Att. 125).<br><br>See SUF 628, 630-633. | |
| **FTC Response to SUF 612-634:**  The Cardiffs do not dispute the substance of FTC SUF 612-634 concerning the advertising of Prolongz on national television | | |

from late 2013 onward, and their objections do not create disputed issues of material fact.   Defendants' use of television advertising to promote Prolongz is clearly relevant to their liability under Sections 5 and 12 of the FTC Act.   The timeframe of the airings placed by Inter/Media, Havas Edge, and Cannella is clearly identified in the declarations submitted by the Commission and referenced in these FTC SUF.

The Defendants' assertions concerning the purported last airings of advertising for TBX-FREE and Eupepsia Thin are irrelevant to SUF dealing with Prolongz.

| 635. | Defendants advertised Prolongz on the websites www.prolongz.com and www.amilonger.com. | Walker Dec. (PX-32), p. 9, ¶ 37 & p. 582 (Att. 56) (Prolongz.com); p. 589 (Att. 57) (amilonger.com).  Adkinson-Connor Dec. (PX-38), p. 13, ¶ 60.  Morris Dec. (TRO PX-4), Dkt. 9, p. 3, ¶ 4 & p. 4-10 (Att. A). | Admit. |

*B.  Defendants' Sexual Performance Claims for Prolongz*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 636.   At least three of Defendants' Prolongz TV ads | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 861, 869, ln. 10-12 (Att. 98). | Objection irrelevant and lacks timeframe. Defendants stopped |

| | | |
|---|---|---|
| | stated that "AMI has given me longevity . . . that ability to control myself." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 914, 921, ln. 23-25 (Att. 99). | marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |
| | | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 1011, 1020, ln. 11-13 (Att. 101). | |
| 637. | At least three of Defendants' Prolongz TV ads stated "As far as my performance has gone, since I've been with AMI, I can go a long, long time." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 861, 894, ln. 4-6 (Att. 98). | |
| | | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 914, 946, ln. 18-19 (Att. 99). | |
| | | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 1011, 1044, ln. 14-15 (Att. 101). | |
| 638. | At least three of Defendants' Prolongz TV ads stated "the product helps you last longer." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 861, 875, ln. 22-23 (Att. 98). | |
| | | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 914, 928, ln. 13-14 (Att. 99). | |

| | | |
|---|---|---|
| | | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 1011, 1026, ln. 11-12 (Att. 101). |
| 639. | At least four of Defendants' Prolongz TV ads promised that taking Prolongz would cause sex and intimacy to be "longer," "long lasting," "longer lasting," "last longer," "go longer," and "go a long long time." | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 861, 865, ln. 4, 12, 14; p. 866, ln. 17-19; p. 868, ln. 8-9; p. 875, ln. 22-23; p. 876, ln. 1-2; p. 877, ln. 8-9; p. 882, ln. 22-24; p. 891, ln. 24; p. 892, ln. 5, 10-11; p. 894, ln. 5-6; p. 895, ln. 22; p. 901, ln. 12-13; p. 902, ln. 10-12; p. 903, ln. 20-21; p. 903, ln. 23 – 904, ln. 2; p. 906, ln. 23-25 (Att. 98).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 914, 917, ln. 20-21; p. 918, ln. 3, 5; p. 919, ln. 7-10; p. 920, ln. 21-22; p. 928, ln. 13-14, 17-18; p. 929, ln. 20-21, 24-25; p. 935, ln. 12-13; p. 945, ln. 1-2, 10- |

| | | |
|---|---|---|
| | 19; p. 946, ln. 18-19; p. 948, ln. 9-11; p. 953, ln. 14-18; p. 954, ln. 15-17; p. 955, ln. 25 – 956, ln. 2; p. 956, ln. 3-8; p. 959, ln. 4-6 (Att. 99). | |
| | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 966, 969, ln. 25 – 970, ln. 2; p. 970, ln. 5-8, 15, 16-17; p. 971, ln. 5-6; p. 972, ln. 1-3; p. 973, line 21-24; p. 974, ln. 5-6; p. 975, ln. 19-24; p. 976, ln. 2-3, 4, 6-7; p. 978, ln. 19-21; p. 979, ln. 4-5, 11-14, 20-21; p. 981, ln. 18-21; p. 982, ln. 21-22, 23-24; p. 983, ln. 2-4, 8-9; p. 986, ln. 7-9; p. 987, ln. 9-11, 19-21; p. 988, ln. 8; p. 990, ln. 11-14, 20-21, 24-25; p. 992, ln. 14-15; p. 995, ln. 13-14, 15-16, 22-23; p. 997, ln. 20, 22-23; p. 999, ln. 17; p. 1002, ln. 20-22; p. 1006, ln. 6-8, | |

15-16 (Att. 100).

Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 1011, 1015, ln. 3-4, 11-13; p. 1016, ln. 24 – 1017, ln. 2; p. 1018, ln. 25 – 1019, ln. 1; p. 1020, ln. 16-22; p. 1021, ln. 24-25; p. 1022, ln. 21; p. 1026, ln. 11-12, 15-16; p. 1027, ln. 23-25; p. 1028, ln. 19, 21-24; p. 1030, ln. 2-3, 24; p. 1032, ln. 14-16; p. 1033, ln. 1-2; p. 1038, ln. 6, 8-12; p. 1039, ln. 14-15; p. 1040, ln. 11; p. 1042, ln. 4-19, 14-16, 20-25; p. 1044, ln. 14-15; p. 1046, ln. 7-10, 14, 16-19; p. 1047, ln. 22-23; p. 1048, ln. 19; p. 1050, ln. 20-24; p. 1053, ln. 17-24; p. 1056, ln. 24 – 1057, ln. 1; p. 1057, ln. 20, 22-25; p. 1059, ln. 3-4, 25 (Att. 101).

**FTC Response to SUF 636-639:** The Cardiffs do not dispute that their Prolongz

-364-

television ads made these claims, and their objections do not create disputed
issues of material fact.

Defendants' conclusory statement that they stopped marketing Prolongz in
February 2018 is insufficient to create a genuine dispute of material fact in light
of specific evidence contradicting that general statement. Jason Cardiffs' own
Declaration shows an active Prolongz website as of June 14, 2018.  Dkt. 491-3,
p. 46 (Prolongz website captured June 14, 2018).  Indeed, that June 14, 2018
website exerpt says that Prolongz "increase[s] ejaculatory control so men can last
longer during sex" and  "lengthen the amount of time it takes men to ejaculate."

Airings of TBX-FREE and Eupepsia Thin, are not relevant to Prolongz.

| | | |
|---|---|---|
| 640.  Defendants' www.prolongz.com website said that "Prolongz is guaranteed to increase your ejaculatory control levels and overall sexual performance!" | Morris Dec. (TRO PX-4), Dkt. 9, p. 2, ¶ 4 & p. 6 (Att. A). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. |

**FTC Response to SUF 640:**  The Cardiffs do not dispute that the prolongz.com
website made this claim, and their objections do not create a disputed issue of
material fact.

Defendants clearly did not stop marketing Prolongz in February 2018, as Jason
Cardiffs' own Declaration exhibit 3 shows.  Dkt. 491-3, p. 46 (Prolongz website
captured June 14, 2018).  Indeed, that June 14, 2018 website exerpt says that

| | | | |
|---|---|---|---|
| | Prolongz "increase[s] ejaculatory control so men can last longer during sex" and "lengthen the amount of time it takes men to ejaculate."<br><br>Furthermore, airings of TBX-FREE and Eupepsia Thin, are not relevant to Prolongz. | | |
| 641. | On the internet website www.prolongz.com, Defendants promise "[l]onger lasting sex is achievable. Prolongz™ will make you firmer and last longer." | Morris Dec. (TRO PX-4), Dkt. 9, p. 2, ¶ 4 & p. 8 (Att. A). | Admit |
| 642. | Defendants' www.prolongz.com website said: "LONGER LASTING SEX INCREASED    EJACULATION    CONTROL TIME" | Morris Dec. (TRO PX-4), Dkt. 9, p. 2, ¶ 4 & p. 7 (Att. A). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. |
| 643. | Defendants' www.prolongz.com website said that Prolongz is an | Morris Dec. (TRO PX-4), Dkt. 9, p. 2, ¶ 4 & p. 8 (Att. A). | Red Ginseng has a "significant" effect on erectile dysfunction. |

| | | | |
|---|---|---|---|
| | FDA registered drug "which helps in the prevention of Premature Ejaculation (PE). It is a first of its kind product which uses Oral (sublingual) dissolvable Strip delivery technology for the treatment of PE." | | 2008 study in US National Library of Medicine, National Institutes of Health. Ex. A, Declaration of Jason Cardiff. ¶23. In a study of 80 people, 40 of who were on placebo and 40 of who took Red Ginseng, all patients increased their unit of measure in Clinical Trial. Ex. A, Declaration of Jason Cardiff. ¶24. Red Ginseng increases the production of Nitric Oxide which leads to improved erectile function and vascular endothelial function. Ex. A, Declaration of Jason Cardiff. ¶25. |
| 644. | Defendants' www.prolongz.com website said that "[i]n clinical studies, the ingredients in Prolongz™ by Advanced Men's Institute (AMI) were proven to increase ejaculatory control level of over 97% in men." | Morris Dec. (TRO PX-4), Dkt. 9, p. 2, ¶ 4 & p. 4, 5 (Att. A). | |
| 645. | On the internet | Morris Dec. (TRO PX-4), | |

| | | |
|---|---|---|
| website www.prolongz.com, Defendants stated that Prolongz is "[p]roven to effectively increase the length in Sex for over 97% of Thousands of Men who have tried Prolongz." | Dkt. 9, p. 2, ¶ 4 & p. 8 (Att. A). | |
| 646. On the internet website www.prolongz.com, Defendants include testimonials like this one: "It's brought adventure back into our sex life. Better than it was when we were a lot younger …I love to have sex and the longer it goes on the more I enjoy it. | Morris Dec. (TRO PX-4), Dkt. 9, p. 2, ¶ 4 & p. 10 (Att. A). | |

| | | |
|---|---|---|
| The bottom line is the Strips work!" | | |

**FTC Response to SUF 642-646:** The Cardiffs do not dispute that prolongz.com contained the challenged advertising claims, including claims of longer lasting sex and ejaculatory control and claims that Prolongz is "proven to effectively increase the length in Sex for over 97% of Thousands of Men who have tried Prolongz."

The timeframe is the period Defendants advertised on prolongz.com. Defendants sold Prolongz from at least 2013 to October 12, 2018. See SUF 604.

The fact that the challenged advertising claims appeared on Defendants' website are relevant to proving that the challenged claims were made and widely disseminated.

| | | |
|---|---|---|
| 647. Jason and Eunjung Cardiff admit that Prolongz was advertised as a male sexual performance aid. | J. Cardiff 3rd RFA Resp., p. 24, ¶ 243 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 47 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 20, ¶ 237 (Sanger Dec. (PX-52), p. 2, ¶10 & p. 95 (Att. 7)). | Admit |
| 648. Jason and Eunjung Cardiff admit that Prolongz was advertised as substantially | J. Cardiff 3rd RFA Resp., p. 24-25, ¶ 244 (Sanger Dec. (PX-52), p. 1, ¶ 6 & p. 47-48 (Att. 3)). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were |

| | | |
|---|---|---|
| increasing ejaculation control and the duration of sex. | E. Cardiff 3rd RFA Resp., p. 20, ¶ 238 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 95 (Att. 7)). | made on their websites in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. Red Ginseng has a "significant" effect on erectile dysfunction. 2008 study in US National Library of Medicine, National Institutes of Health. Ex. A, Declaration of Jason Cardiff. ¶23. In a study of 80 people, 40 of who were on placebo and 40 of who took Red Ginseng, all patients increased their unit of measure in Clinical Trial. Ex. A, Declaration of Jason Cardiff. ¶24. Red Ginseng increases the production of Nitric Oxide which leads to improved erectile function and vascular |

| | | endothelial function. Ex. A, Declaration of Jason Cardiff. ¶25. |
|---|---|---|

**FTC Response to SUF 648:** The Cardiffs do not dispute that Prolongz was advertised as substantially increasing ejaculation control and the duration of sex, and they provide no explanation or documentation establishing that their previous admissions were erroneous. Their objections do not create disputed issues of material fact.

Defendants did not stop marketing Prolongz in February 2018, as Jason Cardiffs' own Declaration exhibit 3 shows. Dkt. 491-3, p. 46 (Prolongz website captured June 14, 2018). Indeed, that June 14, 2018 website exerpt says that Prolongz "increase[s] ejaculatory control so men can last longer during sex" and "lengthen the amount of time it takes men to ejaculate."

Furthermore, Jason Cardiff's characterization of the findings of any scientific study is inadmissible under FRE 701 because he is providing testimony based on "scientific, technical, or other specialized knowledge within the scope of FRE 702," but has not been qualified as an expert.

*C. Defendants' Sexual Performance Claims for Prolongz Were False or Unsubstantiated*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 649. The FTC submitted the Declaration and accompanying expert report of | Declaration of Hossein Sadeghi-Nejad, MD, FACS (TRO PX-9), Dkt. 209 to 209-8. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed |

| | | Hossein Sadeghi-Nejad, M.D.[15] | | the claims that were made on their websites in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. |
|---|---|---|---|---|
| | 650. | The Commission identified Dr. Sadeghi-Nejad to Defendants in its September 26, 2019 Initial disclosures. | Sanger Dec. (PX-52), p. 2-3, ¶ 15.  See also Sanger Dec. (PX-52), p. 2, ¶¶ 13-14 (FTC sent counsel for the Cardiffs copies of its four expert reports in March and April 2019). | Red Ginseng has a "significant" effect on erectile dysfunction. 2008 study in US National Library of Medicine, National Institutes of Health. Ex. A, Declaration of Jason Cardiff. ¶23. |
| | 651. | Dr. Sadeghi-Nejad is a medical doctor and certified by the American Board of Urology. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 4. | In a study of 80 people, 40 of who were on placebo and 40 of who took Red Ginseng, all patients increased their unit of measure in Clinical Trial. Ex. A, Declaration of Jason Cardiff. ¶24. |
| | 652. | Dr. Sadeghi-Nejad is a Professor of Surgery/Urology at Rutgers New Jersey Medical School, and the Chief of Urology at the New Jersey | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 4. | |

---

[15] The Cardiffs submitted a single objection to SUF 649-706; the FTC's response begins on p. 401.

| | | |
|---|---|---|
| | Veterans Affairs Hospitals. | | Red Ginseng increases the production of Nitric Oxide which leads to improved erectile function and vascular endothelial function. Ex. A, Declaration of Jason Cardiff. ¶25. Dr. Sadeghi-Nejad was not provided accurate information about the modified product claims made for Eupepsia Thin [sic] and. Accordingly, his opinions should be excluded under the Daubert test. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, (); *FTC v. Qualcomm Inc.*, 2018 U.S. Dist. LEXIS 208197, *9, 2018 WL 6460573. |
| 653. | Dr. Sadeghi-Nejad is the Director of the Center for Male Reproductive Medicine at the Hackensack University Medical Center, where he maintains a private practice. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 4. | |
| 654. | Dr. Sadeghi-Nejad has served as a member of numerous professional organizations including the American Urological Association, the American Society of Reproductive Medicine, and the Sexual Medicine Society of North America. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 4. | |

| | | |
|---|---|---|
| 655. | Dr. Sadeghi-Nejad has served on the examination committee of the American Board of Urology. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 4. |
| 656. | As a member of the American Urological Association Guidelines Panel, a group tasked with preparation of evidence-based practice guidelines for urologists in the United States, Dr. Sadeghi-Nejad co-authored Guidelines on Erectile Dysfunction (released in 2017), and the AUA Guidelines on Peyronie's Disease (released in 2015). | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 4. |
| 657. | Dr. Sadeghi-Nejad | Sadeghi-Nejad Expert |

| | | |
|---|---|---|
| | has served on the Editorial Bard of the Journal of Sexual Medicine and as a scientific reviewer for numerous peer-reviewed journals. | Report (TRO PX-9), Dkt. 209, p. 4. | |
| 658. | Dr. Sadeghi-Nejad has treated many patients with urological disorders, including premature ejaculation and sexual dysfunction. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 5. | |
| 659. | Based upon his education, training, and experience, training, Dr. Sadeghi-Nejad is an expert in the fields of sexual dysfunction, including but not limited to erectile dysfunction | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 4. | |

| | | |
|---|---|---|
| premature ejaculation; and other urological disorders. | | |
| 660. | Dr. Sadeghi-Nejad stated that premature ejaculation is one of the most common male sexual disorders. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 6. |
| 661. | To evaluate the claims for Prolongz, Dr. Sadeghi-Nejad reviewed materials that had been produced by Defendants as scientific support for Prolongz and conducted a search of the scientific literature to determine whether there was other scientific support for the challenged | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 5, 8, 13-18 & Dkt. 209-2, p. 9 to Dkt. 209-9, p. 151. |

| | Prolongz claims. | |
|---|---|---|
| 662. | Dr. Sadghi-Nejad stated that none of the studies he was provided were of a homeopathic formulation of ginseng or damiana, and that his literature search did not identify any homeopathic formulations of ginseng or damiana for ejaculatory control or premature ejaculation. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 8, 18. |
| 663. | Dr. Sadeghi-Nejad stated that experts in the field of sexual medicine would expect claims that a product substantially increases ejaculatory control | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 8. |

| | | | |
|---|---|---|---|
| | and the duration of sex, or prevents or treats premature ejaculation to be supported by well-designed, randomized, double-blind, properly controlled human clinical testing of the actual product or of a substantially similar product with the same dosage and means of administration for which the efficacy claims are made. | | |
| 664. | Dr. Sadeghi-Nejad stated that those clinical trials must test the appropriate study population (e.g., in the case of PE, men with documented | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 8-9. | |

| | | |
|---|---|---|
| premature ejaculation), be of sufficient sample size and duration, and use reliable and validated efficacy outcome measures. | | |
| 665. Dr. Sadeghi-Nejad stated that testing of individual ingredients alone is not sufficient because ingredients may interact when combined and produce different outcomes. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 9. | |
| 666. Dr. Sadeghi-Nejad stated that testing the same dosage of ingredients as the product at issue is necessary, because a positive effect observed at one dosage may not occur at a lower or | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 9. | |

| | | |
|---|---|---|
| | higher dosage. | |
| 667. | Dr. Sadeghi-Nejad stated testing the same route of administration as that of the product at issue is significant, because different delivery systems (e.g., oral tablet, oral film strip, topical cream) can affect the body's metabolism and absorption of the active ingredients. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 9. |
| 668. | Dr. Sadeghi-Nejad stated that product efficacy studies must be performed on human subjects because the outcomes of in vitro and animal studies cannot be extrapolated to humans. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 9. |

| | | |
|---|---|---|
| 669. | Dr. Sadeghi-Nejad stated that sexual medicine experts would expect the subjects in a study assessing a product's efficacy to reflect the characteristics of the population to whom the product is targeted. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 9. |
| 670. | Dr. Sadeghi-Nejad stated that to support a PE prevention or treatment claim, experts would expect the study population to include men with documented premature ejaculation. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 9. |
| 671. | Dr. Sadeghi-Nejad stated that tosupport a PE prevention or | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 9-10. |

| | | |
|---|---|---|
| treatment claim, there should be documentation that the study population includes men who are at least moderately bothered by their PE as measured by a validated questionnaire. | | |
| 672. | Dr. Sadeghi-Nejad stated a properly designed efficacy study for a PE treatment product efficacy claims must test the treatment product against a placebo or suitable active control in order to be able to distinguish outcomes caused by the test product from those caused by other factors. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 10. |

| | | |
|---|---|---|
| 673. | Dr. Sadeghi-Nejad stated that randomized assignment of study subjects to either a treatment or control group s essential to minimize potential selection bias. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 10. |
| 674. | Dr. Sadeghi-Nejad stated that an important aspect of a well-controlled trial is the blinding of both the study subjects and the investigators as to who has received the treatment product versus the control or reference product. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 10. |
| 675. | Dr. Sadeghi-Nejad stated that "double-blinding" is important to minimize potential | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 10. |

| | | |
|---|---|---|
| bias by both participants and the investigators conducting the study. | | |
| 676. | Dr. Sadeghi-Nejad stated that experts in sexual medicine would expect a study assessing the efficacy of a PE product to include enough participants so the resulting data are sufficiently powered to produce statistically and clinically meaningful results. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 10-11. |
| 677. | Dr. Sadeghi-Nejad stated that to account for dropouts, PE studies typically aim to recruit 100 subjects, with 50 | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 11. |

| | | |
|---|---|---|
| randomized into the test group and 50 into the control group. | | |
| 678. Dr. Sadeghi-Nejad stated that studies to assess the efficacy of a product to treat PE should incorporate the study subjects' hormonal status into sampling strategies, in order to evaluate anticipated hormonal effects of the test product. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 11. | |
| 679. Dr. Sadeghi-Nejad stated that a study to assess the efficacy of a product to treat PE, should include at least a 3-month treatment period in order to fully evaluate the effect. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 11. | |

| | | |
|---|---|---|
| 680. | Dr. Sadeghi-Nejad stated that a study to assess a product's efficacy to substantially increase time before ejaculation in healthy men likewise must be of sufficient duration to allow for collection of baseline data and a reasonable number of sexual attempts during the study period to assess treatment response. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 11-12. |
| 681. | Dr. Sadeghi-Nejad stated that studies testing the efficacy of a product to improve ejaculatory control or to treat or prevent PE must use standardized outcome measures | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 12. |

| | | |
|---|---|---|
| to assess clinical benefit. | | |
| 682. | Dr. Sadeghi-Nejad stated that when evaluating the validity of the study results, experts would examine both the statistical significance and clinical relevance of the data, because a statistically significant measure does not always correspond to a clinically meaningful (real world) outcome, and vice versa. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 13. |
| 683. | Dr. Sadeghi's unrebutted expert opinion is that the study conducted for Redwood Scientific | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 13-15, 18. |

| | | |
|---|---|---|
| | Technologies by Hilltop Research on a product called "Prolong 2" does not provide reliable scientific support that Prolongz substantially increases ejaculation control and the duration of sex, or prevents or treats premature ejaculation. | |
| 684. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that the Hilltop Research study materials did not disclose the Prolong 2 ingredients or dosages of the Prolong 2 product, and therefore there is no way to know whether the tested | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 14. |

| | | |
|---|---|---|
| | product had the same formulation as Prolongz. | |
| 685. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that even if the product that Hilltop Research tested did have the same formulation as Prolongz, the study fails to provide reliable scientific evidence to support efficacy claims for Prolongz because it did not adhere to accepted standards for conducting scientifically sound ejaculatory control or premature ejaculation studies. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 14. |
| 686. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that the Hilltop | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 14. |

| | | |
|---|---|---|
| | Research study did not adhere to scientifically sound scientific standards because it did not have a randomized control group, which is necessary to eliminate potential bias by the investigators and the study subjects. | |
| 687. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that the Hilltop Research study failed to adhere to scientifically sound methods because its duration was too short to properly evaluate a treatment response. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 13-14, 18. |
| 688. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 14, 18. |

| | | |
|---|---|---|
| the Hilltop Research study failed to adhere to scientifically sound methods because the number of participants was too small to draw reliable conclusions about efficacy. | | |
| 689. | Dr. Sadeghi-Nejad's unrebutted expert opinion is that the low number of study participants, and thus, underpowering of the Hilltop Research study, renders conclusions about statistical significance meaningless. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 14, 18-19. |
| 690. | It is Dr. Sadeghi-Nejad's unrebutted | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. |

| | | |
|---|---|---|
| | expert opinion that the inclusion criteria used in the Hilltop Research study did not adhere to standardized criteria for evaluating PE therapies because the study subjects were healthy men who had not been diagnosed with, or complained of PE. | 209, p. 14-15. |
| 691. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that the Hilltop Research study was not properly designed to assess premature ejaculation because it did not use an objective outcome measure to assess time to ejaculation | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 15. |

| | | |
|---|---|---|
| | and, instead, relied solely on an unvalidated questionnaire. | |
| 692. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that given the study's flaws, the conclusions reached by the investigators of the Hilltop Research study cannot be replicated or accepted as scientifically valid. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 15, 18-19. |
| 693. | Dr. Sadeghi-Nejad evaluated four human studies submitted by Defendants assessing the effects of Korean Red Ginseng. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 6, 16, 19. |
| 694. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 6, 16, 19. |

| | | those four human studies assessing the effects of Korean Red Ginseng did not provide reliable scientific support for the challenged claims for Prolongz. | | |
| --- | --- | --- | --- | --- |
| | 695. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that because the Korean Red Ginseng studies tested doses of gingseng that were at least 30 times higher than the dose found in Prolongz, there is no basis for concluding that Prolongz would have the same effects as those reported in the studies. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 16-17, 19. | |

| | | |
|---|---|---|
| 696. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that the Korean Red Ginseng studies do not provide reliable scientific support for the challenged Prolongz claims because the primary endpoint of those studies was the treatment of erectile dysfunction and not ejaculatory control or PE. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 17. | |
| 697. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that the Korean Red Ginseng studies do not provide reliable scientific support for the challenged Prolongz claims because the studies examined the | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 17, 19. | |

| | | effects of ginseng alone rather than a combination of ginseng and damiana, the active ingredients in Prolongz. | |
|---|---|---|---|
| | 698. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that experts in the field of sexual medicine would require human testing of the actual Prolongz formulation, so studies examining the effectiveness of ginseng extract and damiana extract individually would not constitute adequate support for the Prolongz ejaculation efficacy claims. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 17. |
| | 699. | It is Dr. Sadeghi-Nejad's unrebutted | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. |

| | | | |
|---|---|---|---|
| | expert opinion that the results of a study submitted by Defendants of a nine-ingredient topical anesthetic cream cannot be extrapolated to Prolongz because of significant differences in both formulation and route of administration. | 209, p. 17, 19. | |
| 700. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that four rodent studies submitted by Defendants do not provide reliable scientific support for the challenged Prolongz claims because the results of animal studies cannot be extrapolated to | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 16-17. | |

| | | |
|---|---|---|
| | effects in humans. | |
| 701. | Dr. Sadeghi-Nejad also stated that the four rodent studies do not provide reliable scientific support for the challenged Prolongz claims because none found improvements in premature ejaculation or ejaculatory control. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 17. |
| 702. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that review articles submitted by Defendants do not provide reliable scientific support for the challenged Prolongz claims because they do not meet accepted scientific standards | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 18. |

| | | |
|---|---|---|
| | for clinical trials. | |
| 703. | It is Dr. Sadeghi-Nejad's unrebutted expert opinion that his own search of the medical literature did not reveal any scientific evidence to support the conclusion that the combination of ingredients in Prolongz increases ejaculatory control time or treats or prevents PE. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 18. |
| 704. | Based on his knowledge, experience, and training, it is Dr. Sadeghi-Nejad's unrebutted expert opinion that there was no reliable scientific evidence that Prolongz substantially | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 6, 19. |

| | | |
|---|---|---|
| | increases ejaculatory control or the duration of sex (time to ejaculation). | |
| 705. | Based on his knowledge, experience, and training, it is Dr. Sadeghi-Nejad's unrebutted expert opinion that there was no reliable scientific evidence that Prolongz prevents or treats premature ejaculation. | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 6, 19. |
| 706. | The Cardiffs did not submit any expert report disagreeing with Dr. Sadeghi-Nejad's conclusions about Prolongz or supporting the Prolongz claims | Sanger Dec. (PX-52), p. 3, ¶ 18. |

| challenged in this proceeding. | | |
|---|---|---|

**FTC Response to SUF 649-706**:  The Cardiffs do not dispute any of the foregoing facts concerning Dr. Sadeghi-Nejad's explanation of the standards that experts in sexual performance would use to determine whether claims for a sexual performance product are substantiated, or his evaluation of the challenged claims made for Prolongz using those standards.

Dr. Sadeghi-Nejad's expert report is relevant and helpful to the Court. He was asked to opine, as an expert in sexual performance, on whether the claims challenged in the Commission's complaint were substantiated.  That is exactly what he did, setting forth first the standards that experts in the field would use to answer that question and then examining the relevant scientific evidence.

Jason Cardiff's characterization of the findings of any scientific study is inadmissible under FRE 701 because he is providing testimony based on "scientific, technical, or other specialized knowledge within the scope of FRE 702," but has not been qualified as an expert.  Dkt. 490, p. 15-18.

The timeframe is the period when Defendants marketed and sold Prolongz (2013-2018, see SUF 604), and these facts are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

### D. Defendants' Claims That Prolongz Was Proven To Be Effective Were False

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 707.  None of the | Sadeghi-Nejad Expert | Objection irrelevant and |

| | | | |
|---|---|---|---|
| | substantiation materials submitted by Defendants included a study of Prolongz or any product with the same formulation of ginseng and damiana in an oral film strip for improved ejaculatory control or PE. 16 | Report (TRO PX-9), Dkt. 209, p. 17. | lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. Red Ginseng has a "significant" effect on erectile dysfunction. 2008 study in US National Library of Medicine, National Institutes of Health. Ex. A, Declaration of Jason Cardiff. ¶23. In a study of 80 people, 40 of who were on placebo and 40 of who took Red Ginseng, all |
| 708. | Dr. Sadeghi-Nejad found no published reports of human clinical studies of a product with the same formulation of ginseng and damiana and route of administration | Sadeghi-Nejad Expert Report (TRO PX-9), Dkt. 209, p. 18 ("My literature search did not reveal any scientific evidence to support that the combination of ingredients in Prolongz increases ejaculatory | |

[16] The Cardiffs submitted a single objection to SUF 649-708. However, to be consistent with the Commission's original organization, this Response groups SUF 707-708 together, rather than with SUF 649-706.

| | | |
|---|---|---|
| as Prolongz in which the product increased ejaculatory control and the duration of sex. | control time or treats or prevents PE."). | patients increased their unit of measure in Clinical Trial. Ex. A, Declaration of Jason Cardiff. ¶24.<br>Red Ginseng increases the production of Nitric Oxide which leads to improved erectile function and vascular endothelial function. Ex. A, Declaration of Jason Cardiff. ¶25.<br>Dr. Sadeghi-Nejad was not provided accurate information about the modified product claims made for Eupepsia Thin [sic] and. Accordingly, his opinions should be excluded under the Daubert test. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, (); *FTC v. Qualcomm Inc.*, 2018 U.S. Dist. LEXIS 208197, *9, 2018 WL 6460573. |

1

2    **FTC Response to SUF 707-708**:  The Cardiffs do not dispute Dr. Sadeghi-

3    Nejad's assertions (1) that none of the substantiation materials submitted by

4    Defendants included a study of Prolongz or any product with the same

5    formulation of ginseng and damiana in an oral film strip for improved

6    ejaculatory control or premature ejaculation, and (2) that he found no published

7    reports of human clinical studies with the same formulation and route of

8    administration as Prolongz in which the product increased ejaculatory control

9    and the duration of sex.

10   Dr. Sadeghi-Nejad's expert report is relevant and helpful to the Court.  Dr.

11   Sadeghi-Nejad was asked to opine, as an expert in expert in the fields of sexual

12   dysfunction, including but not limited to erectile dysfunction premature

13   ejaculation; and other urological disorders, on whether the Prolongz claims

14   challenged in the Commission's complaint were substantiated.  That is exactly

15   what he did, setting forth first the standards that experts in the field would use to

16   answer that question with respect to a product claimed to improve sexual

17   performance and then examining the relevant scientific evidence.

18   The Cardiffs' extraneous narrative should be disregarded.

19

20

21   The Cardiffs' boilerplate "timeframe" objection is inapposite because the facts

22   deal with the complete absence of any clinical study of Prolongz or any product

23   with the same formulation of ginseng and damiana in an oral film strip for

24   improved ejaculatory control or premature ejaculation.

25

26   These facts are relevant to Defendants' liability for injunctive and monetary

27   relief.

28

| 709.   [reserved] | | |
|---|---|---|

| 710. | [reserved] | | |
| 711. | [reserved] | | |

## VI.   False Made in USA Claim for Eupepsia Thin

| FTC Fact | FTC Citation | Cardiff Admit/Ojection |
|---|---|---|
| 712.  The Eupepsia Thin package purchased by the FTC's undercover investigator showed a circular seal with an American flag encircled by the words "Made in USA." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 15 & Dkt. 10, p. 63 (Att. 027). <br><br> Walker Dec. (PX-32), p. 11, ¶ 48 & p. 620-621 (Att. 67). | Deny. Ex. A, Jason Cardiff Declaration ¶¶81-83. |
| 713.  The Eupepsia Thin package produced in response to the Commission's CID displayed the same seal. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 16 & Dkt. 10, p. 65 (Att. 028). | |

**FTC Response to SUF 712-713:** Although the Cardiffs purport to deny SUF 712 and 713, the cited Paragraphs 81-83 of Jason Cardiff's Declaration do not address whether the Eupepsia Thin packages purchased by the FTC's investigator and the package produced by Redwood in response to the Commission's CID displayed a circular seal with an American flag encircled by the words "Made in USA." Accordingly, their denial does not actually create a

| | | | |
|---|---|---|---|
| genuine dispute of material fact. | | | |
| 714. | Defendants' bethinrx.com website displayed the same seal. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 49 (Att. 026).<br><br>Walker Dec. (PX-32), p. 9, ¶ 37 & p. 547-560 (Att. 49). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. |
| 715. | The Eupepsia Thin page on the Redwood America website, redwoodamerica.com, displayed the same seal. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 17 & Dkt. 10, p. 67 (Att. 029).<br><br>Walker Dec. (PX-32), p. 9, ¶ 37 & p. 591-592 (Att. 58). | .<br>Deny. Ex. A, Jason Cardiff Declaration ¶¶81-83. |
| 716. | Defendants' controltheweight.com website displays the same seal and also says that "RST's newest product, Eupepsia Thin, is made in the USA. . . ." | Sands 3rd Dec. (PX-51), p. 5, ¶ 18 & p. 187, 190, 193 (Att.76).<br><br>Walker Dec. (PX-32), p. 9, ¶ 37 & p. 561-563 (Att. 50). | |
| **FTC Response to SUF 714-716:** The Cardiffs do not dispute that the seal appeared on their Redwood America, bethinrx.com, and controltheweight.com websites. | | | |

-406-

Moreover, Defendants did not stop marketing Eupepsia Thin using that seal in February 2018. The seal was still prominent on the Redwood America website as of March 28, 2018 (Dkt. 7, p. 6, ¶ 17 & Dkt. 10, p. 67 (Att. 029)) and on the controltheweight.com wesite as of August 9, 2018. SUF 940.

The timeframe is when the Defendants marketed Eupepsia Thin (2017-2018, Dkt. 1) and these facts are relevant to the Cardiffs' individual liability for injunctive and monetary relief.

| | | | |
|---|---|---|---|
| 717. | Defendants claimed that Eupepsia Thin was made in the United States. | SUF 712-716. | Deny. Ex. A, Jason Cardiff Declaration ¶¶81-83. |

**FTC Response to SUF 717:** The Cardiffs' denial of FTC SUF 717 does not create a genuine dispute of material fact, because Paragraphs 81-83 of Jason Cardiffs' Declaration do not dispute that Defendants' claimed Eupepsia Thin was made in the United States.

| | | | |
|---|---|---|---|
| 718. | Eupepsia Thin oral film strips were made in China and India. | Walker Dec. (PX-32), p. 11, ¶¶ 47, 49-50 & p. 622 (Att. 68); p. 640 (Att. 73); p. 641-643 (Atts. 74-76).<br><br>See also Wu Dec. (PX-37), p. 2, ¶ 12 (in late 2016, Redwood's sole supplier of Prolongz and TBX-FREE was the | Admit insofar as it does not admit that the entire process of manufacturing Euepsia Thin met the requirements for "Made in the USA" prior to 2017. Ex. A, Declaration of Jason Cardiff ¶¶81-83. |

| | | |
|---|---|---|
| | | Chinese company Dalian). |
| 719. | Jason Cardiff and Eunjung Cardiff admit that Eupepsia Thin oral film strips were not made in the United States. | J. Cardiff 3rd RFA Resp., p. 19, ¶ 211 (Sanger Dec. (PX-52), p. 1, p. 6 & p. 42 (Att. 3)).<br><br>E. Cardiff 3rd RFA Resp., p. 16, ¶ 205 (Sanger Dec. (PX-52), p. 2, ¶ 10 & p. 71 (Att. 7)).<br><br>See also Walker Dec. (PX-32), p. 11, ¶ 47 ("TBX-FREE, Eupepsia Thin, and Prolongz were made in China and India").<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 9-10, ¶¶ 23-27 & Dkt. 10, p. 80-89 (Atts. 033-037). |
| 720. | Jason Cardiff admits that he knew that Eupepsia | J. Cardiff 3rd RFA Resp., p. 20, ¶ 213 (Sanger Dec. (PX- |

| | | |
|---|---|---|
| Thin oral film strips were not made in the United States. | 52), p. 1, ¶ 6 & p. 43 (Att. 3)). See also Walker Dec, p. 11, ¶ 49 (Jason Cardiff communicated with the manufacturers). | |
| 721. Eunjung Cardiff admits that she knew that the Eupepsia Thin oral film strips were imported from India and China. | E. Cardiff 3rd RFA Resp., p. 17, ¶ 208 (Sanger Dec. (PX-52), p. 2, ¶ 10 & 92 (Att. 7). See also Walker Dec. (PX-32), p. 11, ¶ 50 (Eunjung Cardiff authorized payment of the manufacturers' invoices). | |
| **FTC Response to SUF 718-721:** The Cardiffs have previously admitted these facts and do so again.  Their additional narrative should be disregarded as argument. | | |
| 722.  [reserved] | | |
| 723.  [reserved] | | |
| 724.  [reserved] | | |

**VII.   False and Misleading Money Back Guarantee Claims**

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 725. Jason Cardiff stated in a January 9, 2017 Facebook advertisement for TBX-FREE "what have you got to lose? I mean, we have a lifetime, money-back guarantee on this product. We're going to give you, you know, your money back. We're going to cover the shipping." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 7 & Dkt. 7, p. 248, ln. 19-23 (Att. 010). | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were made on their websites in or about February, 2018. Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165. |
| 726. Jason Cardiff stated in a February 7, 2017 Facebook advertisement for TBX-FREE that "We have a lifetime money-back guarantee. So | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 263, ln. 11-21 (Att. 013). | |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14 | for any reason if it doesn't work, you don't even need to ship it back. . . . And if you have a problem . . . or it doesn't work or you want your money back, I mean it's possible. You call . . . we don't even ask you to send the product back." | |
| 15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24 | 727. Jason Cardiff also stated in the February 7, 2017 Facebook advertisement for TBX-FREE that "We want to give you your money back if you're not satisfied." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 8 & Dkt. 7, p. 264, ln. 25 – p. 265, ln. 1 (Att. 013). |
| 25<br>26<br>27<br>28 | 728. Jason Cardiff stated in a February 24, 2017 Facebook ad for | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 4, ¶ 9 & Dkt. 7, p. 278, ln. 11-17 (Att. 016). |

| | | |
|---|---|---|
| TBX-FREE, "We offer a lifetime, money-back guarantee. So TBX-FREE says, wait a minute, wait a minute. Lifetime, money-back guarantee for any reason, okay? If the product doesn't work for you or you become a smoker again, not only will we either give you your money back or we'll send you another box, whatever you want." | | |

**FTC Response to SUF 725-728**:  The Cardiffs do not dispute that Jason Cardiff, in Facebook Live videos, promised TBX-FREE customers that they could get their money back if they were dissatisfied with their order under Redwood's lifetime money back guarantee.

The Defendants' boilerplate "lacks timeframe" objection is inapposite when FTC SUF 725-728 clearly state the dates on which those Facebook advertisements

were posted.  Furthermore, the January 9, 2017, February 7, 2018, and February 24, 2017 Facebook videos were all still live on September 18, 2018, when they were captured by the FTC's investigator.  Dkt. 7, p. 254, 267, 282 (Att. 011, 014, 017).

These facts are relevant to proving that Defendants promised consumers money back guarantees and to Jason Cardiff's individual liability for injunctive and monetary relief.

Their additional narrative is argument and does not address these facts.

| | | | |
|---|---|---|---|
| 729. | A Redwood sales representative asked an FTC investigator making an undercover telephone call if he was "most definitely sure you want to only get the one-box supply?  We do have a money-back guarantee for all options." | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 13, ¶ 33 & Dkt. 10, p. 158, ln. 12-14 (Att. 069). | Admit. |
| 730. | A Redwood sales representative told another FTC | Farrell Dec. (TRO PX-5), Dkt. 11, p. 2, ¶ 4 & p. 11, ln. 25 – p. 12, ln. 9 (Att. | Defendants did offer a money-back guarantee and over 16,000 people |

| | | |
|---|---|---|
| investigator making an undercover telephone purchase of TBX-FREE that "[W]e also offer a 30-day, money-back guarantee. .... If you're not satisfied, whatever the situation, you're still smoking, give us a call back on, you know, the 30th day, and we'll fully refund you. So you really have nothing to lose but, you know, beat [sic] the bad habit itself."[17] | 1). | received refunds from Redwood. Dkt. 7 at 155-165; Ex. A, Declaration of Jason Cardiff ¶¶111-112. |
| 731.  Defendants represented that | SUF 725-730. | |

---

[17] The Cardiffs submitted a single objection to SUF 730-739; the FTC's response begins on p. 424.

| | | |
|---|---|---|
| | TBX-FREE was sold with a money-back guarantee. | See Walker Dec. (PX-32), p. 14, ¶ 61 (Redwood initially advertised a lifetime guarantee for TBX-FREE).<br><br>See also Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 37 (Att. 2). | |
| 732. | Defendants' television ads for Eupepsia Thin included the following:<br>"ON SCREEN: Eupepsia product box and strip container<br>MONEY BACK GUARANTEE LIFETIME<br>1-800-5551212<br>thinliferx.com<br>"Spokeswoman: We are so confident that Eupepsia will work | Sands 3rd Dec. (PX-51 ), p. 9-11, ¶ 37 & p. 564, 589, ln. 2-9; see also p. 593, ln. 12-15 (on-screen graphic: "MONEY BACK GUARANTEE LIFETIME"); p. 622, ln. 13-19 ("And don't forget, we're so confident Eupepsia will work for you, it comes with a lifetime guarantee"; on screen graphic: "MONEY BACK GUARANTEE LIFETIME") (Att. 92).<br><br>Sands 3rd Dec. (PX-51), | |

| | | |
|---|---|---|
| for you, it comes with a lifetime guarantee. | p. 9-11, ¶ 37 & p. 632, 658, ln. 10-17; see also p. 663, ln. 4-7 (on-screen graphic: "MONEY BACK GUARANTEE LIFETIME"); p. 692, ln. 24 – p. 693, ln. 5 ("And don't forget, we're so confident Eupepsia will work for you, it comes with a lifetime guarantee"; on screen graphic: "MONEY BACK GUARANTEE LIFETIME") (Att. 93).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 704, 730, ln. 11-18; see also p. 735, ln. 6-9 (on-screen graphic: "MONEY BACK GUARANTEE LIFETIME"), p. 764, ln. 25 – p. 765, ln. 6 ("And don't forget, we're so confident Eupepsia will work for you, it comes with a lifetime | |

-416-

| | | | |
|---|---|---|---|
| | | guarantee"; on screen graphic: "MONEY BACK GUARANTEE LIFETIME") (Att. 94).<br><br>Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 775, 800, ln. 4-11; see also p. 804, ln. 14-17 (on-screen graphic: "MONEY BACK GUARANTEE LIFETIME"); p. 833, ln. 10-16 (same on-screen graphic; "And don't forget, we're so confident Eupepsia will work for you, it comes with a lifetime guarantee"; on screen graphic: "MONEY BACK GUARANTEE LIFETIME") (Att. 95). | |
| 733. | Eupepsia Thin advertising represented that the product was sold with a "lifetime" money-back | SUF 732.<br><br>Walker Dec. (PX-32), p. 14, ¶ 6 (Eupepsia Thin was launched with a lifetime guarantee but | |

| | | |
|---|---|---|
| guarantee. | that was changed to 30 days after many customer complaints). | |
| 734. | Defendants' television ads for Prolongz included the following onscreen text: "ON SCREEN:  30 DAY SUPPLY, 100% Guaranteed, FULL 30 DAY MONEY BACK GUARANTEE!" | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 861, 870 ln. 24 – p. 871, ln. 2; p. 871, ln. 9-12; p. 872, ln. 11-14; p. 879, ln. 15-18; p. 880, ln. 4-7; p. 881, ln. 7-10; p. 888, ln. 18-21; p. 890, ln. 5-8; p. 897, ln. 10-13; p. 898, ln. 23 – p. 899, ln. 1; p. 909, ln. 2-5; p. 910, ln. 14-17 (Att. 98). |
| | | Sands 3rd Dec. (PX-51), p. 9-11, ¶ 37 & p. 914, 923, ln. 11-14; p. 923, ln. 24 – p. 924, ln. 2; p. 925, ln. 1-4; p. 931, ln. 13-15; p. 932, ln. 2-5; p. 932, ln. 15-18; p. 933, ln. 17-20; p. 941, ln. 5-8; p. 941, ln. 18-21; p. 942, ln. 20-23; p. 949, ln. 22-25; p. 950, ln. 11-14; p. 951, ln. 13-16; p. 961, ln. 9-12; p. |

-418-

| | | |
|---|---|---|
| | | 961, ln. 23 – p. 962, ln. 1; p. 963, ln. 1-4 (Att. 99).<br><br>Sands 3rd Dec. (PX-51), p. 11-12, ¶ 40 & p. 1635, 1639, ln. 10-11; p. 1640, ln. 14-15 (Att. 121). | |
| 735. | Defendants' website, www.prolongz.com, contained the following statements: "Guaranteed to work or your money back"; "30 DAY MONEY BACK GUARANTEE!"; and "100% Satisfaction Guaranteed or Your Money Back." | Morris Dec. (TRO PX-4), Dkt. 9, p. 2, ¶ 4 & p. 4, 5, 6, 8, 10 (Att. A).<br><br>Walker Dec. (PX-32), p. 9, ¶ 37 & p. 582-588 (Att. 56) (see p. 584 for "30 DAY MONEY BACK GUARANTEE!"; see p. 586 for "100% Satisfaction Guaranteed or Your Money Back"). | |
| 736. | Prolongz advertising represented that the product was sold | SUF 734-735. | |

| | | | |
|---|---|---|---|
| | with a money-back guarantee. | | |
| 737. | Defendants' return policies for TBX-FREE and Eupepsia Thin always required customers first to call customer service to obtain a Return Merchandise Authorization (RMA) code and to send back unused product at their own expense. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 15, ¶ 41 & Dkt. 10, p. 205-206 (Att. 77) (TBX-FREE).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 55, 62 (Att. 026) (Eupepsia Thin).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 15, ¶ 40 & Dkt. 10, p. 194, 199 (Att. 076) (FTC investigator was given RMA numbers to return one authorized and one unauthorized shipment of TBX-FREE).<br><br>Walker Dec. (PX-32), p. 16, ¶ 71.<br><br>Melendez Dec. (PX-35), p. 8, ¶ 29. | |

| | | |
|---|---|---|
| | See also Carranza Dec. (PX-33), p. 4, ¶ 16.<br><br>Rodoracio Dec. (PX-36), p. 3-4,<br>¶ 15. | |
| 738. | Although Redwood started selling TBX-FREE and Eupepsia Thin with advertised lifetime moneyback guarantees, Redwood's actual return policy was limited to 30 days. | Walker Dec. (PX-32), p. 14, ¶ 61 (advertising was lifetime guarantee but terms and conditions were that purchases could only be returned within 30 days of initial order); p. 16, ¶ 71.<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 6, ¶ 14 & Dkt. 10, p. 49, 62 (Att. 26) ("DO NOT send an order back that is passed the 30 day return policy.") .<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 15, ¶ 41 & Dkt. 10, p. 205, 206 (Att. 077) ("We will not receive an order back |

| | | |
|---|---|---|
| | once it's passed 30 days' satisfaction guarantee."). | |
| | See also Carranza Dec. (PX-33), p. 4, ¶ 16 (Redwood usually had to receive the returned merchandise within 30 days of the date on which the customer placed the order). | |
| | See also Melendez Dec. (PX-35), p. 7, ¶ 27 (guarantee was sometimes advertised as lifetime and sometimes as 30 days). | |
| 739. | Defendants counted the 30-day period from the date the consumer placed the order, not from when the consumer received and started using the product, even if temporary product | Walker Dec. (PX-32), p. 14, ¶ 61 (terms and conditions were that returns had to be within 30 days of order; p. 16, ¶ 71 (product shortages sometimes made it hard to get shipments to consumers right away, which resulted in them |

| | | |
|---|---|---|
| shortages delayed the consumer's receipt of the product. | not being able to take advantage of the money-back guarantee).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 15, ¶ 41 & Dkt. 10, p. 205, 206 ("Orders sent back after the 30 [sic] day from the order will not be process [sic] for refund credit.") (Att. 077).<br><br>See also, e.g., DeAngelo Dec. (TRO PX-18), Dkt. 211, p. 15, ¶¶ 2-3 (consumer who ordered 3-month supply of Eupepsia Thin after seeing ad promising lifetime money-back guarantee was told he was not eligible for refund because 30 days had passed since he placed his order).<br><br>Roberts Dec. (TRO PX- | |

| | | |
|---|---|---|
| | 23), Dkt. 211, p. 25, ¶ 6 (customer service said refund request was too late because more than 30 days from date of initial order, even though product did not arrive for more than two weeks). | |
| | See Melendez Dec. (PX-35), p. 7, ¶ 27 (when she told Jason Cardiff that customers wanted money back more than 30 days after initial order, he told her to deny those refunds). | |

**FTC Response to SUF 730-739:** Defendants admit that they offered money-back guarantees. They do not dispute that they marketed the challenged products by offering various money-back guarantees. They also do not dispute that customers who requested their money back were required to satisfy a number of conditions before they could receive a refund, or that the lifetime money-back guarantee was only honored for 30 days, which began running from the date of sale. The remainder of the response is narrative and not responsive. For example, Defendants' response that "Redwood never took money directly from consumer bank accounts. Redwood only took credit cards and debit cards" (Dkt. 491-3 at 36, ¶ 112) is not responsive to any of the corresponding undisputed facts.

| 740.   Many customers | Walker Dec. (PX-32), 14, | Object hearsay. Any |
|---|---|---|

| did not realize that they would have only 30 days from when they placed their order to try the product. | ¶ 61; p. 16, ¶ 71 (lifetime guarantee created a lot of confusion in call center and with customers); p. 16, ¶ 71. | customer testimony through Danielle Walker is hearsay. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165. Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff ¶111. |

**FTC Response to SUF 740:**  Defendants do not dispute that customers did not realize they would have only 30 from placing their orders to try Redwood products. Jason Cardiff's sworn statement regarding flexibility exercised in granting refunds (Cardiff ¶ 11) does not address this undisputed fact and is therefore not relevant.

| 741.  The Customer Service Manager was allowed to authorize refunds only up to a certain level. | Walker Depo., p. 64, ln. 16-23 (Sands 3rd Dec. (PX-51), p. 6, ¶ 27 & p. 1672, 1677 (Att. 124)). <br><br> Melendez Dec. (PX-35), | Deny, the customer service manager was not aware of any cap on refunds. Jason Cardiff's policy for refunds was that refunds could not |

| | p. 7, ¶ 28 (Jason Cardiff imposed a daily limit on refunds in 2017). | exceed revenues for the day, and if they did exceed revenues, they |
|---|---|---|
| 742. Jason Cardiff had final decision-making authority when consumers requested refunds above that level. | Walker Depo., p. 64, ln. 24 – p. 65, ln. 2 (Sands 3rd Dec. (PX-51), p. 6, ¶ 27 & p. 1672, 1677-1678 (Att. 124)). | were pushed over to the next day. Ex. A, Declaration of Jason Cardiff ¶110. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165. Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff ¶111. |

**FTC Response to SUF 741-742**: While Defendants' formally "deny" these statements of undisputed fact, they do not dispute that the Customer Service Manager was allowed to authorize refunds up to a certain level and that Jason Cardiff had final decisionmaking authority. The cited Jason Cardiff declaration admits that there was a cap on daily refunds (¶ 110) and admits that "Danielle Walker and myself would approve these refunds" without denying that Jason Cardiff had the final decisionmaking authority. The assertion that "the customer

service manager was not aware of any cap on refunds" is purely argument and
speculative at best because it is not based on any evidence or sworn statement.

| 743. | In many cases, Redwood would deny full refunds if most of the product had been used or a Return Merchandise Authorization had not been obtained. | Walker Dec. (PX-32), p. 16, ¶ 71.<br><br>Walker Depo., p. 63, ln. 11-19 (Sands 3rd Dec. (PX-51), p. 6, ¶ 27 & p. 1672, 1676 (Att. 124)).<br><br>Rodoracio Dec. (PX-36), p. 3-4, ¶ 15 (customers had little chance of getting a refund if they had used all the product or had not gotten an RMA). | Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165.<br>Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff ¶111. |

**FTC Response to SUF 743**: Defendants do not dispute that in many cases
Redwood denied customers requested refunds because most of the products had
been used or the customer failed to obtain an RMA. The declaration of Jason
Cardiff makes a general assertion about the 30-day refund policy without
addressing the FTC's undisputed fact or giving any detailed description
regarding when, and under what circumstances, refunds were given after 30 days
had passed.

| 744. | Defendants for a while offered Prolongz and TBX-FREE on a | Walker Dec. (PX-32), p. 16, ¶ 72.<br><br>Carranza Dec. (PX-33), | Admit. Redwood was very flexible with its Refund policy, and would often refund |

| | | |
|---|---|---|
| 15-day free trial basis in which customers gave their credit or debit card numbers to pay for shipping. | p. 4-5, ¶ 17.<br><br>Rodoracio Dec. (PX-36), p. 4, ¶ 16. | money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff at ¶111. |
| **FTC Response to SUF 744**: Defendants admit and do not dispute that they offered a 15-day free trial. The remaining narrative is not responsive to the undisputed fact. | | |
| 745.   These free-trial customers would then be charged for a 30-day supply on a monthly auto-ship program at the end of the 15-day period, even if they had not received the product for 7 to 10 business days after placing their order, and thus had only tried it for a few days. | Walker Dec. (PX-32), p. 16-17, ¶ 72.<br><br>Rodoracio Dec. (PX-36), p. 4, ¶ 16.<br><br>See also Carranza Dec. (PX-33), p. 4-5, ¶ 17. | Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165.<br>Deny, Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff at ¶111. |
| **FTC Response to SUF 745**: Defendants do not dispute that free-trial customers would be charged for a 30-day auto-ship supply after the expiration of the 15-day trial even if they did not receive their free-trial until a few days prior to the expiration of the trial period. The cited Cardiff declaration (¶ 11) only states that | | |

| | | | |
|---|---|---|---|
| Redwood was "very flexible with its refund policy." Also, whether or not 16,000 customers received refunds does not address this undisputed fact. | | | |
| 746. | Many consumers who only had a couple of days before their credit or debit cards were automatically charged for a 30-day supply complained or sought chargebacks. | Rodoracio Dec. (PX-36), p. 4, ¶ 16. | Deny. The FTC has no direct evidence of customers complaining about this. Object as to the word "many." Redwood had over 200,000 customers so the word "many" is relative. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165. Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff ¶111. |
| 747. | Many customers who sought refunds were told that the charges were not refundable, or that they failed to comply with applicable cancellation and refund policies. | DeAngelo Dec. (TRO PX-18), Dkt. 211, p. 16, ¶¶ 2-3 (consumer who ordered 3-month supply of Euepsia Thin after seeing ad promising lifetime money-back guarantee was not eligible for refund because 30 days had passed since order had been placed).<br><br>Roberts Dec. (TRO PX-23), Dkt. 211, p. 25, ¶ 6 | |

| | | |
|---|---|---|
| 1 | (customer service said | |
| 2 | refund request was too | |
| 3 | late because more than | |
| 4 | 30 days from date of | |
| 5 | initial order). | |
| 6 | | |
| 7 | See also Bryant Dec. | |
| 8 | (TRO PX-16), Dkt. 211, | |
| 9 | p. 12-13, ¶¶ 5-7 | |
| 10 | (consumer unable to get | |
| 11 | refund for the TBX- | |
| 12 | FREE ordered as free | |
| 13 | trial, for which she was | |
| 14 | charged $42.71. | |
| 15 | | |
| 16 | See also Kramer Dec. | |
| 17 | (TRO PX-19), Dkt. 211, | |
| 18 | p. 18, ¶¶ 2-4 (consumer | |
| 19 | unable to get refund for | |
| 20 | $90 "End of Trial Fee" | |
| 21 | charged 30 days after | |
| 22 | placing order for 30-day | |
| 23 | free trial). | |
| 24 | | |
| 25 | See also Grossman Dec. | |
| 26 | (TRO PX-20), Dkt. 211, | |
| 27 | p. 20-21, ¶¶ 3-5 | |
| 28 | (Redwood charged | |

| | | $89.95 days after customer ordered and then cancelled 15-day free trial, and would not refund).<br><br>Carranza Dec. (PX-33), p. 4, ¶ 16 (customers complained about how strictly Redwood enforced its money-back guarantees).<br><br>See also Rodoracio Dec. (PX-36), p. 3-4, ¶ 15 (customer service received calls from customers who believed they were entitled to refunds because money-back guarantee in advertising was open-ended). | |

**FTC Response to SUF 746-747**:  Defendants do not dispute that Redwood customers who only had a couple of days before their credit or debit cards were automatically charged for a 30-day supply complained or sought chargebacks, or that customers who sought refunds were told that the charges were not refundable, or that they failed to comply with applicable cancellation and refund

policies.  Defendants' denial is based on argument and references only those customers who did get refunds (not those who were denied), and the open-ended assertion in ¶ 11 of Jason Cardiff's declaration that "Redwood was flexible with its refunds policy."

| 748. Many customers experienced difficulty reaching customer service, and some had to contact Defendants repeatedly to request refunds or cancel unauthorized autoships. | Walker Dec. (PX-32), p. 17, ¶¶ 74, 75.

Cooper Dec. (TRO PX-12), Dkt. 211, p. 5, ¶ 4 (unsuccessful in attempting to reach Redwood using customer service phone number).

Rosen Dec. (TRO PX-13), Dkt. 211, p. 7, ¶ 3 (made many unsuccessful attempts to reach Redwood).

Harrell-Cox Dec. (TRO PX-14), Dkt. 211, p. 9-10, ¶¶ 5-6 (customer service kept her on "hold" for more than two hours; unable subsequently to reach customer service by | Deny. The FTC has no direct evidence of customers complaining about this. Object as to the word "many." Redwood had over 200,000 customers so the word "many" is relative. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165.
Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff ¶111.
Customer Service representatives were |
|---|---|---|

| | | | |
|---|---|---|---|
| | | phone). | available for over 40 hours a week. Redwood had up to 12 customer service representatives working at a time. Ex. A, Declaration of Jason Cardiff ¶116. |
| | | Reynolds Dec. (TRO PX-17), Dkt. 211, p. 14, ¶¶ 4-5 (consumer stayed on the line for as much as an hour each time trying to reach customer service). | |
| | | Grossman Dec. (TRO PX-20), Dkt. 211, p. 20-21, ¶ 4 (spent hours trying to get through to Redwood, including waiting on "hold" for more than an hour several times). | |
| | | Roberts Dec. (TRO PX-23), Dkt. 211, p. 25-26, ¶¶ 4-5 (difficulty getting through to customer service; was told twice that she would get a return call but none came). | |
| | | *See also* Sands 1st Dec. | |

-433-

| | (TRO PX-1), Dkt. 7, p. 23, ¶ 68 & Dkt. 10-1, p. 30 (Att. 098); Dkt. 7, p. 23-24 ¶¶ 69-75 & Dkt. 10-1, p. 31 (Att. 099); Dkt. 7, p. 25-27 ¶¶ 76-84 & Dkt. 10-1, p. 32 (Att. 100). | |

**FTC Response to SUF 748**: Defendants do not dispute that many customers experienced difficulty reaching customer service to request refunds or cancel orders.  Instead, they dismiss consumer declarations and the detailed descriptions offered by former employees who interacted with their customers on a daily basis, arguing that the FTC did not offer proof that Redwood received complaints about consumers not being able to reach customer service, and offering ¶ 116 of Jason Cardiffs' declaration, alleging that "there were as many as 12 customer service agents" working Monday through Friday from 8:00 a.m. to 5:00 p.m. PST and that the "numbers of people working was based on the phone traffic …." These general assertions without any explanation regarding the difficulty experienced by customers reaching Defendants is not sufficient to raise a genuine issue of material fact. There is no explanation of what occurred after 5:00 p.m. or on weekends. Defendants also offer no explanation for how they handled calls that were received during busy times of day, including whether provision was made for customers to leave voice mail messages, or even whether the company made efforts to return missed messages, including how that was done.

| 749. | In 2017, Jason Cardiff became upset that too many refunds were being | Melendez Dec. (PX-35), p. 7, ¶ 28.  Walker Dec. (PX-32), p. | Deny, the customer service manager was not aware of any cap on refunds. Jason Cardiff's |

| authorized and he ordered that no more than $1,000 in refunds could be issued each day. | 16-17, ¶ 73.<br><br>Carranza Dec. (PX-33), p. 7, ¶ 27.<br><br>See Rodoracio Dec. (PX-36), p. 4, ¶ 17 (at one point Redwood was receiving request for thousands of dollars of refunds each week; Jason Cardiff felt customer service was issuing too many refunds). | policy for refunds was that refunds could not exceed revenues for the day, and if they did exceed revenues, they were pushed over to the next day. Ex. A, Declaration of Jason Cardiff ¶110. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165.<br>Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff ¶111. |

**FTC Response to SUF 749**:  Defendants do not dispute that Jason Cardiff became upset that too many refunds were being authorized or that he placed a cap on daily refunds. Jason Cardiff admits there was a cap on refunds (¶ 110). The remaining narrative is argument unrelated to the undisputed fact and should be disregarded.

| | | |
|---|---|---|
| 750. | Jason Cardiff wanted sales reps to "save the sale" rather than give refunds. | Carranza Dec. (PX-33), p. 7, ¶ 27.<br><br>See Melendez Dec. (PX-35), p. 7, ¶ 27 (Jason Cardiff said that if customer was persistent in demanding a refund, she should try to downsell them before issuing a refund).<br><br>Rodoracio Dec. (PX-36), p. 3, ¶ 14 (got pushback from Jason Cardiff for giving too many refunds). | Admit. |
| 751. | The daily refund cap was sometimes increased to $1,500 when sales of oral film strips were high.[18] | Melendez Dec. (PX-35), p. 7, ¶ 28.<br><br>Walker Dec. (PX-32), p. 16-17, ¶ 73. | Deny. Jason Cardiff's policy for refunds was that refunds could not exceed revenues for the day, and if they did exceed revenues, they were pushed over to the |
| 752. | Daily refund | Melendez Dec (PX-35), | |

---

[18] The Cardiffs submitted a single objection to SUF 751-757; the FTC's response begins on p. 439.

| | | next day. Ex. A, Declaration of Jason Cardiff ¶110. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165. |
|---|---|---|
| | requests exceeded Jason Cardiff's refund limit nearly every day. | p. 8, ¶ 29. |
| 753. | Because daily refund requests exceeded Jason Cardiff's refund cap nearly every day, customer service representatives found reasons to deny or delay refunds, and tried to get customers to agree to partial refunds on just the unused portion of the product. | Melendez Dec. (PX-35), p. 8, ¶ 29 (representatives told consumers they should have read the terms and conditions that were printed on their packing slip).<br><br>Rodoracio Dec. (PX-36), p. 4, ¶ 18 (call center sometimes gave partial refunds or allowed customers to keep the rmaining product).<br><br>Carranza Dec. (PX-33), p. 7, ¶ 27. | Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit A, Declaration of Jason Cardiff ¶111. |
| 754. | Customer service representatives also created a waiting list of consumers whose requests for their money back had been approved | Melendez Dec. (PX-35), p. 8, ¶ 30.<br><br>Walker Dec. (PX-32), p. 16-17, ¶ 73.<br><br>See also Carranza Dec. | |

| | | |
|---|---|---|
| but who could not yet be paid due to the daily refund cap. | (PX-33), p. 6-7, ¶ 26 (would hear from customers who were on the refund list but had not yet received their refund). | |
| 755. The list of customers waiting for approved refunds sometimes became long due to backlogs from previous days. | Melendez Dec. (PX-35), p. 8, ¶ 30 & p. 97 (Att. 7) (by December 7, 2017, the $1,000/day cap had been reached for the entire month of December).<br><br>Carranza Dec. (PX-33), p. 6, ¶ 24 (outstanding refunds would pile up for months). | |
| 756. Customer service staff fielded many complaints from customers who had been promised refunds but who had not yet received them after days or weeks of waiting and | Melendez Dec. (PX-35), p. 8, ¶ 30.<br><br>Garcia Dec. (PX-34), p. 4, ¶ 13 (received many calls from customers who had been promised a refund but had not received it). | |

| | | |
|---|---|---|
| multiple phone calls. | See also Walker Dec. (PX-32), p. 17, ¶ 73 (refund cap contributed to increased complaints and chargebacks). | |
| 757.  Despite the backlog, Jason Cardiff  refused to change the policy to allow more refunds each day. | Melendez Dec. (PX-35), p. 8, ¶ 30. | |

**FTC Response to SUF 751-757**: In response to detailed explanations of refund caps, backlogs, and angry customer responses provided by four former managerial employees who interacted daily with customers, including Redwood documents that confirm their experiences (Melendez Dec. (PX-35), p. 8, ¶ 30 & p. 97 (Att. 7) (by December 7, 2017, the $1,000/day cap had been reached for the entire month of December)), Defendants offer a general denial that the refund caps did not exceed daily revenues and were sometimes pushed over to the next day. These general assertions are not inconsistent with the testimony of employees who provide much more detailed information.  The general denials do not raise a genuine issue of material fact.

| | | |
|---|---|---|
| 758.  [reserved] | | |
| 759.  [reserved] | | |
| 760.  [reserved] | | |

## VIII.  Deceptive Testimonials for Eupepsia Thin

| FTC Fact | FTC Citation | Cardiff |
|---|---|---|

| | | Admit/Objection |
|---|---|---|
| 761. Defendants represented that the individuals featured in their Eupepsia Thin infomercials named Dan, Karen, and Todd had used the product to lose as much as 45, 90, and 132 pounds, respectively. | SUF 491, 493-494. | Admit. |
| 762. In fact, none of the three testimonialists named Danny, Karen, and Todd used Eupepsia Thin for the weight loss they claimed in the advertisement. | Hogan Dec. (PX-45), p. 1, ¶ 6 (had not heard of Eupepsia Thin before shooting the commercial and had never used it). Preston Dec. (PX-46), p. 1, ¶¶ 3, 6, 7 (had not even heard of Eupepsia Thin prior to filming testimonial). Spero Dec. (PX-47), p. 1, ¶ 6 (did not use Eupepsia Thin to lose weight and | Deny. Jason Cardiff did not "instruct" Ty Sherrell about what to tell the testimonials to say in Redwood's television advertising. Cardiff instructed Sherrill to locate indigicuals who took the products and were willing to provide a testimonial. Ex. A, Jason Cardiff Declaration ¶¶91-92. Deny. The Cardiffs ensured that the |

| | | had not even heard of it prior to filming commercial). | testimonials were real and from the person who said them. The Cardiffs had each testimonialist sign a form that indicated that what they were saying was true and based off their own personal experience with the product. Ex. A, Jason Cardiff Declaration ¶¶91-92. The form said: All of the statements made are true and accurate, all of my on-screen representation, of the product [product], are of my own true story. *Id*. If none of the testimonialists used the product and lied about it by signing the form, it was unbeknownst to the Cardiffs |
|---|---|---|---|
| 763. | Testimonialists Dan Hogan, Karen Spero, and Todd Preston had previously lost weight by means other than Eupepsia Thin. | Hogan Dec. (PX-45), p. 1, ¶ 3 (lost 30 to 45 pounds in 2011 due to medical condition and resulting cross fit training program).<br><br>Preston Dec. (PX-46), p. 1, ¶ 3 (lost 132 after 2010 gastric bypass surgery).<br><br>Spero Dec. (PX-47), p. 1, ¶ 3 (lost 90 pounds in 2014 to 2015 through diet and exercise, working with a doctor and a nutritionist). | |

**FTC Response to SUF 762 – 763**:  Defendants do not dispute that the testimonialists did not use Eupepsia Thin to lose the weight they discussed in the infomercial and had lost weight by other means.  Therefore, defendants' denial in the face of specific evidence submitted by the Commission does not create a

genuine dispute of material fact.  The rest of their response is just argument and should be disregarded. Whether Jason Cardiff knew the testimonials were false is not relevant to liability.

However, while he denies it in his response here, Jason Cardiff knew that the testimonialists had not used Eupepsia Thin to lose the weight they discussed in the infomercial.  See Dkt. 434-1, p. 39-40 (Att. 3) (Ty Sherrell emails Jason Cardiff on February 1, 2018 that "[I] am working on gtting testimonials from people who have already lost weight and I'm getting before pictures for them . . . they will still have the product and do the testiomonials but ill [sic] have before picutures from their past fat lives lol [.] this is what you pay me for uncle Jason, to use my [expletive deleted] brain."  Jason Cardiff replies "Love it big time[.] Ty you are great.").  Jason Cardiff thus knew that the releases signed by the testimonialists were not true or based off their own experience with Eupepsia Thin.

| | | | |
|---|---|---|---|
| 764. | Testimonialists Dan Hogan, Karen Spero, and Todd Preston were represented by talent agency Icon Studios Dallas. | Hogan Dec. (PX-45), p. 3, ¶ 4.<br><br>Preston Dec. (PX-46), p. 1, ¶ 3.<br><br>Spero Dec. (PX-47), p. 1, ¶ 4. | Neither admit nor deny, Redwood never had any association with Icon Studios Dallas. Ex. A, Jason Cardiff Declaration at __. |
| 765. | Icon was looking in early 2017 for actors who had lost at least 20 pounds and testimonialists Dan Hogan, Karen | Hogan Dec. (PX-45), p. 1, ¶ 5 & p. 3-4 (Att.1) (received email from Icon January 31, 2017).<br><br>Preston Dec. (PX-46), p. | |

| | | |
|---|---|---|
| | Spero, and Todd Preston applied. | 1, ¶ 4 (saw call for talent posted by Icon in late January or early February 2017).<br><br>Spero Dec. (PX-47), p. 1, ¶ 5 (received email from Icon in late January or early February 2017). | |
| 766. | Icon requested pictures of how the testimonialists looked before and after their weight loss. | Hogan Dec. (PX-45), p. 1, ¶ 5 & p. 3-4 (Att. 1).<br><br>Preston Dec. (PX-46), p. 1, ¶¶ 4-5.<br><br>Spero Dec. (PX-47), p. 1, ¶ 5. | |
| **FTC Response to SUF 764 – 766**:  The Cardiffs do not dispute that the Dan Hogan, Karen Spero, and Todd Preston were represented by Icon Studios Dallas, and that Icon found testimonialists for the Eupepsia Thin infomercial by soliciting for people who had already lost at least 20 pounds.  The Cardiffs' use of the phrase "neither admit nor deny" is the functional equivalent of admitting FTC SUF 764-766. | | |
| 767. | The Eupepsia Thin infomercial was filmed in February 2017. | Walker Dec. (PX-32), p. 12, ¶ 52.<br><br>Hogan Dec. (PX-45), p. 1, ¶ 6. | Objection irrelevant and lacks timeframe. Defendants stopped marketing and changed the claims that were |

| | | made on their websites in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53. The last air date and services provided by Mercury Media to Redwood for Eupepsia Thin was on December 25, 2017. Dkt. 432-1 at 25. The last air date for TBX Free was on October 30, 2017. Dkt. 432-2 at 3-8 |
|---|---|---|
| | Preston Dec. (PX-46), p. 1, ¶¶ 5, 7 & p. 5 (Att. 2).<br><br>Spero Dec. (PX-47), p. 1, ¶ 6. | |

**FTC Response to SUF 767**:  The Cardiffs do not dispute that the Eupepsia Thin infomercial was filmed in February 2017.

The timeframe is identified in the fact itself, which is relevant to the Cardiffs' liability for deceptively advertising Eupepsia Thin, and is relevant to their individual liability for injunctive and monetary relief. Statements by and/or images of the testimonialists were used in Defendants' controltheweight.com website, which was live as of August 9, 2018 (Dkt. 434-1, p. 6, ¶ 18 & Dkt. 434-1, p. 189, 205 (Att. 76)

| 768. | The infomercial director told each of the testimonialists to | Hogan Dec. (PX-45), p. 1, ¶ 6 & p. 5-9 (Att. 2).<br><br>Preston Dec. (PX-46), p. | Deny. The Cardiffs ensured that the testimonials were real and from the person who |
|---|---|---|---|

| | | |
|---|---|---|
| say that their weight loss resulted from using Eupepsia Thin. | 1, ¶ 6 & p. 3-4 (Att. 1). Spero Dec. (PX-47), p. 1, ¶ 6 & p. 3-6 (Att. 1). | said them. The Cardiffs had each testimonialist sign a form that indicated that what they were saying was true and based off their own personal experience with the product. Ex. A, Jason Cardiff Declaration ¶¶91-92. The form said: All of the statements made are true and accurate, all of my on-screen representation, of the product [product], are of my own true story. *Id*. If none of the testimonialists used the product and lied about it by signing the form, it was unbeknownst to the Cardiffs |

**FTC Response to SUF 768**: The Cardiffs do not dispute that the infomercial director instructed three testimonialists to say that their weight loss resulted from using Eupepsia Thin. These testimonialists submitted sworn declarations saying that the infomercial director told them during the filming to say that their weight loss resulted from using Eupepsia Thin, even though none of them had. See SUF 763. In the face of this evidence, the Declaration of Jason Cardiff (who does not

claim personal knowledge of communications between the director and the testimonialists) provides no basis for the Cardiffs' denial of SUF 768. Although defendants' knowledge is not relevant or required to show liability, Jason Cardiff was aware that the testimonials had not used Eupepsia Thin to lose the weight they discussed in the infomercial. See Dkt. 434-1, p. 39-40 (Att. 3) (Ty Sherrell emails Jason Cardiff on February 1, 2018 that "[I] am working on gtting testimonials from people who have already lost weight and I'm getting before pictures for them . . . they will still have the product and do the testiomonials but ill [sic] have before picutures from their past fat lives lol [.] this is what you pay me for uncle Jason, to use my [expletive deleted] brain." Jason Cardiff replies "Love it big time[.] Ty you are great."). Jason Cardiff thus knew that the releases signed by the testimonialists were not true or based on their own experience with Eupepsia Thin.

| 769. | [reserved] | | |
|---|---|---|---|
| 770. | [reserved] | | |
| 771. | [reserved] | | |

## IX.   Defendants' Autoship Plans

### A. *Defendants Enrolled Consumers in Autoship Plans Without Their Authorization*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 772.   Defendants sold most of their oral film strips through auto-ship plans, which caused regular shipments | Walker Dec. (PX-32), p. 12, ¶ 55.<br><br>Melendez Dec. (PX-35), p. 2, ¶ 8. | Objection as to the timeframe. As of July 2018 Defendants did not offer auto-ship program because of the CRM issue. Ex. A, Jason |

-446-

| | | |
|---|---|---|
| to be sent to consumers with charges to their debit or credit cards until the customer cancelled the order. | Carranza Dec. (PX-33), p. 3, ¶ 11.<br><br>See Rodoracio Dec. (PX-36), p. 2, ¶ 10 (Jason Cardiff made it clear that sales representatives were only to sell thin film strip products with auto-ships programs). | Cardiff Declaration ¶89. The customer breakdown for autoship was 35% autoship and 65% one time purchases. Ex. A, Jason Cardiff Declaration ¶116. Redwood had a strict policy to not place anyone on auto ship unless the customer was fully aware of the auto ship and agreed to the auto ship program. Ex. A, Jason Cardiff Declaration ¶87. |

**FTC Response to SUF 772**: Defendants do not dispute that they used autoship, but deny that most of their customers were placed on autoship and that autoship was used after July 2018.  The references they cite do not support their claimed breakdown of auto-ship vs. straight sale percentages – in fact, they say nothing about the distribution of auto-ship vs. straight sale. If the Defendants intended instead to cite to ¶ 118 of Jason Cardiff's declaration, the mere recitation of percentages without any explanation for the declarant's basis for knowing such specific numbers or any reference to any company document should be credited as no more than a general denial insufficient to raise a genuine issue of material fact. The Defendants' general assertion that there was a policy to inform customers about auto-ship, citing ¶ 87 of that Declaration, is not relevant to the undisputed fact: defendants sold most of their film strips on auto-ship plans.

| Whether Defendants offered auto-ship programs after July 2018 is not relevant to Defendants' individual liability for their actions and is not material. | | |
|---|---|---|
| 773. | The auto-ship program was also known as a continuity program or a subscription program. | Melendez Dec. (PX-35), p. 2, ¶ 8. | Admit |
| 774. | If a customer purchased a one-month supply, another shipment would go out to them one month later and their credit or debit card would be charged. | Walker Dec. (PX-32), p. 12, ¶ 55.<br><br>Carranza Dec. (PX-33), p. 3, ¶ 11.<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 14, ¶ 36 & Dkt. 10, p. 165, 166 (Att. 072) ("RETURN & REFUND" information received with FTC's TBX-FREE order included fine print statement that "If you have purchased a 1-month, 2-month, or 3-month supply you have been auto enrolled into our monthly subscription | Deny. A customer would only get another shipment if they the auto-ship designation was on. Redwood had a strict policy to not place anyone on auto ship unless the customer was fully aware of the auto ship and agreed to the auto ship program. Ex. A, Jason Cardiff Declaration ¶87. |

| | | |
|---|---|---|
| | program in order to reach your goals."<br><br>See also Garcia Dec. (PX-34), p. 2, ¶ 8 (sales representatives sometimes were only allowed to place continuity orders). | |

**FTC Response to SUF 774**: Defendants dispute that customers who purchased one-month supplies received additional shipments every month charged to their credit and debit cards, citing a very general statement by Jason Cardiff that there was a "strict policy" to inform customers of the auto-ship program.  No detail is offered regarding this policy, including what the policy looked like, who received notice of the policy, how it was enforced, or whether it was followed.  In contrast, Plaintiff has offered very specific examples of how customers were charged after placing one-time orders, including the experience of an FTC investigator and the testimony of former employees familiar with Defendants' daily interactions with customers.  Defendants' general denial without any factual elaboration or reference to documents does not raise a genuine issue of material fact.

| | | |
|---|---|---|
| 775.  Redwood's website was set up so that the default option was to place the customer on auto-ship. | Carranza Dec. (PX-33), p. 3, ¶ 11. | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶118. |

**FTC Response to SUF 775**: Defendants do not dispute that Redwood's website

| | | |
|---|---|---|
| was set up so that the default option was to place the customer on auto-ship. This fact is relevant to Defendants' liability for injunctive and monetary relief under the FTC Act, ROSCA, and EFTA. | | |
| 776. Jason Cardiff instructed the website developers to design the company's website that way. | Carranza Dec. (PX-33), p. 3, ¶ 11. | Objection, vague. "That way" is not defined. Because of this, Defendants can neither admit nor deny. |
| **FTC Response to SUF 776**:  Defendants do not dispute that Jason Cardiff instructed the website developers to design the company's website that way (to default to auto-ship, see immediately preceding SUF), and their vagueness objection is not a serious objection. Their use of the phrase "neither admit nor deny" is the functional equivalent of not disputing the fact. | | |
| 777. Jason Cardiff was advised by a payment processing consultant in March 2016 that if the product being sold involved auto-shipping or recurring billing, "there should either be an option for the customer not to enter into | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 56 (Att. 12). | Object as to Greg Berard's position or occupation, otherwise, the document speaks for itself |

| | | |
|---|---|---|
| | auto-ship/recurring billing, or at a minimum a disclosure on the checkout page disclosing that the product is subject to enrollment in an auto-ship/recurring billing program, when the customer's card will be billed (monthly, quarterly, etc.), and how to cancel auto-ship." | |
| 778. | Jason Cardiff was advised by a payment processing consultant in March 2016 that it was not sufficient to have information about an auto-ship/recurring | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 56 (Att. 12). |

| | | |
|---|---|---|
| billing program only on the "terms and conditions" page of the website, and that this information should be on the checkout page. | | |
| 779. Jason Cardiff was advised by a payment processing consultant in March 2016 that "I agree" should not be pre-checked on the website's checkout page. | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 56 (Att. 12). | |
| 780. Jason Cardiff was advised by a payment processing consultant in July 2017 that the TBX-FREE.com website said nothing about monthly continuity plans. | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 64 (Att. 16). | |

| | |
|---|---|
| 781. Jason Cardiff was advised by a payment processing consultant in July 2017 that recurring subscriptions had to be clearly disclosed on the TBX-FREE.com website before the customer clicked the purchase button. | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 64 (Att. 16). |
| 782. Jason Cardiff was advised by a payment processing consultant in July 2017 that "many customers are calling saying they only ordered once." | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 64 (Att. 16). |

**FTC Response to SUF 777-782**: Defendants do no dispute that Greg Berard advised Jason Cardiff in March 2016 and July 2017 that if the product being sold involved auto-shipping or recurring billing, "there should either be an option for the customer not to enter into auto-ship/recurring billing, or at a minimum a

disclosure on the checkout page (777); that it was not sufficient to have information about an auto-ship/recurring billing program only on the "terms and conditions" page of the website (778); that "I agree" should not be pre-checked on the website's checkout page (779); that the TBX-FREE.com website said nothing about monthly continuity plans (780); that recurring subscriptions had to be clearly disclosed on the TBX-FREE.com website before the customer clicked the purchase button (781); and that "many customers are calling saying they only ordered once" (782).  Defendants only object to the FTC's characterization of Mr. Berard as a "payment company consultant," without offering any other explanation for who he is or what relation he had to Redwood's credit and debit card processing.

| | | |
|---|---|---|
| 783. Redwood enrolled customers in these auto-ship plans without asking their permission. | Walker Dec. (PX-32), p. 12, ¶ 55.<br><br>Melendez Dec. (PX-35), p. 4, ¶ 16 (spoke to sales representatives who were not telling consumers they were being signed up for auto-ship).<br><br>Carranza Dec. (PX-33), p. 3, ¶ 11-13 (customers did not realize they were being placed on auto-ship plan).<br><br>Fromal Dec. (TRO PX- | Deny. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. Ex. A, Declaration of Jason Cardiff ¶87. |

11), Dkt. 211, p. 2, ¶ 2 (ordered one-month of TBX-FREE, and was then sent and charged for 15 additional times for total of $961).

Cooper Dec. (TRO PX-12), Dkt. 211, p. 5, ¶ 3 (made it clear on the telephone that he was ordering a one-time 30-day trial of Eupepsia Thin; was charged the next month for another order).

Rosen Dec. (TRO PX-13), Dkt. 211, p. 7, ¶¶ 2-4 (authorized one-time payment of $49.95 for TBX-Free using debit card; received another order and had $49.95 removed from checking account each of the next two months).

| | | |
|---|---|---|
| | Harrell-Cox Dec. (TRO PX-14), Dkt. 211, p. 9, ¶¶ 3-5 (ordered TBX-FREE for about $89.00 using debit card; package arrived three weeks after order was placed, and another $89.95 was removed from bank account five days after that). | |
| | Garrett Dec. (TRO PX-15), Dkt. 211, p. 11, ¶¶ 2-3 (purchased 60-day supply of TBX-FREE in January 2018 for $169.90; discovered another charge on credit card for $169.90 in February 2018). | |
| | Reynolds Dec. (TRO PX-17), Dkt. 211, p. 14-15, ¶¶ 2-7 (ordered one-month supply for $69.95 using debit card; received multiple shipments over | |

| | the next months with total of $319.70 withdrawn from his bank account). | |
|---|---|---|

**FTC Response to SUF 783**:  Defendants do not dispute the first-hand experiences of six consumer declarants who were enrolled in auto-ship without their permission, or respond to the detailed recollections of Redwood employees that sales reps were not disclosing the auto-ship program. Instead, they interpose a very general "strict policy" against placing customers on autoship without their permission.  No detail or supporting documentation is offered regarding this policy, including what the policy looked like, who received notice of the policy, how it was enforced, or whether it was followed.  In contrast, Plaintiff has offered very specific examples of how customers were charged after placing one-time orders, including the experience of an FTC investigator and the testimony of former employees familiar with Defendants' daily interactions with customers. Defendants' general denial without any factual elaboration or reference to documents does not raise a genuine issue of material fact.

| | | |
|---|---|---|
| 784.  Auto-ships were unpopular with potential customers. | Melendez Dec. (PX-35), p. 2, ¶ 9.<br><br>Carranza Dec. (PX-33), p. 3, ¶ 12.<br><br>Rodoracio Dec. (PX-36), p. 3, ¶ 13. | Objection as to overly broad and generic and not supported by the evidence. Objection as to hearsay. Melendez, Rodoracio or Carranza had no personal experience with purchasing items from Redwood on the autoship program. Any reliance on |

| | | what customers said is hearsay, otherwise the evidence is not relevant. |
|---|---|---|

**FTC Response to SUF 784**:  Defendants do not dispute that auto-ships were unpopular with potential customers. This was the testimony of former managerial employees who had daily interactions with customers that formed the basis of their knowledge concerning this undisputed fact. This is not hearsay, but a general impression that informed the actions of these former employees, which included notifying the Cardiffs that the auto-ship program was unpopular. It is relevant to individual liability for injunctive and monetary relief.

| 785. | Jason Cardiff instructed his sales staff not to mention the auto-ship aspect to potential customers. | Melendez Dec. (PX-35), p. 2, ¶ 9.<br><br>Carranza Dec. (PX-33), p. 3, ¶ 12.<br><br>See also Rodoracio Dec. (PX-36), p. 2-3, ¶ 11 (sales reps were encouraged not to tell consumers about the auto-ship program). | Deny. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. Ex. A, Declaration of Jason Cardiff ¶87. |
| 786. | Jason Cardiff instructed his sales staff to answer "no" if prospective customers asked whether they | Melendez Dec. (PX-35), p. 2, ¶ 9. | |

| | | |
|---|---|---|
| would be placed on an auto-ship program. | | |

**FTC Response to 785-786**: Defendants do not specifically dispute that Jason Cardiff instructed his sales staff not to mention the auto-ship aspect to potential customers, or that Jason Cardiff instructed his sales staff to answer "no" if prospective customers asked whether they would be placed on an auto-ship program. Defendants instead vaguely deny these undisputed facts by interposing a general "strict policy" against placing customers on autoship without their permission. No detail is offered regarding this policy, including what the policy looked like, who received notice of the policy, how it was enforced, or whether it was followed. In contrast, Plaintiff has offered very specific examples of an FTC investigator and customers who were charged after placing one-time orders (see SUF 783), which is consistent with three Redwood employees' testimony that they were instructed not to tell consumers about the auto-ship enrollment. Defendants' general denial without any factual elaboration or reference to documents does not raise a genuine issue of material fact.

| | | |
|---|---|---|
| 787. Jason Cardiff would get upset if sales representatives told customers about the auto-ship or that they could cancel it at any time. | Melendez Dec. (PX-35), p. 2, ¶ 9.<br><br>Carranza Dec. (PX-33), p. 3, ¶ 12. | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89.<br>Deny. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the |

| | | autoship and agreed to the terms and conditions of the program. Ex. A, Declaration of Jason Cardiff ¶87. |
|---|---|---|

**FTC Response to SUF 787**:  Defendants do not specifically deny that Jason Cardiff would get upset if sales representatives told customers about the auto-ship or that they could cancel it at any time. Their general denial without any direct refutation or any factual elaboration or reference to documents does not raise a genuine issue of material fact. The Cardiffs' extraneous argument should be disregarded.

It is not relevant whether the auto-ship program was no longer in place in July 2018.  The Complaint covers the entire period the challenged products were marketed and sold by Defendants, 2013-2018.

This undisputed fact is relevant to Jason Cardiff's individual liability for injunctive and monetary relief.

| 788. | When customers received their order, the top half of the packing slip would be their receipt and the bottom half would be the terms and conditions for cancellations and | Melendez Dec. (PX-35), p. 2, ¶ 9.<br><br>Carranza Dec. (PX-33), p. 3, ¶ 12.<br><br>Rodoracio Dec. (PX-36), p. 2-3, ¶ 11. | Admit. |
|---|---|---|---|

| | | |
|---|---|---|
| refunds. | | |
| 789. The terms and conditions were in small font, and the last paragraph said that 1-month, 2-month, and 3-month orders had been auto-enrolled into Redwood's monthly subscription program. | Melendez Dec. (PX-35), p. 2, ¶ 9.<br><br>Carranza Dec. (PX-33), p. 3, ¶ 12 (packing slip had information about the auto-ship program in small type at the bottom of the page).<br><br>See also Rodoracio Dec. (PX-36), p. 2-3, ¶ 11. | Deny. The FTC presents no evidence of this outside of testimony of a former employee. There is no evidence of the terms and conditions presented. |

**FTC Response to SUF 788-789**:  Defendants, when confronted with specific documents (e.g., a copy of the packing slip in question (Dkt. 428-3, p. 11-13)) and former employee testimony, do not specifically deny that the terms and conditions were in small font, and the last paragraph said that 1-month, 2-month, and 3-month orders had been auto-enrolled into Redwood's monthly subscription program. Defendants instead attack the weight of this evidence as insufficient and deny that the packing slip contained terms and conditions of the auto-ship program without directing the Court to some other explanation.  Defendants offer no specific reference to terms and conditions of sale that are any different than the ones recognized by former employees familiar with Defendants' daily sales practices.

| | | |
|---|---|---|
| 790. "Straight sales" were one-time sales of Redwood products that did | Walker Dec. (PX-32), p. 14, ¶ 64.<br><br>Melendez Dec. (PX-35), | Admit |

| | | |
|---|---|---|
| not result in consumers being put on auto-ship programs. | p. 2, ¶ 8.<br><br>Garcia Dec. (PX-34), p. 2, ¶ 8. | |
| 791.  Jason Cardiff did not like straight sales, because they decreased long-term sales revenue streams. | Walker Dec. (PX-32), p. 14, ¶ 64.<br><br>See also Carranza Dec. (PX-33), p. 6, ¶ 25 (Jason Cardiff felt strongly that the auto-ship program was necessary). | Object to the phrase "did not like." It is vague and overly broad. Jason Cardiff wanted to help consumers achieve their goals. However, Jason Cardiff understood that it was economically better for Redwood if customers reupped every month as opposed to having to spend more money on customer acquisition. Ex. A, Declaration of Jason Cardiff ¶90. |

**FTC Response to SUF 791**:  Defendants do not dispute that Jason Cardiff did not like straight sales, because they decreased long-term sales revenue streams. Instead, they argue that the FTC's fact was vague and too broad for them to address, but confirm that auto-ship was economically "better for Redwood." Defendants' apt response is an indication that the undisputed fact was not so vague as to make a direct response impossible.

| | | |
|---|---|---|
| 792.  For a brief period in 2017, Jason | Walker Dec. (PX-32), p.14, ¶ 64. | Deny. The straight sales option was always |

| Cardiff allowed sales representatives to offer consumers "straight sales" of Redwood products. | Melendez Dec. (PX-35), p. 2, ¶ 10.<br><br>Carranza Dec. (PX-33), p. 4, ¶ 15.<br><br>Rodoracio Dec. (PX-36), p. 4, ¶ 19. | available. Ex. A, Jason Cardiff Declaration ¶87. |

**FTC Response to SUF 792**: Defendants dispute that "straight sales" of Redwood products were only allowed for a brief period.  Defendants do not offer any specific rebuttal or documentary evidence to counter the more detailed statements of four former employees who had daily contact with other employees and customers. Defendants do not explain how Jason Cardiff knows his assertion is true, how the "straight sales" policy he references was communicated to employees or what the policy looked like.

| 793. | After allowing straight sales for a short period, Jason Cardiff directed that all customers be placed on auto-ship continuity plans. | Walker Dec. (PX-32), p. 14, ¶ 64.<br><br>Rodoracio Dec. (PX-36), p. 4-5, ¶ 19 (Jason Cardiff stopped offering the single-sale option after seeing that revenues had gone down). | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id*. |
| 794. | As a last resort, sales representatives | Rodoracio Dec. (PX-36), p. 2, ¶ 10. | |

| could make a straight sale if necessary to save the sale, but were not otherwise supposed to offer it as an option. | | |
|---|---|---|
| **FTC Response to SUF 793-794**: Defendants do not specifically dispute that Jason Cardiff ordered that all customers be placed on auto-ship programs and that employees could only use a "straight sale" to save the sale. The availability of the straight sale option does not dictate that sales reps were authorized to use it as a first (as opposed to last) resort, and the Cardiffs offer no detail or evidence disputing that sales reps were restricted to offering only the autoship option to customers. Defendants' additional argument relates to whether the autoship plan was adequately disclosed and should be disregarded. | | |
| 795.   From 2014 to 2018, Redwood maintained an in-house call center that received both sales calls and customer service calls. | Melendez Dec. (PX-35), p. 1, 3, ¶¶ 6, 14.<br><br>Garcia Dec. (PX-34), p. 1, ¶ 4 (beginning in Fall 2017, she was making and receiving sales calls, as well as handling customer service calls).<br><br>Walker Dec. (PX-32), p. 12, ¶ 53. | Admit |

| | | |
|---|---|---|
| | See Rodoracio (PX-36), p. 2, ¶ 8 (night shift usually handled orders generated by late-night television advertising; calls during the day shift tended to be complaints and questions). | |
| 796. Jason Cardiff wrote the scripts used by sales representatives. | Walker Dec. (PX-32), p. 12 ¶ 54.<br><br>Melendez Dec. (PX-35), p. 3, ¶ 11 (Jason Cardiff converted talking points into a more formal phone script). | Deny. There were no scripts used by sales representatives. Cardiff developed bullet points, however the conversations between representatives and consumers was relatively script free. Ex. A, Jason Cardiff Declaration ¶113. |

**FTC Response to SUF 796**:  Defendants dispute that they ever used sales scripts, but admit that they used "bullet points."  This does not raise a genuine issue of material fact.

| | | |
|---|---|---|
| 797. Jason Cardiff supervised the training of sales and customer service representatives and sometimes worked | Walker Dec. (PX-32), p. 12 ¶ 54.<br><br>Carranza Dec. (PX-33), p. 3, ¶ 13; p. 5-6, ¶ 22 (Jason Cardiff personally coached reps; met one- | Deny. Jason Cardiff did not supervise or train or supervise the training of sales and customer service representatives. This was the responsibility of Danielle |

| individually with sales representatives. | on-one with reps periodically).<br><br>Rodoracio Dec. (PX-36), p. 1 ¶ 6. | Walker and the customer service manager. Ex. A, Declaration of Jason Cardiff ¶115. |
|---|---|---|

**FTC Response to SUF 797**: Defendants generally and without offering details deny that Jason Cardiff ever supervised or personally participated in the training of customer service or sales representatives. Instead, Defendants assert that Danielle Walker was responsible for this training. Three former employees offer detailed accounts of how personally involved Jason Cardiff was in the training of these sales and customer service employees, including very specific references to Jason Cardiff's periodic one-on-one coaching sessions with employees. The Defendants' general denial without specific details or reference to any company document is not sufficient to raise a genuine issue of material fact.

| 798. In 2017, Redwood added a disclosure of the auto-ship program to its call center scripts, but many sales representatives did not tell customers about it. | Walker Dec. (PX-32), p. 13, ¶ 56.<br><br>Melendez Dec. (PX-35), p. 4, ¶ 16.<br><br>See Carranza Dec. (PX-33), p. 3, ¶ 13 (phone scripts were revised in late 2017 to say something about the auto-ship program).<br><br>See also Garcia Dec. | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id.* |
|---|---|---|

| | | |
|---|---|---|
| | (PX-34), p. 2-3, ¶ 9 & p. 12 (Att. 2) (fine print disclosure in script that "for your convenience we will send your next order 30 days from the original billing date . . . If your feel TBX-FREE is not for you, cancel within the 30 days [sic] period to avoid the enrollment in the stop smoking program."). | |
| 799. Sales representatives would not tell customers about the auto-ship program because, if they did, many potential customers would not complete their purchases. | Walker Dec. (PX-32), p. 13, ¶ 57.<br><br>Garcia Dec. (PX-34), p. 3, ¶ 11. | |

**FTC Response to SUF 798-799**: Defendants do not specifically deny that many sales representatives did not tell customers about the auto-ship disclosure, or that sales representatives would not tell customers about the auto-ship program for fear of losing the sale. Instead, Defendants refer to their purported "strict

1  policy," which has never been produced in any written form and which does not

2  address the behavior of Redwood sales representatives.  Here, Danielle Walker, a

3  managerial employee who supervised sales and customer service managers,

4  states that many sales representatives were not making the auto-ship disclosure.

5  This testimony is corroborated by three other former employees with direct

6  knowledge of Redwood's sales practices.  Defendants' general denial, which

7  does not specifically address the testimony of former employees, is insufficient

8  to raise a genuine issue of material fact.

| 800. Redwood sales representatives worked on commission. | Melendez Dec. (PX-35), p. 4, ¶ 15.<br><br>See also Garcia Dec. (PX-34), p. 3, ¶ 10 (company set sales incentives, including through commission-based income).<br><br>Carranza Dec. (PX-33), p. 5, ¶ 22.<br><br>See also Rodoracio Dec. (PX-36), p. 3, ¶ 12 (sales representatives competed for bonuses and commissions). | Sales representatives were paid hourly and received bonuses based on the number of successful sales they had. Exhibit 1, Jason Cardiff Declaration ¶117. |

**FTC Response to SUF 800**:  Defendants do not dispute that sales employees

were paid bonuses based on the number of sales.  The dispute as to the word

| | | |
|---|---|---|
| "commissions" does not raise a genuine issue of material fact. | | |
| 801. The commission structure rewarded sales reps for making auto-ship sales. | Melendez Dec. (PX-35), p. 4, ¶ 15.<br><br>See also Rodoracio Dec. (PX-36), p. 3, ¶ 12 (in order to close sales, sales representatives would deny or de-emphasize the auto-ship program). | Deny as to the commission, however admit that sales representatives were responsible for placing consumers on auto-ship who wanted to be on the auto-ship program. Ex. A, Jason Cardiff Declaration ¶¶117-118. |
| **FTC Response to SUF 801**: The Cardiffs' general denial offers no specific details disputing the declarations of two employees who supervised sales reps, such as how sales reps were paid if not via a commission structure that rewarded them for making auto-ship sales. | | |
| 802. Redwood sales representatives were expected to meet a minimum level of sales. | Melendez Dec. (PX-35), p. 4, ¶ 15.<br><br>Walker Dec. (PX-32), p. 13, ¶ 57.<br><br>Garcia Dec. (PX-34), p. 3, ¶ 11 (representatives risked being fired if their sales were not high enough).<br><br>Carranza Dec. (PX-33), | Admit |

| | | | |
|---|---|---|---|
| | | p. 5, ¶ 22. | |
| | | Rodoracio Dec. (PX-36), p. 3, ¶ 12; p. 5, ¶ 21 (sales representatives risked being fired if they didn't meet their quotas; Eunjung fired her in part for failing to push staff to meet higher sales quotas). | |
| 803. | Jason and Eunjung Cardiff tracked the performance of individual sales representatives using charts that showed on a daily basis the number of total calls each representative handled and the number of sales they closed. | Melendez Dec. (PX-35), p. 5, ¶ 19 & p. 16-17 (Att. 2). See also Melendez Dec. (PX-35), p. 4, ¶ 17 (sent recordings of sales calls to the Cardiffs so they could monitor sales reps' performance). See also Walker Dec. (PX-32), p. 13, ¶ 57 (the Cardiffs regularly received audio recordings of sales representatives' calls). | Admit |

| | | | |
|---|---|---|---|
| 804. | Eunjung Cardiff was concerned with sales reps who closed a low percentage of potential sales and sometimes asked why one sales representative's numbers were lower than others' numbers. | Melendez Dec. (PX-35), p. 5, ¶ 19 & p. 18-36 (Atts. 3-5). | Admit |
| 805. | Jason Cardiff would often announce bonuses for meeting or exceeding certain sales levels. | Melendez Dec. (PX-35), p. 3, 4, ¶¶ 11, 15. | Admit |
| 806. | Jason Cardiff would publicly congratulate sales representatives who did well, and play recordings of sales representatives' phone calls with customers that he | Garcia Dec. (PX-34), p. 3, ¶ 10.<br><br>See also Carranza Dec. (PX-33), p. 5-6, ¶ 22 (Jason Cardiff would sometimes offer bonuses for the highest sales of the day or week). | Admit |

| | | |
|---|---|---|
| | thought were good or bad examples. | | |
| 807. | Jason Cardiff and Eunjung Cardiff would have the call center supervisors fire under-performing representatives who were not meeting sales quotas. | Walker Dec. (PX-32), p. 13, ¶ 57.<br><br>Melendez Dec. (PX-35), p. 5, ¶ 20.<br><br>Carranza Dec. (PX-33), p. 5, ¶ 22 (sales reps were fired for failing to make sales quotas). | Admit |
| 808. | Neither Redwood's former Director of Operations nor its former Customer Service Relations and Sales Supervisor is aware of any sales representatives being disciplined for failing to disclose the auto-ship program. | Walker Dec. (PX-32), p. 13, ¶ 57.<br><br>Melendez Dec. (PX-35), p. 4, ¶ 17.<br><br>See also Carranza Dec. (PX-33), p. 4, ¶ 14. | Defendants can neither admit or deny that fact. |

**FTC Response to SUF 808**: Defendants do not dispute that neither Redwood's former Director of Operations nor its former Customer Service Relations and Sales Supervisor is aware of any sales representatives being disciplined for

| failing to disclose the auto-ship program. | | |
|---|---|---|
| 809.  Sales representatives did not always tell customers that they could cancel the autoship by calling customer service. | Garcia Dec. (PX-34), p. 2-3, ¶ 9. | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id.* Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |

**FTC Response to SUF 809:**  Defendants do not specifically deny that sales representatives did not always tell customers that they could cancel the autoship by calling customer service.  Their objection states that there was a "strict policy" to disclose auto-ship programs, which does not address the behavior of sales representatives on a day-to-day basis; further, disclosure of an auto-ship program is not equal to an explanation of how to cancel that program.  Plaintiff has offered specific testimony from former employees who were in a position to see and hear what sales representatives were doing.  Whether or not the auto-ship sales stopped after July 2018 is not relevant to liability.

-473-

| The behavior of Defendants' employees in failing to explain to consumers how they could cancel enrollment in auto-ship is relevant to Defendants' liability for injunctive and monetary relief. | | |
|---|---|---|
| 810. Defendants' sales representative did not disclose the auto-ship enrollment to the FTC investigator when he made an undercover purchase by phone on June 12, 2017. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 13, ¶ 33 & Dkt. 10, p. 150-161 (Att. 069). | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id.* Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |
| 811. The FTC's investigator was automatically enrolled in an autoship program when he ordered TBX-FREE over the telephone, despite having clearly stated during that conversation that he wanted only one single box. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 13, ¶ 33 & Dkt. 10, p. 150, 155, ln. 18 – 156, ln. 5 (Att. 069); Dkt. 7, p. 14-15, ¶¶ 37-39 & Dkt 10, p. 189-193 (Atts. 073-75). | |

1
2
3
4
5
6
7
8

**FTC Response to SUF 810-811**:  Defendants do not address, much less dispute, the transcript evidence that their sales representative did not disclose the auto-ship enrollment to the FTC investigator when he made an undercover purchase by phone on June 12, 2017, or that the FTC's investigator was automatically enrolled in an autoship program when he ordered TBX-FREE over the telephone, despite having clearly stated during that conversation that he wanted only one single box.  The substance of their general denial consists of irrelevant argument that should be disregarded.

9
10
11

This deceptive sales practice is relevant to Defendants' liability for injunctive and monetary relief.

| 12 | 812. | The FTC investigator's experience was not unique:  consumers were enrolled in autoship programs even when they made it clear that they wanted only a one-time order and Defendants' representatives told them they would not get automatic shipments. | See Walker Dec. (PX-32), p. 13, ¶ 58 (many customers complained they had been told they would not get automatic shipments but were signed up anyway).<br><br>Garrett Dec. (TRO PX-15), Dkt. 211, p. 11, ¶¶ 2-3 (told sales representative he did not want auto-ship and representative confirmed his preference).<br><br>See also Cooper Dec. | Object to Danielle Walker's testimony on this issue as hearsay. Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. Ex. A, Declaration of Jason Cardiff ¶87. The FTC |
| --- | --- | --- | --- | --- |

| | (TRO PX-12), Dkt. 211, p. 5, ¶¶ 3-4 (made it clear he was only placing a one-time order).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 21, 23, 24, ¶¶ 66, 67, 75 & Dkt. 10-1, p. 31(Att. 099).<br><br>See also Brown Dec. (TRO PX-24), Dkt. 211, p. 28, ¶ 2 (sales representative said she could only buy with auto-ship program but it could be cancelled within 30 days; consumer called and cancelled but was subsequently billed for another order). | could only find 4 people to give testimony on this issue out of over 200,000 people who acquired Redwood products. Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff at ¶89. |

**FTC Response to SUF 812**:  Defendants do not dispute that the FTC investigator's experience was not unique:  consumers were enrolled in autoship programs even when they made it clear that they wanted only a one-time order and Defendants' representatives told them they would not get automatic shipments. The testimony of Danielle Walker is not hearsay because it is offered to show that defendants were aware of these problems.  The defendants object

-476-

that it was the company's "strict policy" to disclose auto-ship programs.  As
discussed above, there is no further description of this "strict policy," including
what it looked like, how it was communicated, and how (if ever) it was enforced.
This would be especially important in light of defendants' practice of giving
bonsues to sales representatives based on their sales.  Whether or not a straight
sale option was available in theory does not address the specific factual
allegations that form the basis of the undisputed fact. The general denial, which
does not specifically address the undisputed fact, is not sufficient to raise a
genuine issue of material fact.  Whether or not the auto-ship program continued
after July 2018 is not relevant to liability.  The fact that customers were signed
up for auto-ship programs without their knowledge is relevant to the defendants'
individual liability for injunctive and monetary relief.

| | | |
|---|---|---|
| 813.  Defendants did not provide clear and conspicuous disclosure of all material terms of the transaction their websites prior to obtaining the consumer's billing information. | Walker Dec. (PX-32), p. 13, ¶ 59.<br><br>E.g., Fromal Dec. (TRO PX-11), Dkt. 211, p. 2, ¶ 2 (nothing on TBX-FREE website made her suspect she was giving permission for 15 additional credit card charges totaling $961).<br><br>Rosen Dec. (TRO PX-13), Dkt. 211, p. 7, ¶ 2 (no reason to believe she would be enrolled in | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. Ex. A, Declaration of Jason Cardiff ¶87. Object as to relevance, the autoship program was |

| | | |
|---|---|---|
| | auto-shipment program). | no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |
| | Reynolds Dec. (TRO PX-17), Dkt. 211, p. 14, ¶ 2 (no recollection of anything in purchase details that gave reason to believe it would be an autoship program). | Object as to lack of timeframe and relevance. Redwood's products pages were redesigned in or about February, 2018. Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. |
| | Roberts Dec. (TRO PX-23), Dkt. 211, p. 25, ¶ 3 (saw nothing on website or at check-out that said she was giving permission to charge her for more than just one purchase). | |
| | Jones Dec. (TRO PX-25), Dkt. 211, p. 29, ¶ 3 (TBX-FREE website did not mention additional shipments or recurring charges). | |
| | Fatch Dec. (TRO PX-26), Dkt. 211, p. 30, ¶ 4 | |

| | | (nothing on the TBX-FREE website that would lead someone to believe additional orders or charges would follow). SUF 814-816. See also SUF 780-781. | |
|---|---|---|---|

**FTC Response to SUF 813**: Defendants do not specifically dispute that they did not provide clear and conspicuous disclosure of all material terms of the transaction their websites prior to obtaining the consumer's billing information. Their general denial involves the purported availability of a straight sales option and a vague and unexplained "strict policy" of disclosing the auto-ship program (all without reference to what was or was not disclosed on their websites). These general denials miss the mark and fail to address the undisputed fact with any particularity and are therefore not sufficient to raise a genuine issue of material fact. Whether or not defendants changed the auto-ship disclosure in February 2018 is not relevant to liability. The defendants' failure to clearly disclose their auto-ship program in their online sales platform before February 2018 is relevant to defendants' inidivudal liability for injunctive and monetary relief.

| 814. | When an FTC investigator made an online undercover purchase of TBX-FREE in June 2017, Defendants' | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 15, ¶ 42, & Dkt. 10, p. 229 (Att. 078). | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. Object as to lack of |
|---|---|---|---|

| | | timeframe and relevance. Redwood's products pages were redesigned in or about February, 2018. Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53. |
|---|---|---|
| website had no disclosure about automatic enrollment in a continuity plan. | | |
| 815. Defendants did not disclose the negative option feature of their autoship continuity program before the FTC's investigator provided his billing information during an online purchase of TBX-FREE, and they enrolled him without obtaining his express informed consent to incur additional charges. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 15, ¶ 42, & Dkt. 10, p. 229 (Att. 078).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 16-17, ¶¶ 47, 48 & Dkt. 10, p. 256-258 (Atts. 083, 084). | |

**FTC Response to SUF 814-815**: Defendants do not specifically dispute that when an FTC investigator made an online undercover purchase of TBX-FREE in June 2017, Defendants' website had no disclosure about automatic enrollment in a continuity plan, or that Defendants did not disclose the negative option feature of their autoship continuity program before the FTC's investigator provided his billing information during an online purchase of TBX-FREE, and they enrolled

him without obtaining his express informed consent to incur additional charges.
Instead, they object as to "timeframe," relevance, they claim that the auto-ship
program was no longer in existence after July 2018, and they claim that the
website was re-designed in February 2018. First, the timeframe is clear:  The
FTC investigator purchased TBX-FREE from defendants' website in June 2017
and the Complaint states that the relevant time period is 2015-2018 (Dkt. 1 at 15,
¶ 36).  Second, the undisputed fact relates to deceptive practices during the
complaint period, whether the practices continued after Feburary 2018 or not.
Third, to the extent defendants claim that they re-designed the website in
February 2018, their declaration do not address, either generally or specifically,
any re-design of the autoship disclosure or default.  Finally, whether or not
defendants stopped selling auto-ship in July 2018 is irrelevant to liability.  The
deceptive sales practice described is relevant to defendants' individual liability
for injunctive and monetary relief.

| | | |
|---|---|---|
| 816.  Many consumers had similar experiences when they purchased Redwood oral film strips online, believing they were placing a one-time order. | E.g., Fromal Dec. (TRO PX-11), Dkt. 211, p. 2, ¶ 2 (nothing on TBX-FREE website made her suspect she was giving permission for 15 additional credit card charges totaling $961).<br><br>Rosen Dec. (TRO PX-13), Dkt. 211, p. 7, ¶ 2 (no reason to believe she would be enrolled in auto-shipment program). | Deny as to "many." The FTC has evidence of nine consumers that encountered this problem out of roughly 200,000 consumers who purchased Redwood products.<br>Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place |

| | | anyone on autoship |
|---|---|---|
| | Reynolds Dec. (TRO PX-17), Dkt. 211, p. 14, ¶ 2 (no recollection of anything in purchase details that gave reason to believe it would be an autoship program). | unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id*. The FTC could only find 4 people to give testimony on this issue out of over 200,000 people who acquired Redwood products. |
| | Boatright Dec. (TRO PX-21), Dkt. 211, p. 22, ¶¶ 4-5 (ordered one shipment of TBX-FREE and discovered after receipt of second shipment that she had been enrolled in autoship program). | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff at ¶89. |
| | Roberts Dec. (TRO PX-23), Dkt. 211, p. 25, ¶ 3 (saw nothing on website or at check-out that said she was giving permission to charge her for more than just one purchase). | |
| | Jones Dec., (TRO PX- | |

| | | |
|---|---|---|
| | 25), Dkt. 211, p. 29, ¶ 3 (TBX-FREE website did not mention additional shipments or recurring charges).<br><br>Fatch Dec., (TRO PX-26), Dkt. 211, p. 30, ¶ 4 (nothing on the TBX-FREE website that would lead someone to believe additional orders or charges would follow). | |

**FTC Response to SUF 816**: While Defendants dispute the use of the word "many," they do not specifically dispute that consumers had similar experiences when they purchased Redwood oral film strips online, believing they were placing a one-time order. Here Defendants again interpose the argument that straight sales were always available as an option and that Redwood had a purported "strict policy" against selling auto-ship programs without permission. Defendants do not explain how the existence of a "strict policy" or a straight sale option would have any bearing on the presentation of their website and the disclosures (or lack thereof) contained therein. This general denial fails to address the fact with any specificity and is insufficient to raise a genuine issue of material fact. Whether or not the auto-ship program ceased in July 2018 is not relevant to liability.

Defendants' deceptively crafted website failed to adequately advise customers of the auto-ship program and is relevant to their liability for injunctive and

| monetary relief. | | |
|---|---|---|
| 817. The majority of customer service calls were complaints from consumers who had been put on the autoship without their authorization and charged for additional product they had not ordered. | Walker Dec. (PX-32), p. 18, ¶ 79.<br><br>Melendez Dec. (PX-35), p. 4, ¶ 16 (majority of complaints were about auto-ship and unauthorized charges).<br><br>Garcia Dec. (PX-34), p. 1, ¶ 5 (about 80% of customer complaints related to unauthorized and unwanted auto-ship charges).<br><br>Wu Dec. (PX-37), p. 2, ¶ 11 (customers complained about being placed on autoship, which was the default order method for Redwood products).<br><br>Carranza Dec. (PX-33), p. 4, ¶ 14. | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id*. The FTC could only find 4 people to give testimony on this issue out of over 200,000 people who acquired Redwood products.<br>Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |

| | Rodoracio Dec. (PX-36), p. 3, ¶ 13 (unauthorized autoships were the primary customer complaint). | |
|---|---|---|

**FTC Response to SUF 817**: Defendants do not specifically deny that the majority of customer service calls were complaints from consumers who had been put on autoship without their authorization and charged for additional product they had not ordered. In their general denial, Defendants again rely on the existence of a purported "strict policy" requiring disclosure of the auto-ship programs and the availiabity of a straight sale option. Neither of these denials addresses the detailed descriptions offered by former employees relating their day-to-day experiences handling customer complaints. The defendants state no basis of knowledge to contradict their former employees' testimony, nor do they offer an alternative description of the majority of customer calls. Whether or not the auto-ship program ceased in July 2018 is not relevant to liability.

The fact that consumers were complaining about being placed on autoship without their authorization and being charged for product they did not order is relevant to Defendants' liability for injunctive and monetary relief.

| 818. | Many customers only learned that they had been signed up for auto-ship after they received the automated second shipment of | Garcia Dec. (PX-34), p. 2-3, ¶ 9.<br><br>Cooper Dec. (TRO PX-12), Dkt. 211, p. 5, ¶ 4 (received email roughly one month after initial order of Eupepsia Thin | Deny as to "many." The FTC has evidence of nine consumers that encountered this problem out of roughly 200,000 consumers who purchased Redwood products. |
|---|---|---|---|

| | | |
|---|---|---|
| product or discovered another charge or debit for product they had not ordered. | saying that he was being charged $49.95 for another order).<br><br>Rosen Dec. (TRO PX-13), Dkt. 211, p. 7, ¶ 3 (received second order of TBX-FREE approximately one month after initial order, and discovered that $49.95 had been removed from checking account).<br><br>Harrell-Cox Dec. (TRO PX-14), Dkt. 211, p. 9, ¶¶ 4-5 (one month after initial charge, Redwood took an additional $89.95 from her bank account and she called the company to find out why).<br><br>Garrett Dec. (TRO PX-15), Dkt. 211, p. 11, ¶¶ 2-3 (one month after initial $169.90 order, he noticed | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |

| | | |
|---|---|---|
| 1 | another charge for | |
| 2 | $169.90 on his credit | |
| 3 | card). | |
| 4 | | |
| 5 | Reynolds Dec. (TRO PX- | |
| 6 | 17), Dkt. 211, p. 14, ¶¶ 2- | |
| 7 | 4 (second shipment | |
| 8 | arrived about a month | |
| 9 | after initial order, along | |
| 10 | with additional | |
| 11 | withdrawal of $49.95 | |
| 12 | from his bank account; | |
| 13 | same thing happened a | |
| 14 | month later). | |
| 15 | | |
| 16 | Boatright Dec. (TRO PX- | |
| 17 | 21), Dkt. 211, p. 22, ¶ 4 | |
| 18 | (received a second | |
| 19 | shipment of TBX-FREE | |
| 20 | one month after the first | |
| 21 | one, and discovered a | |
| 22 | credit card charge for it). | |
| 23 | | |
| 24 | Jones Dec., (TRO PX- | |
| 25 | 25), Dkt. 211, p. 29, ¶ 4 | |
| 26 | (one month after initial | |
| 27 | order, she saw a debit | |
| 28 | charge from Redwood on | |

-487-

| | her bank statement; received a second package a few days later.<br><br>Fatch Dec., (TRO PX-26), Dkt. 211, p. 30, ¶ 3 (discovered he had been enrolled in auto-ship when he received a second order of TBX-FREE about a month after initial order). | |
|---|---|---|
| **FTC Response to SUF 818**: While Defendants take issue with the term "many," they do not deny that nine customers who submitted declarations only learned that they had been signed up for auto-ship after they received the automated second shipment of product or discovered another charge or debit for product they had not ordered.  Whether or not the auto-ship program ceased in July 2018 is not relevant to liability.<br><br>The fact that consumers were only learning they had been placed on auto-ship after receiving their second shipment is relevant to whether there were adequate disclosures of the auto-ship program, and consequently relevant to Defendants' liability for injunctive and monetary relief. | | |
| 819.  Periodically, customer service representatives would not be able | Walker Dec. (PX-32), p. 17, ¶ 75.<br><br>Cooper Dec. (TRO PX- | Deny. Redwood had customer service representatives working over 44 hours during the |

| | | |
|---|---|---|
| to answer all of the incoming phone calls, so consumers had difficulty cancelling autoships or requesting refunds. | 12), Dkt. 211, p. 5, ¶ 4 (unsuccessful reaching Redwood using customer service phone number).<br><br>Rosen Dec. (TRO PX-13), Dkt. 211, p. 7, ¶ 3 (made many unsuccessful attempts to reach Redwood).<br><br>Harrell-Cox Dec. (TRO PX-14), Dkt. 211, p. 8-9, ¶¶ 5-6 (customer service kept her on "hold" for more than two hours; unable subsequently to reach customer service by phone).<br><br>Reynolds Dec. (TRO PX-17), Dkt. 211, p. 14, ¶¶ 4-5 (stayed on the line for as much as an hour each time trying to reach customer service).<br><br>Grossman Dec. (TRO | week, and up to 12 representatives working at a time. Ex. A, Jason Cardiff Declaration ¶116. |

| | | |
|---|---|---|
| | PX-20), Dkt. 211, p. 20-21, ¶ 4 (spent hours trying to get through to Redwood, including waiting on "hold" for more than an hour several times.

Roberts Dec. (TRO PX-23), Dkt. 211, p. 25-26, ¶¶ 4-5 (difficulty getting through to customer service; was told twice she would get a return call but none came).

See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 23, ¶ 68 & Dkt. 10-1, p. 30 (Att. 098).

Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 23-24, ¶¶ 69-75 & Dkt. 10-1, p. 31 (Att. 099).

Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 25-27, ¶¶ | |

| | 76-84 & Dkt. 10-1), p. 32 (Att. 100). | |
|---|---|---|
| **FTC Response to SUF 819**:  Defendants do not specifically dispute that periodically, customer service representatives would not be able to answer all of the incoming phone calls, so consumers had difficulty cancelling autoships or requesting refunds. Instead, they generally deny this without any reference to customer or employee experiences, saying instead that they had employees working 44 hours out of the week.  These general assertions without any explanation regarding the difficulty experienced by customers reaching Defendants is not sufficient to raise a genuine issue of material fact, especially in light of the FTC's consistent evidence from both consumers and former Redwood employees. There is no explanation of what occurred during the hours when they had no phone coverage. Defendants also offer no explanation for how they handled calls that were received during busy times of day, including whether provision was made for customers to leave voice mail messages, or even whether the company made efforts to return missed messages, including how that was done. | | |
| 820.  Jason and Eunjung Cardiff received regular reports of sales and customer service call data, including the reasons for cancellations or refund requests. | Walker Dec. (PX-32), p. 13, ¶¶ 59, 60 (customer complants about the auto-ship program were discussed at regular management meetings). | Admit |
| 821.  Even when consumers | Roberts Dec. (TRO PX-23), Dkt. 211, p. 25-26, | Deny as to often. FTC has two declarations out |

| | | |
|---|---|---|
| successfully reached Redwood's customer service to cancel their enrollment in autoship plans, Defendants often continued sending additional shipments and placing more unauthorized charges on consumers' cards. | ¶¶ 4-7.<br><br>Brown Dec. (TRO PX-24), Dkt. 211, p. 28, ¶¶ 3-4. | of roughly 200,000 consumers who purchased Redwood products. Defendants did offer a money-back guarantee and over 16,000 people received refunds from Redwood. Dkt. 7 at 155-165. Redwood was very flexible with its Refund policy, and would often refund money to people after the 30 days had passed. Exhibit 1, Declaration of Jason Cardiff at __. |

**FTC Response to SUF 821**: Although defendants dispute the use of the word "often," they do not deny that even when consumers successfully reached Redwood's customer service to cancel their enrollment in autoship plans, Defendants continued sending additional shipments and placing more unauthorized charges on consumers' cards. Defendants' general assertions regarding the number of people refunded, their money-back guarantee, and their purported "flexible" refund policy are irrelevant to whether consumers were able to easily and successfully cancel their autoship enrollments. These general assertions do not raise a genuine issue of material fact.

| | | |
|---|---|---|
| 822.  Defendants did not | Walker Dec. (PX-32), p. | Deny, Defendants never |

| | | |
|---|---|---|
| obtain written authorization from debit card customers to make recurring electronic debits from their bank accounts. | 14, ¶ 63.<br><br>Melendez Dec. (PX-35), p. 3, ¶ 12.<br><br>Carranza Dec. (PX-33), p. 2, ¶ 9.<br><br>Rodoracio Dec. (PX-36), p. 2, ¶ 7 (no special authorization was required before debit card customers were put on auto-ship).<br><br>Rosen Dec. (TRO PX-13), Dkt. 211, p. 7, ¶ 3.<br><br>Harrell-Cox Dec. (TRO PX-14), Dkt. 211, p. 9, ¶ 3.<br><br>Reynolds Dec. (TRO PX-17), Dkt. 211, p. 14, ¶ 3.<br><br>Jones Dec. (TRO PX-25), Dkt. 211, p. 29, ¶ 4. | took money directly from consumer bank accounts. Ex. A, Jason Cardiff Declaration at __. |

| | See also Fromal Dec. (TRO PX-11), Dkt. 211, p. 3-4, ¶¶ 4-5 (returned home after extensive work travel to find multiple charges from checking account that resulted in bounced checks and overdraft fees). | |
|---|---|---|
| **FTC Response to SUF 822**: Defendants do not dispute that they did not obtain written authorization from debit card customers to make recurring electronic debits.  Rather, without citing any basis, they dispute that debits were taken from customers' bank accounts. The Court may take judicial notice that debit cards are linked to customers' bank accounts and that a withdrawal occurs when the debit card is charged. Consumers whose bank withdrawals exceed their bank deposits may incur overdraft charges. | | |
| 823.   Defendants did not obtain consumers' express informed consent before charging them for recurring shipments. | SUF 783, 785-786, 810-818. | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration at __. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions |

| | | of the program. Ex. A, Declaration of Jason Cardiff ¶111. The FTC could only find 4 people to give testimony on this issue out of over 200,000 people who acquired Redwood products. Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |
|---|---|---|
| **FTC Response to SUF 823**: Defendants do not specifically dispute that they did not obtain consumers' express informed consent before charging them for recurring shipments and have offered no details or evidence showing if and how they obtained consent from consumers to charge them on an ongoing basis. The Cardiffs' extraneous narrative is irrelevant argument and should be disregarded.<br><br>Defendants' failure to obtain express informed consent before charging customers for recurring shipments is relevant to their liability for injunctive and monetary relief. | | |
| 824.  Defendants did not provide a simple mechanism for the consumer to stop recurring charges | SUF 748, 819. | Deny we had auto stop with the click of a button and we texted and email customers prior to any charging of new orders. |

| | | |
|---|---|---|
| from its autoship programs. | | Ex. A, Jason Cardiff declaration ¶88a-b. |

**FTC Response to SUF 824**: The Cardiffs claim that they had "auto stop with the click of a button," but the cited paragraphs in Jason Cardiff's declaration do not mention an "auto stop" or button-click option to stop recurring charges. Their cited evidence does not support their assertion. The Cardiffs offer no evidence of an easy cancellation mechanism, and if even they did text and email customers prior to charging them, which they do not establish by reference to any evidence, advance warning of a charge is not equal to providing a simple mechanism to avoid that charge.

| | | |
|---|---|---|
| 825.  Defendants made electronic funds transfers from consumers' bank accounts without having provided those consumers with a copy of their written authorization for such transfers because no such authorization existed. | SUF 815, 818, 822. | Deny. Defendants never transferred funds from consumers bank accounts. Ex. A, Jason Cardiff Declaration ¶112. |

**FTC Response to SUF 825**: Defendants admit other facts (see, e.g., FTC SUF 744, 842) showing that they accepted debit card charges, which the Court may take judicial notice are connected to bank accounts. Their general denial does not provide any detail or evidence showing a process or examples of Defendants

both obtaining and providing a copy of written authorizations from and to consumers who made purchases with debit cards.

B. *Chargebacks*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 826. Defendants' merchant accounts had high chargebacks (i.e., credits to customers' credit cards) because many customers complained to their credit card companies about unauthorized auto-ship charges or inability to get refunds for their purchases. | Walker Dec. (PX-32), p. 18, ¶ 79.<br><br>Melendez Dec. (PX-35), p. 8-9, ¶ 31 (customers who were upset about unauthorized chages and unpaid refunds often filed disputes with their credit card companies).<br><br>Carranza Dec. (PX-33), p. 7, ¶ 28 (customers who were upset about unauthorized charges or not getting promised refunds would sometimes dispute credit card charges).<br><br>Rodoracio Dec. (PX-36), p. 3, ¶ 13; p. 5, ¶ 20. | Deny. No processing companies ended their relationship with Redwood because of chargeback rates. In fact, none of the processing companies told me or anyone else that the chargeback rates were too high or that they were concerned about the chargeback rates. Ex. A, Jason Cardiff Declaration ¶¶106-107. Redwood was never penalized by any merchant accounts because of problems with chargebacks. *Id.* |

| | | |
|---|---|---|
| | Ducklow Dec. (TRO PX-3), Dkt. 8, p. 3-5, ¶¶ 5, 11 & p. 7-8 (Att. A & B). | |
| | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 62, ¶ 176 & Att. 24-12, p. 8 (Att. 208) ("the chargebacks were crazy high levels"). | |
| | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 28-34, ¶¶ 90-92, 94, 98, 100, 101 & Dkt. 10-1, p. 42-43, 53-54 (Atts. 105-07, 110). | |

**FTC Response to SUF 826**: Defendants do not dispute that they had high chargebacks due to consumers complaining about autoship and the inability to get refunds. Their general denial that no "processing companies" terminated relationships with Defendants due to high chargebacks does not address the testimony of four former employees, email correspondence, and internal records kept by Defendants' former merchant processors, which show that high chargebacks were a known concern. Whether merchant processors terminated Defendants' accounts for this reason is irrelevant to this fact. The Cardiffs also do not address the cited email evidence showing that Jason Cardiff was informed that Defendants' chargebacks were "crazy high."

| 827. Redwood would use the packing | Melendez Dec. (PX-35), p. 8-9, ¶ 31 & p. 10 (Att. | Admit |
|---|---|---|

| | | |
|---|---|---|
| | slips included with customer orders to challenge chargebacks. | 1).<br><br>Rodoracio Dec. (PX-36), p. 5, ¶ 20. | |
| 828. | Jason Cardiff wanted chargeback rates to be below 1%. | Carranza Dec. (PX-33), p. 7, ¶ 28-29.<br><br>See also Melendez Dec. (PX-35), p. 8-9, ¶ 31 (Jason Cardiff was happy when chargebacks were low). | Admit |
| 829. | As of 2018, both Visa and Mastercard used a chargeback-to-transaction ratio of 1% to decide when a merchant should be placed on a monitoring program because of an excessive level of customer disputes. | Ducklow Dec. (TRO PX-3), Dkt. 8, p. 3-4, ¶ 7; p. 5, ¶ 12. | Admit |
| 830. | During the period from December 2015 through | Ducklow Dec. (TRO PX-3), Dkt. 8; p. 3, ¶ 5; and p. 3-4, ¶ 11 & p. 7-8 (Att. | Deny. No processing companies ended their relationship with |

| | | | |
|---|---|---|---|
| | February 2018 for Visa and from January 2016 through March 2018 for Mastercard, Defendants' chargeback ratios were regularly well above 1%. | A, B). See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 32-33, ¶ 100 (December 2017 memorandum by Vantiv noting the "generally acceptable rate of 1.00% CB # to Sales # Ratio" and that Redwood had historically been above that rate, "indicating potential issues with the product, customer service, and/or marketing."). | Redwood because of chargeback rates. In fact, none of the processing companies told me or anyone else that the chargeback rates were too high or that they were concerned about the chargeback rates. Ex. A, Jason Cardiff Declaration ¶¶106-107. Redwood was never penalized by any merchant accounts because of problems with chargebacks. *Id.* |
| 831. | During the period from December 2015 through February 2018 for Visa and from January 2016 through March 2018 for Mastercard, Defendants' chargeback rates exceeded 10% for | Ducklow Dec. (TRO PX-3), Dkt. 8; p. 3, ¶ 5; and p. 3-4, ¶ 11 & p. 7-8 (Att. A, B). | |

| | | |
|---|---|---|
| some of the banks handling Defendants' merchant accounts. | | |

**FTC Response to SUF 830-831**: Defendants do not dispute that during the period from December 2015 through February 2018 for Visa and from January 2016 through March 2018 for Mastercard, Defendants' chargeback ratios were regularly well above 1%, or that during the period from December 2015 through February 2018 for Visa and from January 2016 through March 2018 for Mastercard, Defendants' chargeback rates exceeded 10% for some of the banks handling Defendants' merchant accounts. Instead they generally deny this arguing that they never lost a merchant account because of chargebacks or paid penalties as a result of high chargebacks. Although not relevant to these undisputed facts, this is not true. Defendants losts their ability to transact credit card charges because of high chargeback rates several times. Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 28-34, ¶¶ 90-92, 94, 98, 100, 101 & Dkt. 10-1, p. 42-43, 53-54 (Atts. 105-07, 110). ("Decline Reason: Per Security Risk: One MID shows high chargebacks and the other was recently closed for being related to the MID with the chargebacks. LP would advise not moving forward with the new application due to the chargeback risk associated with this account.") Dkt. 7, p. 27-28, ¶ 90.

| 832. Merchant banks would impose penalties on Redwood because of its high chargeback rates. | Rodoracio Dec. (PX-36), p. 3, ¶ 13 (when chargebacks went up, the cost of processing went up). | Deny, Redwood was never penalized by merchant banks. Ex. A, Jason Cardiff Declaration ¶107. |
|---|---|---|

**FTC Response to SUF 832**: Defendants generally disputes this fact without

reference to any specific company document and without any elaboration.
Former employee April Rodoracio was primarily responding to customers' credit
card banks to argue chargebacks. PX 35, p. 6, ¶ 20. This is the basis of her
testimony regarding the effect of chargebacks on merchant card fees. The Jason
Cardiff declaration offers no explanation for his basis of knowledge. These
general denials are insufficient to raise genuine issues of material fact.

| | | |
|---|---|---|
| 833. | High chargebacks caused several of the corporate defendants' merchant accounts to be closed. | Walker Dec. (PX-32), p. 18, ¶ 79 & p. 729-752 (Atts. 118-125).<br><br>See also Carranza Dec. (PX-33), p. 7, ¶ 30 (if the chargebacks got too high, merchants would close the account and keep the reserves).<br><br>See also Rodoracio Dec. (PX-36), p. 3, ¶ 13 (Redwood could lose merchant accounts when chargebacks went up).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 55 (Att. 11).<br><br>Sands 1st Dec. (TRO PX- | Deny. No processing companies ended their relationship with Redwood because of chargeback rates. In fact, none of the processing companies told me or anyone else that the chargeback rates were too high or that they were concerned about the chargeback rates. Ex. A, Jason Cardiff Declaration ¶¶106-107. Redwood was never penalized by any merchant accounts because of problems with chargebacks. *Id*. |

| | | |
|---|---|---|
| | 1), Dkt. 7, p. 28-34, ¶¶ 90-92, 94-98, 100, 101 & Dkt. 10-1, p. 41-44, 53-54 (Atts. 105-07, 110). | |
| 834. | When existing merchant accounts were closed, the Cardiffs had to find new ones to process consumers' credit card orders. | Walker Dec. (PX-32), p. 18, ¶¶ 80-81.<br><br>See Carranza Dec. (PX-33), p. 7, ¶ 30 (if the chargeback rate was growing on a particular merchant account, it would be time to line up a new account).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 52-53 (Att. 9) ("We need to start to pen [sic] new merchant accounts again in order to cover us. We can use Identfy llc [sic] for them. We should get chase and vantiv as well as any others we want."); p. 54 (Att. 10) ("Team let's get ready if we lose our vantiv account. We need | |

| | | |
|---|---|---|
| | to get more chase payment tech accounts asap."). | |
| 835. The Cardiffs were aware of their chargeback problems. | Walker Dec. (PX-32), p. 17-18, ¶¶ 76-77 (the Cardiffs got real time reports of sales, and refund/chargeback numbers) & p. 728 (Att. 117); p. 18, ¶ 79 (merchant accounts were terminated on numerous occasions because of high chargebacks) & p. 729-752 (Atts. 118-125); p. 18, ¶¶ 79-81 (the closure of merchant card processing accounts meant that the Cardiffs had to constantly look for and apply for new merchant accounts, and had to sign personal guarantees to obtain them) & p. 753-899 (Atts. 126-135).<br><br>Carranza Dec. (PX-33), | |

| | | |
|---|---|---|
| | p. 7, ¶ 28 (Jason Cardiff closely monitored chargebacks).<br><br>Melendez Dec. (PX-35), p. 9, ¶ 32 (told Jason Cardiff that many customers were disputing charges with their credit card companies because they had been enrolled in auto-ship without their permission but he still wanted to put customers on auto-ship).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 54 (Att. 10) (Jason Cardiff sends email saying "Team let's get ready if we lose our vantiv account. We need to get more chase payment tech accounts asap."); p. 61-63 (Att. 16) ("code red charge back alert"). | |
| **FTC Response to SUF 833-835**: Defendants generally dispute that chargebacks | | |

were ever a problem, that they ever lost merchant accounts, or that they were
ever told about these problems, however, records produced by their merchant
processors tell a different story and the Cardiffs offer no explanation for why the
Court should ignore contemporaneous email communications and the
declarations of former employees specifically recounting Jason Cardiff's close
attention to the issue of chargebacks. Defendants losts their ability to transact
credit card charges because of high chargeback rates several times. Sands 1st
Dec. (TRO PX-1), Dkt. 7, p. 28-34, ¶¶ 90-92, 94, 98, 100, 101 & Dkt. 10-1, p.
42-43, 53-54 (Atts. 105-07, 110). ("Decline Reason: Per Security Risk: One MID
shows high chargebacks and the other was recently closed for being related to the
MID with the chargebacks. LP would advise not moving forward with the new
application due to the chargeback risk associated with this account.") Dkt. 7, p.
27-28, ¶ 90. Documents produced by Defendants' merchant card processors
include letters to Redwood and to Jason Cardiff reflecting concerns about
chargeback history. In response to highly specific and detailed declarations and
documents, Defendants offer no rebuttal to the testimony of their former
employees, their own emails to employees asking them to look for new accounts
(produced by Defendants to the FTC from their own business records), or to
letters received from merchant processors that terminated Defendants' accounts.
These denials are insufficient to raise a genuine issue of material fact.

| 836. | Jason Cardiff was told by a payment processing consultant in May 2016 that one merchant account was being shut down because "The | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 55 (Att. 11). | Admit |
|------|------|------|------|

| | | |
|---|---|---|
| | chargebacks were [at] crazy high levels." | | |
| 837. | Jason Cardiff instructed employees to use fake websites to get approvals for new merchant accounts. | Carranza Dec. (PX-33), p. 8, ¶ 30. | Deny. Jason Cardiff never lied or instructed anyone to lie about websites or family members in order to get new processing accounts. Most of Redwood's processing was through the company Vantiv. Vantiv processed our accounts from 2016 until Vantiv closed the account in or March, 2018. Vantiv ended its relationship with Redwood because of the FTC's investigation. Ex. A, Jason Cardiff Declaration ¶108. |
| 838. | The Cardiffs used family members and friends of employees as "strawmen" for merchant card accounts so they could continue processing sales. | Walker Dec. (PX-32), p. 18-19, ¶ 81.<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 36, ¶ 106 & Dkt. 13, p. 26-32 (Att. 117). | |

**FTC Response to SUF 837-838**: Defendants generally deny asking employees to use fake websites and strawmen to set up new merchant accounts. However, they do not directly confront or rebut the declaration testimony of Tracy Carranza, the employee who kept a spreadsheet of which fake websites obtained merchant approvals. Defendants also do not specifically address the declaration of the FTC investigator who reviewed copies of Defendants' merchant

applications and summarized them as follows: "The applications show various entities and owners, including Gerald Cardiff, father of Defendant and Redwood CEO Jason Cardiff, as well as current and former employees..." (TRO PX-1), Dkt. 7, p. 36, ¶ 106 & Dkt. 13, p. 26-32 (Att. 117).

These general denials in the face of such detailed descriptions of Defendants' activities are insufficient to raise a genuine issue of material fact.

### C. Jason Cardiff's "Straight Sales-to-Continuity" Initiative

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 839. In January 2018, Jason Cardiff directed that brand new continuity orders should be created for customers who had previously made one-time "straight sale" purchases, so that their debit and credit cards could be charged again and going forward on a recurring basis. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 12, ¶ 30 & Dkt. 10, p. 90-149 (Atts. 038-068).<br><br>Walker Depo., p. 128, ln. 25 – p. 129, ln. 9 (Sands 3rd Dec. (PX-51), p. 6, ¶ 27 & p. 1672, 1679-1680 (Att. 124)).<br><br>Walker Dec. (PX-32), p.14-15, ¶¶ 65-67 & p. 657-718 (Atts. 83-114).<br><br>See also Melendez Dec. (PX-35), p. 5-6, ¶¶ 21-22 & p. 37 (Att. 6) ("Per | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id*. The FTC could only find 4 people to give testimony on this issue out of over 200,000 people who acquired Redwood products. |

| | | Jason [t]he straight 1 month supply orders between December 21, 1017 [sic] – January 22, 2018 will be placed [on] continuity."). | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |
| | | | |
| | | Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 50-51, 57-58 (Atts. 8, 13). | |
| 840. | Redwood did not contact these consumers or get their approval for additional charges. | Walker Dec. (PX-32), p. 15, ¶ 66. | |
| | | Walker Depo., p. 128, ln. 25 – p. 129, ln. 11 (Sands 3rd Dec. (PX-51), p. 6, ¶ 27 & p. 1672, 1679-1680 (Att. 124)). | |
| | | Chesko Dec. (TRO PX-22), Dkt. 211, p. 24, ¶¶ 2-4 (ordered TBX-FREE in March or April 2017; additional charge placed on credit card in April 2018). | |
| | | McKinney Dec. (TRO | |

| | PX-28), Dkt. 211, p. 32, ¶¶ 2-4 (ordered TBX-FREE in January 2017; additional debit discovered in April 2018).<br><br>Basford Dec. (TRO PX-29), Dkt. 211, p. 33, ¶¶ 2-3 (ordered TBX-FREE in October 2017; additional charge placed on credit card in March 2018).<br><br>Frantz Dec. (TRO PX-27), Dkt. 211, p. 31, ¶¶ 2-3 (additional charge placed on credit card in April 2018, months after placing a one-time order). | |

**FTC Response to SUF 839-840:** The Cardiffs' general denial does not create a genuine dispute of material fact in the face of specific testimony by former employees who carried out his instructions, and documentary evidence consisting of internal Redwood emails, including emails to Jason Cardiff with the subject line containing a variation of the phrase, "Straight Sales Placed On Continuity," and an email saying, "Per Jason The straight sale 1 month supply orders between December 21, 1017 [sic] – January 22, 2018 will be placed on

1   continuity."  Dkt 428-3, p. 38.The Cardiffs' general assertion that a straight sale

2   option was always available does not respond to the emails sent by Jason Cardiff

3   instructing his employees to "find and run 10 k a day line one" and "increase the

4   year" to push through charges on stale cards.  *Id.* at 73, 86.  Defendants fail to

5   confront any of the detailed testimony gathered from the witnesses who were

6   present and took part in this conduct.

7

8   Defendants' relevance objection is misplaced, as SUF 839-840 clearly state that

9   the actions in question began in January 2018 and emails show that it continued

10  for several months, which is within the date range of the Complaint.

11

12  The fact that the Cardiffs knew about this credit card fraud, as evidenced by their

13  inclusion on emails about it (see, e.g., Dkt. 428-3, p. 81), and that Jason Cardiff

14  instructed his employees to carry it out is relevant to their individual liability for

15  injunctive and monetary relief.

| | | |
|---|---|---|
| 841.  Redwood staff processed hundreds of these unauthorized transactions each day, and reported their success and failure rates to Jason Cardiff and sometimes to Eunjung Cardiff. | Melendez Dec. (PX-35), p. 6, ¶ 23 & p. 37-96 (Att. 6).  Walker Dec. (PX-32), p. 14-15, ¶¶ 65-66 & p. 661-680 (Atts. 85-94); p. 683 (Att. 96); p. 693 (Att. 101) for Jason Cardiff; and p. 697-704 (Atts. 104-106); p. 712 (Att. 110) for Eunjung Cardiff. | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id.* Object as to relevance, |

| | | the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |
|---|---|---|

**FTC Response to SUF 841:** The Cardiffs' general denial does not create a genuine dispute of material fact in the face of specific testimony by former employees who processed hundreds of unauthorized transactions daily and documentary evidence consisting of internal Redwood emails in which these employees reported to the Cardiffs how many customers they had attempted to convert to continuity and how many of those attempts were successful. E.g., Dkt. 428-3, p. 46-54. Defendants fail to confront any of the detailed testimony from the witnesses who were present and took part in this conduct.

Defendants' relevance objection is misplaced, as SUF 841 discusses actions taken beginning in January 2018.

The fact that Defendants harvested former customers' data to process new, unauthorized transactions and that the Cardiffs were involved in near daily email discussions about this deceptive and unfair activity is relevant to their individual liability for injunctive and monetary relief.

| 842. | In some cases, the customers' credit and debit cards had expired since their original orders had been placed. | Melendez Dec. (PX-35), p. 6, ¶ 23.<br><br>Walker Dec. (PX-32), p. 15, ¶ 66.<br><br>Walker Depo., p. 130, ln. | Admit. |
|---|---|---|---|

| | 3-15 (Sands 3rd Dec. (PX-51), p. 6, ¶ 27 & p. 1672, 1681 (Att. 124)). | |
|---|---|---|
| 843.   Jason Cardiff directed his employees to try changing the cards' expiration dates, to see if that would allow the new charges to be processed. | Melendez Dec. (PX-35), p. 6, ¶ 23.<br><br>Walker Dec. (PX-32), p. 15, ¶ 66 & p. 694-695 (Att. 102) ("Increase the year"); p. 699-701 (Att. 105) ("I already said what to do about declines exp").<br><br>Walker Depo., p. 130, ln. 3-15 (Sands 3rd Dec. (PX-51), p. 6, ¶ 27 & p. 1672, 1681 (Att. 124)). | Deny. Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration at 87_. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the prograEx. A, Declaration of Jason Cardiff at 87.<br>Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff at __. |

**FTC Response to SUF 843:**  The Cardiffs' general denial does not create a genuine dispute of material fact in the face of specific testimony by former employees who participated in the straight-to-continuity initiative and documentary evidence consisting of internal Redwood emails from Jason Cardiff telling his employee to "Increase the year" on cards that could not be processed

because they had expired, and subsequently confirming that "I already said what to do about declines exp." Dkt. 426-1, p. 111-112, 116-117 (Att. 102, 105). Again, Defendants fail to confront any of the detailed evidence gathered from the witnesses who were present and took part in this conduct.

Defendants' relevance objection is misplaced, as SUF 843 discusses actions taken beginning in January 2018.

The fact that Jason Cardiff told his employees to increase the expiration date of cards on which they were attempting to run unauthorized charges is relevant to his individual liability for injunctive and monetary relief.

| 844. | Jason Cardiff was impatient at the progress the staff was making at converting accounts from straight sales to continuity programs, and threatened to fire the person working on the project. | Walker Dec. (PX-32), p. 15, ¶ 67. | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. *Id.* |
| 845. | Redwood staff continued converting straight-sale customers to continuity plans | Walker Dec. (PX-32), p. 15, ¶ 67.<br><br>Melendez Dec. (PX-35), p. 6, ¶ 23. | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason |

| and charging them without authorization until April 2018. | | Cardiff ¶89. |
|---|---|---|

**FTC Response to SUF 844-845:** The Cardiffs' general denial does not directly dispute that Jason Cardiff threatened to fire the employee he had tasked with converting straight sales to continuity, or that the initiative lasted until April 2018, and therefore fails to create a genuine dispute of material fact in the face of the specific testimony by former employees who carried out his instructions to convert straight sale customers to continuity.

Defendants' relevance objection is misplaced, as SUF 844-855 discusses actions taken between January 2018 and April 2018.

The unauthorized charges that resulted from Jason Cardiff's straight to continuity initiative are relevant to Defendants' liability for injunctive and monetary relief.

| 846. | Redwood staff continued going back to older and older orders, and ultimately attempted to convert all 2017 straight sale orders into new auto-ship orders. | Melendez Dec. (PX-35), p. 6, ¶ 22. | Object as to vague and confusing. Defendants can neither admit or deny this fact. Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was |
|---|---|---|---|

| | | |
|---|---|---|
| | | fully aware of the autoship and agreed to the terms and conditions of the program. Id. Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. |

**FTC Response to SUF 846:**  The Cardiffs' general denial does not create a genuine dispute of material fact in the face of specific testimony by the former employee who carried out Jason Cardiff's instructions,  who stated that, "After we exhausted the list of straight sale orders from November 2017 through January 2018, we started processing even older orders. First we went back to August 2017, and ultimately we tried to convert all 2017 straight sale orders into new auto-ship orders." Dkt. 428-3, p. 7, ¶ 22.  This process is also reflected in the internal Redwood emails attached to her declaration, to which both Jason Cardiff and sometimes Eunjung Cardiff are copied.

Defendants' relevance objection is misplaced, as SUF 846 discusses actions taken beginning in January 2018 and ending in April 2018 (see SUF 839, 845).

The unauthorized charges that resulted from Jason Cardiff's straight to continuity initiative are relevant to Defendants' liability for injunctive and monetary relief.

| 847. | Defendants processed unauthorized | Walker Dec. (PX-32), p. 15, ¶ 67. | Deny. The straight sales option was always available. Ex. A, Jason |

| | | |
|---|---|---|
| charges for more than 1,500 consumers through Jason Cardiff's straight-to-continuity initiative. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 10-11, ¶ 28 (Table 1) (at least 1,893 conversions). | Cardiff Declaration at 87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. Ex. A, Declaration of Jason Cardiff at 87. |
| 848.  Jason Cardiff told his staff that they had to generate additional revenue of $10,000 each day from his straight-to-continuity initiative. | Walker Dec. (PX-32), p. 14, ¶¶ 65-66 & p. 707-710 (Att. 108) ("We still have to find and run 10 k a day").<br><br>Melendez Dec. (PX-35), p. 6, ¶ 23 & p. 85 (Att. 6).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 83-86 (Att. 27). | Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff a89 89. |

**FTC Response to SUF 847-848:** The Cardiffs' general denial does not create a genuine dispute of material fact in the face of specific testimony by former employees who carried out Jason Cardiff's instructions and documentary evidence consisting of Jason Cardiff's March 24, 2018 email stating that "we still have to find and run 10 k a day line one" in response to an employee informing him that changing the expiration year was not working.  Dkt. 10, p. 138.  The Cardiffs do not dispute the number of new orders that resulted from this initiative, which were calculated by the FTC's investigator based on Redwood's

own spreadsheet records.

Defendants' relevance objection is misplaced, as these facts discuss actions taken from January to April 2018.

The unauthorized charges that resulted from Jason Cardiff's straight to continuity initiative and his control over the process are relevant to Defendants' liability for injunctive and monetary relief.

| 849. Jason Cardiff was not happy that more consumers had not been successfully converted to continuity programs. | Walker Dec. (PX-32), p. 15, ¶ 68.  Melendez Dec. (PX-35), p. 6, ¶ 23 & p. 93-94 (Att. 6) (when she told Jason Cardiff that she was only able to convert 4 of the 204 orders on the list she had received the previous day, he replied "Better come up with something ASAP.")  Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 83-86 (Att. 27). | Deny. The straight sales option was always available. Ex. A, Jason Cardiff Declaration ¶87. Redwood had a strict policy to not place anyone on autoship unless the customer was fully aware of the autoship and agreed to the terms and conditions of the program. Id. Object as to relevance, the autoship program was no longer in existence as of July, 2018. Ex. A, Declaration of Jason Cardiff ¶89. Jason Cardiff understood the auto-ship program to |

-518-

| | | be the most efficient way for the company to make money, but ultimately he wanted our customers to be happy and achieve the best possible results for them. If Redwood's products worked in a month, it was great that our product was able to help them. Id. ¶90. |
|---|---|---|

**FTC Response to SUF 849:**  The Cardiffs' general denial does not create a genuine dispute of material fact in the face of specific testimony by former employees who carried out Jason Cardiff's instructions and documentary evidence consisting of Jason Cardiff's April 4, 2018 statement, "Better come up with something ASAP" when the employee working on the straight-to-continuity initiative told him that she had successfully converted only 4 of the 204 orders she had attempted.  Dkt. 426-1, p. 132.

Defendants' relevance objection is misplaced, as the referenced email is dated April 4, 2018, and their remaining narrative should be disregarded as argument.

The Cardiffs' participation in and knowledge of this initiative is relevant to Defendants' liability for injunctive and monetary relief.

| 850. | Consumer complaints and chargebacks increased after | Walker Dec. (PX-32), p. 15, ¶ 69. | Objection as to relevance. No processing companies ended their relationship with |
|---|---|---|---|

| | | |
|---|---|---|
| Redwood started converting straight sales to auto-ship sales. | | Redwood because of chargeback rates. In fact, none of the processing companies told me or anyone else that the chargeback rates were too high or that they were concerned about the chargeback rates. Ex. A, Jason Cardiff Declaration ¶¶106-107. Redwood was never penalized by any merchant accounts because of problems with chargebacks. Id. |

**FTC Response to SUF 850**:  The Cardiffs do not dispute that consumer complaints and chargebacks increased after Redwood started converting straight sales to auto-ship sales; therefore, they have not created a genuine dispute of material fact in the face of specific testimony by their former employee who had knowledge of the chargeback increases.  The Cardiffs' off-topic objections are argument and should be disregarded.

The increase in chargebacks after Redwood started converting straight sales to continuity was an indicator that the charges were fraudulent and is relevant to Defendants' liability for injunctive and monetary relief.

| 851. Those complaints and chargebacks | Walker Dec. (PX-32), p. 15, ¶ 69. | Deny. No processing companies ended their |

| | | |
|---|---|---|
| caused Redwood to lose merchant accounts or have applications for new accounts denied. | | relationship with Redwood because of chargeback rates. In fact, none of the processing companies told me or anyone else that the chargeback rates were too high or that they were concerned about the chargeback rates. Ex. A, Jason Cardiff Declaration ¶106-107. Redwood was never penalized by any merchant accounts because of problems with chargebacks. Id. |
| 852.  Jason Cardiff only agreed to stop the conversion program when it became clear that continuing would cause Redwood to lose more merchant accounts. | Walker Dec. (PX-32), p. 15, ¶ 69. | |
| **FTC Response to SUF 851**:  The Cardiffs do not dispute that complaints and chargebacks resulting from Jason Cardiffs' straight-to-continuity initiative affected Redwood's ability to obtain and keep merchant accounts or that this concern prompted Jason Cardiff to end the conversion program. Their general denial does not create a genuine dispute of material fact in the face of specific testimony by Redwood's former Director of Operations.  Their extraneous narrative is argument and should be disregarded. | | |
| 853.  [reserved] | | |
| 854.  [reserved] | | |
| 855.  [reserved] | | |

## X.    Ringless Voicemails

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 856.  In early 2018, Jason Cardiff contracted with a company called Just Deliver It to deliver 1 million prerecorded messages, also known as robocalls or ringless voicemails ("RVM"), to consumers. | Walker Dec. (PX-32), p. 19, ¶ 82 & p. 924 (Att. 141); p. 928 (Att. 143). | Admit |
| 857.  Redwood also contracted with a telemarketing company called Gawk to deliver 1.5 million RVMs to consumers' voicemail. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 36, ¶ 107 & Dkt. 10, p. 33-48 (Att. 118).<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 65-67, 72-76 (Atts. 17, 18, 21, 22).<br><br>Walker Dec. (PX-32), p. 19, ¶ 82 & p. 900-915 (Att. 136 ) (pages out of | Admit |

| | FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|---|
| | | order in the original); see p. 906 for reference to "One Million Five Hundred Thousand, Direct Delivery Ringless Voicemail Drops"). | |
| 858. | Jason Cardiff negotiated the contract with Gawk. | Walker Dec. (PX-32), p. 19, ¶ 83.<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 73-76 (Att. 22). | Admit |
| 859. | Redwood used Gawk's platform to deliver 1.5 million ringless voicemail messages to consumers. | Walker Dec. (PX-32), p. 19, ¶¶ 82-83.<br><br>Sands 3rd Dec. (PX-51), p. 3, ¶ 9 & p. 72 (Att. 21). | Admit |
| 860. | [reserved] | | |
| 861. | [reserved] | | |
| 862. | [reserved] | | |

## XI. Rengalife

### A. Defendants' Marketing of the Rengalife Multilevel Marketing Program

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|

| | | |
|---|---|---|
| 863. | Defendants launched the Rengalife multi-level marketing program in March 2018. | Walker Dec. (PX-32), p. 20, ¶ 87.<br><br>McDowell Dec. (PX-48), p. 1, ¶¶ 3-5.<br><br>Ziolkowski Dec. (PX-49), p. 1, ¶¶ 4-5 & p. 3 (Att. 1) (joined Rengalife in March 2018).<br><br>Sands 2nd Dec., Dkt. 277-4, p. 3, ¶ 7 & p. 14 (Att. 7).<br><br>Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, 240, ln. 19-20 (Att. 80) ("We are live.  Rengalife.com is live.  500 founder's spots are being filled up right now."). | Object, not a material fact. Defendants ceased developing "Rengalife" in or about July, 2018. Dkt. 253-1 Declaration of Jason Cardiff ¶17. Rengalife was never an active company. Redwood never made sales or had any customers because market research indicated it was not a viable company. Ex. A, Declaration of Jason Cardiff ¶37. Rengalife was a program that lasted and was advertised for about 45 days. Rengalife was started the end of march and we stopped advertising and the program itself at the beginning of May. *Id*. at ¶84. No consumers acquired any membership from |

| | | Rengalife. *Id*. at ¶85. |
|---|---|---|
| | | |

**FTC Response to SUF 863**:  The Cardiffs do not dispute that the Rengalife multi-level marketing program launched in March 2018.  Indeed, they even state that "Rengalife was a program that lasted and was advertised for about 45 days" and that it "was started at the end of march [sic] and we stopped advertising and the program itself at the beginning of May."  Dkt. 491-1, p. 36.

Jason Cardiff's conclusory statement that Rengalife was never active is insufficient to create a genuine dispute of material fact in light of the two declarations of individuals who had joined Rengalife and purchased product through the program (FTC SUF 863, 869); Jason Cardiff's many previous statements while marketing Rengalife to potential members, see SUF 863, 868, 884 (statements by Jason Cardiff that Rengalife was "live" and had already had numerous members join); his April 7, 2018 email bragging about signing up an additional 9 reps (see SUF 938); testimony of Redwood's former Director of Operations that Rengalife was launched in March 2018 (FTC SUF 863, 868, 884); in light of specific testimony and documentary evidence showing active solicitation and payment by customers, FTC SUF 873-877 (email sent to a Gmail account associated with an FTC undercover identity previously used to make an undercover purchase from Redwood.

SUF 863 is a material fact with respect to Defendants' liability for injunctive and monetary relief for false and unsubstantiated earnings claims associated with the

Rengalife multi-level marketing program. These objections do not create a
disputed issue as to that fact.

| 864. | Rengalife was founded and created by Jason Cardiff and Eunjung Cardiff. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50, ¶¶ 134 & Dkt. 13, p. 151 (Att. 153). | Object, not a material fact. Defendants ceased developing "Rengalife" in or about July, 2018. Dkt. 253-1 Declaration of Jason Cardiff ¶17. Rengalife was never an active company. Redwood never made sales or had any customers because market research indicated it was not a viable company. Ex. A, Declaration of Jason Cardiff ¶37. |

**FTC Response to SUF 864**:  The Cardiffs do not dispute that Rengalife was
founded and created by Jason and Eunjung Cardiff.  Their extraneous narrative
does not address this fact and should be disregarded.

The Cardiffs' creation of the Rengalife program is a material fact relevant to
their individual liability for injunctive and monetary relief.

| 865. | Former Redwood Director of Operations | Walker Dec. (PX-32), p. 20, ¶¶ 90, 91. | Object, not a material fact. Defendants ceased developing "Rengalife" |

-526-

| | | | in or about July, 2018. |
|---|---|---|---|
| | Danielle Walker recognizes FTC TRO Exhibits PX-1, Attachments 143, 146, 149, and 156 as videos promoting Rengalife that featured Jason Cardiff.[19] | | Dkt. 253-1 Declaration of Jason Cardiff ¶17. Rengalife was never an active company. Redwood never made sales or had any customers because market research indicated it was not a viable company. Ex. A, Declaration of Jason Cardiff ¶37. Rengalife was a program that lasted and was advertised for about 45 days. Rengalife was started the end of march and we stopped advertising and the program itself at the beginning of May. *Id.* at ¶84. |
| 866. | Former Redwood Director of Operations Danielle Walker recognizes four video files identified by the FTC as "Rengalife -- Facebook - 03.21.2018," "Rengalife -- Facebook - 03.26.2018," | Walker Dec. (PX-32), p. 20-21, ¶ 92. | |

---

[19] The Cardiffs submitted a single objection to SUF 865-937. To be consistent with the Commission's original organization, this Response separates SUF 865-897 from SUF 898-937.  The Commission's Response to SUF 865-897 begins on p. 547; the Response to SUF 898-937 begins on p. 567.

| | | |
|---|---|---|
| "Rengalife -- Facebook - 03.28.2018," and "Rengalife -- Facebook - 04.25.2018" as Rengalife videos featuring Jason Cardiff. | | No consumers acquired any membership from Rengalife. *Id.* at ¶85. |
| 867. Former Redwood Director of Operations Danielle Walker recognizes FTC TRO Exhibits PX-1, Attachments 152-155 as portions of the rengalife.com website. | Walker Dec. (PX-32), p. 21, ¶ 95. | |
| 868. Jason Cardiff stated in a March 26, 2018 Facebook Live video that "we had a lot of signups this morning.  We have not filled -- we | Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, 244, ln. 13-17 (Att. 80). | |

| | | |
|---|---|---|
| | have not filled all the founder's spots and I say that because everybody needs to know once the founder's spots are gone, they're completely gone." | |
| 869. | Consumers joined Rengalife and purchased oral film strips. | Ziolkowski Dec. (PX-49), p. 1, ¶ 6 & p. 6 (Att. 3) (purchased $199.80 of oral film strips through Rengalife when he joined, and then more later).<br><br>McDowell Dec. (PX-48), p. 1, 2, ¶¶ 5, 7.<br><br>Walker Dec. (PX-32), p. 21, ¶ 96. |
| 870. | Defendants promoted Rengalife online with the website Rengalife.com. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50, ¶¶ 133, 134 & Dkt. 13, p. 145-166 (Att. 152-155). |
| 871. | The Rengalife | Sands 1st Dec. (TRO PX- |

| | | |
|---|---|---|
| website told prospective members "Don't Just Make a Living … Live the Rengalife," asked "Are You Ready to Change Your Life?" | 1), Dkt. 7, p. 50, ¶ 134 & Dkt. 13, p. 154 (Att. 154). | |
| 872. The Rengalife website told prospective members that: "Finally your dreams can become real! It all begins by signing up as a Rengalife member. By becoming a part of the Rengalife family, you will be on the path to creating your ideal life.  Whether you are looking for a few extra dollars or pursuing an | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50, ¶ 134 & Dkt. 13, p. 155 (Att. 154). | |

| | | |
|---|---|---|
| opportunity to replace a full time income, Rengalife has the way." | | |
| 873. | On April 9, 2018, a Gmail account associated with an FTC undercover identity previously used to purchase a Redwood product was sent an email regarding Rengalife. | Sands 2nd Dec., Dkt. 277-4, p. 3, ¶ 7. |
| 874. | The email subject line was, "I wanted to share 2 secrets to succeed in Rengalife." | Sands 2nd Dec., Dkt. 277-4, p. 3, ¶ 7 & p. 14 (Att. 7). See also Ziolkowski Dec. (PX-49), p. 1, ¶ 5 & p. 8 (Att. 5) (email with same subject line). |
| 875. | The email stated that, "Since our official launch date on 3/26/2018 we have had over 200 individuals become | Sands 2nd Dec., Dkt. 277-4, p. 3, ¶ 7 & Att. 7, p. 14 (Att. 7). See also Ziolkowski Dec. (PX-49), p. 1, ¶ 5 & p. 8 |

| | | |
|---|---|---|
| | Rengalife members!" | (Att. 5). |
| 876. | Also included in the email was an embedded video titled, "I have 2 Secrets for You," which featured Defendant Jason Cardiff. | Sands 2nd Dec., Dkt. 277-4, p. 3, ¶ 7 & p. 15 (Att. 7).<br><br>See also Ziolkowski Dec. (PX-49), p. 1, ¶ 5 & p. 8 (Att. 5). |
| 877. | The email concluded with "Sincerely, Jason Cardiff," and the address listed for Rengalife at the bottom of the email is 870 N. Mountain Ave. #118 Upland, CA 91786. | Sands 2nd Dec., Dkt. 277-4, p. 3, ¶ 7 & p. 16 (Att. 7). |
| 878. | Defendants promoted Rengalife in videos on their website and Facebook and YouTube. | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 49-50, ¶¶ 132.<br><br>Walker Dec. (PX-32), p. 21, ¶ 93 (videos were available on website). |

| | | McDowell Dec. (PX-48), p. 1, ¶¶ 3, 4. | |
|---|---|---|---|
| 879. | Jason Cardiff stated in advertising for Rengalife that "this is really simple. It's really easy" and "You can earn as much as you want or as little as you want…." | Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, 244, ln. 4 (Att. 80) (Rengalife – Facebook – 03.26.2018 video).<br><br>Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 130 & Dkt. 13, p. 104, 107, ln. 22-23 (Att. 144) ("Who is Rengalife" video).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49-50, ¶ 132 & Dkt. 13, p. 135, 138, ln. 11-16 (Att. 150) ("the levels, like everything in the Rengalife system, are very simple, because that's the way we have shown, through many, many different studies, you can be the most successful, keeping it very simple and | |

| | | |
|---|---|---|
| | | transparent."). |
| 880. | Jason Cardiff stated in advertising for Rengalife that "we've made it simple and easy for every single Rengalife distributor to use, to enjoy and to understand." | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 130 & Dkt. 13, p. 104, 107, ln. 13-15 (Att. 144) ("Who is Rengalife" video). |
| 881. | Jason Cardiff stated in online advertising that Rengalife "if you're looking to be your own boss, if you're looking to set your own way and decide your own destiny," you have come to the right place." | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 130 & Dkt. 13, p. 104, 107, ln. 7-9 (Att. 144) ("Who is Rengalife" video). |
| 882. | Jason Cardiff stated in online advertising that Rengalife had "technology-proof" | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 114, 118, ln. 21 – p. 119, ln. 1 (Att. 147) ("Get Started |

| | products and this was important because "You don't want to get involved in something . . . where technology can replace you." | Today" video).<br><br>See also Sands 3rd Dec. (PX-51), p. 6, ¶ 25 & p. 264, 268, ln. 11-12 (Att. 84) ("You want to be involved in an opportunity that is technology-proof."). | |
|---|---|---|---|
| 883. | Jason Cardiff stated in online advertising for Rengalife: "So life-changing products.  We don't cap your earnings.  Unlimited team size. . . . Bonuses.  Loyalty Rewards.  World-class support." | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 114, 119, ln. 23 – p. 120, ln. 4 (Att. 147) ("Get Started Today" video). | |
| 884. | Jason Cardiff stated in a Facebook Live video:<br>    "[I]f I told you that you could | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 114, 121, ln. 12-25 (Att. 147) ("Get Started Today" video). | |

| | | |
|---|---|---|
| make $2,000 a month, $5,000 a month, $100,000 a month, we have somebody on pace to make . . . $100,000 a year. We've only been live a week and a half. If I told you you had to make a little tiny investment in product for yourself to get to the executive level, if I showed you how to spend $199.80 and you could make [$]5,000 a month, $6,000 a month, is that a good investment?  And you would say, yes, it is, it's a very good investment." | | |
| 885.  Jason Cardiff | Sands 1st Dec. (PX-1), | |

| | | |
|---|---|---|
| | emphasized the ease of building teams of ten recruits: "What I told you to do was simple. All -- your whole universe is right here: your ten people. You do not care about their ten people or the other ten people. You train your group, your team (inaudible). Team John, Team Eric, Team Susie, Sally, whoever. Team -- Team Rich, Team Independent, Team Happy, Team Living at-the-Beach." | Dkt. 7, p. 49, ¶ 131 & Dkt. 13, p. 126, ln. 16-22 (Att. 147). | |
| 886. | Jason Cardiff stated in Rengalife advertising that Rengalife | Sands 3rd Dec. (PX-51), p. 5, ¶ 19 & p. 218, 221, ln. 25 – p. 224, ln. 11 (Att. 78). | |

| | | |
|---|---|---|
| "Founders" would enjoy special benefits (including direct access to him), and that only 500 Founders seats would ever be available. | McDowell Dec. (PX-48), p. 1-2, ¶¶ 5-6. | |
| 887. Rengalife advertising promised Executives, Directors, Vice Presidents, and Presidents have "five ways to earn." | Sands 3rd Dec. (PX-51), p. 5, ¶ 19 & p. 218, 226 ln. 18-19; p. 227, ln. 13; p. 228, ln. 11; p. 230 ln. 8; p. 232; ln. 20, p. 233; ln. 14 (Att. 78).<br><br>Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 118, 1n. 13 (Att. 147) ("Get Started Today" video).<br><br>Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) ("five ways to generate income") (Rengalife website). | |
| 888. Jason Cardiff | Sands 3rd Dec. (PX-51), | |

| | | |
|---|---|---|
| | stated in Rengalife advertising that Rengalife provides "multiple Streams of Income." | p. 5, ¶ 19 & p. 218, p. 226 ln. 2-7; p. 228 ln. 11-15; p. 233 ln. 14-18 (Att. 78).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt 7, p., ¶ 133 & Dkt. 13, p. 145 (Att. 152) ("We are proud to have you as part of ou[r] Multiple Stream Of Income System"). |
| 889. | The Rengalife website said that "Whether you are looking for a few extra dollars or pursuing an opportunity to replace a full time income, Rengalife has the way." | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 154, 155, (Att. 154). |
| 890. | The Rengalife website's list of the "Benefits Of Becoming a Rengalife Member" included | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 154, 155, (Att. 154). |

| | | |
|---|---|---|
| "Life Changing Products," "No Cap On Earning" and "Easiest Pay Plan." | | |
| 891. The Rengalife website said that "As an Executive, you have qualified with your minimum monthly spend of $199.80 and now have access to all 5 Ways to Earn **PTC – Personal team commission** 30% on all your team's spending and sales 10% on the team below spending and sales 5% on the team below spending and sales **PID – Product introduction and** | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife website).<br><br>See also Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, p. 242, ln. 15 – p. 243, ln. 5 (Att. 80). | |

| | | |
|---|---|---|
| **distribution**<br><br>20% commission all product sales that you sell….<br><br>**PTB – Product onetime bonus**<br>Receive 10% commissions for 60 days after the launch of any new Rengalife product.<br><br>**TRT – Travel and Reflection Time**<br>Rengalife offers many levels of travel and trips to reward sales and distribution<br><br>**PTM – Personal Title Movement**<br>An Executive is recognized when an advancement take place to Director.  This occurs when the Executive signs up its first 10 | | |

| | | |
|---|---|---|
| | Executives. This is a one-time only $500 bonus." | |
| 892. | Rengalife advertising promised Directors, Vice Presidents, and Senior Vice Presidents the same Personal team commissions, product introduction and distribution commission, product onetime bonus, and travel and reflection time as Executives. | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife website). |
| 893. | Rengalife advertising represented that the Personal Title Movement bonus when a Director advanced to Vice President by | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife website). |

| | | |
|---|---|---|
| signing up "its first 10 teams members [sic] at the Director level" was $1,200. | | |
| 894. | Rengalife advertising represented that the Personal Title Movement bonus "when the Vice President advances to Senior Vice President by signing up its first 10 Vice Presidents" was $10,000. | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife website). |
| 895. | Jason Cardiff made the following statement in advertising for Rengalife: "Now, at this [Executive] level, you're getting 30 percent commission everything everybody spends | See also Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 114, 123, ln. 12-21 (Att. 147) ("Get Started Today" video). |

| | | |
|---|---|---|
| as an executive. These are all executives at this point. You're an executive as well. They're executives. Okay. So 30 percent on that. They're spending $200 times 10. They're spending $2,000, equals to $600 commission for you. I just made you $600 commission . . . Okay, and I'm going to show you in a couple easy steps how you can get to $12,600 a month." | | |
| 896.  Rengalife advertising claimed that Directors would receive a "minimum monthly" paid | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife website). | |

| | | |
|---|---|---|
| commission of $600; Vice Presidents would receive a "minimum monthly" paid commission of $2,600; per month; and Senior Vice Presidents would receive a "minimum monthly" paid commission of at least $12,600 per month. | | |
| 897. Jason Cardiff described the progression through the Rengalife system as follows: "The next level you're going to go to is you're going to go from executive to director. . . . This means you have | Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 49-50, ¶ 132 & Dkt. 13 p. 135, 139, ln. 1 – p. 140, ln. 5 (Att. 150) ("New Levels video"). | |

| | | |
|---|---|---|
| built a team of ten people . . . . That also locks in your annual salary at a minimum -- a very minimum of $7,200 a year . . . . The next level you're going to go to is to a vice president level. . . . And what this means is everybody on your level that you've got of your ten people has signed up ten people. . . And at a vice president level, . . . you also lock in your annual income at a minimum of over $30,000.  The next level is a senior vice president level. And not | | |

| | | |
|---|---|---|
| everybody is going to get there, but I believe a lot of people will get there. This means you've filled up your first level, your second level, your third level, you've locked in your income at $144,000 a year." | | |

**FTC Response to SUF 865-897:** The Cardiffs do not dispute that their Facebook and Facebook Live videos featuring Jason Cardiff, and the Rengalife website made claims that the Rengalife program was easy, and that members could earn "as much as you want," including as much as $144,000 per year or more.

The Cardiffs' objection that these facts are not material because Rengalife was never an active company fails to address the array of specific evidence submitted by the Commission.  That evidence includes:  Jason Cardiff's many previous statements to the contrary (including statements that Rengalife was "live" and had already had numerous members join) (SUF 863, 868, 884); testimony of Redwood's former Director of Operations that Rengalife was launched in March 2018 (FTC SUF 863, 868, 884); testimony and documentary evidence showing active solicitation and payment by customers, FTC SUF 873-877 (email sent to a Gmail account associated with an FTC undercover identity previously used to make an undercover purchase from Redwood; and the declarations of two

individuals who joined Rengalife and purchased Redwood film strips (FTC SUF 863, 869).

Indeed, the Cardiffs concede that "Rengalife was a program that lasted and was advertised for about 45 days.  Rengalife was started the end of [M]arch and we stopped advertising and the program itself at the beginning of May."  Dkt. 491-1, p. 6, ¶127; p. 11, ¶ 201-205.  They also state that they "ceased developing 'Rengalife' in or about July 2018."  Dkt. 491-1, p. 11 ¶ 201-205; p. 36, ¶ 863.

These facts are relevant to the Cardiffs' liability under Section 5 of the FTC Act for false and unsubstantiated earnings claims associated with the marketing of the Rengalife multi-level marketing program.

> B. *Defendants' Earnings Claims for Rengalife Were False and Unsubstantiated*

| FTC Fact | FTC Citation | Cardiff Admit/Objection |
|---|---|---|
| 898.  Defendants' advertising statements about Rengalife earnings were not based on actual experience. | Walker Dec. (PX-32), p. 21, ¶ 96. | Object, not a material fact. Defendants ceased developing "Rengalife" in or about July, 2018. Dkt. 253-1 Declaration of Jason Cardiff ¶17. |
| 899.  Defendants' advertising statements about Rengalife earnings were theoretical | Walker Dec. (PX-32), p. 21, ¶ 96.  See also J. Cardiff 2nd RFA Resp., p. 8-9, ¶¶ 86- | Rengalife was never an active company. Redwood never made sales or had any customers because |

| | | |
|---|---|---|
| and assumed that members could develop multiple levels of recruits who bought Redwood film strips every month. | 92 (admitting that all they had were simulated data) (Sanger Dec. (PX-52), p. 1, ¶ 5 & p. 17-18 (Att. 2)).<br><br>See also E. Cardiff 2nd RFA Resp., p. 8-9, ¶¶ 81-87 (admitting that all they had were simulated data) (Sanger Dec. (PX-52), p. 2, ¶ 9 & p. 69-70 (Att. 6)). | market research indicated it was not a viable company. Ex. A, Declaration of Jason Cardiff ¶37. Rengalife was a program that lasted and was advertised for about 45 days. Rengalife was started the end of march and we stopped advertising and the program itself at the beginning of May. *Id.* at ¶84.<br>No consumers acquired any membership from Rengalife. *Id.* at ¶85. |
| 900. The FTC submitted the Declaration and accompanying expert report of Stacie A. Bosley, Ph.D. | Dkt. 210 (PX-10, Declaration of Stacie A. Bosley, Ph.D). | |
| 901. The FTC identified Dr. Bosley as an expert in its September 26, 2019 Initial Disclosures. | Sanger Dec. (PX-52), p. 2-3, ¶ 15.<br><br>See also Sanger Dec. (PX-52), p. 2, ¶¶ 13-14 (FTC sent counsel for the Cardiffs copies of its four expert reports in March and April 2019). | |

| | | |
|---|---|---|
| 902. | Dr. Bosley is an Associate Professor of Economics at Hamline University in Saint Paul, Minnesota. She has a Ph.D. in Applied Economics and a BBA in Finance. | Expert Report – Stacie A. Bosley, Ph.D. (hereafter "Bosley Expert Report") (TRO PX-10), Dkt. 210, p. 4, ¶ 1. |
| 903. | Dr. Bosley's teaching at Hamline University focuses on microeconomics, quantitative analysis, managerial economics, and behavioral economics. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 5, ¶ 3. |
| 904. | Dr. Bosley researches multi-level marketing, direct selling, and pyramid schemes, | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 4, ¶ 2. |

| | | |
|---|---|---|
| and she has written multiple academic papers on these topics, ranging from an analysis of direct selling around the world to an examination of the relationship between domestic economic conditions and multi-level marketing activity. | | |
| 905. | Dr. Bosley published a 2015 paper in the Journal of Public Policy and Marketing addressing the intersection of multi-level marketing and pyramid scheme activity, as well as a 2018 paper in the Journal of | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 4, ¶ 2. |

| | | |
|---|---|---|
| | Financial Crime analyzing community-level risk factors associated with pyramid scheme victimization, and she has presented research on these topics at numerous economics conferences around the country. | |
| 906. | Dr. Bosley's recent research projects use economic experiments to explore pyramid scheme victimization and individual risk factors, as well as information disclosure and consumer earnings expectations in multi-level marketing. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 4, ¶ 2. |

| | | |
|---|---|---|
| 907. | Based on her research, training, and knowledge, Dr. Bosley is an expert in multi-level marketing, direct selling, and pyramid schemes. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 4-5, ¶¶ 2-3. |
| 908. | Dr. Bosley's report on the Rengalife multi-level marketing program focused on the period of March and April 2018. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 5, ¶ 4. |
| 909. | In preparing her report, Dr. Bosley reviewed, among other materials, Rengalife.com website content, and videos available on YouTube and Facebook, including documents or audio-visual files | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 6, ¶ 5, and App. B. |

| | | |
|---|---|---|
| available to Rengalife Distributors or recruits, including the firm's Distributor Agreement, Policies & Procedures, and Terms & Conditions as well as training and marketing materials. | | |
| 910. | Rengalife had two entry levels: Junior Executive and Executive. | Sands 3rd Dec. (PX-51), p. 5, ¶ 23 & p. 248, 256, ln. 22-25 (Att. 82) (March 28, 2018 video).<br><br>Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife website). |
| 911. | A Junior Executive could earn a commission products sold to retail customers, | Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, 241, ln. 14-21 (Att. 80) (March 26, 2018 video). |

| | | | |
|---|---|---|---|
| but could not build a team or earn other income or bonuses. | Sands 3rd Dec. (PX-51), p. 5, ¶ 23 & p. 24, 257, ln. 8-14 (Att. 82) (March 28, 2018 video).<br><br>Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife website). | |
| 912. | Jason Cardiff discouraged prospective Rengalife members from joining as Junior Executives because "you do not get to build a team, you do not get to build a team. You do not qualify for trips, you do not qualify for bonuses, you do not qualify for one-time bonuses, expansion bonuses, product bonuses, any additional pay | Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, 241, ln. 13-25 (Att. 80) (March 26, 2018 video).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 114, 120, ln. 9-15 (Att. 147) ("Get Started Today" video) (Junior Executives "earn only one way, not five ways" and "[are] not eligible to build a team."). | |

| | | |
|---|---|---|
| | bonuses that we put out there." | |
| 913. | Jason Cardiff stated in Renglife advertising that "Executive level is the level you want to be at. That's the level where you get – you get . . . 30 percent commission, you get team-building, you get trips, you get everything, right?" | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 114, 120, ln. 22-25 (Att. 147). |
| 914. | Rengalife members were required to purchase $199.80 of Rengalife products each month. | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) ("minimum monthly spend of $199.80") (Rengalife website).<br><br>Walker Dec. (PX-32), p. 20, ¶ 87 (monthly purchase of Redwood film strips required). |

| | | |
|---|---|---|
| | | See also Ziolkowski Dec. (PX-49), p. 1, ¶¶ 4, 6 & p. 6 (Att. 3) ($199.80 in purchases at outset; understood that buying a minimum amount of product was required). See also Sands 1st Dec. (TRO PX-1), Dkt 7, p. 49, ¶ 131 & Dkt. 13, p. 114, 123, ln. 12-21 (Att. 147) (Jason Cardiff stating that executives all spend $200 per month"). | |
| 915. | Rengalife's products were Redwood Scientific Technologies oral film strips, including TBX-FREE, Eupepsia Thin, and Prolongz. | Sands 1st Dec. (TRO PX-1), Dkt 7, p. 50, ¶ 134 & Dkt. 13, p. 151, 152 (Att. 153); p. 154, 155 (Att. 154); p. 163 (Att. 155) ("Rengalife has paired with Redwood Scientific Technologies, the world leader in oral thin film delivery for everyday health and lifestyle issues."). | |
| 916. | The Rengalife | Sands 3rd Dec. (PX-51), | |

| | | | |
|---|---|---|---|
| | program had three levels above Executive: Director, Vice President, and Senior Vice President. | p. 5, ¶ 21 & p. 237, 242, ln. 18 – p. 163, ln. 3 (Att. 80).<br><br>Sands 3rd Dec. (PX-51), p. 7, ¶ 25 & p. 264, 273, ln. 3-6 (Att. 84).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife webpage video). | |
| 917. | Rengalife members would move up to the next level based on the successful recruitment of members in their downline network. | Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, 242, ln. 18 – p. 163, ln. 3 (Att. 80).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 49-50, ¶ 132 & Dkt. 13, p. 139, ln. 1 – p. 140, ln. 9 (Att. 150) (Rengalife "New Levels" video). | |
| 918. | To become a Rengalife Director, an Executive had to recruit 10 people | Sands 3rd Dec. (PX-51), p. 5, ¶ 21 & p. 237, 242, ln. 21-24 (Att. 80). | |

| | | |
|---|---|---|
| | in his or her "downline" network who would buy $199.80 of Redwood Scientific Technologies oral film strips every month. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 12-13, ¶ 14 & Table 1. |
| 919. | To become a Rengalife Vice President, every one of a Director's 10 first-level downline recruits would have to recruit 10 people in his or her own "downline" network who would buy $199.80 of Redwood Scientific Technologies oral film strips every month. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 12-13, ¶ 14 & Table 1. |
| 920. | Becoming a Rengalife Vice | Bosley Expert Report (TRO PX-10), Dkt. 210, |

| | | |
|---|---|---|
| President required a total of 110 downline people in the member's network: 10 in the first level and 100 in the second level. | p. 12-13, ¶ 14 & Table 1. | |
| 921. | To become a Rengalife Senior Vice President, each of the Vice President's 100 second level downline recruits would have to recruit 10 people in his or her own "downline" network who would buy $199.80 of Redwood Scientific Technologies oral film strips every month. | Bosley Expert Report (TRO PX-10), Dkt. 210, p.12-13, ¶ 14 & Table 1. |
| 922. | Becoming a Rengalife Senior Vice President | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 12-13, ¶ 14 & Table 1. |

| | | |
|---|---|---|
| | required having 10 downline Vice Presidents, 100 downline Directors, and 1,000 downline Executives, for a total of 1,110 people in the member's downline network. | |
| 923. | Rengalife was structured as a pay–recruit ten–duplicate model. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 13, ¶ 15. |
| 924. | A pay–recruit ten–duplicate model means each participant meets minimum monthly purchase requirements, recruits ten people to do the same, and teaches those ten recruits to repeat the process. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 13, ¶ 15. |
| 925. | Rengalife training | Bosley Expert Report |

| | | | |
|---|---|---|---|
| | and marketing materials consistently instructed potential and current members to focus on recruiting new members. | (TRO PX-10), Dkt. 210, p. 8, ¶ 10. | |
| 926. | Rengalife training and marketing materials claimed guaranteed minimum income levels for meeting recruitment targets. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 8, ¶ 10. | |
| 927. | Commissions from building your team were the most important source of income in the Rengalife program. | Sands 3rd Dec. (PX-51), p. 5, ¶ 19 & p. 218, 228, ln. 19 – p. 229, ln. 12; p. 230, ln. 8-9 ("five ways to eearn include you build your team, which is money." (Att. 78) (March 21, 2018 video).<br><br>Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 50, ¶ 134 & Dkt. 13, p. 167 (Att. 156) (Rengalife webpage | |

| | | |
|---|---|---|
| | | video, citing "minimum monthly paid commissions for Directors, Vice Presidents, and Senior Vice Presidents).<br><br>See also Sands 1st Dec. (TRO PX-1), Dkt. 7, p. 49-50, ¶ 132 & Dkt. 13 p. 135, 139, ln. 1 – p. 140, ln. 5 (Att. 150) (guaranteed minimum income is from team building). | |
| 928. | It is Dr. Bosley's unrebutted expert opinion that "Rengalife earnings claims are based almost exclusively on Distributor purchases (not sales to Customers) and advancement is driven by the number of | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 31, ¶ 34; p. 34, ¶ 37. | |

| | | |
|---|---|---|
| recruited Distributors." | | |
| 929. | It is Dr. Bosley's unrebutted expert opinion that Rengalife advancement "is driven by the number of recruited Distributors." | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 31, ¶ 34; see also p. 8, ¶ 10. |
| 930. | It is Dr. Bosley's unrebutted expert opinion that the rewards for selling Redwood products were so dwarfed by recruitment-based rewards as to be effectively meaningless in the context of the Rengalife system as a whole. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 8, ¶ 10. |
| 931. | It is Dr. Bosley's unrebutted expert opinion that the promised income | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 17, ¶ 17; p. 28, ¶ 30; p. 34, ¶ 37. |

| | | |
|---|---|---|
| rewards for Rengalife members would be realized only if successful recruitment continued indefinitely. | | |
| 932. It is Dr. Bosley's unrebutted expert opinion that by design and structure, a program in which earnings are dependent on recruiting others is a system where the vast majority of members cannot recoup their personal investment. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 6, ¶ 7; p.7, ¶ 8. | |
| 933. It is Dr. Bosley's unrebutted expert opinion that the vast majority of Rengalife participants would | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 33-34, ¶ 37. | |

| | | |
|---|---|---|
| | not be expected to earn enough to cover their own investment. | |
| 934. | It is Dr. Bosley's unrebutted expert opinion that at any point in time, the overwhelming majority of Rengalife members would be in a loss position overall. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 27-28, ¶ 30; p. 28-29, ¶ 30 & Table 2; and p. 34, ¶ 37. |
| 935. | It is Dr. Bosley's unrebutted expert opinion that Rengalife's program was effectively an endless recruitment chain that misrepresented income potential and would deliver losses to the majority of participants. | Bosley Expert Report (TRO PX-10), Dkt. 210, p. 31, ¶ 33. |
| 936. | It is Dr. Bosley's | Bosley Expert Report |

| | | |
|---|---|---|
| unrebutted expert opinion that earning claims for the Rengalife program were false or unsupported. | (TRO PX-10), Dkt. 210, p. 27-28, ¶ 30; p. 34, ¶ 37. | |
| 937. The Cardiffs did not submit any expert report disagreeing with Dr. Bosley's conclusions about Rengalife or supporting the Rengalife claims challenged in this proceeding. | Sanger Dec. (PX-52), p. 3, ¶ 19. | |

**FTC Response to SUF 898-937**:  The Cardiffs do not dispute that their advertising statements about Rengalife earnings were not based on actual experience, but were theoretical and assumed that members could develop multiple levels of recruits who bought Redwood film strips every month.  Nor do they dispute the analysis and conclusions of the FTC's multi-level marketing expert, Dr. Stacie Bosley (FTC SUF 928-936).

The Cardiffs' objection that these are not material facts because Rengalife "was never an active company" fails to address the array of specific evidence submitted by the Commission.  That evidence includes:  Jason Cardiff's many explicit previous statements to the contrary (including statements that

Rengalife was "live" and had already had numerous members join) (SUF 863, 868, 884); testimony of Redwood's former Director of Operations that Rengalife was launched in March 2018 (FTC SUF 863, 868, 884); testimony and documentary evidence showing active solicitation and payment by customers, FTC SUF 873-877 (email sent to a Gmail account associated with an FTC undercover identity previously used to make an undercover purchase from Redwood; and the declarations of two individuals who joined Rengalife and purchased Redwood film strips through the program (FTC SUF 863, 869).

Indeed, the Cardiffs concede that "Rengalife was a program that lasted and was advertised for about 45 days. Rengalife was started the end of [M]arch and we stopped advertising and the program itself at the beginning of May." Dkt. 491-1, p. 6, ¶127; p. 11, ¶ 201-205. They also state that they "ceased developing 'Rengalife' in or about July 2018." Dkt. 491-1, p. 11 ¶ 201-205; p. 36, ¶ 863.

These facts are relevant to the Cardiffs' liability for injunctive and monetary relief under Section 5 of the FTC Act for false and unsubstantiated earnings claims associated with the marketing of the Rengalife multi-level marketing program.

## XII. FTC's Response to Additional Material Facts In Cardiff Defendants' Statement of Genuine Disputes

| Cardiffs' Additional Material Fact | FTC Response to Cardiffs' Additional Material Fact | FTC Response Citation |
|---|---|---|
| "Defendants stopped its [sic] marketing | **FTC SUF 938**. Defendants continued advertising TBX-FREE, Eupepsia Thin, and | Dkt. 441-1, p. 6, ¶ 21 (Cardiff Defendants admit they delivered ringless |

| | | |
|---|---|---|
| campaigns in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Declaration of Jason Cardiff ¶¶7, 9, and 46-53." [and close variants, including variants citing January 25, 2018 and January 25, 2018 as the cut-off date] | Prolongz after February 2018. | voicemails to consumers through July 2018).<br><br>Dkt. 428-2, p. 5, ¶ 16 (In September 2018, Redwood sales representatives began using an autodialer to call old customer lists. Redwood employee Sarah Garcia was instructed to try to "resell film strip products to former customers or interest them in Redwood's new products, including Cloverstrips."<br><br>See also SUFs 939-941 (websites for TBX-FREE, Eupepsia Thin, and Prolongz were active and captured by Internet Archive through at least August 29, 2018, August 9, 2018, and October 8, 2018, respectively).<br><br>See also Sands Dec., p. 1, ¶ 2 & p. 13 (Att. 3): On April 30, 2018, Julie Green sent an email to |

| | | |
|---|---|---|
| | | Danielle Cadiz with the subject line, "Screenshots of prolongz (current site)." The content of the email contained the URL https://prolongz.com/v1/. |
| | | |
| | | See also Sands Dec., p. 1, ¶ 2 & p. 23 (Att. 6): On April 6 and 7, 2018, Jason Cardiff and Brent Jay of Brokerage Advisory, LLC exchanged emails about Rengalife. Jason Cardiff's initial email stated, "Since our official launch date on 3/26/2018 we have had over 200 individuals become Rengalife members!" The next day, Jason Cardiff told Brent Jay, "We signed up 9 new reps today." |
| | | |
| | | See also Sands Decl., p. 1, ¶ 2 & p. 14-15 (Att. 4): On April 12, 2018, Redwood's Director of Operations emailed Brent |

| | | |
|---|---|---|
| | | Jay and Jason Cardiff a draft Redwood Scientific Technologies Board Resolution that provided for payment to Mr. Jay's Brokerage Advisory Trust of 15 million shares of Redwood stock in exchange for "help with consulting and marketing strategies." |
| | | That same day, Jason Cardiff forwarded a Redwood press release to Brent Jay, saying, "It's out… Web site updated as well." *Id.* at p. 26-27 (Att. 7). |
| | | The press release, dated April 12, 2018, contained the headline: "Redwood Scientific Technologies (RSCI), the global leader in oral thin film delivery for over the counter drugs, has started the early stages of exploration for delivery prescription opioids in…" |

Sands Dec., p. 1-2, ¶ 3 & p. 28 (Att. 8).

The April 12, 2018 press release contained the following statement, among others: "RSCI currently has 12 products in the market and is growing its suite faster than planned, with plans to have prescription-based medications in the market by the first quarter of 2019." *Id.* at p. 3.

See also Sands Dec. p. 1, ¶ 2 & p. 16, 17 (Att. 5): On April 26, 2018, Julie Green sent an email to Jason Cardiff and Brent Jay containing "statistics from adestra our email marketing tool." The statistics show that Redwood sent over 1.3 million emails advertising TBX-FREE, Eupepsia Thin, and Product X from April 1, 2018 to April 26, 2018. Julie

| | | |
|---|---|---|
| | | Green stated that Redwood's "click through rate" was 34% (TBX-FREE), 43% (Epep), and 23% (Product X). Julie Green's email also describes the order fulfillment process: "orders placed in CRM via checkout form on website, nightly batch sent to shipstation (our fulfillment) from our CRM at 4am with order and shipping details, order processed and shipped via usps." |
| | | See also Sands Dec., p. 2, ¶ 4 & p. 36 (Att. 9): Redwood released another press release on May 14, 2018 with the headline: "Redwood Scientific Technologies, Inc. Will Up-list Trading on OTC Market." |
| | | The May 14, 2018 press release contained the |

| | | following statements, among others: "Jason Cardiff, RSCI Founder and President commented, 'We look forward to being a fully reporting and transparent company for our shareholders as well as the public.' Jason also stated that, 'As we start distribution with the nation's largest national pharmacy chain, being a fully reporting company gives us a much greater level of confidence to our partners and shareholders.'" *Id.* at p. 36.

See also Sands Dec., p. 1, ¶ 2 & p. 10 (Att. 1): Redwood maintained a spreadsheet tracking advertising expenses, promotions, and sales on Amazon for the period March 2018-August 2018. The sheet for July 2018, e.g., |

| | | shows $19,167.36 in sales, a daily budget for "July Sponshor [sic] Ads" of $260.00, and a "spend" of $392.36. "June Payments to Zion" appears in red text below the monthly sales total. The sheet for August 2018, e.g., shows "July Payments to First Western Trust" in the amounts of $5,940.02 (August 10) and $2,200.75 (August 24). |
|---|---|---|
| "Defendants stopped marketing and changed the claims that were made on their [TBX-FREE] website[] in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53." | **FTC SUF 939**. Defendants continued to advertise TBX-FREE on the website ordertbxfree.com at least as late as August 29, 2018 and that website contained the following claims, among others:<br><br>The Breakthrough Stop Smoking Aid<br><br>The Only Stop Smoking Aid With Scientifically Proven Thin Film Technology! | Sands Dec., p. 3, ¶ 7 & p. 51-55 (Att. 12). |

Proven to help smokers quit their addiction with an 88% success rate!

Get TBX-FREE And Say Goodbye To Your Smoking Addiction!
Stop Wasting Money On Nicotine Gum And Patches That Don't Work!

Nicotine gum and other stop smoking aids only prolong your addiction by giving you reduced amounts of nicotine. TBX-FREE is nicotine-free and FDA registered for maximum safety and effectiveness.

Finally Quit For Good With TBX-FREE!

88% Success Rate in clinical trials!

Redwood Scientific

| | | |
|---|---|---|
| | Technologies is bringing to you TBX-FREE; the breakthrough stop smoking aid that is allowing people that have been addicted to smoking for years to finally quit and never look back. | |
| "Defendants stopped marketing and changed the claims that were made on their [Eupepsia Thin] website[] in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53." | **FTC SUF 940**. Defendants continued to advertise Eupepsia Thin on the website controltheweight.com at least as late as August 9, 2018 and the website contained the following claims, among others:<br><br>[image of Made in USA seal]<br><br>April Lost 30 lbs; Jon Lost 90 lbs; Sara Lost 27 lbs<br><br>No diets, no giving up food<br><br>"I'm half the size I used to be" – Karen<br><br>"I lost 45lbs. I went from 230lbs back down to 185lbs." | Dkt. 434-1, p. 6 (¶18), 188-217 (Att. 76). |

| | – Danny | |
| | | |
| | Reach your weight loss goals | |
| "Defendants stopped marketing and changed the claims that were made on their [Prolongz] website[] in or about February, 2018. Dkt. 429-1 PX 38 at 101-102; Ex. A, Jason Cardiff Declaration ¶¶7, 9, and 46-53." | **FTC SUF 941**.  Defendants continued to advertise Prolongz on the websites getprolongz.com, amilonger.com, and prolongz.com/v1 at least as late as August 6, 2018, August 18, 2018, and October 8, 2018, respectively, and the websites contained the following claims, among others: | Sands Dec., p. 2-3, ¶ 5 & p. 38-41 (Att. 10) (getprolongz.com); p. 3, ¶ 6 & p. 42-50 (Att. 11) (amilonger.com); p. 3, ¶ 8 & p. 56-64 (Att. 13) (prolongz.com/v1). |
| | ORDER NOW Prolongz is a [sic] FDA registered OTC homeopathic drug which helps in the prevention of Premature Ejaculation (PE). It is a first of its kind product which uses oral (sublingual) dissolvable strip delivery technology for the treatment of PE. | |
| | -Increased Ejaculation | |

Control

-Medically recommended

LONGER LASTING SEX!

Proven to effectively increase the length in Sex for over 97% of Thousands of Men who have tried Prolongz.

Longer lasting sex is achievable. Prolongz will make you firmer and last longer.

AS SEEN ON NATIONAL TELEVISION
PRESS PLAY TO VIEW
Ryan W.
"I wouldn't be able to prolong it… AMI has given the longevity."

Dated: September 21, 2020        s/ Elizabeth Jones Sanger
                                 ELIZABETH JONES SANGER
                                 esanger@ftc.gov; (202) 326-2757
                                 JAMES A. PRUNTY

jprunty@ftc.gov; (202) 326-2438
EDWIN RODRIGUEZ
erodriguez@ftc.gov; (202) 326-3147
SHIRA D. MODELL
smodell@ftc.gov; (202) 326-3116
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Fax: (202) 326-3259

STACY PROCTER (Local Counsel)
sprocter@ftc.gov; (310) 824-4300
Federal Trade Commission
10990 Wilshire Blvd., Suite 400
Los Angeles, CA 90024
Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION