SPERTUS, LANDES & UMHOFER, LLP
James W. Spertus (SBN 159825)
M. Anthony Brown (SBN 243848)
1990 South Bundy Drive, Suite 705
Los Angeles, California 90025
Telephone: (310) 826-4700
Facsimile: (310) 826-4711
jspertus@spertuslaw.com
tbrown@spertuslaw.com

Attorneys for Non-Party
True Pharmastrip, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| Federal Trade Commission, | Case No. ED 5:18-cv-02104-DMG-PLAx |
|---|---|
| Plaintiff, | |
| v. | **NON-PARTY TRUE PHARMASTRIP INC.'S RESPONSE TO RECEIVER'S FINAL ACCOUNTING (DKT. 654, 659)** |
| Jason Cardiff, et al., | |
| Defendants. | Date: TBD<br>Time: TBD<br>Place: Courtroom 8C<br>        Hon. Dolly M. Gee |

TPI'S RESPONSE TO RECEIVER'S FINAL ACCOUNTING

# TABLE OF CONTENTS

**PAGE**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

I.  INTRODUCTION ................................................................................... 1

II. THE COURT DID NOT AUTHORIZE USING TPI'S FUNDS FOR FEES THAT COULD BE COVERED BY CARDIFF ASSETS .................................................................................................. 4

III. USING TPI'S FUNDS TO PAY THE RECEIVER'S FEES WOULD NOT BE EQUITABLE ............................................................. 6

IV. THE RECEIVER'S PROPOSED ALLOCATION OF THE DEPOSITED FUNDS IS UNSUPPORTED ................................................ 8

V. THERE IS NO BASIS FOR INTERPLEADING THE DEPOSITED FUNDS IN STATE COURT ................................................................... 10

VI. CONCLUSION ..................................................................................... 11

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*City of Morgan Hill v. Brown*,
  71 Cal. App. 4th 1114 (1999) .................................................................................3, 10

*Westamerica Bank v. City of Berkeley*,
  201 Cal. App. 4th 598 (2011) ..................................................................................3, 11

**STATUTES**

Cal. Code Civ. Proc. § 386(b) ..............................................................................................10

**RULES**

Fed. R. Civ. P. 45(d)(2)(B) .....................................................................................................7

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Non-party True Pharmastrip, Inc. ("TPI") has been facing moving targets since its first appearance in this case in August 2019 when it agreed voluntarily to move $1.2 million of its investment capital from Canada to the United States to moot FTC arguments about the possible dissipation of Cardiff assets. TPI expected to intervene, quickly establish its ownership of the funds, and then have the funds returned.[1] Instead, TPI had to wait two years for that opportunity, at which point the FTC perfunctorily abandoned its prior argument that Jason Cardiff owned the funds. Now, rather than have funds that no one disputes belong to TPI returned, the Receiver recommends that a portion of the Deposited Funds be given to the Cardiffs for the benefit of a Redwood Scientific creditor. The Receiver's recommendation is not neutral, is not equitable, is not lawful, and is not in compliance with the Court's prior orders.

On August 5, 2021, the Court ruled that "[i]n recognition of the Cardiffs' wrongdoing and summary judgment entered against them on 16 counts under the FTC Act, ROSCA, and other statutes and rules, *any funds that are owned by the Cardiffs should be applied first to account for Receivership fees*." (Dkt. 640 at 3 (emphasis added).) The Court asked the Receiver to make "recommendations for disbursal of *the remaining assets* in the Receivership Estate taking into account the Court's prior May 24, 2021 and August 5, 2021 Orders [Doc. ## 598, 640]."

---

[1] TPI informed the Court of its intention to intervene before depositing the funds. (Dkt. 212.) TPI then transferred the Deposited Funds to the Receiver on August 27, 2019 and moved to intervene on October 18, 2019. (Dkt. 231.) On October 29, 2019, the Court simultaneously found Jacques Poujade in contempt for not depositing the funds sooner and purged that contempt by finding that the funds had been deposited with the Receiver on August 27, 2019. (Dkt. 238 ("This transfer has already been accomplished.").) On January 10, 2020, the Court then denied TPI's motion to intervene as untimely. (Dkt. 252.)

(Dkt. 650 at 1 (emphasis added).) The Receiver's final accounting establishes that it holds sufficient Cardiff assets to pay its fees in full. Nevertheless, the Receiver does not recommend returning the Deposited Funds to TPI. Instead, the Receiver argues, for the first time, that some "Poujade money" should be "reallocated" to increase the Cardiffs' assets. Specifically, the Receiver wants to take $235,846.76 from TPI's Deposited Funds to pay Receiver fees that have already been paid with Cardiff assets, leaving only $971,468.90 of the Deposited Funds remaining. (Dkt. 654 at 2; Dkt. 659 at 8.) The Receiver concedes that this reallocation is designed "primarily [to] benefit the non-Cardiff creditors of Redwood" (Dkt. 659 at 4, n.2)—in particular, to benefit non-party Inter/Media, which holds a 2017 state court judgment against the Cardiffs and some of the entity defendants for unpaid advertising invoices. In effect, the Receiver wants to implement the post-judgment creditor claims process that this Court has already rejected. (Dkt. 640 at 4.)

As an agent of the Court, the Receiver is supposed to follow the Court's orders and remain neutral. (Dkt. 29 at 19 ("The Receiver shall be solely the agent of this Court in acting as Receiver under this Order.").) However, the Receiver's proposal— designed to aid a third-party creditor's collection efforts against the Cardiffs—is not what the Court ordered and is not neutral. There is no "Poujade money" on deposit with the Receiver. The Deposited Funds belong to non-party TPI, and the only party or non-party ever to have claimed otherwise was the FTC, which ultimately abandoned that claim.[2] The Court has already

---

[2] The Court is familiar with the facts and evidence establishing TPI's ownership of the Deposited Funds: "The Court has reviewed the evidentiary record with regard to the question of ownership of the Deposited Funds and makes the preliminary findings that TPI is a corporate entity with a duly constituted board of directors, the Deposited Funds were raised from third-party investors, and neither Jason Cardiff nor Eunjung Cardiff own the funds, though Jason previously did have access to and control over the funds." (Dkt. 640 at 3, n.1).

1  ordered that any available Cardiff assets should be used to pay the Receiver's
2  remaining fees and, unless there are insufficient Cardiff assets to pay all of the
3  Receiver's fees, the Receiver will distribute the Deposited Funds back to TPI:
4  "After resolution of the Receiver's fees, the remainder of the Deposited Funds
5  will be released to TPI . . . ."  (Dkt. 640 at 3.)
6        Separately, the Receiver's request to interplead the Deposited Funds in a
7  state court action—forcing people with as-yet unasserted claims against TPI, a
8  Canadian company, to assert those claims immediately in California—is neither
9  lawful nor equitable.  The Receiver faces no possible future liability from either
10 TPI or a potential TPI creditor by complying with an order from this Court to
11 distribute the Deposited Funds back to TPI.  The Receiver concedes as much by
12 acknowledging that TPI investors' claims "do not seem to involve any acts or
13 communications by the Receiver" and "would not be a claim against the
14 receivership estate." (Dkt. 659 at 9.)  With this key fact admitted, the Receiver
15 cannot interplead the Deposited Funds in state court and is leading this Court to
16 commit error.  "The right to the remedy of interpleader is founded on the
17 consideration that a person is threatened not just with double liability, but with
18 double vexation in respect to one liability." *Westamerica Bank v. City of*
19 *Berkeley*, 201 Cal. App. 4th 598, 608 (2011).  Thus, an interpleader action may
20 not be maintained "upon the mere pretext or suspicion of double vexation; [the
21 plaintiff] must allege facts showing a reasonable probability of double vexation."
22 *Id.* (citing *City of Morgan Hill v. Brown,* 71 Cal. App. 4th 1114, 1125-1126
23 (1999)).  It would be contrary to California law for the Court to authorize an
24 interpleader action when it is so clear that the Receiver faces no liability to future
25 claims by TPI investors against TPI.  Nor would it be equitable to force investors
26 to assert their claims now in a California state court, or to foist those claims upon
27 a Superior Court judge unfamiliar with the long and contentious history of this
28 case.  Finally, it would not be equitable to force TPI, a nonparty to this action

which has incurred enormous costs complying with all of the Court's orders for the past two years, to start the process all over again in a state court proceeding before an unfamiliar judge.

Because the Cardiffs have plenty of assets to pay all of the Receiver's outstanding fees, the only equitable next step is for the Court to order the Receiver to distribute all the Deposited Funds ($1.2 million) back to TPI.

## II. THE COURT DID NOT AUTHORIZE USING TPI'S FUNDS FOR FEES THAT COULD BE COVERED BY CARDIFF ASSETS

With the Receiver's final accounting, the Court ordered the Receiver to provide "recommendations for disbursal of the remaining assets in the Receivership Estate, taking into account the Court's prior May 24, 2021 and August 5, 2021 Orders [Doc. ## 598, 640]." (Dkt. 650 at 1.) In the Court's August 5, 2021 Order, the Court provided clear directions about how to conduct that accounting:

> In recognition of the Cardiffs' wrongdoing and summary judgment entered against them on 16 counts under the FTC Act, ROSCA, and other statutes and rules, *any funds that are owned by the Cardiffs should be applied first to account for Receivership fees*. This includes whatever remains of Jason Cardiff's Biztank Group, LLC bank account's funds. *Then* with respect to third parties' frozen assets held as Receivership Property, as a matter of equity some of the Deposited Funds claimed by TPI should be allocated to Receivership fees related to litigation over the Deposited Funds, just as VPL's frozen funds were allocated to Receivership fees related to litigation over VPL.

(Dkt. 640 at 3 (emphasis added).) The Court ordered the Receiver to pay any remaining fees from Cardiff assets first and then, only if there were remaining fees due, to turn to third-party assets under principles of equity.

The Receiver did not follow the Court's directions. Instead, the Receiver has proposed retroactively allocating $235,846.76 of TPI's Deposited Funds to historic fees already paid with Cardiff assets. The Receiver claims this proposal was "based on this Court's prior order [Doc. #636], concerning the fees caused to the receivership estate due to the Poujade and Cardiff prior contempts."

4
TPI'S RESPONSE TO RECEIVER'S FINAL ACCOUNTING

(Dkt. 659 at 4; *see also id.* at 8 ("The Court asked the Receiver to break out the fees caused to the receivership estate by the contemptuous behavior of Poujade which were the subject of a purge payment to the Receiver by True Pharmastrip ('TPI') [Doc. #636].")  But the document cited by the Receiver—Docket No. 636—is an order entered on July 20, 2021, *not* one of the two orders this Court asked the Receiver to follow when preparing the final accounting.

       The final accounting ignores other aspects of the Court's order as well.  The Receiver admits that the sole purpose of the combined reallocation and interpleader proposal is to "benefit the non-Cardiff creditors of Redwood" by ensuring that there are more Cardiff assets available for them.  (Dkt. 659 at 4, n.2.)  The Receiver explains its rationale as follows:  "Rather than handing that money to Redwood, and forcing Redwood creditors to chase money that is likely to be sequestered, spent, or otherwise dissipated, Inter/Media, Redwood, Cardiff, VPL, and any other claimant against Redwood would be able to assert such secured or unsecured claims in a state court interpleader action while that court holds the money."  (Dkt. 659 at 8.)  In effect, the Receiver is trying to use an interpleader action to implement a post-judgment creditor claims process, with Inter/Media's state court money judgment against the Cardiffs in mind.  But the Court has already rejected this idea:  "Because third-party creditors may seek remedies *directly against the Cardiffs*, the Receiver need not account for the claims of Inter/Media, Auctus, Amy Cardiff, or any other third-party creditor as they will have other formal avenues of redress available to them."  (Dkt. 640 at 4 (emphasis added).)

       The Receiver's proposal ignores the Court's order that "any funds that are owned by the Cardiffs should be applied first to account for Receivership fees" (Dkt. 640 at 3) and the Court's decision not to implement a post-judgment claims process for Cardiff creditors.  Accordingly, the Receiver's proposal fails to comply with the Court's orders and should be rejected.

## III. USING TPI'S FUNDS TO PAY THE RECEIVER'S FEES WOULD NOT BE EQUITABLE

TPI also challenges the very notion underlying the Receiver's proposed reallocation—namely, that, because Mr. Poujade was held in contempt, equity requires the reallocation of non-party TPI's money to pay the Receiver's fees incurred when litigating the contempt motion.

As an initial matter, the contempt proceedings were unnecessary for their stated purposes: to enforce the TRO/PI's asset freeze. The FTC's contempt motion alleged that, in violation of the TRO's asset freeze, Mr. Poujade secretly channeled TPI money through Alphatech to Jason Cardiff. But Mr. Poujade and Jason Cardiff had already voluntarily disclosed that information to the Receiver and FTC long before the contempt motion was filed.

In February 2019, Cardiff sent an email to the FTC describing the loan, attaching copies of the promissory note with Alphatech, and providing a detailed schedule of $71,013.40 in expenses paid by Alphatech. (Dkt. 157-1 at 9-10, 112-115.) Mr. Poujade also confirmed the loan by email to the FTC in early March 2019. (Dkt. 148-8 at 2; Dkt. 153-3 at 3). Mr. Poujade's counsel twice expressly asked the FTC whether the Alphatech loan violated the TRO. (Dkt. 148-8 at 2; Dkt. 153-3 at 2-3.) The FTC never responded. (*Id.*) The FTC had already subpoenaed Alphatech's bank records in February 2019 (Dkt. 134-6, ¶¶ 14-17); and Mr. Poujade produced TPI's bank statements to the FTC in May 2019. (Dkt. 134-6, ¶ 19; Dkt. 153-3, ¶ 13).[3] Thus, before the contempt motion was filed, both the Receiver and FTC knew about the Alphatech loan and had all the bank records necessary to trace the source of the funds used for that loan. In addition, Mr. Poujade's counsel was actively, openly, voluntarily,

---

[3] Because the FTC already had Alphatech's bank account records, the FTC agreed that Mr. Poujade was not required to produce those, too. (Dkt. 134-6, ¶¶ 14-19; Dkt. 153-3, ¶¶ 3, 5.)

and responsibly seeking the FTC's guidance about whether the loan complied with the TRO. These facts show that the FTC's and Receiver's pursuit of a contempt order to enforce the TRO's asset freeze was both precipitous and unnecessary.[4] By mid-June 2017, when the contempt motion was filed, the only issue that required resolution by the Court was whether Jason Cardiff, as a historical signor on TPI's Canadian bank account, had sufficient "control" over the account to justify freezing it under a TRO signed by a United States District Court Judge. That narrow legal issue easily could have been presented to the Court on stipulated facts and resolved at a short hearing. Fees incurred by the Receiver to litigate the contempt motion were not generated by any need to enforce the TRO's asset freeze but instead by the FTC's and the Receiver's decision to prosecute a contempt order for tactical advantage.

      Just as importantly, TPI is not Jacques Poujade or Jason Cardiff. Even if the Court concluded that Jason Cardiff's authority to sign on then-startup TPI's first bank account in Canada brought that account within the scope of the TRO, the fact remains that TPI voluntarily took steps to prevent those identified assets from being dissipated. Now that it has clearly been determined that those assets

---

[4] The contempt motion also circumvented the procedural safeguards of Federal Rule of Civil Procedure 45(d)(2)(B) by alleging that Mr. Poujade violated the TRO's expedited discovery provisions by not producing documents in response to certain document requests to which he served timely objections. Ultimately, Mr. Poujade was compelled to comply with the subpoena. He gathered and reviewed thousands of TPI documents, produced 20,000 pages of material while logging 1,615 documents on his privilege log, and compiled a detailed 992-page accounting backed by receipts and other evidence so that the FTC could trace all of TPI's and Alphatech's assets from July 31, 2018, through October 31, 2019 (Dkt. 238 at 5)—all without Mr. Poujade's timely objections to the scope of the FTC's subpoena ever being heard. While not one page of the discovery Mr. Poujade was compelled to produce was relevant to a single allegation by the FTC in its Complaint against the Cardiffs, the cost of this aspect of the contempt proceedings for Mr. Poujade and TPI has been astronomical.

do not belong and never did belong to Jason Cardiff, and given that TPI was never alleged to have participated in the consumer fraud charged in the Complaint, it would be wholly inequitable to make TPI, a third party, pay for the misconduct of a defendant to maximize assets for the benefit of that defendants' creditors.

## IV.   THE RECEIVER'S PROPOSED ALLOCATION OF THE DEPOSITED FUNDS IS UNSUPPORTED

The final accounting's calculation of the amount of fees incurred during litigation over the Deposited Funds in the contempt proceedings is unsupported. The Receiver claims that it incurred $235,846.76 in such fees, but nearly half of the fees included in that figure were incurred *after* the contempt motion was resolved and, therefore, cannot be attributed to litigation over the Deposited Funds, even if TPI assets could somehow be used to pay a Receiver's fees incurred as a result of conduct by third parties.

The Receiver proposes reallocating from the Deposited Funds the following amount of expenses and attorney fees for the following time periods:

| Date Range | Receiver Expenses | Receiver Attorney Fees |
|---|---|---|
| 10/1/18 – 9/30/19 | $21,195.90 | $103,128.50 |
| 10/1/19 – 6/30/20 | $13,689.90 | $84,376.50 |
| 7/1/19 – 10/31/20 | $205.20 | $13,994.00 |
| 11/1/20 – 4/21/21 | $68.40 | $935.50 |
| 4/22/21 – 8/31/21 | $5,095.80 | $17,783.50 |

(Dkt. 659-2 at 4-5.)  In other words, the Receiver is claiming that $111,522.36—nearly half of the $235,846.76 in fees that the Receiver seeks to reallocate—was incurred after October 2019.  These fees cannot have been incurred in connection with litigation to seize the Deposited Funds because the contempt motion was

8

TPI'S RESPONSE TO RECEIVER'S FINAL ACCOUNTING

resolved on August 27, 2019.  These fees, which were not incurred when litigating over Deposited Funds, should not be taxed against those funds.

Even for the three-month period when the contempt motion was being litigated, the final accounting's fees are not supported.  In the Receiver's third application for fees—which covers all fees incurred from July 1, 2019 through September 30, 2019[5]—the Receiver claimed that it had incurred $124,324.40 in fees and expenses.  (Dkt. 214.)  The Receiver's final accounting for the same period proposes allocating a total of $121,246.40 in fees to Mr. Poujade, that is, nearly all the fees it claims for this period.  (Dkt. 659-2 at 4.)  However, the declaration of counsel for the Receiver's third fee application clearly shows that some of the Receiver's fees were incurred for tasks other than litigating over the Deposited Funds.  (*See* Dkt. 276; Dkt. 276-1 at 8-9.)

Finally, even if the Court authorized *some* reallocation of funds, which it should not, the amount the Receiver proposes reallocating would be inequitable because, as just discussed, it calls for TPI to cover nearly *all* of the Receiver's litigation expenses.  Again, TPI was not involved in the contempt proceedings, and the FTC's motion was also directed to Jason Cardiff for his role in failing to disclose that he was once a signatory on TPI's bank account.  (Dkt. 134-2.)

---

[5]  According to the Receiver's previous filings, this appears to be the only fee period during which the Receiver incurred fees for litigating over the Deposited Funds.  The Receiver's first and second fee applications, covering the period from October 10, 2018 through June 30, 2019, sought fees totaling $427,680.22.  (*See* Dkt. 81; Dkt. 214.)  That is exactly the amount of fees that the Receiver's final accounting attributes to the Cardiffs for the period from October 18, 2018 through September 30, 2018.  (Dkt. 659-2 at 4.)  This suggests that Receiver fees incurred for the first two fee periods (October 10, 2018 through June 30, 2019) were not for litigation over the Deposited Funds.  The Receiver's applications for fees incurred after October 1, 2019, are almost entirely for work unrelated to the Deposited Funds or litigation to seize them.  (Dkt. 479-1 at 6-7, 10-11; Dkt. 537 at 6-8 & 11-13; Dkt. 580-1 at 3-4 & 11-12.)

9
TPI'S RESPONSE TO RECEIVER'S FINAL ACCOUNTING

## V. THERE IS NO BASIS FOR INTERPLEADING THE DEPOSITED FUNDS IN STATE COURT

Finally, the Receiver argues for permission to interplead the Deposited Funds in a California state court action so that TPI investors can pursue whatever presently unasserted claims they may someday choose to assert. Such an order would be unlawful because the Receiver acknowledges that any claims TPI investors may have "do not seem to involve any acts or communications by the Receiver" and "would not be a claim against the receivership estate." (Dkt. 659 at 9.) "Rather, the holders of the Debenture Claims seem to be angling to receive the Surplus Funds in the Receivership estate, if any, otherwise claimed by Poujade/TPI." (*Id.*) These circumstances cannot support an interpleader action.

An interpleader action is appropriate only when a person holding property in which others claim competing interests faces liability to more than one of the claimants. California Code of Civil Procedure section 386(b), which governs stat interpleader actions, provides in relevant part: "Any person, firm . . . or other entity against whom double or multiple claims are made, or may be made, by two or more persons, which are such that they may give rise to double or multiple liability, may bring an action against the claimants to compel them to interplead and litigate their several claims." Cal. Code Civ. Proc. § 386(b). "[T]he purpose of interpleader is to prevent a multiplicity of suits and double vexation." *City of Morgan Hill v. Brown*, 71 Cal. App. 4th 1114, 1125 (1999); *see also* 4 Witkin, Cal. Proc. 5th Pleadings § 237 (explaining that an interpleader is "an equitable proceeding by which an obligor who is a mere stakeholder may compel conflicting claimants to money or property to interplead and litigate the claims among themselves *instead of separately against the obligor*" (emphasis added)). For this reason, "[a]n interpleader action . . . may not be maintained 'upon the mere pretext or suspicion of double vexation; [the plaintiff] must allege facts showing a reasonable probability of double vexation' [citation], or a

10

TPI'S RESPONSE TO RECEIVER'S FINAL ACCOUNTING

'valid threat of double vexation.'" *Westamerica Bank v. City of Berkeley*, 201 Cal. App. 4th 598, 608 (2011). The Receiver cannot be held liable to any potential claimants to the Deposited Funds by following an order from the Court to distribute those funds to TPI. Because the Receiver does not face potential liability for competing claims, it cannot hope to sustain an interpleader action in state court. Authorizing the Receiver, besides being contrary to law, would be a futile waste of the parties' and the court's resources.

## VI. CONCLUSION

For the foregoing reasons, TPI respectfully requests that the Court order the Receiver to distribute the full amount of the Deposited Funds ($1.2 million) back to TPI through undersigned counsel.

Dated: September 27, 2021        SPERTUS, LANDES & UMHOFER, LLP

By:   /s/ James W. Spertus
      James W. Spertus
      M. Anthony Brown

      Attorneys for True Pharmastrip, Inc.